# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| EDDIE BAUER HOLDINGS, INC., *et al.*,[1] | Case No. 09-12099 (___) |
| Debtors. | Joint Administration Pending |

## MOTION OF THE DEBTORS (A) AUTHORIZING THE CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM, BANK ACCOUNTS, BUSINESS FORMS AND INVESTMENT GUIDELINES; (B) GRANTING POSTPETITION INTERCOMPANY CLAIMS ADMINISTRATIVE STATUS AND (C) AUTHORIZING CONTINUED INTERCOMPANY ARRANGEMENTS AND HISTORICAL PRACTICES

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") file this motion (the "**Motion**") for entry of an order (the "**Order**"), (a) authorizing and approving the Debtors to continue to use their existing cash management system (the "**Cash Management System**"), bank accounts, business forms and investment guidelines; (b) granting postpetition intercompany claims administrative status and (c) authorizing the Debtors' to continue intercompany arrangements and historical practices (the "**Motion**").[2] In support of this Motion, the Debtors respectfully state as follows:[3]

---

[1]      The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Eddie Bauer Holdings, Inc., a Delaware corporation (2352); Eddie Bauer, Inc., a Delaware corporation (9737); Eddie Bauer Fulfillment Services, Inc., a Delaware corporation (0882); Eddie Bauer Diversified Sales, LLC, a Delaware limited liability company (1567); Eddie Bauer Services, LLC, an Ohio limited liability company (disregarded), Eddie Bauer International Development, LLC, a Delaware limited liability company (1571); Eddie Bauer Information Technology, LLC, a Delaware limited liability company (disregarded); Financial Services Acceptance Corporation, a Delaware corporation (7532); and Spiegel Acceptance Corporation, a Delaware corporation (7253). The mailing address for Eddie Bauer Holdings, Inc. is 10401 N.E. 8th Street, Suite 500, Bellevue, WA 98004. On or about the Petition Date, Eddie Bauer of Canada, Inc. and Eddie Bauer Customer Services, Inc., affiliates of the Debtors, commenced a proceeding before the Superior Court of Justice, Commercial List, for the Judicial District of Ontario, for a plan of compromise or arrangement under the Companies' Creditors Arrangement Act.

[2]      A copy of the Order is attached hereto as Exhibit A.

[3]      The facts and circumstances supporting this Motion are set forth in the Declaration of Marvin Edward Toland of Eddie Bauer Holdings, Inc., in Support of First Day Motions (the "**First Day Declaration**") filed contemporaneously herewith.

## JURISDICTION

1.      The Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are Sections 105(a), 345, 363, 364, 503, 507, 1107 and 1108 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "**Bankruptcy Code**").

## BACKGROUND

3.      On June 17, 2009 (the "**Petition Date**"), Eddie Bauer Holdings, Inc. and each of its Debtor affiliates filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**"). The Debtors intend to continue in the possession of their respective properties and the management of their respective businesses as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. The Debtors have requested that these Chapter 11 Cases be consolidated for procedural purposes. As of the date hereof, no trustee, examiner or statutory committee has been appointed in these Chapter 11 Cases.

4.      Subsequent to the commencement of these Chapter 11 Cases, the Debtors' two Canadian affiliates – Eddie Bauer of Canada, Inc. and Eddie Bauer Customer Services, Inc. (the "**Canadian Debtor Affiliates**") – will seek recognition of the Debtors' Chapter 11 Cases in a Canadian Court as "foreign proceedings" pursuant to Section 18.6 of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended. In addition to staying proceedings against the Canadian Debtor Affiliates in Canada, such recognition by the Canadian Court will allow certain orders of this Court to be in full force and effect in the same manner and in all respects as

if they had been made by the Canadian Court. Due to the integrated management of the Canadian Debtor Affiliates with the Debtors' U.S. operations, as well as the role that the Canadian Debtor Affiliates play in the Debtors' overall prepetition debt structure, these Chapter 11 Cases will function as the main proceedings with respect to the Canadian Debtor Affiliates.

5.     As further detailed in the First Day Declaration, the Debtors and the Canadian Debtor Affiliates[4] are a publicly traded general merchandise and specialty retailer that offers men's and women's outerwear, apparel, accessories and gear for an active outdoor lifestyle through catalogs, e-commerce sites and over 370 retail and outlet stores. The Debtors have 556 full-time, part-time, and temporary employees in their corporate headquarters, and 7,144 full-time, part-time, and temporary retail and distribution employees. The Canadian Affiliates have over 950 full-time, part-time, and temporary employees working in management, retail and customer service.

### THE PROPOSED 363 SALE

6.     Due to (i) Debtors' and Debtors' lenders inability to agree upon the terms of a consensual restructuring, (ii) the Debtors' need to reduce debt load and interest expenses, and (iii) the Debtors' mounting concerns regarding the potential deterioration of their businesses – and accompanying degradation in value – stemming from rumors in the marketplace about the Debtors' liquidity and viability, the Debtors have determined that the value of their estates would be best maximized and preserved through a sale process (the "**Sale**"). Therefore, the Debtors have negotiated a going-concern Sale of their businesses and assets (the "**Assets**") to Rainier Holdings LLC as the stalking horse bidder (the "**Stalking Horse Bidder**") pursuant to an asset purchase agreement and commenced these Chapter 11 Cases to implement the Sale pursuant to

---

[4]     The Debtors also have a non-debtor affiliate located in Hong Kong named Pacific NW Sourcing Co. This affiliate was created in 2008 to act as a purchasing agent in Asia. However, it is not currently fully operational, has no assets and has few, nominal liabilities.

