# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| EDDIE BAUER HOLDINGS, INC., *et al.,*[1] | Case No. 09-12099 (___) |
| | Joint Administration Pending |
| Debtors. | |

**MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO (A) HONOR CERTAIN PREPETITION OBLIGATIONS TO CUSTOMERS, (B) MAINTAIN CERTAIN CUSTOMER SERVICE POLICIES, PROGRAMS AND PRACTICES IN THE ORDINARY COURSE OF BUSINESS AND (C) PAY CERTAIN FEES ASSOCIATED WITH CREDIT CARD TRANSACTIONS AND GIFT CARD PROGRAMS**

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") file this motion (the "**Motion**") for entry of an order: authorizing the Debtors to honor certain prepetition obligations to customers, maintain certain customer service policies, programs and practices in the ordinary course of business, and pay certain fees associated with credit card transactions and gift card programs.[2] In support of this Motion, the Debtors respectfully state as follows:[3]

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Eddie Bauer Holdings, Inc., a Delaware corporation (2352); Eddie Bauer, Inc., a Delaware corporation (9737); Eddie Bauer Fulfillment Services, Inc., a Delaware corporation (0882); Eddie Bauer Diversified Sales, LLC, a Delaware limited liability company (1567); Eddie Bauer Services, LLC, an Ohio limited liability company (disregarded), Eddie Bauer International Development, LLC, a Delaware limited liability company (1571); Eddie Bauer Information Technology, LLC, a Delaware limited liability company (disregarded); Financial Services Acceptance Corporation, a Delaware corporation (7532); and Spiegel Acceptance Corporation, a Delaware corporation (7253). The mailing address for Eddie Bauer Holdings, Inc. is 10401 N.E. 8th Street, Suite 500, Bellevue, WA 98004. On or about the Petition Date, Eddie Bauer of Canada, Inc. and Eddie Bauer Customer Services, Inc., affiliates of the Debtors, commenced a proceeding before the Superior Court of Justice, Commercial List, for the Judicial District of Ontario, for a plan of compromise or arrangement under the Companies' Creditors Arrangement Act.

[2] A copy of the proposed order (the "**Order**") is attached hereto as Exhibit A.

[3] The facts and circumstances supporting this Motion are set forth in the Declaration of Marvin Edward Toland of Eddie Bauer Holdings, Inc., in Support of First Day Motions (the "**First Day Declaration**") filed contemporaneously herewith.

## JURISDICTION

1.      The Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are Sections 105(a), 363, 1107(a) and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "**Bankruptcy Code**").

## BACKGROUND

3.      On June 17, 2009 (the "**Petition Date**"), Eddie Bauer Holdings, Inc. and each of its Debtor affiliates filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**"). The Debtors intend to continue in the possession of their respective properties and the management of their respective businesses as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. The Debtors have requested that these Chapter 11 Cases be consolidated for procedural purposes. As of the date hereof, no trustee, examiner or statutory committee has been appointed in these Chapter 11 Cases.

4.      Subsequent to the commencement of these Chapter 11 Cases, the Debtors' two Canadian affiliates – Eddie Bauer of Canada, Inc. and Eddie Bauer Customer Services, Inc. (the "**Canadian Debtor Affiliates**") – will seek recognition of the Debtors' Chapter 11 Cases in a Canadian Court as "foreign proceedings" pursuant to Section 18.6 of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended. In addition to staying proceedings against the Canadian Debtor Affiliates in Canada, such recognition by the Canadian Court will allow certain orders of this Court to be in full force and effect in the same manner and in all respects as

2

if they had been made by the Canadian Court. Due to the integrated management of the Canadian Debtor Affiliates with the Debtors' U.S. operations, as well as the role that the Canadian Debtor Affiliates play in the Debtors' overall prepetition debt structure, these Chapter 11 Cases will function as the main proceedings with respect to the Canadian Debtor Affiliates.

5.      As further detailed in the First Day Declaration, the Debtors and the Canadian Debtor Affiliates[4] are a publicly traded general merchandise and specialty retailer that offers men's and women's outerwear, apparel, accessories and gear for an active outdoor lifestyle through catalogs, e-commerce sites and over 370 retail and outlet stores. The Debtors have 556 full-time, part-time, and temporary employees in their corporate headquarters, and 7,144 full-time, part-time, and temporary retail and distribution employees. The Canadian Affiliates have over 950 full-time, part-time, and temporary employees working in management, retail and customer service.

