# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>EDDIE BAUER HOLDINGS, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 09-12099 (____)<br><br>Joint Administration Pending |

## MOTION OF THE DEBTORS FOR AN ORDER (A) AUTHORIZING DEBTORS TO PAY PREPETITION CLAIMS OF CERTAIN (I) CRITICAL VENDORS, (II) ADMINISTRATIVE CLAIMHOLDERS, (III) CUSTOMS AGENTS AND SHIPPERS, (B) AUTHORIZING THE DEBTORS TO PAY FOR POSTPETITION DELIVERY OF OUTSTANDING ORDERS AND (C) GRANTING CERTAIN RELATED RELIEF

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") file this motion (the "**Motion**") for entry of an order (A) authorizing the Debtors to pay prepetition claims of certain (I) critical vendors, (II) administrative claimholders, (III) customs agents and shippers, (B) authorizing the Debtors to pay for postpetition delivery of Outstanding Orders and (C) granting certain related relief.[2] In support of this Motion, the Debtors respectfully state as follows:[3]

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Eddie Bauer Holdings, Inc., a Delaware corporation (2352); Eddie Bauer, Inc., a Delaware corporation (9737); Eddie Bauer Fulfillment Services, Inc., a Delaware corporation (0882); Eddie Bauer Diversified Sales, LLC, a Delaware limited liability company (1567); Eddie Bauer Services, LLC, an Ohio limited liability company (disregarded), Eddie Bauer International Development, LLC, a Delaware limited liability company (1571); Eddie Bauer Information Technology, LLC, a Delaware limited liability company (disregarded); Financial Services Acceptance Corporation, a Delaware corporation (7532); and Spiegel Acceptance Corporation, a Delaware corporation (7253). The mailing address for Eddie Bauer Holdings, Inc. is 10401 N.E. 8th Street, Suite 500, Bellevue, WA 98004. On or about the Petition Date, Eddie Bauer of Canada, Inc. and Eddie Bauer Customer Services, Inc., affiliates of the Debtors, commenced a proceeding before the Superior Court of Justice, Commercial List, for the Judicial District of Ontario, for a plan of compromise or arrangement under the Companies' Creditors Arrangement Act.

[2] A copy of the proposed interim order (the "**Interim Order**") is attached hereto as <u>Exhibit A</u> and the proposed final order (the "**Final Order**" and together with the Interim Order the "**Orders**" or each individually, an "**Order**") is attached hereto as <u>Exhibit B</u>.

[3] The facts and circumstances supporting this Motion are set forth in the Declaration of Marvin Edward Toland of Eddie Bauer Holdings, Inc., in Support of First Day Motions (the "**First Day Declaration**") filed contemporaneously herewith.

1. The Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2. The statutory bases for the relief requested herein are Sections 105(a), 363, 364, 503(b)(9) and 507(a) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "**Bankruptcy Code**") and Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

**BACKGROUND**

3. On June 17, 2009 (the "**Petition Date**"), Eddie Bauer Holdings, Inc. and each of its Debtor affiliates filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**"). The Debtors intend to continue in the possession of their respective properties and the management of their respective businesses as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. The Debtors have requested that these Chapter 11 Cases be consolidated for procedural purposes. As of the date hereof, no trustee, examiner or statutory committee has been appointed in these Chapter 11 Cases.

4. Subsequent to the commencement of these Chapter 11 Cases, the Debtors' two Canadian affiliates – Eddie Bauer of Canada, Inc. and Eddie Bauer Customer Services, Inc. (the "**Canadian Debtor Affiliates**") – will seek recognition of the Debtors' Chapter 11 Cases in a Canadian Court as "foreign proceedings" pursuant to Section 18.6 of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended. In addition to staying proceedings against the Canadian Debtor Affiliates in Canada, such recognition by the Canadian Court will allow certain orders of this Court to be in full force and effect in the same manner and in all respects as

if they had been made by the Canadian Court. Due to the integrated management of the Canadian Debtor Affiliates with the Debtors' U.S. operations, as well as the role that the Canadian Debtor Affiliates play in the Debtors' overall prepetition debt structure, these Chapter 11 Cases will function as the main proceedings with respect to the Canadian Debtor Affiliates.

5.     As further detailed in the First Day Declaration, the Debtors and the Canadian Debtor Affiliates[4] are a publicly traded general merchandise and specialty retailer that offers men's and women's outerwear, apparel, accessories and gear for an active outdoor lifestyle through catalogs, e-commerce sites and over 370 retail and outlet stores. The Debtors have 556 full-time, part-time, and temporary employees in their corporate headquarters, and 7,144 full-time, part-time, and temporary retail and distribution employees. The Canadian Affiliates have over 950 full-time, part-time, and temporary employees working in management, retail and customer service.

### THE PROPOSED 363 SALE

6.     Due to (i) Debtors' and Debtors' lenders inability to agree upon the terms of a consensual restructuring, (ii) the Debtors' need to reduce debt load and interest expenses, and (iii) the Debtors' mounting concerns regarding the potential deterioration of their businesses – and accompanying degradation in value – stemming from rumors in the marketplace about the Debtors' liquidity and viability, the Debtors have determined that the value of their estates would be best maximized and preserved through a sale process (the "**Sale**"). Therefore, the Debtors have negotiated a going-concern Sale of their businesses and assets (the "**Assets**") to Rainier Holdings LLC as the stalking horse bidder (the "**Stalking Horse Bidder**") pursuant to an asset purchase agreement and commenced these Chapter 11 Cases to implement the Sale pursuant to

---

[4]     The Debtors also have a non-debtor affiliate located in Hong Kong named Pacific NW Sourcing Co. This affiliate was created in 2008 to act as a purchasing agent in Asia. However, it is not currently fully operational, has no assets and has few, nominal liabilities.

