## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| EDDIE BAUER HOLDINGS, INC., *et al.*,[1] | Case No. 09-12099 (____) |
| Debtors. | Joint Administration Pending |

**EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 362, 363 AND 364; (II) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363; (III) GRANTING LIENS AND SUPERPRIORITY CLAIMS; (IV) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES PURSUANT TO 11 U.S.C. § 361, 362, 363 AND 364; AND (V) SCHEDULING FINAL HEARING ON THE DEBTORS' MOTION TO INCUR SUCH FINANCING ON A PERMANENT BASIS PURSUANT TO BANKRUPTCY RULE 4001**

The above-captioned debtors and debtors-in-possession (collectively the "**Debtors**"), hereby move this Court (the "**Motion**") for entry of an interim and, subject to final approval, a final order in substantially the form attached hereto as <u>Exhibit A</u> (the "**Interim Order**" and, subject to final approval, the "**Final Order**"):[2]

    (i)    Authorizing the Debtors to obtain credit and incur debt pursuant to Sections 105, 363 and 364 of the Bankruptcy Code in accordance with that certain Senior Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement,

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Eddie Bauer Holdings, Inc., a Delaware corporation (2352); Eddie Bauer, Inc., a Delaware corporation (9737); Eddie Bauer Fulfillment Services, Inc., a Delaware corporation (0882); Eddie Bauer Diversified Sales, LLC, a Delaware limited liability company (1567); Eddie Bauer Services, LLC, an Ohio limited liability company (disregarded), Eddie Bauer International Development, LLC, a Delaware limited liability company (1571); Eddie Bauer Information Technology, LLC, a Delaware limited liability company (disregarded); Financial Services Acceptance Corporation, a Delaware corporation (7532); and Spiegel Acceptance Corporation, a Delaware corporation (7253). The mailing address for Eddie Bauer Holdings, Inc. is 10401 N.E. 8th Street, Suite 500, Bellevue, WA 98004. On or about the Petition Date, Eddie Bauer of Canada, Inc. and Eddie Bauer Customer Services, Inc., affiliates of the Debtors, commenced a proceeding before the Superior Court of Justice, Commercial List, for the Judicial District of Ontario, for a plan of compromise or arrangement under the Companies' Creditors Arrangement Act.

[2]     The facts and circumstances supporting this Motion are set forth in the Declaration of Marvin Edward Toland of Eddie Bauer Holdings, Inc., in Support of First Day Motions (the "**First Day Declaration**") filed contemporaneously herewith.

substantially in the form attached as Exhibit B to the Motion (as may be amended, modified or supplemented, the "**DIP Credit Agreement**"), among the Debtors, Bank of America, N.A., as agent (in its capacity as agent, together with any successor in such capacity, the "**DIP Agent**") for the Lenders (as defined in the DIP Credit Agreement, the "**DIP Lenders**"), Banc of America Securities LLC, as sole lead arranger and book manager, Bank of America, N.A. and The CIT Group/Business Credit, Inc., as co-syndication agents, General Electric Capital Corporation and The CIT Group/Business Credit, Inc., as co-collateral agents (in such capacity, the "**Co-Collateral Agents**") and General Electric Capital Corporation as documentation agent (the DIP Agent, the DIP Lenders, and the Co-Collateral Agents, collectively, the "**DIP Secured Parties**"), subject to the terms and conditions set forth herein;

(ii)    Granting first priority, valid, priming, perfected and enforceable liens (as defined in Section 101(37) of the Bankruptcy Code) [3] and superpriority claims to the DIP Agent, for the benefit of itself and the other DIP Lenders, against all property of the Debtors' estates pursuant to Sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code, and with priority, as to administrative expenses, as provided in Section 364(c)(1) of the Bankruptcy Code;

(iii)    Authorizing the Debtors to use "cash collateral" as the term is defined Section 363(a) of the Bankruptcy Code and, pursuant to Sections 361 and 363 of the Bankruptcy Code, grant security interests, mortgages and other liens and superpriority claims in order to provide adequate protection to the Pre-Petition Agents (as defined below) for the benefit of the Pre-Petition Lenders;

(iv)    Modifying the automatic stay under Section 362 of the Bankruptcy Code to the extent necessary to implement and enforce the terms and provisions of the DIP Credit Agreement and this Interim Order; and

(v)    Scheduling a final hearing for entry of the Final Order granting the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing (as defined below) pursuant to Rules 2002, 4001 and 9014 of the Bankruptcy Rules.

### CONCISE STATEMENT UNDER BANKRUPTCY RULE 4001

1.    By this Motion, the Debtors seek entry of the Interim and Final Order: (I) (a) authorizing the Debtors to enter into the DIP Credit Agreement, in substantially the form annexed hereto as Exhibit B, and any and all other documents contemplated thereby (the "**DIP Documents**") with the DIP Agents and the DIP Lenders, which provides for maximum aggregate

---

[3] The DIP Liens are junior to Permitted Priority Liens (defined below) and Pre-Petition Term Liens (defined below) on all Term Lender Priority Collateral (defined below).

borrowing in an interim amount of $90,000,000 and a final amount of $100,000,000 (the "**DIP Facility**"), (b) authorizing the Debtors to enter into, execute and perform under the DIP Documents, (c) authorizing the "roll-up" of all Pre-Petition Obligations owed to the Pre-Petition Revolving Lenders into DIP Obligations upon entry of a Final Order and upon entry of the Interim Order, the application of proceeds of post-petition collateral to pre-petition indebtedness (the "**Roll-Up Provisions**" or the "**Roll-Up**"), (d) authorizing the Debtors to use the Cash Collateral and any other Pre-Petition Collateral of the Pre-Prepetition Secured Parties, (e) providing the Pre-Petition Secured Parties adequate protection with respect to their interests in the Pre-Petition Collateral, (f) approving certain stipulations of the Debtors with respect to the Pre-Petition Revolving Credit Agreement, and the Pre-Petition Term Loan Credit Agreement (collectively, the "**Pre-Petition Credit Agreements**") and the Pre-Petition Obligations (defined below), and (g) authorizing the waiver of the Debtors' rights under section 506(c) upon entry of the Final Order; (II) scheduling a final hearing on the Motion ("**Final Hearing**") pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"); and (III) granting related relief.

2.     The attached form of the Interim Order is premised upon an agreement with the Pre-Petition Term Lenders (defined below). In the event that the Pre-Petition Term Lenders do not agree with the terms of the attached Interim Order, the Debtors reserve the right to (i) remove all adequate protection being provided to the Pre-Petition Term Lenders other than the junior replacement liens to which they are entitled under the Intercreditor Agreement (defined below) and (ii) seek to use cash collateral without the consent of the Pre-Petition Term Lenders.

