## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| EDDIE BAUER HOLDINGS, INC., *et al.*,[1] | Case No. 09-12099 (_____) |
| Debtors. | Joint Administration Pending |

**EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 362, 363 AND 364; (II) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363; (III) GRANTING LIENS AND SUPERPRIORITY CLAIMS; (IV) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES PURSUANT TO 11 U.S.C. § 361, 362, 363 AND 364; AND (V) SCHEDULING FINAL HEARING ON THE DEBTORS' MOTION TO INCUR SUCH FINANCING ON A PERMANENT BASIS PURSUANT TO BANKRUPTCY RULE 4001**

The above-captioned debtors and debtors-in-possession (collectively the "**Debtors**"), hereby move this Court (the "**Motion**") for entry of an interim and, subject to final approval, a final order in substantially the form attached hereto as Exhibit A (the "**Interim Order**" and, subject to final approval, the "**Final Order**"):[2]

    (i)    Authorizing the Debtors to obtain credit and incur debt pursuant to Sections 105, 363 and 364 of the Bankruptcy Code in accordance with that certain Senior Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement,

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Eddie Bauer Holdings, Inc., a Delaware corporation (2352); Eddie Bauer, Inc., a Delaware corporation (9737); Eddie Bauer Fulfillment Services, Inc., a Delaware corporation (0882); Eddie Bauer Diversified Sales, LLC, a Delaware limited liability company (1567); Eddie Bauer Services, LLC, an Ohio limited liability company (disregarded), Eddie Bauer International Development, LLC, a Delaware limited liability company (1571); Eddie Bauer Information Technology, LLC, a Delaware limited liability company (disregarded); Financial Services Acceptance Corporation, a Delaware corporation (7532); and Spiegel Acceptance Corporation, a Delaware corporation (7253). The mailing address for Eddie Bauer Holdings, Inc. is 10401 N.E. 8th Street, Suite 500, Bellevue, WA 98004. On or about the Petition Date, Eddie Bauer of Canada, Inc. and Eddie Bauer Customer Services, Inc., affiliates of the Debtors, commenced a proceeding before the Superior Court of Justice, Commercial List, for the Judicial District of Ontario, for a plan of compromise or arrangement under the Companies' Creditors Arrangement Act.

[2]    The facts and circumstances supporting this Motion are set forth in the Declaration of Marvin Edward Toland of Eddie Bauer Holdings, Inc., in Support of First Day Motions (the "**First Day Declaration**") filed contemporaneously herewith.

        

substantially in the form attached as <u>Exhibit B</u> to the Motion (as may be amended, modified or supplemented, the "**DIP Credit Agreement**"), among the Debtors, Bank of America, N.A., as agent (in its capacity as agent, together with any successor in such capacity, the "**DIP Agent**") for the Lenders (as defined in the DIP Credit Agreement, the "**DIP Lenders**"), Banc of America Securities LLC, as sole lead arranger and book manager, Bank of America, N.A. and The CIT Group/Business Credit, Inc., as co-syndication agents, General Electric Capital Corporation and The CIT Group/Business Credit, Inc., as co-collateral agents (in such capacity, the "**Co-Collateral Agents**") and General Electric Capital Corporation as documentation agent (the DIP Agent, the DIP Lenders, and the Co-Collateral Agents, collectively, the "**DIP Secured Parties**"), subject to the terms and conditions set forth herein;

(ii)    Granting first priority, valid, priming, perfected and enforceable liens (as defined in Section 101(37) of the Bankruptcy Code) [3] and superpriority claims to the DIP Agent, for the benefit of itself and the other DIP Lenders, against all property of the Debtors' estates pursuant to Sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code, and with priority, as to administrative expenses, as provided in Section 364(c)(1) of the Bankruptcy Code;

(iii)    Authorizing the Debtors to use "cash collateral" as the term is defined Section 363(a) of the Bankruptcy Code and, pursuant to Sections 361 and 363 of the Bankruptcy Code, grant security interests, mortgages and other liens and superpriority claims in order to provide adequate protection to the Pre-Petition Agents (as defined below) for the benefit of the Pre-Petition Lenders;

(iv)    Modifying the automatic stay under Section 362 of the Bankruptcy Code to the extent necessary to implement and enforce the terms and provisions of the DIP Credit Agreement and this Interim Order; and

(v)    Scheduling a final hearing for entry of the Final Order granting the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing (as defined below) pursuant to Rules 2002, 4001 and 9014 of the Bankruptcy Rules.

<u>**CONCISE STATEMENT UNDER BANKRUPTCY RULE 4001**</u>

1.    By this Motion, the Debtors seek entry of the Interim and Final Order: (I) (a) authorizing the Debtors to enter into the DIP Credit Agreement, in substantially the form annexed hereto as <u>Exhibit B</u>, and any and all other documents contemplated thereby (the "**DIP Documents**") with the DIP Agents and the DIP Lenders, which provides for maximum aggregate

---

[3]    The DIP Liens are junior to Permitted Priority Liens (defined below) and Pre-Petition Term Liens (defined below) on all Term Lender Priority Collateral (defined below).

borrowing in an interim amount of $90,000,000 and a final amount of $100,000,000 (the "**DIP Facility**"), (b) authorizing the Debtors to enter into, execute and perform under the DIP Documents, (c) authorizing the "roll-up" of all Pre-Petition Obligations owed to the Pre-Petition Revolving Lenders into DIP Obligations upon entry of a Final Order and upon entry of the Interim Order, the application of proceeds of post-petition collateral to pre-petition indebtedness (the "**Roll-Up Provisions**" or the "**Roll-Up**"), (d) authorizing the Debtors to use the Cash Collateral and any other Pre-Petition Collateral of the Pre-Prepetition Secured Parties, (e) providing the Pre-Petition Secured Parties adequate protection with respect to their interests in the Pre-Petition Collateral, (f) approving certain stipulations of the Debtors with respect to the Pre-Petition Revolving Credit Agreement, and the Pre-Petition Term Loan Credit Agreement (collectively, the "**Pre-Petition Credit Agreements**") and the Pre-Petition Obligations (defined below), and (g) authorizing the waiver of the Debtors' rights under section 506(c) upon entry of the Final Order; (II) scheduling a final hearing on the Motion ("**Final Hearing**") pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"); and (III) granting related relief.

      2.     The attached form of the Interim Order is premised upon an agreement with the Pre-Petition Term Lenders (defined below). In the event that the Pre-Petition Term Lenders do not agree with the terms of the attached Interim Order, the Debtors reserve the right to (i) remove all adequate protection being provided to the Pre-Petition Term Lenders other than the junior replacement liens to which they are entitled under the Intercreditor Agreement (defined below) and (ii) seek to use cash collateral without the consent of the Pre-Petition Term Lenders.

## A. The DIP Facility[4]

| Term | Summary | Provision in Relevant Document(s) |
|---|---|---|
| The Borrower | Eddie Bauer, Inc. | Interim Order: Introductory paragraph (ii) |
| Agent/Lenders | Bank of America, N.A., as agent for the Lenders, Banc of America Securities LLC, as sole lead arranger and book manager, Bank of America, N.A. and The CIT Group/Business Credit, Inc., as co-syndication agents, General Electric Capital Corporation and The CIT Group/Business Credit, Inc., as co-collateral agents and General Electric Capital Corporation as documentation agent | Interim Order: Introductory paragraph (ii) |
| Size of Facility | Up to $90,000,000 on an interim basis and up to a maximum committed amount of $100,000,000.00 upon entry of the Final Order. | Interim Order: Introductory paragraph (i), ¶ 2(b) |
| Use of Proceeds/Roll-Up Provisions | The proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Credit Agreement) shall be used, in each case in a manner consistent with the terms and conditions of the DIP Credit Agreement, and in accordance with the Budget[5] for (a) working capital and general corporate purposes, (b) payment of costs of administration of the Cases, (c) upon entry of the Interim Order, the deemed re-issuance of all pre-petition Letters of Credit previously issued under the Pre-Petition Revolving Credit Agreement so as to be issued under the DIP Credit Agreement, and (d) upon entry of the Final Order, payment in full in cash of the Pre-Petition Revolving Obligations. | Interim Order: Introductory paragraph (ii), ¶¶ G, 2(c) |
| Application of Proceeds | Subject to prior application to the Carve-Out upon post-default sales or upon the 363 Sale, all proceeds of the sale or other disposition of the Collateral shall be applied <u>first</u>, to permanently reduce the Pre-Petition Obligations, <u>second</u>, to fund $250,000 to the pre-petition revolving lenders indemnity account and $250,000 to the pre-petition term lenders | Interim Order: ¶ H |

---

[4]     The terms and conditions of the DIP Credit Agreement set forth in this Motion are intended solely for informational purposes to provide the Court and interested parties with a brief overview of the significant terms thereof and should only be relied upon as such. For a complete description of the terms and conditions of the DIP Credit Agreement, reference should be made to the DIP Credit Agreement (as defined herein) and the Interim Order. The summary herein is qualified in its entirety by reference to such documents. Parties are strongly encouraged to read the operative documents. In the event there is a conflict or inconsistency between this Motion and the operative documents, the operative documents shall control in all respects. Unless otherwise defined herein, capitalized terms used in this summary shall have the meanings ascribed to them in the Interim Order or the DIP Credit Agreement, as applicable.

[5]     A copy of the Budget is attached to the Interim Order as Exhibit 1.

| Term | Summary | Provision in Relevant Document(s) |
|---|---|---|
| | indemnity account and <u>third</u>, to reduce the DIP Obligations, each in accordance with the terms and conditions of the Pre-Petition Revolving Credit Agreement, the Pre-Petition Term Credit Agreement, the Intercreditor Agreement, the DIP Credit Agreement, to the extent applicable, and the Interim Order. | |
| Term/Maturity Date | The DIP Facility terminates on the earliest of (i) thirty (30) days following the entry of the Interim Order, unless the Final Order has been entered on or before such date, (ii) the date of the consummation of a sale of all or substantially all of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code; (iii) January 31, 2010; (iv) termination of the DIP Facility by either the Borrower or the Lenders in accordance with the DIP Credit Agreement; (v) the date of substantial consummation of a plan of reorganization; or (vi) the date the DIP Credit Agreement is otherwise terminated pursuant to its terms. | Interim Order: ¶ 2(b); DIP Credit Agreement ("Termination Date" definition) |
| Interest Rate | All outstanding Obligations shall bear interest on the unpaid principal amount thereof from the date made until paid in full in cash at a fluctuating per annum rate equal to the Base Rate <u>plus</u> the Applicable Margin, but not to exceed the Maximum Rate.<br><br>"Base Rate" means for any day a fluctuating rate per annum equal to the highest of (a) the rate of interest in effect for such day as publicly announced from time to time by Bank of America, N.A. as its "prime rate"; (b) the Federal Funds Rate for such day, plus 0.50%; and (c) the LIBO Rate for a 30 day interest period as determined on such day, plus 1.0%.<br><br>"Applicable Margin" means, (a) with respect to the Base Rate Loans, 3.00%, and (b) with respect to the Letter of Credit Fee, 4.00%.<br><br>"Maximum Rate" means the maximum rate legally chargeable by the Lender under applicable law for loans of the type provided in Section 3.3 of the DIP Credit Agreement. | DIP Credit Agreement: § 3.1; 3.3. |
| Liens/Security | The DIP Secured Parties will be granted (i) priming first priority, continuing, valid, binding, enforceable, non-avoidable and automatically perfected post-petition security interests and liens, senior and superior in priority to all other secured and unsecured creditors of the Debtors' estates except for the Carve-Out, the Permitted Prior Liens and as otherwise provided in the Interim and Final Orders on all Revolving Lender Priority Collateral; and (ii) priming priority, continuing, valid, binding, enforceable, non-avoidable and automatically perfected post-petition security interests and liens senior and superior in priority to the Pre-Petition Revolving Liens and unsecured creditors of the Debtors' | Interim Order: ¶ 2(e) |

| Term | Summary | Provision in Relevant Document(s) |
|------|---------|-----------------------------------|
| | estates, but junior to the Pre-Petition Term Liens, whether or not fully perfected, except as provided in the Interim and Final Order on all Term Lender Priority Collateral, upon and to all presently owned and hereafter acquired assets and real and personal property of the Debtors. | |
| | Subject to the Carve-Out, the Pre-Petition Term Lien Priority Claims, and the rights afforded certain parties under the Interim Order, all DIP Obligations shall be an allowed superpriority administrative expense claim with priority under the applicable provisions of the Bankruptcy Code, and otherwise over all administrative expense claims and unsecured claims against the Debtors or their estates. | |
| Adequate Protection | The Pre-Petition Revolving Agent will receive, subject in each case to the Intercreditor Agreement: (1) Revolving Lien Adequate Protection Payments, (2) the Pre-Petition Replacement Revolving Liens, (3) the Pre-Petition Revolving Lien Superpriority Claim, and (4) the Pre-Petition Revolving Indemnity Account. | Interim Order: ¶ 4 |
| | The Pre-Petition Term Agent will receive, subject in each case to the Intercreditor Agreement: (1) Term Lien Adequate Protection Payments, (2) Pre-Petition Replacement Term Liens, (3) the Pre-Petition Term Lien Superpriority Claim, and (4) the Pre-Petition Term Lien Indemnity Account. | |
| Fees | Unused Line Fee: The Borrower agrees to pay to the Agent, for the ratable account of the Lenders, an unused line fee equal to 1.00% per annum on the amount by which the average daily Maximum Revolver Amount exceeds the sum of the average daily outstanding amount of Pre-Petition Liabilities, the average daily outstanding amount of Revolving Loans, the average daily aggregate undrawn face amount of all outstanding Letters of Credit, plus the average daily aggregate amount of any unpaid reimbursement Obligations in respect of Letters of Credit, during the immediately preceding month o shorter period if calculated on the Termination Date. | DIP Credit Agreement: §§ 3.4, 3.5, 3.6, 3.7 |
| | Letter of Credit Fee: The Borrower agrees to pay to the Agent, for the ratable account of the Lenders, for each Letter of Credit, a fee equal to the Applicable Margin for Letters of Credit for the average daily outstanding undrawn face amount of such Letter of Credit, plus all costs, fees and expenses incurred by the Agent in connection with such Letter of Credit, which costs, fees and expenses will also include a "fronting fee" of 25 basis points times the face amount of such Letter of Credit. | |
| | Upfront Fee: The Borrower shall pay to the Agent on the Closing Date, for the ratable account of the Lenders, a fee in | |

| Term | Summary | Provision in Relevant Document(s) |
|---|---|---|
|  | an amount equal to 2.25% of the aggregate amount of the Commitments.<br><br>Structuring Fee: The Borrower shall pay to the Agent on the Closing Date, for the account of the Agent, a fee in an amount equal to 0.50% of the Maximum Revolver Amount. |  |
| Carve-Out | "Carve-Out" means: (i) allowed administrative expenses pursuant to 28 U.S.C. Section 1930(a)(6); (ii) the sum of (A) and (B), where (A) is the lesser of (I) the aggregate amount of the Debtors' professional fees and disbursements which have been incurred, accrued, or invoiced (but remain unpaid) by the Debtors prior to the date on which the DIP Agent provides written notice that an Event of Default has occurred and the DIP Agent has triggered the Carve-Out (a "**Carve Out Trigger Notice**") (the "**Reported Professional Fees**") for any professional retained by a final order of the Court under Section 327 of the Bankruptcy Code (which order has not been vacated, stayed, or appealed), or (II) the cumulative amount set forth in the Budget for professional fees of the Debtors' professionals for the period from the Petition Date through the earlier of the Termination Date or the date of receipt by the Debtors and the Debtors' counsel of a Carve-Out Trigger Notice, and (B) is $4,250,000; and (iii) the sum of (A) and (B) where (A) is the lesser of (I) the Reported Professionals Fees of the Creditors' Committee's professionals incurred by the Creditors' Committee for any professional retained by a final order of the Court by the Creditors' Committee under Section 1103 of the Bankruptcy Code (which order has not been vacated, stayed, or appealed), or (II) the cumulative amount set for the in the Budget for professional fees of the Creditors' Committee professionals for the period from the Petition Date through the earlier of the Termination Date or the receipt by the Creditors' Committee's counsel of a Carve-Out Trigger Notice; and (B) is $750,000. For the avoidance of any doubt, no success fee, transaction fee, or bonus due incurred by Peter J. Solomon Company, L.P., the Debtors' investment banker, or any financial advisor retained by the Creditors' Committee, shall be paid from the Carve-Out unless and until all other allowed hourly and monthly professional fees and disbursement have been paid in full in cash on a final basis. | Interim Order: ¶ 8 |

| Term | Summary | Provision in Relevant Document(s) |
|------|---------|-----------------------------------|
| 506(c) Waiver | Subject to the entry of a Final Order, no costs or expenses of administration which have been or may be incurred in the Cases at any time shall be charged against the DIP Secured Parties, the Pre-Petition Secured Parties, their respective claims, the Pre-Petition Collateral, or the DIP Collateral, pursuant to Sections 105, and 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the Agents. Nothing contained in this Interim Order shall be deemed a consent by the Pre-Petition Secured Parties or the DIP Secured Parties to any charge, lien, assessment, claim or other Encumbrance against the DIP Collateral, the Pre-Petition Collateral, the Pre-Petition Indemnity Accounts or the Pre-Petition Replacement Liens under Section 506(c) of the Bankruptcy Code or otherwise. | Interim Order: ¶ 10 |
| Release, waiver, or limitation on claims or other causes of action belonging to the estate or the trustee | The Creditors' Committee must commence a contested matter or adversary proceeding objecting to or challenging the Debtors' Stipulations and the Court's findings set forth in the Interim and Final Orders by the date that is sixty (60) days following the appointment of the Creditors' Committee, or any and all such challenges and objections by any party (including, without limitation, the Creditors' Committee, any Chapter 11 or Chapter 7 trustee appointed here or in any Successor Cases, receiver, administrator, trustee, examiner with expanded powers, responsible officer, other estate representative and any other creditor, interest holder, or party in interest) shall be deemed forever waived and barred. | Interim Order: ¶ 7 |

## B. Pre-Petition Secured Parties' Adequate Protection

3.     As set forth in Paragraph 4 of the Interim Order, the Debtors propose providing the following adequate protection to the Pre-Petition Secured Parties for the Debtors' usage of their cash collateral (collectively, the "**Adequate Protection Package**"). As adequate protection, the Pre-Petition Revolving Agent will receive, subject in each case to the Intercreditor Agreement: (1) Revolving Lien Adequate Protection Payments, (2) the Pre-Petition Replacement Revolving Liens, (3) the Pre-Petition Revolving Lien Superiority Claim, and (4) the Pre-Petition Revolving Indemnity Account. As adequate protection, the Pre-Petition Term Agent will receive, subject in each case to the Intercreditor Agreement: (1) Term Lien Adequate

Protection Payments, (2) the Pre-Petition Replacement Term Liens, (3) the Pre-Petition Term Lien Superpriority Claim; and (4) the Pre-Petition Term Lien Indemnity Account.

<b>JURISDICTION</b>

4.     This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

5.     The statutory bases for the relief requested herein are Sections 105, 361, 362, 363, and 364(c), (d)(1) and (e) of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (the "**Bankruptcy Code**"), and Rules 2002 and 4001 of the Bankruptcy Rules.

<b>BACKGROUND</b>

6.     On the date hereof (the "**Petition Date**"), the Debtors commenced these above-captioned cases (the "**Chapter 11 Cases**") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  Pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are operating their businesses and managing their affairs as debtors-in-possession.  As of the date hereof, no creditors' committee, trustee or examiner has been appointed in any of these Chapter 11 Cases.

7.     Despite these efforts, it has recently become clear that the Debtors do not have sufficient liquidity to survive the current economic downturn in their current state.  As a result, the Debtors contacted Peter J. Solomon Company ("**PJS**") on December 8, 2008 to act as investment bankers for the Debtors to assist the Debtors in exploring possible sale transactions. PJS contacted approximately fifty-five (55) potential financial and strategic counterparties, and after an intense, expedited marketing period the Debtors determined that the highest and best offer presently available to the Debtors was an offer from Rainier Holdings LLC (the "**Stalking**

**Horse Bidder**") to serve as a stalking horse bidder in a sale of substantially all of the Debtors' assets under Section 363 of the Bankruptcy Code. On or about June 17, 2009, the Debtors entered into a binding asset purchase agreement (the "**APA**") with the Stalking Horse Bidder for the purchase of substantially all of the Debtors' assets for approximately $202 million in cash, plus the assumption of certain liabilities. Subject to the approval of this Court, the Debtors have obtained the DIP Facility, which the Debtors believe will provide the Debtors with sufficient liquidity through the above-described sale process.

