# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| EDDIE BAUER HOLDINGS, INC., *et al.*,[1] | Case No. 09-12099 (MFW) |
| Debtors. | Joint Administration Pending |

**MOTION PURSUANT TO 11 U.S.C. §§ 105(A), 363, 365, AND BANKRUPTCY RULES 2002, 6004, 6006 FOR (I) ENTRY OF AN ORDER (A) ESTABLISHING BIDDING AND AUCTION PROCEDURES RELATED TO THE SALE OF ALL OF THE DEBTORS' ASSETS; (B) APPROVING BID PROTECTIONS FOR THE SALE OF THE DEBTORS' ASSETS; (C) SCHEDULING AN AUCTION AND SALE HEARING FOR THE SALE OF THE DEBTORS' ASSETS; (D) ESTABLISHING CERTAIN NOTICE PROCEDURES FOR DETERMINING CURE AMOUNTS FOR EXECUTORY CONTRACTS AND LEASES TO BE ASSIGNED; AND (E) GRANTING CERTAIN RELATED RELIEF; AND (II) ENTRY OF AN ORDER (A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (C) ESTABLISHING REJECTION PROCEDURES AND GUIDELINES FOR CONDUCTING STORE CLOSING SALES; AND (D) EXTENDING THE DEADLINE TO ASSUME OR REJECT UNEXPIRED LEASES OF NONRESIDENTIAL REAL PROPERTY PURSUANT TO 11 U.S.C. § 365(D)(4)**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") hereby move this Court (the "**Motion**") for entry of an order (the "**Order**"), in substantially the form attached hereto as Exhibit A, (A) establishing bidding and auction procedures (the "**Bidding Procedures**") in connection with the potential sale of substantially all

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Eddie Bauer Holdings, Inc., a Delaware corporation (2352); Eddie Bauer, Inc., a Delaware corporation (9737); Eddie Bauer Fulfillment Services, Inc., a Delaware corporation (0882); Eddie Bauer Diversified Sales, LLC, a Delaware limited liability company (1567); Eddie Bauer Services, LLC, an Ohio limited liability company (disregarded); Eddie Bauer International Development, LLC, a Delaware limited liability company (1571); Eddie Bauer Information Technology, LLC, a Delaware limited liability company (disregarded); Financial Services Acceptance Corporation, a Delaware corporation (7532); and Spiegel Acceptance Corporation, a Delaware corporation (7253). The mailing address for Eddie Bauer Holdings, Inc. is 10401 N.E. 8th Street, Suite 500, Bellevue, WA 98004. On or about the Petition Date, Eddie Bauer of Canada, Inc. and Eddie Bauer Customer Services, Inc., affiliates of the Debtors, commenced a proceeding before the Superior Court of Justice, Commercial List, for the Judicial District of Ontario, for a plan of compromise or arrangement under the Companies' Creditors Arrangement Act.

of the Debtors' assets (the "**Assets**"), free and clear of all claims (as defined by section 101(5) of the Bankruptcy Code) and any other interests, liens, mortgages, pledges, security interests, rights of first refusal, obligations and encumbrances of any kind whatsoever (collectively, the "**Interests**"), except to the extent identified in a Successful Bidder's (as defined below) asset purchase agreement; (B) approving the proposed bid protections to Rainier Holdings LLC ("**Rainier**") (the "**Stalking Horse Bidder**") in accordance with that certain Asset Purchase Agreement dated June 18, 2009, (the "**Stalking Horse Asset Purchase Agreement**") for the purchase of the Assets attached hereto as Exhibit B; (C) scheduling an auction (the "**Auction**") and setting a date and time for a sale hearing (the "**Sale Hearing**") for the sale of Assets (the "**Sale**"); (D) establishing procedures for noticing and determining cure amounts for executory contracts and leases to be assigned (the "**Assumption and Assignment Procedures**"); and (E) granting certain related relief. The Debtors further request that at the Sale Hearing, subject to the results of the Auction and the Bidding Procedures set forth herein, this Court enter an order (a "**Sale Order**")[2] (A) approving and authorizing the Sale, free and clear of all Interests, except to the extent set forth in the Successful Bidder's (as defined below) asset purchase agreement; (B) authorizing the assumption and assignment of certain executory contracts and unexpired leases; (C) establishing rejection procedures (the "**Rejection Procedures**") and establishing guidelines for conducting store closing sales (the "**Store Closing Guidelines**"); and (D) extending the deadline to assume or reject unexpired leases of nonresidential real property pursuant to 11 U.S.C. § 365(d)(4). In support hereof, the Debtors respectfully represent:

---

[2]    The Debtors will file a copy of the form of Sale Order on or prior to the date of the hearing on the Bidding Procedures.  The form of Sale Order will be available at no cost on the website maintained by the Debtors' noticing agent at www.kccllc.net/EddieBauer.

<u>**JURISDICTION**</u>

1.     This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.     The statutory bases for the relief requested herein are sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (the "**Bankruptcy Code**"), and sections 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

<u>**BACKGROUND**</u>

**A.     <u>Background and Current Business Operations</u>**

3.     The Debtors commenced these above-captioned cases (the "**Chapter 11 Cases**") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code on June 17, 2009 (the "**Petition Date**").  Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are operating their businesses and managing their affairs as debtors-in-possession. As of the date hereof, no creditors' committee, trustee or examiner has been appointed in any of these Chapter 11 Cases.  The facts and circumstances supporting this Motion are set forth in the Declaration of Marvin E. Toland, the Senior Vice President and Chief Financial Officer of Eddie Bauer Holdings Corporation, in Support of Chapter 11 Petitions and First Day Motions (the "**First Day Affidavit**"), filed contemporaneously herewith.

**B.     <u>The Debtors' Marketing and Sales Efforts</u>**

4.     Prior to the commencement of these Chapter 11 Cases, the Debtors retained Peter J. Solomon Company, L.P. (the "**Investment Bankers**") to act as investment banker in an advisory capacity to evaluate financial and strategic alternatives to preserve the

Debtors as a going concern and pursue a sale process. As part of the engagement and the Investment Bankers' evaluation, the Debtors and the Investment Bankers pursued a potential sale of the Assets. The Debtors and the Investment Bankers undertook efforts to solicit interest in the Company from private equity investors and strategic buyers with the potential to acquire any portion of or substantially all of the Assets.

5.     Prior to the Petition Date, the Debtors and the Investment Bankers identified and contacted approximately fifty-five (55) potential financial and strategic counterparties. Approximately twenty (20) of these parties entered into confidentiality agreements with the Debtors and were provided extensive due diligence materials on an electronic data site (the "**Data Site**"), as well as the opportunity to speak with the Debtors and their advisors and to conduct site visits with respect to the Assets. Five (5) of these parties submitted non-binding letters of intent to the Debtors (each a "**Letter of Intent**", collectively the "**Letters of Intent**").

6.     After an extensive review and in consultation with the Investment Bankers, the Debtors, with the approval of the Debtors' board of directors, selected Rainier to be the stalking horse for the Sale of the Assets. The Debtors and their advisors actively negotiated with Rainier regarding the terms and conditions of an asset purchase agreement and facilitated various diligence requests made by Rainer's representatives and advisors. On June 18, 2009, the Debtors and Rainier executed the Stalking Horse Asset Purchase Agreement.

7.     While negotiating the Stalking Horse Asset Purchase Agreement, Rainier indicated to the Debtors that a relatively expedited sale process with respect to the Assets was critical to their decision to provide a stalking horse bid. In addition, the postpetition financing (the "**DIP Facility**") is conditioned on the Debtors' pursuit of a Sale process within a specified

time frame. Given the Debtors' liquidity situation, the Debtors believe that a Sale process that includes a Sale of substantially all of the Assets will maximize value of the Debtors' estates. Consequently, the Debtors have determined that it is in the best interest of their estates, creditors and other parties-in-interest to move forward with the Sale process set forth herein.

8. Accordingly, the Debtors have proposed the following timeline for the Sale of the Assets:[3]

| Action | Deadline |
| --- | --- |
| Bid Procedures Hearing | June 26, 2009 |
| Submission Deadline for Materials to Become Qualified Bidder | July 10, 2009 |
| Submission Deadline for Qualified Bids (as defined below) | July 14, 2009 |
| Auction | July 16, 2009 |
| Sale Hearing | July 17, 2009 |
| Consummation of Sale | July 31, 2009 |

## C.    The Asset Purchase Agreement

9. A summary of the principal terms of the Stalking Horse Asset Purchase Agreement, set forth in full in the Stalking Horse Asset Purchase Agreement, is as follows:[4]

- Cash Consideration. $202,300,000.

- Deposit. $5,057,500.

- Acquired Assets. Substantially all of the Debtors' assets including intellectual property and goodwill, designated contracts and retail leases, owned real property, inventory, equipment and fixtures, open purchase orders with vendors and most other current assets, including cash and accounts receivable; but excluding, among other

---

[3]    The Debtors, in the exercise of their business judgment, reserve the right to change these sale-related dates in order to achieve the maximum value for the Assets.

[4]    The following summary is qualified in its entirety by reference to the provisions of the Stalking Horse Asset Purchase Agreement. In the event of any inconsistencies between the provisions of the Stalking Horse Asset Purchase Agreement and the terms herein, the terms of the Stalking Horse Asset Purchase Agreement shall control. Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms shall have the meanings assigned to such terms in the Stalking Horse Asset Purchase Agreement.

things, prepaid taxes and avoidance actions (provided that the Debtors' agree to release and not to pursue any such avoidance actions against suppliers and landlords).

