# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| EDDIE BAUER HOLDINGS, INC., et al.,[1] | Case No. 09-12099 (MFW)<br>(Jointly Administered) |
| Debtors. | Hearing Date: June 29, 2009 at 11:30 a.m. ET<br>Objection Deadline: June 26, 2009 at 12:00 p.m. ET<br>Related to Docket No. 24 |

## LIMITED OBJECTION OF THE MACERICH COMPANY, THE FORBES COMPANY, COUSINS PROPERTIES INCORPORATED, AND SOUTHGATE MALL ASSOCIATES TO MOTION PURSUANT TO 11 U.S.C. §§ 105(A), 363, 365, AND BANKRUPTCY RULES 2002, 6004, 6004 FOR (I) ENTRY OF AN ORDER (A) ESTABLISHING BIDDING AND AUCTION PROCEDURES RELATED TO THE SALE OF ALL OF THE DEBTORS' ASSETS; (B) APPROVING BID PROTECTIONS FOR THE SALE OF THE DEBTORS' ASSETS; (C) SCHEDULING AN AUCTION AND SALE HEARING FOR THE SALE OF THE DEBTORS' ASSETS; (D) ESTABLISHING CERTAIN NOTICE PROCEDURES FOR DETERMINING CURE AMOUNTS FOR EXECUTORY CONTRACTS AND LEASES TO BE ASSIGNED; AND (E) GRANTING CERTAIN RELATED RELIEF; AND (II) ENTRY OF AN ORDER (A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (C) ESTABLISHING REJECTION PROCEDURES AND GUIDELINES FOR CONDUCTING STORE CLOSING SALES; AND (D) EXTENDING THE DEADLINE TO ASSUME OR REJECT UNEXPIRED LEASES OF NONRESIDENTIAL REAL PROPERTY PURSUANT TO 11 U.S.C. § 365(D)(4)

TO THE HONORABLE MARY F. WALRATH,
UNITED STATES BANKRUPTCY JUDGE:

The Macerich Company, The Forbes Company, Cousins Properties Incorporated, and Southgate Mall Associates (the "Landlords") hereby object (the "Objection") to the Motion

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Eddie Bauer Holdings, Inc., a Delaware corporation (2352); Eddie Bauer, Inc., a Delaware corporation (9737); Eddie Bauer Fulfillment Services, Inc., a Delaware corporation (0882); Eddie Bauer Diversified Sales, LLC, a Delaware limited liability company (1567); Eddie Bauer Services, LLC, an Ohio limited liability company (disregarded); Eddie Bauer International Development, LLC, a Delaware limited liability company (1571); Eddie Bauer Information Technology, LLC, a Delaware limited liability company (disregarded); Financial Services Acceptance Corporation, a Delaware corporation (7532); and Spiegel Acceptance Corporation, a Delaware corporation (7253). The mailing address of for Eddie Bauer Holdings, Inc. is 10401 N.E. 8th Street, Suite 500, Bellevue, WA 98004. On or about the Petition Date, Eddie Bauer of Canada, Inc. and Eddie Bauer Customer Services, Inc., affiliates of the Debtors, commenced a proceeding before the Superior Court of Justice, Commercial List, for the Judicial District of Ontario, for a plan of compromise or arrangement under the Companies' Creditors Arrangement Act.

Pursuant To 11 U.S.C. §§ 105(A), 363, 365, And Bankruptcy Rules 2002, 6004, 6004 For (I) Entry Of An Order (A) Establishing Bidding And Auction Procedures Related To The Sale Of All Of The Debtors' Assets; (B) Approving Bid Protections For The Sale Of The Debtors' Assets; (C) Scheduling An Auction And Sale Hearing For The Sale Of The Debtors' Assets; (D) Establishing Certain Notice Procedures For Determining Cure Amounts For Executory Contracts And Leases To Be Assigned; And (E) Granting Certain Related Relief; And (II) Entry Of An Order (A) Approving The Sale Of The Debtors' Assets Free And Clear Of All Liens, Claims, Encumbrances And Interests; (B) Authorizing The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases; (C) Establishing Rejection Procedures And Guidelines For Conducting Store Closing Sales; And (D) Extending The Deadline To Assume Or Reject Unexpired Leases Of Nonresidential Real Property Pursuant To 11 U.S.C. § 365(d)(4) (the "Sale Motion"),[2] and respectfully represent as follows:

## I. BACKGROUND FACTS

1. Eddie Bauer Holdings, Inc. and its affiliated co-debtors (the "Debtors"), filed their voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code on June 17, 2009. The Debtors have continued to operate their business and manage their properties as debtors-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.[3]

2. The Debtors lease retail space (the "Premises") from the Landlords where they continue to operate retail stores as tenants pursuant to unexpired leases of nonresidential real property (the "Leases") at the following shopping center locations (the "Centers") attached hereto as Schedule A.

---

[2] Terms not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion and other related documents.

[3] Unless otherwise specified, all statutory references to "Section" are to 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code").

2

3. The Leases are each a "lease of real property in a shopping center" as that term is used in Section 365(b)(3). *See* In re Joshua Slocum, Ltd., 922 F.2d 1081, 1086-1087 (3d Cir. 1990).

