# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| EDDIE BAUER HOLDINGS, INC., | : | Case No. 09-12099 (MFW) |
| *et al.*,[1] | : | (Jointly Administered) |
|  | : |  |
| Debtors. | : | **Hearing Date: June 29, 2009 at 11:30 a.m. ET** |
|  | : | **Objection Deadline: June 26, 2009 at 12:00 p.m. ET** |
|  | : | **Related to Docket No. 24** |

**OBJECTION OF KRAVCO SIMON COMPANY, LEVIN MANAGEMENT AND GGP LIMITED PARTNERSHIP TO MOTION PURSUANT TO 11 U.S.C. §§ 105(A), 363, 365, AND BANKRUPTCY RULES 2002, 6004, 6004 FOR (I) ENTRY OF AN ORDER (A) ESTABLISHING BIDDING AND AUCTION PROCEDURES RELATED TO THE SALE OF ALL OF THE DEBTORS' ASSETS; (B) APPROVING BID PROTECTIONS FOR THE SALE OF THE DEBTORS' ASSETS; (C) SCHEDULING AN AUCTION AND SALE HEARING FOR THE SALE OF THE DEBTORS' ASSETS; (D) ESTABLISHING CERTAIN NOTICE PROCEDURES FOR DETERMINING CURE AMOUNTS FOR EXECUTORY CONTRACTS AND LEASES TO BE ASSIGNED; AND (E) GRANTING CERTAIN RELATED RELIEF; AND (II) ENTRY OF AN ORDER (A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (C) ESTABLISHING REJECTION PROCEDURES AND GUIDELINES FOR CONDUCTING STORE CLOSING SALES; AND (D) EXTENDING THE DEADLINE TO ASSUME OR REJECT UNEXPIRED LEASES OF NONRESIDENTIAL REAL PROPERTY PURSUANT TO 11 U.S.C. § 365(D)(4)**

TO THE HONORABLE MARY F. WALRATH,
UNITED STATES BANKRUPTCY JUDGE:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Eddie Bauer Holdings, Inc., a Delaware corporation (2352); Eddie Bauer, Inc., a Delaware corporation (9737); Eddie Bauer Fulfillment Services, Inc., a Delaware corporation (0882); Eddie Bauer Diversified Sales, LLC, a Delaware limited liability company (1567); Eddie Bauer Services, LLC, an Ohio limited liability company (disregarded); Eddie Bauer International Development, LLC, a Delaware limited liability company (1571); Eddie Bauer Information Technology, LLC, a Delaware limited liability company (disregarded); Financial Services Acceptance Corporation, a Delaware corporation (7532); and Spiegel Acceptance Corporation, a Delaware corporation (7253). The mailing address of for Eddie Bauer Holdings, Inc. is 10401 N.E. 8th Street, Suite 500, Bellevue, WA 98004. On or about the Petition Date, Eddie Bauer of Canada, Inc. and Eddie Bauer Customer Services, Inc., affiliates of the Debtors, commenced a proceeding before the Superior Court of Justice, Commercial List, for the Judicial District of Ontario, for a plan of compromise or arrangement under the Companies' Creditors Arrangement Act.

Kravco Simon Company ("Kravco"), Levin Management ("Levin") and GGP Limited Partnership, a debtor-in-possession, (Bankr. S.D.N.Y. Case No. 09-11977) as Direct and Indirect Owner of Landlord and/or Managing Agent for certain GGP Limited Partnership locations[2] ("GGP" and collectively, the "Objecting Landlords"), by and through their undersigned attorneys, hereby make this objection (the "Objection") to Debtors' Motion Pursuant to 11 U.S.C. §§ 105(A), 363, 365, and Bankruptcy Rules 2002, 6004, 6004 for (I) Entry of an Order (A) Establishing Bidding and Auction Procedures Related to the Sale of All of the Debtors' Assets; (B) Approving Bid Protections for the Sale of the Debtors' Assets; (C) Scheduling an Auction and Sale Hearing for the Sale of the Debtors' Assets; (D) Establishing Certain Notice Procedures for Determining Cure Amounts for Executory Contracts and Leases to Be Assigned; and (E) Granting Certain Related Relief; and (II) Entry of an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (C) Establishing Rejection Procedures and Guidelines for Conducting Store Closing Sales; and (D) Extending the Deadline to Assume or Reject Unexpired Leases of Nonresidential Real Property Pursuant to 11 U.S.C. § 365(d)(4) (the "Motion"), and in support of the Objection, aver as follows:

