# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>EDDIE BAUER HOLDINGS, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 09-12099 (MFW)<br><br>Jointly Administered<br><br>**Hearing Date: June 29, 2009 at 11:30 a.m.** |

**LIMITED OBJECTION OF WILMINGTON TRUST FSB, AS AGENT FOR DEBTORS' SECURED TERM LENDERS, TO DEBTORS' MOTION FOR (I) ENTRY OF AN ORDER (A) ESTABLISHING BIDDING AND AUCTION PROCEDURES RELATED TO SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (B) APPROVING BID PROTECTIONS; (C) SCHEDULING AUCTION AND SALE HEARING; (D) ESTABLISHING CERTAIN NOTICE PROCEDURES FOR DETERMINING CURE AMOUNTS FOR EXECUTORY CONTRACTS AND LEASES TO BE ASSIGNED; AND (E) GRANTING CERTAIN RELATED RELIEF**

Wilmington Trust FSB, successor by assignment to JPMorgan Chase Bank, N.A., as Agent (the "Term Loan Agent") for the pre-petition term loan lenders (collectively, the "Term Lenders"), through its undersigned counsel, respectfully submits this limited objection (the "Objection") to the motion of the above-captioned debtors and debtors in possession (collectively, the "Debtors") (i) for entry of an Order (a) establishing bidding and auction procedures related to sale of substantially all of the Debtors' assets; (b) approving bid

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Eddie Bauer Holdings, Inc., a Delaware corporation (2352); Eddie Bauer, Inc., a Delaware corporation (9737); Eddie Bauer Fulfillment Services, Inc., a Delaware corporation (0882); Eddie Bauer Diversified Sales, LLC a Delaware limited liability company (1567); Eddie Bauer Services, LLC, an Ohio limited liability company (disregarded), Eddie Bauer International Development, LLC, a Delaware limited liability company (1571); Eddie Bauer Information Technology, LLC, a Delaware limited liability company (disregarded); Financial Services Acceptance Corporation, a Delaware Corporation (7532); and Spiegel Acceptance Corporation, a Delaware corporation (7253). The mailing address for Eddie Bauer Holdings, Inc. is 10401 N.E. 8th Street, Suite 500, Bellevue, WA 98004. On or about the Petition Date, Eddie Bauer of Canada, Inc. and Eddie Bauer Customer Services, Inc., affiliates of the Debtors, commenced a proceeding before the Superior Court of Justice, Commercial List, for the Judicial District of Ontario, for a plan of Compromise or arrangement under the Companies' Creditors Arrangement Act.

protections; (c) scheduling an auction and sale hearing; (d) establishing certain notice procedures for determining cure amounts for executory contracts and leases to be assigned; and (e) granting certain related relief; and (ii) for entry of an order (a) approving the sale of the Debtors' assets free and clear of all liens, claims, encumbrances and interests; (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases; (c) establishing rejection procedures and guidelines for conducting store closing sales; and (d) extending the deadline to assume or reject unexpired leases of non-residential real property (the "Motion").[2] In support of this Objection, the Term Loan Agent respectfully states as follows:

## PRELIMINARY STATEMENT

1. No constituency's rights and interests are affected more by the proposed sale of substantially all of the Debtors' assets than are those of the Term Lenders, who collectively hold first and second priority liens on substantially all assets that are the subject of the proposed sale. In recognition of this fact, the Interim DIP Order (as defined below) provides that any proposed order approving bidding procedures must be in a form and substance reasonably acceptable to the Term Loan Agent. (Interim DIP Order at ¶ 20(j)).

2. In the short period that has elapsed from the commencement of the Debtors' Chapter 11 cases, the Term Loan Agent, through its professionals, has been working closely with the Debtors to resolve concerns and issues related both to the bidding and auction procedures and to the terms of the Stalking Horse Purchase Agreement (as defined below) and many such concerns have been resolved consensually. Moreover, the Term Lenders are

---

[2] Any capitalized terms shall have the meaning ascribed to them in the Motion, unless otherwise provided for herein.

supportive of the concept and timing of the auction and sale process which they believe will benefit these estates and all interested parties.

