# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| EDDIE BAUER HOLDINGS, INC., et al.,[1] | Case No. 09-12099 (MFW) |
| | Jointly Administered |
| Debtors. | Hearing Date: TBD<br>Objection Deadline: TBD |

## MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER APPROVING KEY EXECUTIVE INCENTIVE PLAN AND KEY MANAGER INCENTIVE PLAN

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") hereby file this motion for entry of an order (the "**Order**"), authorizing and approving the Debtors' Key Executive Incentive Plan and Key Manager Incentive Plan (the "**Motion**")[2]. In support of this Motion, the Debtors respectfully state as follows:

### JURISDICTION

1. The Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2. The statutory bases for the relief requested herein are Sections 363(b) and

---

[1] The Debtors in these cases are: Eddie Bauer Holdings, Inc., a Delaware corporation; Eddie Bauer, Inc., a Delaware corporation; Eddie Bauer Fulfillment Services, Inc., a Delaware corporation; Eddie Bauer Diversified Sales, LLC, a Delaware limited liability company; Eddie Bauer Services, LLC, an Ohio limited liability company; Eddie Bauer International Development, LLC, a Delaware limited liability company; Eddie Bauer Information Technology, LLC, a Delaware limited liability company; Financial Services Acceptance Corporation, a Delaware corporation; and Spiegel Acceptance Corporation, a Delaware corporation. On June 17, 2009, Eddie Bauer of Canada, Inc. and Eddie Bauer Customer Services, Inc., affiliates of the Debtors, commenced a proceeding before the Superior Court of Justice, Commercial List, for the Judicial District of Ontario, for a plan of compromise or arrangement under the Companies' Creditors Arrangement Act.

[2] A copy of the Order is attached hereto as Exhibit A.

DB02:8379098.1

503(c)(3) of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "**Bankruptcy Code**").

## BACKGROUND

3. On June 17, 2009 (the "**Petition Date**"), Eddie Bauer Holdings, Inc. and each of its Debtor affiliates filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**"). The Debtors intend to continue in the possession of their respective properties and the management of their respective businesses as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. An Official Committee of Unsecured Creditors was appointed on June 26, 2009.

4. Simultaneously with the commencement of these Chapter 11 Cases, the Debtors' two Canadian affiliates – Eddie Bauer of Canada, Inc. and Eddie Bauer Customer Services, Inc. (the "**Canadian Debtor Affiliates**") – sought recognition of the Debtors' Chapter 11 Cases in a Canadian Court as "foreign proceedings" pursuant to Section 18.6 of the Companies' Creditors Arrangement Act, R.S.C. 1985 c. C-36, as amended. In addition to staying proceedings against the Canadian Debtor Affiliates in Canada, such recognition by the Canadian Court will allow certain orders of this Court to be in full force and effect in the same manner and in all respects as if they had been made by the Canadian Court. Due to the integrated management of the Canadian Debtor Affiliates with the Debtors' U.S. operations, as well as the role that the Canadian Debtor Affiliates play in the Debtors' overall prepetition debt structure, these Chapter 11 Cases will function as the main proceedings with respect to the Canadian Debtor Affiliates.

5. The Debtors and the Canadian Debtor Affiliates are a general merchandise and specialty retailer that offers men's and women's outerwear, apparel, accessories and gear for

an active outdoor lifestyle through catalogs, e-commerce sites and over 370 retail and outlet stores. The Debtors have 556 full-time, part-time, and temporary employees in their corporate headquarters, and 7,144 full-time, part-time, and temporary retail and distribution employees. The Canadian Affiliates have over 950 full-time, part-time, and temporary employees working in management retail and customer service.

