UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

_____
                              )
In re:                        ) Chapter 11
                              )
EDDIE BAUER HOLDINGS,         ) Case No. 09-12099 (MFW)
INC., *et al.*,               )
                              )
            Debtors.          ) Jointly Administered
                              )
                              ) Re:  Docket Nos. 9, 60
                              ) Objection Deadline: 6/30/09, 4:00 p.m.
                              ) Hearing Date: 7/7/09, 9:30 a.m.
_____ )

**OBJECTION OF CERTAIN UTILITY COMPANIES TO THE
MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND
FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105(A) AND 366
(I) PROHIBITING UTILITY PROVIDERS FROM DISCONTINUING,
ALTERING OR REFUSING UTILITY SERVICES, (II) DEEMING
UTILITY PROVIDERS ADEQUATELY ASSURED OF FUTURE
PERFORMANCE AND  (III) ESTABLISHING PROCEDURES
FOR DETERMINING ADEQUATE ASSURANCE OF PAYMENT**

Consolidated Edison Company of New York, Inc. ("Con Ed"),

Virginia Electric and Power Company d/b/a Dominion Virginia Power

("DVP"), The East Ohio Gas Company d/b/a Dominion East Ohio

("DEO"), Carolina Power & Light Company d/b/a Progress Energy

Carolinas ("PEC"), Commonwealth Edison Company ("ComEd"), PECO

Energy Company ("PECO"), Duke Energy Carolinas, LLC ("DEC"),

Georgia Power Company ("Georgia Power"), Southern California

Edison Company ("SCE"), The Connecticut Light and Power Company

("CL&P"), Western Massachusetts Electric Company ("WMEC"), Yankee

Gas Services Company ("Yankee"), Public Service Company of New

Hampshire ("PSNH"), Ohio Edison Company ("OE"), The Cleveland

Electric Illuminating Company ("CEI"), Jersey Central Power & Light Company ("JCP&L"), Pennsylvania Electric Company ("Penelec"), Duke Energy Indiana, Inc. ("DEI"), Duke Energy Kentucky, Inc. ("DEK"), and Duke Energy Ohio, Inc. ("Duke Ohio") (collectively, the "Utilities"), by counsel, hereby object to the *Motion of the Debtors For Entry of an Interim and Final Order Pursuant To 11 U.S.C. §§ 105(A) and 366 (I) Prohibiting Utility Providers From Discontinuing, Altering or Refusing Utility Services, (II) Deeming Utility Providers Adequately Assured of Future Performance and (III) Establishing Procedures For Determining Adequate Assurance of Payment* (the "Utility Motion"), and respectfully represent the following:

## Introduction

Section 366(c)(2), as amended, requires a Chapter 11 debtor to provide utilities with adequate assurance of payment that is satisfactory to the utility within 30 days of the Petition Date. If a debtor believes the amount of the utility's request pursuant to Section 366(c)(2) needs to be modified, the debtor can file a motion pursuant to Section 366(c)(3) seeking to modify the amount of the utility's request. Despite the foregoing statutory requirements, the Debtors filed the Utility Motion at the outset of this case that sought, without evidence or supporting documentation, to establish that the Debtors' offer to deposit $654,000, which supposedly represents one-half of the Debtors'

2

monthly utility charges, into a segregated account (the "Escrow Account") constitutes adequate assurance of payment. Although the Escrow Account does not comply with the requirements of Section 366(c) and does not provide the Utilities with adequate assurance of payment, it is even more problematic because the Debtors have failed to: (i) identify who would hold the Escrow Account, (ii) how the Utilities would access the Escrow Account, or (iii) what would happen to the monies contained in the Escrow Account in the event of a default by the Debtors concerning their use of cash collateral.

As case law is clear that adequate assurance of payment is to be determined on a case-by-case basis, it is remarkable how a two-week deposit or two-week escrow account are becoming the debtor's proposed **form** and **amount** of adequate assurance in virtually every bankruptcy case filed in this District. As a customer of the Utilities, the Debtors are aware that the Utilities bill on a monthly basis in arrears and provide the Debtors with generous trade terms, unlike the Debtors' other vendors. Accordingly, with that knowledge, the Debtors should not be entitled to proceed with the Utility Motion that does not even attempt to address the foregoing billing terms or the requirements of Section 366(c). If the Debtors want to modify the adequate assurance of payment satisfactory to the Utilities, the Debtors should be required to file an appropriate Motion that

3

set forth an evidentiary and legal basis as to why this Court should consider modifying the amount of adequate assurance of payment that is satisfactory to the Utilities under Section 366(c)(2).

