# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| EDDIE BAUER HOLDINGS, INC.,[1] et al., | Case No. 09-12099 (MFW) |
| Debtors. | Jointly Administered |
| | Hearing Date: July 7, 2009 at 9:30 a.m (ET)<br>Objection Deadline: July 3, 2009 at 12:00 p.m. (ET) |
| | Re: D.I. 14 |

## OBJECTION OF WILMINGTON TRUST FSB, AS AGENT FOR DEBTORS' SECURED TERM LENDERS, TO DEBTORS' DIP FINANCING MOTION

Wilmington Trust FSB, successor by assignment to JPMorgan Chase Bank, N.A., as Agent (the "Term Loan Agent") for the prepetition term loan lenders (collectively, the "Term Lenders"), through its undersigned counsel, respectfully submits this objection (the "Objection") to the Debtors' Emergency Motion for Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363 and 364; (II) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363; (III) Granting Liens and Superpriority Claims; (IV) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364; and (V) Scheduling a Final Hearing on the Debtors' Motion to Incur

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Eddie Bauer Holdings, Inc., a Delaware corporation (2352); Eddie Bauer, Inc., a Delaware corporation (9737); Eddie Bauer Fulfillment Services, Inc., a Delaware corporation (0882); Eddie Bauer Diversified Sales, LLC a Delaware limited liability company (1567); Eddie Bauer Services, LLC, an Ohio limited liability company (disregarded), Eddie Bauer International Development, LLC, a Delaware limited liability company (1571); Eddie Bauer Information Technology, LLC, a Delaware limited liability company (disregarded); Financial Services Acceptance Corporation, a Delaware Corporation (7532); and Spiegel Acceptance Corporation, a Delaware corporation (7253). The mailing address for Eddie Bauer Holdings, Inc. is 10401 N.E. 8th Street, Suite 500, Bellevue, WA 98004. On or about the Petition Date, Eddie Bauer of Canada, Inc. and Eddie Bauer Customer Services, Inc., affiliates of the Debtors, commenced a proceeding before the Superior Court of Justice, Commercial List, for the Judicial District of Ontario, for a plan of Compromise or arrangement under the Companies' Creditors Arrangement Act.

Such Financing on a Permanent Basis Pursuant to Bankruptcy Rule 4001 (the "Motion") (D.I. 14).[2] In support of this Objection, the Term Loan Agent respectfully states as follows:

**PRELIMINARY STATEMENT**

1. The DIP Facility is expected to be a relatively short-term arrangement designed to provide working capital to the Debtors and to support their operations long enough to fund the comprehensive auction and sale process now underway. Under the terms of the Interim DIP Order, the Debtors are expressly required to obtain entry of an order approving the sale of substantially all of their assets no later than July 31, 2009. (Interim DIP Order, at ¶20(j)).

2. As the Court is aware, the Term Lenders were collectively owed just over $200 million as of the Petition Date (as defined below), and hold first and second priority liens on substantially all of the Debtors' assets. With the exception of their senior liens on the Debtors' real property, plant, and equipment, intellectual property, capital stock and general intangibles, including without limitation the "Eddie Bauer" name, the Term Lenders' liens are junior to those of the Prepetition Revolving Lenders but otherwise senior to all other creditors' liens and claims.

3. Whether viewed in the context of analyzing the bidding and sale procedures governing the auction process, or evaluating the terms of the DIP financing arrangement and proposed Final DIP Order, the Term Loan Agent's primary focus has been directed at ensuring that (i) the auction and sale process be conducted openly, fairly and in a way calculated to stimulate bidding and maximize values, and (ii) the rights and interests of the Term Lenders be preserved and protected, whether arising by operation of law, such as through

---

[2] Capitalized terms used, but undefined herein, shall have the meaning ascribed to them in the Motion.

exercise of credit bid rights, or by contract, such as those contained in the Intercreditor Agreement.

