IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

----------------------------------------------------------- X

In re:

EDDIE BAUER HOLDINGS, INC., *et al.*,

          Debtors.

----------------------------------------------------------- X

:
:
:
:
:
:
:
:
:
:
:

Chapter 11

Case No. 09-12099 (MFW)

Jointly Administered

**Related Docket No. 14**

**Hearing Date: July 7, 2009 at 9:30 a.m.**

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO
DEBTORS' MOTION FOR FINAL ORDER (I) AUTHORIZING DEBTORS TO
OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 362, 363 AND
364; (II) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. §
363; (III) GRANTING LIENS AND SUPERPRIORITY CLAIMS; (IV) GRANTING
ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES PURSUANT TO
11 U.S.C. §§ 361, 362, 363 AND 364; AND (V) SCHEDULING FINAL HEARING ON
THE DEBTORS' MOTION TO INCUR SUCH FINANCING ON A PERMANENT
BASIS PURSUANT TO BANKRUPTCY RULE 4001**

**TO THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY JUDGE:**

The Official Committee of Unsecured Creditors (the "Committee") of Eddie Bauer

Holdings, Inc. and its affiliated debtors and debtors-in-possession in the above-captioned chapter

11 cases (collectively, the "Debtors" or "Eddie Bauer"), by and through its proposed counsel

Cooley Godward Kronish LLP and Benesch, Friedlander, Coplan & Aronoff LLP, hereby

submits this objection (this "Objection") to the Debtors' motion (the "DIP Financing Motion")

for a final order (i) authorizing the Debtors to obtain postpetition financing pursuant to that

certain agreement (the "DIP Credit Agreement") among the Debtors, Bank of America, N.A. and

other lenders and agents party thereto (collectively, the "DIP Lenders"), (ii) authorizing the

Debtors to use the cash collateral of (a) the Revolving Lenders (defined below) and (b)

Wilmington Trust FSB and other lenders and agents party to the Prepetition Term Credit

Agreement (defined below) (collectively, the "<u>Term Lenders</u>" and together with the Revolving Lenders, the "<u>Prepetition Lenders</u>"), and (iii) granting certain liens, superpriority claims and other adequate protection to the Prepetition Lenders, dated June 17, 2009 (Doc. No. 14). In support of its Objection, the Committee respectfully represents as follows:[1]

### PRELIMINARY STATEMENT

1.     The Debtors filed these chapter 11 cases with a stalking horse bidder for substantially all of their assets at a cash purchase price that is insufficient to pay the asserted claims of the Prepetition Lenders,[2] the expenses of preserving and disposing of their collateral and the other estimated costs of administering these cases. The 45-day bridge financing proposed in the DIP Financing Motion is sufficient only to fund the expedited sale process for the benefit of the Prepetition Lenders. Pursuant to procedures approved by this Court on June 29, 2009, an auction for the sale of the Debtors' assets will be held on July 16, 2009 and a hearing to approve that sale is scheduled for July 22, 2009. At the closing of the sale, the DIP Lenders will be paid the full amount of their "rolled up" prepetition and postpetition indebtedness.

2.     Since its appointment on June 25, 2009, the Committee has worked tirelessly to ensure that the interests of general unsecured creditors are not sold short in the three-week sale process proposed by the Debtors and the Prepetition Lenders and approved by this Court. Despite the restrictive bidding and auction procedures requested by the stalking horse bidder and proposed by the Debtors, the Committee successfully argued for flexible procedures that provide

---

[1]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Interim DIP Order.

[2]     The Debtors have acknowledged approximately $240 million in collective prepetition secured claims asserted by the Prepetition Lenders and have valued the stalking horse bid at approximately $202 million.

the best opportunity for these estates to (i) maximize the value of the Debtors' assets, including the assets which are not the Prepetition Lenders' collateral; (ii) minimize the remaining administrative and priority claims, and (iii) produce a return to general unsecured creditors. With these critical goals in mind, the Committee submits this present Objection.

3.    The excessive benefits and protections proposed for the Term Lenders in the Final DIP Order (defined below) are unwarranted and offensive. Unlike their prepetition counterparts, the Term Lenders are merely consenting to the Debtors' use of cash collateral to liquidate the Term Lenders' collateral at a bankruptcy approved auction to be conducted in 10 days. They are not providing any additional funding postpetition. Moreover, based on information provided by the Term Lenders, their claim increased by more than $22,000,000 within the 90-days prior to the Petition Date through an amendment (the "Term Amendment") to the Prepetition Term Credit Agreement executed on April 2, 2009. In addition to other consideration received by the Term Lenders under the Term Amendment (described below), the Debtors paid the Term Lenders an "amendment fee" of approximately $1,900,000 on April 3, 2009,[3] without new funding or waivers being provided by the Term Lenders. Rather, in exchange for the minimal relaxation of certain financial covenants under the Prepetition Term Credit Agreement at a time when (a) Eddie Bauer's prepetition sale efforts were well under way and (b) Eddie Bauer was not suffering liquidity problems, the Term Lenders received at least $24,000,000 in value comprised of the following:

- a cash amendment fee of approximately **$1,900,000** (the "1% Fee"), earned and paid on April 3, 2009, representing the amount equal to 1% of

---

[3]    The $1.9 million "amendment fee" paid to the Term Lenders was in addition to other fees paid by the Debtors in connection with the Term Amendment, including, without limitation, a $500,000 fee paid to Peter J. Solomon, Eddie Bauer's investment banker, for "obtaining" the Term Amendment.

the outstanding principal balance due under the Prepetition Term Credit Agreement as of April 3, 2009;

- another cash amendment fee of approximately **$3,800,000** (the "2% Fee"), earned as of April 3, 2009 and payable on November 30, 2009, representing the amount equal to 2% of the outstanding principal balance due under the Prepetition Term Credit Agreement as of April 3, 2009;

- an initial PIK fee of approximately **$9,471,699.19** (the "First PIK Fee"), representing the sum of (i) an amount equal to 5% of the outstanding principal balance due under the Prepetition Term Credit Agreement as of April 3, 2009, and (ii) PIK interest accruing initially at the Eurodollar Rate for a six-month interest period. The First PIK Fee is deemed earned on April 3, 2009 and payable April 1, 2014 under the Term Amendment;

- a second PIK fee of approximately **$9,221,551.57** (the "Second PIK Fee")[4], representing the sum of (i) an amount equal to 5% of the outstanding principal balance due under the Prepetition Term Credit Agreement (inclusive of the First PIK Fee) as of July 2, 2009, and (ii) PIK interest initially accruing at the Eurodollar Rate for a six-month interest period. The Second PIK Fee is deemed earned and payable on July 2, 2009 under the Term Amendment; and

- interest rates were increased 3.5% or more per annum on the outstanding principal balance due under the Prepetition Term Credit Agreement.[5]

Despite the fact that the Debtors have acknowledged the validity and amount of the Term Lenders' claims, the Committee has a duty to fully investigate these transfers and all other

---

[4]     The Second PIK Fee, deemed payable on July 2, 2009 under the Term Amendment, has not been paid to the Term Lenders by the Debtors. The Term Lenders seek the inclusion of language in the Final DIP Order deeming the Second PIK Fee "made and earned on the Petition Date" and "included as part of the Prepetition Term Obligations," so as to ensure that the amount of the Second PIK Fee will be (a) included in their secured claim and (b) paid directly from the proceeds of the sale of the Debtors' assets. For the reasons set forth herein, the Court should prohibit any form of allowance and payment of these purported obligations as part of the Final DIP Order. Final DIP Order ¶ 4(g).

[5]     In addition to the foregoing, the Term Amendment also provided for: (i) Eddie Bauer's agreement to issue warrants to the Term Lenders for the aggregate purchase of 19.9% of Eddie Bauer Holdings, Inc.'s common stock (as of April 3, 2009) at $.01 per share; (ii) the Term Lenders' right to appoint up to three directors to sit on Eddie Bauer's board of directors; and (iii) a decrease in Eddie Bauer's permitted capital expenditures from (a) $60,000,000 to $20,000,000 for 2009 and (b) $70,000,000 to $20,000,000 for 2010.

potential causes of action against the Term Lenders and, to the extent necessary, will prosecute such claims for the benefit of the Debtors' estates and creditors.

4.     The expedited sale process benefits the Term Lenders and adequately protects them against any diminution in value of their collateral. Even if the Debtors granted them relief from the automatic stay, the Term Lenders could not force a faster sale outside of bankruptcy or obtain the protections that a section 363 sale of their collateral provides them. The Committee respectfully requests this Court to deem the Term Lenders adequately protected by the expedited section 363 sale of their collateral, to find that no other or additional protection is necessary to preserve the value of their collateral, and to expressly deny the Term Lenders' proposed adequate protection in the form of:

- a final claim allowance, with such claim to be paid directly from the proceeds of the sale of the Debtors' assets and which claim (a) includes more than $22,000,000 arising from the Term Amendment executed in April 2009 and (b) extends to the proceeds of previously unencumbered assets by virtue of the other forms of adequate protection sought by the Term Lenders;[6]

- additional liens on, and a superpriority claim to, previously unencumbered assets of the Debtors, including, without limitation, (i) the Debtors' Chicago IT Center and other owned real property, (ii) real estate lease proceeds, (iii) one third of the equity in the Canadian Debtors and (iv) avoidance actions and the proceeds thereof;

- a section 506(c) waiver; and

- reimbursement of the fees and expenses of five professionals, including four separate law firms and an investment banking firm, which firm would stand to collect a transaction fee of more than $2,000,000 in the event the Term Lenders are paid in full.

---

[6]     As discussed herein, not only do the Term Lenders seek to bring the Debtors' previously unencumbered assets within the purview of their secured claim through blanket replacement/additional liens and superpriority claims, but they also seek to avoid their affirmative burden to prove any actual diminution in value of their collateral before pocketing the proceeds of the Debtors' assets.