Section 363 of the Bankruptcy Code, subject to a competitive Sale process and the solicitation of higher and/or otherwise better offers. The Debtors believe that unless the Sale is expeditiously consummated, whether to the proposed Stalking Horse Bidder or to a purchaser submitting a higher or otherwise better offer, there will be significant value deterioration. Consequently, the Debtors have determined that it is in the best interest of their estates, creditors and other parties-in-interest to move forward with the Sale process.

7. The events leading up to the Petition Date and the Sale and the facts and circumstances supporting the relief requested herein are more fully set forth in the First Day Declaration.

RELIEF REQUESTED

8. By this Motion, the Debtors seek entry of an order (a) authorizing and approving the Debtors continued use of their existing Cash Management System, bank accounts, business forms and investment guidelines; (b) granting postpetition intercompany claims administrative status and (c) authorizing the Debtors to continue intercompany arrangements and historical practices. In connection with this relief, the Debtors also request a waiver of certain guidelines established by the Office of the United States Trustee for the District of Delaware (the "**UST**") that require the Debtors to close all prepetition bank accounts, open new accounts designated as debtor-in-possession accounts and provide new business forms and stationary. The Debtors submit that the relief requested herein will help to ensure the Debtors' orderly entry into chapter 11 and avoid many of the possible disruptions and distractions that could divert the Debtors' attention from more pressing matters during the initial days of these Chapter 11 Cases.

BASIS FOR RELIEF

**I. DESCRIPTION OF THE DEBTORS' CASH MANAGEMENT SYSTEM**

9. The Debtors' business and financial affairs are complex, requiring the collection,

4

disbursement and movement of funds through numerous bank accounts throughout the United States and Canada. The UST has established certain operating guidelines for debtors-in-possession relating to cash management systems (the "**UST Guidelines**"). The UST Guidelines require debtors, among other things, to establish one debtor-in-possession account for all estate monies required for the payment of taxes (including payroll taxes), to close all existing bank accounts and open new debtor-in-possession accounts, to maintain a separate debtor-in-possession account for cash collateral and to obtain checks that bear the designation "debtor-in-possession" and reference the bankruptcy case number and type of account on such checks. Enforcement of the UST Guidelines in these Chapter 11 Cases would severely disrupt the Debtors' financial operations and be antithetical to the stabilization of the Debtors' operations and to their all-important ability to maintain "business as usual." This disruption, in turn, would jeopardize the Debtors' ability to maximize value for their estates and creditors through a sale of their businesses. To lessen the disruption caused by these Chapter 11 Cases and to maximize the value of the Debtors' estates, it is essential that the Debtors be allowed to maintain their well-developed Cash Management System.

10. In the ordinary course of business the Debtors utilize a centralized cash management system controlled by Eddie Bauer, Inc. ("**EBI**") in which all Debtors participate. Eddie Bauer of Canada Inc. ("**EBC**"), a Canadian Debtor Affiliate, controls the company's Canadian bank accounts. The Cash Management System is funded by receipts and revenues generated primarily through the Debtors' retail and outlet stores, e-commerce operations and telephonic and mail catalog transactions.

11. The flow of funds into the Cash Management System is described in detail below and in the flowchart of the Cash Management System attached hereto as <u>Exhibit B</u>. Under that

system, the funds generated through the operations of Debtors and their Canadian Debtor Affiliates are deposited daily into depository accounts and thereafter, transferred to concentration accounts maintained at Bank of America ("**BofA**") and Scotiabank in Canada ("**Scotia**"), respectively. The Debtors and EBC maintain multiple disbursement accounts from which obligations to vendors, employees and customers are paid. The majority of these accounts are funded by one of the concentration accounts. It is customary to have a separate disbursement sub-account for each type of obligation which sub-account is linked to the main controlled disbursement account to which it relates. These include such accounts as an accounts payable disbursement account in U.S. dollars, a payroll disbursement account for Canadian payroll or a customer refund account, as required.

12. A list of all of the Debtors' and EBC's bank accounts and the bank names and addresses (the "**Bank Accounts**") are annexed hereto as <u>Exhibit C</u>. The Bank Accounts are described in detail below.

a. Cash Collection and Concentration – United States

*BofA Master Concentration Account.* The focal point of the Debtors' Cash Management system is a master concentration account maintained at BofA by EBI (the "**BofA Master Concentration Account**"). The BofA Master Concentration Account pools all deposits for EBI and is the primary account that provides the funds for the BofA Master Disbursement Account (defined below). The BofA Master Concentration Account receives funds from two store depository concentration accounts, a retail bankcard depository concentration account, electronic transfers from various credit cards, wire transfers from credit card and corporate customers and transfers from separate depository accounts controlled by affiliate Debtors Eddie Bauer Fulfillment Services, Inc. ("**EBFS**"), Eddie Bauer Diversified Sales, LLC ("**EBDS**") and Eddie Bauer International Development ("**EBID**"). The BofA Master Concentration Account also receives excess funds from the Canadian Master Concentration Account, maintained at

Scotia in Canada by EBC (the "**Scotia Canadian Master Concentration Account**").

*Store Depository Accounts.* EBI maintains approximately 15 local U.S. depository bank accounts (the "**Store Depository Accounts**") at 14 banks (the "**Store Depository Banks**") with branches located across 47 states. These accounts receive deposits from the Debtors' approximately 336 U.S. stores. Sales at each of the Debtors' U.S. retail stores are made by customers paying by cash, debit or credit card. Cash and checks received at each of the Debtors' retail stores are deposited on a daily basis (or several times throughout a given week, depending on the location of the store and the time of year) into the Store Depository Accounts. Weekly deposits in the Store Depository Accounts range from approximately $4 million during peak selling seasons to approximately $1 million in non-peak periods. A list of the Store Depository Accounts is included in the list annexed hereto as Exhibit C.