## THE PROPOSED 363 SALE

6.      Due to (i) Debtors' and Debtors' lenders inability to agree upon the terms of a consensual restructuring, (ii) the Debtors' need to reduce debt load and interest expenses, and (iii) the Debtors' mounting concerns regarding the potential deterioration of their businesses – and accompanying degradation in value – stemming from rumors in the marketplace about the Debtors' liquidity and viability, the Debtors have determined that the value of their estates would be best maximized and preserved through a sale process (the "**Sale**"). Therefore, the Debtors have negotiated a going-concern Sale of their businesses and assets (the "**Assets**") to Rainier Holdings LLC as the stalking horse bidder (the "**Stalking Horse Bidder**") pursuant to an asset

---

[4]      The Debtors also have a non-debtor affiliate located in Hong Kong named Pacific NW Sourcing Co. This affiliate was created in 2008 to act as a purchasing agent in Asia. However, it is not currently fully operational, has no assets and has few, nominal liabilities.

DB02:8313467.1                                                                                                    068417.1001

purchase agreement and commenced these Chapter 11 Cases to implement the Sale pursuant to Section 363 of the Bankruptcy Code, subject to a competitive Sale process and the solicitation of higher and/or otherwise better offers. The Debtors believe that unless the Sale is expeditiously consummated, whether to the proposed Stalking Horse Bidder or to a purchaser submitting a higher or otherwise better offer, there will be significant value deterioration. Consequently, the Debtors have determined that it is in the best interest of their estates, creditors and other parties-in-interest to move forward with the Sale process.

7.      The events leading up to the Petition Date and the Sale and the facts and circumstances supporting the relief requested herein are more fully set forth in the First Day Declaration.

## RELIEF REQUESTED

8.      Prior to the Petition Date, and in the ordinary course of their business operations, the Debtors engaged in certain marketing, sales and promotional practices to develop and sustain relationships with the Debtors' customers and build positive reputations for the Debtors' products in the marketplace (collectively, the "**Customer Programs**"). The Customer Programs primarily consist of, but are not limited to, the Debtors' "Creed and Guarantee" (the Debtors' full satisfaction guarantee on all merchandise), gift cards, awards and merchandise certificates, rewards programs, registered card programs and stored value cards. The goals of the Customer Programs are to build and maintain customer loyalty, incentivize future customer purchases, meet competitive pressures and ensure customer satisfaction, there by retaining current customers, attracting new customers and ultimately enhancing revenue and profitability.

9.      By this Motion, the Debtors seek entry of an order pursuant to Sections 105(a), 363, 1107(a) and 1108 of the Bankruptcy Code, authorizing, but not directing, the Debtors, in

4

their business judgment, to (a) perform their prepetition obligations related to the Customer Programs, (b) continue, renew, replace, implement new and/or terminate such of the Customer Programs as the Debtors deem appropriate, in the ordinary course of business, without further application to the Court, (c) authorize and direct all applicable banks and other financial institutions to receive, process, honor and pay any and all checks drawn on the Debtors' accounts on account of the Customer Programs, whether such checks were presented prior to or after the Petition Date and (d) authorize and permit Debtors to continue to receive, process and honor charge card and credit card transactions in the ordinary course of their business, and continue to pay processing and related fees to credit card companies and credit card processors.

10. The Debtors seek to continue their Customer Programs as they have proven: (a) successful and cost-effective business strategies in the past and (b) responsible for generating valuable goodwill, repeat business and net sales increases. The total operational and administrative costs to the Debtors to honor prepetition obligations with respect to the Customer Programs and to continue the Customer Programs is relatively insignificant when compared to the revenue that such Customer Programs generate.

11. In addition, because the retail clothing industry is highly competitive, many of Debtors' customers may seek to shop elsewhere if the Debtors fail to timely perform their obligations under the Customer Programs. For this reason, and the other reasons discussed herein, the Debtors assert that maintaining the Customer Programs throughout the Chapter 11 Cases, and through such time as the Sale is consummated, is in the best interests of the Debtors and their estates and is necessary for the Debtors to stay competitive, maintain their customer base and thereby maintain their going concern value as they attempt to sell their businesses.