Section 363 of the Bankruptcy Code, subject to a competitive Sale process and the solicitation of higher and/or otherwise better offers. The Debtors believe that unless the Sale is expeditiously consummated, whether to the proposed Stalking Horse Bidder or to a purchaser submitting a higher or otherwise better offer, there will be significant value deterioration. Consequently, the Debtors have determined that it is in the best interest of their estates, creditors and other parties-in-interest to move forward with the Sale process.

7. The events leading up to the Petition Date and the Sale and the facts and circumstances supporting the relief requested herein are more fully set forth in the First Day Declaration.

## RELIEF REQUESTED

8. Pursuant to Sections 105(a), 363, 364(b), 503(b)(9) and 507(a) of the Bankruptcy Code and the "necessity of payment" doctrine, the Debtors hereby seek the entry of an order: (a) authorizing the Debtors, in their sole discretion and subject to the terms and conditions set forth herein, to pay, in the ordinary course of the Debtors' businesses, prepetition claims of certain parties who supply goods or services critical to the continued operation of the Debtors' businesses, including service providers and purchasing agents, as more fully set forth below (collectively, the "**Critical Vendors**," and their prepetition claims the "**Critical Vendor Claims**"); (b) authorizing, but not requiring, the payment of prepetition claims for the value of goods received by the Debtors in the ordinary course of their businesses during the 20-day period prior to the Petition Date, which are entitled to administrative expense priority under Section 503(b)(9) of the Bankruptcy Code (the "**Priority Vendor Claims**"); (c) authorizing, but not directing, the Debtors to pay certain prepetition claims of shippers, warehouseman and other parties involved in the transport of the Debtor's inventory and merchandise (collectively, the "**Shippers**" and their prepetition claims the "**Shipping Claims**") and authorizing Debtors to pay

U.S. Customs duties imposed on shipments from foreign suppliers (the "**Priority Customs Claims**" and, collectively, the "**Shipping and Priority Customs Claims**"); (d) authorizing, but not requiring, the payment of claims on account of goods ordered and in transit but not scheduled for delivery until after the Petition Date (the "**Outstanding Orders**") and (e) granting related relief.

9.     In particular, the Debtors request the ability to pay (a) Critical Vendor Claims, in an aggregate amount not to exceed $2,500,000[5] (the "**Critical Vendor Cap**"); (b) Priority Vendor Claims, in and aggregate amount not to exceed $1,300,000 (the "**Priority Vendor Cap**"); (c) Shipping Claims in an aggregate amount not to exceed $2,100,000 (the "**Shippers Cap**") and (d) Priority Customs Claims, in an aggregate amount not to exceed $2,500,000 (the "**Customs Cap**" and together with the Shippers Cap, the "**Shipping and Priority Customs Claims Cap**").

### THE CRITICAL VENDOR CLAIMS

10.     The Debtors are mindful of their duty to preserve and maximize the value of their estates by sustaining the Debtors' enterprise as a going concern as they transition into the Chapter 11 Cases. This is particularly true in light of the Debtors' desire to consummate the Sale because the preservation of Debtors' business value is of utmost importance to the Proposed Stalking Horse Bidder. The types of vendors described below provide goods and services that the Debtors have determined are critical to their ability to operate their retail and outlet stores, website, catalog sales, general business operations and to the preservation of consumer confidence in the Debtors' brand (the "**Critical Goods and Services**"). Additionally, this is a critical time for the Debtors and for their relationships with their vendors. June and July

---

[5]     . This Critical Vendor Cap is based on the prepetition accounts payable run for the period ending June 15, 2009. Certain adjustments and reconciliations will be necessary to account for those invoices which have been issued by the different Critical Vendors, but not yet received by the Debtors at the time the Debtors filed this Motion. Accordingly, the Debtors reserve the right to request increases in the Critical Vendor Cap prior to the final hearing on the Motion.

represent the Debtors' peak product ordering, shipping and manufacturing period – even the slightest disruption of their relationships with their Critical Vendors will have a crippling effect upon the Debtors' ability to preserve their going concern value and therefore their ability to consummate a Sale. The Critical Vendors include:

11.     ***Direct Selling Support Vendors***.  Certain of the Debtors' vendors produce and deliver essential services related to the Debtors' catalogs, advertising and promotional services and provide certain services related to the Debtors' e-commerce sites and to the store operations of the Debtors (collectively, the "**Direct Selling Support Vendors**").  These include the printers and distributors of the Debtors' merchandise catalogs, the service providers who maintain and modify the Debtors' website www.eddiebauer.com, the call center support service providers who answer customer calls, place catalog orders, respond to customer questions and process returns, and other vendors who provide critical services to support and maintain the Debtors' direct (online and catalog) selling channel.

12.     Direct sales are a critical component of the Debtors' continued business operations.  Direct sales represent an important component of the Debtors' sales channels and Direct Selling Support Services Vendors play an integral role in facilitating such operations.  In fiscal year 2008, Eddie Bauer's direct channel sales generated net merchandise sales of $274.2 million, comprising 28.2% of net merchandise sales.  As of the Petition Date, the Debtors estimate that they owe the Direct Selling Support Services Vendors approximately $2,450,000 in outstanding claims.