## A. The DIP Facility[4]

| Term | Summary | Provision in Relevant Document(s) |
|---|---|---|
| The Borrower | Eddie Bauer, Inc. | Interim Order: Introductory paragraph (ii) |
| Agent/Lenders | Bank of America, N.A., as agent for the Lenders, Banc of America Securities LLC, as sole lead arranger and book manager, Bank of America, N.A. and The CIT Group/Business Credit, Inc., as co-syndication agents, General Electric Capital Corporation and The CIT Group/Business Credit, Inc., as co-collateral agents and General Electric Capital Corporation as documentation agent | Interim Order: Introductory paragraph (ii) |
| Size of Facility | Up to $90,000,000 on an interim basis and up to a maximum committed amount of $100,000,000.00 upon entry of the Final Order. | Interim Order: Introductory paragraph (i), ¶ 2(b) |
| Use of Proceeds/Roll-Up Provisions | The proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Credit Agreement) shall be used, in each case in a manner consistent with the terms and conditions of the DIP Credit Agreement, and in accordance with the Budget[5] for (a) working capital and general corporate purposes, (b) payment of costs of administration of the Cases, (c) upon entry of the Interim Order, the deemed re-issuance of all pre-petition Letters of Credit previously issued under the Pre-Petition Revolving Credit Agreement so as to be issued under the DIP Credit Agreement, and (d) upon entry of the Final Order, payment in full in cash of the Pre-Petition Revolving Obligations. | Interim Order: Introductory paragraph (ii), ¶¶ G, 2(c) |
| Application of Proceeds | Subject to prior application to the Carve-Out upon post-default sales or upon the 363 Sale, all proceeds of the sale or other disposition of the Collateral shall be applied first, to permanently reduce the Pre-Petition Obligations, second, to fund $250,000 to the pre-petition revolving lenders indemnity account and $250,000 to the pre-petition term lenders | Interim Order: ¶ H |

---

[4]    The terms and conditions of the DIP Credit Agreement set forth in this Motion are intended solely for informational purposes to provide the Court and interested parties with a brief overview of the significant terms thereof and should only be relied upon as such. For a complete description of the terms and conditions of the DIP Credit Agreement, reference should be made to the DIP Credit Agreement (as defined herein) and the Interim Order. The summary herein is qualified in its entirety by reference to such documents. Parties are strongly encouraged to read the operative documents. In the event there is a conflict or inconsistency between this Motion and the operative documents, the operative documents shall control in all respects. Unless otherwise defined herein, capitalized terms used in this summary shall have the meanings ascribed to them in the Interim Order or the DIP Credit Agreement, as applicable.

[5]    A copy of the Budget is attached to the Interim Order as Exhibit 1.

| Term | Summary | Provision in Relevant Document(s) |
|------|---------|-----------------------------------|
| | indemnity account and <u>third</u>, to reduce the DIP Obligations, each in accordance with the terms and conditions of the Pre-Petition Revolving Credit Agreement, the Pre-Petition Term Credit Agreement, the Intercreditor Agreement, the DIP Credit Agreement, to the extent applicable, and the Interim Order. | |
| Term/Maturity Date | The DIP Facility terminates on the earliest of (i) thirty (30) days following the entry of the Interim Order, unless the Final Order has been entered on or before such date, (ii) the date of the consummation of a sale of all or substantially all of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code; (iii) January 31, 2010; (iv) termination of the DIP Facility by either the Borrower or the Lenders in accordance with the DIP Credit Agreement; (v) the date of substantial consummation of a plan of reorganization; or (vi) the date the DIP Credit Agreement is otherwise terminated pursuant to its terms. | Interim Order: ¶ 2(b); DIP Credit Agreement ("Termination Date" definition) |
| Interest Rate | All outstanding Obligations shall bear interest on the unpaid principal amount thereof from the date made until paid in full in cash at a fluctuating per annum rate equal to the Base Rate <u>plus</u> the Applicable Margin, but not to exceed the Maximum Rate.<br><br>"Base Rate" means for any day a fluctuating rate per annum equal to the highest of (a) the rate of interest in effect for such day as publicly announced from time to time by Bank of America, N.A. as its "prime rate"; (b) the Federal Funds Rate for such day, plus 0.50%; and (c) the LIBO Rate for a 30 day interest period as determined on such day, plus 1.0%.<br><br>"Applicable Margin" means, (a) with respect to the Base Rate Loans, 3.00%, and (b) with respect to the Letter of Credit Fee, 4.00%.<br><br>"Maximum Rate" means the maximum rate legally chargeable by the Lender under applicable law for loans of the type provided in Section 3.3 of the DIP Credit Agreement. | DIP Credit Agreement: § 3.1; 3.3. |
| Liens/Security | The DIP Secured Parties will be granted (i) priming first priority, continuing, valid, binding, enforceable, non-avoidable and automatically perfected post-petition security interests and liens, senior and superior in priority to all other secured and unsecured creditors of the Debtors' estates except for the Carve-Out, the Permitted Prior Liens and as otherwise provided in the Interim and Final Orders on all Revolving Lender Priority Collateral; and (ii) priming priority, continuing, valid, binding, enforceable, non-avoidable and automatically perfected post-petition security interests and liens senior and superior in priority to the Pre-Petition Revolving Liens and unsecured creditors of the Debtors' | Interim Order: ¶ 2(e) |

| Term | Summary | Provision in Relevant Document(s) |
|------|---------|-----------------------------------|
| | estates, but junior to the Pre-Petition Term Liens, whether or not fully perfected, except as provided in the Interim and Final Order on all Term Lender Priority Collateral, upon and to all presently owned and hereafter acquired assets and real and personal property of the Debtors. | |
| | Subject to the Carve-Out, the Pre-Petition Term Lien Priority Claims, and the rights afforded certain parties under the Interim Order, all DIP Obligations shall be an allowed superpriority administrative expense claim with priority under the applicable provisions of the Bankruptcy Code, and otherwise over all administrative expense claims and unsecured claims against the Debtors or their estates. | |
| Adequate Protection | The Pre-Petition Revolving Agent will receive, subject in each case to the Intercreditor Agreement: (1) Revolving Lien Adequate Protection Payments, (2) the Pre-Petition Replacement Revolving Liens, (3) the Pre-Petition Revolving Lien Superpriority Claim, and (4) the Pre-Petition Revolving Indemnity Account. | Interim Order: ¶ 4 |
| | The Pre-Petition Term Agent will receive, subject in each case to the Intercreditor Agreement: (1) Term Lien Adequate Protection Payments, (2) the Pre-Petition Replacement Term Liens, (3) the Pre-Petition Term Lien Superpriority Claim, and (4) the Pre-Petition Term Lien Indemnity Account. | |
| Fees | Unused Line Fee: The Borrower agrees to pay to the Agent, for the ratable account of the Lenders, an unused line fee equal to 1.00% per annum on the amount by which the average daily Maximum Revolver Amount exceeds the sum of the average daily outstanding amount of Pre-Petition Liabilities, the average daily outstanding amount of Revolving Loans, the average daily aggregate undrawn face amount of all outstanding Letters of Credit, plus the average daily aggregate amount of any unpaid reimbursement Obligations in respect of Letters of Credit, during the immediately preceding month o shorter period if calculated on the Termination Date. | DIP Credit Agreement: §§ 3.4, 3.5, 3.6, 3.7 |
| | Letter of Credit Fee: The Borrower agrees to pay to the Agent, for the ratable account of the Lenders, for each Letter of Credit, a fee equal to the Applicable Margin for Letters of Credit for the average daily outstanding undrawn face amount of such Letter of Credit, plus all costs, fees and expenses incurred by the Agent in connection with such Letter of Credit, which costs, fees and expenses will also include a "fronting fee" of 25 basis points times the face amount of such Letter of Credit. | |
| | Upfront Fee: The Borrower shall pay to the Agent on the Closing Date, for the ratable account of the Lenders, a fee in | |