## PREPETITION CAPITAL STRUCTURE

8.      As of the Petition Date, the aggregate amount of approximately $328,500,000 was due and owing in respect to loans and other financial accommodations made by the Pre-Petition Revolving Lenders and Pre-Petition Term Lenders (the "**Prepetition Indebtedness**"). The major components of the Debtor's consolidated funded debt obligations are described in greater detail below.

### C.      Senior Secured Revolving Credit Facility

9.      Prior to the Petition Date, the Debtors entered into a certain Loan and Security Agreement, dated June 21, 2005 (as amended and in effect, the "**Pre-Petition Revolving Credit Agreement**") by and among, among others, Eddie Bauer, Inc., as borrower, the other Debtors, as guarantors, Bank of America, N.A., as Agent (in such capacity, the "**Pre-Petition Revolving Agent**") for certain "Lenders" (as defined therein) (the "**Pre-Petition Revolving Lenders**", and together with the Pre-Petition Revolving Agent, collectively, the "**Pre-Petition Revolving Secured Parties**") pursuant to which the Pre-Petition Revolving Secured Parties extended a working capital facility providing for revolving credit loans, letters of credit and other financial accommodations and services.

10.     As of the Petition Date, Eddie Bauer, Inc. was indebted to the Pre-Petition Revolving Secured Parties in the approximate principal sum of $41,550,999.99 in "Revolving Loans" (as defined in the Pre-Petition Revolving Credit Agreement), issued and outstanding "Letters of Credit" (as defined in the Pre-Petition Revolving Credit Agreement) in the amount of $9,689,362.11, together with all other financial accommodations or services (including, without limitation, any obligations relating to "Bank Products" (as defined in the Pre-Petition Revolving Credit Agreement) provided by the Pre-Petition Revolving Secured Parties or their affiliates), accrued interest, costs, fees, reimbursement obligations, Attorney Costs (as defined in the Pre-Petition Revolving Credit Agreement) and other professional fees and expenses, and all other "Obligations" (as defined in the Pre-Petition Revolving Credit Agreement) (collectively, hereinafter the "**Pre-Petition Revolving Obligations**").

11.     To secure the Pre-Petition Revolving Obligations, the Debtors granted security interests in and first priority Liens (as defined in the Pre-Petition Revolving Credit Agreement) (collectively, the "**Pre-Petition Revolving Liens**") on, among other assets, the Debtors' inventory and certain accounts receivable balances (and assets related thereto) (collectively, the "**Pre-Petition Revolving First Lien Collateral**") and a second priority lien on substantially all of the Debtors' other assets other than the Groveport, Ohio distribution facility (collectively, the "**Pre-Petition Revolving Second Lien Collateral**", and together with the Pre-Petition Revolving First Lien Collateral and any other collateral covered by the Pre-Petition Revolving Liens, collectively, the "**Pre-Petition Revolving Collateral**").

**D.     Senior Secured Term Credit Facility**

12.     Prior to the Petition Date, the Debtors entered into a certain Amended and Restated Term Loan Agreement, dated as of June 21, 2005 and as amended and restated on April 4, 2007 (as amended by that certain First Amendment, dated as of April 2, 2009, and as further

amended and in effect, the "**Pre-Petition Term Credit Agreement**") by and among, among others, Eddie Bauer, Inc., as borrower, Eddie Bauer Holdings, Inc., Wilmington Trust FSB (as successor by assignment to JPMorgan Chase Bank, N.A.), as Agent (in such capacity, the "**Pre-Petition Term Agent**", and together with the Pre-Petition Revolving Agent, collectively, the "**Pre-Petition Agents**") for certain "Lenders" (as defined therein) (together with the Pre-Petition Term Agent, collectively, the "**Pre-Petition Term Secured Parties**", and together with the Pre-Petition Revolving Secured Parties, collectively, the "**Pre-Petition Secured Parties**") pursuant to which the Pre-Petition Term Secured Parties provided a term loan to the Debtors.

13.     As of the Petition Date, Eddie Bauer, Inc. was indebted to the Pre-Petition Term Secured Parties in the approximate sum of $191,404,503.59, together with all other financial accommodations or services, costs, fees, and professional fees and expenses, and all other "Obligations" (as defined in the Pre-Petition Term Credit Agreement) (collectively, hereinafter the "**Pre-Petition Term Obligations**", and together with the Pre-Petition Revolving Obligations, collectively, the "**Pre-Petition Obligations**").

14.     Pursuant to a certain Amended and Restated Guarantee and Collateral Agreement dated as of June 21, 2005 and as amended and restated as of April 4, 2007 (as amended and in effect, the "**Pre-Petition Term Loan Security Agreement**"), to secure the Pre-Petition Term Obligations, the Debtors granted security interests and first priority Liens (as defined in the Pre-Petition Term Credit Agreement) (collectively, the "**Pre-Petition Term Liens**", and together with the Pre-Petition Revolving Liens, collectively, the "**Pre-Petition Liens**") to the Pre-Petition Term Secured Parties on certain real estate assets, equipment, general intangibles, capital stock, and intellectual property (collectively, the "**Pre-Petition Term First Lien Collateral**") and second priority Liens on substantially all of the other assets of the Debtors (collectively, the

"**Pre-Petition Term Second Lien Collateral**", and together with the Pre-Petition Term First Lien Collateral and any other collateral covered by the Pre-Petition Term Liens, collectively, the "**Pre-Petition Term Collateral**" (together with the Pre-Petition Revolving Collateral, hereinafter the "**Pre-Petition Collateral**")).

### E. Intercreditor Agreement

15.     Prior to the Petition Date, the Pre-Petition Revolving Agent and the Pre-Petition Term Agent entered into that certain Intercreditor Agreement, dated June 21, 2005 (as amended and in effect, the "**Intercreditor Agreement**"), which governs the respective rights, interests, obligations, priority, and the positions of the Pre-Petition Revolving Secured Parties and Pre-Petition Term Secured Parties with respect to, among other things, the assets and properties of the Debtors. Pursuant to the Intercreditor Agreement, and except as set forth therein, among other things, (a) the Pre-Petition Revolving Liens on the Pre-Petition Revolving First Lien Collateral are senior and prior in right to the Pre-Petition Term Liens on the Pre-Petition Term Second Lien Collateral, (b) the Pre-Petition Term Liens on the Pre-Petition Term First Lien Collateral are senior and prior in right to the Pre-Petition Revolving Liens on the Pre-Petition Revolving Second Lien Collateral, and (c) the Pre-Petition Revolving Liens and the Pre-Petition Term Liens are ratable in priority in respect of any collateral not constituting Pre-Petition Revolving First Lien Collateral, Pre-Petition Revolving Second Lien Collateral, constituting Pre-Petition Term First Lien Collateral or Pre-Petition Term Second Lien Collateral, in each case as provided therein.

### F. Convertible Senior Unsecured 5.25% Notes Due 2014

16.     In addition, on April 4, 2007, Eddie Bauer Holdings, Inc. completed an offer of a $75 million aggregate principal amount, 5.25% convertible senior notes ("**Convertible Notes**"). The Convertible Notes have a maturity date of April 1, 2014 and pay interest at an annual rate of

5.25% semiannually in arrears on April 1 and October 1 of each year, beginning October 1, 2007 unless earlier redeemed, repurchased or converted.

17. The Convertible Notes are fully and unconditionally guaranteed by all of Eddie Bauer Holdings, Inc.'s existing and future subsidiaries that are parties to any domestic credit facilities, whether as a borrower, co-borrower or guarantor, including Eddie Bauer, Inc. The Convertible Notes are unsecured and senior obligations of the Eddie Bauer Holdings, Inc. and rank equally in right of payment with all existing and future senior unsecured indebtedness and senior in right of payment to any subordinated indebtedness.

18. Under the indenture governing the Convertible Notes (the "**Indenture**"), the Convertible Notes may be converted to stock or cash depending on when they are converted. The Convertible Notes were not convertible prior to January 4, 2009 except upon the occurrence of specified corporate transactions. Subsequent to January 4, 2009 and prior to April 1, 2013, holders may convert all or a portion of their Convertible Notes under certain circumstances identified in the Indenture. The initial conversion rate, which is subject to adjustment, for the Convertible Notes was 73.8007 shares per $1,000 principal amount of Convertible Notes (which represented an initial conversion price of approximately $13.55 per share).

## IMMEDIATE NEED FOR FINANCING AND USE OF CASH COLLATERAL

19. The Debtors' obligations to the Pre-Petition Secured Parties are secured by perfected first priority liens and security interests in substantially all of the personal property of the Debtors, including cash collateral (but subject to the intercreditor arrangements entered into by and among the Pre-Petition Secured Parties). Thus, the Debtors do not have any unencumbered cash with which to operate their businesses. Moreover, the Pre-Petition Secured Parties under the Pre-Petition Credit Agreements were unwilling to lend additional funds to the Debtors in excess of the amounts outstanding under the Pre-Petition Credit Agreements. At this

time, the Debtors have an immediate need for additional liquidity, without which they would be unable to operate their businesses. Although the use of cash collateral is necessary to the operation of the Debtors' businesses, the use of cash collateral alone is insufficient to operate the Debtors' businesses successfully. Therefore, the Debtors also have an immediate need for additional liquidity, which could only be obtained through entry into a secured debtor in possession financing facility.

## RELIEF REQUESTED

20. By this Motion, the Debtors request entry of the Interim Order and the Final Order authorizing the Debtors to:

a. obtain credit and incur debt pursuant to Sections 363, 364(c) and 364(d) of the Bankruptcy Code, on an interim basis for a period up to a maximum amount of $90,000,000 on an interim basis, and up to a maximum committed amount of $100,000,000.00 upon entry of the Final Order secured by first priority, valid, priming, perfected and enforceable liens (as defined in Section 101(37) of the Bankruptcy Code on property of the Debtors' estates pursuant to Sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, and with priority, as to administrative expenses, as provided in Section 364(c)(1) of the Bankruptcy Code.

b. establish the DIP Facility and use of the proceeds of the DIP Facility (net of any amounts used to pay fees, costs, and expenses under the DIP Credit Agreement) in a manner consistent with the terms and conditions of the DIP Credit Agreement and in accordance with the Budget solely for (1) general corporate purposes, (2) payment of costs of administration of the Cases (and certain pre-petition claims against the Debtors approved by the Bankruptcy Court), (3) upon entry of the Interim Order, the deemed re-issuance of all pre-petition "Letters of Credit" (as defined in the Pre-Petition Revolving Credit Agreement previously issued under the Pre-Petition Revolving Credit Agreement so as to be issued under the DIP Credit Agreement, and (4) upon entry of the Final Order, payment in full in cash of the Pre-Petition Revolving Obligations.

c.     Grant, pursuant to Sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, to the DIP Agent priming first priority, continuing, valid, binding, enforceable, non-avoidable and automatically perfected post-petition security interests and liens, senior and superior in priority to all other secured and unsecured creditors of the Debtors' estates except as otherwise provided in the Interim Order and the Final Order, on all Revolving Lender Priority Collateral; and (ii) priming priority, continuing, valid, binding, enforceable, non-avoidable and automatically perfected post-petition security interests and liens senior and superior in priority to the Pre-Petition Revolving Liens and unsecured creditors of the Debtors' estates, but junior to the Pre-Petition Term Liens, whether or not fully perfected, except as provided in the Interim Order and the Final Order, on all Term Lender Priority Collateral upon and to all presently owned and hereafter acquired assets and real and personal property of the Debtors.

d.     Grant, pursuant to Section 364(c)(1) of the Bankruptcy Code, the DIP Agent superpriority administrative claim status in respect of all DIP Obligations, subject only to the Carve-Out as provided herein.

e.     Authorize the use of Cash Collateral in which the Pre-Petition Revolving Agent, the Pre-Petition Term Agent, and the other Pre-Petition Secured Parties have an interest.

f.     (1) grant the Pre-Petition Revolving Agent Pre-Petition Replacement Revolving Liens and Pre-Petition Revolving Lien Superpriority Claims, to the extent of any diminution in the value of the Pre-Petition Revolving Agent's interest in the Pre-Petition Revolving Collateral as adequate protection for the granting of the DIP Liens to the DIP Agent, the use of Cash Collateral, the subordination to the Carve-Out, for the imposition of the automatic stay and for any decline in the market value of the collateral, (2) grant the Pre-Petition Term Agent Pre-Petition Replacement Term Liens and Pre-Petition Term Lien Superpriority Claims, to the extent of any diminution in the value of the Pre-Petition Term Agent's interest in the Pre-Petition Term Collateral as adequate protection for the granting of the DIP Liens to the DIP Agent, the use of Cash Collateral, the subordination to the Carve-Out, for the imposition of the automatic stay and for any decline in the market value of the collateral, (3) make the Adequate Protection Payments

and (4) establish the Pre-Petition Revolving Indemnity Account and the Pre-Petition Term Indemnity Account.

g. Vacate and modify the automatic stay imposed by Section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Facility and the Interim Order.

h. Schedule the Final Hearing to consider entry of the Final Order granting the relief requested in the DIP Motion on a final basis and approving the form of notice with respect to the Final Hearing.

i. Waive any applicable stay (including under Rule 6004 of the Federal Rules of Bankruptcy Procedure) and provide for immediate effectiveness of this Interim Order.

## G.    Authorization to use Cash Collateral

21. During the ordinary course of operations, the Debtors generate cash from the use of the Pre-Petition Collateral (the "**Cash Collateral**"). The Debtors need the use of Cash Collateral to maintain their assets, provide financial information, pay necessary employees, payroll taxes, inventory suppliers and other vendors, overhead, and other expenses necessary to maximize the value of the Debtors' assets. The Debtors need to supplement their use of Cash Collateral with the funding being provided by the DIP Facility to continue to operate their businesses and to maximize the value of their estates. As the DIP Facility is contingent upon the Debtors obtaining approval to use Cash Collateral, it is imperative that the Debtors obtain authority to use Cash Collateral subject to the terms of this Motion and the Interim Order and the Final Order (once entered). Accordingly, in order to obtain the financing under the DIP Facility and to avoid immediate and irreparable harm to the Debtors' business operations and their estates, the Debtors have the need for authority to continue to use Cash Collateral.

### H. Adequate Protection to the Pre-Petition Secured Parties

22.     To the extent that their interests in the Pre-Petition Collateral constitute valid and perfected security interests and liens as of the Petition Date, the Pre-Petition Secured Parties are entitled, pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their interest in the Pre-Petition Collateral, including the Cash Collateral. Accordingly, the Debtors have agreed, subject to this Court's approval, to provide the Pre-Petition Secured Parties with the Adequate Protection Package in order to obtain the Pre-Petition Secured Parties' consent to the use of Cash Collateral and the Pre-Petition Revolving Lenders' consent to have their liens primed by the DIP Liens (to the extent set forth in the Interim Order). The Pre-Petition Secured Parties have agreed to consent to the usage of their Cash Collateral on the condition that the Adequate Protection Package is approved.

### I. Local Rule 4001-2 Disclosures

23.     Local Rule 4001-2 requires the disclosure of certain provisions of the DIP Documents and Interim Order. The following disclosures are intended to comply with the requirement of the Local Rules.

    a.     Local Rule 4001-2(a)(i)(A) requires the disclosure of provisions that grant cross-collateralization protection. The Debtors' obligations to the Pre-Petition Lenders are subject to the Roll-Up Provisions, which provide for a gradual rollup of the Pre-Petition Obligations, and the conversion of the Pre-Petition Revolving Obligations to DIP Obligations upon the entry of the Final Order.

    b.     Local Rule 4001-2(a)(i)(B) requires the disclosure of provisions or findings of fact that bind the estate with respect to validity, amount, or perfection of liens or a waiver of claims, without first giving certain parties in interest an opportunity to conduct an investigation. Paragraph D of the Interim Order contains stipulations with respect to the validity, amount, or perfection of liens held by the Pre-Petition Secured Parties (collectively, the "**Debtor Stipulations**"). (Interim Order, ¶ D.) However,

Paragraph 7 provides that parties-in-interest, including the Creditors Committee, shall have sixty (60) days from the entry of the Interim Order to challenge the Debtors' Stipulations. (Interim Order, ¶ 7.)

c. Local Rule 4001-2(a)(i)(C) requires disclosure of provisions that seek to waive, without notice, whatever rights the estate may have under section 506(c) of the Bankruptcy Code. The Interim Order does not provide for an immediate waiver of the Debtors' rights under section 506(c) of the Bankruptcy Code, therefore no disclosure is necessary. However, the Debtors highlight that the Interim Order does provide for a waiver of the Debtors' rights under section 506(c) of the Bankruptcy Code effective upon the entry of the Final Order. (Final Order, ¶ 33.)

d. Local Rule 4001-2(a)(i)(D) requires disclosure of provisions that immediately grant the prepetition secured creditor liens on avoidance actions. The Pre-Petition Secured Parties are granted a lien upon all DIP Collateral (Interim Order ¶ E). While the DIP Liens do ultimately attach to the proceeds of Specified Bankruptcy Recoveries (as defined in the Interim Order) they do so solely to the extent (a) arising under Section 549 of the Bankruptcy Code, or (b) constituting proceeds of avoidance actions under Section 547 of the Bankruptcy Code to the extent necessary to reimburse the DIP Secured Parties for the amount that any Carve-Out under the DIP Credit Agreement funded the Borrower's expenses in investigating such actions, commencing such actions, and conducting the litigation and/or settlement discussions that resulted in the receipt of such proceeds, and any and all recoveries or proceeds of any such claims or causes of action. (Interim Order, ¶ 2(e)).

e. Local Rule 4001-2(a)(i)(E) requires disclosure of provisions that use postpetition loans to repay prepetition debt. Subject to the prior payment of the Carve-Out upon a post-default disposition or the 363 Sale, all proceeds of the sale or other disposition of the Collateral shall be applied first, to permanently reduce the Pre-Petition Obligations, second, to fund $250,000 to the pre-petition revolving lenders indemnity account and $250,000 to the pre-petition term lenders indemnity account and third, to reduce the DIP Obligations, each in accordance with the terms and conditions of the Pre-Petition Revolving Credit Agreement, the Pre-Petition Term Credit Agreement, the Intercreditor

Agreement, the DIP Credit Agreement, to the extent applicable, and the Interim Order. (Interim Order, ¶ H).

f.  Local Rule 4001-2(a)(i)(F) requires disclosure of provisions that provide disparate treatment to professionals retained by the Creditors Committee from professionals retained by the Debtors. Neither the DIP Credit Agreement nor the proposed Interim Order provide for disparate treatment of the professionals retained by the Debtors and the Creditors Committee, respectively. (See Interim Order, ¶ 8).

g.  Finally, Local Rule 4001-2(a)(i)(G) requires disclosure of provisions that prime any secured liens without the consent of the lienholder. As discussed more fully herein, the Pre-Petition Revolving Lenders are consenting to any liens provided to the DIP Lenders priming their liens in exchange for the Pre-Petition Secured Parties' Adequate Protection Package. All other lienholders holding valid, perfected and unavoidable liens in existence immediately prior to the Petition Date (other than the Pre-Petition Liens) or valid and unavoidable liens in existence immediately prior to the Petition Date perfected in accordance with section 546(b) of the Bankruptcy Code are not primed by the DIP Liens ("**Permitted Prior Encumbrances**"); the DIP Liens are junior to such Permitted Priority Liens and the Pre-Petition Term Liens. (Interim Order, ¶ 2(e)).

24.  The foregoing provisions of the DIP Facility are all justified under the circumstances of these cases. First and foremost, the DIP Lenders would not agree to the DIP Credit Agreement and the Pre-Petition Secured Parties would not agree to the use of their Cash Collateral in accordance therewith and the Pre-Petition Revolving Lenders would not agree to the priming of their liens by the DIP Lenders without the inclusion of such terms. In addition, with respect to the Roll-Up, the Debtors determined in the exercise of their sound business judgment that agreeing to the Roll-Up was appropriate under the circumstances of these cases in light of the unavailability of other adequate financing alternatives on terms more favorable to the Debtors and for the reasons set forth more fully below. Accordingly, the facts and circumstances of these cases justify the inclusion of the terms that required disclosure under Local Rule 4001-2.

## J.    The DIP Facility Should Be Approved

25.    The Debtors propose to obtain financing by providing security interests and liens as set forth above pursuant to Sections 364(c) and (d) of the Bankruptcy Code.  The statutory requirement for obtaining postpetition credit under Section 364(c) is a finding, made after notice and hearing, that the debtors are "unable to obtain unsecured credit allowable under Section 503(b)(1) of the [the Bankruptcy Code]." 11 U.S.C. § 364(c).  Indeed, Section 364(c) financing is appropriate when the debtor in possession is unable to obtain unsecured credit allowable as an ordinary administrative claim.  See In re Ames Dep't Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under Sections 364(a) and (b) of the Bankruptcy Code); In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under Section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

26.    Courts have articulated a three-part test to determine whether a debtor is entitled to financing under Section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

a.    the debtor is unable to obtain unsecured credit under Section 364(b), i.e., by allowing a lender only an administrative claim;

b.    the credit transaction is necessary to preserve the assets of the estate; and

c.    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re Ames Dep't Stores, 115 B.R. at 37-39.