- **Assumed Liabilities.** All of the ordinary course liabilities to customers of the business, including gift card, reward and return liabilities, liabilities under designated contracts and retail leases, liabilities arising in the ordinary course under purchase orders with suppliers, accounts payable, and certain liabilities relating to employees.

- **Limitation on Rejection of Leases.** The Stalking Horse Bidder will assume at least 250 domestic real property leases and 36 Canadian real property leases on or before the date that is 210 days after the Petition Date.

- **Employees.** All or substantially all of the employees of the Debtors' will receive offers of employment.

- **Break-Up Fee.** The Break-Up Fee shall equal $5,057,500 and is payable if the Stalking Horse Asset Purchase Agreement is terminated and the Debtors' consummate (i) a transaction pursuant to a bid made by a third-party which is selected by the Debtors' as the "highest and best offer" in accordance with the Bidding Procedures or (ii) a restructuring, liquidation or sale transaction, including a sale of all or substantially all of the assets to a third-party, within 12 months following termination of the Stalking Horse Asset Purchase Agreement and the aggregate cash price paid by such third-party acquirer in any such transaction is equal to or greater than $208,500,000 (disregarding any post-closing adjustments to purchase price); provided, that the termination fee is not payable on consummation of a plan of reorganization under which the Debtors' secured lenders receive substantially all of the equity interests issued by the reorganized Debtors or a credit bid by any of the Debtors' secured lenders. Irrespective of whether the Debtors consummate a transaction of the type described in clauses (i) or (ii) above, the Break-Up Fee shall not be payable if the Stalking Horse Asset Purchase Agreement is terminated as a result of a breach by the Stalking Horse Bidder.

In addition, if the Debtors propose to consummate a transaction of the type described in clause (ii) above (other than a non-going concern liquidation of the Debtors in connection with which all or substantially all of the proceeds are distributed to creditors) on or prior to the date that is twelve months after the date the Stalking Horse Asset Purchase Agreement is terminated other than as a result of a breach by the Stalking Horse Bidder, but the aggregate cash price to be paid by the third-party acquirer in such transaction is less than $208,500,000 (disregarding any post-closing adjustments to purchase price), then the Debtors may elect, at their option, (i) to pay the Break-Up Fee to the Stalking Horse Bidder upon consummation of such transaction, or (ii) to provide the Stalking Horse Bidder a right of first-offer prior to the consummation of such transaction and allow the Stalking Horse Bidder to acquire the Debtors' for a cash purchase price (disregarding any post-closing adjustments to purchase price) that is equal to the cash purchase price offered by the third-party acquirer (disregarding any post-closing adjustments to purchase price) and otherwise substantially on the same terms and conditions as the proposed transaction with the

third-party acquirer (including any post-closing adjustments to purchase price). If the Debtors' offer and the Stalking Horse Bidder does not exercise its right of first refusal, then the Debtors' may consummate the third-party acquisition without paying the Stalking Horse Bidder the Break-Up Fee.

- <u>Expense Reimbursement</u>. The Expense Reimbursement shall be up to a maximum of $250,000 plus any fees and expenses of the escrow agent and is payable (i) two business days after termination of the Stalking Horse Asset Purchase Agreement by the Stalking Horse Bidder, (ii) on the date that the Stalking Horse Asset Purchase Agreement is terminated by the Debtors other than as a result of a breach by the Stalking Horse Bidder, or (iii) on the closing date.

## RELIEF REQUESTED

10.     The Debtors have determined that given their liquidity and current market conditions, a prompt Sale of the Assets is the best way to maximize the value of the Assets for their respective estates and creditors.

11.     Accordingly, by this Motion, the Debtors seek entry of the Bidding Procedures Order (A) approving procedures for (i) submitting bids for any or all of the Debtors' Assets, (ii) conducting an Auction with respect to the Assets on which the Debtors receive more that one bid ("**Competing Bids**"); (B) approving the proposed bid protections to the Stalking Horse Bidder; (C) scheduling the Auction and a Sale Hearing with respect to any bid accepted by the Debtors; and (D) establishing Notice (as defined herein) and Assumption and Assignment Procedures.

12.     The Debtors also request that this Court set a Sale Hearing on or before July 31, 2009, but reserve the right to extend the Sale process, including, but not limited to, the applicable bid deadline and Auction date, and request a continuance of the Sale Hearing. At the Sale Hearing, pending the outcome of the Auction and as set forth in the Bidding Procedures, the Debtors intend to seek entry of a Sale Order approving the Sale of substantially all of the Assets

free and clear of all interests and/or additional postpetition financing for the business and authorizing the assumption and assignment of certain executory contracts and unexpired leases.

## BASIS FOR RELIEF

13.     The events leading to these Chapter 11 Cases are set forth in the First Day Affidavit.

14.     In furtherance of the Debtors' duty to maximize the value of their estates and in accordance with their obligations under the DIP Facility, the Debtors have filed this Motion seeking approval of a Sale process, including the Bidding Procedures.[5]

### A.     Necessity for Sale

15.     The Debtors face severe liquidity constraints and have exhausted their options for addressing this issue, including an attempt to raise cash through a refinancing of their prepetition credit facility and other strategic transactions. To date, none of these options has been successful. Given current economic market conditions, the Debtors' liquidity situation has not improved.

16.     As set forth above, the Debtors presently face the possibility of continued financial deterioration. However, the Debtors have managed to obtain necessary financing to conduct the Sale process proposed herein. Accordingly, the Debtors have decided to pursue a Sale of all of the Assets and believe that they must be permitted to conduct the process in the manner and on the timetable set forth herein and in the Bidding Procedures.

17.     As indicated above, the Debtors have marketed and solicited offers for the Sale of substantially all of the Assets for the last two months. The Debtors have received a

---

[5]     Terms used but not otherwise defined in this section of this Motion shall have the meanings ascribed to them in the Stalking Horse Asset Purchase Agreement.

binding offer from the Stalking Horse Bidder for substantially all of the Assets and the Debtors are confident that the Sale process will maximize the value of the Assets.

**B.    The Bidding Procedures[6]**

18.    In order to maximize the value of the Assets for the benefit of the Debtors' estates and their respective creditors, the Debtors seek to implement a competitive bidding process that is designed to generate maximum recovery. As described more fully in the Bidding Procedures, attached as <u>Exhibit 1</u> to the Bidding Procedures Order attached hereto as <u>Exhibit A</u>, the Debtors may sell all of the Assets to any bidder that makes the highest or otherwise best offer for the Assets.

19.    As described more fully in the Bidding Procedures, the Debtors propose that competing bids for the Assets be governed by the following:[7]

- <u>Participation Requirements</u>.    A Potential Bidder must deliver (unless previously delivered) to the Debtors at the addresses specified below, not later than July 10, 2009:

    i.    An executed confidentiality agreement in form and substance acceptable to the Debtors;

    ii.    A letter of indication stating the estimated purchase price and consideration for the Assets (including any assets to be excluded from such bid, if any), clearly indicating total cash consideration to be provided to the Debtors at closing and specifying any deductions from or adjustments to the total cash consideration and which items, if any, the Debtors would be required to pay at closing;

    iii.    Sufficient information, as may be requested by the Debtors, to allow the Debtors to determine that the bidder has the financial wherewithal to close a sale of the Assets, including, but not limited to, a signed commitment for any debt or equity financing, a bank account statement showing the ability of a Potential Bidder to pay cash for the Assets, and current audited financial statements (or such other

---

[6]    Terms used but not otherwise defined in this section of this Motion shall have the meanings ascribed to them in the Bidding Procedures attached as <u>Exhibit 1</u> to the Bidding Procedures Order.

[7]    The following description of the Bidding Procedures is only a summary of the terms set forth in the Bidding Procedures attached as <u>Exhibit 1</u> to the Bidding Procedures Order. The following summary is qualified in its entirety by reference to the provisions of the Bidding Procedures. In the event of any inconsistencies between the provisions of the Bidding Procedures and the terms herein, the terms of the Bidding Procedures shall control.

form of financial disclosure and credit-quality support or enhancement acceptable to the Debtors) of the Potential Bidder or those entities that will guarantee in full the payment obligations of the Potential Bidder; and

iv. Written acknowledgement and agreement that the sale, if any, of customer lists, customer data and other consumer privacy information shall be subject to and conform to the recommendations of the consumer privacy ombudsperson to be appointed pursuant to 11 U.S.C. §332 (the "**Consumer Privacy Ombudsperson**") (to the extent that appointment of a Consumer Privacy Ombudsman is necessary) in connection with the transactions contemplated herein.

- Bid Deadline. A qualified Bidder that desires to make a bid shall deliver written copies of its bid and the Required Bid Materials not later than 5:00 p.m. (prevailing Eastern time) on July 14, 2009 (the "**Bid Deadline**"). In the event that a bid is determined to be a Qualified Bid for the Assets, the Debtors shall deliver a written copy of any such Qualified Bid to the Stalking Horse Bidder's counsel.