4. On June 17, 2009, the Debtors filed the Sale Motion, which proposes to enter into a stalking horse bid with Rainier Holdings LLC (the "Stalking Horse"). As proposed, the bid procedures and auction and sale process, deny essential protections afforded to Landlords through principles of due process, the Bankruptcy Code, and under the negotiated terms of the Leases themselves.

## II. ARGUMENT

### A. OBJECTION TO AUCTION SCHEDULE AND SALE MOTION

#### i. The proposed auction timetable and sale approval denies Landlords due process.

5. The timetable proposed by the Debtors does not provide adequate time for the Landlords to make an informed decision as to the ability of any successful bidder, to perform under the Leases (much less to file any meaningful objection). The Sale Motion proposes the following schedule:

- July 14, 2009 – Bid deadline.
- July 16, 2009 @ 10:00 a.m. ET – Auction
- July __, 2009 @ 4:00 p.m. ET – General deadline to object to Sale Motion and cure.
- July __, 2009 @ 4:00 p.m. ET – Deadline to object to adequate assurance information.
- July 17, 2009 @ 11:00 a.m. ET – Sale Hearing.

6. The proposed Bidding Procedures do not set a specific deadline for cure objections or for filing objections to the potential assumption and assignment of the Leases. Based upon the timing of the proposed schedule, however, there is not enough time between the proposed bid deadline and proposed sale for the provision of adequate assurance of future performance information, much less time for any meaningful objection to any proposed sale.

7. This proposed schedule is clearly unduly burdensome to Landlords, unnecessarily short, inconsistent with Section 365, and denies Landlords due process. Fundamental concepts

of due process require that "notice must be reasonably calculated to apprise interested parties of the pendency of an action and to afford them an opportunity to present objections." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950). *See also* Sullivan v. Barnett, 139 F.3d 158, 171 (3d Cir. 1998) (due process requires notice and a meaningful opportunity to be heard). The schedule proposed by the Debtor does not preserve these concepts of due process.

8. The Sale Motion does not provide any justifiable basis for such expedited procedures, which serve to increase expenses to Landlords and deprive them of their statutory right to obtain and review adequate assurance of future performance information prior to the objection deadline and sale hearing dates.

9. In addition, The Sale Motion itself does not state that the Debtor will provide Landlords with adequate assurance of future performance information, and only states that the Debtor will establish the requisite adequate assurance of future performance at the Auction and/or Sale Hearing. *See* Sale Motion at ¶¶ 35 & 67.

10. The Sale Motion is somewhat vague as to how the Debtors intend to proceed at the proposed Sale Hearing. The Sale Motion states that the Debtors shall present evidence necessary to demonstrate adequate assurance of future performance by any Successful Bidder. *See* Sale Motion at ¶¶ 35 & 67. The Sale Motion also states that the Stalking Horse shall have until 210 days after the petition date to determine whether to assume or reject the Leases. *See* Sale Motion at ¶ 27. Finally, however, the Sale Motion provides for procedures for the post-closing assumption and assignment of Leases that does not include the provision of adequate assurance of future performance information. *See* Sale Motion at ¶ 37.

11. The provision of adequate assurance of future performance at a Sale Hearing, along with the cursory description of the Stalking Horse's controlling shareholder in paragraph 67, does not satisfy Section 365(b), or the heightened shopping center requirements of Section 365(b)(3)(A) – (D). The information does not meet the requirements of Section 365(b), and it does not provide the Landlords any time to review such information or prepare an objection prior to the proposed Sale Hearing. The Debtors should provide Landlords complete adequate

4

assurance information (as set forth below) by e-mail not less than 10 (ten) days prior to any deadline to object the an assumption and assignment of any Lease.[4] Without adequate assurance information that satisfies the standards of Section 365, the Landlords will have no choice but to file a blanket and general objection seeking to continue any sale hearing so that it can receive information that complies with the requirements of the Bankruptcy Code.

12. In order to satisfy the adequate assurance of future performance burden as more fully discussed below, the Debtors and the Stalking Horse (or any Successful Bidder) will need to provide Landlords not less than ten (10) days prior to any objection deadline, at a minimum, the following information:

(i) the specific name of the proposed bidder, the proposed tenant that will act as the assignee, and the proposed name under which the assignee intends to operate the store;
(ii) the potential assignee's intended use for the space;
(iii) audited financial statements and annual reports for the past three (3) years, including all supplements or amendments thereto;
(iv) cash flow projections for the proposed assignee, the proposed assignee's most recent business plan, all cash flow projection for the Lease subject to the assignment request, and any financial projections, calculations and/or pro-formas prepared in contemplation of purchasing the Leases;
(v) all documents and other evidence of the potential assignee's retail experience and experience operating in-line stores in a shopping center; and
(vi) a contact person for the proposed assignee that Landlord may directly contact in connection with the adequate assurance of future performance.