1. Eddie Bauer Holdings, Inc. and its affiliated co-debtors (the "Debtors"), filed their voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on June 17, 2009. The Debtors have continued to operate their

---

[2]     GGP and certain of the entities which are the direct owners of GGP locations have filed voluntary petitions under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York, which cases are jointly administered under the matter *In re: General Growth Properties, Inc.*, Case No. 09-11977-ALG. Accordingly, no action may be taken against any of the GGP bankruptcy entities, or which affects GGP entity property without first obtaining relief from the automatic stay in the GGP bankruptcy case, including the assumption and assignment and/or rejection of the GGP leases. GGP will promptly file a Suggestion of Bankruptcy in this matter identifying the specific GGP entities and locations which are debtors.

business and manage their properties as debtors-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

2.      Objecting Landlords are the owners or agents for the owners of various shopping centers in which Debtors operate retail stores pursuant to written leases (the "Leases" and each a "Lease") which are affected by the relief sought by the Motion.

3.      All of Objecting Landlords' premises are premises located in shopping centers, as that term is used in 11 U.S.C. § 365(b)(3). *See In Re: Joshua Slocum, Ltd.*, 922 F.2d 1081 (3d Cir. 1990). The premises affected by the Motion are set forth on Exhibit A, attached hereto.

4.      By the Motion, Debtors seek, *inter alia*, approval of various bidding and sale procedures (the "Procedures"), approval of the possible sale of some or all of Debtors' assets to the stalking horse bidder, Rainier Holdings LLC (the "Stalking Horse") or other successful bidder, approval of bid protections for the Stalking Horse, approval of certain rejection procedures, and/or approval of guidelines for the right to conduct store closing ("GOB") sales.

5.      Debtors propose the following schedule for the auction and sale of all or substantially all of their assets.

| June 29, 2009 at 11:30 a.m. ET | ▶ Bid Procedures Hearing |
|---|---|
| July 14, 2009 at 5:00 p.m. | ▶ Bid Deadline[3] |
| No date proposed | ▶ General Objection Deadline to Sale |
| July 16, 2009 at 11:00 a.m. ET | ▶ Auction at Young Conaway Stargatt & Taylor, LLP |
| July 17, 2009 at 11:00 a.m. | ▶ Sale Approval Hearing |
| No dates proposed | ▶ Objections to Assumption and Assignment of Leases and Cure Amounts |
| No date proposed | ▶ Hearing on Assumption and Assignment of Leases |
| July 31, 2009 | ▶ Consummation of Sale |

### Bidding Procedures Generally

6. Objecting Landlords are extremely concerned with certain portions of the compressed time frame for the proposed sale. This applies particularly to the proposed scheduling of the Sale Hearing with less than one day between the proposed Auction and the Sale Hearing and no deadline set to either object to the Sale or for the provision of adequate assurance of future performance information by the Debtors to the counterparties to the executory contracts and leases proposed to be assumed and assigned to the Successful Bidder. Adequate safeguards must be put in place to protect the interests of third parties.

### Scheduling of Bidding, Auction, Objections and Hearings; Adequate Assurance Information

7. Bids are due to be filed by 5:00 p.m. on July 16, 2009. In order to be a Qualified Bidder for the Auction, the bidder must supply the Debtors with written evidence of its financial wherewithal to consummate the proposed transaction . . . sufficient to satisfy the standards to provide adequate assurance of future performance of any contracts and leases to be assumed and assigned under Bankruptcy Code section 365. (Bidding Procedures, pp. 4-5). Nevertheless, there are no provisions in the Motion or the Bidding Procedures for the

---

[3] Terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

dissemination of such adequate assurance information to Debtors' landlords, or, for that matter, the counterparties to any contracts or leases which are proposed to be assumed and assigned, in advance of the Sale Hearing. Adequate assurance information must be supplied to the affected landlords and their counsel of record by email or fax and overnight courier service within twenty-four (24) hours of receipt by Debtors. All too often proposed assignees are "Newcos" with no meaningful financial information and no proposed guarantor or other credit enhancement offered.