3. Still, a number of provisions of the Stalking Horse Purchase Agreement and the bidding procedures remain problematic. Among these are (i) the failure to allow bidding on groups of assets or to devise workable bidding procedures that would accommodate multiple buyers bidding on separate lots, (ii) the failure to ensure that all bids are evaluated based not only on the top line purchase price, but also on the overall net economic value to the estate, (iii) the improper limitations and other restrictions regarding a secured creditor's ability to make a credit bid for its collateral, and (iv) the right of the Stalking Horse Bidder to receive a Break-Up Fee before it is fully and unconditionally obligated to close on the proposed Sale.

4. As more fully described below, collectively these provisions, if left to stand, would chill the prospect of meaningful competitive bidding, impede the exercise of fundamental rights of secured creditors, and greatly decrease the likelihood of achieving maximum value for the Debtors' assets.

5. The Term Loan Agent will continue to work with the Debtors and the Stalking Horse Bidder to resolve its concerns. Absent such agreement, however, the Term Loan Agent, for itself and on behalf of the Term Lenders, respectfully requests that approval of the Motion be conditioned on the modifications and clarifications described below.

## BACKGROUND

### A. Introduction

6. On June 17, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware.

7. The Debtors continue in possession of their properties and the management of their affairs as debtors-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code. An Official Committee of Unsecured Creditors was appointed herein by the United States Trustee on June 25, 2009. No trustee or examiner has been appointed in the Debtors' Chapter 11 cases.

### B. Prepetition Secured Indebtedness

8. The Term Loan Agent, the Term Lenders, and the Debtors are parties to that certain Amended and Restated Term Loan Agreement dated April 4, 2007, as amended (the "Prepetition Term Loan Agreement"). As of the Petition Date, the principal outstanding indebtedness under the Prepetition Term Loan Agreement as acknowledged by the Debtors was at least $200,607,949, together will all fees, costs, interest, professional fees and other obligations properly chargeable thereunder. Interim DIP Order at p. 10.

9. In addition to their secured obligations to the Term Lenders, the Debtors have also incurred secured revolving indebtedness to certain prepetition lenders (the "Prepetition Revolving Lenders") under that certain Loan and Security Agreement dated June 21, 2005, as amended, with Bank of America, N.A., as Agent (the "Prepetition Revolving Credit Agreement") and the lender parties thereto. As of the Petition Date, the outstanding principal

4

indebtedness due and owing under the Prepetition Revolving Credit Agreement, as acknowledged by the Debtors, was approximately $41,551,000, together with issued and outstanding letters of credit totaling $9,689,362, plus all interest, fees, costs, professional fees and other obligations properly chargeable thereunder. Interim DIP Order at p. 8.

10. The Debtors' obligations to both the Term Lenders and the Prepetition Revolving Lenders are secured by substantially all of the Debtors' assets, with the specific rights and priorities between and among the secured creditors governed by that certain Intercreditor Agreement dated June 21, 2005 (the "Intercreditor Agreement").

11. Under the terms of the Intercreditor Agreement, the obligations of the Debtors under the Prepetition Term Loan Agreement are secured by first priority liens on, and security interests in, all of the Debtors' real property, plant and equipment, intellectual property, capital stock and general intangibles (other than certain intangibles pledged to the Term Lenders) (collectively, the "Term Priority Collateral"). In addition, the Term Lenders were granted a second priority lien on the Revolver Priority Collateral (as defined below).

12. The Debtors' obligations under the Prepetition Revolving Credit Agreement are secured by first priority liens on accounts receivable, inventory and specified general intangibles related thereto (the "Revolver Priority Collateral"), together with a second priority lien on the Term Priority Collateral.

13. On June 18, 2009, this Court entered its Interim Order (1) Authorizing Incurrence by the Debtors of Post-Petition Secured Indebtedness with Priority Over Certain Secured Indebtedness and with Administrative Superpriority, (2) Granting Liens, (3) Authorizing Use of Cash Collateral by the Debtors Pursuant to 11 U.S.C. § 363 and Providing for Adequate

Protection, (4) Modifying the Automatic Stay and (5) Scheduling a Final Hearing (the "Interim DIP Order") [D.I. 64].