### THE PROPOSED 363 SALE

6. The Debtors engaged in a number of activities prepetition in an attempt to restructure their debt, however, due to (i) rejection by the Debtors' lenders of a consensual restructuring at market rates, (ii) the Debtors' concerns about ability to meet debt covenants and (iii) the Debtors' mounting concerns regarding the potential deterioration of their businesses – and accompanying degradation in value – stemming from rumors in the marketplace about the Debtors' liquidity and viability, these activities were unsuccessful. The Debtors therefore determined, in consultation with their advisors, that the value of their estates would be best maximized and preserved through a sale process (the "**Sale**").

7. Therefore, the Debtors negotiated a going-concern Sale of their businesses and assets (the "**Assets**") to Rainier Holdings LLC as the stalking horse bidder (the "**Stalking Horse Bidder**") pursuant to an asset purchase agreement. The Debtors then commenced these Chapter 11 Cases to implement the Sale pursuant to Section 363 of the Bankruptcy Code, subject to a competitive Sale process and the solicitation of higher and/or otherwise better offers.

RELIEF REQUESTED

8. By this Motion, the Debtors seek entry of an order authorizing and approving the Debtors' Key Executive Incentive Plan (the "**KEIP**") and Key Manager Incentive Plan (the "**KMIP**," and, collectively with the KEIP, the "**Incentive Plans**"). The Debtors submit that the relief requested herein will incentivize the Debtors' management to maximize value in the Sale process.[3]

BASIS FOR RELIEF

I. DESCRIPTION OF THE INCENTIVE PLANS

9. Prior to the Petition Date, the Debtors had several incentive and severance plans in place. The Debtors maintained, in the ordinary course of business, a prepetition severance policy (the "**Severance Plan**")[4] for eligible employees, including the participants under the Incentive Plans (the "**Participants**"), pursuant to which employees who are terminated without cause due to a store closure, reduction in job force or job elimination receive benefits based, in part, on years of service and base compensation. Benefits received under the Severance Plan may include lump sum or periodic severance pay, continuance of medical and dental benefits under COBRA for a period of time, outplacement services, payment in full of accrued and unused vacation benefits and a continuation of services under the Debtors' employee assistance program (the "**Severance Benefits**"). Such terminated employees received Severance

---

[3] Given the challenging but necessary time constraints under which the case is proceeding, the Debtors have not yet provided the Committee or the Debtors' prepetition secured lenders with a reasonable opportunity to review the proposed incentive plans. The Debtors will consult with both such constituencies, the US Trustee and others who may have a view promptly and the Debtors may modify the requested relief at the hearing based on this Motion based on the comments and views of these constituents.

[4] The Debtors requested relief in their first day Wages Motion, to continue to honor their Severance Plan in the ordinary course of business. As of the date of this Motion, such relief has not yet been granted and is scheduled to be heard by this Court on July 7, 2007. As discussed herein, any Participant who receives an payment under a KEIP or KMIP will recuse him or herself from receiving any payout under the Severance Plan.

DB02:8379098.1

4

Benefits in exchange for providing the Debtors with a release of claims and/or settlement agreement.

10. Furthermore, prior to the Petition Date, certain of the Participants were entitled to benefits in the event of a sale of the Debtors or the Debtors' assets under certain senior officer Change in Control Plans and/or under individual agreements (collectively with the benefits under the Severance Plan, the "**Prepetition Benefits**").

11. In lieu of the Prepetition Benefits, the Debtors propose that the Participants would instead receive benefits under the Incentive Plans. To be eligible to receive the benefits under the Incentive Plans, the Participants shall be required to waive all rights to any amounts or claims under the Prepetition Benefits.

12. The proposed Incentive Plans consist of two postpetition incentive plans: (a) the KEIP and (b) the KMIP. The KEIP covers eight of the Debtors' executive officers, and is designed to incentivize those officers to optimize the value received by the Debtors' estates from the contemplated Sale. In addition to their existing responsibilities, such executives are also actively engaged in identifying, providing information to, and negotiating with, including ongoing discussions, analysis, meetings and due diligence production to, potential purchasers. Under the KEIP, the KEIP Participants would, upon the closing of a Sale, receive a share, allocated pro rata by the Participants' current annual salary, of 5% of the gross sale proceeds received from a Sale of the Debtors' assets in excess of $202.5 million up to $252.5 million maximum. The cost of the KEIP, in other words, would range from $0 (5% of $0 for a sale at $202.5 million) to $2.5 million (5% of $50 million for a sale at $252.5 million). The names of the KEIP Participants, their positions at the Debtors and their respective potential KEIP payments are set forth on Exhibit B hereto which is being filed separately under seal.