As discussed herein, this Court should deny the Utility Motion as not being properly before the Court because the Utility Motion: (1) was not heard after notice and a hearing; and (2) does not seek to modify the amount of the Utilities' deposit requests.

## Facts

### Procedural Facts

1.     On June 17, 2009 (the "Petition Date"), the Debtors commenced their cases under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") that are now pending with this Court.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

2.     The Debtors' cases are being jointly administered.

### The Utility Motion

3.     On the Petition Date, the Debtors filed the Utility Motion.

4.     No notice of the Utility Motion was given to the Debtors' utilities prior to the Court entering the *Interim Order Pursuant To 11 U.S.C. §§ 105(A) and 366 (I) Prohibiting Utility*

4

*Providers From Discontinuing, Altering, or Refusing Utility*
*Services, (II) Deeming Utility Providers Adequately Assured of*
*Future Performance, and (III) Establishing Procedures For*
*Determining Adequate Assurance of Payment* (the "Interim Utility
Order") on June 18, 2009.

5.    Thus, because the Utilities were never served with the
Utility Motion, they had no opportunity to respond to the Utility
Motion or otherwise be heard at the *ex parte* hearing on the
Utility Motion that took place on June 18, 2009, despite the fact
that Section 366(c)(3) (presuming this was the statutory basis
for the relief sought by the Debtors) requires that there be
"notice and a hearing" and the Utilities were known entities that
provided continuous prepetition utility goods and services to the
Debtors.

6.    Through the Utility Motion, the Debtors seek to avoid
the procedural and substantive requirements of Section 366.
Instead of responding to adequate assurance demands of their
utility companies, the Debtors elected to file the Utility Motion
and seek Court approval for their own form of adequate assurance
in the form of an escrow account containing $654,000, supposedly
representing approximately 50% of the Debtors' estimated utility
charges.  Utility Motion at ¶ 11; Interim Utility Order at p. 2.

7.    The Debtors' estimate that on average they spend
approximately $1,224,000 each month on utility costs.  Utility

Motion at ¶ 8.

## Facts Regarding the Debtors

8. The Debtors and their Canadian Debtor affiliates (collectively, "Eddie Bauer") sell outerwear, apparel and accessories, as well as selected products for the home. *Declaration of Marvin Edward Toland of Eddie Bauer Holdings, Inc., In Support of First Day Motions* at ¶ 6. (hereinafter "Toland Dec. at ¶ __").

## The Spiegel Bankruptcy

9. Catalog retailer Spiegel, Inc. ("Spiegel"), together with its subsidiaries and affiliates, including Eddie Bauer, Inc., filed petitions for Chapter 11 relief on March 17, 2003 in the United States Bankruptcy Court for the Southern District of New York, Case No. 03-11540 (the "Spiegel Bankruptcy"). Eddie Bauer emerged from the Spiegel Bankruptcy as a stand-alone company pursuant to Eddie Bauer, Inc.'s, and its related Debtor affiliates', Amended Joint Plan of Reorganization (the "Plan"). On May 25, 2005, the Court confirmed the Plan which became effective on June 21, 2005. Toland Dec. at ¶ 33.

10. Under the Plan, Eddie Bauer Holdings, Inc. was formed as a new holding company to serve as the parent company for Eddie Bauer, Inc. and its subsidiaries. In exchange for Eddie Bauer Holdings, Inc.'s issuance of thirty million shares of common stock to certain unsecured creditors of Eddie Bauer, Inc. and its

6

related Debtor affiliates, certain subsidiary operations were transferred to Eddie Bauer Holdings, Inc. Toland Dec. at ¶ 34.

11. Eddie Bauer, Inc. and Eddie Bauer Holdings, Inc., along with their U.S. subsidiaries as guarantors, entered into a $300 million senior secured term loan agreement, the proceeds from which were used to pay Spiegel creditors and not to fund operations of Eddie Bauer Holdings, Inc. or its subsidiaries. Toland Dec. at ¶ 35.

## Summary of Prepetition Loans

12. On June 21, 2005, Eddie Bauer, Inc. entered into the $300 million senior secured loan agreement (the "Original Term Loan Agreement") upon its emergence from bankruptcy. To (a) reduce the principal balance of the loans outstanding under the Original Term Loan Agreement (the "Original Term Loan") from $273.8 million to $225 million, (b) extend the maturity date of the Original Term Loan to April 1, 2014, and (c) authorize the issuance of not less than $75 million of convertible notes, Eddie Bauer Holdings, Inc., Eddie Bauer, Inc., Wilmington Trust FSB (as successor by assignment to JPMorgan Chase Bank, N.A.), as administrative agent, Goldman Sachs Credit Partners L.P., as syndication agent and the several banks and other financial institutions or entities from time to time parties thereto (collectively, the "Term Loan Lenders") entered into the Amended and Restated Term Loan Agreement (the "Amended Term Loan

7

Agreement") on April 4, 2007 which refinanced the Original Term Loan.  Toland Dec. at ¶ 37.