4. With the limited but important exceptions described below, the Term Loan Agent is supportive generally of the key terms of the proposed $100 million DIP Facility and does not oppose its approval. Not only will the proposed financing provide the Debtors with necessary working capital to fund ongoing operations, it has also allowed for a seamless transition into Chapter 11 and will facilitate a prompt auction and sale process. Inexplicably, however, a number of provisions that had been included in the Interim DIP Order to uphold and protect existing rights and interests of the Term Lenders or to memorialize understandings previously reached with the Debtors were stricken from the proposed Final DIP Order, or otherwise modified in a way that greatly diminishes their effect. Among these are inclusions or deletions which would (i) directly contravene certain rights contained in the Intercreditor Agreement that would permit the Term Lenders to make loans to the Debtors secured by certain priming liens on the Term Lenders' first priority collateral, (ii) remove all meaning and effect to the extensively negotiated 506(c) waiver rights, and (iii) force the Term Lenders to seek emergency relief before the Court if the Debtors, with only the consent of the DIP Lenders, were to unilaterally and materially change the Budget. As such, the offending provisions should be revised to be consistent with the Interim DIP Order.

5. The Term Loan Agent will continue to work with the Debtors and other interested parties to resolve their concerns. Absent such agreement, however, the Term Loan Agent, for itself and on behalf of the Term Lenders, will not consent to the continued use of its cash collateral and respectfully requests that approval of the Motion be conditioned on the modifications described below.

## BACKGROUND

### A. Introduction

6. The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware on June 17, 2009 (the "Petition Date").

7. The Debtors continue in possession of their properties and the management of their affairs as debtors-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code. An Official Committee of Unsecured Creditors was appointed herein by the United States Trustee on June 25, 2009. No trustee or examiner has been appointed in the Debtors' Chapter 11 cases.

### B. Prepetition Secured Indebtedness

8. The Term Loan Agent, the Term Lenders, and the Debtors are parties to that certain Amended and Restated Term Loan Agreement dated April 4, 2007, as amended (the "Prepetition Term Loan Agreement"). As of the Petition Date, the principal outstanding indebtedness under the Prepetition Term Loan Agreement as acknowledged by the Debtors was at least $200,607,949, together will all fees, costs, interest, professional fees and other obligations properly chargeable thereunder. (Interim DIP Order, at p. 10, ¶D(v)).

9. In addition to their secured obligations to the Term Lenders, the Debtors also have incurred secured revolving indebtedness to certain prepetition lenders (the "Prepetition Revolving Lenders") under that certain Loan and Security Agreement dated June 21, 2005, as amended, with Bank of America, N.A., as Agent (the "Prepetition Revolving Credit Agreement") and the lender parties thereto. As of the Petition Date, the outstanding principal

indebtedness due and owing under the Prepetition Revolving Credit Agreement, as acknowledged by the Debtors, was approximately $41,551,000, together with issued and outstanding letters of credit totaling $9,689,362, plus all interest, fees, costs, professional fees and other obligations properly chargeable thereunder. (Interim DIP Order, at p. 8, ¶D(ii)).

10. The Debtors' obligations to both the Term Lenders and the Prepetition Revolving Lenders are secured by substantially all of the Debtors' assets, with the specific rights and priorities between and among the secured creditors governed by that certain Intercreditor Agreement dated June 21, 2005 (the "Intercreditor Agreement"), attached hereto as **Exhibit A**.

11. Under the terms of the Intercreditor Agreement, the obligations of the Debtors under the Prepetition Term Loan Agreement are secured by first priority liens on, and security interests in, all of the Debtors' real property, plant and equipment, intellectual property, capital stock and general intangibles (other than certain intangibles pledged to the Prepetition Revolving Lenders) (collectively, the "Term Priority Collateral"). In addition, the Term Lenders were granted second priority liens on the Revolver Priority Collateral (as defined below).

12. The Debtors' obligations under the Prepetition Revolving Credit Agreement are secured by first priority liens on accounts receivable, inventory and specified general intangibles related thereto (the "Revolver Priority Collateral"), together with a second priority lien on the Term Priority Collateral.