5.      To the extent the Court finds that the Term Lenders are entitled to protections beyond those inherently conferred by the truncated sale process, the Court should strike the broad forms of adequate protection proposed for the Term Lenders in the Final DIP Order and craft narrow protections that are appropriate under the circumstances of these cases, provided that the Term Lenders meet their burden to prove actual diminution in value of their prepetition collateral.  The inappropriate and offensive protections currently proposed for the Term Lenders seek to both insulate them from attack on their prepetition liens and claims and broaden the scope of their collateral to include unencumbered assets of the Debtors.  The Term Lenders, who are not funding these chapter 11 cases and whose prepetition liens, claims and conduct are the subject of Committee scrutiny, must not be permitted to marginalize the possibility of a recovery for general unsecured creditors through unwarranted benefits and protections.

## BACKGROUND

6.      On June 17, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware.  Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and properties as debtors-in-possession.  No trustee or examiner has been appointed in these cases.

7.      On the Petition Date, the Debtors filed the DIP Financing Motion.

8.      Following a hearing held on June 18, 2008, the Court entered an interim order (the "Interim DIP Order") approving the DIP Financing Motion with certain modifications and scheduled a hearing to consider approval of the DIP Financing Motion on a final basis (a "Final DIP Order") for July 7, 2009.

9.     On June 25, 2009, the Committee was appointed in these cases by the Office of the United States Trustee for the District of Delaware, consisting of the following seven members: (i) The Bank of New York Mellon, as Indenture Trustee; (ii) Tara Hill, c/o Marc Primo, Esq., Initiative Legal Group LLP; (iii) RR Donnelley & Sons Company; (iv) Simon Property Group; (v) GGP Limited Partnership; (vi) AQR Capital; and (vii) Highbridge International LLC.  On that same day, the Committee selected Cooley Godward Kronish LLP as its proposed lead counsel, Benesch, Friedlander, Coplan & Aronoff LLP as its proposed local counsel, and Capstone Advisory Group, LLC as its proposed financial advisors.

## DEBTORS' PREPETITION CAPITAL STRUCTURE

### A.     Prepetition Revolving Credit Facility

10.    The Debtors, as borrowers and guarantors, are party to that certain Loan and Security Agreement, dated June 21, 2005 (as amended and in effect, the "Prepetition Revolving Credit Agreement") with Bank of America, N.A. as agent for certain lenders party thereto (collectively, the "Revolving Lenders").  According to the Debtors, as of the Petition Date, the outstanding principal amount owing under the Prepetition Revolving Credit Agreement was approximately $41,550,999.99 and outstanding letter of credit issued pursuant thereto totaled approximately $9,689,362.11.  According to the Debtors, the Revolving Lenders hold first priority liens on the Revolving Lender Priority Collateral (as defined in the Intercreditor Agreement) and second priority liens on the Term Lender Priority Collateral (as defined in the Intercreditor Agreement).

### B.     Prepetition Term Credit Facility

11.    The Debtors, as borrowers and guarantors, are party to that certain Amended and Restated Term Loan Agreement, dated as of June 21, 2005 and as amended and restated on April

4, 2007 (as amended by that certain First Amendment, dated as of April 2, 2009, and as further amended and in effect, the "<u>Prepetition Term Credit Agreement</u>") with the Term Lenders. According to the Debtors, as of the Petition Date, the outstanding principal amount owing under the Prepetition Term Credit Agreement was approximately $191,404,503.59. According to the Debtors, the Term Lenders hold first priority liens on the Term Lender Priority Collateral and second priority liens on the Revolving Lender Priority Collateral.

### C.     The Intercreditor Agreement

12.     The Prepetition Lenders entered into that certain Intercreditor Agreement, dated June 21, 2005 (as amended and in effect, the "<u>Intercreditor Agreement</u>"), which governs the respective rights, interests, obligations, priority and positions of the Prepetition Lenders with respect to the Debtors' assets. Pursuant to the Intercreditor Agreement, the Revolving Lenders hold liens senior to the Term Lenders on the Revolving Lender Priority Collateral and the Term Lenders hold liens senior to the Revolving Lenders on the Term Lender Priority Collateral.

### <u>THE DIP FACILITY</u>

13.     On the Petition Date, the Debtor filed the DIP Financing Motion seeking, among other things, immediate use of cash collateral and authority to enter into the DIP Financing Agreement with the DIP Lenders providing for a senior revolving credit facility with a maximum borrowing amount of $100,000,000.00 (the "<u>DIP Facility</u>").

14.     The obligations under the DIP Facility (the "<u>DIP Obligations</u>") are secured by a first priority lien on substantially all of the Debtors' assets (the "<u>Collateral</u>"). Each of the DIP Lenders is also a Revolving Lender.

15.     The Interim DIP Order provides, *inter alia*, that upon entry of the Final DIP Order (as defined below) the proceeds of (i) the DIP Facility are to be used to pay the Revolving

Lenders' prepetition indebtedness in full, and (ii) the sale of the Debtors' assets are to be used, in order of priority and subject to the respective rights in the Collateral as set forth in the Intercreditor Agreement, to pay the Prepetition Lenders' indebtedness in full, to fund a $250,000 indemnity account for each of the Prepetition Lenders, and to pay the DIP Obligations in full.