*Store Depository Concentration Accounts.* The funds on deposit in the Store Depository Accounts are transmitted via automated clearing house drawdowns ("**ACH**") on a daily basis to one of two BofA concentration accounts for the Store Depository Banks (the "**Store Depository Concentration Accounts**"). The funds from these concentration accounts are then transferred each day by ACH drawdowns into the BofA Master Concentration Account.

*Card Depository Accounts.* Retail Bankcard, Direct Bankcards, Amex, Discover and ADS Credit Deposits are collected in two separate depository accounts at BofA and transferred each day into the BofA Master Concentration Account. Corporate deposits and other credit card receipts are directly transferred by the remitting party through wire transfers and ACH drawdowns into the BofA Master Concentration Account.

*Affiliate Debtor Depository Accounts.* EBDS, EBFS and EBID all hold BofA depository accounts in their respective names and transfer deposits by ACH on a daily basis into the BofA Master Concentration Account.

b. Cash Collection and Concentration – Canada

*Canadian Store Depository Accounts.* EBC holds two local

DB02:8313466.1

068417.1001

Canadian depository bank accounts (the "**Canadian Store Depository Accounts**") at two separate Canadian banks (the "**Canadian Store Depository Banks**") located across 8 provinces. These accounts receive deposits denominated in Canadian dollars from approximately 37 of EBC's stores across Canada. Some deposits are made directly into the Scotia Canadian Master Concentration Account. Sales at each of EBC's retail stores are made by customers paying by cash, debit or credit card and deposited on a daily basis into the Canadian Store Depository Accounts, maintained by the Canadian Store Depository Banks and the Scotia Canadian Master Concentration Account. A list of the Canadian Store Depository Accounts is also included in the list annexed hereto as Exhibit C.

*Scotia Concentration Accounts.* The funds on deposit in the Canadian Store Depository Accounts are transmitted via ACH drawdowns on a daily basis to one of two Scotia concentration accounts. These accounts are then emptied into the Scotia Canadian Master Concentration Account.

*Canadian Card Depository Accounts.* Canadian Amex payments are transferred by ACH drawdowns directly by the remitting party into the Scotia Canadian Master Concentration Account. Customer payments made by Canadian MasterCard, Visa and Debit cards are all held in separately named Scotia depository accounts and transferred daily into the Scotia Canadian Master Concentration Account.

c. Disbursements – United States

*BofA Master Disbursement Account.* EBI pays its obligations out of a master operating disbursement account maintained by BofA (the "**BofA Master Disbursement Account**"). Each morning, the company analyzes the day's total disbursements and transfers required funds from the BofA Master Depository Concentration Account to the Master Disbursement Account.

*BofA Disbursement Accounts.* The BofA Master Concentration Account then funds the obligations of the Debtors and their Canadian Debtor Affiliates through wire and ACH transfers to various disbursement accounts established at BofA. These disbursement accounts are named for their separate purposes, including the Accounts Payable Electronic Disbursement Account, the Payroll

Disbursement Account and the Refund Check Disbursement Account.

*VEBA Benefit Accounts.* The BofA Master Concentration Account also transfers funds into two VEBA Benefit tax exempt trust accounts. Funds transferred into the VEBA accounts include employee contributions made through payroll deductions as well as premiums paid by the Debtors as part of the Debtors' benefits program. The VEBA accounts are then used to pay healthcare and FSA claims on behalf of the Debtors' employees. One imprest account is held at Citibank and is used to process healthcare claims to CIGNA. CIGNA requires that the Debtors maintain a balance of $413,000 in this account. The second imprest account is held at JP Morgan Chase on behalf of EBFS and is used to process healthcare claims to United Healthcare ("**UHG**"). UHG requires that the Debtors maintain a balance of $76,000 in this account.

d.  Disbursements – Canada

*Scotia Canadian Master Disbursement Account.* EBC and EBCS pays their Canadian obligations using two disbursement accounts. The first is a master disbursement account denominated in Canadian dollars and maintained at Scotia by EBC (the "**Scotia Canadian Master Disbursement Account**"). The Scotia Canadian Master Concentration Account directly funds the Scotia Canadian Master Disbursement Account and is used to pay for the obligations of the Canadian Debtor Affiliate's payroll, customer refunds and accounts payable that are denominated in Canadian dollars.

*USD Canadian Disbursement Account.* A second disbursement account for EBC is held in U.S. dollars and maintained at BofA by EBC (the "**USD Canadian Disbursement Account**") but funded by the BofA Master Depository Concentration Account. The USD Canadian Disbursement Account is used to pay EBC's and EBCS's accounts payable that are denominated in US dollars. Canadian receipts and disbursements are analyzed on a daily basis. Excess receipts that will not be required for short term payments are wired each day from the Scotia Canadian Master Concentration Account to the BofA Master Depository Concentration Account. When necessary, funds are also wired back to the Scotia Canadian Master Concentration Account to handle cash shortfalls.

e. Disbursements – International

> *Foreign Escrow Account.* An escrow account used for payments to the Debtors' logistics services provider, Expeditor's International, is maintained at BofA by EBI (the "**Foreign Escrow Account**"). The Foreign Escrow Account is used to fund logistics services and payment of customs fees for the shipment of merchandise into the United States.

e. Investments

> *BofA Overnight Sweep Account.* The Debtors maintain three accounts for investing excess cash with BofA. The first two accounts are short-term Overnight Investment Sweep Accounts (the "**BofA Overnight Sweep Accounts**") which transfer daily excess balances from the BofA Master Concentration Account and the BofA Master Disbursement Account into Eurodollars overnight and returns these funds to the same accounts the following day.