5

## SUMMARY OF CUSTOMER PROGRAMS

12.     Prior to the Petition Date, in the ordinary course of their retail business, the Debtors provided their customers with certain satisfaction, loyalty and incentive programs in the form of the Customer Programs and, as a result thereof, received from customers, without limitation, (a) payments for gift, award or similar certificates that customers have not yet redeemed for goods or services, (b) overpayments (including, but not limited to, overpayments in respect of miscalculations of shipping and handling charges) and (c) prepayments related to sales of goods and services that the Debtors have not yet delivered, provided (in full or in part) or obtained from third parties.

13.     There also exist contingent prepetition claims held by customers against the Debtors for returns, refunds, warranties, exchanges, substitutions, sales price adjustments, merchandise certificates, promotional offers or discount codes, complimentary certificates, promotional points programs, registered card programs, stored value cards and other credit balances relating to goods sold or services rendered to customers in the ordinary course of business prior to the Petition Date.

14.     The majority of the Debtors' sales are paid with credit or debit cards. To facilitate such transactions, the Debtors are parties to certain agreements with credit card companies and processors which enable the Debtors to accept credit and debit card purchases in their retail stores, through catalog mail orders and online retail sites, subject to certain refunds, returns, exchanges, substitutions, price adjustments (including sale price adjustments to billing in certain circumstances) and other credit balances (collectively, the "**Credit Card Agreements**"). The Debtors are also parties to agreements with World Financial Network National Bank ("**WFNNB**"), the issuer of private label credit cards provided to the Debtors' customers, and

6

with e-commerce companies that process purchases made at Debtors' online retail sites.

15.     The Debtors' continued ability to honor and process credit and debit card transactions is essential to continued customer loyalty and to the Debtors' ability to effect a Sale. Without this ability, the Debtors would lose their main avenue for conducting sales transactions in the ordinary course of their retail store, catalog and online retail sites. Under the terms of their Credit Card Agreements, the Debtors are required to pay the credit card companies and processors fees for their services, certain of which have accrued but remain unpaid as of the Petition Date. The Debtors request authority to continue to pay these fees in the ordinary course of their business in order to avoid interruption of these vital credit card processing services. For the fiscal year ended January 3, 2009, 88% of Debtors sales were paid using credit and debit cards, resulting in approximately $16.5 million in credit card processing and related fees paid by the Debtors. As of the Petition Date, the Debtors estimate that approximately $201,000 in prepetition fees are owed to credit card companies and processors.

16.     Finally, the success and viability of the Debtors' business, and ultimately the ability to effectuate the Sale, is entirely dependent upon maintaining the patronage and loyalty of their customers. In this regard, the Debtors' Customer Programs are critical and any delay in honoring the Debtors' obligations thereunder will severely and irreparably impair customer relations, thereby impacting the ongoing Sale efforts that are vital for the Debtor's emergence from these Chapter 11 cases.

17.     Accordingly, the Debtors seek Court authority to continue the Customer Programs, including authority to honor prepetition claims arising therefrom, as set forth in greater detail below.

18.     ***Returns, Refunds and Exchanges.*** Certain customers hold contingent claims

7

against the Debtors for refunds, returns, exchanges, substitutions, price adjustments (including sales price adjustments to billing) and other credit balances (collectively, the "**Refunds**" and individually each a "**Refund**") relating to goods sold or services rendered to customers in the ordinary course of business prior to the Petition Date. The Debtors also distinguish themselves from their competitors through their 89-year-old "unconditional lifetime guarantee" of customer satisfaction on every item, including licensed products returned to the Debtors' retail stores and catalogs (the "**Guarantee**"). The Guarantee provides that if a customer is dissatisfied with a product for any reason, the customer may return the product for a full Refund, with certain limited exceptions. Customers rely on the existence of the Guarantee and Refunds when they shop in the Debtors' retail stores, catalog and online retail sites. In addition, the Debtors typically issue Refunds in the ordinary course of business for damaged or faulty goods. As of the Petition Date, the current monthly returns reserve is approximately $4.0 million.