13.     ***Foreign Purchasing Agents***.  The Debtors work with two main foreign purchasing agents – Li & Fung (Trading) Limited and Eddie Bauer International, Ltd.[6] – which

---

[6]     Eddie Bauer International, Ltd. is a subsidiary of OTTO International Hong Kong Ltd. and has no institutional or ownership relationship to the Debtors, except that it shares the name "Eddie Bauer" pursuant to a licensing agreement with the Debtors.

provide essential services in procuring the manufacture and purchase of certain apparel, hardgoods and accessories abroad and send such products to the Debtors (the "**Foreign Purchasing Agents**"). The Foreign Purchasing Agents locate suppliers, negotiate pricing and timing of delivery, serve as a conduit for purchase orders and change orders, inspect goods to maintain quality control, arrange for appropriate documentation for export and invoicing and, in general, expedite the process of procuring merchandise in foreign areas. The Debtors pay to the Foreign Purchasing Agents a fee for their services based on the price of the goods sourced.

14. In 2008, over 76% of the Debtors' products were purchased through their Foreign Purchasing Agents. With their extensive networks of vendors throughout Asia, the Foreign Purchasing Agents are able to provide essential sourcing services for the Debtors' unique goods while adhering to the Debtors' high quality standards. By managing the payment process with each vendor, the Foreign Purchasing Agents also eliminate the need for the Debtors to obtain costly letters of credit with each vendor.

15. Given that the Foreign Purchasing Agents place orders with vendors approximately 6 months in advance of the date that products are expected to go on sale, June and July are the Debtors' peak months for order placement and processing for items that they will carry for sale during the holiday shopping season. Absent uninterrupted sourcing and purchasing by their Foreign Purchasing Agents in the next 6 to 8 weeks, the Debtors will not be able to meet their inventory needs and will suffer sales losses during the peak holiday shopping season.

16. The Debtors believe that it is necessary and essential to their continued business operations and the success of their Sale efforts to make payments to the Foreign Purchasing Agents on account of certain prepetition claims. As of the Petition Date, the Debtors estimate that they owe the Foreign Purchasing Agents $50,000 for such claims, in the aggregate.

17.     Thus, in the aggregate, the Debtors owe the Critical Vendors approximately $2,500,000 in prepetition Critical Vendor Claims.

18.     In light of the fact that many of the national and regional retailers who have filed for chapter 11 protection in the past few months have experienced issues due to vendor refusal to supply inventory for retail sale that is critical for continued retail operations, and given the weakness in the global economy overall, but especially in the retail sale of apparel, the Debtors believe that certain of the Critical Vendors will not, absent full payment of their prepetition claims, continue to supply the Critical Goods and Services for the Debtors on a postpetition basis. As discussed above, the failure of the Debtors to continue to obtain the benefit of the postpetition Critical Goods and Services could have an immediate and adverse impact upon the Debtors' ability to generate revenue, and ultimately, their ability to effectuate the Sale. This is particularly true in light of the critical timing for placing orders for the holiday shopping season. Absent Critical Vendor confidence in the Debtors' ability to pay for such orders, Critical Vendors may refuse to ship holiday orders or accept orders for the spring selling season.

19.     Further, the Debtors believe that as to those certain Critical Vendors that are foreign, that payment of the Critical Vendor Claims is of paramount importance because they may not be subject to the jurisdiction of this Court. Accordingly, efforts by the Debtors to enforce the Bankruptcy Code against them will be expensive, time-consuming and, ultimately, of little practical value. Further, the Debtors are concerned that, if these foreign Critical Vendors do not believe that the Bankruptcy Code can be enforced against them, some may (a) file lawsuits in foreign courts and obtain judgments against the Debtors or (b) exercise "self help" remedies and seize valuable assets that the Debtors hold abroad to secure payment on their Critical Vendor Claims.

20. The Debtors therefore believe that any interruption in the supply of the Critical Goods and Services would immediately jeopardize their ability to maintain their operations and, in turn, their Sale efforts. Indeed, the Stalking Horse Bidder and other potential bidders with whom the Debtors have spoken have indicated to the Debtors that the maintenance of the Debtors' relationships with their Critical Vendors is of utmost importance and a critical factor in determining the purchase price for the Debtors' assets and businesses.

21. Therefore, to safeguard the Debtors' ability to obtain the Critical Goods and Services, the Debtors are requesting authority to pay the Critical Vendor Claims up to an aggregate amount of the Critical Vendor Cap, subject to the terms and conditions of the proposed Orders granting the relief sought herein. The Debtors reserve the right to later seek Court authority to increase the Critical Vendor Cap.

22. After consulting with the appropriate members of their management team to identify those vendors that are most essential to the Debtors' operations, the Debtors determined the estimated total payments that would be necessary to ensure the continued supply of the Critical Goods and Services to the Debtors. The Critical Vendor Cap represents this estimated payment total. In making this estimate, the Debtors reviewed their relationships with each of their vendors and used the following criteria: (a) whether the vendor in question is a "sole-source" or "limited source" provider, (b) whether the Debtors receive advantageous pricing or other terms from such vendor such that replacing the vendor postpetition would result in significantly higher costs to the Debtors, (c) whether Debtors could successfully purchase goods or services from another source and receive such goods and services on a timely basis if such vendor refused to accept orders or ship goods, (d) the overall impact on the Debtors' operations if such vendor ceased or delayed shipments, (e) the likelihood that such vendor would extend trade terms postpetition despite the Debtors' failure to pay such vendor's pre-petition outstanding

trade debt and (f) whether such vendor was a foreign vendor that may not have the same understanding or customs (or be subject to this Court's jurisdiction) with respect to the U.S. bankruptcy process.

23.     The Debtors believe that each of the Critical Vendors satisfies one or more of the above criteria and is vital to the operation of the Debtors' businesses and therefore payment of the Critical Vendors Claims is necessary.