| Term | Summary | Provision in Relevant Document(s) |
|------|---------|-----------------------------------|
| | an amount equal to 2.25% of the aggregate amount of the Commitments.<br><br>Structuring Fee: The Borrower shall pay to the Agent on the Closing Date, for the account of the Agent, a fee in an amount equal to 0.50% of the Maximum Revolver Amount. | |
| Carve-Out | "Carve-Out" means: (i) allowed administrative expenses pursuant to 28 U.S.C. Section 1930(a)(6); (ii) the sum of (A) and (B), where (A) is the lesser of (I) the aggregate amount of the Debtors' professional fees and disbursements which have been incurred, accrued, or invoiced (but remain unpaid) by the Debtors prior to the date on which the DIP Agent provides written notice that an Event of Default has occurred and the DIP Agent has triggered the Carve-Out (a "**Carve Out Trigger Notice**") (the "**Reported Professional Fees**") for any professional retained by a final order of the Court under Section 327 of the Bankruptcy Code (which order has not been vacated, stayed, or appealed), or (II) the cumulative amount set forth in the Budget for professional fees of the Debtors' professionals for the period from the Petition Date through the earlier of the Termination Date or the date of receipt by the Debtors and the Debtors' counsel of a Carve-Out Trigger Notice, and (B) is $4,250,000; and (iii) the sum of (A) and (B) where (A) is the lesser of (I) the Reported Professionals Fees of the Creditors' Committee's professionals incurred by the Creditors' Committee for any professional retained by a final order of the Court by the Creditors' Committee under Section 1103 of the Bankruptcy Code (which order has not been vacated, stayed, or appealed), or (II) the cumulative amount set for the in the Budget for professional fees of the Creditors' Committee professionals for the period from the Petition Date through the earlier of the Termination Date or the receipt by the Creditors' Committee's counsel of a Carve-Out Trigger Notice; and (B) is $750,000. For the avoidance of any doubt, no success fee, transaction fee, or bonus due incurred by Peter J. Solomon Company, L.P., the Debtors' investment banker, or any financial advisor retained by the Creditors' Committee, shall be paid from the Carve-Out unless and until all other allowed hourly and monthly professional fees and disbursement have been paid in full in cash on a final basis. | Interim Order: ¶ 8 |

| Term | Summary | Provision in Relevant Document(s) |
|---|---|---|
| 506(c) Waiver | Subject to the entry of a Final Order, no costs or expenses of administration which have been or may be incurred in the Cases at any time shall be charged against the DIP Secured Parties, the Pre-Petition Secured Parties, their respective claims, the Pre-Petition Collateral, or the DIP Collateral, pursuant to Sections 105, and 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the Agents. Nothing contained in this Interim Order shall be deemed a consent by the Pre-Petition Secured Parties or the DIP Secured Parties to any charge, lien, assessment, claim or other Encumbrance against the DIP Collateral, the Pre-Petition Collateral, the Pre-Petition Indemnity Accounts or the Pre-Petition Replacement Liens under Section 506(c) of the Bankruptcy Code or otherwise. | Interim Order: ¶ 10 |
| Release, waiver, or limitation on claims or other causes of action belonging to the estate or the trustee | The Creditors' Committee must commence a contested matter or adversary proceeding objecting to or challenging the Debtors' Stipulations and the Court's findings set forth in the Interim and Final Orders by the date that is sixty (60) days following the appointment of the Creditors' Committee, or any and all such challenges and objections by any party (including, without limitation, the Creditors' Committee, any Chapter 11 or Chapter 7 trustee appointed here or in any Successor Cases, receiver, administrator, trustee, examiner with expanded powers, responsible officer, other estate representative and any other creditor, interest holder, or party in interest) shall be deemed forever waived and barred. | Interim Order: ¶ 7 |

**B.      Pre-Petition Secured Parties' Adequate Protection**

3.      As set forth in Paragraph 4 of the Interim Order, the Debtors propose providing the following adequate protection to the Pre-Petition Secured Parties for the Debtors' usage of their cash collateral (collectively, the "**Adequate Protection Package**").      As adequate protection, the Pre-Petition Revolving Agent will receive, subject in each case to the Intercreditor Agreement: (1) Revolving Lien Adequate Protection Payments, (2) the Pre-Petition Replacement Revolving Liens, (3) the Pre-Petition Revolving Lien Superpriority Claim, and (4) the Pre-Petition Revolving Indemnity Account.      As adequate protection, the Pre-Petition Term Agent will receive, subject in each case to the Intercreditor Agreement: (1) Term Lien Adequate

Protection Payments, (2) the Pre-Petition Replacement Term Liens, (3) the Pre-Petition Term Lien Superpriority Claim; and (4) the Pre-Petition Term Lien Indemnity Account.

## JURISDICTION

4.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

5.      The statutory bases for the relief requested herein are Sections 105, 361, 362, 363, and 364(c), (d)(1) and (e) of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (the "**Bankruptcy Code**"), and Rules 2002 and 4001 of the Bankruptcy Rules.

## BACKGROUND

6.      On the date hereof (the "**Petition Date**"), the Debtors commenced these above-captioned cases (the "**Chapter 11 Cases**") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  Pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are operating their businesses and managing their affairs as debtors-in-possession.  As of the date hereof, no creditors' committee, trustee or examiner has been appointed in any of these Chapter 11 Cases.

7.      Despite these efforts, it has recently become clear that the Debtors do not have sufficient liquidity to survive the current economic downturn in their current state.  As a result, the Debtors contacted Peter J. Solomon Company ("**PJS**") on December 8, 2008 to act as investment bankers for the Debtors to assist the Debtors in exploring possible sale transactions. PJS contacted approximately fifty-five (55) potential financial and strategic counterparties, and after an intense, expedited marketing period the Debtors determined that the highest and best offer presently available to the Debtors was an offer from Rainier Holdings LLC (the "**Stalking**

Horse Bidder") to serve as a stalking horse bidder in a sale of substantially all of the Debtors' assets under Section 363 of the Bankruptcy Code. On or about June 17, 2009, the Debtors entered into a binding asset purchase agreement (the "**APA**") with the Stalking Horse Bidder for the purchase of substantially all of the Debtors' assets for approximately $202 million in cash, plus the assumption of certain liabilities. Subject to the approval of this Court, the Debtors have obtained the DIP Facility, which the Debtors believe will provide the Debtors with sufficient liquidity through the above-described sale process.