27. Pre-Petition, the Debtors endeavored to identify potential sources of postpetition financing. Based on discussions with potential lenders, the Debtors have determined that adequate postpetition financing on an unsecured basis or on a junior priority basis to the Pre-Petition Secured Parties is not available. Without postpetition financing, the Debtors would be unable to operate their businesses as a going concern, which would significantly impair the value of the Debtors' assets to the detriment of all creditor constituencies. Furthermore, by obtaining postpetition financing, the Debtors will be in a position to preserve and maximize the value of their assets for the benefit of all creditors. Finally, the terms of the DIP Facility are fair, reasonable and adequate given the Debtors' circumstances, all as more fully set forth below.

### K. Approval of Priming Liens and Adequate Protection under Section 364(d)

28. If a debtor is unable to obtain credit under the provisions of Section 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming lien." 11 U.S.C. § 364(d). Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of postpetition debt secured by senior or "priming" liens, provides that the court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

a. the trustee is unable to obtain credit otherwise; and

b. there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).

29. The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis. See In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996). "Its application is left to the vagaries of each case . . . but its focus is protection of the secured

creditor from diminution in the value of its collateral during the reorganization process." Id. (quoting In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)). The Debtors have concluded that adequate alternative financing on terms more favorable than those being provided by the DIP Lenders under the DIP Credit Agreement is currently unobtainable. Moreover, the Pre-Petition Secured Parties advised the Debtors that they would not consent to the granting of senior or *pari passu* liens to a new third party debtor-in-possession lender.

30.     In accordance with Section 364(d) of the Bankruptcy Code, and consistent with the purposes underlying the provision of adequate protection, the proposed Interim Order provides the Pre-Petition Secured Parties with adequate protection as described in paragraph 3 above, including: (a) the adequate protection liens, (b) a claim under section 507(b) of the Bankruptcy Code, (c) the Roll-Up; (d) payment of pre- and postpetition interest on the Pre-Petition Obligations, and (e) the fees and expenses of the Pre-Petition Revolving Secured Parties' professionals. The Pre-Petition Secured Parties have consented provided that the relief requested herein is granted, including the grant of the Pre-Petition Secured Parties' Adequate Protection Package.

### L.     Use of Cash Collateral

31.     Section 363 of the Bankruptcy Code governs the Debtors' use of property of the estates.[6] Section 363(c)(1) of the Bankruptcy Code provides that:

> If the business of the debtor is authorized to be operated under Section . . . 1108 . . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing,

---

[6]     Pursuant to Section 1107 of the Bankruptcy Code, a debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with Section 363 of the Bankruptcy Code. See 11 U.S.C. § 1107(a).

> and may use property of the estate in the ordinary course of
> business without notice or a hearing.

11 U.S.C. § 363(c)(1).

32. Section 363(c)(2) of the Bankruptcy Code, however, provides an exception with respect to "cash collateral" to the general grant of authority to use property of the estate in the ordinary course set forth in section 363 of the Bankruptcy Code. Specifically, a trustee or debtor-in-possession may not use, sell, or lease "cash collateral" under subsection (c)(1) unless:

    a.    each entity that has an interest in such collateral consents; or

    b.    the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

33. The Debtors submit that, under the circumstances here, their request to use Cash Collateral should be approved. The Pre-Petition Secured Parties and the DIP Lenders have consented to the use of Cash Collateral provided that the relief requested herein is granted. Absent access to the usage of Cash Collateral, the Debtors' access to liquidity would be severely limited, and the Debtors' efforts to preserve the value of their estates during these cases would be impaired.

**M.     No Adequate Alternative to the DIP Facility is Currently Available**

34. A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) and (d) of the Bankruptcy Code. See In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986); see also In re Plabell Rubber Prods., Inc., 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).

35. Substantially all of the Debtors' assets are subject to the liens granted under the various agreements among the Debtors and the Pre-Petition Secured Parties. Because of the

extent of the Pre-Petition Secured Parties' secured claims, obtaining the financing needed by the Debtors as unsecured debt or debt which would be secured by liens junior to the liens of the Pre-Petition Secured Parties was not a realistic option.

36.     In the weeks prior to the commencement of these cases, the Debtors' financial advisors pursued efforts to find replacement financing that would also provide additional debtor-in-possession funding.  In that regard, they contacted potential lenders with the capability of providing a debtor-in-possession facility sufficient to fund these Chapter 11 Cases.  The Debtors determined that the instant DIP Facility was the best proposal, especially in light of the fact that any alternative facility would require the priming of the Pre-Petition Secured Parties, which would be on a non-consensual basis and, as a result, time consuming and costly.  Because the Pre-Petition Secured Parties would not consent to being primed by a third party lender and the Debtors decided not to seek to prime the Pre-Petition Secured Parties on a contested basis in light of the attendant risk and cost, the Debtors determined that the proposed debtor-in-possession financing with the DIP Lenders is the best financing option available to the Debtors under the circumstances.

37.     Accordingly, the Debtors have satisfied the requirement of Sections 364(c) and (d) of the Bankruptcy Code that alternative credit on more favorable terms was unavailable to the Debtors.

**N.     The DIP Credit Agreement Terms are Fair, Reasonable, and Appropriate**

38.     The proposed terms of the DIP Facility and the other DIP Documents are fair, reasonable, and adequate under the circumstances.  First and foremost, as discussed more fully above, the Debtors have made a concerted, good-faith effort to obtain credit on the most favorable terms that are available.  Although the Debtors contacted various alternate lending institutions, no other lender was willing to provide an adequate stand alone financing facility

absent the priming of the Pre-Petition Revolving Liens which would have been on a contested basis. Moreover, no lender was willing to provide financing sufficient to repay the Pre-Petition Obligations in full and provide additional liquidity sufficient for the Debtors to maximize the value of their assets in these cases. Against this backdrop, the Debtors carefully evaluated the proposed financing structure from the DIP Lenders, engaged in extensive negotiations with the DIP Lenders regarding the proposed terms, worked with their various advisors to obtain the best possible pricing from the DIP Lenders, and, eventually, agreed to the DIP Lenders' proposal as the proposal best suited to the Debtors' needs. Moreover, the terms and conditions of the DIP Facility were negotiated by the parties in good faith and at arm's length, and, as outlined above, were instituted for the purpose of enabling the Debtors to meet ongoing operational expenses while in chapter 11 while preserving and maximizing the value of the Debtors' estates.

39.    The proposed DIP Credit Agreement provides that the security interests and administrative expense claims granted to the DIP Lenders are subject to the Carve-Out. In re Ames Dep't Stores, 115 B.R. 34 (Bankr. S.D.N.Y. 1990), the court found that such "carve-outs" are not only reasonable, but are necessary to ensure that official committees and the debtor's estate will be assured of the assistance of counsel. Id. at 40.

40.    Likewise, the various fees and charges required by the DIP Agent and the DIP Lenders under the DIP Credit Agreement are reasonable and appropriate under the circumstances. Indeed, courts routinely authorize similar lender incentives beyond the explicit liens and other rights specified in section 364 of the Bankruptcy Code. See, e.g., In re Defender Drug Stores, Inc., 145 B.R. 312, 316 (9th Cir. BAP 1992) (authorizing credit arrangement under section 364, including a lender "enhancement fee").

41.    Accordingly, the terms of the DIP Credit Agreement are fair, reasonable and adequate, and the DIP Agent and the DIP Lenders under the DIP Credit Agreement should be accorded the benefits of section 364(e) of the Bankruptcy Code in respect of such agreement.

**O.    Roll-up of the Pre-Petition Secured Obligations**

42.    The Debtors' agreement to the Roll-Up should be approved pursuant to Sections 363 and 105(a) of the Bankruptcy Code. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part: "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). In addition, Section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

43.    The proposed use, sale, or lease of property of the estate may be approved under Bankruptcy Code section 363(b) if it is supported by sound business justification. See In re Montgomery Ward, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions"). Although established in the context of a proposed sale, the "business judgment" standard has been applied in non-sale situations. See, e.g., Institutional Creditors of Continental Air Lines v. Continental Air Lines (In re Continental Air Lines), 780 F.2d 1223, 1226 (5th Cir. 1986) (court applied "business judgment" standard in context of proposed "use" of estate property). Moreover, pursuant to Section 105, the Court has expansive equitable powers to fashion any order or decree which is in the interest of preserving or protecting the value of the Debtor's assets. See, e.g., In re Chinichian, 784 F.2d 1440, 1443 (9th Cir. 1986).

44. As noted above, the Roll-Up is supported by sound business judgment as the Roll-Up will satisfy the Debtors' obligations to the Pre-Petition Secured Parties. In addition, it was a condition to the Pre-Petition Secured Parties' consent to use of Cash Collateral and the adequate protection provided for the priming of the Pre-Petition Revolving Lender's pre-petition liens by the DIP Lenders. Additionally, the DIP Lenders' liens extend to substantially the same collateral. Finally, the rights of the Creditors' Committee (as defined in the Interim Order) and other parties in interest to challenge the Pre-Petition Secured Parties' claims are not eliminated by the Roll-Up during the investigation period provided for under the proposed interim and final orders.

**P.     Interim Approval Should Be Granted**

45. Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fifteen (15) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates.

46. The Debtors request that the Court hold and conduct an interim hearing immediately to consider entry of the proposed Interim Order authorizing the Debtors from and after the entry of the Interim Order until the Final Hearing to borrow under the DIP Facility in an amount not less than $90,000,000. This relief will enable the Debtors to operate their businesses in a manner that will permit them to preserve and maximize value and therefore avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

## FINAL HEARING

47. The Debtors further respectfully request that this Court schedule the Final Hearing and authorize them to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, by first-class mail upon (i) the United States Trustee for the District of Delaware; (ii) counsel to the DIP Agent; (iii) any known lienholders of the Debtors; (iv) the United States Internal Revenue Service; (v) counsel to the Creditors' Committee; (vi) any party who filed a request for notices in these Chapter 11 Cases prior to the date set forth in the Interim Order for service of notice of the Final Hearing or would otherwise be entitled to notice pursuant to Bankruptcy Rule 2002; (vi) counsel to administrative agent under the prepetition term loan facility; (vii) counsel to agent under the prepetition revolving credit facility; and (viii) counsel for the indenture trustee for the $75 million 5.25% convertible senior notes due 2014. The Debtors request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001 and Local Rule 2002-1.[7]

## NOTICE

48. No trustee, examiner or creditors' committee has been appointed in the Chapter 11 Cases. The Debtors have provided notice of this Motion to: (a) the United States Trustee for the District of Delaware; (b) counsel to administrative agent under the prepetition term loan facility; (c) counsel to the steering committee for the prepetition term lenders; (d) counsel to agent under the prepetition revolving credit facility; (e) counsel for the indenture trustee for the $75 million 5.25% convertible senior notes due 2014 and (f) the creditors listed on the Debtors' consolidated list of 30 largest unsecured creditors, as filed with the chapter 11 petitions. In light

---

[7] Local Rule 2002-1(b) provides that "[i]n cases under chapter 11, all motions . . . shall be served only upon counsel for the debtor, the United States Trustee, counsel for all official committees, all parties who file a request for service of notices pursuant to Fed. R. Bankr. P. 2002(i), and on any party whose rights are affected by the motion."

of the nature of the relief requested, the Debtors submit that no further notice is required or needed under the circumstances.

49.     A copy of the Motion is available on the Court's website: www.deb.uscourts.gov. Additional copies of the Motion are available on the website of the Debtors' proposed claims, noticing, soliciting and balloting agent, Kurtzman Carson Consultants, at www.kccllc.net/eddiebauer or can be requested by calling (866) 967-1781.

## NO PRIOR REQUEST

50.     No prior motion for the relief requested herein has been made to this Court or any other court.

WHEREFORE, the Debtors respectfully request that this Court enter the Interim Order, substantially in the form attached hereto as Exhibit A, (a) authorizing the Debtors to obtain postpetition secured and superpriority financing on an interim basis as set forth in the DIP Documents; (b) scheduling the Final Hearing; (c) approving the form and manner of notice of the Final Hearing; and (d) granting such other and further relief as this Court deems appropriate.

DB02:8315263.1

068417.1001

Dated: June 17, 2009
Wilmington, Delaware

Respectfully Submitted,

_Kara Coyle_

Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

David S. Heller
Josef S. Athanas
LATHAM & WATKINS LLP
Sears Tower, Suite 5800
233 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 876-7700
Facsimile: (312) 993-9767

-and-

Heather L. Fowler
LATHAM & WATKINS LLP
355 South Grand Avenue
Los Angeles, California 90071-1560
Telephone: (213) 485-1234
Facsimile: (213) 891-8763

PROPOSED ATTORNEYS FOR DEBTORS AND
DEBTORS-IN-POSSESSION

DB02:8315263.1

068417.1001

**EXHIBIT A TO DIP MOTION**

**FORM OF INTERIM DIP ORDER**

------------------------------------------------------- x
                                                        :
In re:                                                  :    Chapter 11
                                                        :
EDDIE BAUER, INC., et al,                               :    Case No. 09-12099 (MFW)
                                                        :
                                  Debtors.[1]           :    Jointly Administered
                                                        :
                                                        x
------------------------------------------------------- 

**INTERIM ORDER PURSUANT TO 11 U.S.C. SECTIONS 105, 361, 362, 363 AND 364 AND
RULES 2002, 4001 AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (1)
AUTHORIZING INCURRENCE BY THE DEBTORS OF POST-PETITION SECURED
INDEBTEDNESS WITH PRIORITY OVER CERTAIN SECURED INDEBTEDNESS AND
WITH ADMINISTRATIVE SUPERPRIORITY, (2) GRANTING LIENS, (3) AUTHORIZING
USE OF CASH COLLATERAL BY THE DEBTORS PURSUANT TO 11 U.S.C. SECTION 363
AND PROVIDING FOR ADEQUATE PROTECTION, (4) MODIFYING THE AUTOMATIC
STAY AND (5) SCHEDULING A FINAL HEARING**

THIS MATTER having come before the United States Bankruptcy Court for the District of

Delaware (the "**Court**") upon the Motion (the "**DIP Motion**") of Eddie Bauer, Inc. ("**EB**") and each of

the other the above-captioned debtors, each as debtor and debtor-in-possession (collectively, the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:
Eddie Bauer Holdings, Inc., a Delaware corporation (2352); Eddie Bauer, Inc., a Delaware corporation (9737);
Eddie Bauer Fulfillment Services, Inc., a Delaware corporation (0882); Eddie Bauer Diversified Sales, LLC, a
Delaware limited liability company (1567); Eddie Bauer Services, LLC, an Ohio limited liability company
(disregarded); Eddie Bauer International Development, LLC, a Delaware limited liability company (1571); Eddie
Bauer Information Technology, LLC, a Delaware limited liability company (disregarded); Financial Services
Acceptance Corporation, a Delaware corporation (7532); and Spiegel Acceptance Corporation, a Delaware
corporation (7253). The mailing address for Eddie Bauer Holdings, Inc. is 10401 N.E. 8th Street, Suite 500,
Bellevue, WA 98004. On or about the Petition Date, Eddie Bauer of Canada, Inc. and Eddie Bauer Customer
Services, Inc., affiliates of the Debtors, commenced a proceeding before the Superior Court of Justice, Commercial
List, for the Judicial District of Ontario, for a plan of compromise or arrangement under the Companies' Creditors
Arrangement Act.

"**Debtors**", and individually, a "**Debtor**") in the above captioned Chapter 11 Cases (the "**Cases**") seeking, among other things, the entry of an interim order (this "**Interim Order**") authorizing the Debtors to:

(i) Obtain credit and incur debt pursuant to Sections 363, 364(c) and 364(d) of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended (the "**Bankruptcy Code**"), on an interim basis for a period (the "**Interim Period**") from the commencement of the Cases through and including the date of the "Final Hearing" (as defined below) up to a maximum amount of $90,000,000 on an interim basis, and up to a maximum committed amount of $100,000,000.00 upon entry of the "Final Order" (as defined below) (in each case on terms and conditions more fully described herein[2]) secured by first priority, valid, priming, perfected and enforceable liens (as defined in Section 101(37) of the Bankruptcy Code) on property of the Debtors' estates pursuant to Sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, and with priority, as to administrative expenses, as provided in Section 364(c)(1) of the Bankruptcy Code, subject to the terms and conditions contained herein;

(ii) (a) Establish that financing arrangement (the "**DIP Facility**") pursuant to: (I) that certain Senior Secured, Super-Priority Debtor-In-Possession Loan and Security Agreement, substantially in the form filed of record in the Cases, by and among the Debtors, as Borrowers, Bank of America, N.A., as agent (in its capacity as agent, together with any successor in such capacity, the "**DIP Agent**") for the Lenders (as defined in the DIP Credit Agreement, the "**DIP Lenders**"), Banc of America Securities LLC, as sole lead arranger and book manager, Bank of America, N.A. and The CIT Group/Business Credit, Inc., as co-syndication agents, General Electric Capital Corporation and The CIT Group/Business Credit, Inc., as co-collateral agents (in such capacity, the "**Co-Collateral Agents**") and General Electric Capital

---

2    The DIP Credit Agreement also includes the ability under certain terms and conditions for the maximum committed amount to be increased by an additional $20,000,000.00. See, Section 2.5 of the DIP Credit Agreement.

Corporation as documentation agent (the DIP Agent, the DIP Lenders, and the Co-Collateral Agents, collectively, the **"DIP Secured Parties"**); and (II) all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of the DIP Secured Parties, including, without limitation, security agreements, notes, guaranties, mortgages, and Uniform Commercial Code (**"UCC"**) financing statements and all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto (collectively, as may be amended, modified, or supplemented in accordance with the terms of this Interim Order (or the Final Order, as applicable) and in effect from time to time, the **"DIP Credit Agreement"**);[1] and (b) incur the "Obligations" under and as defined in the DIP Credit Agreement (collectively, the **"DIP Obligations"**);

(iii) Authorize the use of the proceeds of the DIP Facility (net of any amounts used to pay fees, costs, and expenses under the DIP Credit Agreement) in a manner consistent with the terms and conditions of the DIP Credit Agreement and in accordance with the "Budget" (as defined below and attached hereto as Exhibit 1) with the variations permitted in Paragraph 3 hereof solely for (a) general corporate purposes, (b) payment of costs of administration of the Cases and certain pre-petition claims against the Debtors approved by the Bankruptcy Court, in each case to the extent set forth in the Budget with the variations permitted in Paragraph 3 hereof, and subject to the terms of this Interim Order, (c) upon entry of the Interim Order, the deemed re-issuance of all pre-petition "Letters of Credit" (as defined in the Pre-Petition Credit Agreement referred to below) previously issued under the Pre-Petition Credit

---

[1]	Except as otherwise defined herein, all defined terms used herein shall have the meanings as defined in the DIP Credit Agreement.

Agreement so as to be issued under the DIP Credit Agreement, and (d) upon entry of the Final Order, payment in full in cash of the "Pre-Petition Revolving Obligations" (as defined below);

(iv) Grant, pursuant to Sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, to the DIP Agent (for the benefit of itself and the other DIP Secured Parties) first priority priming, valid, perfected and enforceable liens, subject only to the Carve-Out and the "Permitted Prior Encumbrances" (as defined below), upon all of the Debtors' real and personal property as provided in and as contemplated by this Interim Order, the DIP Facility, and the DIP Credit Agreement;

(v) Grant, pursuant to Section 364(c)(1) of the Bankruptcy Code, to the DIP Agent (for the benefit of itself and the other DIP Secured Parties) superpriority administrative claim status in respect of all DIP Obligations, subject only to the Carve-Out as provided herein;

(vi) Authorize the use of "cash collateral" as such term is defined in Section 363 of the Bankruptcy Code (the "**Cash Collateral**") in which the Pre-Petition Revolving Agent, the Pre-Petition Term Agent, and the other Pre-Petition Secured Parties (each as defined below) have an interest;

(vii) (A) grant the Pre-Petition Revolving Agent (for the benefit of the Pre-Petition Revolving Secured Parties) (each as defined below) Pre-Petition Replacement Revolving Liens and Pre-Petition Revolving Lien Superpriority Claims (each as defined below), to the extent of any "Diminution in Value" (as defined below) of the Pre-Petition Revolving Agent's interest · in the "Pre-Petition Revolving Collateral" (as defined below) as adequate protection for the granting of the "DIP Liens" (as defined below) to the DIP Agent, the use of Cash Collateral, the subordination to the Carve-Out, and for the imposition of the automatic stay, (B) grant the Pre-Petition Term Agent (for the benefit of the Pre-Petition Term Secured Parties) (each as defined below) Pre-Petition Replacement Term Liens and Pre-Petition

Term Lien Superpriority Claims (each as defined below), to the extent of any Diminution in the Value of the Pre-Petition Term Agent's interest in the "Pre-Petition Term Collateral" (as defined below) as adequate protection for the granting of the DIP Liens to the DIP Agent, the use of Cash Collateral, the subordination to the Carve-Out, and for the imposition of the automatic stay, and (C) make the Adequate Protection Payments;

(viii) Terminate and modify the automatic stay imposed by Section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Facility and this Interim Order;

(ix) Schedule a final hearing (the **"Final Hearing"**) to consider entry of an order (the **"Final Order"**) granting the relief requested in the DIP Motion on a final basis and approving the form of notice with respect to the Final Hearing; and

(x) Waive any applicable stay (including under Rule 6004 of the Federal Rules of Bankruptcy Procedure) and provide for immediate effectiveness of this Interim Order.