- Required Bid Materials. All bids, other than the Stalking Horse Bid, must include, among other things: (i) a cash purchase price equal to or greater than $208,500,000 (the "**Minimum Bid Amount**"), (ii) a letter stating that the bidder's offer is irrevocable until the first business day after the Assets on which the Qualified Bidder is submitting a bid have been sold pursuant to the closing of the sale or sales approved by the Bankruptcy Court and the Canadian Court, (iii) a cash deposit in the amount of $5,057,500 and (iv) an executed copy of a purchase agreement and a redline of a Qualified Bidder's proposed purchase agreement reflecting variations from the Stalking Horse Asset Purchase Agreement (the "**Marked Agreement**").

- Overbid Amount. There shall be an overbid amount that a Qualified Bidder must bid to exceed the Stalking Horse Bid ("**Overbid Amount**"), and that amount shall be at least $6,200,000 for all bids made by Qualified Bidders. For example, if a Qualified Bidder bids the Overbid Amount, the next bid cannot be less than $208,500,000 ($202,300,000 plus $6,200,000).

- Auction. If a Qualified Bid, other than that submitted by the Stalking Horse Bidder, has been received by the Debtors, the Debtors may conduct an auction (the "**Auction**") with respect to all or some of the Assets. The Auction shall be conducted at the offices of Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, Wilmington, Delaware 19801 (the "**Auction Site**") at 11:00 a.m. (prevailing Eastern time) on July 16, 2009 (the "**Auction Date**"), or such other place and time as the Debtors shall notify all Qualified Bidders who have submitted Qualified Bids and expressed their intent to participate in the Auction as set forth above.

- Minimum Bid Increment. Subsequent bids shall not be less than $500,000 in excess of the preceding bid. The Debtors will take into account the Break-Up Fee and Expense Reimbursement in each round of bidding by the Stalking Horse Bidder.

- Break Up Fee and Expense Reimbursement. The Break-Up Fee shall equal $5,057,500 and the Expense Reimbursement shall equal $250,000 and shall be payable in accordance with the terms set forth in the Stalking Horse Asset Purchase Agreement (a summary of which is detailed above).

### C. Stalking Horse Asset Purchase Agreement and Bid Protection

20. In order to provide an incentive and to compensate the Stalking Horse Bidder for entering into the Stalking Horse Asset Purchase Agreement, the Debtors have agreed to a break-up fee in the amount of $5,057,000 (the "**Break-Up Fee**") and an expense reimbursement in the amount of $250,000 (the "**Expense Reimbursement**") to reimburse the Stalking Horse Bidder for costs and expenses incurred in connection with the Stalking Horse Bidder's attempted purchase of the Assets. The Debtors will take into account the Break-Up Fee and the Expense Reimbursement in each round of bidding.

21. The Debtors believe that offering the Break-Up Fee and the Expense Reimbursement to the Stalking Horse Bidder will benefit the Debtors' estates by establishing a floor and promoting more competitive bidding. The availability of the Break-Up Fee and the Expense Reimbursement is necessary in order to provide the Stalking Horse Bidder with some assurance that it will be compensated for the time and expense it has spent in putting together its offer for the Assets and the risk that arises from participating in the bidding and subsequent Auction process.

### D. Credit Bidding

22. In connection with the Sale of substantially all of the Assets, if the cash consideration provided by the Successful Bidder is less than all outstanding prepetition and postpetition debt due and owing to the Debtors' prepetition secured lenders (the "**Prepetition Secured Lenders**"), and the postpetition lenders under the Debtors' existing debtor-in-possession financing facilities (the "**DIP Lenders**" and together with the Prepetition Secured

Lenders, collectively, the "**Secured Lenders**"), the Secured Lenders may seek to credit bid some or all of their claims for their respective collateral (a "**Credit Bid**"). The Debtors seek this Court's allowance of credit bidding in connection with any Sale to the extent of Bankruptcy Code section 363(k).

        **E.**    **Notice of Bid Procedures and Sale**

        23.    <u>Notice of Sale Hearing</u>. Within three (3) days after the entry of the Bidding Procedures Order (the "**Mailing Date**") or as soon as thereafter as practicable, the Debtors (or their agents) shall serve the Motion, the Stalking Horse Asset Purchase Agreement, the Bidding Procedures and a copy of the Bidding Procedures Order by first-class mail, postage prepaid, upon (i) all entities known to have expressed an interest in a transaction with respect to the Assets during the past two (2) months; (ii) all entities known to have asserted any lien, claim, interest or encumbrance in or upon any of the Assets; (iii) counsel to the postpetition lender; (iv) the Prepetition Secured Lenders; (v) all federal, state, county and local regulatory and foreign or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion; (vi) the United States Attorney's Office; (vii) the Internal Revenue Service; (viii) the Securities and Exchange Commission; (ix) the Pension Benefit Guaranty Corporation; (x) counsel for the indenture trustee for the $75 million 5.25% convertible senior notes due 2014; (xi) those parties who have filed the appropriate notice requesting notice of all pleadings filed in these cases and (xii) each of the Debtors' landlords and each of the notice parties identified in the real property leases, to the extent possible (collectively, the "**Sale Notice Parties**").

        24.    <u>Sale Notice</u>. On the Mailing Date or as soon thereafter as practicable, the Debtors (or their agents) shall serve by first-class mail, postage prepaid, a sale notice (the "**Sale**

**Notice**"), substantially in the form attached hereto as <u>Exhibit C</u>, upon all other known creditors of the Debtors.

25. <u>Publication Notice</u>. The Debtors also propose, pursuant to Bankruptcy Rule 2002(l) and 2002(d), that the publication of the Sale Notice, attached hereto as <u>Exhibit D</u>, once in *The Wall Street Journal*, on the Mailing Date or as soon as practicable thereafter, be deemed proper notice to any other interested parties whose identities are unknown to the Debtors.

26. <u>Post Auction Notice</u>. As soon as possible after the conclusion of the Auction the Debtors shall file, but not serve, a notice identifying any Successful Bidder (the "**Post Auction Notice**"), substantially in the form attached hereto as <u>Exhibit E</u>. The Post Auction Notice will be available on the website maintained by the Debtors' noticing agent at www.kccllc.net/EddieBauer.

**F.    Assumption/Assignment/Rejection Generally Under Stalking Horse Asset Purchase Agreement and Extension of Time to Assume/Reject Nonresidential Real Property Leases**

27. The Stalking Horse Bidder has not yet determined which executory contracts and leases it will assume and the Stalking Horse Asset Purchase Agreement provides for certain deadlines pursuant to which the Stalking Horse Bidder must select which executory contracts and leases to assume. The Designation Deadline shall be (i) the Closing, with respect to the Domestic Non-Real Property Contracts other than the Specified Contracts, or (ii) 5:00 p.m. (New York time) on the date that is two hundred ten (210) days from the Petition Date with respect to the Domestic Real Property Leases, or (iii) 5:00 p.m. (New York time) on the date that is one hundred twenty (120) days from the Petition Date with respect to the Specified Contracts.[8]

---

[8]    Capitalized terms used in this paragraph shall have the meanings ascribed to them in the Stalking Horse Asset Purchase Agreement.

28.    The Closing, with respect to the non-real property contracts other than the contracts set forth on Schedule 1.1(b) of the Purchase Agreement, or (ii) 5:00 p.m. (New York time) on the date that is two hundred and ten (210) days from the Petition Date with respect to the real property leases and the non-real property contracts set forth on Schedule 1.1(b) of the Stalking Horse Asset Purchase Agreement.

29.    On or prior to the applicable Designation Deadline, the Stalking Horse Bidder may, in its sole discretion, designate any non-real property contract as an Assumed Agreement or any real property lease as an assumed real property lease or remove any real property lease or contract from the list of contracts that it currently anticipates assuming, in each case by providing written notice of such designation or removal to the Debtors; *provided, however*, that the Stalking Horse Bidder shall designate a minimum of 250 Real Property Leases as the Assumed Real Property Leases.

30.    Accordingly, to ensure that none of the real property leases are rejected prior to the Designation Deadline in contravention of the Stalking Horse Asset Purchase Agreement, pursuant to section 365(d)(4) of the Bankruptcy Code, the Debtors request authority to extend the period to assume or reject their unexpired leases of nonresidential real property (the "**Unexpired Leases**") which currently expires on the date that is 120 days from the Petition Date, through the date which is 210 days from the Petition Date.  Such an extension would be without prejudice to the rights of the Debtors to seek further extensions of the time to assume or reject the Unexpired Leases with the consent of the affected lessors as contemplated by section 365(d)(4)(B)(ii) of the Bankruptcy Code.

**G.    Assumption and Assignment Procedures**

31.    The Debtors propose the following procedures for notifying counterparties to executory contracts and unexpired leases of potential cure amounts with respect to those

executive contracts and unexpired leases that the Debtors may seek to assume and assign (the "**Assumed Contracts**").

32.     Within five (5) business days after entry of an order approving the Bidding Procedures or as soon as thereafter practicable, the Debtors will file a notice of cure amounts (the "**Cure Notice**"), substantially in the form attached hereto as Exhibit F, with this Court and serve the Cure Notice on all non-debtor parties to any executory contracts and unexpired leases for the Debtors (the "**Contract Notice Parties**") that may be assumed by the Debtors and assigned to any Successful Bidder.

33.     The Cure Notice shall state the cure amounts that the Debtors believe are necessary to assume such executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code (the "**Cure Amount**") and notify the non-debtor party that such party's contract or lease may be assumed and assigned to a purchaser of the Assets to be identified at the conclusion of the Auction. The Cure Notice shall set a deadline by which the non-debtor party shall file an objection to the Cure Amount. The Debtors request that this Court set the deadline to object to any Cure Amount as fourteen (14) days after service of the Cure Notice. The Cure Notice shall also provide that objections to any Cure Amount will be heard at the Sale Hearing or at a later hearing, as determined by the Debtors.