13. The above constitutes a non-exclusive list of the minimum information the Landlords will need to assess any potential assignee. The Debtors cannot carry their burden under Section 365 without providing this information, and without receipt of such information, the Landlords cannot meaningfully assess the bona fides of any proposed assignee. Landlords reserve the right to request further information that they deem necessary to make an informed decision as to the ability of a potential assignee to satisfy the requirements of Section 365.

---

[4] To the extent the Debtors do not seek an assumption and assignment of the Leases at the Sale Hearing, the adequate assurance of future performance information should be included with the Post-Closing Assumption Notice at the time the Debtors seek to assume and assign any Lease. The Stalking Horse or other Successful Bidder's ability to perform under the Leases may substantially change in during the Designation Period (as defined below).

### ii. The Debtors must provide adequate assurance of future performance information.

14. The Debtors may not assume and assign the Leases unless there is adequate assurance of future performance under the Leases. 11 U.S.C. § 365(b)(1)(C); *see also* 11 U.S.C. § 365(f)(2). The Debtors bear the ultimate burden of persuasion as to issues under 11 U.S.C. § 365. *See* In re Rachels Industries, Inc., 109 B.R. 797, 802 (Bankr. W.D. Tenn. 1990); *see also* Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1309 (5th Cir. 1985).

15. Courts require a specific factual showing through competent evidence to determine whether an adequate assurance of future performance has been provided. *See e.g.,* Matter of Haute Cuisine, Inc., 58 B.R. 390 (Bankr. M.D. Fla. 1986) (even though experts presented cash flow projections, the court found that insufficient documentary evidence had been presented); In re Bygaph, Inc., 56 B.R. 596 (Bankr. S.D.N.Y. 1986) (court granted motion to assume and assign based on assignee's capital contribution, personal financial resources, and expressed willingness to devote sufficient funding which gave new restaurant a strong likelihood of succeeding, coupled with assignee's experience as an owner/operator of a successful restaurant and his family's planned involvement in the day-to-day management). Without this type of information, the Landlords are denied their statutory right to conduct a meaningful analysis of any proposed assignee.

16. The Court should require the Debtors to provide Landlords with the adequate assurance of future information for the Stalking Horse (as well as any Successful Bidders) as required by the Bankruptcy Code, as well as adequate time to analyze such information, as set forth above. In order to preserve the Landlords' due process rights, all information and evidence upon which the Debtors and any proposed assignee intends to rely to establish adequate assurance of future performance under Section 365 (e.g., financials, business plans, etc.) should be delivered to the Landlords no later than ten (10) days prior to any deadline to object to the proposed assumption and assignment of any Lease. To do otherwise deprives the Landlords of due process, and the benefits of Section 365.

### iii. The Landlords are entitled to heightened adequate assurance under Section 365(b)(3).

17. In this case, the Leases are shopping center leases and, as such, the Bankruptcy Code requires more than the basic adequate assurance of future performance of the Lease under Section 365(b)(1)(C). In re Sun TV and Appliances, Inc., 234 B.R. 356, 359 (Bankr. D. Del. 1999). The heightened adequate assurance requirements that Debtor must satisfy under Section 365(b)(3) include the following:

- the source of rent and that the financial condition and operating performance of the proposed assignee and its guarantors, if any, must be similar to the financial condition and operating performance of the debtor and its guarantor(s), if any, as of the time the debtor became the lessee. See 11 U.S.C. § 365(b)(3)(A);
- that any percentage rent due under the lease will not decline substantially. See 11 U.S.C. § 365(b)(3)(B);
- that assumption and assignment of the lease is subject to all provisions thereof, including (but not limited to) provisions such as a radius, location, use, or exclusivity provision, and will not breach of any such provision in any other lease, financing agreement, or master agreement relating to such shopping center. See 11 U.S.C. § 365(b)(3)(C); and
- that assumption and assignment of the lease will not disrupt the tenant mix or balance in the shopping center. See 11 U.S.C. § 365(b)(3)(D).

18. This adequate assurance of future performance determination must be satisfied in connection with an assumption and assignment under Section 365(f)(2)(B). Sun TV and Appliances, Inc., 234 B.R. at 370. And, in connection with the heightened adequate assurance requirement for shopping center leases, courts do require a specific factual showing through competent evidence to determine whether the Debtors have provided adequate assurance of future performance. Matter of Haute Cuisine, Inc., 58 B.R. at 394.

19. The Stalking Horse, or any other proposed assignee, appears to take the form of a newly formed entity with no financial or operating history. At this time, the Debtors have provided no information with respect to the Stalking Horse or any potential assignee's structure, capitalization, principals or experience in the industry. While it may be that the eventual assignee is backed by one or more other entities with industry experience and/or adequate capitalization, if the assignee entity itself does not possess such experience or capitalization, the Landlords will require such assignee to provide some type of credit enhancement, such as: (i) a

guaranty of future performance from a financially capable parent entity; (ii) a letter or credit; or (iii) a cash security deposit. Landlords require that an existing entity with acceptable financing guaranty the performance of any newly-formed company that seeks an assignment of the Leases. In addition, pursuant to Section 365(l), the Landlords may require a security deposit or letter of credit as security for the performance of the assignee's obligations under the Leases in the event that the assignee fails to perform on a going-forward basis. This is a reasonable condition of demonstrating adequate assurance of future performance where the Debtors are seeking approval of an assignee with no operating history.