8.     Further, because the Motion and the Asset Purchase Agreement ("APA") contemplate the Stalking Horse acquiring Designation Rights for the real property leases, it is unclear whether the Debtors intend to seek a separate objection deadline for interested parties, including the Objecting Landlords, to object to the proposed assumption and assignment of leases to the Successful Bidder or, rather, to have the general assumption and assignment approved subject to the later designation of specific leases. Objecting Landlords must be given the opportunity to object to the assumption and assignment of their Leases at the time of the proposed assignment, not days or months in advance and the determination of adequate assurance must be made at the time of the proposed assignment of the leases based upon the then existing facts, not based upon economic conditions which may have changed significantly over a period of time.

9.     Further, the scheduling of the Sale Hearing must provide for sufficient time for Objecting Landlords to conduct discovery and file such objections to the sale as may be appropriate. Accordingly, the Bidding Procedures should notify potential bidders that their evidence of adequate assurance of future performance will be delivered to the affected landlord and that they will be subject to expedited discovery in the event that their bid includes the assumption and assignment of any leases. Also, any Sale Approval Hearing contemplating a sale

5

other than to a liquidator should be scheduled no earlier than ten (10) days after notification of the successful bidder and service of documentation pertaining to the winning bidder. The Proposed Order should also clarify that there will be no hearing on assumption and assignment of leases at any Sale Hearing unless the ten (10) day notice period has been met.

## Assumption and Assignment and Cure Procedures

10. The Debtors state that the Stalking Horse Bidder has not yet determined which executory contracts and leases it will assume and therefore, the Asset Purchase Agreement sets up a designation period in which the Stalking Horse must select such contracts and leases to assume that is 210 days from the Petition Date with respect to the leases. *See* ¶ 27-29 of the Motion.

11. The Debtors' proposed assumption and assignment procedures deny the Objection Landlords due process, adequate assurance of future performance and the payment of the cure amounts due under the Leases at the time of assignment. The Debtors propose to file a written notice of assumption and assignment of a lease and serve the landlord with that notice by overnight delivery. Then, no later than 10 days after service of the notice, the Debtors seek to file a proposed order authorizing the assumption and assignment of the lease which will approve the assumption and assignment and state that the Successful Bidder has provided adequate assurance of future performance under the lease. As set forth above, the proposed assumption and assignment may occur up to 210 days after the Petition Date, approximately six months after the Sale Hearing. Indeed, the financial condition and operating history of the Successful Bidder may change during that time and adequate assurance of future performance must exist as of the time of the assumption and assignment of the Leases.

12. Accordingly, the Debtors should be required to file and serve adequate assurance of future performance information, as well as current proposed cure amounts, with any

6

Post-Closing Notice at the time of the proposed assumption and assignment, and the Objecting Landlords should have a reasonable opportunity to object, i.e., 10 days, with an expedited hearing to be scheduled in the event a timely filed objection cannot be resolved.

13.     Further, no Sale Order shall approve the assumption and assignment of any lease to any Successful Bidder until such time as the lease is actually assumed and assigned, and the Objecting Landlords have had an opportunity to be heard. In addition, any assumption and assignment must clearly set forth which party will be responsible for the payment of accrued but unbilled year-end adjustments and reconciliations.

14.     The Debtors also propose to serve a Cure Notice within five (5) days after entry of the Bidding Procedures Order or as soon as practicable thereafter upon all non-debtor parties to any executory contracts and unexpired leases that may be assumed and assigned to the Successful Bidder. The Cure Notice will state the cure amounts that the Debtors believe are necessary to assume such executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code and notify the non-debtor party that such party's contract or lease may be assumed and assigned to a purchaser of the Assets to be identified at the conclusion of the auction. Further, the Debtors propose that objections to the Cure Notice be filed within fourteen (14) days after service of the Cure Notice or will be forever barred. The Debtors also intend to go forward with any objections to the Cure Amounts at the Sale Hearing.