### C. Summary of Relief Requested

14. In the two months prior to the Petition Date, the Debtors, with the assistance of their financial advisors, engaged in efforts to identify a "stalking horse" bidder for the sale of their assets as part of a contemplated sale process to be conducted under the auspices of the Bankruptcy Court. Rainier Holdings LLC (the "Stalking Horse Bidder"), a private equity investor, emerged as the successful stalking horse bidder, with an all-cash bid of $202,300,000 (the "Stalking Horse Bid"), as memorialized in that certain Asset Purchase Agreement among the Debtors and the Stalking Horse Bidder dated as of June 16, 2009 (the "Stalking Horse Purchase Agreement"). It goes without saying that the Stalking Horse Bidder's "headline" price of approximately $202 million for substantially all of the Debtors' Assets would not come close to paying the Term Lenders in full.[3]

15. Pursuant to the Motion, the Debtors seek, *inter alia*, approval of the bid and sale procedures (the "Bidding Procedures") related to the submission of competitive bids for substantially all of their assets (the "Assets") and the approval of certain proposed bid protections to the Stalking Horse Bidder.

### LIMITED OBJECTION

16. Bidding procedures in the bankruptcy context must be reasonably calculated to benefit a debtor's estate by enabling the debtor to maximize values. *See Calpine*

---

[3] The Term Lenders, however, believe that the value to be obtained at an auction of their collateral is far in excess of what the Stalking Horse Bidder is offering.

6

*Corp. v. O'Brien Environmental Energy, Inc.*, 181 F.3d 527, 537 (3rd Cir. 1999) (only bidding procedures designed to benefit estate through maximization of asset recoveries can be approved); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair sale process designed to maximize value for the estate."). Procedures calculated to encourage competitive bidding necessarily benefit the estate, while those whose effect is to chill active bidding subvert the goal of maximizing asset values. *See Calpine Corp. v. O'Brien*, 181 F.3d at 537.

17. As described below, the Bidding Procedures developed by the Debtors for the submission and evaluation of competitive bids will necessarily chill robust bidding and may favor approval of a transaction with a lower net economic benefit to the estate than an alternative bid which is would not qualify under the proposed regime.

**A. Bidding Should Include Assets Broken Down Into Separate Lots**

18. The proposed Bidding Procedures require that any bid be for substantially all of the Debtors' Assets. (Bidding Procedures, at pg. 2). The Bidding Procedures do not provide a mechanism for bidding on assets in lots to ascertain whether the "sum of the parts" may yield greater value than the whole. From the standpoint of the Stalking Horse Bidder, this makes complete sense, in that by limiting the universe of potential buyers to those only interested in acquiring all of the Debtors' Assets, the number of potential bidders will likely be small, thereby decreasing the likelihood of a protracted bidding war. However, from the standpoint of the Debtors and their estates, the development of procedures which promote rather than chill competitive bidding is the paramount objective.

7

19. The Debtors collectively have a disparate portfolio of assets that can easily be broken down into distinct categories of assets, including intellectual property (i.e. the "Eddie Bauer" brand), real property, inventory, and leases, some located in the US, others in Canada. It cannot be gainsaid that different categories of buyers may exist for different categories of assets. Buyers who would have no interest in bidding on all of the Debtors' assets may have an interest in one or more smaller lots and a combination of such bidders may reap the greatest value for the Debtors' estates.

20. A bankruptcy court requiring that bidding on the assets of the Debtor proceed as the Term Loan Agent is requesting is far from unprecedented. In fact, recently in In re BearingPoint, Inc., et al., the Court rejected a stalking horse bidder's attempt to condition qualifying competing bids on both assets comprising the stalking horse bid. *In re BearingPoint, Inc., et al.,* Case No. 09-10691 (REG), April 27, 2009 Hearing Transcript at 33:4 – 33:7 (Bankr. S.D.N.Y., Feb. 18, 2009) (upholding creditors' committee's objection to bidding procedures to extent they required that all bids be for both assets being acquired by the stalking horse bidder) (the April 27, 2009 Transcript is annexed hereto as Exhibit A).