13. The KMIP covers 39 of the Debtors' key operational vice presidents and managers. Payments under the KMIP are designed to incentivize certain managers who hold critical operational leadership positions to preserve the going concern value of the business to help maximize value in the Sale. Such individuals are responsible during the sale period for maintaining certain operational performance targets across all areas of the business, from retail sales and merchandising, call center support and loss prevention to ongoing sourcing of goods, distribution and warehousing efforts. Given their essential roles in the enterprise, such individuals have also had to take on substantial additional tasks and responsibilities to help effectuate and further the Sale, in addition to their existing responsibilities. Under the KMIP, Participants would, upon closing of a sale of all or substantially all of the Debtors' assets, receive a share, allocated pro rata by the Participant's current annual salary, of 2.5% of the gross sale proceeds in excess of $202.5 million up to $252.5 million maximum. The cost of the KMIP would range from $0 (for a sale at $202.5 million) to $1,250,000 (2.5% of $50 million for a sale at $252.5 million). A list of the of the KMIP Participants, their titles and their respective potential KMIP payments are set forth on Exhibit C hereto which is being filed separately under seal.

14. The Incentive Plans were designed and promulgated by the Debtors' Senior Vice President and Chief Financial Officer, Senior Vice President and Chief Human Resources Officer and the Compensation Committee of the Debtors' Board of Directors, with the assistance of the executive compensation firm Stephen Hall & Partners ("**SHP**"). In assisting with the construction of the proposed Incentive Plans, SHP surveyed 24 Chapter 11 cases in which the Debtors conducted asset sales pursuant to Section 363 of the Bankruptcy Code and in which the Debtors received court authorization to implement a postpetition incentive program.

Of those 24 cases, 19 were filed in either this Court or in the United States Bankruptcy Courts of New York. Eight of the 24 cases involved retail companies. The results of that survey indicate that the potential payments under the Incentive Plans are consistent with and within the range of the payments under incentive programs previously approved by this Court and other courts.

## II. IMPLEMENTING THE INCENTIVE PLANS IS A SOUND EXERCISE OF THE DEBTORS' BUSINESS JUDGMENT

15. Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." To approve the use of estate property under Section 363(b)(1) of the Bankruptcy Code, a debtor must show that the decision to use the property outside of the ordinary course of business was based on the debtor's business judgment. See In re Chateaugay Corp., 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge determining a 363(b) application must find a good business reason to grant such application); see also In re Lionel Corp., 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring "some articulated business justification" to approve the use, sale or lease of property outside the ordinary course of business); In re Ionosphere Clubs, Inc., 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (noting that the standard for determining a Section 363(b) motion is "a good business reason"); In re Global Crossing Ltd., 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003).

16. The business judgment rule shields a debtor's management's decisions from judicial second guessing. In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) (a "presumption of reasonableness attaches to a Debtor's management decisions" and courts will generally not entertain objections to the debtor's conduct after a reasonable basis is set forth). Once a debtor articulates a valid business justification, the law

vests the debtor's decision to use property outside of the ordinary course of business with a strong presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (citations and internal quotations omitted), appeal dismissed, 3 F.3d 49 (2d Cir. 1993). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under Section 363(b)(1) of the Bankruptcy Code.