13.  After submitting two proposals to the Term Loan Lenders to amend the Amended Term Loan Agreement at market rates, both of which were turned down, and facing potential violations of various financial covenants contained in the Amended Term Loan Agreement due to increased leverage, Eddie Bauer, Inc. was forced to enter into an amendment to the Amended Term Loan Agreement on April 2, 2009 (the "Term Loan First Amendment").  The Term Loan First Amendment in part allowed Eddie Bauer, Inc. to increase its permitted senior secured leverage ratio and decrease its permitted fixed charge coverage ratio through the fourth quarter 2009 and to extend to do the same through the fourth quarter 2010 if Eddie Bauer was able to cause the maturity date of its Revolving Loan Agreement (defined below) to be extended, and if Eddie Bauer met certain quotas for raising proceeds from the issuance of stock and convincing convertible noteholders to convert their outstanding notes to equity.  In exchange for the extension to 2010, the Term Loan Lenders would receive warrants for Eddie Bauer Holdings, Inc. common stock.  Toland Dec. at ¶ 39.

14.  Eddie Bauer was unable to reach any agreement with its convertible noteholders.  Toland Dec. at ¶ 40.

15.  Upon its emergence from bankruptcy, Eddie Bauer, Inc.

also entered into a $150 million senior secured revolving loan and security agreement dated June 21, 2005 (the "Original Revolving Loan Agreement") with, among others, Bank of America, N.A. as agent for the lenders and as co-syndication agent, Banc of America Securities LLC, as sole lead arranger and book manager, General Electric Capital Corporation, as Documentation Agent and CIT Group/Business Credit, Inc., as co-syndication agent. Toland Dec. at ¶ 41.

16.    In order to facilitate (i) the issuance of the Convertible Notes and (ii) the amendment and restatement of the Original Term Loan Agreement, the Original Revolving Loan Agreement was amended by a First Amendment and Waiver to Loan and Security Agreement dated April 4, 2007 (the Original Revolving Loan Agreement, as amended, the "Revolving Loan Agreement"). Toland Dec. at ¶ 42.

17.    The funds available under the Revolving Loan Agreement equaled $88.4 million as of January 3, 2009. Eddie Bauer, Inc. had $8.7 million of letters of credit outstanding and no amounts drawn under the Revolving Loan Agreement as of January 3, 2009. The Revolving Loan Agreement is scheduled to mature on June 21, 2010. Toland Dec. at ¶ 43.

18.    On April 4, 2007, Eddie Bauer Holdings, Inc. completed an offer of $75 million aggregate principal amount 5.25% convertible senior notes (the "Convertible Notes"). The

Convertible Notes have a maturity date of April 1, 2014. Toland Dec. at ¶ 44.

## Events Leadings to the Debtors' Chapter 11 Cases

19. Various internal and external factors have resulted in a severe negative impact on Eddie Bauer, and most prominently, the $300 million debt loan taken on by Eddie Bauer as a result of the Spiegel Bankruptcy, a diminishment in brand identity by owners of Eddie Bauer over time and the economic downturn that began to affect Eddie Bauer in the fourth quarter of 2008. Toland Dec. at ¶ 47.

20. As of the Petition Date, Eddie Bauer's total consolidated debt (excluding trade debt) was $304,175,468. That debt level is projected to result in an annual cash interest expense for Eddie Bauer of over $21 million. Approximately 50% of the EBITDA is dedicated to the servicing of the existing indebtedness and in turn, funds available for operations have been greatly reduced. Toland Dec. at ¶ 53.

21. The substantial amount of debt service has adversely affected the financial health and business operations of Eddie Bauer in other ways such as limiting its ability to fund working capital and capital expenditure needs, and increasing its vulnerability to adverse economic conditions. Toland Dec. at ¶ 54.

22. Prior to the Petition Date, Eddie Bauer began to pursue

the potential sale of its assets to preserve Eddie Bauer as a going concern.  Toland Dec. at ¶ 60.

23.  Eddie Bauer's board of directors selected Rainier Holdings LLC (the "Stalking Horse Bidder") to be the stalking horse for the sale of substantially all of the Debtors' assets (or in whatever form such a sale takes place as to any purchaser, the "Sale").  On June 17, 2009, Eddie Bauer and the Stalking Horse Bidder executed the Stalking Horse Asset Purchase Agreement.  Toland Dec. at ¶ 62.