C. **Summary of Relief Requested**

13. On the Petition Date, the Debtors filed the Motion seeking, *inter alia*, approval of that certain Senior Secured, Superpriority Debtor-in-Possession Loan and Security Agreement with, Bank of America, N.A., as DIP Agent, the lender parties thereto (the "DIP Lenders"), and certain other parties (the "DIP Credit Agreement"). The DIP Credit Agreement

provides the Debtors with a $100 million revolving facility (the "DIP Facility"), with $90 million to be made available upon entry of an interim approval order, and the balance following a final hearing on the Motion (the "Final Hearing").

14. The institutions comprising the DIP Lenders are identical to those that comprise the Prepetition Revolving Lenders, and the DIP Credit Agreement contemplates the complete "roll-up" of the Prepetition Revolving Lenders' obligations through full payment following entry of the Final DIP Order. With the exception of the Term Priority Collateral and certain narrowly defined permitted claims and encumbrances, the DIP Lenders were granted, *inter alia,* priming liens on substantially all of the Debtors' assets to secure the Debtors' loan repayment and adequate protection obligations. (DIP Credit Agreement, at Section 6.1).

15. On June 18, 2009, this Court entered its Interim Order (1) Authorizing Incurrence by the Debtors of Post-Petition Secured Indebtedness with Priority Over Certain Secured Indebtedness and with Administrative Superpriority, (2) Granting Liens, (3) Authorizing Use of Cash Collateral by the Debtors Pursuant to 11 U.S.C. § 363 and Providing for Adequate Protection, (4) Modifying the Automatic Stay and (5) Scheduling a Final Hearing (the "Interim DIP Order") [D.I. 64].

## OBJECTION

16. The Term Loan Agent's support for the Motion at the interim hearing was predicated in large part on certain protections and benefits that were either negotiated into the Interim DIP Order at its insistence, or were otherwise approved by the Court at the initial hearing and incorporated into the Interim DIP Order. However, certain of the provisions incorporated into the Interim DIP Order for the benefit of the Term Lenders were effectively – and, in the Term Loan Agent's opinion, inappropriately -- written out of the Final DIP Order. As

more fully described below, the Term Loan Agent respectfully suggests that the Debtors got it right the first time and should be required to make appropriate additions and deletions as needed to bring the Final DIP Order in line with specific protections and benefits conferred on the Term Lenders as part of the Interim DIP Order.

    A.    **Consistent With Intercreditor Agreement, Final DIP Order Should Not Specifically Preclude Entry of Subsequent Financing Order Which May Provide for <u>Priming of Liens on Term Priority Collateral</u>**

17. The Intercreditor Agreement, which Debtors signed and acknowledged, governs virtually all rights and responsibilities as between the Term Lenders and the Prepetition Revolving Lenders, both in and out of bankruptcy and including, most significantly, with respect to rights and relative priorities related to the collateral securing the prepetition loans. (Intercreditor Agreement, at Section 2.2). Thus, even though the Prepetition Revolving Lenders and the Term Lenders both have security interests in substantially all assets of the Debtors, it is the Intercreditor Agreement that makes clear that the Term Lenders have a first priority lien on certain real property, plant and equipment, intellectual property, and certain intangible property, including the "Eddie Bauer" brand, while the Prepetition Revolving Lenders have senior liens on inventory, accounts receivable and substantially all other assets of the Debtors. (Intercreditor Agreement, at Section 2.2).

18. Consistent with those priority rights, the Intercreditor Agreement contains a number of provisions that ensure that the Term Lenders' rights in and to the Term Priority Collateral and the Prepetition Revolving Lenders' rights in and to the Revolver Priority Collateral are upheld, preserved and protected in virtually all circumstances. For example, under sections of the Intercreditor Agreement dealing with insolvency proceedings, all Term Lenders are expressly precluded from proposing a postpetition financing arrangement that would result in

priming the Prepetition Revolving Lenders' liens in the Revolver Priority Collateral. Similarly, the Prepetition Revolving Lenders are prevented from seeking to prime the liens of the Term Lenders on the Term Priority Collateral. (Intercreditor Agreement, at Section 5.12(b)).