16.    The Debtors now move for approval of an order (the "<u>Final DIP Order</u>") authorizing, on a final basis, substantially all of the relief granted in the Interim Order, including the unwarranted and offensive forms of proposed adequate protection for the Term Lenders that are the subject of this Objection.

## <u>OBJECTION</u>[7]

### I.    THE TERM LENDERS ARE ADEQUATELY PROTECTED BY THE EXPEDITED SECTION 363 SALE AND NO FURTHER ADEQUATE PROTECTION IS NECESSARY OR WARRANTED TO PRESERVE THE VALUE OF THEIR COLLATERAL

17.    The excessive benefits and protections proposed for the Term Lenders in the Final DIP Order are unwarranted and offensive. The Term Lenders, as opposed to the Revolving Lenders, are not providing any additional funding postpetition and are merely consenting to the Debtors' use of cash collateral to liquidate their collateral at a bankruptcy approved auction to be conducted in 10 days. The expedited sale process benefits the Term Lenders and adequately protects them against any diminution in value of their collateral. Even if the Debtors granted the Term Lenders relief from the automatic stay to liquidate their collateral, the Term Lenders could not force a faster sale outside of bankruptcy or obtain the protections that a section 363 sale of their collateral provides to them. The Committee respectfully requests this Court to deem the Term Lenders adequately protected by the expedited section 363 sale of their collateral in these

---

[7]    A redline comparing the proposed Final DIP Order against the modifications requested by the Committee herein is annexed hereto as **Exhibit A**.

chapter 11 cases, and to find that no other or additional protection is necessary to preserve the value of their collateral.

**A.    The Final DIP Order Should Not Provide The
Term Lenders With A Final Claim Allowance**

18.    The Term Lenders demand a final allowance of their prepetition claim, within the meaning of section 502 of the Bankruptcy Code, which claim includes more than $24,000,000 in potentially actionable transfers from the Debtors pursuant to the Term Amendment executed in April 2009.  A final allowance at this time would preempt the Committee's right to investigate and challenge the Term Lenders' prepetition liens, claims and conduct.  Allowing the Term Lenders' potentially inflated claim three weeks into these chapter 11 cases is unnecessary, and certainly not appropriate before the Committee investigates the Term Lenders' claims.

**B.    The Final DIP Order Should Not Provide The
Term Lenders With A Section 506(c) Waiver**

19.    The Term Lenders demand a full waiver from the Debtors of their rights, under section 506(c) of the Bankruptcy Code, to seek reimbursement from the Term Lenders of the costs of preserving and disposing of their collateral.  Such a waiver is particularly inappropriate here, where the Debtors will incur substantial costs related to this expedited sale process, and the Term Lenders – who are not providing new funding to the Debtors – will receive the benefit, at these estates' expense, of selling their collateral more quickly and effectively than they could outside of a bankruptcy proceeding.  The Debtors should not be compelled to waive their section 506(c) surcharge rights in cases such as these where, "absent the costs expended, the property would yield less to the creditor than it does as a result of the expenditure."  *Brookfield Prod. Credit Ass'n v. Borron*, 738 F.2d 951, 952 (8th Cir. 1984) (citations omitted).

20.     Congress's intent in enacting section 506(c) was to ensure that the debtor-in-possession would be entitled to recover expenses from its secured lender to the extent those expenses are necessarily and reasonably associated with preserving or disposing of the lender's collateral. *In re Visual Industries, Inc.*, 57 F.3d 321, 326 (3d Cir. 1995) (discussing the Congressional Record, 124 Cong.Rec. 32,398 (cum. ed. Sept. 28, 1978) (statement of Rep. Edwards)). Section 506(c) is thus designed to prevent "a windfall to the secured creditor at the expense of the claimant." *Id.* (citing *IRS v. Boatmen's First Nat'l Bank of Kan. City*, 5 F.3d 1157, 1159 (8th Cir. 1993)). Section 506(c) waivers have been found unenforceable in cases, such as these, where they "operate as a windfall to the secured creditor at the expense of the administrative claimants." *In re Lockwood Corp.*, 223 B.R. 170 (8th Cir. BAP 1998) *see also In re Brown Brothers, Inc.*, 136 B.R. 470, 474 (W.D. Mich. 1991) (holding a 506(c) waiver "is not enforceable in light of the congressional mandate that a trustee have the authority to use a portion of secured collateral for its preservation or proper disposal"); *In re Ridgeline Structures, Inc.,* 154 B.R. 831, 832 (Bankr. D.N.H. 1993) (holding 506(c) waiver in cash collateral order applicable regardless of any "action inaction, or acquiescence" by secured lender to be "against public policy and unenforceable per se").

21.     The Debtors' rights under section 506(c) must be preserved and the proceeds of the Term Lenders' collateral must be made available to pay the costs and expenses of preserving and disposing of their collateral and to ensure the administrative solvency of these estates.