> *BofA Directed Investment Account.* The third account is an Investment Account maintained at Banc of America Securities (the "**BofAS Directed Investment Account**"). At the end of each business day, if a balance in excess of the discretionary balance remains in the BofA Master Concentration Account, the excess balance is transferred into the BofAS Directed Investment Account for investment in treasury funds. Amounts deposited in the BofAS Directed Investment Account are then transferred back to the Concentration Account, as cash is needed by the Debtors. The Directed Investment Account may only invest in "Permitted Investments," as defined therein.[5]

## II.    CONTINUING THE DEBTORS' INTEGRATED CASH MANAGEMENT IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES AND CREDITORS.

13.    As stated above, and pursuant to 28 U.S.C. § 586, the UST generally requires a debtor-in-possession to (i) close all existing bank accounts upon filing of their chapter 11 petitions and to open new "debtor-in-possession" accounts in certain financial institutions

---

[5]    See: Eddie Bauer, Inc. Investment Policy (authorized August 3, 2007).

DB02:8313466.1                                                                                          068417.1001

designated as authorized depositories by the UST and (ii) maintain separate accounts for all estate monies required for cash collateral and the payment of taxes. However, in complex chapter 11 cases, such as these, courts in this district and other districts routinely grant chapter 11 debtors authority to continue utilizing existing cash management systems and treat requests for such authority as a relatively "simple matter." In re Baldwin United Corp., 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987). This is particularly true where, as here, the Chapter 11 Cases involve affiliated debtors with complex financial affairs. See, e.g., In re The Charter Co., 778 F.2d 617 (11 Cir. 1985). In chapter 11 cases such as these, courts in this circuit have recognized that allowing a debtor to maintain its existing cash management system is often appropriate. See, e.g., In re GWLS Holdings, Inc., Case No. 08-12430 (PJW) (Bankr. D. Del. Oct. 22, 2008); In re ACG Holdings, Inc., Case No. 08-11467 (CSS) (Bankr. D. Del. July 16, 2008); In re Pierre Foods, Inc., Case No. 08-11480 (KG) (Bankr. D. Del. Aug. 13, 2008); In re Tropicana Entm't, LLC, Case No. 08-10856 (KJC) (Bankr. D. Del. May 6, 2008); In re Leiner Health Prods. Inc., Case No. 08-10446 (KJC) (Bankr. D. Del. Mar 12, 2008).

14. Allowing debtors to use their prepetition cash management systems is also entirely consistent with applicable provisions of the Bankruptcy Code. Delaware bankruptcy courts have recognized that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." In re Columbia Gas Sys., Inc., 136 B.R. 930, 934 (Bankr. D. Del. 1992), aff'd in part and rev'd in part, 997 F.2d 1039 (3d Cir. 1993), cert. denied sub nom Official Comm. of Unsecured Creditors v. Columbia Gas Transmission Corp., 510 U.S. 1110 (1994). The Third Circuit agreed, emphasizing the "huge administrative burden" and economic inefficiency of requiring the debtors to maintain all accounts separately. Columbia

Gas, 997 F.2d at 1061; see also, In re Southmark Corp., 49 F.3d 1111, 1114 (5th Cir. 1995) (maintaining existing cash management system allows debtor "to administer more efficiently and effectively its financial operations and assets").

15.    The Debtors have utilized their Cash Management System substantially in its current structure as part of their ordinary, usual and essential business practices. The Cash Management System resembles those commonly employed by large retail enterprises comparable to Debtors' size and complexity. Such large, complex retail businesses tend to use such systems because of the numerous benefits they provide, including the ability to: (a) quickly create status reports on the location and amount of funds, allowing management to track and control corporate funds; (b) invest idle cash at higher returns; (c) ensure cash availability and (d) reduce administrative expenses by facilitating the movement of funds. These controls are particularly important here, in a retail context, given the significant amount of cash that flows through the Debtors' integrated Cash Management System.

16.    Given the Debtors' complex corporate and financial structure it would be difficult to establish an entirely new system of accounts and a new cash management system for each Debtor entity. For example, as described in more detail below, if the Debtors had to open separate accounts as debtors-in-possession and rearrange their Cash Management System, it would necessitate opening numerous new accounts for receipts, cash concentration and disbursements. The delays that would result from opening new accounts, revising cash management procedures, modifying technology systems and instructing customers and other third parties to redirect payments would negatively impact the Debtors' ability to operate their businesses while pursuing these arrangements.

17.    Under these circumstances, maintaining the Debtors' Cash Management System

12

is both essential and in the best interests of the Debtors' respective estates and creditors. Furthermore, preserving the "business as usual" atmosphere and avoiding the unnecessary distractions that would inevitably be associated with any substantial disruption in the Debtors' Cash Management System will facilitate the Debtors' Sale. The Debtors will continue their historical practice of maintaining records with respect to transfers of cash, so that transactions can be ascertained, traced and recorded properly on applicable intercompany accounts. For these reasons, the Debtors request the authority to continue to use their Cash Management System.

18.     In conjunction with the authority to continue to use their Cash Management System, the Debtors request that no bank participating in the Cash Management System (collectively, the "**Cash Management Banks**") that honors a prepetition check or other item drawn on any account that is the subject of this Motion (a) at the direction of the Debtors, (b) in a good faith belief that the Court has authorized such prepetition check or item to be honored or (c) as a result of an innocent mistake made despite implementation of reasonable item handling procedures, be deemed to be liable to the Debtors or to their estates on account of such prepetition check or other item being honored postpetition. The Debtors believe that such flexibility accorded the Cash Management Banks is necessary to induce the Cash Management Banks to continue providing cash management services without additional credit exposure.