19. *Gift Cards.* Prior to the Petition Date, the Debtors sold in the ordinary course of business gift cards, e-gift cards and gift certificates to retail customers for the purchase of merchandise in the Debtors' retail stores, catalog and online retail businesses (collectively, the "**Gift Cards**"). In addition, and as part of marketing promotions with Ford for the sale of Eddie Bauer co-branded SUVs, the Debtors issued gift cards and certificates to certain purchasers of Eddie Bauer branded Ford SUVs (the "**Ford Gift Cards**"). Customers can use their Ford Gift Cards in the same manner as the Debtors' ordinary course gift cards.

20. Gift Cards do not have expiration dates, and as of the Petition Date, certain customers had not yet redeemed certain of these prepetition Gift Cards or Ford Gift Cards for merchandise. At the time that these Gift Cards were purchased by customers, or provided to customers as part of the Ford sales promotions, the Debtors had every expectation that they

8

would be redeemable.

21.     *Award Certificates.*  Prior to the Petition Date, the Debtors sold in the ordinary course of business award certificates and award cards to businesses for rewarding or incentivizing their employees.  Such awards certificates and cards could be used in the Debtors' retail stores, catalog and online retail businesses, (collectively, "**Award Certificates**").  There are two categories of Award Certificates.  The majority of Award Certificates are purchased by businesses in advance, and these businesses then provide the Award Certificates to their employees for redemption of the Debtors' merchandise at any time.  The second category, incentive award resales (the "**Award Certificate Resales**"), are purchased by businesses from various vendors (the "**Award Resale Vendors**") in various amounts.  The holders redeem these Award Certificate Resales for the Debtors' merchandise, and the Debtors then submit monthly invoices to the Award Resale Vendors for the amounts due.  Notwithstanding the type of Award Certificate, at the time that the businesses purchased these Award Certificates for their employees, they had every expectation that they would be redeemable, since one of the selling points of the Award Certificates is that they do not expire.  Yet as of the Petition Date, certain recipients of Award Certificates had not redeemed their prepetition Award Certificates.

22.     *Merchandise Certificates and Coupons.*  Prior to the Petition Date, the Debtors have issued in the ordinary course of business (a) merchandise certificates in respect of certain returned items and (b) merchandise certificates as promotional items to existing customers and as incentives to other individuals to build the Debtors' customer base, ((a) and (b) collectively, the "**Merchandise Certificates**").  As of the Petition Date, certain of these Merchandise Certificates had not yet been redeemed for goods.

23.     *Promotional Codes.*  In the ordinary course of their business, the Debtors issue

DB02:8313467.1                                                                          068417.1001

promotion, offer and discount codes (collectively, the "**Promotional Codes**") to be presented by customers at the time of purchase of goods from the Debtors' catalogs and online retail businesses. The Debtors believe that continuing to honor the Promotional Codes is an essential component to maintaining their relationships with their customers.

24.     *Complimentary Certificates.*  In the ordinary course of business, the Debtors issue complimentary certificates to customers who have experienced a significant customer service inconvenience, to qualified companies as donations and to internal employees as corporate incentives (collectively, the "**Complimentary Certificates**").  Each of these certificates may be presented by customers at the time of purchasing goods from the Debtors. The Complimentary Certificates have no expiration date. The Debtors believe that continuing to honor the Complimentary Certificates in accordance with their terms is an important component to establishing customer and employee satisfaction and maintaining these relationships.

25.     The Debtors estimate that as at the end of May, 2009, their aggregate outstanding obligations on Gift Cards, Ford Gift Cards, Award Certificates, Merchandise Certificates, Promotional Codes and Complimentary Certificates was $25.9 million, net of breakage.[5]

26.     *Eddie Bauer Friends and Canadian Rewards Programs.*  In the ordinary course of business, the Debtors offer promotional points (the "**Points**") in a loyalty program called "Eddie Bauer Friends" in the United States and "Canadian Rewards" in Canada (collectively the "**Rewards Program**").  As of January 3, 2009, there were approximately 4.7 million customers enrolled as Rewards program members (the "**Members**").  Members earn 10 points for every dollar spent at the Debtors' stores, from the Debtors' catalogues or at the Debtors' online sites. Alternatively, members can accumulate 12 points for every dollar spent on the Debtors'