### THE PRIORITY VENDOR CLAIMS

24.     Certain of the obligations related to the relief sought in this Motion are Priority Vendor Claims for goods or services that were received by the Debtors in the ordinary course of business within the 20-day period prior to the Petition Date. Pursuant to Section 503(b)(9) of the Bankruptcy Code, such claims are entitled to administrative priority. Therefore, the Debtors believe that they are authorized to pay these Priority Vendor Claims as administrative expense claims incurred in the ordinary course of the Debtors' businesses pursuant to Section 363(c)(1) of the Bankruptcy Code, regardless of whether the claimant would independently qualify as a Critical Vendor.

25.     The Priority Vendor Claims consist of claims related to goods that the Debtors' third party manufacturing vendors (collectively, "**Priority Vendors**") have produced, all of which have been sent to or received by the Debtors in the ordinary course of business within the 20-day period prior to the Petition Date. In the ordinary course of business, the Debtors purchase overseas the majority of the goods they sell to customers and then import such goods into the United States and Canada (the "**Imported Goods**"). Title to the Imported Goods passes to the Debtors upon delivery to the Debtors' shipping agents and customs brokers, or at such time as the Imported Goods reach the Debtors' distribution centers, where the manufacturer arranges for shipping. The Debtors believe that they have received certain Imported Goods in

the ordinary course of business in the 20-day period prior to the Petition Date, and therefore have Priority Vendor Claims.

26.     The Imported Goods are invaluable to the continued operation of the Debtors' retail and outlet stores and direct (catalog and website) business.  Because the Debtors do not have any manufacturing facilities of their own, all production is performed by third party manufacturers.  All goods supplied by the manufacturing vendors are either designed "in-house" by the Debtors and then manufactured externally by third party vendors (the "**Custom Manufactured Merchandise**") or designed and manufactured by external vendors (the "**Third Party Branded Products**").

27.     It is imperative for the Debtors to maintain good standing with the Priority Vendors in order to ensure their continued access to the Manufactured Merchandise and Third Party Branded Products in order to maintain product production and meet their ongoing sales and customer needs.  Accordingly, to operate their business, the Debtors must maintain a continuing and timely flow of such goods to the Debtors' distribution and warehousing facilities across the United States.  Further, many of the manufacturing vendors are (i) among only a few such suppliers in the world, (ii) offer products that are far superior than those available elsewhere, (iii) offer products upon which the Debtors rely and cannot practicably replace because of the unique nature of the goods or due to the long lead time to source raw materials and manufacture, or (iv) provide goods or services for a reduced cost.

28.     The preservation of the Debtors' relationship with the Priority Vendors is particularly essential given the Debtors' need to place orders for merchandise and product for sale during the holiday season during the next 6 to 8 weeks.  Any disruption in the flow of the Debtors' product or in their relationship with the Priority Vendors will have profound effects

upon the Debtors' holiday season and sales, and certainly on their ability to consummate a going concern sale.

29.    The Debtors' estimate that approximately $1,300,000 in Priority Vendor Claims are owed on account of goods that the Debtors received during the 20-day period prior to the Petition Date.  Payment of Priority Vendor Claims – even if made to Critical Vendors – shall not count against the Critical Vendor Cap.

## SHIPPING AND PRIORITY CUSTOMS CLAIMS

30.    ***Shipping Claims***.  An integral component of the Debtors' retail operations is the efficient flow of inventory and merchandise from manufacturers and suppliers to their distribution centers, and from those distribution centers to retail and outlet stores and directly to customers purchasing through catalogs or the Debtors' website.  In the ordinary course of business, the Debtors purchase overseas the majority of the goods they sell to customers and then import such goods into the United States and Canada.  Products are then moved through the Debtors' domestic channels to flow to distribution centers, stores, out to customers and, in the case of returns, back from customers.  Accordingly, the Debtors rely heavily on numerous foreign and domestic commercial common carriers, movers, shippers, warehousemen and certain third party vendors and logistics service providers to ship, transport, store, move through customs and deliver goods through established domestic and international distribution networks. Without the uninterrupted purchase and delivery of the Imported Goods, the Debtors could not maintain normal business and uninterrupted distribution of products to their customers.

31.    In addition, the majority of the Debtors' shipping processes are coordinated by logistics providers who consolidate and prepare the requisite data and documentation that the U.S. and Canadian Customs Services require for the import of such goods

across the U.S. and Canadian borders. For other, limited, manufacturers, the goods are delivered through the manufacturers' carriers to the Debtors.

32. The Debtors believe that it is necessary and essential to their continued business operations and the success of their Sale and reorganization efforts to make payments to the Shippers on account of certain prepetition claims. Such payments are not expected to exceed $2,100,000 in the aggregate.

33. *Priority Customs Claims*. When goods arrive in the United States the Debtors arrange for the custom's "entry" – an estimated duty is assessed and paid to the U.S. Customs Service by the Debtors within a certain period from the time that U.S. Customs releases the goods to the Debtors. In the 12 months preceding the Petition Date, the Debtors paid approximately $37,009,068 in U.S. Customs' Fees.

34. Pursuant to Section 507(a)(8) a substantial portion, if not all, of the Debtors' accrued, but unpaid customs fees are priority claims. Additionally, if the Priority Customs Claims are not timely paid, the U.S. Customs Service may demand, pursuant to U.S. Customs Regulations, liquidated damages far in excess of the Priority Customs Claims, in addition to other sanctions. It is therefore in the best interests of the Debtors' estates that the Debtors be authorized to pay all Priority Customs Claims when they become due, including prepetition Priority Customs Claims, in order to ensure continuous manufacturing operations and product distribution and to avoid paying significant amounts in damages and sanctions and the assertion of various liens against the Debtors' goods.

35. The Debtors estimate that as of the Petition Date the amount of their Priority Customs Claims will not exceed $2,500,000. Thus, in the aggregate, the Debtors believe they owe $4,600,000 in prepetition Shipping and Priority Customs Claims.