### PREPETITION CAPITAL STRUCTURE

8.       As of the Petition Date, the aggregate amount of approximately $328,500,000 was due and owing in respect to loans and other financial accommodations made by the Pre-Petition Revolving Lenders and Pre-Petition Term Lenders (the "**Prepetition Indebtedness**"). The major components of the Debtor's consolidated funded debt obligations are described in greater detail below.

**C.       Senior Secured Revolving Credit Facility**

9.       Prior to the Petition Date, the Debtors entered into a certain Loan and Security Agreement, dated June 21, 2005 (as amended and in effect, the "**Pre-Petition Revolving Credit Agreement**") by and among, among others, Eddie Bauer, Inc., as borrower, the other Debtors, as guarantors, Bank of America, N.A., as Agent (in such capacity, the "**Pre-Petition Revolving Agent**") for certain "Lenders" (as defined therein) (the "**Pre-Petition Revolving Lenders**", and together with the Pre-Petition Revolving Agent, collectively, the "**Pre-Petition Revolving Secured Parties**") pursuant to which the Pre-Petition Revolving Secured Parties extended a working capital facility providing for revolving credit loans, letters of credit and other financial accommodations and services.

10.    As of the Petition Date, Eddie Bauer, Inc. was indebted to the Pre-Petition Revolving Secured Parties in the approximate principal sum of $41,550,999.99 in "Revolving Loans" (as defined in the Pre-Petition Revolving Credit Agreement), issued and outstanding "Letters of Credit" (as defined in the Pre-Petition Revolving Credit Agreement) in the amount of $9,689,362.11, together with all other financial accommodations or services (including, without limitation, any obligations relating to "Bank Products" (as defined in the Pre-Petition Revolving Credit Agreement) provided by the Pre-Petition Revolving Secured Parties or their affiliates), accrued interest, costs, fees, reimbursement obligations, Attorney Costs (as defined in the Pre-Petition Revolving Credit Agreement) and other professional fees and expenses, and all other "Obligations" (as defined in the Pre-Petition Revolving Credit Agreement) (collectively, hereinafter the "**Pre-Petition Revolving Obligations**").

11.    To secure the Pre-Petition Revolving Obligations, the Debtors granted security interests in and first priority Liens (as defined in the Pre-Petition Revolving Credit Agreement) (collectively, the "**Pre-Petition Revolving Liens**") on, among other assets, the Debtors' inventory and certain accounts receivable balances (and assets related thereto) (collectively, the "**Pre-Petition Revolving First Lien Collateral**") and a second priority lien on substantially all of the Debtors' other assets other than the Groveport, Ohio distribution facility (collectively, the "**Pre-Petition Revolving Second Lien Collateral**", and together with the Pre-Petition Revolving First Lien Collateral and any other collateral covered by the Pre-Petition Revolving Liens, collectively, the "**Pre-Petition Revolving Collateral**").

**D.    Senior Secured Term Credit Facility**

12.    Prior to the Petition Date, the Debtors entered into a certain Amended and Restated Term Loan Agreement, dated as of June 21, 2005 and as amended and restated on April 4, 2007 (as amended by that certain First Amendment, dated as of April 2, 2009, and as further

amended and in effect, the "**Pre-Petition Term Credit Agreement**") by and among, among others, Eddie Bauer, Inc., as borrower, Eddie Bauer Holdings, Inc., Wilmington Trust FSB (as successor by assignment to JPMorgan Chase Bank, N.A.), as Agent (in such capacity, the "**Pre-Petition Term Agent**", and together with the Pre-Petition Revolving Agent, collectively, the "**Pre-Petition Agents**") for certain "Lenders" (as defined therein) (together with the Pre-Petition Term Agent, collectively, the "**Pre-Petition Term Secured Parties**", and together with the Pre-Petition Revolving Secured Parties, collectively, the "**Pre-Petition Secured Parties**") pursuant to which the Pre-Petition Term Secured Parties provided a term loan to the Debtors.

13.     As of the Petition Date, Eddie Bauer, Inc. was indebted to the Pre-Petition Term Secured Parties in the approximate sum of $191,404,503.59, together with all other financial accommodations or services, costs, fees, and professional fees and expenses, and all other "Obligations" (as defined in the Pre-Petition Term Credit Agreement) (collectively, hereinafter the "**Pre-Petition Term Obligations**", and together with the Pre-Petition Revolving Obligations, collectively, the "**Pre-Petition Obligations**").

14.     Pursuant to a certain Amended and Restated Guarantee and Collateral Agreement dated as of June 21, 2005 and as amended and restated as of April 4, 2007 (as amended and in effect, the "**Pre-Petition Term Loan Security Agreement**"), to secure the Pre-Petition Term Obligations, the Debtors granted security interests and first priority Liens (as defined in the Pre-Petition Term Credit Agreement) (collectively, the "**Pre-Petition Term Liens**", and together with the Pre-Petition Revolving Liens, collectively, the "**Pre-Petition Liens**") to the Pre-Petition Term Secured Parties on certain real estate assets, equipment, general intangibles, capital stock, and intellectual property (collectively, the "**Pre-Petition Term First Lien Collateral**") and second priority Liens on substantially all of the other assets of the Debtors (collectively, the

"**Pre-Petition Term Second Lien Collateral**", and together with the Pre-Petition Term First Lien Collateral and any other collateral covered by the Pre-Petition Term Liens, collectively, the "**Pre-Petition Term Collateral**" (together with the Pre-Petition Revolving Collateral, hereinafter the "**Pre-Petition Collateral**")).

### E.    Intercreditor Agreement

15.    Prior to the Petition Date, the Pre-Petition Revolving Agent and the Pre-Petition Term Agent entered into that certain Intercreditor Agreement, dated June 21, 2005 (as amended and in effect, the "**Intercreditor Agreement**"), which governs the respective rights, interests, obligations, priority, and the positions of the Pre-Petition Revolving Secured Parties and Pre-Petition Term Secured Parties with respect to, among other things, the assets and properties of the Debtors.  Pursuant to the Intercreditor Agreement, and except as set forth therein, among other things, (a) the Pre-Petition Revolving Liens on the Pre-Petition Revolving First Lien Collateral are senior and prior in right to the Pre-Petition Term Liens on the Pre-Petition Term Second Lien Collateral, (b) the Pre-Petition Term Liens on the Pre-Petition Term First Lien Collateral are senior and prior in right to the Pre-Petition Revolving Liens on the Pre-Petition Revolving Second Lien Collateral, and (c) the Pre-Petition Revolving Liens and the Pre-Petition Term Liens are ratable in priority in respect of any collateral not constituting Pre-Petition Revolving First Lien Collateral, Pre-Petition Revolving Second Lien Collateral, constituting Pre-Petition Term First Lien Collateral or Pre-Petition Term Second Lien Collateral, in each case as provided therein.