The Court having considered the DIP Motion, the Declaration of Marvin Edward Toland of Eddie Bauer Holdings, Inc. in Support of First Day Motions (the **"First Day Affidavit"**), in support of the Debtors' first day motions and orders, the exhibits attached thereto, the DIP Facility and the DIP Credit Agreement, and the evidence submitted at the hearing (the **"Interim Hearing"**) on this Interim Order; and in accordance with Rules 2002, 4001(b), (c), and (d), and 9014 of the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**) and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the **"Local Rules"**), due and proper notice of the DIP Motion and the Interim Hearing having been given; an Interim Hearing

having been held and concluded on June 18, 2009; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing and otherwise is fair and reasonable and in the best interests of the Debtors, their creditors, their estates, and equity holders, and is essential for the continued operation of the Debtors' business; and it further appearing that the Debtors are unable to obtain (i) unsecured credit for money borrowed allowable as an administrative expense under Section 503(b)(1) of the Bankruptcy Code, (ii) credit for money borrowed with priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code, (iii) credit for money borrowed secured solely by a lien on property of the estate that is not otherwise subject to a lien, or (iv) credit for money borrowed secured by a junior lien on property of the estate which is subject to a lien; and there is adequate protection of the interests of holders of Encumbrances on the property of the estate on which Encumbrances are to be granted; and all objections, if any, to the entry of this Interim Order having been withdrawn, resolved, or overruled by this Court; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING BY THE DEBTORS, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.    <u>Petition Date</u>.  On June 17, 2009 (the "**Petition Date**"), the Debtors each filed a voluntary petition under Chapter 11 of the Bankruptcy Code with the Court. The Debtors have continued in the management and operation of their respective business and property as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Cases, nor has an official committee of unsecured creditors (the "**Creditors' Committee**") been appointed as of the date hereof.

B.    Jurisdiction and Venue. Pursuant to 28 U.S.C. § 1334, this Court has jurisdiction over this proceeding and over the persons and property affected hereby. Consideration of the DIP Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (C), (D), (G), (K), and (O). Venue for the Cases and proceedings on the DIP Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    Notice.    The Interim Hearing is being held pursuant to the authorization of Bankruptcy Rule 4001 and Local Rule 9013-1. Notice of the Interim Hearing and the emergency relief requested in the DIP Motion has been provided by the Debtors, whether by telecopy, email, overnight courier or hand delivery on June 17, 2009 to certain parties in interest, including: (i) the Office of the United States Trustee, (ii) the Debtors' forty (40) largest unsecured creditors, (iii) counsel to the "Pre-Petition Revolving Agent" (as defined below), (iv) counsel to the "Pre-Petition Term Agent" (as defined below), (v) counsel to the proposed DIP Agent, (vi) all parties asserting a security interest in the assets of the Debtors to the extent reasonably known to the Debtors, (viii) the Office of the United States Attorney General for the District of Delaware; and (ix) the Internal Revenue Service. Under the circumstances, such notice of the Interim Hearing and the relief requested in the DIP Motion is due and sufficient notice and complies with Sections 102(1), 364(c) and 364(d) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001(c), 4001(d) and the Local Rules.

D.    Debtors' Acknowledgments and Agreements.    Without prejudice to the rights

of parties in interest as set forth in Paragraph 7 below, each Debtor admits, stipulates, acknowledges, and

agrees to the following (collectively, the **"Debtors' Stipulations"**)[3]:

    (i)    <u>Pre-Petition Revolving Credit Agreement</u>.    Prior to the Petition Date, the Debtors entered into a certain Loan and Security Agreement dated June 21, 2005 (as amended and in effect, the **"Pre-Petition Revolving Credit Agreement"**) with, among others, Bank of America, N.A., as Agent (in such capacity, the **"Pre-Petition Revolving Agent"**) for certain "Lenders" (as defined therein) (the **"Pre-Petition Revolving Lenders"**, and together with the Pre-Petition Revolving Agent, collectively, the **"Pre-Petition Revolving Secured Parties"**) pursuant to which the Pre-Petition Revolving Secured Parties extended a working capital facility providing for revolving credit loans and letters of credit.

    (ii)    <u>Pre-Petition Revolving Obligations Amount</u>. Each Debtor stipulates and agrees that as of the Petition Date, the Debtors were indebted to the Pre-Petition Revolving Secured Parties in the approximate principal sum of $41,550,999.99 in "Revolving Loans" (as defined in the Pre-Petition Revolving Credit Agreement), issued and outstanding "Letters of Credit" (as defined in the Pre-Petition Revolving Credit Agreement) in the amount of $9,689,362.11, together with all other financial accommodations or services (including, without limitation, any obligations relating to "Bank Products" (as defined in the Pre-Petition Revolving Credit Agreement provided by the Pre-Petition Revolving Secured Parties or their affiliates) accrued interest, costs, fees, reimbursement obligations, Attorney Costs and other professional fees and expenses, and all other "Obligations" (as defined in the Pre-Petition Revolving Credit Agreement) (collectively, hereinafter the **"Pre-Petition Revolving Obligations"**). In particular, each Debtor acknowledges and agrees that (i) the 2002 Master Agreement dated as of October 14, 2005 between Bank of America, N. A. and the Debtor, the Schedule to the Master Agreement dated as of October 14, 2005, and the Confirmation (as defined in the Master Agreement) dated April 6, 2007, Ref. No. 5148853 (collectively, the **"Hedge Agreement"**) have been terminated in accordance with the terms and provisions of Sections 5 and 6 of the Hedge Agreement, (ii) Bank of America, N.A. will proceed to calculate the Early Termination Amount (as such term is defined in the Hedge Agreement) in respect of such termination in accordance with the terms and provisions of the Hedge Agreement (and, for the avoidance of any doubt, Bank of America, N.A. may, as permitted by the definition of the term "Close-out Amount" set out in the Hedge Agreement, determine such amount with reference to quotations for replacement transactions obtained by Bank of America, N.A. from one or more third parties) and

---

3    All capitalized terms used in this Finding D shall have the meanings as defined in the Pre-Petition Revolving Credit Agreement and the Pre-Petition Term Credit Agreement, respectively.

communicate such Early Termination Amount to the Debtors in accordance with the terms and provisions of Section 6(d) of the Hedge Agreement, and such Early Termination Amount (which is anticipated to fall within the range from and including $7,400,000 to and including $10,100,000) is due and payable by the Debtors to Bank of America, N.A. in accordance with the terms and provisions of Section 6(d) of the Hedge Agreement, and (iii) the Early Termination Amount so due under the Hedge Agreement is and shall be included in the principal balance of the Pre-Petition Obligations set forth above.

(iii)    Pre-Petition Revolving Collateral.    To secure the Pre-Petition Revolving Obligations, the Debtors granted security interests and Liens (as defined in the Pre-Petition Revolving Credit Agreement) (collectively, the **"Pre-Petition Revolving Liens"**) to the Pre-Petition Revolving Secured Parties upon substantially all of the Debtors' assets and personal property, including, without limitation, (a) all Accounts, (b) all Inventory, (c) all contract rights, (d) all Chattel Paper, (e) all Documents, (f) all Instruments, (g) all Supporting Obligations and Letter of Credit Rights, (h) all General Intangibles [4], (i) all Payment Intangibles, (j) all Equipment, (k) all Investment Property (other than the equity interests in SAC and FSAC owned by Holdings as of the Closing Date) [5], (l) all money, cash, cash equivalents, securities and other property of any kind held directly or indirectly by the Pre-Petition Revolving Agent or any of the Pre-Petition Secured Parties, (l) all deposit accounts, credits, and balances with and other claims against the Pre-Petition Revolving Agent or any of the Pre-

---

[4] Pursuant to that certain Intellectual Property Security Agreement dated as of June 21, 2005 (as amended, restated, supplemented or otherwise modified and in effect, the **"Revolving IP Security Agreement"**) by and between EB and certain of its subsidiaries and the Pre-Petition Revolving Agent, EB and such subsidiaries granted to the Pre-Petition Revolving Agent, for the benefit of the Pre-Petition Revolving Secured Parties, security interests and Liens in the "IP Collateral" (as such term is defined in the Revolving IP Security Agreement), which constitutes Pre-Petition Revolving Collateral hereunder.  A copy of the Revolving IP Security Agreement is on file with the Pre-Petition Revolving Agent and is available upon request.

[5] Pursuant to (i) that certain Pledge Agreement dated as of June 21, 2005 (as amended, restated, supplemented or otherwise modified and in effect, the **"Holdings Revolving Pledge Agreement"**) by and between Eddie Bauer Holdings, Inc. and the Pre-Petition Revolving Agent, Eddie Bauer Holdings, Inc. granted to the Pre-Petition Revolving Agent, for the benefit of the Pre-Petition Revolving Secured Parties, security interests and Liens in outstanding capital stock of EB and other "Pledged Collateral" (as such term is defined in the Holdings Revolving Pledge Agreement), which constitute Pre-Petition Revolving Collateral hereunder, and (ii) that certain Pledge Agreement dated as of June 21, 2005 (as amended, restated, supplemented or otherwise modified and in effect, the **"EB Revolving Pledge Agreement"** and, together with the Holdings Revolving Pledge Agreement, collectively, the **"Revolving Pledge Agreements"**) by and between EB and the Pre-Petition Revolving Agent, EB granted to the Pre-Petition Revolving Agent, for the benefit of the Pre-Petition Revolving Secured Parties, security interests and Liens in outstanding capital stock of Eddie Bauer Services, LLC, Eddie Bauer Information Technology, LLC and Distribution Fulfillment Services, Inc. (DFS) and other "Pledged Collateral" (as such term is defined in the EB Revolving Pledge Agreement), which constitute Pre-Petition Revolving Collateral hereunder.  Copies of the Revolving Pledge Agreements are on file with the Pre-Petition Revolving Agent and are available upon request.

Petition Secured Parties or any of their affiliates or any other financial institution with which the Debtors maintain deposits, including any Payment Accounts, (m) certain specified commercial tort claims as set forth in the Pre-Petition Revolving Credit Agreement, (n) all other assets and properties of the Debtors, (o) all books, records and other property related to or referring to any of the foregoing, including, without limitation, books, records, account ledgers, data processing records, computer software and other property and General Intangibles at any time evidencing or relating to any of the foregoing; and (p) all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing, including, but not limited to, proceeds of any insurance policies, claims against third parties, and condemnation or requisition payments with respect to all or any of the foregoing (collectively, the "**Pre-Petition Revolving Collateral**") , however, the Pre-Petition Revolving Collateral does not include any of the assets of Eddie Bauer Diversified Sales, LLC ("**EB Diversified**") or Eddie Bauer International Development, LLC ("**EB International**").

(iv)    <u>Pre-Petition Term Credit Agreement</u>.    Prior to the Petition Date, the Debtors entered into a certain Amended and Restated Term Loan Agreement dated April 4, 2007 (as amended and in effect, the "**Pre-Petition Term Credit Agreement**") with, among others, Wilmington Trust FSB (as successor by assignment to JPMorgan Chase Bank, N.A.), as Agent (in such capacity, the "**Pre-Petition Term Agent**", and together with the Pre-Petition Revolving Agent, collectively, the "**Pre-Petition Agents**") for certain "Lenders" (as defined therein) (the "**Pre-Petition Term Lenders**") (together with the Pre-Petition Term Agent, collectively, the "**Pre-Petition Term Secured Parties**", and together with the Pre-Petition Revolving Secured Parties, collectively, the "**Pre-Petition Secured Parties**") pursuant to which the Pre-Petition Term Secured Parties provided a term loan to the Debtors.

(v)    <u>Pre-Petition Term Obligations Amount</u>.  Each Debtor stipulates and agrees that as of the Petition Date, the Debtors were indebted to the Pre-Petition Term Secured Parties in the approximate principal sum of $191,404,503.59, together with all other financial accommodations or services, accrued interest, costs, fees, and professional fees and expenses, and all other "Obligations" (as defined in the Pre-Petition Term Credit Agreement) (collectively, hereinafter the "**Pre-Petition Term Obligations**", and together with the Pre-Petition Revolving Obligations, collectively, the "**Pre-Petition Obligations**").

(vi)    <u>Pre-Petition Term Collateral</u>.    Pursuant to (w) a certain Amended and Restated Guarantee and Collateral Agreement dated April 4, 2007 (the "**Pre-Petition Term Loan Security Agreement**") and (x) that certain Amended and Restated Open-End Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing, dated April 4, 2007 (the "**Term Loan Mortgage**"), (y) that certain Grant of Security Interest in Trademark Rights, effective as of April 4, 2007 (the "**Trademark Security Agreement**"), and (z) that certain Grant of Security Interest in Copyright Rights,

effective as of April 4, 2007 (the "**Copyright Security Agreement**") to secure the Pre-Petition Term Obligations, the Debtors granted security interests and Liens (as defined in the Pre-Petition Term Credit Agreement) (collectively, the "**Pre-Petition Term Liens**", and together with the Pre-Petition Revolving Liens, collectively, the "**Pre-Petition Liens**") to the Pre-Petition Term Secured Parties upon substantially all of the Debtors' assets and personal property, including, without limitation, (a) all Accounts, (b) all Chattel Paper, (c) all Contracts, (d) all Deposit Accounts, (e) all Documents (other than title documents with respect to Vehicles), (f) all Equipment, (g) all Fixtures, (h) all General Intangibles, (i) all Instruments, (j) all Intellectual Property, (k) all Inventory, (l) all Investment Property other than the "Capital Stock" (as defined in the Pre-Petition Term Loan Security Agreement") of the "Securitization Subsidiaries" (as defined in the Pre-Petition Term Loan Security Agreement") and any dividends from the Securitization Subsidiaries payable to Eddie Bauer Holdings, Inc. in respect of the "Securitization Note" (as defined in the Pre-Petition Term Loan Security Agreement"), (m) all Letter-of-Credit Rights, (n) certain specified commercial tort claims as set forth in the Pre-Petition Term Loan Security Agreement, (o) all other property not otherwise described above (except for any property specifically excluded from any clause above, and any property specifically excluded from any defined term used in any clause above), (p) all books and records pertaining to the foregoing, (q) to the extent not otherwise included, all Proceeds, Supporting Obligations and products of any and all of the foregoing, and (r) certain Real Estate (as defined in the Term Loan Mortgage) and all collateral security and guarantees given by any Person with respect to any of the foregoing, and (s) substantially all of the assets of EB Diversified and EB International (collectively, the "**Pre-Petition Term Collateral**", and together with the Pre-Petition Revolving Collateral, collectively, the "**Pre-Petition Collateral**").

(vii)     Intercreditor Agreement.     Prior to the Petition Date, the Pre-Petition Revolving Agent and the Pre-Petition Term Agent entered into that certain Intercreditor Agreement dated June 21, 2005 (as amended and in effect, the "**Intercreditor Agreement**" and, together with the Pre-Petition Revolving Credit Agreement and the Pre-Petition Term Credit Agreement, the "**Pre-Petition Credit Documents**"), which governs the respective rights, interests, obligations, priority, and the positions of the Pre-Petition Revolving Secured Parties and Pre-Petition Term Secured Parties with respect to, among other things, the assets and properties of the Debtors. Pursuant to the Intercreditor Agreement, and except as set forth therein, among other things, (a) the Pre-Petition Revolving Liens are senior and prior in right to the Pre-Petition Term Liens on the "Revolving Lender Priority Collateral" (as defined in the Intercreditor Agreement), and (b) the Pre-Petition Term Liens are senior and prior in right to the Pre-Petition Revolving Liens on the "Term Lender Priority Collateral" (as defined in the Intercreditor Agreement), in each case as provided therein. The Intercreditor Agreement shall remain in full force and effect and be enforceable according to its terms, provided, however, that for purposes of the Intercreditor Agreement, the DIP Facility shall be deemed a

refinancing of the Pre-Petition Revolver Obligations and the DIP Agent and DIP Lenders, and the Pre-Petition Term Agent and the Pre-Petition Term Lenders, shall be entitled to all the benefits and subject to all conditions of the Intercreditor Agreement.

(viii)  Pre-Petition Liens. (a) As of the Petition Date, (i) the Pre-Petition Liens[6] are valid, binding, enforceable, and perfected first-priority and second priority liens, subject only to any valid, properly perfected liens that were senior to the Pre-Petition Revolving Liens as of the Petition Date and are not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law (referred to herein as the "**Permitted Prior Encumbrances**"), and, (ii) the Pre-Petition Obligations constitute legal, valid and binding obligations of the Debtors, enforceable in accordance with the terms of the Pre-Petition Revolving Credit Agreement or the Pre-Petition Term Credit Agreement, as applicable (other than in respect of the stay of enforcement arising from Section 362 of the Bankruptcy Code), and no offsets, defenses, or counterclaims to any of the Pre-Petition Obligations exists, and no portion of the Pre-Petition Obligations is subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (iii) the Pre-Petition Obligations constitute allowable secured claims, and (b) on the date that this Interim Order is entered, the Debtors have waived, discharged and released the Pre-Petition Secured Parties, together with their affiliates, agents, attorneys, officers, directors and employees, of any right the Debtors may have (x) to challenge or object to any of the Pre-Petition Obligations, (y) to challenge or object to the security for the Pre-Petition Obligations, and (z) to bring or pursue any and all claims, objections, challenges, causes of action and/or choses in action arising out of, based upon or in any way related to the Pre-Petition Revolving Credit Agreement, the Pre-Petition Term Credit Agreement (including with respect to any payments made by the Debtors pursuant thereto prior to the Petition Date), or otherwise.  For the avoidance of doubt, the term "Permitted Prior Encumbrances" shall not include, and specifically excludes, the Pre-Petition Revolving Liens, which pre-petition liens are to be subordinate and junior to the liens granted to the DIP Secured Parties.

The Debtors do not possess and shall not assert any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the Pre-Petition Revolving Credit Agreement, the Pre-Petition Term Credit Agreement, or the Pre-Petition Liens, or any claim of the Pre-Petition Secured Parties pursuant to the Pre-Petition Revolving Credit Agreement or the Pre-Petition Term Credit Agreement, as applicable.

(ix)  Cash Collateral. The Pre-Petition Secured Parties have a security interest in Cash Collateral, including all amounts on deposit in the Debtors' banking, checking, or other deposit accounts and all proceeds of Pre-Petition Collateral, to secure the Pre-Petition

---

[6] Other than with respect to Leasehold Interests, as to which the Debtors make no admission, stipulation, acknowledgment or agreement.  The Debtors' Stipulations made in clauses (iii), (vi), and (viii) do not apply with respect to any security interests and Encumbrances on the Leasehold Interests.

Obligations and to the same extent and order of priority as that which was held by such party prior to the commencement of these Cases.

(x)     Priming of DIP Facility. In entering into the DIP Credit Agreement, and as consideration therefor, each Debtor hereby agrees that until such time as all DIP Obligations have been indefeasibly paid in full in cash and the DIP Credit Agreement has been terminated in accordance with the terms thereof, such Debtor shall not in any way prime or seek to prime the security interests and DIP Liens provided to the DIP Secured Parties under this Interim Order by offering a subsequent lender or a party-in-interest a superior or *pari passu* lien or claim pursuant to Section 364(d) of the Bankruptcy Code or otherwise.

E.     Findings Regarding the Post-Petition Financing.

(i)     Need for Post-Petition Financing.     An immediate need exists for the Debtors to obtain funds from the DIP Facility in order to continue their operations and to engage in a process for the sale of their assets (the "**Sale Process**") in order to preserve and maximize the value of their estates. The ability of the Debtors to finance their operations, to pursue the Sale Process, to preserve and maintain the value of the Debtors' assets, and maximize a return for all creditors requires the availability of working capital from the DIP Facility, the absence of which would immediately and irreparably harm the Debtors, their estates, their creditors, and their equity holders.