34.     As soon as possible after the conclusion of the Auction, the Debtors shall file with this Court a Post Auction Notice that identifies any Successful Bidder and provides notice that the Debtors will seek to assume and assign certain of the Assumed Contracts at the Sale Hearing.

35.     At the Sale Hearing, the Debtors shall (i) present evidence necessary to demonstrate adequate assurance of future performance by any Successful Bidder and (ii) request

entry of any order requesting approval of the assumption and assignment of any or all executory contracts and unexpired leases to any Successful Bidder. For the foregoing reasons, the Debtors believe that granting the relief requested herein is appropriate and in the best interests of all parties-in-interest.

36.     At the conclusion of the Sale Hearing, the Debtors will file a notice substantially in the form of the notice attached hereto as Exhibit G and serve on all Contract Notice Parties that identifies the Successful Bidder and provides notice of which Assumed Contracts the Debtors will assume and assign to the Successful Bidder at the Closing (the "**Assumption Notice**").

37.     In the case of any Assumed Contract that the Debtors seek to assume after the Closing pursuant to Section 2.5(b) of the Stalking Horse Asset Purchase Agreement, the Debtors request that the Court authorize the following expedited assumption procedures:

- The Debtors shall file with the Court a written notice (a "**Post-Closing Assumption Notice**") of the Debtors' intent to assume and assign any executory contract or lease and will serve such Post-Closing Assumption Notice via overnight delivery on (i) each counter party or landlord to any contract or lease to be assume or assigned by the Debtors, (ii) any other interested parties with respect to such contract or lease, (iii) the U.S. Trustee, (iv) counsel to the Creditors' Committee, (v) counsel to the Successful Bidder, and (vi) counsel to the pre-petition and post-petition lenders.

- No later than ten (10) days after the date that the Debtors served the Post-Closing Assumption Notice for the contract or lease at issue, the Debtors shall file with the Court an order authorizing the assumption/assignment of the contract or lease which provides (1) that the assumption and assignment of such lease or contract is approved, final and effective, pursuant to section 365 of the Bankruptcy Code and (2) the Successful Bidder provided adequate assurance of future performance under the applicable contract or lease in accordance with section 365(f)(2)(B), and, if applicable, section 365(b)(3).

38.     Given that all parties to executory contracts and leases will receive the Cure Notice as set forth above and an opportunity to object to the assumption and assignment of their particular contract and the application Cure Amount in connection with the Sale Hearing, the Debtors respectfully submit that the proposed Post-Closing Assumption Notice will

streamline the Debtors' ability to transfer such contracts and leases to the Successful Bidder. The Cure Notice affords parties-in-interest their due process rights with respect to notice and the opportunity to be head in the event of objections. In addition, the Post-Closing Assumption Notice affords parties-in-interest full notice of the transfer of the applicable contracts and leases. For the foregoing reasons, the assumption procedures set forth herein should be approved and the Debtors should be authorized to assume and assign the leases and contracts consistent with the terms of such procedures, pursuant to section 365 of the Bankruptcy Code.[9]

### H.    Rejection Procedures

39.    In the case of any executory contract or unexpired lease that the Successful Bidder does not want to assume, after the earlier of (a) the applicable Designation Deadline, or (b) such other time that the Successful Bidder informs the Debtors in writing that it does not want to assume any executory contract or unexpired lease, then the Debtor seeks authority to promptly reject such contract or lease. Accordingly, the Debtors request that the Court authorize the following expedited rejection procedures:

    i.    The Debtors will file with the Court a written notice (the "**Rejection Notice**") of the Debtors' intent to reject any contract or lease, and will serve the Rejection Notice via overnight delivery service upon the following parties (collectively, the "**Rejection Notice Parties**"): (i) the counterparties or landlords affected by the Rejection Notice and any parties to any subleases, (ii) the U.S. Trustee, (iii) counsel to the Creditors' Committee, (iv) counsel to the Successful Bidder, (v) counsel to the pre-petition and post-petition lenders, and (vi) any other interested parties with respect to such contract or lease. The affected contract or lease which is the subject of a Rejection Notice shall be deemed to be subject to a motion to reject such contract or lease pursuant to section 365 of the Bankruptcy Code.

---

[9]    Certain of the leases and contracts may contain provisions that restrict, prohibit, condition or limit the assumption and/or assignment of a lease or contract. The Debtors reserve the right to argue that such clauses are unenforceable anti-assignment or ipso facto clauses under section 365 of the Bankruptcy Code.

ii. The Rejection Notice will set forth the following information, to the best of the Debtors' knowledge: (i) the street address of the real property that is the subject of any lease that the Debtors seek to reject or a description of the contract that the Debtors seek to rject, (ii) the name and address of the affected counterparties or landlords (and their counsel, if known), (iii) a description of the deadlines and procedures for filing objections to the Rejection Notice (as set forth below), and (iv) the proposed order approving the rejection (the "**Rejection Order**").

iii. Should a party in interest object to the proposed rejection by the Debtors of a contract or lease, such party must file and serve a written objection so that such rejection is filed with this Court and <u>actually</u> <u>received</u> by the Debtors and the Rejection Notice Parties as set forth in the Rejection Notice no later than ten (10) days after the date that the Debtors served the Rejection Notice to reject the contract or lease at issue.

iv. If no timely objection is filed and served with respect to the rejection of a contract or lease, the Debtor shall file with the Court a certificate of no objection with the Rejection Order. The Rejection Order shall provide, <u>inter alia</u>, that the rejection of such contract or lease shall become effective on the later of (i) ten (10) days from the date the applicable Rejection Notice was served on the affected counterparty or landlord (notwithstanding any extension of the objection deadline beyond such date pursuant to Bankruptcy Rule 9006), or (ii) if a lease, the date that the Debtor vacated the premises, evidenced by actions such as turning over the keys or "key codes" to the affected landlord.

v. If a timely objection is properly filed and served on the Rejection Notice Parties as specified above, unless the parties agree otherwise in writing, a hearing will be scheduled to consider that objection. If that objection is overruled by the Court or withdrawn, the rejection of the affected contract or lease shall be deemed effective on the later of (i) ten (10) days from the date the applicable Rejection Notice was served on the affected counterparty or landlord, or (ii) if a lease, the date that the Debtors vacated the premises to the affected landlord, evidenced by actions such as turning over keys or "key codes" to the affected landlord.

vi. In connection with the rejection of a lease, if the Debtors have deposited monies with a lessor as a security deposit or other arrangement, such lessor may not set off or recoup or otherwise use such deposit without the prior approval of the Court.

vii. In connection with the rejection of a lease, with respect to any personal property of the Debtors located at any of the premises subject to any Rejection Notice, the Debtors shall remove such property prior to the later of (i) the expiration of the period within which a party must file and serve a written objection to the Rejection Notice, and (ii) the date of rejection of the underlying lease. If the Debtors determine that the property at a particular location has no value or the cost of removing the property exceeds the value of such property, the Debtors shall generally describe the property in the Rejection Notice and their intent to abandon such property. Absent a timely objection, the property will be deemed abandoned pursuant to section 554 of the Bankruptcy Code, as is, where is, effective as of the date of the rejection of the underlying lease. Upon abandonment, the landlord may dispose of such property without further notice or court order and free of liability for such action. The right of any party in interest to assert a claim against the Debtors' estate for costs associated with such abandoned property is fully preserved, provided that such claim must be made in accordance with the procedures established below for the filing of proofs of claim. The Debtors' rights to contest any such claims are fully preserved.

viii. If an affected landlord or counterparty or any other party in interest (the "**Rejection Claimant**") asserts a claim or claims against the Debtor arising from the rejection of a Contract or Lease, such Rejection Claimant shall submit a proof of claim to Kurtzman Carson Consultants LLC, Eddie Bauer Claims Processing Center c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo CA 90245, on or before the later of (i) the date that is 30 days after the effective date of rejection of the contract or lease, or (ii) the bar date established by this Court for filing proofs of claim against the Debtors. If a Rejection Claimant does not timely file such proof of claim, such claimant shall be forever barred from asserting a claim for such rejection damages.

40. The above proposed Rejection Procedures will streamline the Debtors' ability to reject burdensome contracts and leases that provide no benefit to the Debtors' estates, and thereby minimize unnecessary post-petition obligations, while also providing landlords and other affected parties with adequate notice of rejection of any such leases and contracts and an opportunity to object to such rejection within a reasonable time period. Accordingly, at the Sale Hearing, the Debtors respectfully submit that the Rejection Procedures should be approved as

they balance the respective interests of the parties, are an appropriate exercise of the Debtors' business judgment and constitute a common form of relief in many retail bankruptcy cases in this and other jurisdictions.

## I.  Store Closing Guidelines

41.  As noted above, the Stalking Horse Bidder will assume at least 250 domestic real property leases and 35 Canadian real property leases.  In connection with those real property leases that the Stalking Horse Bidder does not assume, the Stalking Horse Bidder will seek to close such stores and liquidate the inventory contained therein and the Stalking Horse Asset Purchase Agreement requires the Debtors to obtain permission of the Court to conduct store closing sales (the "**Store Closing Sales**").  Accordingly, by this Motion the Debtors also request that the Court authorize the Stalking Horse Bidder or Successful Bidder to conduct Store Closing Sales in accordance with the terms of the Store Closing Guidelines, which are attached hereto as Exhibit H, with such sales to be free and clear of all liens, claims and encumbrances.