20. If the Landlords do not have sufficient information (or time) to make a determination as to a proposed assignee, or if the proposed assignee is unacceptable, the Landlords will need to object to the proposed sale and prepare for a contested evidentiary hearing. In preparation of such evidentiary hearing, the Landlords will need to conduct expedited discovery, arrange for expert testimony, and file supplemental objections based upon the information gleaned from whatever information is actually produced by the Debtors, the Stalking Horse, or any Successful Bidder. This process cannot be accomplished on Debtors' proposed schedule. This schedule serves only to limit the Landlords' ability to fully assess any successful bidder, or to contest the assumption and assignment of the Leases in a prepared and informed manner.

21. The Landlords object to any attempt to approve an assignment of the Leases at the proposed Sale Hearing under the proposed schedule. The Court should not permit the Debtors to seek an assumption and assignment of the Leases on the proposed schedule, and (unless there is no objection to the proposed assignment) to the extent that any hearing goes forward under the schedule proposed by the Debtors, it should serve only as a status conference to set expedited discovery, a briefing schedule, and a further evidentiary hearing for any landlord that contests the proposed assumption and assignment of their leases. Until adequate assurance of future performance information is provided to Landlords, Landlords reserve all rights to object to the sufficiency of the adequate assurance information provided in support of any successful bidder.

### iv. The cure claim procedure is not practical and all charges due under the Lease must be preserved in any sale.

22. The propose Debtors to send out a Cure Notice within five (5) business days of the entry of the Bidding Procedures. *See* Sale Motion at ¶ 32. The Debtors then request that the Landlords shall have fourteen (14) days to object to the Cure Notice. *See* Sale Motion at ¶ 33. Finally, the Debtors propose that this deadline shall apply to the assumption and assignment of the Leases, whether the Debtors seek to assume and assign a Lease at the Sale Hearing or well after the closing of the sale. *See* Sale Motion at ¶ 38.

23. As an initial matter, based upon the June 29, 2009 hearing on the Bidding Procedures, the deadline to object to cure amounts may extend beyond the proposed Sale Hearing. This does not make practical sense, and it is a further demonstration that the proposed schedule is too condensed.

24. Furthermore, the Debtors cannot establish cure amounts for Leases that they may not assume and assign for over six (6) months, without providing for a means of amending such amounts at the time of an actual request to assume and assign a Lease. To the extent that the Debtors will not seek to assume and assign the Leases at the Sale Hearing, the proposed cure amounts should be included with the Post-Closing Assumption Notice, which should provide Landlords with ample time to object to the proposed cure at that time.

25. Moreover, to the extent there is an assumption and assignment of any Leases, the Debtors provide no mechanism for the resolution of cure claims in the event of a dispute. The Debtors should provide that all undisputed cure amounts will be paid immediately upon the assumption and assignment of the Leases. To the extent that there are disputed amounts, those amounts must be escrowed, and a procedure should be put in place to resolve these remaining disputed cure amounts within thirty (30) days of the assumption and assignment of the Leases with a status conference set to deal with any amounts that remain unresolved after such period.

26. Finally, any order approving the sale needs to specify that either the Debtors and/or assignee must satisfy all charges due under the Leases, including charges which have not

yet been reconciled and/or adjusted from pre-petition (or even post-petition) periods. Any assumption and assignment of the Leases cannot cut off the Landlords' right to recover unbilled charges that have accrued, or are accruing, under the Leases. The Debtors must cure all existing defaults and compensate Landlords for any actual pecuniary loss as a result of those defaults in order to assume the Leases under Section 365(b). *See* 11 U.S.C. § 365(b)(1)(A) and (B). This principle is well-recognized. *See* Elkton Associates v. Shelco Inc. (Matter of Shelco), 107 B.R. 483, 487 (Bankr. D. Del. 1989). Upon Court approval of the Sale Motion, these obligations are payable immediately by Debtor and/or the successful assignee. In re Tandem Group, Inc., 60 B.R. 125 127 (Bankr. C.D. Cal. 1986), *citing* In Matter of Condominium Administrative Services, Inc., 55 B.R. 792 (Bankr. M.D. Fla. 1985). Any proposed assignee must take the assignment of a Lease subject to its terms, as well as pay all obligations owing under such Lease, including obligations that have accrued but may not yet have been billed under such Lease.

v.      **Any assumption and assignment must comply with the terms of the Leases.**

27.     Through the BAPCPA[5] amendments, "Section 365(f)(1) is amended to make sure that all of the provisions of Section 365(b) are adhered to and that 365(f) of the code does not override Section 365(b)." Floor Statement of Senator Orrin Hatch, 151 Cong. Rec. S. 2459, 2461-62 (daily ed. March 10, 2005). In explaining the change to Section 365(f)(1), Senator Hatch stated:

> The bill helps clarify that an owner should be able to retain control over the mix of retail uses in a shopping center. When an owner enters into a use clause with a retail tenant forbidding assignments of the lease for a use different than that specified in the lease, that clause should be honored. Congress has so intended already, but bankruptcy judges have sometimes ignored the law.