15.     The proposed cure procedures are premature and not practical. The Debtors should not be allowed to propose an objection deadline for cure amounts that shall apply to the assumption and assignment of Leases that may be assumed and assigned well after the closing of the sale, nor can they establish cure amounts for Leases that they may not assume and assign for six months, without providing for a means of amending such amounts at the time of the actual assumption and assignment. Moreover, to the extent there is an assumption and

7

assignment of any of the Leases, the Debtors provide no mechanism for the resolution of disputed cure claims. Thus, cure amounts and the determination of adequate assurance of future performance should be addressed at the time of the actual assumption and assignment of the lease and not before, with an opportunity for notice and a hearing. Further, all undisputed cure amounts should be paid immediately upon the assumption and assignment of the Leases. To the extent there are disputed amounts, those amounts must be escrowed, and a procedure should be put in place to resolve these remaining cure amounts within 30 days of the assumption and assignment of the Leases with a hearing set to deal with any amount that remains unresolved after such period.

16.     Also, in order that landlords will have the full benefit of any objection period established by the Cure Notice, any and all notices regarding the assumption and assignment of executory contracts and leases should be required to be served upon such counterparties and their counsel of record by email (if known), or otherwise by fax and overnight courier service.

17.     Finally, the Debtors should be required to file and serve the landlords with a breakdown of how the cure amounts were computed. Debtors certainly know what items comprise the cure amounts and likely have readily available reports, on a property by property basis, showing the composition of each payable.[4] Simply having the Debtors and/or landlords set forth gross cure numbers is of no assistance in attempting to establish, let alone reconcile, the cure amounts.

18.     Moreover, the proposed Designation Deadline violates Section 365(d)(4) of the Bankruptcy Code, because it contemplates the assumption and assignment or rejection of

---

[4]     In the *Hoop Holdings* (The Disney Store) matter currently pending in the District of Delaware, the Debtors provided detailed statements of cures for their assumed stores, which numbered approximately 200.

Leases beyond the expiration of the 210 day period. The effective date of any assumption and assignment or rejection of the leases must take place before the expiration of the 210 day period, absent landlord consent.

## Rejection Procedures

19.    The Objecting Landlords do not object to the general rejection procedures set forth in the Motion, except that the effective date of any rejection cannot take place after the expiration of the 210 day period. Accordingly, any Rejection Notice must be served no later than 10 days prior to the expiration of the 210 day period.

20.    In addition the effective date of the rejection should be clarified, such that the rejection of the lease shall become effective on the later of (i) ten (10) days from the date the Rejection Notice was served, and (ii) the date upon which the Debtors have unequivocally surrendered the premises to the landlord, with all key codes and alarm codes, and all inventory, furnishings, fixtures and equipment ("FF&E") and signs are removed.

21.    In the event that an objection to the rejection is raised by a party other than the landlord of the lease, the lease must be deemed rejected as of the later of either surrender of the premises or entry of this Court's Order. Thus, if the objection is not filed by the landlord of the premises, no retroactive rejection should be allowed.

## GOB Sales - Generally

22.    The Motion seeks the authority to allow the Stalking Horse Bidder or a Successful Bidder to conduct store closing sales in accordance with the terms of the Store Closing Guidelines that are attached to the Motion at certain yet undetermined locations.

23.    At the outset, the Motion is unclear as to who will be conducting the store closing sales, and what property will be sold in connection with such sales. According to the APA, the Stalking Horse Bidder is purchasing all of the Debtors' inventory and operating the

9

stores post-Closing, thus it would appear that they would be seeking to liquidate property which is no longer property of the estate. If that is the case, the Stalking Horse has no authority to conduct GOB sales in violation of the leases. However, to the extent the Court permits such sales, they must be subject to reasonable guidelines and protections for third parties.

24. Any GOB sales will contravene the provisions of Objecting Landlords' Leases not only with regard to the conduct of the GOB sales in general but also insofar as Debtors seek to limit a landlord's rights to enforce the provisions of the Leases, including, but not limited to, the right to control signage.

25. While Objecting Landlords understand the desire to maximize the value of the inventory in the stores, and that historically courts have granted **debtors** the right to conduct such sales, notwithstanding the seemingly contrary provisions of Section 365(d)(3), the sales must not be allowed to have a detrimental effect on Objecting Landlords and the other tenants of their shopping centers, and must not be allowed to subvert the requirements of § 365(d)(3) which specifically requires compliance with all of the terms of each of the leases.

26. This Court should neither engraft upon Section 363(b) an unfettered "right" to conduct "GOB" sales where that section of the statute pertains generally to the use, sale or lease of property of the estate other than in the ordinary course of business, nor invoke the provisions of Section 105(a) of the Bankruptcy Code, to effectively excise portions of the Leases where Section 365 specifically requires compliance with all lease provisions. Section 105(a) was never intended to allow courts to dispense with specific statutory mandates.