21. The Term Loan Agent respectfully requests that the Debtors, in consultation with the Term Loan Agent and other key constituencies, be required to offer the Assets in appropriate bundles to ensure that substantial value is not being left on the table by consolidating all Assets together. If, as the Debtors believe, the value of the Assets in toto is greater than the value derived from breaking the Assets down into smaller lots, then nothing will be lost by confirming that fact through the solicitation of bids for less than all of the Assets. If, on the other hand, the presence of a broader group of potential bidders at the auction stimulates bidding, or results in joint bids by multiple parties that would increase values over those

realizable through the one-lot approach favored by the Debtors, all parties in interest will stand to benefit.

22. Further, breaking the Assets into lots will not prejudice the Stalking Horse Bidder or any other party. In the event that the Debtors determine that the Stalking Horse Bidder's offer is the highest and best offer, the Stalking Horse Bidder will receive the benefit of its bargain and will be able to consummate the sale after Court approval. Alternatively, if the Debtors determine that another bid or combination of bids will bring in the greatest benefit to the estate and choose to enter into an Alternative Transaction, the Stalking Horse Bidder, subject to the terms of the Stalking Horse Purchase Agreement, will be entitled to its bidding protections. Accordingly, the Term Loan Agent requests that the Bidding Procedures allow for bidders to submit bids for specified bundles of lots in addition to bids for substantially all of the Debtors' assets.

### B. Secured Creditors' Credit Bid Rights Unduly Curtailed

23. An auction in a bankruptcy cannot undermine a secured creditor's credit bid rights unless the Court, for cause, orders otherwise. 11 U.S.C. § 363(k). Moreover, credit bid rights are not capped at the economic value of the collateral securing the secured party's claim. *See Cohen v. KB Mezzanine Fund II, LP, et al. (In re Submicron Systems Corp.)*, 432 F. 3d 448, 459 (3d Cir. 2006) (undersecured creditor permitted to credit bid at full face amount of claim regardless of the value of underlying collateral).

24. Here, there has been no showing of "cause" to curtail those rights, and in fact, the Debtors expressly contemplate the preservation of all secured creditors' right to make a credit bid as part of the auction. (Motion, at ¶ 22). However, under the Bidding Procedures, the

Term Lenders are precluded from making a credit bid for just the assets on which it has a first priority lien because they are required to bid on substantially all of the Debtors' assets. In fact, this Court has required a debtor to break-up assets that were the subject of an auction in order to allow parties to bid on the assets to which they asserted a property interest. *See e.g. In re Eclipse Aviation Corp.*, 08-13031 (MFW), Dec. 15, 2008 Hearing Transcript, at 110:14 – 110:18 (Bankr. D. Del., Dec. 23, 2008) (requiring that debtor allow lot bidding on a airplane that was collateral for a secured party to ensure that such party could bid on that asset) (the December 15, 2008 Transcript is annexed hereto as **Exhibit B**).

25. Further, the overbid amount and minimum bid increments for any secured party making a credit bid should mirror those of the Stalking Horse Bidder because consummation of a transaction with a secured lender exercising its credit bid rights will not trigger the obligation to pay the Break-Up Fee to the Stalking Horse Bidder pursuant to the express terms of the Stalking Horse Purchase Agreement. (Stalking Horse Purchase Agreement, Section 7.11(a)). Accordingly, there is no logic for imposing an overbid requirement that includes the $5,057,500 Break-Up Fee on the Term Lenders other then to dilute their credit bid rights, and, in doing so, also chill the bidding. Further, this adjustment for the Term Lenders should be taken into account in every round of bidding, just as the Bidding Procedures currently provide for each bid of the Stalking Horse Bidder.

26. If approved, this procedure would effectively emasculate the Term Lenders' credit bid rights without cause – in direct contravention of section 363(k). There is no basis in law or fact to support this limitation on time-honored rights of secured creditors and, accordingly, any order approving the bid and sale procedures should expressly enable the Term Lenders to exercise their credit bid rights solely as to the collateral securing their allowed claims.

In addition, any overbid required for a credit bid should account for the fact that no Break-Up Fee shall be payable to the Stalking Horse Bidder.