17. The implementation of the Incentive Plans is a proper exercise of the Debtors' business judgment and is in the best interests of their estates and the interests of all stakeholders in these Chapter 11 Cases. In addition to their ordinary course activities overseeing the Debtors' businesses and maintaining key relationships with employees, long-standing customers and suppliers, the Participants must work with potential purchasers to assist in the diligence necessary for purchasers to increase their bids during the sale process. The skills, knowledge and motivation of the Participants are essential to meeting the Debtors' budgets, preserving the going concern value of the Debtors' businesses and achieving the highest or otherwise best possible value for the Debtors' businesses through a Sale.

18. Furthermore, the Incentive Plans align the interests of the Participants and all stakeholders in these Chapter 11 Cases. Payments under the Incentive Plans are only made if the Participants attain certain sale price targets. The sale price targets can only be met if the Participants preserve the going concern value of the Debtors' businesses and maximize the value received for those businesses in the Sale process. The Incentive Plans are calibrated to meet their stated goal: motivating the Participants through the remainder of these Chapter 11 Cases by rewarding them for maximizing value for all parties in interest in these Chapter 11 Cases. Thus,

the Incentive Plans are designed to "achieve the desired performance." In re Dana Corp., 358 B.R. 567, 576, 583 (Bankr. S.D.N.Y. 2006) (emphasis omitted).

19. Not only are the Incentive Plans calculated to achieve the desired performance, but any payouts under the Incentive Plans are reasonable. SHP analyzed the potential payouts under the Incentive Plans using benchmarks for senior management compensation in 24 Chapter 11 cases in which the debtors conducted asset sales pursuant to Section 363 of the Bankruptcy Code and in which the Debtors received court authorization to implement a postpetition incentive program. Of those 24 cases, 19 were filed in either this Court or in the United States Bankruptcy Courts in New York. Eight of the 24 cases involved retail companies. SHP found the potential payouts to be reasonable and within market practice. Even if payouts under the Incentive Plans are at the high end of the ranges described herein, such payouts would reflect a substantial increase in the consideration received in the Sale of the businesses or as a result of the focused efforts to preserve and optimize the Sale value by maintaining operational efficiency and employee productivity during a very uncertain and turbulent period. An incentive plan designed in such a manner will incentivize the Participants to maximize value for all stakeholders in these Chapter 11 Cases.

20. This Court and other courts have recognized that programs such as the Incentive Plans can provide a highly efficient means of maximizing value for a debtor's estate and, accordingly, have approved similar incentive programs. See In re Leiner Health Prods. Inc., Case No. 08-10446 (KJC) (Bankr. D. Del. Apr. 14, 2008) (approving sale-related incentive payments to senior management); In re Dura Automotive Systems, Inc., Case No. 06-11202 (KJC) (Bankr. D. Del. June 28, 2007) (approving sale-related incentive payments to senior management); Dura, (Bankr. D. Del. Apr. 25, 2007) (approving cash payments under the

debtors' key management incentive plan for progress made in the debtors' operational restructuring initiatives); In re Riverstone Networks, Inc., Case No. 06-10110 (CSS) (Bankr. D. Del. Mar. 28, 2006) (approving an employee bonus program providing for cash payments for successful completion of certain individual and company performance goals); In re Pliant Corp., Case No. 06-10001 (MFW) (Bankr. D. Del. Mar. 14, 2006) (approving management incentive compensation plan providing for cash awards for achievement of organizational performance goals); In re Nobex Corp., Case No. 05-20050 (MFW) (Bankr. D. Del. Jan. 19, 2006) (approving sale-related incentive payments to certain employees, with amount of payments tied to sale price achieved); Dana, 358 B.R. at 584 (approving management incentive plan); In re PlusFunds Group, Inc., Case No. 06-10402 (JMP) (Bankr. S.D.N.Y. Apr. 19, 2006) (granting debtor's request to implement a sale-related incentive plan for six senior managers, payable upon a successful sale of substantially all of the debtor's assets as a going concern); In re Musicland Holding Corp., Case No. 06-10064 (SMB) (Bankr. S.D.N.Y. Feb. 1, 2006) (approving continuation of management incentive plan); and In re Kimball Hill, Inc., Case No. 08-10095 (SPS) (Bankr. N.D. Ill. Dec. 17, 2008 (approving management incentive plan in connection with the wind-down of the debtors' operations).