24.  While negotiating the Stalking Horse Asset Purchase Agreement, the Stalking Horse Bidder indicated to Eddie Bauer that a relatively expedited sale process with respect to Eddie Bauer's assets was critical to their decision to provide a stalking horse bid.  Additionally, the post-petition financing (the "DIP Facility") is conditioned on Eddie Bauer's pursuit of a Sale process within a specified time frame.  Toland Dec. at ¶ 63.

### The Debtors' Post-Petition Financing

25.  On the Petition Date, 2009, the Debtors filed the *Emergency Motion For Interim and Final Orders (I) Authorizing Debtors To Obtain Postpetition Financing Pursuant To 11 U.S.C. §§ 105, 362, 363 and 364; (II) Authorizing Use of Cash Collateral Pursuant To 11 U.S.C. § 363; (III) Granting Liens and Superpriority Claims; (IV) Granting Adequate Protection To Prepetition Secured Parties Pursuant to 11 U.S.C. § 361, 362, 363*

and 364; and (V) *Scheduling Final Hearing on the Debtors' Motion To Incur Such Financing on a Permanent Basis Pursuant To Bankruptcy Rule 4001* (the "Financing Motion").  Through the Financing Motion, the Debtors seek Court authorization to borrow up to $90 million on an interim basis and $100 million on a final basis (the "DIP Facility").  Additionally, through the Financing Motion, the Debtors also seek a carve-out of up to $4.25 million to pay the fees and expenses of Debtors' counsel and other professionals.

26.  It is unclear from the 13-week DIP budget (the "Budget") whether the Debtors have budgeted sufficient funds for the timely payment of their post-petition utility bills.

27.  On May 29, 2009, the Court entered the *Interim Order Pursuant To 11 U.S.C. Sections 105, 361, 362, 363 and 364 and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (1) Authorizing Incurrence By the Debtors of Post-Petition Secured Indebtedness With Priority Over Certain Secured Indebtedness and With Administrative Superpriority, (2) Granting Liens, (3) Authorizing Use of Cash Collateral By the Debtors Pursuant to 11 U.S.C. Section 363 and Providing For Adequate Protection, (4) Modifying the Automatic Stay and (5) Scheduling a Final Hearing (*(the "Interim Financing Order").  The Interim Financing Order in part authorized the Debtors to borrow up to $90 million on an interim basis.  Additionally, the Interim

Financing Order approved a carve-out of up to $3 million to pay the fees and expenses of Debtors' counsel and other professionals.

## The Sale Motion

28. On the Petition Date, the Debtors filed the *Motion Pursuant To 11 U.S.C. §§ 105(A), 363, 365, and Bankruptcy Rules 2002, 6004, 6006 For (I) Entry of An Order (A) Establishing Bidding and Auction Procedures Related to the Sale of All of the Debtors' Assets; (B) Approving Bid Protections For the Sale of the Debtors' Assets; (C) Scheduling An Auction and Sale Hearing For the Sale of the Debtors' Assets; (D) Establishing Certain Notice Procedures For Determining Cure Amounts For Executory Contracts and Leases to Be Assigned; and (E) Granting Certain Related Relief; and (II) Entry of an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (C) Establishing Rejection Procedures and Guidelines For Conducting Store Closing Sales; and (D) Extending the Deadline To Assume or Reject Unexpired Leases of Nonresidential Real Property Pursuant to 11 U.S.C. § 365(D)(4)* (the "Sale Motion").

29. The Sale Motion in part proposes the following deadlines for the sale of the Debtors' assets: (i) bid procedures hearing – June 26, 2009; (ii) submission deadline for

13

material to become qualified bidder – July 10, 2009; (iii)

submission deadline for qualified bids – July 14, 2009; (iv)

auction – July 16, 2009; (v) sale hearing – July 17, 2009; and

(vi) consummation of sale – July 31, 2009.

## Facts Concerning the Utilities

30. Each of the Utilities provided the Debtors with

prepetition utility goods and/or services and has continued to

provide the Debtors with utility goods and/or services since the

Petition Date.

31. Under the Utilities' billing cycles, the Debtors

receive approximately one month of utility goods and/or services

before the Utility issues a bill for such charges. Once a bill

is issued, the Debtors have approximately 15 to 30 days to pay

the applicable bill. If the Debtors fail to timely pay the bill,

a past due notice is issued and a late fee is subsequently

imposed on the account. If the Debtors fail to pay the bill

after the issuance of the past due notice, the Utilities issue a

notice that informs the Debtors that they must cure the arrearage

within a certain period of time or their service will be

disconnected. Accordingly, under the Utilities' billing cycles,

the Debtors could receive at least 2 months of unpaid charges

before the utility could cease the supply of goods and/or

services for the post-petition payment default.