19. Significantly, however, the prohibition that prevents the Term Lenders and the Prepetition Revolving Lenders from proposing, consenting to or participating in a loan to the Debtors which primes the respective first priority liens of the other lender group does not apply to a proposed financing that would prime only the collateral on which they, themselves, have a first priority lien. Thus, the Intercreditor Agreement expressly states that "nothing herein shall prohibit a Revolving Lender from proposing a post-petition financing for the Borrower that primes the liens on the Revolving Lender Priority Collateral or a Term Loan Lender from proposing a post-petition financing for the Borrower that primes the liens on the Term Lender Priority Collateral." (Intercreditor Agreement, at Section 5.12(b)).

20. The Debtors, for their part, obviously recognize the importance of the Intercreditor Agreement and of ensuring that the rights and obligations contained therein are enforceable during the bankruptcy. With the support of both the Term Lenders and the Prepetition Revolving Lenders, the Debtors have therefore included the following identical language in both the Interim DIP Order and the Final DIP Order expressly reaffirming those rights without qualification:

> <u>Continuing Effect of Intercreditor Agreement</u>. Each of the Pre-Petition Revolving Secured Parties, the Pre-Petition Term Secured Parties, and the Debtors shall continue to be bound by and subject to all the terms, provisions and restrictions of the Intercreditor Agreement, and the Intercreditor Agreement shall apply and govern respective rights, obligations, and priorities of each of the DIP Agent, the DIP Lenders, the Debtors, the Pre-Petition Revolving Secured Parties, and the Pre-Petition Term Secured Parties in these Cases.

(Interim DIP Order and Final DIP Order, at ¶20(c)).

21. If it becomes necessary for the Debtors to seek additional or alternative financing, however, and despite the clearly contemplated ability of the Term Lenders to make a loan to the Debtors with liens that may prime the Term Priority Collateral, the Final DIP Order, as currently drafted, would expressly preclude them from doing so.

22. Specifically, the proposed Final DIP Order provides that, absent the consent of the DIP Agent and the Prepetition Revolving Agent, and as long as any obligations under either the DIP Credit Agreement or the Prepetition Revolving Credit Agreement remain outstanding, no order shall be entered in the within Chapter 11 cases, or any successor cases, which authorizes the obtaining of credit or the incurring of indebtedness that is secured by a lien "which is equal or senior to that granted to the Prepetition Secured Parties or the DIP Secured Parties herein." (Final DIP Order, at ¶11(a)). Likewise, the Final DIP Order provides that the "DIP Liens shall secure all DIP Obligations and shall not be made subject to or *pari passu* with any lien or security interest by any court order heretofore or hereafter entered in the Cases...." (Final DIP Order, at ¶2(f)). Finally, the Final DIP Order includes an acknowledgement and agreement by the Debtors that they will not "in any way prime or seek to prime the security interests and DIP Liens provided to the DIP Lenders ... by offering a subsequent lender or party-in-interest a superior or *pari passu* lien or claim." (Final DIP Order, at ¶D(x)).

23. These provisions would, by their terms, prevent the Debtors from incurring debt secured by priming liens on the Term Priority Collateral and, if left to stand, would directly contravene the Intercreditor Agreement as well as the Debtors' stated intention to uphold that agreement for all purposes.

24. The foregoing issue was addressed and resolved at the hearing on the Interim DIP Order through inclusion of language in the Interim DIP Order that would uphold the Debtors' ongoing ability to obtain financing that might prime the Term Priority Collateral to the extent otherwise permitted under the Intercreditor Agreement. Thus, under the Interim DIP Order, the prohibition against priming liens on the Term Priority Collateral was expressly made "subject to the terms of the Intercreditor Agreement." Interim DIP Order, at ¶¶11(a); D(x)). Unfortunately, that *proviso* was stricken from the Final DIP Order.

25. There is absolutely no reason to gratuitously include language in the Final DIP Order purporting to prohibit a right contemplated in the Intercreditor Agreement, especially when it has only a positive effect for the Debtors by giving them options if additional financing is needed. If, in the future, such a financing is proposed, the Prepetition Revolving Lenders can object or otherwise respond as they deem appropriate, to the extent allowed under the Intercreditor Agreement. In the meantime, this clear, unmistakable and very material right should be preserved.