### C.     The Final DIP Order Should Not Provide The Term Lenders With Liens On Previously Unencumbered Assets Or A Superpriority Claim To The Proceeds Thereof

22.     The Term Lenders demand automatically valid and perfected additional and replacement liens on all of the Debtors' assets – irrespective of whether the Term Lenders even

held liens in such assets prepetition or whether the liens were valid and properly perfected. Not only does the proposed Final DIP Order extend additional and replacement liens to assets of the Debtors that were not part of Term Lenders' prepetition collateral or subject to validly perfected liens, including, without limitation, the Debtors' Chicago IT Center and other owned real property, real estate lease proceeds and one third of the equity in the Canadian Debtors, but it also provides the Term Lenders with liens on preference action proceeds – including, as presently drafted, proceeds of a recovery ***against the Term Lenders***. Proposed Final DIP Order ¶ 2(e), 4(e). Similarly, the Term Lenders demand a superpriority administrative expense claim with recourse to all of the Debtors' assets and the proceeds thereof, including causes of action under chapter 5 of the Bankruptcy Code.

23. Accordingly, the proposed Final DIP Order not only provides the Term Lenders with a lien on the proceeds of estate causes of action, a form of adequate protection generally frowned upon by courts, but it also subsumes any preference liability on the part of the Term Lenders by granting them liens on "Specified Bankruptcy Recoveries," which term is defined to include "any and all recoveries or proceeds of any such [section 547 or 549] claims or causes of action." Proposed Final DIP Order ¶ 2(e). Nothing in the proposed Final DIP Order should deprive general unsecured creditors of their *meaningful* challenge rights against the Term Lenders, nor should it allow an undersecured creditor, who is providing no financing to the Debtors, protections that are customarily and narrowly reserved for lenders who provide postpetition financing. The Term Lenders are not providing such financing and should not be permitted to so enhance their collateral position through new liens and superpriority claims.

24. The Term Lenders are, in effect, asking this Court to authorize a form of *de facto* cross-collateralization to secure their prepetition claims. See *In re Saybrook Mfg. Co.*, 963 F.2d

1490, 1495 (11th Cir. 1992) (cross-collateralization is incompatible with bankruptcy law because it is directly contrary to the fundamental priority scheme established by the Bankruptcy Code). This relief is unwarranted given that the  Term Lenders (a) have not agreed to provide a single dollar of postpetition financing in these cases, and (b) are adequately protected through this expedited sale process because they could not force a faster or more beneficial sale of their collateral if the Debtors granted them relief from the automatic stay.  *In re Gallegos Research Group, Corp.*, 193 B.R. 577, 586 n.2 (Bankr. D. Col. 1995) ("[i]t is even more objectionable to allow cross collateralization where no new funds are advanced").

25.     Accordingly, the Court should (i) prohibit the Term Lenders from receiving any new liens on, or superpriority claims to, unencumbered assets, including avoidance actions and their proceeds, (ii) restrict any replacement liens granted to only those assets of the Debtors in which the Term Lenders held valid, fully perfected security interests prior to the Petition Date, and (iii) force the Term Lenders to meet their burden to prove actual diminution in value of their collateral before the grant of any replacement liens takes effect.

**D.      The Final DIP Order Should Not Require These Estates
To Pay The Unconscionable Fees And Expenses Of
The Term Lenders' Professionals**

26.     Despite the fact that they are woefully undersecured based on the stalking horse bid, the Term Lenders nevertheless have the gall to demand that their **five** professionals, including two law firms and an investment banking firm retained to represent the "Prepetition Term Agent" and two law firms retained to represent the "Term Lender Group," be paid millions of dollars in fees by the Debtors without any requirement that the Term Lenders look to the proceeds of their collateral for such payment or prove that it has actually diminished in value. As if this abuse is not enough, the Term Lenders further demand that these estates agree to pay

Lazard Freres & Co. LLC ("Lazard"), the Prepetition Term Agent's investment banking firm, monthly payments of $150,000, plus a "Transaction Fee" equal to the sum of (a) $1,500,000 plus (b) 2% of the portion of any "Consideration" in excess of an amount equal to 80% of the aggregate face value of the Term Lenders' indebtedness.[8]

27.     Thus, notwithstanding the fact that the Debtors have sought to retain their own investment banking firm, the Term Lenders would have these estates assume the obligation to pay a *second* investment banking firm a *second* Transaction Fee that would exceed **$2,000,000** if the sale of the Debtors' assets pays the Term Lenders in full.  To add insult to injury, if the Term Lenders were to receive a section 506(c) waiver, then these outrageous fees would not be paid from the proceeds of the Term Lenders' collateral, but rather from the proceeds of the Debtors' unencumbered assets.  Moreover, the Term Lenders also demand that the Debtors indemnify Lazard – who are not retained professionals of these estates – for, among other things, any and all losses, claims, damages, liabilities or expenses arising out of or connection with its engagement.

28.     This Court should not permit the Term Lenders to saddle these estates with such excessive and unreasonable obligations.  If this Court determines that the professional fees of the Term Lenders should be paid after the section 506(c) expenses of these estates are paid in full, then the Court should (i) subject the Term Lender Group and Prepetition Term Agent to a collective cap on professional fees and expenses that can be reimbursed by these estates, (ii) require the Term Lender Group and Prepetition Term Agent to submit copies (and not "summaries") of invoices for reimbursement of reasonable professional fees and expenses to the Debtors, the US Trustee, and the Committee prior to receiving such payment from the Debtors,

---

[8]     A copy of Lazard's engagement letter is annexed hereto as **Exhibit B**.

and (iii) eliminate any obligation of these estates to indemnify or pay any kind of success, transaction or restructuring fee to Lazard.