### III.     THE DEBTORS SHOULD BE GRANTED AUTHORITY TO MAINTAIN THEIR EXISTING BANK ACCOUNTS

19.     As stated above, the UST Guidelines require a chapter 11 debtor-in-possession to open new bank accounts (in certain financial institutions designated as authorized depositories by the UST) and close all existing accounts. These requirements are designed to provide a clear line of demarcation between prepetition and postpetition claims and payments and to help protect against the Debtors' inadvertent payment of prepetition claims.

DB02:8313466.1                                                                                    068417.1001

20.     The Debtors seek a waiver of the UST requirement that their Bank Accounts be closed and that new postpetition bank accounts be opened. If enforced in these Chapter 11 Cases, the UST bank account closing requirement would cause enormous disruption in the Debtors' businesses and would impair their efforts to effect a Sale. Specifically, the Debtors would be subject to significant administrative burdens and expenses if they were required to close and reopen new accounts, execute new signatory cards and/or depository agreements and create an entirely new manual system for issuing checks and paying postpetition obligations, as generally required by the UST Guidelines.

21.     As described above, the Debtors' Bank Accounts comprise an established cash management system that the Debtors must maintain in order to ensure smooth collections and disbursements in the ordinary course of their businesses. Therefore, to avoid delays in paying debts incurred postpetition, and to ensure a smooth transition into chapter 11, the Debtors should be permitted to continue to maintain the existing Bank Accounts and, if necessary, to open new accounts and close existing accounts in the normal course of business operations.

22.     Furthermore, the Debtors have concurrently herewith filed a motion with this Court seeking authority to pay certain prepetition employee claims.[6] If such motion is granted by this Court, it will be essential for the Debtors to maintain their existing Bank Accounts, books and records and centralized Cash Management System in order to facilitate the relief requested in such motion. The continued use of the existing Bank Accounts, books and records and centralized Cash Management System will facilitate and streamline the Debtors' ability to effect

---

6     The complete title of the motion to pay certain prepetition employee claims is "Motion of the Debtors for Order Authorizing, But Not Directing, (A) The Debtors to Pay Certain Prepetition: (I) Wages, Salaries, and Other Compensation; (II) Employee, Medical and Similar Benefits; (III) Reimbursable Employee Expenses; (IV) Other Miscellaneous Employee Expenses and Benefits and (V) Independent Contractor Fees and Expenses and (B) Directing Banks to Receive, Process, Honor and Pay All Checks Presented for Payment and Electronic Payment Requests Relating to the Foregoing."

a Sale.

23.    Accordingly, the Debtors request that this Court waive the strict enforcement of the requirement that the Debtors open new bank accounts. The Debtors further request that the Bank Accounts be deemed debtor-in-possession accounts and that the Debtors be authorized to maintain and continue using these accounts in the same manner and with the same account numbers, styles and document forms as those employed during the prepetition period.

24.    In other cases, this Court has waived the strict enforcement of bank account closing requirements and replaced them with an alternative procedure that provides the same protection. See, e.g., In re GWLS Holdings, Inc., Case No. 08-12430 (PJW) (Bankr. D. Del. Oct. 22, 2008); In re ACG Holdings, Inc., Case No. 08-11467 (CSS) (Bankr. D. Del. July 16, 2008); In re Pierre Foods, Inc., Case No. 08-11480 (KG) (Bankr. D. Del. July 16, 2008); In re JHT Holdings, Inc., Case No. 08-11267 (BLS) (Bankr. D. Del. June 25, 2008); In re Tropicana Entm't, LLC, Case No. 08-10856 (KJC) (Bankr. D. Del. May 6, 2008); In re Leiner Health Prods. Inc., Case No. 08-10446 (KJC) (Bankr. D. Del. Mar. 12, 2008); In re Delta Fin. Corp., Case No. 07-11880 (CSS) (Bankr. D. Del. Dec. 19, 2007).

25.    The Debtors represent that, if the relief requested herein is granted, they will implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by them prior to the Petition Date, other than those authorized by this Court. To prevent the possible inadvertent payment of prepetition claims, except those otherwise authorized by the Court, the Debtors will work closely with the Cash Management Banks to ensure appropriate procedures are in place to prevent checks issued prepetition from being honored absent this Court's approval.

## IV. THE DEBTORS SHOULD BE GRANTED AUTHORITY TO USE EXISTING BUSINESS FORMS AND CHECKS.

26.     In the ordinary course of their businesses, the Debtors use a multitude of checks and other business forms, including certain pre-printed letterhead, purchase orders, invoices and other such related forms (the "**Business Forms**"). The Debtors request that they be authorized to continue to use all such Business Forms existing immediately before the Petition Date without reference to the Debtors' status as debtors-in-possession.

27.     By virtue of the nature and scope of the Debtors' business operations and the large number of suppliers of goods and services with whom the Debtors deal on a regular basis, it is important that the Debtors be permitted to continue to use their existing checks and other business forms without alteration or change, except as requested herein. Indeed, because parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as a debtor-in-possession as a result of the large and highly publicized nature of these Chapter 11 Cases, changing business forms would be unnecessary and burdensome to the estates, as well as expensive and disruptive to the Debtors' business operations.