---

[5]      Breakage represents the estimated amount of gift cards that will go unredeemed, estimated by applying historical redemption rates.

merchandise if they use their Eddie Bauer Credit Card, a private label credit card issued by WFNNB. Members of the Rewards Program who hold between 2,000 and 7,000 points are able to convert points into Eddie Bauer merchandise at any time by visiting www.eddiebauerfriends.com. Also, at the end of three separate rewards periods (the last day of February, June and October, each period, individually a "**Reward Period**"), if the Member accumulates sufficient points to reach a designated reward threshold, the points are automatically converted into a reward certificate ("**Reward Certificate**") which is provided to the recipient Member. For instance, each Member of Eddie Bauer Friends who accumulates 1,750 Points over the course of a Reward Period will receive a $10 Reward Certificate, and an additional $10 certificate for every subsequent 1,750 Points, to a maximum of $80. The Reward Certificates are redeemable for purchases of Eddie Bauer merchandise and are valid for at least 30 days. The Debtors estimate that as of the Petition Date, they are liable for obligations of approximately $2.8 million for fully and partially earned Reward Certificates. This represents customers who will have accumulated 1,750 points by the last day of June, which marks the end of the current Reward Period and will be entitled to receipt of a Reward Certificate under the Rewards Program, as well as for customer accounts where the points earned have not yet met the threshold for a certificate but are expected to do so at a later date. The Debtors believe that continuing to honor the Points and to generate Reward Certificates is essential for maintaining customer relationships and driving additional sales. Accordingly, the Debtors request that they be authorized to (1) award Reward Certificates to each of the Members who have accumulated points under the Rewards Program, (2) continue the Loyalty Program for existing and new members and (3) honor such points in connection with any new customers who enroll in the program prior to or after the Petition Date.

11

27.     ***Third Party Credit Card Registration Programs.***     The Debtors also hold relationships with certain companies (the "**Registered Card Companies**") and participate as a registered merchant in the Registered Card Companies' credit and debit card reward programs (the "**Registered Card Programs**").  When customers of these Registered Card Programs use their debit or credit cards to shop for the Debtors' merchandise they accumulate points which can be redeemed for gift cards, cash or educational savings plans.  The Debtors then pay a commission to these companies as payment for inclusion in the Registered Card Program.  The commission ranges from 4 to 6% of the value of the merchandise, inclusive of a 1% administrative fee.  The Debtors estimate that as of the Petition Date, the Debtors owe commissions valued at $120,000 to these Registered Card Companies.  The Debtors believe that continuing to participate in the Registered Card Programs provides valuable incremental sales opportunities and helps maintain relationships with existing customers.  Accordingly, the Debtors request that the Debtors be authorized to honor the terms of the Registered Card Programs and continue to pay commissions to the Registered Card Companies regardless of whether these commissions were accrued by the Debtors prior to or after the Petition Date.

28.     ***Stored Value Cards.***  The Debtors also participate in reward programs involving certain stored value cards (the "**Stored Value Cards**") that third parties develop for businesses to use as employee rewards.  These third party developers create Stored Value Cards that may be branded and used at certain designated merchants.  When businesses purchase Stored Value Cards from the third party developers, those businesses may select the Debtors as the designated merchant.  The Debtors then keep track of all merchandise purchased using the Stored Value Cards and provide a commission to the third party developers.  As of the Petition Date, the Debtors owe commissions valued at $6,000 to the Stored Value Card developers.  The Debtors

12

believe that participation in the Stored Value Card program generates additional sales opportunities and also helps to maintain existing customer relationships.