## TERMS FOR PAYMENT OF CRITICAL VENDOR CLAIMS, PRIORITY VENDOR CLAIMS AND SHIPPING CLAIMS

36.     The Debtors propose to be granted the authority to pay all or a portion of all Critical Vendor Claims, Priority Vendor Claims and Shipping Claims (collectively, the "**Claims**") only if the Critical Vendors, Priority Vendors and Shippers (collectively, the "**Critical Vendors and Shippers**" or, individually, a "**Critical Vendor or Shipper**") agree to continue to supply goods or services to the Debtors on their applicable  Customary Trade Terms.[7]  The Debtors reserve the right to negotiate trade terms with any Critical Vendor or Shipper who demands terms less favorable to the Debtors (to the extent the Debtors determine such terms are necessary to procure Critical Goods and Services or are otherwise in the best interests of the Debtors' estates).

37.     If a Critical Vendor or Shipper later refuses (unless such refusal is based on the Debtors' failure to make timely payments subsequent to the Petition Date contrary to the Customary Trade Terms) to continue to supply goods or services to the Debtors on Customary Trade Terms during the pendency of these Chapter 11 Cases (or on such terms as were individually agreed to between the Debtors and such Critical Vendor or Shipper), then the Debtors may, in their discretion, and without further order of the Court, declare that (a) any payment of a Claim made by the Debtors under the Interim or Final Order granting this Motion shall be deemed to be a postpetition advance that the Debtors may recover from such Critical Vendor or Shipper in cash, goods or services and (b) upon any such recovery by the Debtors, the Claim of such Critical Vendor or Shipper paid after the Petition Date shall be reinstated in the amount so recovered.

---

[7]     As used herein, "Customary Trade Terms" are defined as the normal and customary trade terms, practices and programs including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, normal product mix and availability and other applicable terms and programs in effect between such trade creditor or shipper and the Debtors on a historical basis for the period prior and up to the Petition Date or such other trade terms, practices and programs that are at least as favorable as those that were in effect during such time.

38.     To commit the Critical Vendor or Shipper to Customary Trade Terms, the

Debtors propose that they be authorized, but not directed, to add a legend substantially in the

following form to checks used to pay any Claims:

> By accepting this check, the payee agrees (a) to provide the payor
> and its affiliates with normalized trade credit and provide other
> business terms on a postpetition basis (consistent with past
> practices), including with respect to any applicable credit limits,
> pricing and the provision of equivalent levels of service, on terms
> at least as favorable as those extended to the payor and its affiliates
> prior to the commencement of payor's chapter 11 case, or as are
> otherwise acceptable to the payor, for the duration of the payor's
> chapter 11 case, identified as Case No. _____, pending in the
> United States Bankruptcy Court for the District of Delaware (the
> "Bankruptcy Court"), and (b) upon request, to release to payor any
> property of payor in payee's possession. Payee hereby submits to
> the jurisdiction of the Bankruptcy Court for the enforcement of this
> agreement.

39.     In addition, the Debtors propose that they be authorized, but not directed,

to send letters, substantially in the form of the letter attached hereto as Exhibit C, to Vendors and

Shippers and that such letters include, but not be limited to, the following terms (the "**Trade

Payment Plan**"):

(a)     The amount of such Critical Vendor or Shipper's prepetition trade
claims to be paid by the Debtors, after accounting for any setoffs,
other credits and discounts thereto, shall be as mutually determined
in good faith by the Critical Vendor or Shipper and the Debtors
(but such amount shall be used only for purposes of the Order and
shall not be deemed a claim allowed by the Court, and the rights of
all parties in interest to object to such claim shall be fully
preserved until further order of the Court);

(b)     The Critical Vendor or Shipper's agreement to be bound by the
Customary Trade Terms (including, but not limited to, credit
limits, pricing, cash discounts, timing of payments, allowances,
rebates, coupon reconciliation, normal product mix and availability
and other applicable terms and programs), which were favorable to
the Debtors and in effect between such Critical Vendor or Shipper
and the Debtors on a historical basis for the period within 120 days
of the Petition Date, or such other trade terms as are mutually
agreed to by the Debtors and such Critical Vendor or Shipper.

(c)      The Critical Vendor or Shipper's agreement to provide goods and/or services to the Debtors based upon Customary Trade Terms, and the Debtors' agreement to pay in accordance with such terms;

(d)      The Critical Vendor or Shipper's agreement not to file or otherwise assert against any of the Debtors, their estates or any of their respective assets or property (real or personal) any lien (a "**Lien**") (regardless of the statute or other legal authority upon which such Lien is asserted) related in any way to any remaining prepetition amounts allegedly owed to the Critical Vendor or Shipper by the Debtors arising from goods or services provided to the Debtors prior to the Petition Date, and that, to the extent that the Critical Vendor or Shipper has previously obtained such a Lien, the Critical Vendor or Shipper shall immediately take all necessary actions to release such Lien;

(e)      The Critical Vendor or Shipper's acknowledgment that it has reviewed the terms and provisions of the Order and consents to be bound thereby;

(f)      The Critical Vendor or Shipper's agreement that it will not separately assert or otherwise seek payment for reclamation claims or other Claims outside of the terms of the Interim or Final Order granting this Motion unless the Critical Vendor or Shipper's participation in the Trade Payment Plan authorized by the Interim or Final Order granting this Motion is terminated; provided that such claims, if thereafter raised by the Critical Vendor or Shipper as permitted by the Interim or Final Order granting this Motion, shall be treated as though raised on the date of the Interim or Final Order granting this Motion; and

(g)      If either the Trade Payment Plan or the Critical Vendor or Shipper's participation therein terminates, or a Critical Vendor or Shipper who has received payment of a Claim later refuses to continue to supply goods or services to the Debtors on Customary Trade Terms, subject to defenses, any payments received by the Critical Vendor or Shipper on account of such Critical Vendor or Shipper's prepetition claim will be deemed to have been in payment of then outstanding postpetition obligations owed to such Critical Vendor or Shipper and that such Critical Vendor or Shipper shall immediately repay to the Debtors any payments made to it on account of its Claim to the extent that the aggregate amount of such payments exceed the postpetition obligations then outstanding, without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims, or otherwise.