### F.    Convertible Senior Unsecured 5.25% Notes Due 2014

16.    In addition, on April 4, 2007, Eddie Bauer Holdings, Inc. completed an offer of a $75 million aggregate principal amount, 5.25% convertible senior notes ("**Convertible Notes**"). The Convertible Notes have a maturity date of April 1, 2014 and pay interest at an annual rate of

5.25% semiannually in arrears on April 1 and October 1 of each year, beginning October 1, 2007 unless earlier redeemed, repurchased or converted.

17.     The Convertible Notes are fully and unconditionally guaranteed by all of Eddie Bauer Holdings, Inc.'s existing and future subsidiaries that are parties to any domestic credit facilities, whether as a borrower, co-borrower or guarantor, including Eddie Bauer, Inc. The Convertible Notes are unsecured and senior obligations of the Eddie Bauer Holdings, Inc. and rank equally in right of payment with all existing and future senior unsecured indebtedness and senior in right of payment to any subordinated indebtedness.

18.     Under the indenture governing the Convertible Notes (the "**Indenture**"), the Convertible Notes may be converted to stock or cash depending on when they are converted. The Convertible Notes were not convertible prior to January 4, 2009 except upon the occurrence of specified corporate transactions. Subsequent to January 4, 2009 and prior to April 1, 2013, holders may convert all or a portion of their Convertible Notes under certain circumstances identified in the Indenture. The initial conversion rate, which is subject to adjustment, for the Convertible Notes was 73.8007 shares per $1,000 principal amount of Convertible Notes (which represented an initial conversion price of approximately $13.55 per share).

IMMEDIATE NEED FOR FINANCING AND USE OF CASH COLLATERAL

19.     The Debtors' obligations to the Pre-Petition Secured Parties are secured by perfected first priority liens and security interests in substantially all of the personal property of the Debtors, including cash collateral (but subject to the intercreditor arrangements entered into by and among the Pre-Petition Secured Parties). Thus, the Debtors do not have any unencumbered cash with which to operate their businesses. Moreover, the Pre-Petition Secured Parties under the Pre-Petition Credit Agreements were unwilling to lend additional funds to the Debtors in excess of the amounts outstanding under the Pre-Petition Credit Agreements. At this

time, the Debtors have an immediate need for additional liquidity, without which they would be unable to operate their businesses. Although the use of cash collateral is necessary to the operation of the Debtors' businesses, the use of cash collateral alone is insufficient to operate the Debtors' businesses successfully. Therefore, the Debtors also have an immediate need for additional liquidity, which could only be obtained through entry into a secured debtor in possession financing facility.

## RELIEF REQUESTED

20. By this Motion, the Debtors request entry of the Interim Order and the Final Order authorizing the Debtors to:

a. obtain credit and incur debt pursuant to Sections 363, 364(c) and 364(d) of the Bankruptcy Code, on an interim basis for a period up to a maximum amount of $90,000,000 on an interim basis, and up to a maximum committed amount of $100,000,000.00 upon entry of the Final Order secured by first priority, valid, priming, perfected and enforceable liens (as defined in Section 101(37) of the Bankruptcy Code on property of the Debtors' estates pursuant to Sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, and with priority, as to administrative expenses, as provided in Section 364(c)(1) of the Bankruptcy Code.

b. establish the DIP Facility and use of the proceeds of the DIP Facility (net of any amounts used to pay fees, costs, and expenses under the DIP Credit Agreement) in a manner consistent with the terms and conditions of the DIP Credit Agreement and in accordance with the Budget solely for (1) general corporate purposes, (2) payment of costs of administration of the Cases (and certain pre-petition claims against the Debtors approved by the Bankruptcy Court), (3) upon entry of the Interim Order, the deemed re-issuance of all pre-petition "Letters of Credit" (as defined in the Pre-Petition Revolving Credit Agreement previously issued under the Pre-Petition Revolving Credit Agreement so as to be issued under the DIP Credit Agreement, and (4) upon entry of the Final Order, payment in full in cash of the Pre-Petition Revolving Obligations.

c. Grant, pursuant to Sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, to the DIP Agent priming first priority, continuing, valid, binding, enforceable, non-avoidable and automatically perfected post-petition security interests and liens, senior and superior in priority to all other secured and unsecured creditors of the Debtors' estates except as otherwise provided in the Interim Order and the Final Order, on all Revolving Lender Priority Collateral; and (ii) priming priority, continuing, valid, binding, enforceable, non-avoidable and automatically perfected post-petition security interests and liens senior and superior in priority to the Pre-Petition Revolving Liens and unsecured creditors of the Debtors' estates, but junior to the Pre-Petition Term Liens, whether or not fully perfected, except as provided in the Interim Order and the Final Order, on all Term Lender Priority Collateral upon and to all presently owned and hereafter acquired assets and real and personal property of the Debtors.

d. Grant, pursuant to Section 364(c)(1) of the Bankruptcy Code, the DIP Agent superpriority administrative claim status in respect of all DIP Obligations, subject only to the Carve-Out as provided herein.

e. Authorize the use of Cash Collateral in which the Pre-Petition Revolving Agent, the Pre-Petition Term Agent, and the other Pre-Petition Secured Parties have an interest.

f. (1) grant the Pre-Petition Revolving Agent Pre-Petition Replacement Revolving Liens and Pre-Petition Revolving Lien Superpriority Claims, to the extent of any diminution in the value of the Pre-Petition Revolving Agent's interest in the Pre-Petition Revolving Collateral as adequate protection for the granting of the DIP Liens to the DIP Agent, the use of Cash Collateral, the subordination to the Carve-Out, for the imposition of the automatic stay and for any decline in the market value of the collateral, (2) grant the Pre-Petition Term Agent Pre-Petition Replacement Term Liens and Pre-Petition Term Lien Superpriority Claims, to the extent of any diminution in the value of the Pre-Petition Term Agent's interest in the Pre-Petition Term Collateral as adequate protection for the granting of the DIP Liens to the DIP Agent, the use of Cash Collateral, the subordination to the Carve-Out, for the imposition of the automatic stay and for any decline in the market value of the collateral, (3) make the Adequate Protection Payments

and (4) establish the Pre-Petition Revolving Indemnity Account and the Pre-Petition Term Indemnity Account.

g.    Vacate and modify the automatic stay imposed by Section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Facility and the Interim Order.

h.    Schedule the Final Hearing to consider entry of the Final Order granting the relief requested in the DIP Motion on a final basis and approving the form of notice with respect to the Final Hearing.

i.    Waive any applicable stay (including under Rule 6004 of the Federal Rules of Bankruptcy Procedure) and provide for immediate effectiveness of this Interim Order.

### G.    Authorization to use Cash Collateral

21.    During the ordinary course of operations, the Debtors generate cash from the use of the Pre-Petition Collateral (the "**Cash Collateral**"). The Debtors need the use of Cash Collateral to maintain their assets, provide financial information, pay necessary employees, payroll taxes, inventory suppliers and other vendors, overhead, and other expenses necessary to maximize the value of the Debtors' assets. The Debtors need to supplement their use of Cash Collateral with the funding being provided by the DIP Facility to continue to operate their businesses and to maximize the value of their estates. As the DIP Facility is contingent upon the Debtors obtaining approval to use Cash Collateral, it is imperative that the Debtors obtain authority to use Cash Collateral subject to the terms of this Motion and the Interim Order and the Final Order (once entered). Accordingly, in order to obtain the financing under the DIP Facility and to avoid immediate and irreparable harm to the Debtors' business operations and their estates, the Debtors have the need for authority to continue to use Cash Collateral.