(ii)     No Credit Available on More Favorable Terms.     The Debtors have been unable to obtain (A) unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense, (B) credit for money borrowed with priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code, (C) credit for money borrowed secured solely by an Encumbrance on property of the estate that is not otherwise subject to an Encumbrance, or (D) credit for money borrowed secured by a junior Encumbrance on property of the estate which is subject to an Encumbrance, in each case, on more favorable terms and conditions than those provided in the DIP Credit Agreement and this Interim Order. The Debtors are also unable to

obtain secured credit, allowable only under Sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code on more favorable terms and conditions than those provided in the DIP Credit Agreement and this Interim Order. The Debtors are unable to obtain credit for borrowed money without granting to the DIP Secured Parties the "DIP Protections" (as defined below).

(iii)    Prior Liens. Nothing herein shall constitute a finding or ruling by this Court that any Pre-Petition Liens or Permitted Prior Encumbrances are valid, senior, perfected, and unavoidable. Moreover, nothing shall prejudice (A) the rights of any party in interest including, but not limited to, the Debtors (other than with respect to the Pre-Petition Secured Parties), the DIP Secured Parties (other than with respect to the Pre-Petition Term Secured Parties), the Pre-Petition Term Secured Parties (other than with respect to the Pre-Petition Revolving Secured Parties), or the Creditors' Committee to challenge the validity, priority, perfection and extent of any such Pre-Petition Lien, Permitted Prior Encumbrance, and/or security interest, or (B) the rights of the Creditors' Committee to challenge the validity, priority, perfection, and extent of the Pre-Petition Liens as set forth in this Interim Order.

F.    Section 506(c) Waiver. As a further condition of the DIP Facility and any obligation of the DIP Lenders to make credit extensions pursuant to the DIP Credit Agreement, and in light of the Pre-Petition Secured Parties' consent to subordinate their liens and superpriority claims to the Carve-Out and the DIP Liens (to the extent provided for herein) and allowing the Debtors' continued use of Cash Collateral, upon entry of the Final Order the Debtors (and any successors thereto or any representatives thereof, including any trustees or examiners appointed in the Cases or any Successor Cases) shall be deemed to have waived any rights or benefits of Section 506(c) of the Bankruptcy Code.

G.   <u>Use of Proceeds of the DIP Facility</u>.  Proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Credit Agreement) shall be used, in each case in a manner consistent with the terms and conditions of the DIP Credit Agreement, and in accordance with the "Budget" (as defined below) with the variations permitted in Paragraph 3 hereof and this Interim Order, solely for (a) working capital and general corporate purposes, (b) payment of costs of administration of the Cases and certain pre-petition claims against the Debtors approved by the Bankruptcy Court, in each case to the extent set forth in the Budget with the variations permitted in Paragraph 3 hereof, and (c) upon entry of this Interim Order, all pre-petition "Letters of Credit" (as defined in the Pre-Petition Revolving Credit Agreement) issued under the Pre-Petition Revolving Credit Agreement shall be deemed issued under the DIP Credit Agreement.  The Debtors shall seek that the Final Order authorizes the Debtors to repay in full any then remaining outstanding balance of the Pre-Petition Revolving Obligations with the first advance made under the DIP Facility after entry of the Final Order.

H.   <u>Application of Proceeds of Collateral to Pre-Petition Obligations</u>.  All proceeds of the sale or other disposition of the "Collateral" (as defined below) whether in the ordinary course of business or otherwise (except as provided in Paragraph 8(d) hereof) shall be applied <u>first</u>, to permanently reduce the Pre-Petition Obligations, to fund the "Pre-Petition Revolving Indemnity Account" and the "Pre-Petition Term Indemnity Account" (each as defined below) in accordance with the terms of this Interim Order, and <u>second,</u> to reduce the DIP Obligations, each in accordance with the terms and conditions of the Pre-Petition Revolving Credit Agreement, the Pre-Petition Term Credit Agreement, the Intercreditor Agreement, the DIP Credit Agreement, to the extent applicable, and this Interim Order.  Payment of the Pre-Petition Obligations in accordance with this Interim Order is necessary as the Pre-Petition Secured Parties will not otherwise consent to the priming of the Revolving Lender Priority Collateral.  Such

payment will not prejudice the Debtors or their estates because payment of such amounts is subject to the rights of parties-in-interest under Paragraph 7 below.

I.    Adequate Protection for Pre-Petition Secured Parties. As a result of the grant of the DIP Liens, the subordination to the Carve-Out, the use of Cash Collateral authorized herein, and any Diminution in Value of their respective interest in the Pre-Petition Collateral (including Cash Collateral), the Pre-Petition Secured Parties are entitled to receive adequate protection pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code. As adequate protection, the Pre-Petition Revolving Agent (for the benefit of the Pre-Petition Revolving Secured Parties) will receive, subject in each case to the Intercreditor Agreement: (1) "Revolving Lien Adequate Protection Payments" (as defined below), (2) the Pre-Petition Replacement Revolving Liens, (3) the Pre-Petition Revolving Lien Superpriority Claim, and (4) the Pre-Petition Revolving Indemnity Account. As adequate protection, the Pre-Petition Term Agent (for the benefit of the Pre-Petition Term Secured Parties) will receive, subject in each case to the Intercreditor Agreement: (1) "Term Lien Adequate Protection Payments" (as defined below), (2) the Pre-Petition Replacement Term Liens, (3) the Pre-Petition Term Lien Superpriority Claim, and (4) the Pre-Petition Term Lien Indemnity Account.

J.    Section 552. In light of their agreement to subordinate their liens and superpriority claims (i) to the Carve-Out in the case of the DIP Secured Parties, and (ii) the Carve-Out and the DIP Liens as provided herein in the case of the Pre-Petition Secured Parties, the DIP Secured Parties and the Pre-Petition Secured Parties are each entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code and the "equities of the case" exception shall not apply.

K.    Extension of Financing. The DIP Secured Parties have indicated a willingness to provide financing to the Debtors in accordance with the DIP Credit Agreement and subject to (i) the entry of this Interim Order and the Final Order, and (ii) findings by this Court that such financing is essential to the

Debtors' estates, that the DIP Secured Parties are good faith financiers, and that the DIP Secured Parties' claims, superpriority claims, security interests and liens, and other protections granted pursuant to this Interim Order (and the Final Order) and the DIP Facility will not be affected by any subsequent reversal, modification, vacatur or amendment of this Interim Order or the Final Order or any other order, as provided in Section 364(e) of the Bankruptcy Code.

L.    <u>Assent of Pre-Petition Secured Parties</u>. The Pre-Petition Secured Parties have indicated a willingness to assent to the entry of this Interim Order and the Final Order in good faith and the superpriority claims, security interests and liens, and other protections granted to the Pre-Petition Secured Parties pursuant to this Interim Order (and the Final Order) will not be affected by any subsequent reversal, modification, vacatur or amendment of this Interim Order or the Final Order or any other order, as provided in Section 364(e) of the Bankruptcy Code.

M.    <u>Business Judgment and Good Faith Pursuant to Section 364(e)</u>.     The terms and conditions of the DIP Facility and the DIP Credit Agreement, and the fees paid and to be paid thereunder are fair, reasonable, and the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration. The DIP Credit Agreement was negotiated in good faith and at arms' length among the Debtors and DIP Secured Parties. Credit to be extended under the DIP Facility and the use of Cash Collateral will be so extended and used in good faith, and for valid business purposes and uses, the consequence of which is that the DIP Secured Parties are entitled to the protection and benefits of Section 364(e) of the Bankruptcy Code.

N.    <u>Relief Essential; Best Interest</u>.    The relief requested in the DIP Motion (and as provided in this Interim Order) is necessary, essential, and appropriate for the continued operation of the Debtors'

business and to avoid immediate and irreparable harm to the Debtors' estates, in order to pursue the Sale Process, and to preserve and maximize the Debtors' assets and personal property. It is in the best interest of the Debtors' estate to be allowed to establish the DIP Facility contemplated by the DIP Credit Agreement.

O.  _Entry of Interim Order_.  For the reasons stated above, the Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

NOW, THEREFORE, on the DIP Motion of the Debtors and the record before the Court with respect to the DIP Motion, and with the consent of the Debtors, the Pre-Petition Secured Parties, and the DIP Secured Parties to the form and entry of this Interim Order, and good and sufficient cause appearing therefor,

IT IS ORDERED AND ADJUDGED that:

1.  **MOTION GRANTED**.  The DIP Motion is granted in its entirety in accordance with the terms and conditions of this Interim Order and the DIP Credit Agreement.

2.  **DIP Credit Agreement**.

(a)  _Approval of Entry into DIP Credit Agreement_.  The Debtors are hereby expressly and immediately authorized, empowered, and directed to execute and deliver the DIP Credit Agreement and to incur and perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Credit Agreement, and to execute and deliver all instruments, certificates, agreements, and documents which may be required or necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP

Liens described in and provided for by this Interim Order and the DIP Credit Agreement. In connection therewith, the Debtors are expressly and immediately authorized and empowered to incur any such DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Credit Agreement. The Debtors are hereby authorized and directed to do and perform all acts, pay the principal, interest, fees, expenses, and other amounts described in the DIP Credit Agreement and all other documents comprising the DIP Facility as such become due, including, without limitation, closing fees, administrative fees, commitment fees, letter of credit fees and reasonable attorneys', financial advisors' and accountants' fees and disbursements as provided for in the DIP Credit Agreement, which amounts shall not otherwise be subject to approval of this Court; provided, however, that, upon request, copies of any such invoices, redacted as necessary to preserve the attorney-client privilege, shall be provided to the United States Trustee, counsel to the Creditors' Committee, counsel to the Pre-Petition Term Agent, and counsel to the Term Lender Group, and shall be subject to a ten (10) day review and objection period for such parties. Upon execution and delivery, the DIP Credit Agreement shall represent valid and binding obligations of the Debtors, enforceable against the Debtors in accordance with its terms.

(b)     Authorization to Borrow. In order to enable the Debtors to continue to operate their business, during the Interim Period and subject to the terms and conditions of this Interim Order, the DIP Credit Agreement, documents comprising the DIP Facility, and the Budget with the variations permitted in Paragraph 3 hereof, the Debtors are hereby authorized under the DIP Facility to borrow up to $90,000,000 during the period commencing on the date on which this Interim Order has been entered by this Court and continuing until the earliest to occur of (i) the

entry by this Court of a further interim order with respect to the subject matter hereof, (ii) the entry by this Court of the Final Order, or (iii) the "Termination Date" (as defined in the DIP Credit Agreement).

(c) <u>Application of DIP Proceeds</u>. The proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Credit Agreement) shall be used, in each case in a manner consistent with the terms and conditions of the DIP Credit Agreement, and in accordance with the Budget with the variations permitted in Paragraph 3 hereof solely for (a) working capital and general corporate purposes, to the extent set forth in the Budget with the variations permitted in Paragraph 3 hereof, (b) payment of costs of administration of the Cases and certain pre-petition claims against the Debtors approved by the Bankruptcy Court, to the extent set forth in the Budget with the variations permitted in Paragraph 3 hereof, and (c) upon entry of this Interim Order, all pre-petition "Letters of Credit" (as defined in the Pre-Petition Credit Agreement) issued under the Pre-Petition Credit Agreement shall be deemed issued under the DIP Credit Agreement.

(d) <u>Conditions Precedent</u>. The DIP Secured Parties shall have no obligation to make any loan or advance under the DIP Credit Agreement during the Interim Period unless the conditions precedent to make such loan under the DIP Credit Agreement have been satisfied in full or waived in accordance with the DIP Credit Agreement.

(e) <u>Post-Petition Liens</u>. Effective immediately upon the entry of this Interim Order, the DIP Secured Parties are hereby granted pursuant to Sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, but subject to the Carve-Out and the Permitted

Pre-Petition Liens, (i) priming first priority, continuing, valid, binding, enforceable, non-avoidable and automatically perfected post-petition security interests and liens, senior and superior in priority to all other secured and unsecured creditors of the Debtors' estates on all Revolving Lender Priority Collateral; and (ii) priming priority, continuing, valid, binding, enforceable, non-avoidable and automatically perfected post-petition security interests and liens senior and superior in priority to the Pre-Petition Revolving Liens and unsecured creditors of the Debtors' estates, but junior to the Pre-Petition Term Liens, whether or not fully perfected on all Term Lender Priority Collateral (collectively, the "**DIP Liens**") upon and to all presently owned and hereafter acquired assets and real and personal property of the Debtors, including, without limitation, the following:

      a.      All Accounts;

      b.      All Inventory;

      c.      All contract rights;

      d.      All Chattel Paper;

      e.      All Documents;

      f.      All Instruments;

      g.      All Supporting Obligations and Letter of Credit Rights;

      h.      All General Intangibles;

      i.      All Payment Intangibles;

      j.      All Equipment;

      k.      All Investment Property;

      l.      All money, cash, cash equivalents, securities and other property of any kind of any Debtor held directly or indirectly by the DIP Secured Parties;

m.    All Specified Bankruptcy Recoveries (as defined below);

n.    All of the Debtors' deposit accounts, credits, and balances with and other claims against the DIP Secured Parties or any of their affiliates or any other financial institution with which any Debtor maintains deposits;

o.    All Commercial Tort Claims, to the extent described on Schedule 6.1(a)(xiv) of the DIP Credit Agreement and all future Commercial Tort Claims in which a security interest is granted to the DIP Agent pursuant to Section 9.27 of the DIP Credit Agreement;

p.    The proceeds of all interests in any real property, including, without limitation, proceeds of all leasehold interests (but excluding the leasehold interests themselves);

q.    all other assets and properties of the Debtors;

r.    all books, records and other property related to or referring to any of the foregoing, including, without limitation, books, records, account ledgers, data processing records, computer software and other property and General Intangibles at any time evidencing or relating to any of the foregoing;

s.    all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing, including, but not limited to, proceeds of any insurance policies, claims against third parties, and condemnation or requisition payments with respect to all or any of the foregoing; and

t.    all obligations now or hereafter owing to the Debtors, or any of them, by any one or more of the "Canadian Subsidiaries" (as defined in the DIP Credit Agreement), as well as all property of any one or more of the Canadian Subsidiaries which constitutes collateral security for those obligations and which is subject to a lien, encumbrance, security interest, or charge granted to the Debtors, or any of them;

(collectively, the "**DIP Collateral**" and, together with the Pre-Petition Collateral, the "**Collateral**"). As used herein, "**Specified Bankruptcy Recoveries**" shall mean any claims and causes of action to which the Borrower may be entitled to assert by reason of any avoidance or other power vested in or on behalf of the Borrower or the estate of the Borrower under Chapter 5

of the Bankruptcy Code, but solely to the extent (a) arising under Section 549 of the Bankruptcy Code, or (b) constituting proceeds of avoidance actions under Section 547 of the Bankruptcy Code to the extent necessary to reimburse the DIP Secured Parties or the Pre-Petition Secured Parties for the amount that any Carve-Out under this Interim Order funded the Borrower's expenses in investigating such actions, commencing such actions, and conducting the litigation and/or settlement discussions that resulted in the receipt of such proceeds, and any and all recoveries or proceeds of any such claims or causes of action.

(f)     Subject to the rights afforded the Creditors' Committee and other parties under Paragraph 7 of this Interim Order, the Encumbrances to be created and granted to the DIP Agent, as provided herein, (i) are created pursuant to Sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, (ii) are first, valid, prior, perfected, unavoidable, and superior to any security, mortgage, or collateral interest or lien or claim to the DIP Collateral, subject only to (i) the Carve-Out and Permitted Prior Encumbrances, and (ii) the liens and claims of the Pre-Petition Term Agent in the Term Lender Priority Collateral. The DIP Liens shall secure all DIP Obligations and shall not be made subject to or *pari passu* with any lien or security interest by any court order heretofore or hereafter entered in the Cases, and shall be valid and enforceable against any trustee or examiner appointed in the Cases, upon the conversion of these Cases to cases under Chapter 7 of the Bankruptcy Code or in any other proceedings related to the foregoing (any "**Successor Case**"), and/or upon the dismissal of the Cases. The DIP Liens shall not be subject to Sections 510, 549, 550 or 551 of the Bankruptcy Code or the "equities of the case" exception of Section 552(b) of the Bankruptcy Code, or, if approved in the Final Order, Section 506(c) of the Bankruptcy Code.

(g)     <u>Enforceable Obligations</u>.     The DIP Credit Agreement shall constitute and evidence the valid and binding obligations of the Debtors, which obligations shall be enforceable against the Debtors, their estates and any successors thereto and their creditors, in accordance with the terms and conditions of the DIP Credit Agreement.

(h)     <u>Protection of DIP Secured Parties and Other Rights</u>.     From and after the Petition Date, the Debtors shall use the proceeds of the extensions of credit under the DIP Facility only for the purposes specifically set forth in the DIP Credit Agreement and this Interim Order and in compliance with the Budget with the variations permitted in Paragraph 3 hereof.

(i)     <u>Superpriority Administrative Claim Status</u>.     Subject to the Carve-Out, the Pre-Petition Term Lien Super Priority Claim (solely with respect to any Diminution in Value of the interests of the Pre-Petition Secured Parties in the Term Lender Priority Collateral), and to the rights afforded the Creditors' Committee under Paragraph 7 of this Interim Order, all DIP Obligations shall be an allowed superpriority administrative expense claim (the "**DIP Superpriority Claim**", and, together with the DIP Liens, the "**DIP Protections**") with priority under Sections 364(c)(1), 503(b), and 507(b) of the Bankruptcy Code, and otherwise over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in, arising, or ordered pursuant to Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of Final Order), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113, and 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment.  Other than the Carve-Out, and the Pre-Petition Term Lien Superpriority Claims

(solely with respect to any Diminution in Value of the interests of the Pre-Petition Term Secured Parties in Pre-Petition Term Priority Collateral), no costs or expenses of administration, including, without limitation, professional fees allowed and payable under Sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in this proceeding, or in any Successor Cases, and no priority claims are, or will be, senior to, prior to, or on a parity with the DIP Protections or the DIP Obligations, or with any other claims of the DIP Secured Parties arising hereunder.

(j)     Allowance of Claim.   The Pre-Petition Obligations are hereby deemed "allowed claims" within the meaning of Section 502 of the Bankruptcy Code.

3.     Authorization to Use Cash Collateral and Proceeds of DIP Credit Agreement.

(a)     Pursuant to the terms and conditions of this Interim Order, the DIP Facility and the DIP Credit Agreement, and in accordance with the budget (as the same may be modified, supplemented or updated from time to time consistent with the terms of this Interim Order, the "Budget"), filed on record in the Cases, the Debtors are authorized to use Cash Collateral and to use the advances under the DIP Credit Agreement during the period commencing immediately after the entry of the Interim Order and terminating (except as set forth in Paragraph 17 hereof) upon the earlier to occur of: (i) notice being provided to the Debtors that an "Event of Default" (as defined below) has occurred as provided in Paragraph 17(b) hereof, or (ii) the Termination Date. Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business or other proceeds resulting therefrom, except as permitted in the DIP Facility and the DIP Credit Agreement and in accordance with the Budget

with the permitted variations set forth in this Paragraph 3(a). Without limiting the Debtors' obligations under Section 9.31 of the DIP Credit Agreement, but subject to Paragraph 20(b) hereof, in no event shall the Debtors request any transfer, nor use any of the Cash Collateral, nor use the advances under the DIP Credit Agreement, to pay any disbursement item in excess of 110% of the cumulative amount set forth for such disbursement item in the Budget for the period from the Petition Date through the week in which the Debtors use such Cash Collateral or advances (x) by line item, or (y) in the aggregate. Further, any unused portion of a line item in the Budget may not be reallocated to another line item in the Budget.

(b) No Cash Collateral or advances under the DIP Credit Agreement may be used by the Debtors, the Creditors' Committee, or any other person or entity to object to or contest in any manner, or raise any defenses to the validity, extent, perfection, priority or enforceability of the Pre-Petition Obligations, or any liens or security interests with respect thereto or any other rights or interests of the Pre-Petition Secured Parties, or to assert any claims or causes of action, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, against the Pre-Petition Secured Parties, or for any other purpose prohibited by the terms of the DIP Credit Agreement.