### APPLICABLE AUTHORITY

42.  "Under Delaware law, the business judgment rule operates as a presumption 'that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest.'" Continuing Creditors' Committee of Star Telecomms., Inc. v. Edgecomb, 385 F. Supp. 2d 449, 462 (D. Del. 2004)(quoting Grobow v. Perot, 539 A.2d 180, 187 (Del. 1988)); see also Ad Hoc Committee of Equity Holders of Tectonic Network, Inc. v. Wolford, 554 F. Supp. 2d 538, 555 n.111 (D. Del. 2008).  Thus, this Court should grant the relief requested in this Motion if the Debtors demonstrate a sound business justification therefore. See In re Delaware Hudson Ry. Co., 124 B.R. 169, 179 (Bankr. D. Del. 1991).

43. The Debtors have sound business justifications for selling the Assets at this time. Success in the retail business requires significant liquidity. While the Debtors currently have limited access to capital, they are endowed with a strong customer base. Accordingly, the Debtors have determined that the best option for maximizing the value of their estates for the benefit of their creditors is through a Sale of substantially all of the Assets.

## A. The Bidding Procedures are Fair and Are Designed to Maximize the Value Received for the Assets

44. Bankruptcy Code section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The Debtors believe that the Bidding Procedures are appropriate under Bankruptcy Code sections 105 and 363 to ensure that the bidding process is fair and reasonable and will yield the maximum value for their estates and creditors. The Bidding Procedures proposed herein are designed to maximize the value received for the Assets by facilitating a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids. The Bidding Procedures provide potential bidders with sufficient notice and an opportunity to acquire information necessary to submit a timely and informed bid. At the same time, the Bidding Procedures provide the Debtors with the opportunity to consider all competing offers and to select the highest and best offer for the sale of substantially all of the Assets as determined by the Debtors, in consultation with the Committee and Secured Lenders.

45. The Debtors request this Court's approval of the Bidding Procedures, including the dates established thereby for an Auction and a Sale Hearing. Accordingly, the Debtors and all parties-in-interest can be assured that the consideration for the Assets will be fair and reasonable, and there are sound business reasons to approve the Bidding Procedures.

### B.    The Break-Up Fee and Expense Reimbursement Are Necessary to Preserve the Value of the Debtors' Estates

46.    Pursuant to Bankruptcy Rule 6004(f)(1), a sale of property outside the ordinary course of business may be by private sale or by public auction. The Debtors believe that having the ability to offer the bid protections (as outlined in the Bidding Procedures) to the Stalking Horse Bidder will likely maximize the realizable value of the Assets for the benefit of the Debtors' estates, creditors and other parties-in-interest.

47.    Approval of the bid protections to the Stalking Horse Bidder is governed by standards for determining the appropriateness of bid protections in the bankruptcy context. Courts have identified at least two instances in which bid protections may benefit the estate. First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 537 (3d Cir. 1999) (hereinafter, "O'Brien"). Second, if the availability of break-up fees and expense reimbursements were to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth. Id.

48.    The Third Circuit identified at least two instances in which bidding incentives may benefit the estate. First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." O'Brien, 181 F.3d at 537. Second, if the availability of

break-up fees and expenses were to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth. Id.

49. In O'Brien, the court reviewed the nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee. Such factors are as follows:

A. the presence of self-dealing or manipulation in negotiating the break-up fee;

B. whether the fee harms, rather than encourages, bidding;

C. the reasonableness of the break-up fee relative to the purchase price;

D. whether the unsuccessful bidder placed the estate property in a "sales configuration, mode" to attract other bidders to the auction;

E. the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;

F. the correlation of the fee to a maximum of value of the debtor's estate;

G. the support of the principal secured creditors and creditors committees of the break-up fee;

H. the benefits of the safeguards to the debtor's estate; and

I. the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

See O'Brien, 181 F.3d at 536.

50. Stalking Horse Bidder Bid Protection. The Break-Up Fee set forth in the Bidding Procedures will enable the Debtors to secure an adequate floor for the Assets and, thus, insist that competing bids be materially higher or otherwise better than the Stalking Horse Asset Purchase Agreement – a clear benefit to the Debtors' estates. Moreover, the Stalking Horse Bidder would not agree to act as a stalking horse without the Break-Up Fee and the Expense Reimbursement. Without the Break-Up Fee and the Expense Reimbursement, the Debtors might lose the opportunity to obtain the highest or best offer for the Assets and would certainly lose the

downside protection that will be afforded by the existence of the Stalking Horse Bidder. Furthermore, without the benefit of the Stalking Horse Bidder, the bids received at Auction for the Assets could be substantially lower than that offered by the Stalking Horse Bidder.

51.     Moreover, payment of the Break-Up Fee will not diminish the Debtors' estates. The Break-Up Fee is only payable if a Sale to a higher or better bidder is consummated.

### C.     Credit Bidding Should be Authorized

52.     A secured creditor is allowed to "credit bid" the amount of its claim in a sale. Section 363(k) of the Bankruptcy Code provides, in relevant part, that in a sale under section 363 of the Bankruptcy Code, unless this Court for cause orders otherwise, the holder of a claim secured by property that is subject of the sale "may bid at such sale, and, if the holder of such claims purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k). Even if a secured creditor is undersecured, as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the claim's economic value. See Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.), 432 F.3d 448, 459-60 (3d Cir. 2006) (explaining that "[i]t is well settled among district and bankruptcy courts that creditors can bid the full face value of their secured claims under § 363(k)").

53.     Pursuant to the Bidding Procedures, the Debtors' Secured Lenders are entitled to credit bid some or all of their claims for their respective collateral pursuant to section 363(k) of the Bankruptcy Code if the cash consideration offered for the Assets is less than the amount of all indebtedness due and owing to the Secured Lenders.

**D.** **Approval of the Sale is Warranted Under Bankruptcy Code 363(b)**

54.     Bankruptcy Code section 363(b)(1) provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although Bankruptcy Code section 363 does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts in this district and elsewhere have found that a debtor's sale or use of assets outside the ordinary course of business should be approved if the debtor can demonstrate a sound business justification for the proposed transaction. See, e.g., In re Eagle Picher Holdings, Inc., 2005 Bankr. LEXIS 2894, at ¶ 3 (Bankr. S.D. Ohio 2005); In re Martin, 91 F.3d 389, 395 (3d Cir. 1996); In re Abbotts Dairies of Penn., Inc., 788 F.2d 143 (3d Cir. 1986); In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983). Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" In re S.N.A. Nut Co., 186 B.R. 98 (Bankr. N.D. Ill. 1995); see also In re Integrated Res., Inc., 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992); In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions").

55.     The sale of a debtor's assets is appropriate where there are sound business reasons behind such a determination. See Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); see also Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (Bankr. D. Del. 1999); In re Del. & Hudson Ry. Co., 124 B.R. 169, 176 (D.D.C. 1991); Stephens Indus., Inc. v. McClung, 789 F.2d 386 (6th Cir. 1986) (sale of substantially all assets of estate authorized where "a sound business purpose dictates such action"). The Debtors have a sound business justification for selling the

Assets at this time. Based on the results of their analysis of the Debtors' ongoing and future business prospects, the Debtors' management and team of financial advisors have concluded that a Sale of all of the Assets in accordance with the procedures set forth in the Bidding Procedures may be the best method to maximize recoveries to the estates. Maximization of the Assets' value is a sound business purpose warranting authorization of any proposed Sale.

56.     The Debtors have proposed a fair and open process for achieving the objective of obtaining the highest or best offer and sale of their businesses for the benefit of the Debtors' estates and their creditors. The Sale of the Assets will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Assets. Consequently, the fairness and reasonableness of the consideration to be received by the Debtors will ultimately be demonstrated by a "market check" through the auction process, which is the best means for establishing whether a fair and reasonable price is being paid.[10]

57.     In addition, all creditors and parties-in-interest will receive adequate notice of the Bidding Procedures and Sale Hearing as set forth above. Such notice is reasonably calculated to provide timely and adequate notice to the Debtors' major creditor constituencies, those parties most interested in these Chapter 11 Cases, those parties potentially interested in bidding on the Assets and others whose interests are potentially implicated by a proposed Sale. Accordingly, consummating the Sale as soon as possible is in the best interests of the Debtors and its creditors and parties-in-interest.

---

[10]     The Debtors reserve all rights to not submit any bid which is not acceptable to the Debtors for approval to the Bankruptcy Court.

### E. The Proposed Sale Satisfies the Requirements of Section 363(f) for a Sale Free and Clear of Interests

58. Section 363(f) of the Bankruptcy Code permits the Debtors to sell assets free and clear of all liens, claims, interests, charges and encumbrances (with any such liens, claims, interests, charges, and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets). As Bankruptcy Code section 363(f) is stated in the disjunctive, when proceeding pursuant to section 363(b), it is only necessary to meet one of the five conditions of section 363(f). Citicorp Homeowners Servs., Inc. v. Elliot, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988); (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that if any of the five conditions of § 363(f) are met, the trustee has the authority to conduct the sale free and clear of all liens). The Debtors believe that they will be able to demonstrate at the Sale Hearing that they have satisfied one or more of these conditions.