151 Cong. Rec. S. 2459, 2461 (daily ed. March 10, 2005).

---

[5] On October 17, 2005, the Bankruptcy Abuse Prevention And Consumer Protection Act of 2005 (the "BAPCPA") went into effect, clarifying, *inter alia*, the protections that Landlord is entitled to under 11 U.S.C. § 365.

28. The changes embodied in the BAPCPA specifically preserve a landlords' right to enforce use and other lease provisions. Again, Senator Hatch's remarks in the Congressional Record clarify the intent behind Section 365(b) and 365(f):

> A shopping center operator... must be given broad leeway to determine the mix of retail tenants it leases to. Congress decided that use or similar restrictions in a retail lease, which the retailer cannot evade under nonbankruptcy law, should not be evaded in bankruptcy. It is my understanding that some bankruptcy judges have not followed this mandate. Under another provisions of the Code, Section 365(f), a number of bankruptcy judges have misconstrued the Code and allowed the assignment of a lease even though terms of the lease are not being followed.

151 Cong. Rec. S. 2459, 2461-62 (daily ed. March 10, 2005).

29. As set forth above, bankruptcy courts must strictly enforce the use and other provisions in the Leases. This intent is echoed by comments from the House of Representatives, and the legislative history leaves no doubt that such provisions must be strictly enforced:

> Section 404(b) amends § 365(f)(1) to assure that § 365(f) does not override any part of § 365(b). Thus, § 404(b) makes a trustee's [debtor-in-possession's] authority to assign an executory contract or unexpired lease subject not only to § 365(c), but also to § 365(b), which is given full effect. <u>Therefore, for example, assumption or assignment of a lease of real property in a shopping center must be subject to the provisions of the lease, such as use clauses.</u> (Emphasis added)

H.R. Rep. No. 109-31, pt. 1, at 87, reprinted in 2005 U.S. Code Cong. & Admin. News 153.

30. The BAPCPA clarified Section 365 to reflect the Congressional intent that Section 365(f)(1) not be used by debtors to avoid lease provisions. The language of Section 365(f), and any such ability to assume and assign the Leases, is subject to the protections provided by Section 365(b)(1) and (3). It does not modify Section 365(b). Therefore, any assignment must remain subject to all provisions of the Leases, including those provisions concerning use, radius, exclusivity, tenant mix and balance, etc.

31. The revisions to Section 365 make it clear that the Debtors cannot use Section 365(f) to render lease provisions unenforceable. While such provisions may indirectly limit the assignment of the Leases, Section 365(b) specifically protects these provisions.

32. Provisions governing use, radius and the permitted conduct upon the Premises, therefore, are not anti-assignment provisions and are not rendered unenforceable by Section

365(f). These are negotiated provisions that legitimately seek to preserve the Landlords' control over shopping center environments. Section 365(b)(3) no longer permits even insubstantial breaches of provisions such as use, radius, location or exclusivity. These critical lease terms are enforceable under Section 365(b), and this Court should deny any attempted assignment that fails to comply with such provisions.

### vi. Any sale must not be free and clear of obligations to pay all charges due under the Leases, including unbilled year-end adjustments and reconciliations.

33. The Sale Motion seeks authority for the sale of the leases free and clear of liens, claims and encumbrances. *See* Sale Motion at ¶ 58. The Landlords object to any sale free and clear of the Debtor's obligations to satisfy unbilled taxes, reconciliations, percentage rent, or other year-end adjustments or unbilled charges that may have accrued under the Leases prior to the assignment of the Leases, but which have not yet been billed. The Debtors continue to be responsible for all such unbilled charges as they come due under the Leases, and the Debtors, the Stalking Horse, or any Successful Bidder must continue to satisfy all charges due under the Leases, including charges which have not yet been billed, reconciled and/or adjusted from pre-petition (or even post-petition) periods. Any assumption and assignment of the Leases cannot cut off the Landlords' right to recover unbilled charges that have accrued, or are accruing, under the Leases.

34. Therefore, the Sale Motion, any sale order, and any assignment must specify that these charges will survive the assumption and assignment of any of the Leases. It should be clear that any assignee will inherit the responsibility for all unbilled charges that may come due under the Leases.

### B. OBJECTION TO THE DESIGNATION OF THE LEASES

35. The Sale Motion provides that the Stalking Horse, or other Successful Bidder, may continue to operate the Leases without deciding which Leases it will seek to have assumed and assign to it, until 210 days after the petition date (the "Designation Period"). To the extent that the Stalking Horse, or any Successful Bidder, is permitted to operate the Debtors' stores

during the Designation Period, such party must comply with all terms of the Leases during such Designation Period in all respects.

36. In addition, the Stalking Horse, or any other Successful Bidder, must be responsible for all obligations during the time that it controls the Leases. If tax obligations become due under the Remaining Leases, the Stalking Horse or other Successful Bidder must satisfy these amounts.