27. In the event that the Court does allow **the Stalking Horse** to conduct store closing sales, such sales must be of limited duration, subject to reasonable guidelines and balance the rights and interests of both Objecting Landlords, whose leases Debtors and the Stalking Horse seek to breach, and the landlords' other non-debtor tenants, who must compete

10

for the consumer's retail dollars without the benefit of being allowed to breach signage and other restrictions in such tenants' leases or are otherwise affected by the proposed activities.

28.     Debtors cite to *In re: Ames Dep't Stores*, 136 B.R., 357 (Bankr. S.D.N.Y. 1992) for the proposition that going out of business sales are regularly approved by courts. However, Debtors, as with most other debtors who cite to *Ames*, fail to mention a further significant holding of that case wherein the Court stated that "**§ 363(e) <u>reserves for Bankruptcy Courts</u> the discretion to condition the time, place and manner of store closing sales <u>thereby providing adequate safeguards to protect shopping center landlords and their other tenants</u>, ...."** [Emphasis added]

## Sale Guidelines and Procedures

29.     Objecting Landlords object to the use of any exterior signage and/or banners at any of their locations except as set forth herein. Objecting Landlords demand that Debtors and the Store Closing Agent prove, by competent evidence, the necessity for any proposed exterior banners. Debtors' leases do not give them the right to use any space in any shopping center, building of which the premises are a part or at any other location, outside of the premises for any purposes other than, perhaps, the installation of store identification signs strictly in accordance with the landlord's sign and design criteria. No provision of the Bankruptcy Code empowers the Court to allow a debtor to use a third party's property without the third party's consent. In many instances, the property lying outside the interior premises is common area property which all tenants have an undivided right to use pursuant to the terms of their leases. The fact that Debtor has filed a voluntary petition under the United States Bankruptcy Code does not suddenly grant it the right to use property that it has not leased for any purpose whatsoever, including the posting of GOB sale signage.

30.     In the event that this Court allows the use of exterior banners at certain store locations, such banners must be limited to the size and location of Debtors' existing

exterior signs, and may only be placed in or on that part, or those parts, of the premises that are actually leased by Debtors. Signage must not be permitted in any other area of either the shopping center or the building of which the premises are a part and no other exterior devices, such as balloons, may be permitted in any other areas of Objecting Landlords' shopping centers or buildings. In addition, exterior banners must be limited to one per store and affixed without drilling or otherwise penetrating either the façade of Objecting Landlords' buildings or the roof of any such building. Such penetrations may well have the effect of voiding landlords' warranties.

31.     In the event that exterior banners are allowed, such banners must also be limited to stand alone stores or those shopping centers that are not "up-scale" and where the particular store has frontage facing a major street or highway and where the signage is not prohibited by local law. Many non-enclosed shopping centers have the same character as enclosed malls but, for various reasons, such as the climate in which those shopping centers are located, the owners have chosen not to enclose same. Those shopping centers are, indeed, non-roofed enclosed shopping centers rather than non-enclosed shopping centers. Accordingly, village type centers, lifestyle centers and other centers which are, in essence, malls without roofs, should not be subjected to the use of exterior banners any more than enclosed malls. Further, in any shopping center where the subject premises faces an interior area without a reasonable view of a highway or street, the employment of exterior banners should be prohibited. Finally, no exterior banners should be permitted absent prior notification to local authorities with jurisdiction over the shopping center.

32.     Guideline #2 indicates that Sales shall be conducted during hours that are deemed appropriate by the Store Closing Agent (irrespective of any operating hours restriction

12

provision contained in any of the Leases). All stores must be operated in accordance with the operating hours of the Leases.

33. Debtors request that "sign walkers" and street signage be permitted despite any state or local laws to the contrary. [*See* Guideline #20]. Such advertising is particularly offensive and gives the area a cluttered look not in keeping with the look Objecting Landlords have attempted to preserve for their properties. No signage or sign walkers may be allowed on Objecting Landlords' property. Moreover, such signage should not be permitted without giving notice to each affected governmental unit and affording said unit an opportunity to be heard. Governmental officials have complained that sign walkers in particular cause traffic hazards.