    **C. Stalking Horse Purchase Agreement is Highly Conditional; Right to Receive Break-Up Fee Should Only Be Earned if Stalking Horse Bidder Agrees to Waive Certain "Soft" Termination Rights or When the Stalking Horse Bidder is Obligated to Close**

27. As is customary, the Stalking Horse Purchase Agreement contains a number of termination rights and closing conditions which, if triggered, would enable the Stalking Horse Bidder to walk away from the deal. (Stalking Horse Purchase Agreement, at Section 7.11). For example, if the Stalking Horse Purchase Agreement is terminated for any reason other than a breach by the Stalking Horse Bidder (including the Soft Termination Conditions as described below), and the Debtors consummate certain transactions within a year thereafter (which is essentially a foregone conclusion), the Debtors will thereupon be obligated to pay a termination fee of $5,057,500, together with expense reimbursement of up to $250,000.[4] (Stalking Horse Purchase Agreement, at Section 7.11). Most importantly, based on the current Stalking Horse Purchase Agreement, the Stalking Horse Bidder could be paid the Break-Up Fee at a time when it is not even obligated or bound to close the transaction.

28. In a number of instances the Stalking Horse Bidder is granted the right to terminate and to receive a Break-Up Fee based on facts and circumstances that are largely in the

---

[4] The Motion only discloses the expense reimbursement of $250,000 to the Stalking Horse Bidder. However, the Motion fails to disclose, as the Term Loan Agent understands, <u>that the Debtors' paid approximately $1.25 million to the Stalking Horse Bidder by the Debtors on the eve of the Petition Date</u>. The Term Loan Agent expressly reserves all rights pertaining to such payment; including the right to seek disgorgement should the Stalking Horse Purchase Agreement be terminated based on a breach by the Stalking Horse Bidder or for any other reason.

Stalking Horse Bidder's control, or otherwise outside of the Debtors' control. These circumstances include (i) receiving landlord consents under Canadian real property leases representing 75% of the Debtors' 2008 EBITDA generated from Canadian operations (Section 8.2(g)); (ii) securing employment agreements with certain key employees on terms it considers acceptable (Section 8.2(f)); and (iii) maintaining availability under the Debtors' postpetition financing facility of not less than $10 million at all times (Section 9.1(h)) (collectively, the "Soft Termination Conditions"). The Stalking Horse Purchase Agreement contains a "drop dead date" of August 31, 2009. Curiously, however, the Debtors' budget annexed to the Interim DIP Order indicates that there will be less then $10 million in availability in early August, thereby giving the Stalking Horse Bidder an option to walk away from the proposed transaction before the expiration date contained in the Stalking Horse Purchase Agreement. Even more troubling is the fact that the Debtors filed an emergency motion requesting that this Court authorize the posting of a customs bond and the issuance of a letter of credit to support the bond because if the relief requested in that motion were granted it would cause the Debtors to have only approximately $10.8 million in availability at the end of July, which is only $800,000 above the $10 million availability condition.

29. The Stalking Horse Purchase Agreement allows the Stalking Horse Bidder to earn the Break-Up Fee at a time when it would not be obligated to consummate the Sale itself because of the Soft Termination Conditions. The Stalking Horse Bidder should only receive a Break-Up Fee if it is fully bound and committed to consummate the transaction at the time such fee is actually earned. Viewed collectively, the Soft Termination Conditions effectively create unacceptable optionality in favor of the Stalking Horse Bidder that would enable the Stalking Horse Bidder to terminate the Stalking Horse Purchase Agreement and collect a multi-million

dollar Break-Up Fee based (i) at a time when the Stalking Horse Bidder was not obligated to close the transaction, and (ii) based on circumstances outside of the Debtors' control, and in some cases, within the control or influence of the Stalking Horse Bidder. The ability of the Stalking Horse Bidder to earn the Break-Up Fee at a time it would not be bound to consummate the Sale should not be countenanced by the Court and the Stalking Horse Bidder's right to earn the Break-Up Fee should be conditioned on the Soft Termination Conditions having been satisfied or waived by the Stalking Horse Bidder prior to the commencement of the Auction.