21. Accordingly, the Debtors submit that implementing the Incentive Plans is a valid exercise of the Debtors' business judgment and that approval of the Incentive Plans is in the best interests of the Debtors' stakeholders

## III. THE INCENTIVE PLANS SATISFY THE REQUIREMENTS OF SECTION 503(C) OF THE BANKRUPTCY CODE

22. Certain of the Participants in the Incentive Plans are "insiders" within the meaning of Section 101(31) of the Bankruptcy Code and, therefore, the Incentive Plans implicate Section 503(c) of the Bankruptcy Code. Section 503(c) of the Bankruptcy Code contains three subsections: Section 503(c)(1) of the Bankruptcy Code contains a general prohibition of retention plans, Section 503(c)(2) of the Bankruptcy Code places limitations on severance payments and Section 503(c)(3) of the Bankruptcy Code sets forth standards governing other transfers. The Debtors submit that neither Sections 503(c)(1) nor 503(c)(2) of the Bankruptcy Code are applicable to evaluating the Incentive Plans. While Section 503(c)(3) of the Bankruptcy may be applicable to the Incentive Plans, as described below, that Section mirrors Section 363(b) of the Bankruptcy Code. Thus, the Debtors submit that the standard for evaluating the Incentive Plans pursuant to Section 503(c)(3) of the Bankruptcy Code is the same as the standard pursuant to Section 363(b) of the Bankruptcy Code, discussed supra.

(a) **The Incentive Plans Are Neither Retention Nor Severance Plans**

23. By the statute's plain language, Section 503(c)(1) of the Bankruptcy Code pertains solely to retention plans and Section 503(c)(2) of the Bankruptcy Code pertains solely to severance plans. Neither provision applies to performance-based incentive plans. See, e.g., Nobex, Hr'g Tr. at 67 (Bankr. D. Del. Jan. 12, 2006) (Section 503(c)(1) of the Bankruptcy Code does not apply to incentive programs); In re Werner Holding Co., Inc., Case No. 06-10578 (KJC) (Bankr. D. Del. July 28, 2006, Aug. 22, 2006 and Dec. 27, 2006) (ordering various relief requested in connection with debtors' incentive bonus plans pursuant to Sections 363(b) and 503(c) of the Bankruptcy Code); Musicland, (Bankr. S.D.N.Y. Feb. 1, 2006) (debtor continuing

to provide incentive bonuses under management incentive plan did not violate Section 503(c) of the Bankruptcy Code); Dana, 358 B.R. at 576 (applying Section 503(c)(3) of the Bankruptcy Code to evaluate management incentive plan in absence of applicability of Sections 503(c)(1) or 501(c)(2) of the Bankruptcy Code); In re Calpine Corp., Case No. 05-60200, Hr'g Tr. at 84-85 (Bankr. S.D.N.Y. Apr. 26, 2006), (Sections 503(c)(1) and 503(c)(2) of the Bankruptcy Code do not apply to incentive programs).

24. The Incentive Plans contain neither retention nor severance components. Rather, the Incentive Plans provide only for targeted incentive payments. These incentive payments are based upon achievement of a Sale price in excess of the price offered by the stalking horse bidder, which may only be achieved if the Participants do an outstanding job of maintaining the going concern value of the business during these Chapter 11 Cases and identifying, providing information to, and negotiating with, potential higher bidders. Furthermore, there is no guarantee that the Participants will receive any payment pursuant to the Incentive Plans. If the Debtors fail to close a sale of the Debtors' assets for a purchase price in excess of $202.5 million, no payments will be made under the KEIP or the KMIP. Therefore, the Debtors respectfully submit that Sections 503(c)(1) and 503(c)(2) of the Bankruptcy Code do not apply to this Motion.