32. In order to avoid the need to bring witnesses and have

lengthy testimony regarding the Utilities regulated billing
cycles, the Utilities request this Court, pursuant to Rule 201 of
the Federal Rules of Evidence, to take judicial notice of the
Utilities' billing cycles.  Pursuant to the foregoing request and
based on the voluminous size of the applicable documents, the
Utilities are providing the following web site links to the
tariffs and/or state laws, regulations and/or ordinances, and/or
cooperative service rules:

Con Ed –
    Electric –http://www.coned.com/rates/elec-sched1.asp
    Gas – http://www.coned.com/rates/gas_main.asp

DVP –
    http://www.dom.com/customer/vabus_rates.jsp

DEO –
    http://www.dom.com/customer/ohres_tariffs.jsp

PEC –
    http://www.progress-energy.com/aboutenergy/rates/index.asp#b0

ComEd –
    http://www.exeloncorp.com/ourcompanies/comed/comedbiz/energy_rates/our_rates_and_prices.htm

PECO –
    Tariffs –
    http://www.exeloncorp.com/ourcompanies/peco/pecores/energy_rates/our_rates_and_prices.htm

    Regulations -
    http://www.pacode.com/secure/data/052/chapter55/chap55toc.html

DEC –
    http://www.duke-energy.com/rates/north-carolina.asp

Duke Ohio –
    http://www.duke-energy.com/rates/ohio/electric.asp

15

DEI –
    http://www.duke-energy.com/rates/indiana/tariff.asp

DEK –
    http://www.duke-energy.com/kentucky-business/rates.asp

Georgia Power –
    http://www.georgiapower.com/pricing/gpc_rates.asp

SCE –
    http://www.sce.com/AboutSCE/Regulatory/tariffbooks/rules.htm

CL&P –
    http://www.cl-p.com/esuppliers/rates.aspx

Yankee –
    http://www.yankeegas.com/AboutYG/rates_riders.asp

WMEC –
    http://www.wmeco.com/business/forsuppliers/ratestariffs.aspx

PSNH –
    http://www.psnh.com/Business/Rates/default.asp

Ohio Edison –
    http://www.firstenergycorp.com/Residential_and_Business/Customer_Choice/files/Tariff_-_OH/OE-2009%20-%20Electric%20Service.pdf

CEI –
    http://www.firstenergycorp.com/Residential_and_Business/Customer_Choice/Tariff_Information/Ohio_Tariffs.html

JCP&L –
    http://www.firstenergycorp.com/Residential_and_Business/Customer_Choice/Tariff_Information/New_Jersey_Tariffs.html

Penelec –
    http://www.firstenergycorp.com/Residential_and_Business/Customer_Choice/Tariff_Information/Pennsylvania_Tariffs.html

33. Subject to a reservation of the Utilities' rights to supplement their post-petition deposit requests if additional accounts belonging to the Debtors are subsequently identified, the Utilities' estimated prepetition debt owed by the Debtors to the Utilities, and post-petition deposit requests are currently as follows:

| Utility | No. of Accts. | Est. Pre-Pet. Debt | Dep. Request |
|---------|---------------|--------------------|--------------| 
| Con Ed | 1 | not available | $830 (2-month) |
| DVP | 6 | $5,000.00 | $10,214(2-month) |
| DEO | 2 | $115.00 | $180 (2-month) |
| PEC | 3 | $3,291.35 | $7,196 (2-month) |
| ComEd | 11 | $3,780.00 | $12,425 (2-month) |
| PECO | 1 | $3,400.00 | $4,600 (2-month) |
| DEC | 2 | $1,603.17 | $5,520 (2-month) |
| Georgia Power | 2 | $536.40 | $2,335 (2-month) |
| SCE | 9 | not available | $29,280 (2-month) |
| CL&P | 2 | $2,498.31 | $6,925 (3-month) |
| Yankee | 1 | $78.75 | $200 (3-month) |
| WMECO | 1 | $2,013.90 | $2,625 (2-month) |
| PSNH | 1 | $1,698.34 | $3,715 (2-month) |
| Ohio Edison | 2 | $3,928.77 | $3,808 (2-month) |
| CEI | 2 | $4,386.42 | $4,838 (2-month) |
| JCP&L | 3 | $3,024.84 | $7,750 (2-month) |
| Penelec | 1 | $1,868.01 | $3,000 (2-month) |

17

| | | | |
|---|---|---|---|
| DEI | 1 | not available | $3,145 (2-month) |
| DEK | 1 | not available | $2,505 (2-month) |
| Duke Ohio | 2 | not available | $6,845 (2-month) |

34.  DVP maintained prepetition deposits totaling $7,646 on the Debtors' prepetition accounts that will be applied to the Debtors' estimated pre-petition debt pursuant to Section 366(c)(4).  Any excess prepetition deposits remaining after DVP recoups the prepetition deposits may be applied to DVP's post-petition deposit request.