26. Accordingly, the Term Loan Agent respectfully requests that the qualifying language stricken by the Debtors from the Final DIP Order -- to wit, "subject to the terms of the Intercreditor Agreement" -- be reinserted at the beginning of paragraph 11(a) and at the end of paragraph E(x) of the Final DIP Order and, for consistency, added just prior to the above-quoted language in paragraph 2(f).

**B. New Language Added to Final DIP Order That Would Effectively Abrogate the 506(c) Waiver Should Be Removed**

27. Prior to the initial hearing to consider the Motion on an interim basis, the Term Loan Agent and the Debtors were engaged in extensive negotiations regarding, among

other things, the Debtors' continued use of the Term Lenders' collateral, including their cash collateral, the nature and amount of adequate protection payments related thereto, consent to the subordination of their liens and claims with respect to the Carve-Out and the DIP Facility, and other material issues the Debtors were anxious to resolve. Through the ensuing give and take, a comprehensive understanding was reached as to all major issues, and the resulting agreements were incorporated into the Interim DIP Order. One such agreement involved the waiver of section 506(c) surcharge rights as against both the Prepetition Revolving Lenders' and the Term Lenders' collateral.

28. This waiver represented a significant component of the Term Lenders' overall bargain with the Debtors leading up to the initial hearing on the Motion, and to the various consents extended by the Term Lenders regarding use of cash collateral, consent to the Carve-Out, subordination to other liens and claims and other issues that directly and materially affected the Term Lenders' rights and interests.

29. Consistent with the understanding reached with the Term Lenders, as well as with the Prepetition Revolving Lenders and the DIP Lenders, the Interim DIP Order and the Final DIP Order both recognize and uphold the 506(c) waiver for all such parties through inclusion of the following unambiguous language:

> Section 506(c) Claims. No costs or expenses of administration which have been or may be incurred in the Cases at any time shall be charged against the DIP Secured Parties, the Pre-Petition Secured Parties, their respective claims, the Pre-Petition Collateral, or the DIP Collateral, pursuant to Sections 105, and 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the Agents. Nothing in the Interim Order or this Final Order shall be deemed a consent by the Pre-Petition Secured Parties or the DIP Secured Parties to any charge, lien, assessment, claim, or other encumbrance against any of them or the DIP Collateral, the Pre-Petition Collateral, the Pre-Petition replacement Liens, or the

>Pre-Petition Indemnity Accounts under Section 506(c) of the
>Bankruptcy Code, or otherwise.

(Interim DIP Order and Final DIP Order, at ¶10).

30. However, in the most recent proposed Final Order, the 506(c) waiver in favor of the Term Lenders was effectively vitiated through inclusion of qualifying language that, on its face, would enable the Debtors to re-visit the waiver if the Term Lenders refused to consent to allowing administrative and other priority claims to be satisfied out of the proceeds of the auction sale. The specific language that would abrogate the previously granted 506(c) waiver to the Term Lenders was added as a footnote to the above-quoted section of the Final DIP Order relating to Section 506(c) claims, as well as to a number of other parts of the order, and reads as follows:

>In the event the Pre-Petition Term Secured Parties are unwilling to agree to permit unpaid administrative and priority claims to be paid out of the proceeds of a 363 sale on terms and conditions acceptable to the Debtors, the Debtors reserve the right to seek approval of a form of Final Order that does NOT grant a Section 506(c) waiver to the Pre-Petition Term Secured Parties.

(Final DIP Order, at ¶¶ F, 4(f), 8(c) and 10).