## II. ANY FURTHER ADEQUATE PROTECTION PROVIDED TO THE TERM LENDERS, INCLUDING THE PAYMENT OF SALE PROCEEDS, SHOULD BE CONDITIONED ON THE TERM LENDERS PROVING ACTUAL DIMINUTION IN VALUE OF THEIR COLLATERAL

29. The Term Lenders will no doubt argue that each of the aforementioned benefits and protections will be triggered only in the event there is actual diminution in value of their prepetition collateral and, therefore, the Committee's concerns are premature. This Court should not be persuaded by any such attempt to shift the Term Lenders' burden of proof to the Debtors. Indeed, the Term Lenders do not intend to satisfy their burden to demonstrate an actual diminution in value of their collateral. The Court need look no further than ¶ H of the proposed Final DIP Order (Application of Proceeds of Collateral to Prepetition Obligations) for evidence of this manifest injustice.

30. Paragraph H of the proposed Final DIP Order provides that all proceeds of the sale or other disposition of the "Collateral" (defined in ¶ 2(e) to include the "DIP Collateral" in which the Term Lenders demand automatically valid, perfected and blanket liens on superpriority claims) shall be first applied to permanently reduce the prepetition indebtedness of the Revolving Lenders and the Term Lenders. The proposed Final DIP Order is devoid of any affirmative requirement for the Term Lenders to substantiate their adequate protection claims before receiving the gross proceeds of the Collateral, and the proposed definition of "Collateral" allows the Term Lenders to receive the proceeds of assets that were previously unencumbered and within their reach *only* by virtue of the proposed adequate protection. The proposed language shifts the burden away from the Term Lenders to prove actual diminution in value of

their collateral and places it upon the Debtors' estates to prove the *absence* of such diminution and seek affirmative "clawback" relief.

31.     The Term Lenders have failed to demonstrate that they are entitled to *any* adequate protection in theses cases.  The purpose of adequate protection "is to insure that the creditor receives the value for which he bargained prebankruptcy."  *See In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987).  Adequate protection is, therefore, a protection for the creditor to assure its collateral is not depreciating or diminishing in value and is made on a case-by-case basis.  *Id.* at 1397; *see also United Savings Ass'n v. Timbers of Inwood Forest  Associates, Ltd.*, 484 U.S. 365, 370 (1988) (an "interest is not adequately protected if the security is depreciating during the term of the stay."); *In re Saypol*, 31 B.R. 796, 800 (Bankr. S.D.N.Y. 1983) ("In the context of the automatic stay, Congress believed the existence *vel non* of such a decline [in the value of the secured creditor's interest] to be almost decisive in determining the need for adequate protection.").

32.     For these reasons, the secured creditor "must, therefore, prove this decline in value – or the threat of a decline – in order to establish a prima facie case."  *In re Gunnison Ctr. Apts., LP*, 320 B.R. 391, 396 (Bankr. D. Colo. 2005); *In re Elmira Litho, Inc.*, 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994).  Secured creditors are only entitled to adequate protection to the extent of the anticipated or actual decrease in value of the secured collateral during the bankruptcy case. *See In re First South Savings Assoc.*, 820 F.2d 700, 710 (5th Cir. 1987); *In re Gallegos Research Group, Corp.*, 193 B.R. 577, 584 (Bankr. D. Col. 1995).  A corollary to that rule is that "the adequate protection provided must not substantially exceed that to which the secured creditor is entitled."  *In re Blehm Land & Castle Co.,* 859 F.2d 137 (10th Cir. 1988).

33.     Here, the Term Lenders have not offered a shred of proof of any actual or threatened diminution in the value of their collateral and, in fact, the proposed Final DIP Order is devoid of any affirmative requirement for the Term Lenders to substantiate their adequate protection claims before receiving the gross proceeds of the sale of their collateral and previously unencumbered assets of the Debtors.  Because the Term Lenders have not established even a *prima facie* case for adequate protection, this Court should deny the requested adequate protection.

34.     Moreover, no provision of the Bankruptcy Code provides for the payment of prepetition claims before confirmation of a plan of reorganization and the Term Lenders, who are not providing the Debtors with postpetition financing and are the beneficiaries of a truncated section 363 sale process, certainly do not warrant exception to the general rule.  *See, e.g., Chiasson v. Matherne & Assoc. (In re Oxford Mgmt., Inc.)*, 4 F.3d 1329, 1334 (5th Cir. 1993) (holding bankruptcy court improperly allowed the payment of post-petition funds to satisfy pre-petition claims and noting that "[n]either the appellees nor the bankruptcy court cited a specific provision of the Code that would allow the payment of post-petition funds to satisfy prepetition claims"); *Crowe & Assocs., Inc. v. Bricklayers & Masons Union Local No. 2 (In re Crowe & Assocs.)*, 713 F.2d 211, 216 (6th Cir. 1983) (bankruptcy courts do not have the power to authorize debtors to pay prepetition claims prior to a plan of reorganization); *In re Allegheny Intl, Inc.*, 118 B.R. 282, 296 (W.D. Pa. 1990) ("It is beyond dispute that a debtor may not pay creditors outside of a plan of reorganization.").