28.     In other large cases, this Court has allowed debtors to use their prepetition business forms without the "debtor-in-possession" label. See, e.g., In re GWLS Holdings, Inc., Case No. 08-12430 (PJW) (Bankr. D. Del. Oct. 22, 2008); In re ACG Holdings, Inc., Case No. 08-11467 (CSS) (Bankr. D. Del. July 16, 2008); In re Pierre Foods, Inc., Case No. 08-11480 (KG) (Bankr. D. Del. July 16, 2008); In re Tropicana Entm't, LLC, Case No. 08-10856 (KJC) (Bankr. D. Del. May 6, 2008); In re Leiner Health Prods. Inc., Case No. 08-10446 (KJC) (Bankr. D. Del. Mar. 12, 2008); In re Delta Fin. Corp., Case No. 07-11880 (CSS) (Bankr. D. Del. Dec. 19, 2007).

29.     Due to the burdensome tangible and intangible costs of replacing the Debtors'

DB02:8313466.1                                                                                    068417.1001

Business Forms, the Debtors respectfully request that they be authorized to use their existing Business Forms for the duration of these Chapter 11 Cases.

## V. THE DEBTORS SHOULD BE AUTHORIZED TO CONTINUE USING DEBIT, WIRE AND AUTOMATIC CLEARING HOUSE PAYMENTS.

30.     The Debtors should be granted further relief from the UST Guidelines to the extent that they require the Debtors to make all disbursements by check. In particular, the UST Guidelines require that all disbursements of estate funds be by check with a notation representing the reason for the disbursement.

31.     Considering the complexity of the Debtors' operations, it is necessary for the Debtors to conduct transactions by debit, wire or ACH payments and other similar methods, as discussed above. To deny the Debtors the opportunity to conduct transactions by debit, wire or ACH payments or other similar methods would interfere with the Debtors' performance of their contracts and unnecessarily disrupt the Debtors' business operations, as well as create additional costs to the Debtors.

## VII.  REQUEST FOR A WAIVER OF THE DEPOSIT REQUIREMENTS OF 11 U.S.C. § 345(B)

32.     The Debtors are requesting that the Court waive the requirements of 11 U.S.C. § 345(b) and permit them to maintain deposits in their accounts in accordance with their existing deposit practices.

33.     Section 345(a) of the Bankruptcy Code authorizes deposits or investments of money of a bankruptcy estate, such as cash, in a manner that will "yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a). For deposits or investments that are not "insured or guaranteed by the United States or by a department agent or instrumentality of the United States or backed by the full faith and credit of the United States," Section 345(b) of the Bankruptcy Code provides that the estate

must require from the entity with which the money is deposited or invested a bond in favor of the United States secured by the undertaking of an adequate corporate surety. 11 U.S.C. § 345(b).[7]

34.     A court may, however, relieve a debtor-in-possession of the restrictions imposed by Section 345(b) for "cause." 11 U.S.C. § 345(b). Consistent with Section 345(b), Rule 2015-2(b) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**") provides that "no waiver of the investment requirements of 11 U.S.C. § 345 shall be granted by the Court without notice and an opportunity for hearing in accordance with these Local Rules." Nevertheless, Local Rule 2015-2(b) further provides that "if a motion for such waiver is filed on the first day of a chapter 11 case in which there are more than 200 creditors, the Court may grant an interim waiver until a hearing on the debtor's motion can be held." As this Motion is being filed on the first day of the Debtors' Chapter 11 Cases and the Debtors have in excess of 200 creditors, the Debtors request that the Court enter an order waiving, on an interim basis, the requirements of Section 345(b) for sixty days, without prejudice to the Debtors' ability to seek a further interim or final waiver.

35.     Given the complexity of the Debtors' Cash Management System and the relative security of the Cash Management System, the Debtors submit that cause exists to grant an interim sixty-day waiver of the requirements of Section 345(b) of the Bankruptcy Code. This Court previously has granted similar relief on numerous occasions. See, e.g., In re Pierre Foods, Inc., Case No. 08-11480 (KG) (Bankr r. D. Del. July 16, 2008); In re Tropicana Entm't, LLC,

---

[7]     Prior to the Petition Date, the Debtors hold two investment accounts, one at BofA and the other at Banc of America Securities, as described in Paragraph 7 above. Also prior to the petition date the Debtors were permitted to invest excess cash in accordance with the terms of the Eddie Bauer, Inc. Investment Policy (authorized August 3, 2007) as well as the specific terms of their credit facilities: (i) Section 6.8 of that certain Amended and Restated Term Loan Agreement dated as of April 4, 2007, among Eddie Bauer Holdings, Inc. ("**Holdings**"), Eddie Bauer, Inc. ("**Borrower**"), JPMorgan Chase Bank, N.A., and the other parties thereto; (ii) Section 9.9 of that certain Loan and Security Agreement dated as of June 21, 2005, as amended by that First Amendment to Loan and Security Agreement dated as of April 4, 2007 among Holdings, Borrower, and Bank of America, N.A., as agent and the other parties thereto; and any other credit facility outstanding as of the Petition Date.

Case No. 08-10856 (KJC) (Bankr. D. Del. May 6, 2008); In re Leiner Health Prods. Inc., Case No. 08-10446 (KJC) (Bankr. D. Del. Mar 12, 2008).

## VII. DESCRIPTION OF THE DEBTORS' POSTPETITION INTERCOMPANY CLAIMS.

36. The Debtors maintain business relationships with each other and with their Debtor Affiliates.[8] As a result, the Debtors' hold numerous intercompany claims and cross-border intercompany claims that reflect intercompany receivables and payments made in the ordinary course of the Debtors' businesses throughout the United States and Canada (the "**Intercompany Claims**"). These include, but are not limited to:

> *Accrued interest.* The Debtors owe interest between and among each other and their Canadian Debtor Affiliates on outstanding Intercompany Claims. Such interest is charged monthly based on the net Intercompany Claims outstanding at the end of the prior month.