<u>BASIS FOR RELIEF</u>

A.     Ample Cause Exists for the Court to Authorize the Debtors to Pay Customer Obligations

29.     Sections 1107(a) and 1108 of the Bankruptcy Code authorize a debtor-in-possession to continue to operate its business. Further, Section 363(c) of the Bankruptcy Code authorizes a debtor-in-possession operating its business pursuant to Section 1108 of the Bankruptcy Code to use property of the estate in the ordinary course of business without notice or a hearing. The Debtors submit that continuing, renewing, replacing, initiating and/or terminating their Customer Programs in the ordinary course of business is permitted by Sections 363(c), 1107(a) and 1108 of the Bankruptcy Code without further application to the Court. However, out of an abundance of caution, the Debtors seek authority from this Court to honor their prepetition obligations arising from the Customer Programs in the ordinary course of business.

30.     To the extent that the Debtors' obligations under the Customer Programs are considered prepetition obligations, the Debtors should be authorized to honor and continue the Customer Programs in their sound business judgment pursuant to Section 363(b)(1) of the Bankruptcy Code. See In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (affirming lower court order authorizing payment of prepetition wages pursuant to Section 363(b) of the Bankruptcy Code). To do so, "the debtor must articulate some business justification, other than the mere appeasement of major creditors." Id at 175.

31.     Here, the continued loyalty of the Debtors' existing customers and the Debtors' ability to attract new customers is critical to their continued operations, preservation of their

13

going concern value and ultimate ability to consummate the Sale. If the Debtors are prohibited from honoring and maintaining the Customer Programs consistent with their past business practices, then customers' lost confidence in the Debtors will damage the Debtors' business to an extent that far exceeds the costs associated with honoring and continuing such practices. At this critical time, the Debtors cannot afford to lose the loyalty of their customers or to be placed at a competitive disadvantage with respect to prospective customers. The requested order will protect the Debtors' goodwill and going concern value during this restructuring process and enhance the Debtors' ability to generate revenue, thereby directly benefiting all of the Debtors' creditors.

32. Additionally, Section 105(a) of the Bankruptcy Code authorizes a court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). The purpose of Section 105(a) of the Bankruptcy Code is "to assure the bankruptcy court's power to take whatever action is appropriate or necessary in aid of the exercise of their jurisdiction." 2 Collier on Bankruptcy ¶ 105.01 (15th ed. rev. 2003). The Debtors submit that the relief requested in this Motion is critical to the Debtors and is justified under Section 105(a) of the Bankruptcy Code.

33. The Debtors submit that, consistent with Bankruptcy Rule 6003(b), immediate entry of an order approving the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates. The success and viability of the Debtors' businesses are dependent upon the loyalty and confidence of the customers who purchase the Debtors' products. While that is true for most businesses, it is particularly true in the case of the Debtors, who in the face of fierce pricing and product competition must rely on customer loyalty as a major driver of sales. The continued support of customers is essential to the survival of the

14

Debtors' businesses and the Debtors' ability to consummate the Sale. Any delay in honoring various Customer Programs or discontinuation of Customer Programs as a result of the commencement of these Chapter 11 Cases will severely and irreparably impair the Debtors' customer relations at a time when the loyalty and support of customers are needed most.

34.    By contrast, honoring these prepetition obligations will likely require minimal expenditure of estate funds and will assist the Debtors in preserving customer relationships for the benefit of all stakeholders. The Debtors anticipate that any cost of continuation of the Customer Programs will be satisfied primarily (if not exclusively) by the Customers' continued purchases of the Debtors' products, rather than by payment of cash from the Debtors' estates. Accordingly, to preserve the value of their estates, the Debtors must be permitted, in the Debtors' sole discretion, to continue honoring the Customer Programs without interruption or modification. In addition, to provide necessary assurances to the Debtors' customers going forward, the Debtors request authority to continue honoring or paying all obligations to customers, whether such obligations arise prior to or after the Petition Date in the ordinary course of the Debtors' businesses.

35.    In similar circumstances where retaining the loyalty and patronage of customers is critical to a successful Sale, courts in other cases, including cases in this District, have granted relief similar to that requested herein. See, e.g., In re Pierre Foods, Inc., Case No. 08-11480 (KG) (Bankr. D. Del. July 16, 2008); In re Tropicana Entm't, LLC, Case No. 08-10856 (KJC) (Bankr. D. Del. May 6, 2008); In re Leiner Health Prods. Inc., Case No. 08-10446 (KJC) (Bankr. D. Del. Mar. 12, 2008); In re Tweeter Home Entm't Group, Inc., Case No. 07-10787 (PJW) (Bankr. D. Del. June 13, 2007). In addition, the Debtors expect to have sufficient resources available to maintain all Customer Programs, to the extent described herein.