40.      Such a letter, once agreed to and accepted by a Critical Vendor or Shipper,

shall be the agreement between the parties that governs their postpetition trade relationship (the

"**Trade Agreement**"). The Debtors hereby seek authority to enter into Trade Agreements with the Critical Vendors and Shippers if the Debtors determine that such an agreement is necessary to their postpetition operations. In the event that the Debtors are unable to enter into a Trade Agreement with any the Debtors may nevertheless seek authority to pay such Critical Vendor or Shipper's Vendor Claim if the Debtors determine that such payment is necessary to prevent irreparable harm to the Debtors' business operations.

41. For those Critical Vendor and Shippers who have agreed to provide goods or services to the Debtors on terms different from their Customary Trade Terms, the Debtors reserve the right to seek written acknowledgment of such terms on a case-by-case basis.

42. If a Critical Vendor or Shipper refuses to supply goods or services to the Debtors on Customary Trade Terms or such other trade terms as are mutually agreed to by the Debtors, following payment of its Vendor Claim, or fails to comply with any Trade Agreement it entered into with the Debtors, the Debtors hereby seek authority to, in their discretion and without further order of the Court, (i) declare that any Trade Agreement between the Debtors and such Critical Vendor or Shipper is terminated (if applicable) and (ii) declare that any payments made to such Critical Vendor or Shipper on account of its Vendor Claim, whether pursuant to a Trade Agreement or otherwise, be deemed to have been in payment of then-outstanding postpetition claims of such Critical Vendor or Shipper without further order of the Court.

43. In the event the Debtors exercise either of the rights set forth in the preceding paragraph, the Debtors request that the Critical Vendor or Shipper against which the Debtors exercise such rights be required to immediately return to the Debtors any payments made on account of its Vendor Claim to the extent that such payments exceed the postpetition amounts then owed to such Critical Vendor or Shipper, without giving effect to any rights of setoff or reclamation. In essence, the Debtors seek to return the parties to their respective

positions immediately prior to entry of the Order in the event a Trade Agreement is terminated or a Critical Vendor or Shipper refuses to supply goods or services to the Debtors on Customary Trade Terms or such other trade terms as the Debtors find acceptable, following payment of its Vendor Claim.

### THE OUTSTANDING ORDERS

44. In the ordinary operation of the Debtors' businesses, numerous vendors provide the Debtors with millions of dollars of goods, materials, products and related items ("**Goods**") on a monthly basis. On a daily basis, many truckloads of Goods are in transit and delivered to the Debtors' distribution center. As of the Petition Date, and in the ordinary course of their businesses, the Debtors had numerous Outstanding Orders with their vendors for such Goods. As a result of the Debtors' filing these Chapter 11 Cases, many of the vendors may be concerned that delivery or shipment of Goods after the Petition Date pursuant to an Outstanding Order will render a vendor who makes such shipment a general unsecured creditor of the Debtors' estates.

45. Accordingly, unless (i) the Debtors issue substitute purchase orders postpetition, or (ii) this Court issues an order confirming that all of the Debtors' obligations arising from Outstanding Orders are to be granted administrative status pursuant to section 503(b)(1)(A) of the Bankruptcy Code, the vendors who have Outstanding Orders may instruct their shippers not to deliver the Goods to the Debtors. Therefore, the Debtors seek entry of an order reaffirming for their vendors that any Outstanding Orders are afforded administrative expense priority pursuant to Section 503(b)(1)(A) of the Bankruptcy Code and the Debtors have the authority to honor all obligations that arise in connection with the postpetition delivery of Goods, irrespective of the time the orders were first placed.

**BASIS FOR RELIEF**

**A.** **This Court May Allow Payment of Critical Vendor Claims Under Section 363 of the Bankruptcy Code and Under Section 105 of the Bankruptcy Code and the Necessity of Payment Doctrine.**

46.     The Court's general equitable powers are codified in Section 105(a) of the Bankruptcy Code. Section 105(a) empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of this title." 11 U.S.C. § 105(a). A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). Under Section 105(a), a court "can permit pre-plan payment of a prepetition obligation when essential to the continued operation of the debtor." In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992); see also In re Just for Feet, Inc., 242 B.R. 821, 826 (D. Del. 1999) ("To invoke the necessity of payment doctrine, a debtor must show that payment of the prepetition claims is critical to the debtor's reorganization.") (internal quotation omitted).

47.     Section 363(b)(1) of the Bankruptcy Code authorizes the trustee to use property of the estate other than in the ordinary course of business after notice and a hearing. 11 U.S.C. § 363(b)(1). Pursuant to Bankruptcy Rule 6003(b), authorization to use property of the estate, "including a motion to pay all or part of a claim that arose before the filing of the petition," may not be granted in the first 20 days of a bankruptcy case, except "to the extent that relief is necessary to avoid immediate and irreparable harm." F.R.B.P. 6003(b).