### H. Adequate Protection to the Pre-Petition Secured Parties

22.     To the extent that their interests in the Pre-Petition Collateral constitute valid and perfected security interests and liens as of the Petition Date, the Pre-Petition Secured Parties are entitled, pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their interest in the Pre-Petition Collateral, including the Cash Collateral. Accordingly, the Debtors have agreed, subject to this Court's approval, to provide the Pre-Petition Secured Parties with the Adequate Protection Package in order to obtain the Pre-Petition Secured Parties' consent to the use of Cash Collateral and the Pre-Petition Revolving Lenders' consent to have their liens primed by the DIP Liens (to the extent set forth in the Interim Order). The Pre-Petition Secured Parties have agreed to consent to the usage of their Cash Collateral on the condition that the Adequate Protection Package is approved.

### I. Local Rule 4001-2 Disclosures

23.     Local Rule 4001-2 requires the disclosure of certain provisions of the DIP Documents and Interim Order.  The following disclosures are intended to comply with the requirement of the Local Rules.

    a.  Local Rule 4001-2(a)(i)(A) requires the disclosure of provisions that grant cross-collateralization protection.  The Debtors' obligations to the Pre-Petition Lenders are subject to the Roll-Up Provisions, which provide for a gradual rollup of the Pre-Petition Obligations, and the conversion of the Pre-Petition Revolving Obligations to DIP Obligations upon the entry of the Final Order.

    b.  Local Rule 4001-2(a)(i)(B) requires the disclosure of provisions or findings of fact that bind the estate with respect to validity, amount, or perfection of liens or a waiver of claims, without first giving certain parties in interest an opportunity to conduct an investigation.  Paragraph D of the Interim Order contains stipulations with respect to the validity, amount, or perfection of liens held by the Pre-Petition Secured Parties (collectively, the "**Debtor Stipulations**").  (Interim Order, ¶ D.)  However,

Paragraph 7 provides that parties-in-interest, including the Creditors Committee, shall have sixty (60) days from the entry of the Interim Order to challenge the Debtors' Stipulations. (Interim Order, ¶ 7.)

c.    Local Rule 4001-2(a)(i)(C) requires disclosure of provisions that seek to waive, without notice, whatever rights the estate may have under section 506(c) of the Bankruptcy Code. The Interim Order does not provide for an immediate waiver of the Debtors' rights under section 506(c) of the Bankruptcy Code, therefore no disclosure is necessary. However, the Debtors highlight that the Interim Order does provide for a waiver of the Debtors' rights under section 506(c) of the Bankruptcy Code effective upon the entry of the Final Order. (Final Order, ¶ 33.)

d.    Local Rule 4001-2(a)(i)(D) requires disclosure of provisions that immediately grant the prepetition secured creditor liens on avoidance actions. The Pre-Petition Secured Parties are granted a lien upon all DIP Collateral (Interim Order ¶ E). While the DIP Liens do ultimately attach to the proceeds of Specified Bankruptcy Recoveries (as defined in the Interim Order) they do so solely to the extent (a) arising under Section 549 of the Bankruptcy Code, or (b) constituting proceeds of avoidance actions under Section 547 of the Bankruptcy Code to the extent necessary to reimburse the DIP Secured Parties for the amount that any Carve-Out under the DIP Credit Agreement funded the Borrower's expenses in investigating such actions, commencing such actions, and conducting the litigation and/or settlement discussions that resulted in the receipt of such proceeds, and any and all recoveries or proceeds of any such claims or causes of action. (Interim Order, ¶ 2(e)).

e.    Local Rule 4001-2(a)(i)(E) requires disclosure of provisions that use postpetition loans to repay prepetition debt. Subject to the prior payment of the Carve-Out upon a post-default disposition or the 363 Sale, all proceeds of the sale or other disposition of the Collateral shall be applied first, to permanently reduce the Pre-Petition Obligations, second, to fund $250,000 to the pre-petition revolving lenders indemnity account and $250,000 to the pre-petition term lenders indemnity account and third, to reduce the DIP Obligations, each in accordance with the terms and conditions of the Pre-Petition Revolving Credit Agreement, the Pre-Petition Term Credit Agreement, the Intercreditor

Agreement, the DIP Credit Agreement, to the extent applicable, and the Interim Order. (Interim Order, ¶ H).

f.   Local Rule 4001-2(a)(i)(F) requires disclosure of provisions that provide disparate treatment to professionals retained by the Creditors Committee from professionals retained by the Debtors. Neither the DIP Credit Agreement nor the proposed Interim Order provide for disparate treatment of the professionals retained by the Debtors and the Creditors Committee, respectively. (See Interim Order, ¶ 8).

g.   Finally, Local Rule 4001-2(a)(i)(G) requires disclosure of provisions that prime any secured liens without the consent of the lienholder. As discussed more fully herein, the Pre-Petition Revolving Lenders are consenting to any liens provided to the DIP Lenders priming their liens in exchange for the Pre-Petition Secured Parties' Adequate Protection Package. All other lienholders holding valid, perfected and unavoidable liens in existence immediately prior to the Petition Date (other than the Pre-Petition Liens) or valid and unavoidable liens in existence immediately prior to the Petition Date perfected in accordance with section 546(b) of the Bankruptcy Code are not primed by the DIP Liens ("**Permitted Prior Encumbrances**"); the DIP Liens are junior to such Permitted Priority Liens and the Pre-Petition Term Liens. (Interim Order, ¶ 2(e)).

24.   The foregoing provisions of the DIP Facility are all justified under the circumstances of these cases. First and foremost, the DIP Lenders would not agree to the DIP Credit Agreement and the Pre-Petition Secured Parties would not agree to the use of their Cash Collateral in accordance therewith and the Pre-Petition Revolving Lenders would not agree to the priming of their liens by the DIP Lenders without the inclusion of such terms. In addition, with respect to the Roll-Up, the Debtors determined in the exercise of their sound business judgment that agreeing to the Roll-Up was appropriate under the circumstances of these cases in light of the unavailability of other adequate financing alternatives on terms more favorable to the Debtors and for the reasons set forth more fully below. Accordingly, the facts and circumstances of these cases justify the inclusion of the terms that required disclosure under Local Rule 4001-2.