4. **Adequate Protection for Pre-Petition Obligations**. Subject to the rights afforded the Creditors' Committee under Paragraph 7 of this Interim Order, as adequate protection for the interest of the Pre-Petition Secured Parties in the Pre-Petition Collateral (including Cash Collateral) for (a) any Diminution in Value of the Pre-Petition Collateral for any reason, including, without limitation, resulting from (a) the priming of the Pre-Petition Liens, to the extent provided for herein, (b) subordination to the Carve-Out, (c) the Debtors' use of Cash Collateral, (d) other decline in value arising out of the automatic

stay or the Debtors' use, sale, lease, depreciation, or disposition of the Pre-Petition Collateral (including Cash Collateral), and (e) change in market value of the Collateral (collectively, the "**Diminution in Value**"), the Pre-Petition Secured Parties shall receive adequate protection as follows:

(a) <u>Pre-Petition Replacement Revolving Liens</u>. Solely to the extent of the Diminution in Value of the interests of the Pre-Petition Revolving Secured Parties in the Pre-Petition Revolving Collateral, the Pre-Petition Revolving Secured Parties shall have, subject to the terms and conditions set forth below and subject to the Intercreditor Agreement, pursuant to Sections 361, 363(e) and 364 of the Bankruptcy Code additional and replacement security interests and liens in the DIP Collateral (the "**Pre-Petition Replacement Revolving Liens**"), which shall be junior only to (i) the DIP Liens, (ii) the Carve-Out, and (iii) the Pre-Petition Term Liens and the Pre-Petition Replacement Term Liens solely with respect to Pre-Petition Term Lender Priority Collateral (except to the extent set forth in the Intercreditor Agreement) as provided herein. The Pre-Petition Replacement Revolving Liens herein granted: (i) are and shall be in addition to all security interests, liens and rights of set-off existing in favor of the Pre-Petition Revolving Secured Parties on the Petition Date; (ii) are and shall be valid, perfected, enforceable and effective as of the Petition Date without any further action by the Debtors or the Pre-Petition Revolving Secured Parties and without the necessity of the execution, filing, or recordation of any financing statements, security agreements, filings with the United States Patent and Trademark Offices, mortgages or other document, obtaining control agreements over bank accounts or possession of stock certificates; and (iii) shall secure the payment of indebtedness to the Pre-Petition Revolving Secured Parties in amount equal to the extent of any Diminution in Value of the Pre-Petition Revolving Secured Parties' interest in the Collateral from and after the Petition

Date. Notwithstanding the foregoing, the Pre-Petition Revolving Agent may, in its sole discretion, file such financing statements, mortgages, leasehold mortgages, notices of liens, and other similar documents, and is hereby granted relief from the automatic stay of Section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, leasehold mortgages, notices, and other documents shall be deemed to have been filed or recorded as of the Petition Date.

(b) <u>Pre-Petition Revolving Lien Superpriority Claim.</u>     Solely to the extent of the Diminution in Value of the interests of the Pre-Petition Revolving Secured Parties in the Pre-Petition Revolving Collateral, the Pre-Petition Revolving Secured Parties shall have an allowed superpriority administrative expense claim (the **"Pre-Petition Revolving Lien Superpriority Claim"**) which shall have priority (except with respect to (a) the DIP Liens, (b) the DIP Superpriority Claim, (c) the Carve-Out, and (d) the Pre-Petition Term Lien Superpriority Claims (solely with respect to any Diminution in Value of the interests in the Pre-Petition Term Secured Parties in the Term Lender Priority Collateral) in these Cases under Sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of a Final Order), 507(a), 507(b), 546(c), 546(d), 552, 726, 1113, and 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non consensual lien, levy or attachment, which allowed claims shall be payable from and have recourse to all Collateral and all proceeds thereof, as well as all causes of

action under Chapter 5 of the Bankruptcy Code and all proceeds thereof. Other than the DIP Liens, the DIP Superpriority Claim, the Carve-Out, and the Pre-Petition Term Lien Superpriority Claims (solely with respect to any Diminution in Value of the interests in the Pre-Petition Term Secured Parties in the Pre-Petition Term Priority Collateral), no costs or expenses of administration, including, without limitation, professional fees allowed and payable under Sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in this proceeding, or in any Successor Cases, and no priority claims are, or will be, senior to, prior to or on a parity with the Pre-Petition Revolving Lien Superpriority Claim.

(c)    <u>Revolving Lien Adequate Protection Payments</u>.    The    Pre-Petition    Revolving Secured Parties shall receive adequate protection in the form of (i) repayment in full in cash of the outstanding amount of the Pre-Petition Revolving Obligations (including, principal, interest, fees, costs, expenses) in accordance with this Interim Order, (ii) all "Letters of Credit" (as defined in the Pre-Petition Revolving Credit Agreement) issued under the Pre-Petition Credit Agreement and all obligations on account of cash management services and bank products shall be deemed issued and "Obligations" under the DIP Credit Agreement, and (iii) payment of costs, expenses, indemnities and other amounts with respect to the Pre-Petition Revolving Obligations hereafter arising in accordance with the Pre-Petition Revolving Credit Agreement and this Interim Order (including without limitation, any such payments from the Pre-Petition Revolving Indemnity Account) (collectively, the **"Revolving Lien Adequate Protection Payments "**).

(d)    <u>Pre-Petition Revolving Indemnity Account</u>.    Incidental to the payment in full in cash of the Pre-Petition Revolving Obligations in accordance with the terms of this Interim Order, the Debtors shall establish an account in the "control" (as defined in the UCC) of the Pre-Petition

Revolving Agent (the "**Pre-Petition Revolving Indemnity Account**"), into which the sum of $250,000.00 shall be deposited as security for any reimbursement, indemnification or similar continuing obligations of the Debtors in favor of the Pre-Petition Revolving Secured Parties under the Pre-Petition Revolving Credit Agreement (the "**Pre-Petition Revolving Indemnity Obligations**"); provided, however, that the Pre-Petition Revolving Indemnity Account shall terminate and all remaining amounts held therein shall be released to the Debtors if the Pre-Petition Revolving Obligations have been indefeasibly paid in full in cash upon the earliest to occur of: (i) the "Challenge Period Termination Date" (as defined below) if, as of such date, no party has filed or asserted an adversary proceeding, cause of action, objection, claim, defense, or other challenge as contemplated in Paragraph 7 hereof providing for such release; or (ii) the date this Court enters a final order closing the Cases. The Pre-Petition Revolving Indemnity Obligations shall be secured by a first priority lien on the Pre-Petition Revolving Indemnity Account. The Pre-Petition Revolving Indemnity Account and the amounts therein shall remain property of the Debtors and the Debtors' estates under Section 541 of the Bankruptcy Code, subject to the lien granted herein.

(e)     <u>Pre-Petition Replacement Term Liens</u>.     Solely to the extent of the Diminution in Value of the interests of the Pre-Petition Agent and the Pre-Petition Term Secured Parties in the Pre-Petition Term Collateral, the Pre-Petition Agent and the Pre-Petition Term Secured Parties shall have, subject to the terms and conditions set forth below and subject to the Intercreditor Agreement, pursuant to Sections 361, 363(e) and 364 of the Bankruptcy Code additional and replacement security interests and liens in the DIP Collateral (the "**Pre-Petition Replacement Term Liens**", and together with the Pre-Petition Replacement Revolving Liens, collectively, the

"**Pre-Petition Replacement Liens**"), and junior only to (x) the DIP Liens and the Pre-Petition

Revolving Liens, each solely on the Revolving Lender Priority Collateral (to the extent set forth

in the Intercreditor Agreement) and (y) the Carve-Out. The Pre-Petition Replacement Term Liens

herein granted: (i) are and shall be in addition to all security interests, liens, and rights of set-off

existing in favor of the Pre-Petition Term Secured Parties on the Petition Date; (ii) are and shall

be valid, perfected, enforceable, and effective as of the Petition Date without any further action

by the Debtors or the Pre-Petition Term Secured Parties and without the necessity of the

execution, filing, or recordation of any financing statements, security agreements, filings with the

United States Patent and Trademark Offices, mortgages or other document, obtaining control

agreements over bank accounts or possession of stock certificates; and (iii) shall secure the

payment of indebtedness to the Pre-Petition Term Secured Parties, as the case may be, in amount

equal to the extent of any Diminution in Value of the Pre-Petition Term Secured Parties' interest

in the Collateral from and after the Petition Date. Notwithstanding the foregoing, the Pre-Petition

Term Agent may, in its sole discretion, file such financing statements, mortgages, leasehold

mortgages, notices of liens, and other similar documents, and is hereby granted relief from the

automatic stay of Section 362 of the Bankruptcy Code in order to do so, and all such financing

statements, mortgages, leasehold mortgages, notices, and other documents shall be deemed to

have been filed or recorded as of the Petition Date.

(f)    <u>Pre-Petition Term Lien Superpriority Claim.</u>    Solely to the extent of the Diminution

in Value of the interests of the Pre-Petition Term Secured Parties in the Pre-Petition Term

Collateral, Pre-Petition Term Secured Parties shall have an allowed superpriority administrative

expense claim (the "**Pre-Petition Term Lien Superpriority Claim**" and together with the Pre-

Petition Revolving Lien Superpriority Claim, collectively, the "**Pre-Petition Superpriority Claims**") which shall be subject to the Intercreditor Agreement and shall have priority (except with respect to (a) each of (i) the DIP Liens, (ii) the DIP Superpriority Claim, and (iii) the Pre-Petition Revolving Lien Superpriority Claim (each solely with respect to Diminution in Value of the interests of the Pre-Petition Revolving Secured parties in the Revolving Lender Priority Collateral), and (b) the Carve-Out in these Cases under Sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of a Final Order), 507(a), 507(b), 546(c), 546(d), 552, 726, 1113, and 1114 of the Bankruptcy Code, and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever, whether or not such expenses or claims may become secured by a judgment lien or other non consensual lien, levy or attachment, which allowed claims shall be payable from and have recourse to all Collateral and all proceeds thereof, as well as all causes of action under Chapter 5 of the Bankruptcy Code and all proceeds thereof. Other than (a) each of (i) the DIP Liens, (ii) the DIP Superpriority Claim, and (iii) the Pre-Petition Revolving Lien Superpriority Claim (each solely with respect to Diminution in Value of the interests of the Pre-Petition Revolving Secured parties in the Revolving Lender Priority Collateral), and (b) the Carve-Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under Sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in this proceeding, or in any

Successor Cases, and no priority claims are, or will be, senior to, prior to or on a parity with the Pre-Petition Term Lien Superpriority Claim.

(g) <u>Term Lien Adequate Protection Payments.</u> The Debtors (i) agree that, notwithstanding anything to the contrary set forth in that certain First Amendment to the Amended and Restated Term Loan Agreement, dated as of April 2, 2009, among the Pre-Petition Term Agent, the Pre-Petition Term Lenders and the Debtors (the **"First Amendment to Pre-Petition Term Credit Agreement"**), the 90-Day Extension PIK Fee (as defined in the First Amendment to the Pre-Petition Term Credit Agreement) shall be deemed to have been made and earned on the Petition Date and shall be included as part of the Pre-Petition Term Obligations, and (ii) shall pay the Pre-Petition Term Agent, for the benefit of itself and the Pre-Petition Term Secured Parties, adequate protection in the form of payment of costs, expenses, indemnities, and other amounts (excluding interest, which shall accrue post-petition at the non-default rate and be payable upon the earlier to occur of the closing of the 363 Sale or the occurrence of an Event of Default) with respect to the Pre-Petition Term Obligations hereafter arising in accordance with the Pre-Petition Term Credit Agreement and this Interim Order, and all such costs and expenses as set forth in Paragraph 20(b) incurred by the "Term Lender Group" (as referred to in Paragraph 20(b) hereof) (the **"Term Lien Adequate Protection Payments"**, and together with the Revolving Lien Adequate Protection Payments, collectively, the **"Adequate Protection Payments"**); provided, however, that in the event the Pre-Petition Term Secured Parties are determined by this Court to be undersecured, payments made hereunder may be recharacterized and recredited to the principal balance of the Pre-Petition Term Obligations.

(h)  Pre-Petition Term Lien Indemnity Account.  Contemporaneously with the payment in full in cash of the Pre-Petition Term Obligations in accordance with the terms of this Interim Order, the Debtors shall establish an account in the "control" (as defined in the UCC) of the Pre-Petition Term Agent (the **"Pre-Petition Term Lien Indemnity Account"**, and together with the Pre-Petition Revolving Indemnity Account, collectively, the **"Pre-Petition Indemnity Accounts"**), into which the sum of $250,000.00 shall be deposited as security for any reimbursement, indemnification or similar continuing obligations of the Debtors in favor of the Pre-Petition Term Secured Parties under the Pre-Petition Term Credit Agreement (the **"Pre-Petition Term Lien Indemnity Obligations"**, and together with the Pre-Petition Revolving Indemnity Obligations, collectively, the **"Pre-Petition Indemnity Obligations"**); provided, however, that the Pre-Petition Term Lien Indemnity Account shall terminate and all remaining amounts held therein shall be released to the Debtors if the Pre-Petition Term Obligations have been indefeasibly paid in full in cash upon the earliest to occur of:  (i) the Challenge Period Termination Date if, as of such date, no party has filed or asserted an adversary proceeding, cause of action, objection, claim, defense, or other challenge as contemplated in Paragraph 7 hereof providing for such release; or (ii) the date this Court enters a final order closing the Cases.  The Pre-Petition Term Lien Indemnity Obligations shall be secured by a first priority lien on the Pre-Petition Term Lien Indemnity Account.  The Pre-Petition Revolving Indemnity Account and the amounts therein shall remain property of the Debtors and the Debtors' estates under Section 541 of the Bankruptcy Code, subject to the lien granted herein.

(i)  Consultation on Budget.  The DIP Agent shall consult with and provide prior written notice of no less than five (5) business days to the Pre-Petition Term Agent and the Term Lender

Group prior to agreeing to any material changes to the Budget (any such change, a "**Budget Change**"); provided, however, that in no event shall the Pre-Petition Term Agent or the Term Lender Group have a consent right regarding any Budget Change whatsoever, except to the extent, if any, that the Pre-Petition Term Agent is expressly granted a consent right under the terms of the Intercreditor Agreement, until such time as the Pre-Petition Revolving Obligations and the DIP Obligations have been paid in full. For the avoidance of doubt, nothing contained in this subsection (i) shall be deemed to limit, restrict, or constitute a waiver of any of the respective rights and remedies of the DIP Agent or the Pre-Petition Term Agent under the Bankruptcy Code or other applicable law, including, without limitation, any right of the Pre-Petition Term Agent or the Term Lender Group (as such right may be limited by the terms and conditions of the Intercreditor Agreement) to file an objection or other appropriate pleading with this Court in the event that it does not agree with any Budget Change to which the DIP Agent has consented or the DIP Agent's and Debtors' respective rights to contest such objection. The Pre-Petition Term Agent and the Term Lender Group shall have a right to be heard on an objection to a Budget Change (or an updated Budget) by the Court on an expedited basis (not to exceed three (3) business days).

5. **Section 507(b) Reservation**. Nothing herein shall impair or modify the Pre-Petition Secured Parties' rights under Section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Pre-Petition Secured Parties hereunder is insufficient to compensate for the Diminution in Value of the interest of such Pre-Petition Secured Parties in the applicable Pre-Petition Collateral during the Cases or any Successor Cases, provided, however, that (i) any claim granted in the Cases to the Pre-Petition Secured Parties pursuant to Section 507(b) of the Bankruptcy Code shall be

junior in right of payment to all DIP Obligations (other than with respect to the Term Lender Priority Collateral) and subject to the Carve-Out and the Intercreditor Agreement. Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the Pre-Petition Revolving Agent, Pre-Petition Term Agent, or other Pre-Petition Secured Parties that the adequate protection granted herein does in fact adequately protect the Pre-Petition Secured Parties against any Diminution in Value of their respective interests in the Pre-Petition Collateral (including Cash Collateral), subject to the Intercreditor Agreement.

6.     **Post-Petition Lien Perfection**.  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens and the Pre-Petition Replacement Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement or securities account control agreement) to validate or perfect the DIP Liens and the Pre-Petition Replacement Liens or to entitle the DIP Liens and the Pre-Petition Replacement Liens to the priorities granted herein.  Notwithstanding the foregoing, the DIP Agent, the Pre-Petition Revolving Agent and the Pre-Petition Term Agent (collectively, the "**Agents**") may, each in their sole discretion, file such financing statements, mortgages, security agreements, notices of liens and other similar documents, and is hereby granted relief from the automatic stay of Section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices and other agreements or documents shall be deemed to have been filed or recorded at the time and on the Petition Date.  The Debtors shall execute and deliver to the Agents all such security agreements, financing statements, mortgages, notices and other documents as the Agents may reasonably request to evidence, confirm,

validate or perfect, or to insure the contemplated priority of, the DIP Liens and the Pre-Petition Replacement Liens granted pursuant hereto. The DIP Agent, in its discretion, may file a photocopy of this Interim Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which the Debtors have real or personal property, and in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Interim Order. The DIP Agent shall, in addition to the rights granted to the DIP Agent under the DIP Credit Agreement, be deemed to be the successor in interest to the Pre-Petition Revolving Secured Parties with respect to all third party notifications in connection with the Pre-Petition Revolving Credit Agreement, all Blocked Account Agreements (as defined in the Pre-Petition Revolving Credit Agreement) and all other agreements with third parties (including any agreement with a landlord, warehouseman, customs broker, freight forwarder, or credit card processor) relating to, or waiving claims against, any Pre-Petition Revolving Collateral, including without limitation, each collateral access agreement executed and delivered by any landlord of the Debtors and including, for the avoidance of doubt, all deposit account control agreements, securities account control agreements, and credit card agreements, provided that the Pre-Petition Revolving Agent shall continue to have all rights pursuant to each of the foregoing.

7. **Reservation of Certain Third Party Rights and Bar of Challenges and Claims**. Nothing in this Interim Order or the DIP Credit Agreement shall prejudice whatever rights the Creditors' Committee may have (a) to file an adversary proceeding or contested matter or otherwise to object to or challenge the Debtors' Stipulations and the findings herein, including, but not limited to, those in relation to (i) the validity, extent, perfection, enforceability or priority of the mortgage, security interests and liens of the Pre-Petition Secured Parties in and to the Pre-Petition Collateral, or (ii) the validity, allowability,

priority, status, enforceability or amount of the Pre-Petition Obligations, or (b) to bring suit against any of the Pre-Petition Secured Parties in connection with or related to the Pre-Petition Obligations, or the actions or inactions of any of the Pre-Petition Secured Parties arising out of or related to the Pre-Petition Obligations; provided, however, that, unless the Creditors' Committee commences a contested matter or adversary proceeding raising such filing or other objection or challenge, including without limitation any claim against the Pre-Petition Secured Parties in the nature of a setoff, counterclaim, defense, or other claim of avoidance to the Pre-Petition Obligations (including but not limited to, those under Sections 506, 544, 547, 548, 549, 550 and/or 552 of the Bankruptcy Code, or by way of suit against any of the Pre-Petition Secured Parties), during the sixty (60) day period following the appointment of the Creditors' Committee (the "**Challenge Period**," with the date that is the next calendar day after the termination of the Challenge Period, in the event that no objection or challenge is raised during the Challenge Period, being referred to as the "**Challenge Period Termination Date**"), then upon the Challenge Period Termination Date, any and all such challenges and objections by any party (including, without limitation, the Creditors' Committee, any Chapter 11 or Chapter 7 trustee appointed herein or in any Successor Cases, receiver, administrator, trustee, examiner, responsible officer, other estate representative and any other creditor, interest holder, or party in interest) shall be deemed to be forever waived and barred, and (i) the Pre-Petition Obligations shall be deemed to be allowed in full and shall be deemed to be allowed as a fully secured claim within the meaning of Section 506 of the Bankruptcy Code for all purposes in connection with these Cases and any Successor Cases, and the Debtors' Stipulations shall be binding on all creditors, interest holders and parties in interest (including, any Creditors' Committee, any creditor, or Chapter 11 or Chapter 7 trustee appointed herein or in any Successor Cases, receiver, administrator, trustee, examiner, responsible officer, and other estate representative), (ii) the Pre-Petition Agents' and other Pre-Petition Secured Parties' security interests and Encumbrances upon the Pre-Petition Collateral

shall be deemed to have been, as of the Petition Date, legal, valid, binding, enforceable, and perfected security interests and Encumbrances, not subject to recharacterization, subordination or otherwise avoidable, and (iii) the payment of the Pre-Petition Obligations in accordance with this Interim Order (whether prior or subsequent to the Petition Date) shall be deemed final and indefeasible, not subject to subordination or disgorgement and otherwise unavoidable. To the extent any such objection or complaint is filed, the Pre-Petition Secured Parties shall be entitled to include such costs and expenses, including but not limited to reasonable attorneys' fees, incurred in defending the objection or complaint as part of the Pre-Petition Obligations.

8. **Carve-Out**.