59. The Debtors believe that the Secured Lenders will consent to the sale free and clear under section 363(f)(2). In the event they do not, a sale free and clear can proceed pursuant to section 363(f)(5) of the Bankruptcy Code because the Secured Lenders' liens will attach to the proceeds of the Sale and the Debtors will establish at the Sale Hearing that the Secured Lenders can be compelled to accept a monetary satisfaction of their claims.

60. The Debtors propose that any *bona fide* and allowed Interests shall attach to the Sale proceeds with the same force, validity, effect, priority and enforceability as such Interests had in the Assets prior to such Sale.

### F. A Successful Bidder Should be Entitled to the Protections of Section 363(m)

61. Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse

claims. See In re Abbotts Dairies, 788 F.2d at 147; In re Mark Bell Furniture Warehouse, Inc., 992 F.2d 7, 9 (1st Cir. 1993); In re Willemain v. Kivitz, 764 F.2d 1019, 1023 (4th Cir. 1985).

62.     The Stalking Horse Asset Purchase Agreement was negotiated at arm's-length, with both parties represented by their own counsel. Although the Debtors engaged in discussions with other parties interested in acquiring certain of their Assets, the Debtors submit that the Stalking Horse Bidder's proposal as contained in the Stalking Horse Asset Purchase Agreement represents the Stalking Horse Bidder's highest and best offer for the Assets. Additionally, the Debtors will adduce facts at the Sale Hearing on any objection demonstrating that any bidder who is deemed a Successful Bidder for all of the Assets had negotiated at arm's-length, with all parties represented by their own counsel.

63.     Accordingly, the Sale Order will include a provision that the Successful Bidder for the Assets, is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code. The Debtors believe that providing any Successful Bidder with such protection will ensure that the maximum price will be received by the Debtors for the Assets and closing of the same will occur promptly.

### G.     The Assumption and Assignment of Executory Contracts and Unexpired Leases

64.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. See e.g., In re Stable Mews Assoc., Inc., 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984). If the debtor's business judgment has been reasonably exercised, a court should approve the

assumption or rejection of an unexpired lease or executory contract. See Group of Institutional Investors v. Chicago M. St. P. & P.R.R. Co., 318 U.S. 523 (1943); Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39-40 (3rd. Cir. 1989). The business judgment test "requires only that the trustee [or debtor-in-possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting In re Stable Mews Assoc., 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984)). Any more exacting scrutiny would slow the administration of a debtors' estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten this Court's ability to control a case impartially. See Richmond Leasing Co. v. Capital Bank, NA., 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

65.     Once an executory contract is assumed, the trustee or debtor-in-possession may elect to assign such contract. See In re Rickel Home Center, Inc., 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors fee assignability as a means to maximize the value of the debtor's estate"); see also In re Headquarters Doge, Inc., 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

66.     Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate

assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc., 103 B. R. 524, 538 (Bankr. D.N.J. 1989); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. Accord In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when a prospective assignee of a lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

67.     CCMP Capital Advisors, LLC ("**CCMP Capital**"), the controlling shareholder of the Stalking Horse Bidder, is a leading global private equity firm specializing in buyouts and growth equity investments in companies ranging from $500 million to more than $3 billion in size. CCMP Capital focuses on four primary industries: consumer, retail and services; energy; healthcare infrastructure and industrial.     Selected investments include: Aramark Corporation, Edwards Limited, Generac Power Systems, Grupo Corporativo ONO, Legacy Hospital Partners, Quiznos Sub and Warner Chilcott. CCMP Capital's founders have invested over $12 billion since 1984. CCMP Capital's latest fund, CCMP Capital Investors II, L.P., closed in September 2007 with commitments of $3.4 billion. CCMP Capital has offices in New York, Houston and London. Through active management, its global resources and its powerful value creation model, CCMP Capital has established a reputation as a world-class investment partner. Upon closing, the Stalking Horse Bidder, will have financial resources that are more

than sufficient to perform under any executory contracts or unexpired leases it seeks to have assumed by the Debtors. Moreover, if necessary, the Debtors will adduce facts at the hearing on any objection demonstrating the financial wherewithal of the Stalking Horse Bidder or any Successful Bidder, and their willingness and ability to perform under the contracts to be assumed and assigned to them. The Sale Hearing therefore will provide this Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of any Successful Bidder to provide adequate assurance of future performance under the Assumed Contracts that it seeks to assume.

68. The Debtors respectfully submit that the proposed Assumption and Assignment Procedures are appropriate and reasonably tailored to provide Contract Notice Parties with adequate notice in the form of the Assumption Notice or Cure Notice, as applicable, of the proposed assumption and/or assignment of their applicable contract, as well as proposed Cure Amounts, if applicable. Such Contract Notice Parties will then be given an opportunity to object to such notice. If an objection is filed, such objection will be heard at the Sale Hearing or at a later hearing, as determined by the Debtors.

69. Furthermore, to the extent that any defaults exist under any executory contract or unexpired lease that is to be assumed and assigned in connection with the Sale of the Assets, the Debtors will cure any such default prior to such assumption and assignment. Moreover, the Debtors will adduce facts at the Sale Hearing demonstrating the financial wherewithal of the Successful Bidder, its experience in the industry, and its willingness and ability to perform under the contracts to be assumed and assigned to it.

70. Accordingly, the Debtors submit that implementation of the proposed Assumption and Assignment Procedures and the Rejection Procedures is appropriate in these

cases. This Court therefore should have a sufficient basis to authorize the Debtors to assume and

assign contracts as may be set forth in any Successful Bidder's asset purchase agreement.

### H. Extension of Time Under Section 365(d)(4) of the Bankruptcy Code is Appropriate

71. Section 365(d)(4) of the Bankruptcy Code provides as follows:

(A) Subject to subparagraph (B), an unexpired lease of nonresidential real property under which the debtor is the lessee shall be deemed rejected, and the trustee shall immediately surrender that nonresidential real property to the lessor, if the trustee does not assume or reject the unexpired lease by the earlier of—

    (i) the date that is 120 days after the date of the order for relief; or

    (ii) the date of the entry of an order confirming a plan.

(B) (i) The court may extend the period determined under subparagraph (A), prior to the expiration of the 120-day period, for 90 days on the motion of the trustee or lessor for cause.

    (ii) If the court grants an extension under clause (i), the court may grant a subsequent extension only upon prior written consent of the lessor in each instance.

11 U.S.C. § 365(d)(4). Accordingly, if a court finds that cause exists, the court may grant an

extension up to 90 days after the Initial 120 Day Period allotted to debtors under the Bankruptcy

Code to assume or reject nonresidential real property leases.

72. Courts have recognized the benefits to granting additional time under

section 365(d)(4) of the Bankruptcy Code. See, e.g., In re Channel Home Ctrs., Inc., 989 F.2d

682, 687-88 (3d Cir. 1993), cert. denied, 510 U.S. 865 (1993); In re GST Telecom, Inc., No.

00-1982-GMS, 2001 WL 686971 (D. Del. June 8, 2001). As the Third Circuit Court of Appeals

has stated, "nothing prevents a bankruptcy court from granting an extension because a particular

debtor needs additional time to determine whether the assumption or rejection of particular

leases is called for by the plan of reorganization that it is attempting to develop." Channel Home Ctrs., 989 F.2d at 689; see also Coleman Oil Co. v. Circle K Corp. (In re Circle K Corp.), 127 F.3d 904, 909 (9th Cir. 1997), cert. denied, 522 U.S. 1148 (1998) (noting that bankruptcy courts often grant debtor's request for an extension).

73.    The term "cause," as used in section 365(d)(4) of the Bankruptcy Code, is not defined in the Bankruptcy Code. In determining whether cause exists for an extension of the Initial 120 Day Period, courts have relied on a non-exhaustive list of factors, including the following:

(1)    whether the debtor was paying for the use of the property;

(2)    whether the debtor's continued occupation could damage the lessor beyond the compensation available under the Bankruptcy Code;

(3)    whether the lease is the debtor's primary asset;

(4)    whether the debtor has had sufficient time to formulate a plan of reorganization; and

(5)    the complexity of the case facing the debtor.

South St. Seaport L.P. v. Burger Boys, Inc. (In re Burger Boys, Inc.), 94 F.3d 755, 760-61 (2d Cir. 1996); see also In re Wedtech Corp., 72 B.R. 464, 471-72 (Bankr. S.D.N.Y. 1987); Channel Home Ctrs., 989 F.2d at 689 ("[I]t is permissible for a bankruptcy court to consider a particular debtor's need for more time in order to analyze leases in light of the plan it is formulating.").

74.    In this case, the foregoing factors weigh heavily in favor of granting the requested extension. First, pursuant to the Stalking Horse Asset Purchase Agreement, the Debtors must maintain the ability to assume and assign the Unexpired Leases to the Stalking Horse Bidder.

75. Second, the Debtors are currently paying for the use of the properties subject to the Unexpired Leases at the applicable lease rates and are continuing to perform their other obligations under the Unexpired Leases in a timely fashion, to the extent required by section 365(d)(3) of the Bankruptcy Code.

76. Third, the proposed extension will not damage the counterparties to the Unexpired Leases or affect their ability to recover rejection damages available to them under the Bankruptcy Code. As previously stated, pending the Debtors' election to assume or reject the Unexpired Leases, the Debtors will continue to perform all of their obligations arising from and after the Petition Date in a timely fashion, to the extent required by section 365(d)(3) of the Bankruptcy Code, including the payment of postpetition rent.