## C. OBJECTION TO ASSUMPTION AND ASSIGNMENT PROCEDURES AND REJECTION PROCEDURES FOR REMAINING LEASES.

*(i) Assumption and assignment procedures for Leases.*

37. The Landlords do not object to the general assumption and assignment procedures set forth in the Sale Motion to the extent that they will have ten (10) days to object to the assumption and assignment of a Lease after the date of service of the Post-Closing Assumption Notice. However, the Post-Assumption Notice should provide adequate assurance of future performance information, as well as a current proposed cure amount at the time of the proposed assumption and assignment.

38. In addition, any assumption and assignment must clearly set forth which party will be responsible for the payment of accrued but unbilled year-end adjustments and reconciliations. In addition, the Landlords request that the information provided in the Assumption Notice also include a form of order. In some instances, even if a landlord does not object to the proposed assignee, the form of order may be objectionable to such landlord. Providing the form of order in advance will minimize delays and prevent potentially unnecessary objections to an assumption and assignment. Finally, as set forth above, the Post-Assumption Notice should include updated adequate assurance of future performance information, as well as an updated proposed cure amount for each Lease.

*(ii) Rejection procedures for Leases.*

39. The Landlords do not object to the general rejection procedures set forth in the Sale Motion. The effective date of rejection should be clarified, however, so that it is clear that

such date is no earlier than the date that the Debtors turn over the Premises in <u>broom clean condition</u> with all keys or "key codes" and alarm codes to the Landlords (or to the mall managers or to the mall management office where the leased premises are located) and all inventory, furnishings, fixtures and equipment ("<u>FF&E</u>") and signs are removed.

40.     In the event the Debtors seek to abandon property at any Premises (*See* Sale Motion at ¶ 39(vii)), such abandonment can result in significant costs to Landlords for the removal of signage, inventory, supplies and FF&E. It may also result in third party leased equipment that is left at the Premises. Therefore, the Debtors should serve the Rejection Notice, along with a general description of any personal property that the Debtors intend to abandon, to any third party lessor or party with a secured interest in personal property of the Debtors, which notice will expire on or before any proposed rejection date. Upon the expiration of this notice period, <u>any</u> property left at the Premises shall be deemed abandoned to the Landlords upon a rejection of such Lease, free and clear of any claims, liens or interests, so that the Landlords may thereafter dispose of such abandoned property in their sole discretion, without liability to <u>any</u> other party.

### D.    OBJECTION TO STORE CLOSING SALES AND SALE GUIDELINES.

41.     As part of the Sale Motion, the Debtors seek authority to conduct store closing sales at certain as yet undetermined locations. In connection with the proposed sale, the Debtors included proposed sale guidelines (the "<u>Sale Guidelines</u>") and a proposed agency agreement for a liquidator to conduct sales.

42.     At this time, the identity of the liquidator(s) and stores subject to the sale is not known. It is likely that any liquidator that prevails at the auction will seek to modify the proposed guidelines and agency agreement. As a result, the Landlords reserve the right to object to any proposed form of agency agreement or sale guidelines once a successful liquidator prevails at the auction.

43.     At this time, the Landlords note that the proposed Sale Guidelines seek to deny the benefit of restrictions on Debtors' store-closing activities as specifically negotiated in the

Lease and under state law. Such blanket relief is unnecessary and inappropriate. The Bankruptcy Court did hold that an outright attempt to preclude store closing sales "would contravene overriding federal policy requiring a [debtor in possession] to maximize estate assets by imposing additional constraints never envisioned by Congress." The Bankruptcy Court recognizes the competing interests at play between a shopping center and a retail debtor, and held:

> "That is not to say the Code abrogates all lease provisions and statutes conditioning GOB sales. Section 363(e) reserves for bankruptcy courts the discretion to condition the time, place and manner of GOB sales, thereby providing adequate safeguards to protect shopping center landlords and their other tenants, while allowing the [Debtor] to fulfill its fiduciary obligations."

In re Ames Department Stores, Inc., 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992), .

44. Therefore, the Court has the discretion to fashion an order to adequately protect the interests of all parties under Section 363(e). Other cases agree. *See, e.g.*, In re Lisbon Shops, Inc., 24 B.R. 693, 695 (Bankr. E.D. Pa. 1982) (purpose of restrictive clauses in leases may be preserved by Bankruptcy Court supervision of GOB sales).

45. This is consistent with section 365(d)(3), which provides special protections to commercial landlords (and especially shopping center landlords) to ensure that the interests of shopping center landlords and other tenants are protected. Specifically, Section 365(d)(3) provides:

> The trustee shall timely perform all the obligations of the debtor, except those specified in Section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such time as the lease is assumed or rejected, ....