34. Guideline #8 should be amended to place further limits on the number of window and interior signs, and the size thereof, to be used in the stores and store windows. Window signs should be limited to one per window. No more than eight (8) signs per 1000 square feet and no larger than 30"x36" each may be employed within the stores themselves. Interior banners should be limited to no more than 1 per store, no larger than 3'x10' and set back at least 1/3 of the way from the front of the Premises.

35. To the extent that a landlord reaches an agreement with a liquidator or the Store Closing Agent for modification of any approved guidelines, such agreement or "side letter" should control over any court approved guidelines, and a provision should be added to the Sale Order to so provide.

36. The Motion, at ¶¶ 81-85, asks that the Court to invalidate any restrictions in Restrictive Documents that may impair the Debtors' ability to conduct the store closing sales. This language is extremely broad and could easily be interpreted to include provisions requiring the payment of the full contract rent, participation in marketing funds, heating and air conditioning requirements, requirements regarding lighting of the premises, store hours and even

13

use clauses, all of which ostensibly restrict the right of the Debtors to conduct a GOB sale in the manner they so desire. Only those specific provisions which the Debtors address and which the Court finds to be restrictive, such as "go dark" clauses, should be included in any provisions of an Order approving GOB sales.

37.     Objecting Landlords also request the inclusion in the Guidelines, or the Order approving same, of a provision which provides for the indemnification of Objecting Landlords by the Debtors and any liquidation agents in the event that Objecting Landlords receive citations from local authorities as a result of the conduct of GOB sales in general, and the signage employed with regard thereto in particular. In the past certain landlords have received citations because the signage employed by the agent violates local ordinances. Since the ordinances may be applicable to the landowner, local authorities have issued the citations notwithstanding the orders of the Bankruptcy Courts which purport to allow these sales to be conducted by debtors without interference from such local authorities. Accordingly, in the event that an Objecting Landlord does receive any such citations, Objecting Landlords request that this Court order the Debtors and any agent to indemnify and hold Objecting Landlords harmless from any and all costs, fines, and attorneys' fees which Objecting Landlords are required to pay or expend in defense of such citations in the event that Debtors and the Store Closing Agent are unable to have the local authorities withdraw such citation or citations. Further, any provision of a sale order exempting Debtors and the liquidator from action by various governmental authorities should also extend to Objecting Landlords.

38.     The Motion does not indicate when the proposed store closing sales will begin or for what duration. The GOB sales should be limited in duration for the minimum period of time in which it is necessary to liquidate the inventory remaining in the stores.

## Augmentation of Inventory

39.     It is unclear whether the Stalking Horse seeks to augment store inventory with goods other than those that may be existing in the stores at the time of a proposed sale. Objecting Landlords object to any augmentation of inventory.

## Transitional Services Agreement

40.     Pursuant to the Transitional Services Agreement the Stalking Horse will have all of Debtors' rights in and to the various real property leases, will be responsible for all occupancy costs and will retain all proceeds from sales within the premises. In other words, the Stalking Horse will be running the business, paying the costs and keeping the profits. The Stalking Horse is even required to pay rent directly to the landlords. It is clear, then, that the Transitional Services Agreement is in actuality an assumption and assignment of the leases and the thinly veiled attempt to disguise it as something else should be denied. The agreement should not be approved by the Court.

41.     Objecting Landlords have no direct relationship with the Stalking Horse. Objecting Landlords Leases require Debtors to pay the rentals due thereunder and there is no authority for Debtors to delegate that responsibility to any other party. If the Transitional Services Agreement is approved, Debtors must continue to pay all rentals due and any reimbursement for the rentals should be a separate agreement between Debtors and the Stalking Horse.

42.     Section 4.2 regarding rental refunds is contrary to the law in this jurisdiction whereby debtor-tenants are required to pay the entire month's rent if they are occupying the premises on the first of the month.

43.     All Store Operations must be in full compliance with the terms of the underlying leases, not just "material compliance" as provided in Section 6(d).

15

44.     The Transitional Services Agreement only obligates the purchaser to maintain public liability insurance and insurance policies covering injuries of persons or property in connection with the purchasers operating at such store in such amounts as it deems commercially reasonable or as otherwise required by the Leases. The purchaser must at a minimum maintain all insurance and name the Objecting Landlords as additional insureds or loss payees as required by the Leases. Such insurance coverage must be in addition to, and not instead of, the insurance which Debtors, as tenats, are required to maintain under the leases.