### D. Determination of "Qualified Bid" Status Should Be Based on Net Economic Value to the Estate and Not Only Top Line Purchase Price

30. Under the Bidding Procedures, all the determination of whether a bid is a "Qualified Bid" is based, in part, on the gross cash purchase price being offered and without regard to the actual net economic value flowing to the estates. (Bidding Procedures, at pg. 5) (requiring a cash price of no less then $208,500,000 to become a Qualified Bidder without taking the assumed assets or liabilities into account). A party prepared to submit what may be the highest value bid or the Assets may be excluded from even participating in the auction because the cash component of the bid failed to qualify it as a Qualified Bidder under the requirements imposed by the Debtors. Thus, for example, depending on the unexpired leases and executory contracts assumed or rejected, the cure amounts required to be paid, the liabilities that may be assumed, the non-cash consideration that may be provided, and other potential value-affecting provisions that may be added or subtracted from the Stalking Horse Purchase Agreement by any competitive bidder, it is entirely possible that a bid with a lower "headline" purchase price in fact

creates and preserves substantially more value for the Debtors' estates than one with a higher gross purchase price.

31. Stated simply, the gross cash purchase price contained in a purchase agreement is but one measure of value which may or may not be determinative in considering overall net values, yet under the Debtors' proposed Bidding Procedures, that is the only determinant for selecting the highest and best offer. It is incumbent on the Debtors to devise procedures that are calculated to maximize values for the Debtors' estates. *See Calpine Corp. v. O'Brien*, 181 F.3d at 537; *In re Edwards*, 228 B.R. at 561. By failing to even acknowledge, much less seek to determine, components of value aside from the cash purchase price that will necessarily affect net recoverable values, the Debtors cannot meet their burden of demonstrating that the bid and auction procedures they have developed can reasonably be expected to result in maximum values for these estates. The Debtors should be required to account for all value derived from a competitive bidder's proposed transaction, not just that derived from reference to the cash purchase price.

### E. Term Loan Agent's Section 363(f) Rights Should be Preserved

32. The Term Loan Agent has requested that the Bidding Procedures explicitly state that its rights under section 363(f) of the Bankruptcy Code are preserved. The Debtors have refused to include this reservation of rights in either the Bidding Procedures or the proposed order. The Bidding Procedures should not be approved unless they contain an explicit statement preserving the Term Loan Agent's and the Term Lender's rights under section 363(f) of the Bankruptcy Code.

**STANDARD OF REVIEW**

33. The Interim DIP Order provides that any order "approving the sale of the Debtors' assets or procedures for bidding on such sale, shall be in a form and substance reasonably acceptable to the Pre-Petition Term Agent and the Term Lender Group and shall provide consultation and notice rights to the Pre-Petition Term Agent and the Term Lender Group." Interim DIP Order at ¶ 20(j)(emphasis added). The modifications requested by the Term Loan Agent are aimed solely at ensuring that the Debtors receive the maximum value in any sale of the Assets, and to facilitate competitive bidding. As such, its requests are clearly "reasonable" as contemplated by the Interim DIP Order, and approval of the Motion should be conditioned on their adoption in the resulting sale order.

34. In addition to the objections above, the Term Loan Agent has a number of concerns regarding material terms of the Stalking Horse Purchase Agreement which are not before this Court at this time. The Term Loan Agent reserves its right to object to any terms of the Stalking Horse Purchase Agreement or any alternative asset purchase agreement sought to be approved at the Sale Hearing.[5]

[*Remainder of Page Intentionally Left Blank*]

---

[5] The Debtors have made additional changes to the Bidding Procedures which are currently being reviewed. The Term Loan Agent reserves its right to address any additional objections to the revised Bidding Procedures at the hearing.

WHEREFORE, the Term Loan Agent respectfully submits that the Court should condition approval of the Motion on appropriate modifications to the Bidding Procedures substantially in conformity with the issues and concerns raised herein and grant such other and further relief as is just and proper. The Term Loan Agent respectfully reserves the right to supplement this Objection as circumstances warrant.

Dated: June 28, 2009
Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Erin R. Fay*
Robert J. Dehney (No. 3578)
Gregory W. Werkheiser (No. 3553)
Erin R. Fay (No. 5268)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

and

Luc A. Despins, Esquire
Leslie A. Plaskon, Esquire
Christopher M. Desiderio, Esquire
PAUL HASTINGS JANOFSKY & WALKER LLP
Park Avenue Tower
75 E. 55th Street, First Floor
New York, NY 10022
Telephone: (212) 318-6000
Facsimile: (212) 319-4090

*Counsel for Wilmington Trust FSB*

2966351.1