(b) **The Incentive Plans Meet the Requirements of Section 503(c)(3) of the Bankruptcy Code**

25. Section 503(c)(3) of the Bankruptcy Code also does not preclude the Incentive Plans. This "catch all" provision of the 2005 amendments to compensation procedures in chapter 11 cases prohibits transfers made to officers, managers, consultants and others that are both outside the ordinary course of business and not justified by the facts and circumstances of the case. 4 Collier on Bankruptcy ¶ 503.17 (15th ed. rev. 2009). Courts that have analyzed the

prohibition on "other transfers" to certain categories of employees set forth in Section 503(c)(3) of the Bankruptcy Code have applied the same standard under that Section as they do under Section 363(b) of the Bankruptcy Code: namely, whether the decision to use estate property outside of the ordinary course of business is based on a sound exercise of the debtor's business judgment. See Dana, 358 B.R. at 576 (the test for evaluating a compensation proposal under Section 503(c)(3) of the Bankruptcy Code is the "sound business judgment" test) (citing Nobex, 2006 Bankr. LEXIS 417 (Bankr. D. Del. Jan. 19, 2006); see also Nobex, (Bankr. D. Del. Jan. 12, 2006), Hr'g Tr. at 86- 87 (concluding that the standard under Section 503(c)(3) of the Bankruptcy Code was "quite frankly nothing more than a reiteration of the standard under [Section] 363 [of the Bankruptcy Code]…the business judgment of the debtor").

26. As set forth above, implementing the Incentive Plans has a sound business purpose: motivating the Participants through the remainder of these Chapter 11 Cases by rewarding them for maximizing value for all parties in interest in these Chapter 11 Cases. Thus, the Incentive Plans satisfy Section 503(c)(3) of the Bankruptcy Code because, as discussed above, the implementation of the Incentive Plans is a proper exercise of the Debtors' business judgment and is justified by the facts and circumstances of these Chapter 11 Cases.

## NOTICE

27. The Debtors have provided notice of this Motion to: (a) the United States Trustee for the District of Delaware; (b) counsel to the administrative agent under the prepetition term loan facility; (c) counsel to the steering committee for the prepetition term lenders; (d) counsel to the agent under the prepetition revolving credit facility; (e) counsel for the indenture trustee for the $75 million 5.25% convertible senior notes due 2014; (f) any party in interest that has requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy

Procedure and (g) counsel to the Official Committee of Unsecured Creditors appointed in these cases. In light of the nature of the relief requested, the Debtors submit that no further notice is required or needed under the circumstances.

28. A copy of the Motion is available on the Court's website: www.deb.uscourts.gov. Additional copies of the Motion are available on the website of the Debtors' claims, noticing, soliciting and balloting agent, Kurtzman Carson Consultants, at www.kccllc.net/eddiebauer or can be requested by calling (866) 967-1781.

## NO PRIOR REQUEST

29. No prior motion for the relief requested herein has been made to this or any other court.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

WHEREFORE, the Debtors respectfully request the entry of an order, substantially in the form attached hereto as <u>Exhibit A</u>, authorizing and approving the Debtors' Key Employee Incentive Program and Key Manager Incentive Program and (b) granting such other and further relief as the Court deems appropriate.

Dated: June 29, 2009
Wilmington, Delaware

Respectfully Submitted,

_____
Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

David S. Heller
Josef S. Athanas
Caroline A. Reckler
LATHAM & WATKINS LLP
Sears Tower, Suite 5800
233 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 876-7700
Facsimile: (312) 993-9767

-and-

Heather L. Fowler
LATHAM & WATKINS LLP
355 South Grand Avenue
Los Angeles, California 90071-1560
Telephone: (213) 485-1234
Facsimile: (213) 891-8763

PROPOSED ATTORNEYS FOR DEBTORS AND
DEBTORS-IN-POSSESSION