35.  DEO maintained prepetition deposits totaling $421 on the Debtors' prepetition accounts that will be applied to the Debtors' estimated pre-petition debt pursuant to Section 366(c)(4).  Any excess prepetition deposits remaining after DVP recoups the prepetition deposits may be applied to DVP's post-petition deposit request.

36.  PEC maintained prepetition deposits totaling $7,158 on the Debtors' prepetition accounts that has been applied to the Debtors' estimated pre-petition debt pursuant to Section 366(c)(4).  The excess prepetition deposits remaining after PEC recouped the prepetition deposits may be applied to PEC's post-petition deposit request.

37.  SCE maintained a $39,280 prepetition surety bond on the Debtors' accounts.

<u>**Discussion**</u>

**A.    THE UTILITY MOTION SHOULD BE DENIED AS TO THE UTILITIES.**

Sections 366(b) and (c) of the Bankruptcy Code, in pertinent part, provide:

(b) Such utility may alter, refuse, or discontinue service if neither the trustee nor the debtor, within 20 days after the date of the order for relief, furnishes adequate assurance of payment, in the form of a deposit or other security, for service after such date.

(c)(1)(A) For purposes of this subsection, the term "assurance of payment" means

(i) a cash deposit;

(ii) a letter of credit;

(iii) a certificate of deposit;

(iv) a surety bond;

(v) a prepayment of utility consumption; or

(vi) another form of security that is mutually agreed upon between the utility and the debtor or the trustee.

(B) For purposes of this subsection an administrative expense priority shall not constitute an assurance of payment,

(2) Subject to paragraphs (3) and (4), with respect to a case filed under chapter 11, a utility referred to in subsection (a) may alter, refuse, or discontinue utility service, if during the 30-day period beginning on the date of the filing of the petition, the utility does not receive from the debtor or the trustee adequate assurance of payment for utility service that is satisfactory to the utility;

(3)(A) On request of a party in interest and after notice and a hearing, the court may order modification of the amount of an assurance of payment under paragraph (2).

(B) In making a determination under this paragraph

19

whether an assurance of payment is adequate, the court
may not consider

> (i) the absence of security before the date
> of the filing of the petition;

> (ii) the payment by the debtor of charges for
> utility service in a timely manner before the date
> of the filing of the petition; or

> (iii) the availability of an administrative
> expense priority.

(4) Notwithstanding any other provision of law, with
respect to a case subject to this subsection, a utility
may recover or set off against a security deposit
provided to the utility by the debtor before the date
of the filing of the petition without notice or order
of the court.

11 U.S.C. §366.

As set forth by the United States Supreme Court, "[i]t is
well-established that 'when the statute's language is plain, the
sole function of the courts--at least where the disposition
required by the text is not absurd--is to enforce it according to
its terms.'" *Lamie v. United States Trustee*, 540 U.S. 526, 534,
124 S. Ct. 1023, 157 L. Ed. 2d 1024 (2004) (*quoting Hartford
Underwriters Ins. Co.* v. *Union Planters Bank, N. A.,* 530 U.S. 1,
6, 120 S. Ct., 1942, 147 L. Ed. 2d 1 (2000)). *Rogers v. Laurain
(In re Laurain)*, 113 F.3d 595, 597 (6th Cir. 1997)("Statutes . .
. must be read in a 'straightforward' and 'commonsense'
manner.").

A plain reading of Section 366(c)(2) makes clear that a
debtor is required to provide adequate assurance of payment
satisfactory to its utilities on or within thirty (30) days of

20

the filing of the petition. If a debtor believes the **amount** of the utility's request needs to be modified, then the debtor can file a motion under Section 366(c)(3) requesting the court to modify the **amount** of the utility's request.

In this case, the Debtors completely ignore the Utilities' adequate assurance requests. Instead, the Debtors filed the Utility Motion to improperly shift the focus of their obligations under Section 366(c) from modifying the amount of the Utilities' adequate assurance requests to establishing the **form** and the amount of adequate assurance of payment acceptable to the Debtors.