31. The Term Loan Agent submits that it is inappropriate, at best, and disingenuous, at worst, for the Debtors to exact concessions from the Term Lenders in the context of a negotiations leading up to the interim financing hearing and represent in the Motion and include in the Interim DIP Order an unbridled 506(c) waiver in favor of all secured parties, only to casually add a footnote in the Final DIP Order that undercuts the waiver by seeking to condition it on the Term Lenders' agreement to allow untold numbers of administrative and priority claims to be paid out of the proceeds of their collateral following the auction. Further, similar language is not included for the 506(c) waiver granted to the DIP Lenders or Revolving

Lenders. This disparate treatment is inexplicable and unwarranted. Moreover, it is entirely unclear exactly what the Debtors have in mind by inclusion of the above-quoted language or how it would work in the real world. Simply put, are the Term Lenders receiving a 506(c) waiver or not?

32. As noted above, the Term Lenders were granted a 506(c) waiver as part of a broad understanding covering a number of issues, and the Debtors should not now be allowed to effectively renege on that arrangement by unilaterally taking back a principal element of that deal from the standpoint of the Term Lenders. Further, such 506(c) waivers have been granted to pre-petition lenders in this district to induce such lenders to consent to the continued use of cash collateral. *See e.g. In re Pliant Corp., et al.*, Order dated March 20, 2009, Case No. 09-10443(MFW)(Bankr. D. Del., Feb. 11, 2009). The Term Loan Agent respectfully requests that the unworkable language the Debtors seek to add to the Final DIP Order related to the Term Lenders' 506(c) rights be stricken from the Final DIP Order and that the Term Lenders receive the same waiver and benefit as is being provided to the Pre-Petition Revolving Lenders and DIP Lenders.

C. **Term Loan Agent Must Have Consent Rights Related to Material Changes to the Budget**

33. Since the commencement of the Chapter 11 cases, the Debtors have been operating -- and will continue to operate -- in accordance with a strict and detailed weekly and cumulative cash budget (the "Budget"), as the same may be modified from time to time as permitted under the DIP Credit Agreement and the Interim and Final DIP Orders. (See Interim DIP Order and Final DIP Order, at ¶3(a)). All cash expended by the Debtors while the DIP Facility remains outstanding, whether in the form of loans, cash collateral, or from any other

13

source, may only be used as permitted under the Budget, subject to limited permitted variances. Id.

34. The Term Lenders are keenly interested in the make-up of the Budget as well as the Debtors' ability to adhere to its limits, and the Term Loan Agent therefore had substantial input in its development and finalization. Moreover, as a result of the Term Lenders' collateral position and the priority and amount of their claims, the Term Lenders have a unique interest in the Debtors' compliance with the Budget, as well as in any attempt by the Debtors to change it, particularly if the changes resulted from any kind of deterioration in the Debtors' businesses or financial condition. Those same concerns may not apply with equal force to the DIP Lenders, whose collateral coverage will, with near certainty, be sufficient to allow for payment in full of their claims regardless of the direction these cases may take.

35. Under the proposed Final Order, only the DIP Agent has consent rights with respect to proposed changes to the Budget. The Term Loan Agent and the Term Lenders are limited to advance consultation rights, with no power to stop any proposed modification, regardless of its materiality, without first securing a court order preventing it. (Final DIP Order, at ¶4(i)). Presumably, this would also apply to the $20 million "accordion" feature built into the DIP Credit Agreement, pursuant to which the Debtors can, under specified circumstances, increase their borrowings under the DIP Facility by up to $20 million. (DIP Credit Agreement, at Section 2.5). The Budget, as now drafted, does not currently contemplate the increased borrowings under the accordion feature, nor does it make provision for their disbursement if, as and when such funds do come in the estate. With the limited consultation rights offered them by the Debtors, the Term Loan Agent would have no ability to prevent the new borrowings, or contest any modifications to the Budget, without effectively running into Court and obtaining an

injunction. Such remedy is not sufficient for the Term Loan Agent in light of the current quick pace and short timeline of this case.

36. To remedy the inadequate structure proposed by the Debtors for making changes to the Budget, the Term Loan Agent successfully argued for inclusion in the Interim DIP Order of language which expressly granted the Term Loan Agent the same consent rights as the DIP Agent with respect to any material changes to the Budget (Interim DIP Order, at 4(i)). However, as with both the priming issue related to the Term Priority Collateral and the 506(c) waiver, each as described above, the Debtors have elected not to perpetuate that protection in favor of the Term Lenders as part of the Final DIP Order and have instead restored the Term Lenders to what they consider ineffective consultation rights. (Final DIP Order, at 4(i)).