35.     Shifting the Term Lenders' burden to these estates is particularly inappropriate under the circumstances of these cases.  These estates should not be forced to waste precious resources chasing the Term Lenders for the return of sale proceeds that they were not entitled to

in the first place. The Committee submits that the Court should stay any distribution of sale proceeds to the Term Lenders until the earlier of (i) the date the Committee waives its right to challenge the Term Lenders' liens, claims and conduct, (ii) the date by which any such challenge is fully and finally resolved by agreement of the parties or order of this Court, and (iii) the date this Court allows the Term Lenders' claims on a final basis. Under all circumstances, the Court should stay any distribution to the Term Lenders until the section 506(c) expenses are paid in full and further stay any distribution to the Term Lenders of sale proceeds allocated to previously unencumbered assets of the Debtors until such time as the Term Lenders meet their affirmative burden to prove actual diminution in value of their collateral.

### III. THE COMMITTEE'S OBJECTIONS TO OTHER PROVISIONS OF THE DIP FACILITY AND RESERVATION OF RIGHTS

36. The Committee recognizes that the Debtors require DIP financing and would be willing to support a DIP Facility that adequately protects the Prepetition Lenders' interests in their collateral while reasonably safeguarding the interests of general unsecured creditors. However, the proposed DIP Facility, without appropriate modification, unfairly disadvantages general unsecured creditors. In addition to the foregoing, the specific grounds for the Committee's objection are as follows:[9]

> (a) <u>The Second PIK Fee</u>: The Final DIP Order should not contain a provision conclusively deeming the Second PIK Fee as made and earned on the Petition Date and included as part of the Term Lenders' claim. (Final DIP Order at ¶4(g)). Nothing in the Final DIP Order should provide the Term Lenders with an allowed claim for the Second PIK Fee. As discussed above, the Second PIK Fee, as well as the facts, circumstances and other provisions of the Term Amendment, will be the subject of intense scrutiny and

---

[9] The Committee understands that the Debtors and the DIP Lenders have submitted a revised proposed Final DIP Order that would resolve certain of the objections set forth below. To the extent the Court accepts those modifications in the Final DIP Order, the Committee will withdraw its corresponding objections.

investigation by the Committee and the Final DIP Order must not prejudice those critical rights.

(b) <u>Postpetition Interest to Term Lenders</u>: The Debtors should not be required to pay any postpetition interest to the Term Lenders prior to the confirmation of a plan of reorganization (Final DIP Order ¶ 4(g)). Such payments should only be made after a plan of reorganization has been confirmed and this Court determines that the Term Lenders are oversecured. This restriction is particularly appropriate here, given the Debtors' capital structure and stalking horse bid. Unless there is a robust auction for the sale of substantially all of the Debtors' assets, the Term Lenders are undersecured by a significant margin.[10]

(c) <u>Adequate Protection</u>: The Term Lenders are not entitled to adequate protection for a "change in market value of the Collateral." (DIP Credit Agreement at Section 4). As discussed herein, the Term Lenders could not have forced a faster sale of their collateral if the Debtors granted them relief from the automatic stay. The speedy sale of their collateral is sufficient adequate protection for the Term Lenders. Any additional adequate protection provided to the Term Lenders should be limited to actual diminution in value – that is proved by the Term Lenders – arising out of the automatic stay or the Debtors' use, sale or lease of their collateral.

(d) <u>Indemnity Account</u>: The Term Lenders are not entitled to a $250,000 Indemnity Account (Final Order at ¶¶ 4(h). The Term Lenders should be responsible for the fees of their numerous professionals in the event of a successful Committee challenge. In the event the Committee's challenge to the Term Lenders' liens, claims or conduct is unsuccessful, then the Term Lenders can simply add the amount of the fees and expenses of their professionals to their secured claim.

(e) <u>Section 552(b)</u>: The Term Lenders should not be excused from the "equities of the case" exception under section 552(b) of the Bankruptcy Code (Final DIP Order at ¶ 20(k)). These estates should not be forced to waive their rights under section 552(b) before the Committee investigates the Term Lenders' prepetition liens, claims and conduct.

---

[10]     Although section 506(b) of the Bankruptcy Code allows for payment of postpetition interest to an oversecured creditor, it is well settled that such payments cannot be made prior to the confirmation of a plan or its effective date, whichever is earlier. *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 484 U.S. 365, 108 S.Ct. 626 (1988) ("The timing of the payment of accrued interest to an oversecured creditor [at the conclusion of the proceeding] is doubtless based on the fact that it is not possible to compute the amount of the §506(c) recovery . . . until the end of the proceeding."); see also *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (Matter of T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 799 (5th Cir. 1997) (bankruptcy court erred by ordering the payment of interest on a secured claim before confirmation).