> *Administrative fees.* Certain Debtors and the Canadian Debtor Affiliates are charged administrative fees for services rendered to support Debtor's affiliates, including some services associated with billing and accounts payable. Services and fees vary depending on the Debtor and the service provided, as defined in each intercompany agreement.

> *Centrally-billed expenses.* In the ordinary course of business, the Debtors and Canadian Debtor Affiliates incur centrally billed expenses, such as insurance premiums, payroll, 401(k) payments, benefits, payroll taxes, other taxes (e.g., real estate, franchise sales, etc.), workman's compensation obligations and technology equipment. Centrally-billed expenses are then invoiced to each Debtor entity and charged through intercompany accounts.

> *Intercompany Transfers.* In the ordinary course of business, the daily operations of the Debtors' entities and

---

[8] Debtors also hold 100% ownership of a non-debtor affiliate subsidiary, Pacific North West Sourcing, ("**PNS**") that was incorporated in Hong Kong to provide administrative support for Debtors' product sourcing functions in Asia. However, since PNS does not operate its own bank account and has de minimis cash needs which are handled by the Debtors, PNS is not discussed in detail in this Motion.

Debtor Affiliates are funded via cash transfers between the concentration and disbursement accounts. These transfers consist of revenues earned and expenses incurred that are transferred to and from the concentration accounts in order to process and fund the ongoing operations of the Debtors and their Canadian Debtor Affiliates. These transfers are not related to any loans or outstanding obligations between Debtor entities and Debtor Affiliates.

*Royalties.* Royalties are charged either with reference to costs incurred or as a percentage of sales to certain Debtors and their Canadian Debtor Affiliates for the use of certain intellectual property of the Debtors.

37.     Also, in many instances, the Debtors' funds and Canadian Debtor Affiliates' funds are commingled throughout the Cash Management System. Accordingly, at any given time, there may be Intercompany Claims owing between Debtors and their Canadian Debtor Affiliates. These transactions, including those examples listed above, are made between and among the Debtors and their Canadian Debtor Affiliates in the ordinary course of the Debtors' and their Canadian Debtor Affiliates' businesses as part of their Cash Management System (the "**Intercompany Transactions**").[9] The Debtors maintain records of all fund transfers and can ascertain, trace and account for Intercompany Transactions.

## VIII.    THE DEBTORS REQUEST THAT THE COURT ALLOW ADMINISTRATIVE EXPENSE STATUS FOR INTERCOMPANY CLAIMS AND FOR AUTHORIZATION TO CONTINUE PERFORMING UNDER THE INTERCOMPANY TRANSACTIONS AND HISTORICAL PRACTICES

38.     As described above, the Debtors and their Canadian Debtor Affiliates engage in

---

[9]     Because the Debtors engage in Intercompany Transactions on a regular basis and such transactions are common among enterprises similar to the Debtors', the Debtors believe the Intercompany Transactions are ordinary course transactions within the meaning of Section 363(c)(1) and, thus, do not require the Court's approval. Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such transactions on a postpetition basis. Moreover, the continued performance of the ordinary course Intercompany Transactions is integral to ensure the Debtors' ability to operate their businesses as debtors-in-possession. Were the Debtors to obtain the services they currently receive pursuant to the Intercompany Transactions on an isolated per-company basis, aside from incurring excessive financial burdens in identifying appropriate providers of these services and entering into individual agreements for providing these services, the Debtors would be required to divert their attention from their restructuring efforts and the smooth transition into operating as debtors-in-possession.

DB02:8313466.1                                                                      068417.1001

certain usual and customary business practices in the ordinary course of their businesses that govern the various intercompany relationships among the Debtors and their Canadian Debtor Affiliates, including, among other practices, incurring centrally-billed expenses, making and receiving payments on behalf of each other, and making intercompany loans. The Debtors believe that continued performance under the Intercompany Transactions is not only essential to their Sale prospects but is absolutely integral to ensure the Debtors' ability to operate their businesses as debtors-in-possession. Were the Debtors required to obtain the services they currently receive under the Intercompany Transactions on a per company basis, aside from incurring excessive financial burdens in identifying appropriate providers of these services and entering into individual agreements for providing these services, the Debtors would be required to divert their attention and efforts from ensuring a smooth transition into the chapter 11 process and, ultimately, working towards a successful Sale. Moreover, as noted above, the services provided under the Intercompany Transactions are ordinary course.

39. Further, despite the fact that the Canadian Debtor Affiliates are self-funding on an aggregate basis, the cyclical nature of the retail industry and the need to build inventory before peak sales periods means that the Canadian Debtor Affiliates may incur cash deficits and require short-term financing on a periodic basis from the Debtors. Since the Canadian Debtor Affiliates do not carry any independent third-party funded debt they have historically met their short-term financing needs as well as some long-term capital expenditures by downstream loans provided by the Debtors using funds from their secured and unsecured financing facilities.

40. Without such short-term financing, the Canadian Debtor Affiliates would be unable to satisfy their commitments to existing vendors and suppliers, meet payroll and fund ordinary course operations. Such inability would, aside from endangering the overall value of

the Debtors' equity interest in the Canadian Debtor Affiliates, jeopardize the Debtors' relationships with vendors and manufacturers in Canada and worldwide.

41.     The Debtors' current funding requirements are based on forecasts created by the Debtors in consultation with their financial advisor. Specifically, the Debtors forecast that the foreseeable funding requirements of the Canadian Debtor Affiliates over the next 90 days will be $6.0 million.