DB02:8313467.1                                                                                    068417.1001

36.     The Debtors' creditors also will benefit from the relief sought herein. If the Debtors are prohibited from maintaining policies consistent with past business practices, then customers' lost confidence in the Debtors will damage the Debtors' business to an extent that far exceeds any cost associated with continuing such practices. An order authorizing the relief sought herein will protect the Debtors' reputation during this critical time and enhance the Debtors' ability to generate revenue and effectuate a Sale.

37.     Accordingly, the Debtors request that they be authorized, but not directed, in their business judgment, to: (a) pay and perform such of their prepetition obligations under the Customer Programs as they deem appropriate and (b) continue, renew, replace, implement and/or terminate such of their Customer Programs as they deem appropriate, in the ordinary course of business without further application to the Court.

**B.      The Court Should Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers Relating to Customer Obligations**

38.     As discussed in the Debtors' Cash Management Motion[6] filed simultaneously herewith, the Debtors request that all applicable banks and other financial institutions be authorized and directed to receive, process, honor and pay all checks presented for payment, and to honor all fund transfer requests made by the Debtors related to the prepetition obligations described herein, whether such checks were presented or fund transfer requests were submitted prior to or after the Petition Date. The Debtors further request that all such banks and financial institutions be authorized and directed to rely on the Debtors' designation of any particular check or electronic payment request as approved pursuant to this Motion.

39.     For the foregoing reasons, the Debtors believe that granting the relief requested

---

[6]     The full title of the Debtors' Cash Management Motion is: Motion of the Debtors for Entry of an Order (A) Authorizing The Continued Use Of Existing Cash Management System, Bank Accounts, Business Forms And Investment Guidelines; (B) Granting Postpetition Intercompany Claims Administrative Status And (C) Authorizing Continued Intercompany Arrangements And Historical Practices

herein is appropriate and in the best interests of all parties in interest.

## NOTICE

40.    No trustee, examiner or creditors' committee has been appointed in the Chapter 11 Cases.  The Debtors have provided notice of this Motion to:  (a) the United States Trustee for the District of Delaware; (b) counsel to administrative agent under the prepetition term loan facility; (c) counsel to the steering committee for the prepetition term lenders; (d) counsel to agent under the prepetition revolving credit facility; (e) counsel for the indenture trustee for the $75 million 5.25% convertible senior notes due 2014 and (f) the creditors listed on the Debtors' consolidated list of 30 largest unsecured creditors, as filed with the chapter 11 petitions.  In light of the nature of the relief requested, the Debtors submit that no further notice is required or needed under the circumstances..

41.    A copy of the Motion is available on the Court's website: www.deb.uscourts.gov. Additional copies of the Motion are available on the website of the Debtors' proposed claims, noticing, soliciting and balloting agent, Kurtzman Carson Consultants, at www.kccllc.net/eddiebauer or can be requested by calling (866) 967-1781.

## NO PRIOR REQUEST

42.    No prior motion for the relief requested herein has been made to this or any other court.

DB02:8313467.1                                    068417.1001

WHEREFORE, the Debtors respectfully request the entry of a final order, substantially in the form attached hereto as Exhibit A, (a) authorizing the Debtors to honor certain prepetition obligations to customers, maintain certain customer service policies, programs, and practices in the ordinary course of business, and pay certain fees associated with credit card transactions and gift card programs, and (b) granting such other and further relief as the Court deems appropriate.

Dated: June 17, 2009
Wilmington, Delaware

Respectfully Submitted,

_____
Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

David S. Heller
Josef S. Athanas
LATHAM & WATKINS LLP
Sears Tower, Suite 5800
233 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 876-7700
Facsimile: (312) 993-9767

-and-

Heather L. Fowler
LATHAM & WATKINS LLP
355 South Grand Avenue
Los Angeles, California 90071-1560
Telephone: (213) 485-1234
Facsimile: (213) 891-8763

PROPOSED ATTORNEYS FOR DEBTORS AND
DEBTORS-IN-POSSESSION