48.     The "necessity of payment" rule further supports the relief requested in this Motion. See, e.g., Just for Feet, Inc., 242 B.R. at 826 (authorizing payment of prepetition claims of trade creditors that continue customary trade terms). The "necessity of payment" doctrine "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the

debtor." Ionosphere Clubs, 98 B.R. at 176; In re Chateaugay Corp., 80 B.R. 279 (S.D.N.Y. 1987). This rule is consistent with the paramount goal of chapter 11, *i.e.*, "facilitating the continued operation and rehabilitation of the debtor." Ionosphere Clubs, 98 B.R. at 176.

49.     Courts in this and other jurisdictions have routinely granted the same or similar critical vendor relief in other cases. See, e.g., In re GWLS Holdings, Inc., No. 08-12430 (PJW) (Bankr. D. Del. Oct. 20, 2008); JHT Holdings, Inc., No. 08-1126 (Bankr. D. Del. June 25, 2008); In re Global Motorsport Group, Inc., No. 08-10192 (KJC) (Bankr. D. Del. Feb. 1, 2008); In re American Home Mortgage Holdings, Inc., No. 07-11047 (CSS) (Bankr. D. Del. Aug. 6, 2007).

50.     In addition, courts have recognized that "the foundation of a critical vendors order is the belief that the vendor not paid for prior deliveries will refuse to make new ones." In re K-Mart Corp., 2003 WL 22282518, at *3 (N.D. Il.. Sept. 30, 2003). The Toland Declaration has sought to clarify, and Mr. Toland is prepared to testify, that many of the Debtors' Critical Vendors likely will not resume deliveries postpetition if they are not paid for their prepetition deliveries.

51.     The Debtors believe that authorizing payment of each Critical Vendor Claim is essential to consummate a Sale and to successfully emerge from these Chapter 11 Cases. The preservation of the relationship with each of the Critical Vendors is crucial to the continued viability of the Debtors – absent preservation of these relationships, the Stalking Horse Bidder and other potential buyers have indicated they would not be interested in purchasing the Debtors' assets and certainly not for the purchase price listed in the Sale documents. Thus, if the Debtors were to lose the ability to obtain Critical Goods or Services from its Critical Vendors, the Debtors' prospects of utilizing these Chapter 11 Cases to effectuate a Sale for the greatest benefit to the Debtors' estates and creditors will be greatly reduced.

52.     This is especially true given the nature of the Debtors' business which depends upon the prompt payment of Customs Fees, shipping charges, Outstanding Orders and other such Critical Vendor costs as may be necessary to obtain delivery of Critical Goods or Services.  Unless the Debtors have the authority to pay these essential product and service providers, the Debtors' businesses will likely suffer irreparable harm and their ability to maximize value for their estates from a Sale will likewise suffer.

53.     Moreover, finding a replacement goods provider for the Critical Goods and Services would be an arduous and lengthy process and would be detrimental to the Debtors' estates.  The lead time required for sourcing materials and trims, and for the manufacturing process, may make it impossible to timely replace, receive and merchandise the inventory necessary for Debtors' seasonal product offerings, including critical holiday inventory.  Debtors' management may need to shift time and resources away from customer and employee issues in order to seek out an alternative provider of goods or services.  In addition, the Debtors may be forced to pay a premium to any replacement for the Critical Vendors because of the perceived risk of doing business in chapter 11 or short notice of the requested shipment of goods. Authorizing payment of the Vendor Claims would protect the ongoing relationship between the Debtors and the Critical Vendors, avoiding the detrimental effects of locating replacement goods.

**B.      This Court May Allow Payment of Priority Vendor Claims Under Section 503(b)(9) of the Bankruptcy Code.**

54.     Pursuant to Section 503(b)(9) of the Bankruptcy Code, "there shall be allowed administrative expenses … including … the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business."  11 U.S.C. § 503(b)(9).

55.     By this Motion, the Debtors do not seek to alter the priority of these claims — much less do so in a manner that prejudices the rights of the Debtors' general unsecured creditors. Instead, the Debtors merely seek to alter the timing of undisputed administrative expense payments that holders of Priority Vendor Claims already are entitled to receive as a matter of statute.

56.     Instead of satisfying Priority Vendor Claims after confirmation of a plan of reorganization (at which time such payments may be too late to benefit the estates), the Debtors seek to pay these claims as and when they become due in the ordinary course of business, while such payments can still induce the individual vendor to adhere to favorable trade terms and to conduct business with the Debtors on a going-forward basis.

57.     The Debtors believe that this relief is in the best interests of the Debtors' estates because: (a) favorable trade terms will prevent the contraction of the Debtors' liquidity and (b) this Court's time and resources will not be burdened with numerous motions from individual vendors requesting payment on account of their administrative priority expense claims.

58.     This Court and others have approved the payment of similar claims pursuant to the new Section 503(b)(9) of the Bankruptcy Code. See In re GWLS Holdings, Inc., No. 08-12430 (PJW) (Bankr. D. Del. Oct. 20, 2008) (order granting payment of vendors' administrative expense claims with priority under Section 503(b)(9) of the Bankruptcy Code); In re Werner Holding Co. (DE), Inc., No. 06-10578 (Bankr. D. Del. June 13, 2006) (order granting vendors' administrative expense claims with priority under Sections 503(b) and 507(a)(2) of the Bankruptcy Code); see also In re Pliant Corp., No. 06-10001 (Bankr. D. Del. Jan. 4, 2006) (same); In re Dana Corp., No 06-10354 (BRL) (Bankr. S.D.N.Y. Mar. 3, 2006) (order authorizing payment of administrative priority claims under Section 503(b)(9)).

**C. This Court May Allow Payment on Shipping and Priority Custom Claims Under Sections 105(a), 363(b) and 507(a)(8) of the Bankruptcy Code and the Necessity of Payment Doctrine**

59. The Court may authorize the Debtors to pay the Shipping and Priority Customs Claims pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code. As discussed above, pursuant to Section 105(a) of the Bankruptcy Code and the "necessity of payment" doctrine, a bankruptcy court may use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor" and is otherwise essential to the continued operation of the debtor. See In re Ionosphere Clubs, Inc., 98 B.R. at 175.