**J.      The DIP Facility Should Be Approved**

25.      The Debtors propose to obtain financing by providing security interests and liens as set forth above pursuant to Sections 364(c) and (d) of the Bankruptcy Code.  The statutory requirement for obtaining postpetition credit under Section 364(c) is a finding, made after notice and hearing, that the debtors are "unable to obtain unsecured credit allowable under Section 503(b)(1) of the [the Bankruptcy Code]." 11 U.S.C. § 364(c).  Indeed, Section 364(c) financing is appropriate when the debtor in possession is unable to obtain unsecured credit allowable as an ordinary administrative claim.  See In re Ames Dep't Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under Sections 364(a) and (b) of the Bankruptcy Code); In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under Section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

26.      Courts have articulated a three-part test to determine whether a debtor is entitled to financing under Section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

  a.      the debtor is unable to obtain unsecured credit under Section 364(b), i.e., by allowing a lender only an administrative claim;

  b.      the credit transaction is necessary to preserve the assets of the estate; and

  c.      the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re Ames Dep't Stores, 115 B.R. at 37-39.

27.     Pre-Petition, the Debtors endeavored to identify potential sources of postpetition financing. Based on discussions with potential lenders, the Debtors have determined that adequate postpetition financing on an unsecured basis or on a junior priority basis to the Pre-Petition Secured Parties is not available. Without postpetition financing, the Debtors would be unable to operate their businesses as a going concern, which would significantly impair the value of the Debtors' assets to the detriment of all creditor constituencies. Furthermore, by obtaining postpetition financing, the Debtors will be in a position to preserve and maximize the value of their assets for the benefit of all creditors. Finally, the terms of the DIP Facility are fair, reasonable and adequate given the Debtors' circumstances, all as more fully set forth below.

**K.    Approval of Priming Liens and Adequate Protection under Section 364(d)**

28.     If a debtor is unable to obtain credit under the provisions of Section 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming lien." 11 U.S.C. § 364(d). Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of postpetition debt secured by senior or "priming" liens, provides that the court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

    a.    the trustee is unable to obtain credit otherwise; and

    b.    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).

29.     The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis. See In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996). "Its application is left to the vagaries of each case . . . but its focus is protection of the secured

creditor from diminution in the value of its collateral during the reorganization process." Id. (quoting In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)). The Debtors have concluded that adequate alternative financing on terms more favorable than those being provided by the DIP Lenders under the DIP Credit Agreement is currently unobtainable. Moreover, the Pre-Petition Secured Parties advised the Debtors that they would not consent to the granting of senior or *pari passu* liens to a new third party debtor-in-possession lender.

30.     In accordance with Section 364(d) of the Bankruptcy Code, and consistent with the purposes underlying the provision of adequate protection, the proposed Interim Order provides the Pre-Petition Secured Parties with adequate protection as described in paragraph 3 above, including: (a) the adequate protection liens, (b) a claim under section 507(b) of the Bankruptcy Code, (c) the Roll-Up; (d) payment of pre- and postpetition interest on the Pre-Petition Obligations, and (e) the fees and expenses of the Pre-Petition Revolving Secured Parties' professionals. The Pre-Petition Secured Parties have consented provided that the relief requested herein is granted, including the grant of the Pre-Petition Secured Parties' Adequate Protection Package.

**L.     Use of Cash Collateral**

31.     Section 363 of the Bankruptcy Code governs the Debtors' use of property of the estates.[6] Section 363(c)(1) of the Bankruptcy Code provides that:

> If the business of the debtor is authorized to be operated under Section . . . 1108 . . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing,

---

[6]     Pursuant to Section 1107 of the Bankruptcy Code, a debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with Section 363 of the Bankruptcy Code. See 11 U.S.C. § 1107(a).

> and may use property of the estate in the ordinary course of
> business without notice or a hearing.

11 U.S.C. § 363(c)(1).

32.     Section 363(c)(2) of the Bankruptcy Code, however, provides an exception with

respect to "cash collateral" to the general grant of authority to use property of the estate in the

ordinary course set forth in section 363 of the Bankruptcy Code.   Specifically, a trustee or

debtor-in-possession may not use, sell, or lease "cash collateral" under subsection (c)(1) unless:

> a.     each entity that has an interest in such collateral consents;
>        or
>
> b.     the court, after notice and a hearing, authorizes such use,
>        sale, or lease in accordance with the provisions of this
>        section.

11 U.S.C. § 363(c)(2).

33.     The Debtors submit that, under the circumstances here, their request to use Cash

Collateral should be approved.   The Pre-Petition Secured Parties and the DIP Lenders have

consented to the use of Cash Collateral provided that the relief requested herein is granted.

Absent access to the usage of Cash Collateral, the Debtors' access to liquidity would be severely

limited, and the Debtors' efforts to preserve the value of their estates during these cases would be

impaired.

**M.     No Adequate Alternative to the DIP Facility is Currently Available**

34.     A debtor need only demonstrate "by a good faith effort that credit was not

available without" the protections afforded to potential lenders by sections 364(c) and (d) of the

Bankruptcy Code.  See In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986); see also In re

Plabell Rubber Prods., Inc., 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).

35.     Substantially all of the Debtors' assets are subject to the liens granted under the

various agreements among the Debtors and the Pre-Petition Secured Parties.   Because of the

extent of the Pre-Petition Secured Parties' secured claims, obtaining the financing needed by the Debtors as unsecured debt or debt which would be secured by liens junior to the liens of the Pre-Petition Secured Parties was not a realistic option.

36.     In the weeks prior to the commencement of these cases, the Debtors' financial advisors pursued efforts to find replacement financing that would also provide additional debtor-in-possession funding.  In that regard, they contacted potential lenders with the capability of providing a debtor-in-possession facility sufficient to fund these Chapter 11 Cases.  The Debtors determined that the instant DIP Facility was the best proposal, especially in light of the fact that any alternative facility would require the priming of the Pre-Petition Secured Parties, which would be on a non-consensual basis and, as a result, time consuming and costly.  Because the Pre-Petition Secured Parties would not consent to being primed by a third party lender and the Debtors decided not to seek to prime the Pre-Petition Secured Parties on a contested basis in light of the attendant risk and cost, the Debtors determined that the proposed debtor-in-possession financing with the DIP Lenders is the best financing option available to the Debtors under the circumstances.

37.     Accordingly, the Debtors have satisfied the requirement of Sections 364(c) and (d) of the Bankruptcy Code that alternative credit on more favorable terms was unavailable to the Debtors.

**N.     The DIP Credit Agreement Terms are Fair, Reasonable, and Appropriate**

38.     The proposed terms of the DIP Facility and the other DIP Documents are fair, reasonable, and adequate under the circumstances.  First and foremost, as discussed more fully above, the Debtors have made a concerted, good-faith effort to obtain credit on the most favorable terms that are available.  Although the Debtors contacted various alternate lending institutions, no other lender was willing to provide an adequate stand alone financing facility

absent the priming of the Pre-Petition Revolving Liens which would have been on a contested basis. Moreover, no lender was willing to provide financing sufficient to repay the Pre-Petition Obligations in full and provide additional liquidity sufficient for the Debtors to maximize the value of their assets in these cases. Against this backdrop, the Debtors carefully evaluated the proposed financing structure from the DIP Lenders, engaged in extensive negotiations with the DIP Lenders regarding the proposed terms, worked with their various advisors to obtain the best possible pricing from the DIP Lenders, and, eventually, agreed to the DIP Lenders' proposal as the proposal best suited to the Debtors' needs. Moreover, the terms and conditions of the DIP Facility were negotiated by the parties in good faith and at arm's length, and, as outlined above, were instituted for the purpose of enabling the Debtors to meet ongoing operational expenses while in chapter 11 while preserving and maximizing the value of the Debtors' estates.