(a) Notwithstanding anything in this Interim Order or the DIP Credit Agreement to the contrary, subject only to the terms and conditions contained in Paragraph 8(b), the DIP Liens, DIP Superpriority Claims, the Pre-Petition Replacement Liens, the Pre-Petition Indemnity Accounts, and the Pre-Petition Superpriority Claims are subordinate to the sum of the amounts described in subparagraphs (i), (ii), and (iii) below (with the sum of those amounts hereinafter referred to as the "**Carve-Out**"):

(i) Allowed administrative expenses pursuant to 28 U.S.C. Section 1930(a)(6);

(ii) The sum of (A) and (B), where (A) is the lesser of (I) the aggregate amount of the Debtors' professional fees and disbursements which have been incurred, accrued, or invoiced (but remain unpaid) by the Debtors prior to the date on which the DIP Agent provides written notice that an Event of Default has occurred and the DIP Agent has triggered the Carve-Out (a "**Carve Out Trigger Notice**") (the "**Reported Professional Fees**") for any professional retained by a final

order of the Court under Section 327 of the Bankruptcy Code (which order has not been vacated, stayed, or appealed), or (II) the cumulative amount set forth in the Budget for professional fees of the Debtors' professionals for the period from the Petition Date through the earlier of the Termination Date or the date of receipt by the Debtors and the Debtors' counsel of a Carve-Out Trigger Notice, and (B) is $3,000,000; and

(iii) The sum of (A) and (B) where (A) is the lesser of (I) the Reported Professionals Fees of the Creditors' Committee's professionals incurred by the Creditors' Committee for any professional retained by a final order of the Court by the Creditors' Committee under Section 1103 of the Bankruptcy Code (which order has not been vacated, stayed, or appealed), or (II) the cumulative amount set for the in the Budget for professional fees of the Creditors' Committee professionals for the period from the Petition Date through the earlier of the Termination Date or the receipt by the Creditors' Committee's counsel of a Carve-Out Trigger Notice; and (B) is $500,000. For the avoidance of any doubt, no success fee, transaction fee, or bonus due incurred by Peter J. Solomon Company, L.P., the Debtors' investment banker, or any financial advisor retained by the Creditors' Committee, shall be paid from the Carve-Out unless and until all other allowed hourly and monthly professional fees and disbursements have been paid in full in cash on a final basis.

(b)     The Carve-Out shall exclude any fees and expenses (x) incurred in connection with the assertion or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defenses or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief (A) invalidating, setting aside, avoiding, or subordinating, in whole or in part, (i) the DIP Obligations, (ii) the Pre-Petition Obligations, (iii) the Pre-Petition Liens in the Pre-Petition Collateral, (iv) the DIP Agent's or the DIP Secured Parties' Liens in the DIP

Collateral, or (v) the Pre-Petition Replacement Liens in the DIP Collateral, or (B) preventing, hindering or delaying, whether directly or indirectly, the DIP Agent's, the DIP Secured Parties', or the Pre-Petition Secured Parties' assertions or enforcement of their Encumbrances, security interests, or their realization upon any DIP Collateral, the Pre-Petition Collateral, the Pre-Petition Replacement Liens, or the Pre-Petition Indemnity Accounts, and no Cash Collateral or proceeds from the DIP Facility may be used to accomplish any of the foregoing, provided, however, that such exclusion does not encompass any investigative work conducted by attorneys and financial advisors employed by the Debtors or the Creditors' Committee pursuant to Sections 327 and 1103 of the Bankruptcy Code prior to bringing any action relating to the foregoing to the extent such fees and expenses do not exceed $50,000.00, (y) in using Cash Collateral of the DIP Secured Parties, selling or otherwise disposing of any other DIP Collateral, or incurring any indebtedness not permitted under the DIP Credit Agreement, without the DIP Agent's express written consent or (z) arising after the conversion of these Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code.

(c)    Except as otherwise provided in this paragraph, nothing contained in this Interim Order shall be deemed a consent by the Pre-Petition Secured Parties, or the DIP Secured Parties to any charge, lien, assessment, or claim against any of them or the DIP Collateral, the Pre-Petition Collateral, the Pre-Petition Replacement Liens, or the Pre-Petition Indemnity Accounts under Section 506(c) of the Bankruptcy Code or otherwise. Nothing herein shall be construed to obligate the Pre-Petition Secured Parties, or the DIP Secured Parties, in any way, to pay the Professional Fees, or to assure that the Debtors have sufficient funds on hand to pay any Professional Fees. So long as no Event of Default exists that has not been waived in writing, the

Debtors shall be permitted to pay compensation and reimbursement of expenses allowed and payable under Sections 330 and 331 of the Bankruptcy Code and in accordance with the Budget with the variations permitted in Paragraph 3 hereof, as the same may be due and payable and the same shall not reduce the Carve-Out.

(d)     The Carve-Out shall be funded upon the earlier to occur of (x) the closing on the 363 Sale out of the first proceeds thereof, or (y) from the first proceeds realized from the disposition of the Collateral, as provided in Paragraph 17(b) hereof.   In either circumstance, in the event that there are not sufficient proceeds of the Revolving Lender Priority Collateral to satisfy and pay in full in cash all Pre-Petition Revolving Obligations (to the extent any then remain outstanding) and all DIP Obligations, then the Carve-Out shall be re-allocated between, and paid out of proceeds of, the Revolving Lender Priority Collateral and the Term Lender Priority Collateral on a 50%/50% basis.

9.     **Payment of Compensation**.     Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of the Debtors, the Creditors' Committee, or of any person, or shall affect the right of the Agents to object to the allowance and payment of such fees and expenses or to permit the Debtors to pay any such amounts not set forth in the Budget after taking into account the variations permitted in Paragraph 3 hereof.

10.     **Section 506(c) Claims**.     Subject to the entry of a Final Order, no costs or expenses of administration which have been or may be incurred in the Cases at any time shall be charged against the DIP Secured Parties, the Pre-Petition Secured Parties, their respective claims, the Pre-Petition Collateral, or the DIP Collateral, pursuant to Sections 105, and 506(c) of the Bankruptcy Code, or otherwise, without

the prior written consent of the Agents. Nothing contained in this Interim Order shall be deemed a consent by the Pre-Petition Secured Parties or the DIP Secured Parties to any charge, lien, assessment, claim, or other Encumbrance against any of them or the DIP Collateral, the Pre-Petition Collateral, the Pre-Petition Replacement Liens, or the Pre-Petition Indemnity Accounts under Section 506(c) of the Bankruptcy Code or otherwise.

11. **Collateral Rights.** Unless (x) the DIP Agent and the Pre-Petition Revolving Agent have provided their prior written consent or all Pre-Petition Revolving Obligations and DIP Obligations have been paid in full in cash (or will be paid in full in cash upon entry of an order approving indebtedness described in subparagraph (a) below), all commitments to lend (including, without limitation, all "Commitments" (as defined in each of the Pre-Petition Credit Agreement and the DIP Credit Agreement, as applicable)) have irrevocably terminated, all Letters of Credit have been cash collateralized as required by the DIP Credit Agreement, all fixed and liquidated indemnification obligations under the DIP Credit Agreement have been cash collateralized and the Pre-Petition Revolving Indemnity Account has been established and fully funded, and (y) the Pre-Petition Term Agent has provided its written consent or all Pre-Petition Term Obligations have been paid in full in cash and the Pre-Petition Term Indemnity Account has been established and fully funded, there shall not be entered in this proceeding, or in any Successor Cases, any order which authorizes any of the following:

(a) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, lien, collateral interest or other Encumbrance on all or any portion of the DIP Collateral, the Pre-Petition Collateral, or the Pre-Petition Indemnity Accounts and/or entitled to priority administrative status which is equal or senior to that granted to the Pre-Petition Secured Parties or the DIP Secured Parties herein; or

(b)     relief from stay by any person other than of the DIP Agent or other the DIP Secured Parties on or with respect to all or any portion of the Collateral; or

(c)     the Debtors' return of goods constituting Collateral pursuant to Section 546(h) of the Bankruptcy Code.

12.     **Proceeds of Subsequent Financing.**     Without limiting the provisions and protections of Paragraph 11, above, if at any time prior to the indefeasible payment in full in cash of all Pre-Petition Obligations and all DIP Obligations and the termination of the DIP Agent's and the DIP Lenders' obligations to make loans and advances under the DIP Credit Agreement (including, without limitation, in respect of the Commitments), including subsequent to the confirmation of any Chapter 11 plan or plans (singly and collectively, the "**Plan**") any or all of the Debtors, their estates, any trustee, any examiner, or any responsible officer subsequently appointed, obtains credit or incur debt pursuant to Sections 364(b), 364(c) or 364(d) of the Bankruptcy Code in violation of the DIP Credit Agreement, then all of the cash proceeds and all Cash Collateral derived from such credit or debt shall immediately be turned over to the Pre-Petition Revolving Agent or the DIP Agent, as applicable, for application in reduction of the Pre-Petition Obligations and the DIP Obligations in accordance with the terms of the DIP Credit Agreement, the Intercreditor Agreement, and this Interim Order.

13.     **Termination Date.**     Immediately upon the Termination Date, all (i) DIP Obligations shall be immediately due and payable, and (ii) the Debtors' authority to use the proceeds of the DIP Credit Agreement and to use Cash Collateral (except as provided in Paragraph 17 hereof), shall cease.

14.     **Payment from Proceeds of Collateral.**     All products and proceeds of the Collateral (including, for the avoidance of doubt, proceeds from receivables and sales in the ordinary course of

business or from any Permitted Sale, insurance proceeds, and proceeds of all dispositions of Collateral, whether or not in the ordinary course) regardless of whether such Collateral came into existence prior to the Petition Date, shall be remitted to the DIP Agent for application in accordance with the terms of this Interim Order, the DIP Credit Agreement, and the Intercreditor Agreement.

15. **Disposition of Collateral**. The Debtors shall not (a) sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral or Pre-Petition Collateral, without the prior written consent of the requisite DIP Secured Parties and Pre-Petition Secured Parties (and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Secured Parties, the Pre-Petition Secured Parties, or an order of this Court), except (i) for sales of the Debtors' inventory in the ordinary course of business, (ii) for sale(s) of assets in connection with the 363 Sale, so long as the proceeds thereof are paid in cash to the DIP Secured Parties and the Pre-Petition Secured Parties at closing on the 363 Sale for application as provided in this Interim Order, or (iii) as otherwise provided for in the DIP Credit Agreement and this Interim Order and approved by the Court, or (b) assume, reject, or assign any lease, except as otherwise provided for in the DIP Credit Agreement.

16. **Events of Default**. The occurrence of any Event of Default (as defined in the DIP Credit Agreement) shall constitute an Event of Default under this Interim Order. Unless and until the Pre-Petition Obligations and the DIP Obligations have been repaid in full in cash, all commitments to lend have irrevocably terminated (including, without limitation, the Commitments), all Letters of Credit have been cash collateralized in accordance with the DIP Credit Agreement, all fixed and liquidated DIP Obligations that survive termination of the obligations have been cash collateralized to the reasonable satisfaction of the Pre-Petition Revolving Agent and DIP Agent, and the Pre-Petition Indemnity Accounts have been established and fully funded, the protections afforded to Pre-Petition Secured Parties and the

DIP Secured Parties pursuant to this Interim Order and under the DIP Credit Agreement, and any actions taken pursuant thereto, shall survive the entry of any order confirming a Plan or converting these Cases into Successor Cases, and the DIP Liens, the DIP Superpriority Claim, the Pre-Petition Replacement Liens, and the Pre-Petition Superpriority Claims shall continue in this proceeding and in any Successor Cases, and such DIP Liens, DIP Superpriority Claim, Pre-Petition Replacement Liens, and the Pre-Petition Superpriority Claims shall maintain their priority as provided by this Interim Order.

17. **Rights and Remedies Upon Event of Default**.

    (a)    Any automatic stay otherwise applicable to the Pre-Petition Secured Parties and the DIP Secured Parties is hereby modified so that after the occurrence of any Event of Default or the Termination Date and at any time thereafter, upon five (5) business days prior written notice of such occurrence, in each case given by the DIP Agent, the Pre-Petition Revolving Agent, or the Pre-Petition Term Agent to each of (i) the Debtors, (ii) counsel to the Debtors, (iii) counsel to the Pre-Petition Term Agent, counsel to the Pre-Petition Revolving Agent, and/or the DIP Agent, as the case may be, (iv) counsel to the Creditors' Committee, and (v) the United States Trustee, the Pre-Petition Secured Parties and the DIP Secured Parties shall be entitled to exercise their rights and remedies in accordance with the Pre-Petition Revolving Credit Agreement, the Pre-Petition Term Credit Agreement, and the DIP Credit Agreement, as applicable. Immediately following the giving of notice by the DIP Agent, the Pre-Petition Revolving Agent, or the Pre-Petition Term Agent of the occurrence of an Event of Default or the Termination Date, as the case may be: (i) the Debtors shall continue to deliver and cause the delivery of the proceeds of Collateral to the DIP Agent as provided in the DIP Credit Agreement and this Interim Order; and (ii) the DIP Agent shall continue to apply such proceeds in accordance with the provisions of this Interim Order, the

DIP Credit Agreement and the Intercreditor Agreement. Following the giving of written notice by the DIP Agent or the Pre-Petition Term Agent of the occurrence of an Event of Default or the Termination Date, the Debtors shall be entitled to an emergency hearing before this Court solely for the purpose of contesting whether an Event of Default or the Termination Date has occurred (such hearing, an **"Emergency Stay Hearing"**). If the Debtors do not within the time period specified above contest the right of the Pre-Petition Secured Parties and the DIP Secured Parties to exercise their remedies based upon whether an Event of Default or the Termination Date has occurred, or if the Debtors do timely contest the occurrence of an Event of Default and this Court, after notice and hearing, declines to stay the enforcement thereof, the automatic stay as to the Pre-Petition Secured Parties and the DIP Secured Parties shall automatically terminate at the end of such notice period. After the applicable Emergency Stay Hearing, unless this Court shall have entered an order to the contrary: (i) the Debtors shall have no right to use any of such proceeds, nor any other Cash Collateral other than towards the satisfaction of the Pre-Petition Obligations, the DIP Obligations, and the Carve-Out; and (ii) any obligation otherwise imposed on the DIP Agent or the other DIP Secured Parties to provide any loan or advance to the Debtors pursuant to the DIP Facility shall be suspended. For avoidance of doubt, the service of any notice of the occurrence of an Event of Default shall be subject to the Intercreditor Agreement. Further, and notwithstanding the foregoing, the Pre-Petition Term Agent may not serve a notice of an Event of Default with respect to matters that are exclusively within the domain of the DIP Credit Agreement. For the avoidance of doubt, a violation of the terms of Paragraph 3(a), Paragraph 20(j) or Paragraph 20(k) hereof shall entitle the Pre-Petition Term Agent to provide notice of an Event of Default.

(b)     Subject to the provisions of Paragraph 17(a), upon the occurrence of an Event of Default that has not been waived by the DIP Agent, the Pre-Petition Revolving Agent, or the Pre-Petition Term Agent, as applicable, or upon the Termination Date, and unless this Court shall have entered an order to the contrary, the DIP Secured Parties are authorized to exercise their remedies and proceed under or pursuant to the DIP Credit Agreement, and, to the extent that any Pre-Petition Term Obligations remain outstanding, the Pre-Petition Term Agent shall be entitled to exercise its rights and remedies under the Pre-Petition Credit Agreement and under the Pre-Petition Term Liens. All proceeds realized pursuant to this Paragraph 17(b) shall be applied first, to fund the Carve-Out (provided that any application of such proceeds to the Carve-Out shall not reduce the DIP Obligations or the Pre-Petition Obligations), and second, to the DIP Obligations and the Pre-Petition Obligations under, and in accordance with the provisions of, the DIP Credit Agreement, the Pre-Petition Revolving Credit Agreement, the Pre-Petition Term Credit Agreement, the Intercreditor Agreement, and this Interim Order.

(c)     The automatic stay imposed under Section 362(a) of the Bankruptcy Code is hereby modified pursuant to the terms of the DIP Credit Agreement as necessary to (i) permit the Debtors to grant the Pre-Petition Replacement Liens, and the Pre-Petition Indemnity Accounts and the DIP Liens, and to incur all Obligations and obligations to the Pre-Petition Secured Parties, the DIP Secured Parties under the DIP Credit Agreement, the DIP Facility and this Interim Order, and (ii) authorize the DIP Secured Parties and the Pre-Petition Secured Parties to retain and apply payments in accordance with the terms of the DIP Credit Agreement and this Interim Order.

(d)     Nothing included herein shall prejudice, impair, or otherwise affect the Pre-Petition Secured Parties' or the DIP Secured Parties' rights to seek any other or supplemental

relief in respect of the Debtors nor the DIP Agent's or DIP Lenders' rights, as provided in the DIP Credit Agreement, to suspend or terminate the making of loans under the DIP Credit Agreement.

18. **Rights with Respect to Certain Pre-Petition Agreements**. The DIP Agent and the other the DIP Secured Parties shall have all the rights and benefits with respect to each Blocked Account Agreement (as defined in the Pre-Petition Revolving Credit Agreement), each other agreement with a third party (including any agreement with a landlord, warehouseman, customs broker, freight forwarder, or credit card processor), and each other notification or agreement received or furnished in connection with the Pre-Petition Revolving Credit Agreement, and all depository banks, blocked account banks, landlords, warehousemen, customs brokers, freight forwarders, credit card processors and other third parties shall continue to comply for the benefit of the DIP Secured Parties, with the terms and conditions of each such agreement or notification, in each such case whether or not, and as if, an additional agreement or notification has been executed or furnished in connection with the DIP Credit Agreement.

19. **Proofs of Claim**. Each Debtor acknowledges and agrees that both the Pre-Petition Obligations and the DIP Obligations, and the related liens, rights priorities and protections granted to or in favor of the applicable Pre-Petition Secured Parties and DIP Secured Parties, respectively, as set forth herein and in the Pre-Petition Credit Agreement, the Pre-Petition Term Credit Agreement and the DIP Credit Agreement, as applicable, shall each constitute a proof of claim on behalf of the applicable Pre-Petition Secured Parties or DIP Secured Parties in the Cases. Neither the Pre-Petition Secured Parties nor the DIP Secured Parties are required to file proofs of claim in the Cases or in any Successor Cases, however, each are hereby authorized and entitled to file (and amend and/or supplement) proofs of claim (including the proofs of claim provided for by this Paragraph 19) in the Cases or any Successor Cases.

20. **Other Rights and Obligations**

(a) <u>Good Faith Under Section 364(e) of the Bankruptcy Code. No Modification or Stay of this Interim Order.</u>     Based on the findings set forth in this Interim Order and in accordance with Section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility contemplated by this Interim Order, in the event any or all of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of this or any other Court, the DIP Secured Parties are entitled to the protections provided in Section 364(e) of the Bankruptcy Code, and no such appeal, modification, amendment or vacation shall affect the validity and enforceability of any advances made hereunder or the liens or priority authorized or created hereby. Notwithstanding any such modification, amendment or vacation, any claim granted to the DIP Secured Parties hereunder arising prior to the effective date of such modification, amendment, or vacation of any DIP Protections granted to the DIP Secured Parties shall be governed in all respects by the original provisions of this Interim Order, and the DIP Secured Parties shall be entitled to all of the rights, remedies, privileges and benefits, including the DIP Protections granted herein, with respect to any such claim. Since the loans made pursuant to the DIP Credit Agreement are made in reliance on this Interim Order, the obligations owed the DIP Secured Parties prior to the effective date of any stay, modification, or vacation of this Interim Order shall not, as a result of any subsequent order in the Cases, or in any Successor Cases, be subordinated, lose their lien priority or superpriority administrative expense claim status, or be deprived of the benefit of the status of the liens and claims granted to the DIP Secured Parties under this Interim Order and/or the DIP Credit Agreement.