77. Fourth, certain of the Unexpired Leases represent important assets of the Debtors' estates. The Debtors believe that they will assume many, if not most, of their Unexpired Leases, but there is still the possibility that some of the Unexpired Leases may ultimately be rejected.

78. Fifth, even if certain Unexpired Leases will not be assumed, the Debtors should not be forced to prematurely incur potentially significant administrative claims or settle on a business plan before having an opportunity to explore fully their options with respect to their operations. Lastly, although the requested extension would not prejudice the lessors, the Court's failure to grant such extension would significantly prejudice the Debtors and their estates by depriving them of the ability to maximize the profitability of their business operations and the value of their assets.

79. Courts in this and other districts have granted similar relief in other large chapter 11 cases for similar reasons. See, e.g., In re Pierre Foods, Inc., Case No. 08-11480 (KG)

(Bankr. D. Del. Oct. 29, 2008) (granting 90-day extension of time to assume or reject unexpired leases of nonresidential real property); In re Boscov's, Inc., Case No. 08-11637 (KG) (Bankr. D. Del. Aug. 28, 2008) (same); In re Tropicana Entm't LLC, Case No. 10856 (KJC) (Bankr. D. Del. Aug. 8, 2008) (same); In re Linens Holdings Co., Case No. 08-10832 (CSS) (Bankr. D. Del. June 4, 2008) (same); In re Dura Auto. Sys., Inc., Case No. 06-11202 (KJC) (Bankr. D. Del. Mar. 20, 2007) (same).

80.     Accordingly, the Debtors respectfully submit that this Court should grant the Debtors an extension of time within which the Debtors must assume or reject their Unexpired Leases, through the date that is 210 days from the Petition Date, without prejudice to the Debtors' rights to seek further extensions of such deadline with the consent of the affected Lessors as provided in section 365(d)(4)(B)(ii) of the Bankruptcy Code.

## I.      The Store Closing Guidelines Should be Approved

### 1.      *The Court Should Invalidate Any Restrictions in Restrictive Documents That May Impair the Debtors' Ability to Conduct the Store Closing Sales.*

81.     The Debtors lease each of the stores where Store Closing Sales will be conducted.    Thus, the contemplated Store Closing Sales may be inconsistent with certain provisions of leases or other documents (the "**Anti-Alienation Provisions**") whether or not filed of record with respect to any of such leased premises (the "**Premises**") in the land records, including (without limitation) reciprocal easement agreements, agreements containing covenants, conditions and restrictions (including, without limitation, "go-dark" provisions and landlord recapture rights), or other similar documents or provisions (collectively, the "**Restrictive Documents**"),[7] with respect to the Premises, that are intended to protect the image of a shopping

---

[7]      With respect to any other documents that may relate to any of the Debtors' Premises, but are not recorded and to which the Debtors are not a party, such documents cannot, as a matter of law, prohibit, restrict, or otherwise prevent the Debtors' use of the respective portions of the Premises. See Chevron U.S.A., Inc. v. Traillour Oil Co.,

center or mall or avoid disruption of normal commerce, including Anti-Alienation Provisions

purporting to restrict or prohibit the Debtors or their agents (the "**Store Closing Agent**") from

conducting store closing, going out of business, inventory liquidation, or similar sales.

82. Store closing or liquidation sales, such as the sales described herein, are a

routine part of chapter 11 cases involving retail debtors. Such sales are consistently approved by

courts, despite provisions of recorded documents or agreements purporting to forbid such sales in

the ordinary course of business. Indeed, Anti-Alienation Provisions in leases have been deemed

unenforceable in other chapter 11 cases as impermissible restraints on a debtor's ability to

maximize the value of its assets under Bankruptcy Code section 363. See, e.g., In re R.H. Macy

& Co., 170 B.R. 69, 77 (Bankr. S.D.N.Y. 1994) (holding that the lessor could not recover

damages for breach of a covenant to stay open because the debtor had a duty to maximize the

value of the estate and the debtor fulfilled this obligation by holding a store closing sale and

closing the store); In re Ames Dep't Stores, Inc., 136 B.R. at 359 (finding that "to enforce the

anti-GOB sale clause of the [l]ease would contravene overriding federal policy requiring Debtors

to maximize estate assets by imposing additional constraints never envisioned by Congress"); see

also In re Tobago Bay Trading Co., 112 B.R. 463, 467 (Bankr. N.D. Ga. 1990) (finding anti-

going-out-of-business sales clause in lease unenforceable); In re Lisbon Shops, Inc., 24 B.R. 693,

695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in Chapter 11

case where debtor sought to conduct going-out-of-business sale).

83. The Store Closing Guidelines are similar to store closing guidelines

approved in connection with store closing sales by bankruptcy courts in Delaware and other

districts. See, e.g., In re KB Toys Inc., Case No. 08-13269 (KJC) (Bankr. D. Del. Dec. 18,

---

987 F.2d 1138, 1158 (5th Cir. 1993) (holding that lease could not be enforced against sublessee in absence of privity
of contract or estate).

2008); In re Whitehall Jewelers Holdings, Inc., Case No. 08-11261 (KG) (Bankr. D. Del. Aug. 8, 2008) (approving store closing sales pursuant to sale guidelines); In re Goody's Family Clothing, Inc., Case No. 08-11133 (CSS) (Bankr. D. Del. June 13, 2008) (same); In re Linens Holding Co., Case No. 08-10832 (CSS) (Bankr. D. Del. May 30, 2008) (same); In re Sharper Image Corp., Ch. 11 Case No. 08-10322 (KG) (Bankr. D. Del. May 30, 2008) (same).

84.     The Store Closing Guidelines, like the store closing guidelines approved in other cases, provide appropriate protections to any legitimate concerns that landlords might otherwise have concerning the conduct of the Store Closing Sales. Accordingly, for the reasons set forth above, the Debtors believe that the conduct of the Store Closing Sales by the Store Closing Agent, pursuant to the terms of the Store Closing Guidelines is the most efficient means of maximizing the value of their assets for the benefit of their stakeholders. The Store Closing Agent should have the right to use the stores and all related store services, furniture, fixtures, equipment, and other assets for the purpose of conducting the closing sales free of any interference from any entity or person, including, but not limited to, landlords other persons affected, directly or indirectly, by the Store Closing Sales.

85.     Thus, the Court should ensure that no clause in any of the Restrictive Documents for the Premises is an impediment to the Store Closing Sales, the store closures, or the activities connected therewith, as interested parties are adequately protected by the terms and conditions of the Store Closing Guidelines and the notice and objection procedures set forth in the Sale Order. To the extent such Anti-Alienation Provisions exist in any Restrictive Documents, they should not be permitted to interfere with, or otherwise restrict the Store Closing Agent from conducting the Store Closing Sales or the closing of such closing stores. Accordingly, the Debtors request that the Court authorize the Debtors and the Store Closing

Agent to conduct the Store Closing Sales without interference by any landlords or other persons affected, directly or indirectly, by the Store Closing Sales.

### 2. The Store Closing Sales Should Be Exempt from Certain Federal, State, and Local Laws, Statutes, Rules, and Ordinances Related to Store Closing and Liquidation Sales.

86.     The Debtors operate stores in a number of states, certain of which may have licensing and other requirements governing the conduct of store closing, liquidation, or other inventory clearance sales, including (but not limited to) state and local statutes and regulations establishing licensing or permitting requirements, waiting periods, time limits, bulk sale restrictions, augmentation limitations that would otherwise apply to the Store Closing Sales, or consumer fraud laws, with the exception of deceptive advertising laws (the "**Liquidation Sale Laws**"). Typical statutes and regulations provide that if a liquidation or bankruptcy sale is court authorized, however, then a company need not comply with these Liquidation Sale Laws. <u>See</u>, <u>e.g.</u>, Iowa Code § 537.1202 (2004); Tex. Bus. & Com. Code § 17.91 (2004). Moreover, pursuant to section 105 of the Bankruptcy Code, the Court has the authority to permit the Store Closing Sales to proceed notwithstanding contrary Liquidation Sale Laws. <u>See</u> 11 U.S.C. §105(a).

87.     To eliminate the time, delay, and expense associated with the administrative procedures necessary for non-bankruptcy sales, the Debtors request that the Court, pursuant to § 105(a), expressly authorize the Store Closing Agent to conduct the Store Closing Sales without the necessity of, and the delay associated with, complying with the Liquidation Sale Laws. Upon information and belief, the Store Closing Agent will comply with the state and local health and safety laws and consumer protection laws in conducting the Store Closing Sales, and seek waiver of Liquidation Sale Laws only.

88.     Because the Debtors, their assets and the Store Closing Agent are subject to this Court's jurisdiction, this Court will be able to supervise the Store Closing Sales and the

liquidation of the assets contained therein. As part of the sale of their assets and the negotiation of the Stalking Horse Asset Purchase Agreement, the Debtors submit that the Store Closing Sales are a legitimate method by which the Debtors can maximize the return from the sale of the assets for the benefit of their estates and creditors. Creditors are adequately protected by the notice of this Motion and the jurisdiction and supervision of this Court. Accordingly, this Court should dispense with any requirement that the Debtors and Store Closing Agent comply with technical requirements that are not intended to curtail persons from conducting store closing sales with bankruptcy court supervision, including bulk sales laws.