11 U.S.C. § 365(d)(3)

46. A store closing sale or liquidation detrimentally impacts the shopping center as a whole, as well as the surrounding tenants individually, and the Landlord has a primary interest in maintaining an appropriate and aesthetic appearance in their shopping centers that benefit all tenants. To better protect Landlord and other shopping center tenants, any order approving store closing sales should require that the Debtors and Agent comply with <u>all terms</u> of the Lease,

except as modified by any Court-approved sales guidelines. As set forth above, the Debtors have proposed guidelines (the "Sale Guidelines") that do not adequate protect Landlords in connection with the contemplated store closing sales. Landlords request at least the following additional changes to those guidelines.

a. The Sale Guidelines provide that the Stalking Horse or its agent may conduct the closing sales during any hours they deem appropriate, except in enclosed malls. *See* Proposed Guidelines at ¶ 2. The Stores should remain open for the hours prescribed for in the Lease or as dictated by each Center, irrespective of whether they are enclosed or non-enclosed. As set forth below, whether the shopping center is enclosed or non-enclosed, the Landlords still have the same obligations to other tenants to make sure all tenants comply with the terms of their Leases and the Centers.

b. There should be no augmentation of the Debtors' inventory.

c. The Proposed Guidelines do not adequately limit the size or number of signs. Window signs should be no larger than 36" x 60", and which sign is recessed at least 12" inches from the glass. Such window signs should also be limited to one such window sign per window that does not exceed 50% of the window total area. Window signs must not be stapled, taped or otherwise affixed together to exceed the 36" x 60" limitation.

d. The Agent should only be allowed to place five (5) additional hanging signs per 1,000 square feet, that are no more than 28" x 40" at appropriate locations throughout the stores, provided that theses interior signs shall not be visible from the doors or windows of the stores. No other signs should taped, push-pinned, or otherwise affixed to the walls of the stores. If any interior banner is allowed, it should be limited to one interior banner not to exceed 3' x 15', which banner is only permitted in the back 1/3 of the closing store.

e. All signs shall be professionally produced and lettered. No neon or "day-glo" colors shall be used in the signage. Unless a center manager agrees in writing to a different signage package, the liquidator should agree that they will only use three color signage produced on white background.

f. To the extent used, "toppers" should not exceed 7 ½ inches by 11 inches, and should be limited to one for each rack, counter or shelf. There should be conspicuous signs stating whether gift cards issued by the Debtors and/or the Center will be honored during the sale.

g. The guidelines should also limit the content of signage used to advertise the store closing sales. Landlords do not object to the use of the term "Store Closing Sale" in advertising the sales. However, the Landlords do object to the use of terms such as "Going out of Business," "Total Liquidation Sale," "court ordered sale," "bankruptcy sale," "Chapter 11 sale," or "lost our lease." Unless there is a chain-wide liquidation of all stores, the words should not be used.

h. There shall be no tethered, hot-air or other balloons, inflatable images, sandwich boards, A-frames, sign walkers or rooftop advertising of any kind in or around the Premises or Centers. Additionally, no flashing lights, strobe lights, large spotlights, bullhorns or any type of amplified sound should be used in any advertising. Moreover, the liquidator shall not distribute handbills, leaflets, or other written materials outside of the closing store.

i. There should be no sign-walkers, A-Frames, exterior banners, or other common area signage, regardless of whether the mall is enclosed or non-enclosed. *See* Proposed Guidelines at ¶ 8. There is no rational or legal basis to differential between an enclosed and non-enclosed mall. This differentiation is inappropriate and the case law does not support treating a shopping center differently merely because it is not completely covered by a roof. *See* Joshua Slocum, 922 F.2d at 1087-88; In re Sun TV and Appliances, Inc., 234 B.R. 356, 370 (Bankr. D. Del. 1999) (a shopping center for purposes of Section 365(b)(3) may go beyond the traditional "shopping center" and that all shopping centers do not necessarily take the form of shopping mall), *citing* Joshua Slocum, 922 F.2d at 1087. A non-enclosed shopping center relies on its rules and regulations, use, and signage provisions to control the appearance of the shopping center just as an enclosed shopping center does. It should receive no less protections in any final sale guidelines just because it may be in a climate that does not require that the mall be fully enclosed. Landlords do not consent to the Debtors and/or Agent placing any sign and/or advertising or marketing the sale in any common area, parking lot, side walk, building façade, or other Center property owned by the Landlords. Any attempt to do so is an improper taking. The exterior of the Premises is part of the common area and not property of the Debtors.

j. There shall be no auction of inventory and outside sales, sidewalk sale, tent sales, or any sale of any merchandise outside the store.

k. Upon the conclusion of the store closing sales, the Landlords should have access to the Store to conduct a walk-through and dress store windows, if necessary, to minimize the appearance of a dark store. Any such dressing shall not be deemed to be an acceptance by Landlord of surrender of the location, and the Leases shall only be deemed rejected at such time as notice has been given in compliance with an order of the Bankruptcy Court.

l. The Debtors purport to grant authority to use street walkers and signage on non-mall property. Such signage often violates local or city ordinances. As a result, the Debtors and/or the Stalking Horse of its agent should indemnify the Landlords for any fine or citation that the city or other governmental agency issues to the Landlords that results from their advertising or conduct of the store closing sales. Alternatively, any final order authorizing sales should clearly provide that the Landlords are not subject to such fines or citations during the store closing sales.