## Objection to Sale Order

45.     Objecting Landlords reserve their right to object to the specific provisions of any Sale Order once a final Sale Order is proposed. In the interim, Objecting Landlords note the following basic objections to the proposed Sale:

• The Motion proposes a sale free and clear of all "claims". Objecting Landlords object to any attempt to cut off their rights to be paid for accrued but unbilled pre-assignment amounts, such as year-end adjustments with regard to common area maintenance, taxes and percentage rent. Although such amounts may have accrued pre-assumption, in most cases payment has not become due and, therefore, there can be no default on the part of the Debtors for failure to pay same. Section 365 only requires the Debtors and/or assignee to cure all defaults. Nevertheless, these accrued amounts, or pre-petition "claims", are still the responsibility of either the Debtors or the assignee and the language of any sale order must make clear that those obligations are not waived.

• As with year-end adjustments, audited amounts, such as with regard to percentage rent, are likely not known prior to an assumption and assignment of the lease. Nothing in the Bankruptcy Code gives the Debtors and the assignee the right to deprive the landlords of amounts that come due under the leases in the ordinary course of events. Again, the Bankruptcy Code only requires that a Debtor cure defaults, not that at the time of assignment the

16

parties conger up all possible claims which may be made under the leases and account for same at the time of assignment. Rather, consideration of these issues should be given when determining whether or not the Debtors and proposed assignee have provided adequate assurance of future performance. The Debtors and assignee can simply either make an adjustment in the purchase price to account for the possibility that such amounts may become due in the future or they may reserve sufficient funds to cover any such issues. It is impractical to require landlords to attempt to perform any and all audits which may effect a lease prior to the proposed assignment of same, particularly where all of the relevant information, such as annual gross sales pertaining to percentage rent, may not be available.

## Advance Waiver of the Stay Under
## Bankruptcy Rule 6004(h) Is Inappropriate

46. Debtors seek an advance waiver of the ten-day stay of Rule 6004(h) of the Federal Rules of Bankruptcy Procedure. (Motion at ¶96). Such an advance waiver is unjustified and inappropriate. There is no reason to eliminate the mandated stay in a contested matter. In the event of an adverse ruling, Objecting Landlords must be given sufficient time to prosecute an appeal of that ruling without the risk that the appeal will immediately become moot by a quick closing. *See In re Quanalyze Oil & Gas Corp.*, 250 B.R. 83, 92 (Bankr. W.D. Tex. 2000) (in reviewing Rule 6004(g) [now (h)] observing that "[a] party seeking to obtain appellate review of just such a sale should not find its efforts frustrated by a 'quick closing' that renders an appeal moot.").

## Reservation of Rights

47. Objecting Landlords reserve the right to make such other and further objections as may be appropriate when a proposed assignee of one or more of their leases is identified.

## Joinder in Other Landlord Objections

48.  Objecting Landlords hereby join in the objections filed by Debtors' other landlords to the extent that such objections are not inconsistent with the provisions hereof.

**WHEREFORE,** Objecting Landlords pray for relief consistent with the foregoing objections; and for such other and further relief as may be just and required under all of the circumstances

Dated: June 26, 2009
Wilmington, Delaware

Respectfully submitted,

/s/ Leslie C. Heilman
Tobey M. Daluz, Esquire (No. 3939)
Leslie C. Heilman, Esquire (No. 4716)
BALLARD SPAHR ANDREWS & INGERSOLL, LLP
919 N. Market Street, 12th Floor
Wilmington, DE 19801
Telephone: (302) 252-4465
Facsimile: (302) 252-4466
E-mail:  tdaluz@ballardspahr.com
         heilmanl@ballardspahr.com

– and –

David L. Pollack, Esquire
Jeffrey Meyers, Esquire
BALLARD SPAHR ANDREWS & INGERSOLL, LLP
51ST  Fl – Mellon Bank Center
1735 Market Street
Philadelphia, Pennsylvania  19103
Telephone: (215) 864-8325
Facsimile: (215) 864-9473
Email: pollack@ballardspahr.com
       meyers@ballardspahr.com

Counsel for Kravco Simon Company, Levin Management and GGP Limited Partnership