Accordingly, this Court should not reward the Debtors for their failure to comply with the requirements of Section 366(c) and deny the Utility Motion as to the Utilities. *See In re Viking Offshore (USA), Inc.*, 2008 WL 782449 at *3 (Bankr. S.D. Tex. Mar. 20, 2008) ("The relief requested by Debtors would reverse the burden, by making an advance determination that the proposed assurance was adequate. . . . the court lacks the power to reverse the statutory framework for provision of adequate assurance of payment."); *see also In re Pilgrim's Pride Corporation*, Case No. 08-45664 (DML)(Docket No. 447), United States Bankruptcy Court For the Northern District of Texas, *Memorandum Order* entered on January 5, 2009 (Denying debtors' motion seeking to establish adequate assurance of payment).

SL1 932714v1/000000.00000

1.  **The Debtors' Proposed Escrow Account Does Not Provide the Utilities With Adequate Assurance of Payment.**

The Escrow Account is an improper and otherwise unreliable form of adequate assurance of future payment for the following reasons:

(i)     This Court only has authority under Section 366(c)(3) to modify the <u>amount</u> of the Utilities' deposit requests.  Neither the Debtors nor this Court have the authority to establish the <u>form</u> of adequate assurance of payment, i.e., the creation of an escrow account instead of the cash deposits that the Utilities are requesting from the Debtors.

(ii)    The Debtors have failed to propose any procedures as to when and how utilities could obtain funds from the Escrow Account.  The Utilities would presumably have to incur legal fees and costs to file and litigate an application for payment of post-petition administrative expenses, which would be for at least one month's service because the Utilities' bill the Debtors on a monthly basis.

(iii)   The Escrow Account may not continue to exist if the Debtors default on their use of DIP financing.

(iv)    The Utilities bill monthly in arrears so any request by the Utilities upon the Escrow Account would be, at a minimum, for monthly bills.  Accordingly, the Escrow Account that would merely contain the estimated cost of 50% of the Debtors' monthly utility charges would be undercapitalized from the outset. Furthermore, it is not clear if the Debtors correctly estimated their monthly post-petition utility expenses.

Accordingly, the Court should not approve the Escrow Account as adequate assurance to the Debtors' utility providers on a final basis because the Escrow Account is not the **<u>form</u>** of adequate assurance requested by the Utilities herein and because it is an

22

otherwise unreliable form of adequate assurance.

> **2.      The Utility Motion Should Be Denied As To the Utilities Because the Debtors Have Not Set Forth Any Basis For Modifying the Utilities' Requested Deposits.**

In the Utility Motion, the Debtors fail to address why this Court should modify the Utilities' requests for the adequate assurance of payment deposits set forth above.  Under Section 366(c)(3), the Debtors have the burden of proof as to whether the Utilities' adequate assurance of payment requests should be modified.  *See In re Stagecoach Enterprises, Inc.*, 1 B.R. 732, 734 (Bankr. M.D. Fla. 1979) (holding that the debtor, as the petitioning party at a Section 366 hearing, bears the burden of proof).  However, the Debtors do not offer the Court with any evidence or factually supported documentation to explain how or why the amount of the Utilities' adequate assurance requests should be modified.  Accordingly, the Court should deny the relief requested by Debtors in the Utility Motion and require the Debtors to comply with the requirements of Section 366(c) with respect to the Utilities.  *See In re Lucre, Inc.*, 333 B.R. 151, 154 (Bankr. W.D. Mich. 2005) (holding that the right of a debtor or trustee to seek modification of a utility's deposit request "arises only after the adequate assurance payment has been agreed upon by the parties.").

23

**B.   THE COURT SHOULD ORDER THE DEBTORS TO PROVIDE THE ADEQUATE ASSURANCE OF PAYMENT REQUESTED BY THE UTILITIES PURSUANT TO SECTION 366 OF THE BANKRUPTCY CODE.**

Section 366(c) was amended to overturn decisions such as *Virginia Electric and Power Company v. Caldor, Inc.*, 117 F.3d 646 (2d Cir. 1997), that held that an administrative expense, without more, could constitute adequate assurance of payment in certain cases.  Section 366(c)(1)(A) specifically defines the forms that assurance of payment may take as:

> (i) a cash deposit;
>
> (ii) a letter of credit;
>
> (iii) a certificate of deposit;
>
> (iv) a surety bond;
>
> (v) a prepayment of utility consumption; or
>
> (vi) another form of security that is mutually agreed upon between the utility and the debtor or the trustee.