37. The Term Lenders have every incentive to work with the Debtors and the DIP Lenders in addressing any needed Budget changes and, with the exception of any changes made for the benefit of particular constituencies at the expense and to the detriment of the Term Lenders, it is very likely that any desired Budget amendments can be worked out consensually. If, however, the Term Lenders are truly troubled by any proposed Budget change to which the DIP Agent has consented, including changes related to any subsequent funding under the accordion feature in the DIP Credit Agreement, the burden should be on the Debtors, and not the Term Lenders, to seek and obtain the requisite Court Order before any such material changes to the Budget can become final. The Term Lenders therefore request that the consent rights previously granted to the Term Lenders and the Term Loan Agent as part of the Interim DIP Order be extended as part of the Final DIP Order.

**D. Debtors' Continuing Financial and Indemnification Obligations Under Lazard Engagement Should Be More Clearly Articulated in Final DIP Order**

38.  Lazard Frères & Co., LLC ("Lazard") was retained as the financial advisors to the Term Agent pursuant to an Engagement Letter dated June 1, 2009 (the "Lazard Engagement Letter"). As contemplated under the DIP Credit Agreement, as well as the Prepetition Revolving Credit Agreement and the Prepetition Term Loan Agreement, and as provided for in the Budget, the Final DIP Order provides that all fees, expenses and other obligations of Term Loan Agent's professionals, including Lazard, shall be paid by the Debtors during the cases. (Final DIP Order, at ¶20(b)). Furthermore, the Lazard Engagement Letter is expressly "approved" under the Final DIP Order, which also includes a mechanism for funding those obligations, including the Lazard indemnification obligations, both during the Chapter 11 cases and subsequent to a Termination Date. (Final DIP Order, at ¶20(b)).

39.  The protections and benefits afforded the Term Loan Agent in the Lazard Engagement Letter are of utmost importance to the Term Agent's ability to monitor and participate in these cases and to uphold its fiduciary duties to the Term Lenders. The Term Loan Agent does not want to risk any unintended impairment of that agreement that might limit its effect or enforceability merely because of ambiguous language unnecessarily included in the Final DIP Order by the Debtors.

40.  The assumption by Debtors in bankruptcy of engagement letters containing similar indemnification obligations is not unusual, including cases in which Lazard, itself, was acting as a financial advisor to a secured lender. *See, e.g., In re Calpine Corp., et al.,* Order dated January 30, 2006, Case No. 05-60200 (Bankr. S.D.N.Y., Dec. 21, 2005); *In re US*

*Airways, Inc., et al.*, Order dated October 14, 2004, Case No. 04-13819 (Bankr. E.D. Va., Sept. 12, 2004). The Term Loan Agent respectfully requests that the Final DIP Order clearly, and without qualification or limitation, state that the Lazard Engagement Letter, including the indemnification obligations contained therein, be expressly approved and ratified by the Debtors.

## **RESERVATION OF RIGHTS**

41. The Term Loan Agent respectfully reserves the right to supplement this Objection in response to any further proposed revisions which the Debtors may seek to incorporate in the Final DIP Order, or as circumstances may warrant.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Term Loan Agent respectfully submits that the Court should condition approval of the Motion on appropriate modifications to the Final DIP Order as described herein and grant such other and further relief as is just and proper.

Dated: July 3, 2009
Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

_____
Robert J. Dehney (No. 3578)
Gregory W. Werkheiser (No. 3553)
Erin R. Fay (No. 5268)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

and

Luc A. Despins, Esquire
Leslie A. Plaskon, Esquire
Christopher M. Desiderio, Esquire
PAUL HASTINGS JANOFSKY & WALKER LLP
Park Avenue Tower
75 E. 55th Street
First Floor
New York, NY 10022
Telephone: (212) 318-6000
Facsimile: (212) 319-4090

*Counsel for Wilmington Trust FSB*

2990395.2