(f) <u>Litigation Carve Out</u>: The Carve Out is insufficient to ensure an investigation of the Term Lenders' prepetition liens, claims and conduct (Final DIP Order at ¶ 8). At the Committee's request, and as consideration for the Committee's agreement to support the expedited timeline to sell the Debtors' assets on July 16, 2009, the DIP Lenders agreed, and the Debtors consented, to cash collateralize the lesser of (a) the aggregate amount of the fees and expenses incurred by the Committee's professionals in these cases, and (b) $1,500,000, which may be used by the Committee to fund the investigation and/or challenge of the Term Lenders' prepetition liens, claims and conduct and other estate causes of action (the "<u>Litigation Carve Out</u>"). The Committee submits that this agreement is appropriate under the circumstances and language memorializing this agreement with the DIP Lenders and the Debtors should be included in the Final DIP Order.

(g) <u>Carve Out</u>: The Committee should be permitted to look to the Carve Out and the Litigation Carve Out for the payment of professional fees and expenses incurred in connection with a challenge of the Term Lenders' prepetition liens, claims and conduct (Final DIP Order at ¶ 8(b)).

(h) <u>Committee Member Expense Reimbursement</u>: The Carve Out should be available to reimburse the reasonable out-of-pocket expenses incurred by members of the Committee in furtherance of their statutory duties (Final DIP Order at ¶ 8(ii) and (iii)).

(i) <u>Challenge Period</u>: No time bar (other than any applicable statutory limit) should be imposed to bring claims or causes of action against the Term Lenders, including, without limitation, causes of action based on theories of preference, fraudulent conveyance, recharacterization and equitable subordination. (Final DIP Order at ¶ 7).

(j) <u>Automatic Standing and Authority</u>: The Final DIP Order should include language granting the Committee (i) authority under Rule 2004 of the Federal Rules of Bankruptcy Procedure to investigate the liens, claims and conduct of the Prepetition Lenders, and (ii) automatic standing to challenge such liens, claims and conduct (Final DIP Order at ¶ 7). These important protections are particularly appropriate here, where the Debtors have already acknowledged the claims of the Prepetition Lenders and the Term Lenders are attempting to impose timing and funding restrictions on the Committee's investigation and challenge rights.

(k) <u>Committee Investigation</u>: The Final DIP Order should include language clarifying that, notwithstanding any provision of the DIP Credit Agreement to the contrary, the Committee's investigation and challenge of the Prepetition Lenders' liens, claims and conduct, as provided in the Final DIP Order, shall not constitute an Event of Default under the DIP Credit Agreement (Final DIP Order ¶ 16).

(l) <u>Remedies for Prepetition Lenders</u>:  The Final DIP Order should include language clarifying that, notwithstanding any provision of the Prepetition Revolving Credit Agreement or the Prepetition Term Credit Agreement to the contrary, the Prepetition Lenders (i) may not foreclose upon any assets of the Debtors, or the proceeds thereof, in which they did not hold a valid, fully perfected lien prior to the Petition Date, and (ii) shall be subject to disgorgement in the event of a successful challenge by the Committee with respect to any assets or proceeds foreclosed upon in which the Prepetition Lenders did not hold a valid, fully perfected lien prior to the Petition Date (Final DIP Order ¶ 17(a)).

(m) <u>Credit Bidding</u>:  The Term Lenders should not be permitted to credit bid any portion of their claims arising from the Term Amendment.  (Final DIP Order ¶ 20(j)).  The Court's final bid procedures order includes important modifications and limitations to the Term Lenders' credit bidding rights and should not be diluted by any provision of the Final DIP Order.

37.    Additionally, in the event that any further changes to the order are proposed, the Committee reserves all of its rights to object to any and all such provisions and otherwise supplement this Objection.


REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

**WHEREFORE**, the Committee respectfully requests that this Court enter an order denying the relief requested by the DIP Financing Motion or, alternatively, modifying the proposed Final DIP Order in accordance with the recommendations set forth herein, and granting such additional relief as is just and proper.

Dated:  July 6, 2009
         Wilmington, Delaware

                                        Respectfully Submitted,

                                        By: /s/Bradford J. Sandler_____
                                        Bradford J. Sandler (#4142)
                                        Jennifer R. Hoover (#5111)
                                        Jennifer E. Smith (#5278)
                                        BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
                                        222 Delaware Avenue, Suite 801
                                        Wilmington, DE  19801
                                        (302) 442-7007
                                        (302) 442-7012 (Facsimile)

                                              -and-

                                        COOLEY GODWARD KRONISH LLP
                                        1114 Avenue of the Americas
                                        New York, New York 01136
                                        (212) 479-6000
                                        (212) 479-6275 (Facsimile)
                                        Jay R. Indyke (JI 0353)
                                        Cathy R. Hershcopf (CH 5875)
                                        Seth Van Aalten (SV 2663)

                                        *Proposed Local and Lead Counsel For The Official
                                        Committee Of Unsecured Creditors Of Eddie Bauer
                                        Holdings, Inc., et al.*