42.     The Debtors' Debtor-In-Possession Facility, memorialized by a Debtor-In-Possession Credit Agreement, contemplates and allows the Debtors to advance up to $7 million to the Canadian Debtor Affiliates (the "**Permitted Loans**").

43.     Absent the ability to timely provide short-term financing or pay prepetition intercompany claims, the Debtors may be forced to shut down certain Canadian Debtor Affiliates since such Debtor Affiliates may be unable to procure goods and services from their vendors and be forced to cease operation. This result would be disastrous for the Debtors for two principal reasons. First, the Debtors share many of the same vendors with their Canadian Debtor Affiliates so any disruption to the Canadian Debtor Affiliates' relationships with vendors would likewise impair the Debtors relationships with vendors. This could disrupt the Debtors' supply and distribution of goods in the United States as well as in Canada. Second, the Canadian Debtor Affiliates' inability to timely provide merchandise to customers could lead customers to migrate to other Canadian competitors to the Debtors' direct detriment.

44.     The Debtors further submit that to the extent that they extend, receive, defer, subordinate or repay the permitted loans to or from Canadian Debtor Affiliates, they will (i) record such payments, subordination or receipts appropriately in their books and records; and (ii) provide such notice as is set forth in the Order.

DB02:8313466.1

068417.1001

45.     Further, to ensure that each individual Debtor will not fund, at the expense of their creditors, the operations of another entity, or their Canadian Debtor Affiliates, the Debtors respectfully request that, pursuant to Bankruptcy Code Sections 503(b)(1) and 364(b), all Intercompany Claims against the Debtors by an affiliate debtor entity arising after the Petition Date, as a result of ordinary course Intercompany Transactions through the Cash Management System, be accorded administrative priority expense status.   If Intercompany Claims are accorded administrative priority expense status, each entity utilizing funds flowing through the Cash Management System should continue to bear ultimate repayment responsibility for such ordinary course transactions.

46.     Administrative expense treatment for intercompany transactions, as requested here, has been granted in other comparable chapter 11 cases in this District and in other districts. See, e.g., In re Intermet Corp., Case No. 08-11859 (KG) (Bankr. D. Del. Aug. 14, 2008) (granting administrative priority status to intercompany claims); In re Tropicana Entm't, LLC, Case No. 08-10856 (KJC) (Bankr. D. Del. May 6, 2008); In re SemCrude, L.P., Case No. 08-11523 (BLS) (Bankr. D. Del. July 22, 2008) (approving an interim order with such relief); In re Pope & Talbot, Inc., Case No. 07-11738 (CSS) (Bankr. D. Del. Nov. 9, 2007); In re Joan Fabrics Corp., Case No. 07-10479 (CSS) (Bankr. D. Del. Apr. 11, 2007); In re Dura Automotive Systems, Inc., Case No. 06-11202 (KJC) (Bankr. D. Del. Nov. 20, 2006).

47.     For the reasons discussed herein, the Debtors believe that the relief requested herein is necessary to allow the Debtors to preserve the value of key assets—their interests in the Canadian Debtor Affiliates b y ensuring that the Canadian Debtor Affiliates can meet their collective commitments to vendors and customers and thus maximize value for the benefit of their estates and creditors.  After careful analysis and in the exercise of their business judgment,

DB02:8313466.1                                                                                    068417.1001

the Debtors have determined, and respectfully submit, that for all of the foregoing reasons, the Court should authorize the Debtors to continue to perform under the Intercompany Transactions.

## NOTICE

48.     No trustee, examiner or creditors' committee has been appointed in the Chapter 11 Cases. The Debtors have provided notice of this Motion to: (a) the United States Trustee for the District of Delaware; (b) counsel to administrative agent under the prepetition term loan facility; (c) counsel to the steering committee for the prepetition term lenders; (d) counsel to agent under the prepetition revolving credit facility; (e) counsel for the indenture trustee for the $75 million 5.25% convertible senior notes due 2014 and (f) the creditors listed on the Debtors' consolidated list of 30 largest unsecured creditors, as filed with the chapter 11 petitions. In light of the nature of the relief requested, the Debtors submit that no further notice is required or needed under the circumstances.

49.     A copy of the Motion is available on the Court's website: www.deb.uscourts.gov. Additional copies of the Motion are available on the website of the Debtors' proposed claims, noticing, soliciting and balloting agent, Kurtzman Carson Consultants, at www.kccllc.net/eddiebauer or can be requested by calling (866) 967-1781.

## NO PRIOR REQUEST

50.     No prior motion for the relief requested herein has been made to this or any other court.

DB02:8313466.1

068417.1001

WHEREFORE, the Debtors respectfully request the entry of an order, substantially in the form attached hereto as <u>Exhibit A</u>, authorizing and approving the Debtors to continue use of their existing cash management system (the "**Cash Management System**"), bank accounts, business forms and investment guidelines; (b) granting postpetition intercompany claims administrative status; (c) authorizing the Debtors' to continue intercompany arrangements and historical practices and (d) granting such other and further relief as the Court deems appropriate.

DB02:8313466.1                              068417.1001

Dated: June 17, 2009                    Respectfully Submitted,

Wilmington, Delaware

_[signature]_
_____
Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

David S. Heller
Josef S. Athanas
LATHAM & WATKINS LLP
Sears Tower, Suite 5800
233 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 876-7700
Facsimile: (312) 993-9767

-and-

Heather L. Fowler
LATHAM & WATKINS LLP
355 South Grand Avenue
Los Angeles, California 90071-1560
Telephone: (213) 485-1234
Facsimile: (213) 891-8763

PROPOSED ATTORNEYS FOR DEBTORS AND
DEBTORS-IN-POSSESSION