60. The payment of the Shipping and Priority Customs Claims are not simply necessary for the continued operations of the Debtors, but critical to the survival of the Debtors' business. The Debtors believe in their sound business judgment that continuation of their positive relationship with the Shippers and Customs Agents is imperative to their continued operations and to the preservation of the value of the Debtors' estates.

61. Moreover, the Debtors believe in their sound business judgment that continuation of their positive relationship with the Shippers and U.S. Customs is imperative to their continued operations and greatly increases the likelihood of a successful going concern sale.

62. The Debtors submit that payment of the Shipping and Priority Customs Claims will benefit the Debtors and their creditors by allowing the Debtors to receive the products that they need to meet sales needs and maintain customer satisfaction and confidence. As such, the Debtors respectfully submit that the Court should exercise its equitable power to grant the relief requested in the Motion.

63. In addition, the Debtors believe that a substantial portion, if not all, of the Priority Customs Claims sought to be paid hereunder would be entitled to priority pursuant to Section 507(a)(8)(F) of the Bankruptcy Code as customs duties arising out of the importation of

merchandise. Specifically, Section 507(a)(8)(F) provides that "allowed unsecured claims of governmental units [are entitled to eighth priority], only to the extent that such claims are for … a customs duty arising out of the importation of merchandise – (i) entered for consumption within one year before the date of the filing of the petition…" 11 U.S.C. § 507(a)(8)(F).

64. Additionally, as discussed above, payment of the Priority Customs Claims may be necessary to obtain possession of the Debtors' goods. Absent payment, the Debtors' Customs Agents, as well as U.S. Customs, may be able to assert liens against the goods. The U.S. Customs Service may also demand, pursuant to the U.S. Customs Regulations, liquidated damages far in excess of the Priority Customs Claims, in addition to other sanctions.

65. Thus, payment of the Shipping and Priority Customs Claims will benefit the Debtors' estates because (a) the Debtors' operations will likely otherwise be interrupted, (b) the eventual sale of goods in transit will generate income for the Debtors, (c) forfeiture of goods for which the Debtors have already become indirectly obligated will be avoided, (d) important consumer goodwill based on availability of products sold in good faith to the Debtors' customers will be protected and (e) potential fines, penalties and interest charges would be avoided.

**D. This Court May Allow Payment on Account of Certain Outstanding Orders**

66. Pursuant to the provisions of Section 503(b)(1)(A) of the Bankruptcy Code, all obligations that arise in connection with the postpetition delivery of Goods to the Debtors, are, by definition, administrative expenses. Therefore, the Debtors believe that they have the authority to make payment for Goods received postpetition irrespective of the time the orders were first placed. However, the Debtors' relationship with their vendors is so essential that it is critical to give them the utmost assurance that their valid postpetition claims will be given administrative expense priority status, and that they will continue to be paid by the Debtors in the ordinary course of business. Moreover, many non-U.S. vendors will not be familiar with

the ability of the Debtors to pay for Goods delivered postpetition, having never or rarely dealt with a chapter 11 debtor. Thus, confirmation by this Court of the Debtors' authority in this regard is highly desirable.

67.     By reason of the foregoing, the interests of the Debtors, their estates and their stake holders would be best served by granting the Motion and authorizing, but not directing, payment of the Critical Vendor Claims, Priority Vendor Claims, Shipping and Priority Customs Claims and Outstanding Orders, as well as authorizing the payment of Shipping and Priority Custom Claims.

**NOTICE**

68.     No trustee, examiner or creditors' committee has been appointed in the Chapter 11 Cases. The Debtors have provided notice of this Motion to: (a) the United States Trustee for the District of Delaware; (b) counsel to administrative agent under the prepetition term loan facility; (c) counsel to the steering committee for the prepetition term lenders; (d) counsel to agent under the prepetition revolving credit facility; (e) counsel for the indenture trustee for the $75 million 5.25% convertible senior notes due 2014 and (f) the creditors listed on the Debtors' consolidated list of 30 largest unsecured creditors, as filed with the chapter 11 petitions. In light of the nature of the relief requested, the Debtors submit that no further notice is required or needed under the circumstances.

69.     A copy of the Motion is available on the Court's website: www.deb.uscourts.gov. Additional copies of the Motion are available on the website of the Debtors' proposed claims, noticing, soliciting and balloting agent, Kurtzman Carson Consultants, at www.kccllc.net/eddiebauer or can be requested by calling (866)967-1781.

**<u>NO PRIOR REQUEST</u>**

70.     No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request the entry of interim and final orders, substantially in the forms attached hereto as <u>Exhibit A</u> and <u>Exhibit B</u>, (a) authorizing the Debtors to pay prepetition claims of certain critical vendors, administrative claimholders and shipping and priority customs claims, (b) authorizing the Debtors to pay for postpetition delivery of Outstanding Orders and (c) granting such other and further relief as the Court deems appropriate.

Dated: June 17, 2009
Wilmington, Delaware

Respectfully Submitted,

~~signature~~

Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

David S. Heller
Josef S. Athanas
LATHAM & WATKINS LLP
Sears Tower, Suite 5800
233 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 876-7700
Facsimile: (312) 993-9767

-and-

Heather L. Fowler
LATHAM & WATKINS LLP
355 South Grand Avenue
Los Angeles, California 90071-1560
Telephone: (213) 485-1234
Facsimile: (213) 891-8763
PROPOSED ATTORNEYS FOR DEBTORS AND
DEBTORS-IN-POSSESSION