39.     The proposed DIP Credit Agreement provides that the security interests and administrative expense claims granted to the DIP Lenders are subject to the Carve-Out. In In re Ames Dep't Stores, 115 B.R. 34 (Bankr. S.D.N.Y. 1990), the court found that such "carve-outs" are not only reasonable, but are necessary to ensure that official committees and the debtor's estate will be assured of the assistance of counsel. Id. at 40.

40.     Likewise, the various fees and charges required by the DIP Agent and the DIP Lenders under the DIP Credit Agreement are reasonable and appropriate under the circumstances. Indeed, courts routinely authorize similar lender incentives beyond the explicit liens and other rights specified in section 364 of the Bankruptcy Code. See, e.g., In re Defender Drug Stores, Inc., 145 B.R. 312, 316 (9th Cir. BAP 1992) (authorizing credit arrangement under section 364, including a lender "enhancement fee").

41.     Accordingly, the terms of the DIP Credit Agreement are fair, reasonable and adequate, and the DIP Agent and the DIP Lenders under the DIP Credit Agreement should be accorded the benefits of section 364(e) of the Bankruptcy Code in respect of such agreement.

**O.     Roll-up of the Pre-Petition Secured Obligations**

42.     The Debtors' agreement to the Roll-Up should be approved pursuant to Sections 363 and 105(a) of the Bankruptcy Code.  Section 363(b)(1) of the Bankruptcy Code provides, in relevant part: "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  In addition, Section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

43.     The proposed use, sale, or lease of property of the estate may be approved under Bankruptcy Code section 363(b) if it is supported by sound business justification.  See In re Montgomery Ward, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions").  Although established in the context of a proposed sale, the "business judgment" standard has been applied in non-sale situations.  See, e.g., Institutional Creditors of Continental Air Lines v. Continental Air Lines (In re Continental Air Lines), 780 F.2d 1223, 1226 (5th Cir. 1986) (court applied "business judgment" standard in context of proposed "use" of estate property).  Moreover, pursuant to Section 105, the Court has expansive equitable powers to fashion any order or decree which is in the interest of preserving or protecting the value of the Debtor's assets.  See, e.g., In re Chinichian, 784 F.2d 1440, 1443 (9th Cir. 1986).

44. As noted above, the Roll-Up is supported by sound business judgment as the Roll-Up will satisfy the Debtors' obligations to the Pre-Petition Secured Parties. In addition, it was a condition to the Pre-Petition Secured Parties' consent to use of Cash Collateral and the adequate protection provided for the priming of the Pre-Petition Revolving Lender's pre-petition liens by the DIP Lenders. Additionally, the DIP Lenders' liens extend to substantially the same collateral. Finally, the rights of the Creditors' Committee (as defined in the Interim Order) and other parties in interest to challenge the Pre-Petition Secured Parties' claims are not eliminated by the Roll-Up during the investigation period provided for under the proposed interim and final orders.

**P.    Interim Approval Should Be Granted**

45. Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fifteen (15) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates.

46. The Debtors request that the Court hold and conduct an interim hearing immediately to consider entry of the proposed Interim Order authorizing the Debtors from and after the entry of the Interim Order until the Final Hearing to borrow under the DIP Facility in an amount not less than $90,000,000. This relief will enable the Debtors to operate their businesses in a manner that will permit them to preserve and maximize value and therefore avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

## FINAL HEARING

47.     The Debtors further respectfully request that this Court schedule the Final Hearing and authorize them to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, by first-class mail upon (i) the United States Trustee for the District of Delaware; (ii) counsel to the DIP Agent; (iii) any known lienholders of the Debtors; (iv) the United States Internal Revenue Service; (v) counsel to the Creditors' Committee; (vi) any party who filed a request for notices in these Chapter 11 Cases prior to the date set forth in the Interim Order for service of notice of the Final Hearing or would otherwise be entitled to notice pursuant to Bankruptcy Rule 2002; (vi) counsel to administrative agent under the prepetition term loan facility; (vii) counsel to agent under the prepetition revolving credit facility; and (viii) counsel for the indenture trustee for the $75 million 5.25% convertible senior notes due 2014. The Debtors request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001 and Local Rule 2002-1.[7]

## NOTICE

48.     No trustee, examiner or creditors' committee has been appointed in the Chapter 11 Cases. The Debtors have provided notice of this Motion to: (a) the United States Trustee for the District of Delaware; (b) counsel to administrative agent under the prepetition term loan facility; (c) counsel to the steering committee for the prepetition term lenders; (d) counsel to agent under the prepetition revolving credit facility; (e) counsel for the indenture trustee for the $75 million 5.25% convertible senior notes due 2014 and (f) the creditors listed on the Debtors' consolidated list of 30 largest unsecured creditors, as filed with the chapter 11 petitions. In light

---

[7]     Local Rule 2002-1(b) provides that "[i]n cases under chapter 11, all motions . . . shall be served only upon counsel for the debtor, the United States Trustee, counsel for all official committees, all parties who file a request for service of notices pursuant to Fed. R. Bankr. P. 2002(i), and on any party whose rights are affected by the motion."

of the nature of the relief requested, the Debtors submit that no further notice is required or needed under the circumstances.

49.     A copy of the Motion is available on the Court's website: www.deb.uscourts.gov. Additional copies of the Motion are available on the website of the Debtors' proposed claims, noticing, soliciting and balloting agent, Kurtzman Carson Consultants, at www.kccllc.net/eddiebauer or can be requested by calling (866) 967-1781.

## No Prior Request

50.     No prior motion for the relief requested herein has been made to this Court or any other court.

WHEREFORE, the Debtors respectfully request that this Court enter the Interim Order, substantially in the form attached hereto as Exhibit A, (a) authorizing the Debtors to obtain postpetition secured and superpriority financing on an interim basis as set forth in the DIP Documents; (b) scheduling the Final Hearing; (c) approving the form and manner of notice of the Final Hearing; and (d) granting such other and further relief as this Court deems appropriate.

Dated:  June 17, 2009
Wilmington, Delaware

Respectfully Submitted,

_Kara Hammond Coyle_
Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

David S. Heller
Josef S. Athanas
LATHAM & WATKINS LLP
Sears Tower, Suite 5800
233 South Wacker Drive
Chicago, IL 60606
Telephone:  (312) 876-7700
Facsimile:   (312) 993-9767

-and-

Heather L. Fowler
LATHAM & WATKINS LLP
355 South Grand Avenue
Los Angeles, California 90071-1560
Telephone:  (213) 485-1234
Facsimile:   (213) 891-8763

PROPOSED ATTORNEYS FOR DEBTORS AND
DEBTORS-IN-POSSESSION

DB02:8315263.1                                                      068417.1001