(b)     Expenses. As provided in the Pre-Petition Revolving Credit Agreement, the Pre-Petition Term Credit Agreement, the DIP Credit Agreement, and Paragraph 4(g) hereof, all costs and expenses of the DIP Secured Parties and the Pre-Petition Secured Parties in connection with the DIP Credit Agreement, the Pre-Petition Revolving Credit Agreement, and the Pre-Petition Term Credit Agreement, including, without limitation, reasonable, legal, accounting, collateral examination, monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants, indemnification and reimbursement of fees and expenses, and other out of pocket expenses (including, without limitation, the reasonable expenses of the so called "Term Lender Group"), including the following professionals, without limitation:

(i) Paul, Hastings, Janofsky & Walker, LLP ("PHJ&W"), legal counsel to the Pre-Petition Term Agent;

(ii) Morris, Nichols, Arsht & Tunnell LLP, legal counsel to the Pre-Petition Term Agent;

(iii) Lazard Frères & Co. LLC ("Lazard"), as financial advisors (as provided for in the engagement letter among Lazard, the Pre-Petition Term Agent, and PHJ&W, dated as of June 1, 2009 (the "**Lazard Engagement Letter**") to the Pre-Petition Term Agent, which is hereby deemed approved;

(iv) Kasowitz, Benson, Torres & Friedman LLP legal counsel to the Term Lender Group; and

(v) Saul Ewing, legal counsel to the Term Lender Group,

which shall be paid by the Debtors, whether or not the transactions contemplated hereby, including the 363 Sale, are consummated; provided, however, that prior to the earlier to occur of (a) the occurrence of an Event of Default which has not been waived in writing, (b) the closing of the 363 Sale, or (c) September 1, 2009 (each a "**Trigger Event**"), payment of such fees and expenses shall be limited to the amounts and times set forth in the Budget and, upon the closing of the 363 Sale, the DIP Agent and the Pre-Petition Term Agent shall reserve an amount for such unpaid fees and expenses from the distributions otherwise payable to the DIP Lenders and Pre-Petition Revolving Lenders in the case of the DIP Agent and the Pre-Petition Term Lenders in the case of the Pre-Petition Term Agent and the Term Lender Group.

Upon a Trigger Event (subject to compliance with the procedures above), all such fees and expenses shall be paid to the DIP Agent, the Pre-Petition Term Agent, and the Term Lender Group, as applicable, notwithstanding any limitations in the Budget. In the event that the Debtors do not timely pay such fees and expenses, the DIP Agent and the Pre-Petition Term Agent, as applicable, shall pay same from proceeds of the Collateral in accordance with the Intercreditor Agreement.

Payment of such fees shall be subject to the rights of the Creditors' Committee under Paragraph 7 hereof, but shall not be subject to allowance by the Court. Under no circumstances shall professionals for the DIP Secured Parties or the Pre-Petition Secured Parties be required to comply with the United States Trustee fee guidelines; provided, however, that upon request, copies of any such invoices, redacted as necessary to preserve the attorney-client privilege, shall be provided to the United States Trustee, counsel to the Creditors' Committee, counsel to the Debtors, counsel to the DIP Agent, counsel to the Pre-Petition Term Agent, and counsel to the

Term Lender Group and shall be subject to a ten (10) day review and objection period for such parties.

      (c)    <u>Continuing Effect of Intercreditor Agreement</u>.  Each of the Pre-Petition Revolving Secured Parties, the Pre-Petition Term Secured Parties, and the Debtors shall continue to be bound by and subject to all the terms, provisions and restrictions of the Intercreditor Agreement, and the Intercreditor Agreement shall apply and govern respective rights, obligations, and priorities of each of the DIP Agent, the DIP Lenders, the Debtors, the Pre-Petition Revolving Secured Parties, and the Pre-Petition Term Secured Parties in these Cases.  All loans made by the DIP Lenders which constitute part of the DIP Facility and all other Obligations arising thereunder shall be included in the definition of "Revolving Loan Debt" (as such term is defined in the Intercreditor Agreement).  The Intercreditor Agreement shall govern the respective rights of the DIP Agent's and the Pre-Petition Term Loan Agent's interests in the Collateral (including, without limitation, with respect to the timing and manner of the disposition of any such Collateral by either of them).  For the avoidance of doubt, in no instance shall the DIP Liens prime any of the Pre-Petition Term Liens on the Term Lender Priority Collateral (as provided for by the Intercreditor Agreement).  The Intercreditor Agreement is a "subordination agreement" under Section 510(a) of the Bankruptcy Code and shall continue to be effective during and after the pendency of the Cases and any Successor Cases.  Nothing in this Interim Order is meant to or shall be deemed to alter or otherwise modify the rights, including consent rights, contained in the Intercreditor Agreement as between and among each of the Pre-Petition Revolving Secured Parties, the Pre-Petition Term Secured Parties, and the Debtors.

(d)   <u>No Duty to Monitor Compliance</u>. Except as set forth herein, the Pre-Petition Agents and Pre-Petition Lenders may assume that the Debtors will comply with all terms and conditions of this Interim Order and the Budget, and the Pre-Petition Agents and Pre-Petition Lenders shall not (i) have any obligation with respect to the Debtors' use of Cash Collateral or the proceeds of loans or other extensions of credit under the DIP Credit Agreement, (ii) be obligated to ensure or monitor the Debtors' compliance with any financial covenants, formulae, or other terms and conditions of this Interim Order, the DIP Credit Agreement, or the Pre-Petition Credit Documents, (iii) be obligated to pay (directly or indirectly from Cash Collateral or otherwise) any expenses incurred or authorized to be incurred pursuant to this Interim Order or in connection with the operation of the Debtors' business, or (iv) be obligated to ensure or monitor that Cash Collateral or "Combined Availability" (as defined in the DIP Credit Agreement) exists to pay such expenses.

(e)   <u>Monitoring of Collateral</u>. The Debtors shall permit representatives, agents, and/or employees of the Pre-Petition Agents and the DIP Agent to have reasonable access to their premises and their records during normal business hours (without unreasonable interference with the proper operation of the Debtors' business) and shall cooperate, consult with, and provide to such persons all such non-privileged public information as they may request.  The Debtors shall provide the Pre-Petition Term Agent copies of all financial reports and financial information provided to the DIP Agent pursuant to the DIP Credit Agreement.

(f)   <u>Binding Effect of Interim Order</u>.  The provisions of this Interim Order shall be binding upon and inure to the benefit of the DIP Secured Parties and the Pre-Petition Secured Parties, the Debtors, and their successors and assigns (including any examiner, trustee, or other

fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors) whether in the Cases, in any Successor Cases, or upon dismissal of any such Chapter 11 or Chapter 7 Cases.

(g)    No Waiver.   The failure of the Pre-Petition Secured Parties or the DIP Secured Parties to seek relief or otherwise exercise their rights and remedies under the DIP Credit Agreement, the DIP Facility, this Interim Order, the Pre-Petition Revolving Credit Agreement, or the Pre-Petition Term Credit Agreement, as applicable, shall not constitute a waiver of any of the Pre-Petition Secured Parties' and the DIP Secured Parties' rights hereunder, thereunder, or otherwise.   Notwithstanding anything herein, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair the Pre-Petition Secured Parties or the DIP Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including without limitation, the rights of the Pre-Petition Secured Parties or the DIP Secured Parties to: (i)  request conversion of any one or more of the Cases to Cases under Chapter 7, dismissal of any one or more of the Cases, or the appointment of a trustee or examiner in any one or more of the Cases, or (ii) propose, subject to the provisions of Section 1121 of the Bankruptcy Code, a Plan or (iii) exercise any of the rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Secured Parties or the Pre-Petition Secured Parties.

(h)    No Third Party Rights.   Except as specifically provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holders, or any direct, indirect, or incidental beneficiary.

(i)     No Marshaling.  Neither the DIP Secured Parties nor the Pre-Petition Secured Parties shall be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to any of the Collateral.

(j)     363 Sale .  Any proposed order approving the sale of the Debtors' assets or procedures for bidding on such sale, shall be in a form and in substance reasonably acceptable to the Pre-Petition Term Agent and the Term Lender Group and shall provide consultation and notice rights to the Pre-Petition Term Agent and the Term Lender Group.  The Sale Documents shall permit the Pre-Petition Term Secured Parties' to "credit bid" all or part of their claims to the extent permitted pursuant to Section 363(k) of the Bankruptcy Code.

(k)     Amendment.  The Debtors and the DIP Agent may amend, modify, supplement, or waive any provision of the DIP Facility, provided that (a) the amendment, modification, or supplement is (i) in accordance with the DIP Documents, (ii) beneficial to the Debtors, and (iii) not adverse in any material respect to the rights of third parties; (b) a copy (which may be provided through electronic mail or facsimile) of the amendment, modification, or supplement is provided to counsel for the Term Lender Group, the Pre-Petition Term Agent, the Creditors' Committee, and the U.S. Trustee two days prior to execution thereof (absent exigent circumstances, in which case a copy shall be provided as soon as practicable); and (c) the amendment, modification, or supplement is filed with the Court; provided, however, that consent of the Term Lender Group, the Pre-Petition Term Agent, the Creditors' Committee, or the U.S. Trustee, and approval of the Court is not necessary to effectuate any such amendment, modification, or supplement.  Except as otherwise provided herein, no material waiver,

modification, or amendment of any of the provisions hereof shall be effective unless set forth in writing, signed by the Debtors and the DIP Agent and approved by the Court.

(l) <u>Survival of Interim Order</u>. The terms of this Interim Order and any actions taken pursuant hereto, shall survive the entry of any order which may be entered: (a) confirming any Plan in the Cases; (b) dismissing the Cases; (c) converting the Cases to any other Chapter under the Code; (d) withdrawing of the references of the Cases from the Court; and (e) providing for abstention from handling or retaining of jurisdiction of these Cases in the Court. The terms and provisions of this Interim Order as well as the DIP Protections granted pursuant to this Interim Order and the DIP Credit Agreement, shall continue in full force and effect notwithstanding the entry of such order, and such DIP Protections shall maintain their priority as provided by this Interim Order until all the obligations of the Debtors to the DIP Secured Parties pursuant to the DIP Credit Agreement, and all obligations of the Debtors to the Pre-Petition Secured Parties under the Pre-Petition Revolving Credit Agreement and Pre-Petition Term Credit Agreement have been indefeasibly paid in full in cash and discharged (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms). The Adequate Protection granted to and conferred upon the Prepetition Secured Parties shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order and the Intercreditor Agreement until such Adequate Protection has been satisfied. The DIP Obligations shall not be discharged by the entry of an order confirming a Plan, the Debtors having waived such discharge pursuant to Section 1141(d)(4) of the Bankruptcy Code. The Debtors shall not propose or support any Plan that is not conditioned upon the indefeasible payment in full in cash of all of the DIP Obligations and the termination of any ability of the Debtors to borrow

under the DIP Credit Agreement, and the payment in full in cash of the Pre-Petition Revolving Obligations, on or prior to the earlier to occur of (i) the effective date of such Plan and (ii) the Termination Date.

(m)    Inconsistency.    In the event of any inconsistency between the terms and conditions of the DIP Credit Agreement and of this Interim Order, the provisions of this Interim Order shall govern and control.

(n)    Enforceability.    This Interim Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052, and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof.

(o)    Objections Overruled.    All objections to the DIP Motion to the extent not withdrawn or resolved, are hereby overruled.

(p)    No Waivers or Modification of Interim Order.    Each Debtor irrevocably waives any right to seek any modification or extension of this Interim Order without the prior written consent of the Agents, and no such consent shall be implied by any other action, inaction or acquiescence of the Agents.

(q)    Waiver of any Applicable Stay.    Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to this Interim Order.

21.    **Final Hearing**.    Each Debtor shall, on or before July [_____], 2009 serve by U.S. mail copies of the notice of entry of this Interim Order, together with a copy of this Interim Order to (i) parties

having been given notice of the emergency hearing, (ii) any other party which has filed a request for special notice with this Court and served such request upon the Debtors' counsel, (iii) counsel for the Creditors' Committee, if any, and (iv) the United States Trustee. The notice of entry of this Interim Order shall state that any party in interest objecting to the DIP Facility or the terms of the Final Order shall file written objections with the United States Bankruptcy Court Clerk for the District of Delaware no later than June [_____], 2009, which objections shall be served so that same are received by no later than 4:00 p.m. (prevailing Eastern time) on such date by: (a) the United States Trustee, Office of the United States, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attention David Buchbinder, Esq.; (b) counsel for the Debtors: Latham & Watkins LLP, 233 S. Wacker Drive, Chicago Illinois 60606, facsimile: (312)997-9767, Attention: David Heller, Esq., and Josef Athanas, Esq.; (c) counsel for the DIP Agent: Riemer & Braunstein LLP, Three Center Plaza, Boston, Massachusetts 02108, Attention: Donald E. Rothman, Esq.; (d) counsel to the Creditors' Committee; (e) counsel to the Pre-Petition Revolving Agent: Riemer & Braunstein LLP, Three Center Plaza, Boston, Massachusetts 02108, Attention: Donald E. Rothman, Esq.; and (f) counsel to the Pre-Petition Term Agent: Paul Hastings Janofsky & Walker LLP, 75 East 55th Street, New York, New York 10022 (Attn: Luc Despins, Esq. and Leslie A. Plaskon, Esq.); and (g) counsel to the Term Lender Committee: Kasowitz, Benson, Torres & Friedman LLP, 1633 Broadway, New York, New York 10019 (Attn: David S. Rosner, Esq. and Adam L. Shiff, Esq.).

22.  **Retention of Jurisdiction**.     The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

23.  **Final Hearing**.     The Final Hearing to consider the Motion and Final Order shall be held on July [_____], 2009 at _____: 0___ ___.m. before the Honorable _____, United States Bankruptcy Judge. If no objections to the relief sought in the Final Hearing are filed and

served in accordance with this Interim Order, no Final Hearing may be held, and a separate Final Order may be presented by the Debtors and entered by this Court.

SO ORDERED by the Court this _____ day of June, 2009.

_____
UNITED  STATES  BANKRUPTCY  JUDGE

Exhibit 1

DIP Budget

**Eddie Bauer, Inc.**
**Summary for DIP Position**
**Weekly Cash Flow Projection**
**$'s in 000s**

| Fiscal Week | | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | June | | | | July | | | | | August | | | | Total |
| Week Ending | | wk ending 6-Jun | wk ending 13-Jun | wk ending 20-Jun | wk ending 27-Jun | wk ending 4-Jul | wk ending 11-Jul | wk ending 18-Jul | wk ending 25-Jul | wk ending 1-Aug | wk ending 8-Aug | wk ending 15-Aug | wk ending 22-Aug | wk ending 29-Aug | Total |
| **Cash Flows** | | | | | | | | | | | | | | | |
| Receipts Total | $ | 14,933 | 16,668 | 15,964 | 18,551 | 13,405 | 11,978 | 13,987 | 11,903 | 14,278 | 13,818 | 14,479 | 14,838 | 15,944 | $ 176,927 |
| Home: Checks Deposits (Net) Included Above | | 271 | (1,740) | 5 | (165) | (1,178) | (97) | 144 | (1,460) | (569) | (589) | 128 | (1,177) | 235 | (7,696) |
| **Disbursements** | | | | | | | | | | | | | | | |
| Merchandise Payments | | 13,172 | 8,032 | 4,687 | 3,174 | 4,818 | 4,556 | 12,071 | 5,762 | 6,214 | 10,265 | 4,191 | 89,465 | | |
| Payroll & Benefits | | 92 | 515 | 5,514 | 515 | 5,605 | 515 | 515 | 515 | 515 | 515 | 53,621 | | | |
| Rent & Occupancy | | 6,179 | 5,708 | 6,900 | 1,352 | 160 | 4,722 | 6,300 | 2,247 | 746 | 2,180 | 6,009 | 25,428 | | |
| Other Operating | | 235 | 301 | 301 | 2,025 | 2,152 | 2,633 | 4,421 | 2,533 | 746 | 4,791 | 5,786 | | | |
| Capital Spending | | 48 | | | 301 | 410 | 410 | 410 | 410 | 746 | 746 | | | | |
| Operating Disbursements Subtotal | | 19,724 | 25,497 | 14,913 | 20,022 | 7,248 | 13,775 | 6,936 | 32,344 | 14,080 | 15,043 | 33,218 | 205,498 | | |
| Cash Professionals - US Only | | 354 | 2,286 | 642 | | 200 | 345 | 6,990 | | | | | 16,532 | | |
| US Trustee Professionals | | | | | | | | | | | | | | | |
| Committee Professionals | | 354 | | 803 | | | | | | | 160 | | | | |
| Term Loan Professionals | | | | 400 | | | | | | | 487 | | | | |
| Other Professionals | | | | | | | | | | | | | | | |
| Cash Payment Subtotal | | 354 | 2,286 | 1,845 | | 200 | 345 | | | | | | | | |
| **Financing Expenses** | | | | | | | | | | | | | | | |
| DIP Interest and Fees | | 100 | | 2,750 | | 51 | 51 | 163 | 163 | 263 | 263 | | | 3,469 | |
| Pre-Petition Revolver Interest | | 100 | | | | | | | | | | | | 163 | |
| Term Loan Interest | | | | | | | | | | | | | | | |
| Financing Expenses Subtotal | | | | 2,750 | | 51 | 51 | 163 | 163 | 263 | 263 | | | 3,332 | |
| **Other Expenses** | | | | | | | | | | | | | | | |
| Utility Deposits | | 2 | | | | | | | | 50 | | | | | |
| Sweep/LC Fees/Misc | | | 400 | 400 | 400 | | 9,500 | 9,500 | | | | | | 9,900 | |
| Other Expenses Subtotal | | | 400 | 400 | 400 | | 9,500 | 9,500 | | | | | | 10,532 | |
| Bk-related Disbursements Subtotal | | 356 | 2,686 | 4,995 | 400 | 251 | 10,013 | | 30 | 2,723 | 800 | | | 21,498 | |
| Disbursements Total | | 19,101 | 27,838 | 20,007 | 14,532 | 6,900 | 13,120 | 16,469 | 24,874 | 11,333 | 25,586 | 21,218 | 230,058 | | |
| **Net Cash Flow** | $ | (4,278) | (15,722) | (4,243) | 4,239 | (2,115) | (1,242) | (9,522) | (30,931) | 2,747 | (10,780) | (6,091) | (9,630) | (9,610) | (30,731) |
| Change in Float | | 5,121 | (342) | 1,010 | 14,312 | 6,900 | 13,013 | 10,460 | 24,674 | 11,333 | 9,748 | 21,218 | 1,079 | | |
| Beginning Bank Balance | | 701 | 3,564 | 3,678 | 4,228 | 4,600 | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 701 | | |
| Net Cash Flow (Repay) | | (4,278) | (15,722) | (4,243) | 4,239 | (2,115) | (1,242) | (9,522) | (30,931) | 2,747 | (14,769) | (7,180) | (46,239) | | |
| Repaid/(Draw) Repaid | | 7,121 | 16,016 | 4,665 | 4,255 | 2,114 | 1,842 | 5,522 | 30,331 | (10,951) | 4,731 | (6,731) | 59,527 | | |
| Ending Bank Balance | $ | 3,564 | 3,678 | 4,228 | 4,600 | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 |
| Beginning Revolver Balance (Draw) | | 17,374 | 24,495 | 40,411 | 46,276 | 42,347 | 45,101 | 46,955 | 50,233 | 51,077 | 73,807 | 69,076 | 76,746 | 17,374 | |
| Revolver Return (Draw) | | 7,121 | 16,016 | 4,665 | (4,065) | 2,114 | 1,842 | 5,522 | 30,331 | 21,711 | 4,731 | (7,180) | (4,731) | 59,372 | |
| Ending Revolver Balance | | 24,495 | 40,411 | 46,276 | 42,347 | 45,601 | 45,403 | 50,233 | 61,877 | 73,807 | 69,076 | 76,746 | 76,111 | 76,111 | |
| Less: Total Reserves | | (11,011) | (19,413) | (13,413) | (13,359) | (13,359) | (13,359) | (13,359) | (19,713) | (20,523) | (19,721) | (19,721) | (19,721) | (19,721) | |
| Less: Revolver Balance | | (74,678) | (74,276) | (74,247) | (73,807) | (76,555) | (76,107) | (96,509) | (96,715) | (96,277) | (95,193) | (95,527) | (76,340) | (76,340) | |
| Less: Letters of Credit | | (24,441) | (24,216) | (24,047) | (24,181) | (20,041) | (20,047) | (20,042) | (20,042) | (20,042) | (20,042) | (20,041) | (20,211) | (20,211) | |
| Combined Availability | $ | 27,082 | 17,611 | 16,516 | 14,219 | 11,972 | 13,652 | 52,356 | 51,977 | 52,521 | 55,568 | 53,146 | 57,727 | 57,727 | |

**Pre-Emergence of Correction and Calculations:**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| US Cases Professionals — Incurred Fees | | | | 830 | | 1,530 | 2,205 | 2,600 | 3,825 | 4,459 | 5,155 | 5,830 | 6,485 | 7,139 | |
| Debtor Professionals | | | | 450 | | 450 | 400 | 700 | 950 | 950 | 950 | 950 | 950 | 950 | |
| Committee Professionals | | | | | | | | | | | | | | | |
| Total Incurred Professional Fees | | | | 650 | | 1,015 | 1,800 | 2,055 | 2,600 | 4,235 | 4,453 | 5,270 | 5,770 | 7,085 | 8,089 |