89. Moreover, 28 U.S.C. § 959, which requires trustees (and, thus, debtors-in-possession) to otherwise comply with state and other laws in performance of their duties, does not apply to the Store Closing Sales. Courts have held that 28 U.S.C. § 959 does not apply to debtors or their agents when they are liquidating assets. See, e.g., Cal. State Bd. of Equalization v. Goggin, 191 F. 2d 726 (9th Cir. 1951) (holding that 28 U.S.C. § 959 does not apply to transactions that are in the nature of liquidation), cert. denied, 342 U.S. 909 (1952); see also In re Borne Chem. Co.., 54 B.R. 1260, 135 (Bankr. D.N.J. 1984) (holding that 28 U.S.C. § 959(b) is applicable only when property is being managed or operated for purpose of continuing operations).

90. Here, the Store Closing Sales will continue for a limited duration, all advertising will fairly describe the Store Closing Sales, and no aspect of the relief sought is intended to alter laws or regulations affecting public safety. For these and other reasons, 28 U.S.C. § 959(b) should not be read to apply to the Store Closing Sales, as the Store Closing Agent will be ceasing their operations at the stores with the knowledge and oversight of their creditors and this Court.

91.     The Bankruptcy Code preempts state and local laws that conflict with its underlying policies. See, e.g., Belculfine v. Aloe (In re Shenango Group, Inc.), 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code .... [A] state statute [] cannot place burdens on them where the result would contradict the priorities established by the federal bankruptcy code."), aff'd, 112 F.3d 633 (3d Cir. 1997). While preemption of state law is not always appropriate, as when the protection of public health and safety is involved, see Baker & Drake, Inc. v. Pub. Serv. Comm'n of Nev. (In re Baker & Drake, Inc.), 35 F. 3d 1348, 1353-54 (9th Cir. 1994) (finding no preemption when state law prohibiting taxicab leasing was promulgated in part as a public safety measure), it is appropriate when, as here, the only state laws involved concern economic regulation rather than the protection of public health and safety. Id. at 1353 (finding that "federal bankruptcy preemption is more likely ... where a state statute is concerned with economic regulation rather than with protecting the public health and safety"); see also In re Scott Housing Sys. Inc., 91 B.R. 190, 196-97 (Bankr. S.D. Ga. 1988) (holding that automatic stay under Section 362 is broad and preempts state law expect for those laws designed to protect public health and safety).

92.     Here, section 363 of the Bankruptcy Code, which requires debtors to operate their businesses in a way that maximizes recoveries for creditors, will be severely undermined if the Court does not provide for the waiver of the Liquidation Sale Laws. Similar relief has been granted in other bankruptcy cases in Delaware and other jurisdictions. See, e.g., In re Gottschalks Inc., Case No. 09-10157 (KJC) (Bankr D. Del. Apr. 1, 2009); In re Whitehall Jewelers Holdings, Inc., Case No. 08-11261 (KG) (Bankr. D. Del. Aug. 8, 2008) (approving store closing sales pursuant to sale guidelines); In re Goody's Family Clothing, Inc., Case No.

08-11133 (CSS) (Bankr. D. Del. June 13, 2008) (same); In re Linens Holding Co., Case No. 08-10832 (CSS) (Bankr. D. Del. May 30, 2008) (same); and In re Sharper Image Corp., Case No. 08-10322 (KG) (Bankr. D. Del. May 30, 2008) (same).

93.     The Debtors also request that no other person or entity, including (but not limited to) any landlords, utilities, creditors, or federal, state, or local agency, department, or governmental authority, be allowed to take any action to prevent, interfere with, or otherwise hinder consummation of the Store Closing Sales, or the advertising and promotion (including through the posting of signs) of such Store Closing Sales, in the manner set forth in the Store Closing Guidelines, and this Court should retain exclusive jurisdiction to resolve any such dispute, and such parties or persons should take no action against the Debtors, the Store Closing Agent, the landlords, or the Sale until this Court has resolved such dispute. The Debtors request that this Court hear the request of such persons or parties with respect to any such disputes on an expedited basis, as may be appropriate under the circumstances. The Debtors do not seek to bind any governmental units by this injunctive provision unless it was either previously served with the Motion or subsequently served with the Order granting the relief requested herein, and has had an opportunity to object and failed to timely file an objection.

94.     In order to maximize the return for their merchandise, Debtors and Store Closing Agent also seek authorization to conduct, advertise, post signs, and otherwise promote the Sale as a "store closing", "sale on everything", "everything must go," or similar themed sale, without further consent of any person, in accordance with the Store Closing Guidelines, and without further compliance with applicable federal, state or local laws Liquidation Sale Laws, other than those designed to protect public health and safety.

95. The Debtors further request that the Court direct that each and every federal, state, or local agency, department, or governmental authority with regulatory authority over the sale and all newspapers and other advertising media in which the sale is advertised accept this Court's Order granting the relief requested herein as binding and allow Debtors and Store Closing Agent to consummate the transactions provided for in the Stalking Horse Asset Purchase Agreement and Store Closing Guidelines, including, but not limited to, the conducting and advertising in the manner contemplated by Store Closing Guidelines, without the necessity of any further approval, license, or permit of any governmental authority.

**J.     Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

96. Bankruptcy Rule 6006(h) provides that an "order authorizing the use, sale or lease of property… is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease… is stayed until the expiration of the 10 days after the entry of the order, unless the court orders otherwise." The Debtors request that any Sale Order be effective immediately by providing that the 10-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

**K.     Payment of Secured Creditors at Closing**

97. At the Sale Hearing, the Debtors expect that they will seek approval to pay certain or all of the allowed secured claims out of the proceeds of such creditors' collateral. However, the Debtors will also establish an escrow of the sale proceeds to ensure that they will have sufficient liquidity to pay all amounts potentially due under the Asset Purchase Agreement, including cure amounts due and owing to all non-debtor parties to executory contracts and unexpired leases that the Successful Bidder assumes post-closing.

<u>**NOTICE**</u>

98.     No trustee, examiner or creditors' committee has been appointed in these Chapter 11 Cases. The Debtors have provided a written notice of this Motion and a copy of the Motion burned on a compact disk[11] by overnight mail to: (a) the United States Trustee for the District of Delaware; (b) counsel to administrative agent under the prepetition term loan facility; (c) counsel to agent under the prepetition revolving credit facility; (d) counsel for the indenture trustee for the $75 million 5.25% convertible senior notes due 2014; (e) the creditors listed on the Debtors' consolidated list of 30 largest unsecured creditors, as filed with the chapter 11 petitions; (f) counsel to the administrative agent for the Debtors' proposed debtor-in-possession lenders; (g) counsel to the Stalking Horse Bidder; (h) all parties asserting a security interest in the assets of the Debtors to the extent reasonably known to the Debtors; and (i) each of the Debtors' landlords and each of the notice parties identified in the real property leases, to the extent possible.

99.     The Debtors have provided a written notice of this Motion and a copy of the Motion burned on a compact disk by regular first class mail to: (a) the National Association of Attorneys General; (b) the State Attorney General's offices (upon (1) Chief or Director of the Consumer Protection Division or Bureau; and (2) Chief or Director of the Bankruptcy Division or Bureau) and State Consumer Protection Agency for each State where a store or distribution center is located; (c) the local mayor or similar representative of each village, or city official, and the county or parish where a store or distribution center is located, addressed to the attention of the municipal, city or county attorney, in each case to the consumer protection division; (d) each

---

[11]     Due to the voluminous nature of the Motion and accompanying exhibits, the Debtors' claims agent will burn the materials on a compact disk and serve the compact disk with an attached written notice explaining its content, as well as instructions explaining how parties may obtain paper copies of the materials at no expense, if so desired.

of the utilities for the stores; and (e) various federal, state, county and city tax and regulatory authorities. In light of the nature of the relief requested, the Debtors submit that no further notice is required or needed under the circumstances.

## NO PRIOR REQUEST

100. No prior motion for the relief requested herein has been made to this Court or any other Court.

WHEREFORE, the Debtors respectfully request that this Court enter the Order, substantially in the form attached hereto, (i) approving the Bidding Procedures; (ii) approving the Break-Up Fee, the Expense Reimbursement and Bid Protections; (iii) scheduling an Auction and a Sale Hearing to approve such sale, and approving the form and manner of notice thereof; (iv) the Assumption and Assignment Procedures; and (v) granting such other and further relief as this Court deems appropriate. Additionally, the Debtors request that at the Sale Hearing this Court enter a Sale Order subject to the result of the Auction and to the Bidding Procedures (i) approving and authorizing the Sale; (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases; (iii) authorizing the Rejection Procedures, (iv) authorizing the Store Closing Guidelines, (v) extending the deadline to reject non-residential non-real property leases pursuant to section 365(d)(4)of the Bankruptcy Code until the date that is 210 days from the Petition Date and (vi) granting such other and further relief as this Court deems appropriate.

Dated: June 17, 2009
Wilmington, Delaware

Respectfully Submitted,

Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

David S. Heller
Josef S. Athanas
LATHAM & WATKINS LLP
Sears Tower, Suite 5800
233 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 876-7700
Facsimile: (312) 993-9767

-and-

Heather L. Fowler
LATHAM & WATKINS LLP
355 South Grand Avenue
Los Angeles, California 90071-1560
Telephone: (213) 485-1234
Facsimile: (213) 891-8763

PROPOSED ATTORNEYS FOR DEBTORS AND
DEBTORS-IN-POSSESSION