47. The guidelines should strike a balance between the interests of the Debtors, Landlords, and non-debtor tenants in the Centers. Landlords are entitled to full performance

under their Leases, and the Debtors must tailor their sales to fit within the terms of the Leases as much as possible. In addition, the Court should not permit the Debtors or their agents to compromise the interests of non-debtor tenants who must continue to comply with all signage and other restrictions in their leases. The Landlords have a primary interest in maintaining an aesthetic appearance in the Center for the benefit of all tenants. Signage restrictions are critical to maintaining the desired appearance and environment. Such provisions are reasonable restrictions to any proposed store closing sale.

### E. The proposed waiver of Federal Rule of Bankruptcy Procedure 6004 and 6006 is improper.

48. Unless a consensual deal exists, the Landlords object to the waiver of requirements of Federal Rule of Bankruptcy Procedure ("Rule") 6004(h) and 6006(d). In light of the lack of information that Landlords have with respect to any potential sale of the Leases, this request is especially inappropriate. Any order approving the Sale Motion, therefore, should not include a prospective waiver of Rules 6004(g) or 6006(d). For example, subsection (g) was added to Rule 6004, specifically to *protect* the rights of the objecting parties, and thus eliminate the "rush to the courthouse" to obtain stay orders by those parties adversely affected by entry of orders under Sections 363 or 365. Moreover, such an order is inappropriate in connection with an order approving bid procedures. Landlords should not have their appellate rights compromised by an advance waiver of these protections, particularly since the Debtor has failed to establish any cause for such a waiver, and particularly where the Landlords have such a negligible amount of time between the auction and the hearing to approve any proposed sale.

### F. RESERVATION OF RIGHTS TO RAISE FURTHER OBJECTIONS.

49. In light of the objections raised above, the Landlords reserve all rights to: (i) raise additional objections at this, or any further, sale hearing; (ii) raise all objections to an assignment of Leases to the Stalking Horse (or any other Successful Bidder) upon receipt of adequate assurance of future performance information; (iii) object to any attempt by the Stalking Horse (or any other successful bidder) to designate any of the Leases for assignment to a third party; (iv) to

object to any final store closing guidelines; and (v) require any proposed assumption and assignment to comply with all lease terms.

## G. JOINDER IN OBJECTIONS RAISED BY OTHER LANDLORDS.

50. To the extent consistent with the objections expressed herein, Landlords also join in the objections of other shopping center lessors to the Debtors' proposed relief.

## III. CONCLUSION

The Debtors provide no authority to disregard the terms of the Leases and the protections granted Landlords under the Bankruptcy Code. The Landlords did not create Debtors' financial maladies, and should not bear the consequences of this bankruptcy through loss of their contractual rights. The Court should modify any final sale order to incorporate the objections raised above, and grant such further relief as the Court deems proper.

Dated: June 25, 2009
Wilmington, Delaware

Respectfully submitted,

/s/ Leslie C. Heilman
Leslie C. Heilman, Esquire (No. 4716)
BALLARD SPAHR ANDREWS & INGERSOLL, LLP
919 Market Street, 12th Floor
Wilmington, DE 19801
Telephone: (302) 252-4465
Facsimile: (302) 252-4466
E-mail: heilmanl@ballardspahr.com

-and-

KATTEN MUCHIN ROSENMAN LLP
Thomas J. Leanse (SBN: 084638)
Dustin P. Branch (SBN: 174909)
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
Telephone: (310) 788-4400
Facsimile: (310) 788-4471
E-mail: thomas.leanse@kattenlaw.com
dustin.branch@kattenlaw.com

Attorneys for Landlord Creditors The Macerich Company, The Forbes Company, Cousins Properties Incorporated and Southgate Mall Associates

# SCHEDULE A

| | | |
|---|---|---|
| **The Macerich Company** | | |
| Store No. Unknown | Chandler Fashion Center | Chandler, AZ |
| Store No. Unknown | Danbury Fair Mall | Danbury, CT |
| Store No. Unknown | Empire Mall | Sioux Falls, SD |
| Store No. Unknown | Flagstaff Mall | Flagstaff, AZ |
| Store No. Unknown | Flat Iron Mall | Broomfield, CO |
| Store No. Unknown | Redmond Town Center | Redmond, WA |
| Store No. Unknown | Rimrock Mall | Billings, MT |
| Store No. Unknown | Rushmore Mall | Rapid City, SD |
| Store No. Unknown | San Tan Village | Gilbert, AZ |
| Store No. Unknown | Scottsdale Fashion Square | Scottsdale, AZ |
| Store No. Unknown | South Towne Marketplace | Sandy, UT |
| Store No. Unknown | South Plains | Lubbock, TX |
| Store No. Unknown | Southern Hills | Sioux City, IA |
| Store No. Unknown | Tyson's Corner | McLean, VA |
| Store No. Unknown | Washington Square | Portland, OR |
| **Southgate Mall Associates** | | |
| Store No. Unknown | Southgate Mall | Missoula, MT |
| **The Forbes Company** | | |
| Store No. Unknown | Somerset Collection | Troy, MI |
| **Cousins Properties Incorporated** | | |
| Store No. Unknown | Ave. at Carriage Crossing | Memphis, TN |
| Store No. Unknown | Ave. at East Cobb | Marrieta, GA |
| Store No. Unkown | Ave. at West Cobb | Marrieta, GA |