A determination of adequate assurance is within the court's discretion, and is made on a case-by-case basis, subject to the new requirements of Section 366(c). *See In re Utica Floor Maintenance, Inc.*, 25 B.R. 1010, 1016 (Bankr. N.D.N.Y. 1982); *In re Cunha*, 1 B.R. 330, 332-33 (Bankr. E.D. Va. 1979).  Section 366 of the Bankruptcy Code was enacted to balance a debtor's need for utility services from a provider that holds a monopoly on such services, with the need of the utility to ensure for itself and its rate payers that it receives payment for providing these essential services. *See In re Hanratty*, 907 F.2d 1418, 1424 (3d

24

Cir. 1990). The deposit or other security "should bear a reasonable relationship to expected or anticipated utility consumption by a debtor." *In re Coastal Dry Dock & Repair Corp.*, 62 B.R. 879, 883 (Bankr. E.D.N.Y. 1986). In making such a determination, it is appropriate for the Court to consider "the length of time necessary for the utility to effect termination once one billing cycle is missed." *In re Begley*, 760 F.2d 46, 49 (3d Cir. 1985). Based on the Debtors' anticipated utility consumption, the minimum period of time the Debtors could receive service from the Utilities before termination of service for non-payment of bills is approximately two (2) months. Accordingly, the deposits requested by the Utilities are reasonable. *See In re Stagecoach*, 1 B.R. at 735-36 (holding that a two month deposit is appropriate where the debtor could receive sixty (60) days of service before termination of services because of the utilities' billing cycle.); *see also In the Matter of Robmac, Inc.*, 8 B.R. 1, 3-4 (Bankr. N.D. Ga. 1979).

As set forth above, the Utilities' adequate assurance requests are based on: (1) the Utilities' billing exposure created by their applicable Tariffs; and (2) amounts that the applicable public service commission, which are neutral third-party entities, permit the Utilities to request from their customers. Although the Utilities recognize that this Court is not bound by the Tariffs, the Tariffs are extremely relevant

information of a determination made by an independent entity on the appropriate amount of adequate assurance that should be paid to the Utilities.

In contrast, the Debtors do not provide an objective, much less an evidentiary, basis for their proposed adequate assurance in the form of a two-week Escrow Account. Additionally, the Debtors proposed two-week Escrow Account does not cover the Utilities' monthly invoices and is woefully inadequate to cover the exposure that the Utilities would face if the Debtors fail to timely pay for one month's service and receive another month's service before a Utility could terminate service for the post-petition payment default. The bottom line is that if the Debtors want to continue to receive the Utilities' generous trade terms established by the Tariffs (i.e. bills issued monthly in arrears with due dates 15 to 30 days thereafter), they need to provide the Utilities with more security than a two-week deposit escrow. The Debtors are not asking their counsel to provide unsecured post-petition service, and even sought and obtained Court approval for a significant carve-out for payment of their attorneys' fees, and likely are on reduced credit terms with most of their other post-petition vendors, so they should not be allowed to treat the Utilities so differently.

WHEREFORE, the Utilities respectfully request that this Court enter an order:

1. Denying the Utility Motion as to the Utilities;

2. Awarding the Utilities the post-petition adequate assurance of payment pursuant to Section 366 in the amount and form satisfactory to the Utilities; and

3. Providing such other and further relief as the Court deems just and appropriate.

Dated: June 30, 2009     STEVENS & LEE, P.C.

/s/ John D. Demmy_____
John D. Demmy (DE Bar No. 2802)
1105 North Market Street, 7th Floor
Wilmington, Delaware 19801
Phone:    (302) 425-3308
Fax:     (610) 371-8515
E-mail:   jdd@stevenslee.com
-and-

Russell R. Johnson III
John M. Craig
Law Firm of Russell R. Johnson III, PLC
2258 Wheatlands Drive
Manakin-Sabot, Virginia  23103
Telephone: (804) 749-8861
Facsimile: (804) 749-8862
E-mail:  russj4478@aol.com

*Counsel For Consolidated Edison Company of New York, Inc., Virginia Electric and Power Company d/b/a Dominion Virginia Power, The East Ohio Gas Company d/b/a Dominion East Ohio, Carolina Power & Light Company d/b/a Progress Energy Carolinas, Commonwealth Edison Company, PECO Energy Company, Duke Energy Carolinas, LLC, Georgia Power Company, Southern California Edison Company, The Connecticut Light and Power Company, Western Massachusetts Electric Company, Yankee Gas Services Company, Public Service Company of New Hampshire, Ohio Edison Company, The Cleveland Electric Illuminating Company, Jersey Central Power & Light Company, Pennsylvania Electric Company, Duke Energy Indiana, Inc., Duke Energy Kentucky, Inc., and Duke Energy Ohio, Inc.*

SL1 932714v1/000000.00000