IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EDDIE BAUER HOLDINGS, INC., et al., | ) | Case No. 09-12099-MFW |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | Hearing Dates: July 22, 2009 at 9:30 a.m. |
| | ) | Objection Deadline: July 15, 2009 at 4:00 p.m. |
| | ) | Related to Docket Nos.298 & 299 |

## THE TAUBMAN LANDLORDS' PRECAUTIONARY OBJECTION TO THE MOTION FOR APPROVAL OF SALE OF ASSETS AND POTENTIAL ASSUMPTION AND ASSIGNMENT OF REAL PROPERTY LEASES, OBJECTION TO REQUEST FOR AUTHORIZATION TO CONDUCT GOING OUT OF BUSINESS SALES, AND CURE CLAIM OBJECTION

The Taubman Landlords[1], by their attorneys, Andrew S. Conway and Susan E. Kaufman, for their precautionary[2] objection to the debtors' motion for approval of sale of assets and potential assumption and assignment of real property leases, objection to the debtors' request to conduct going out of business sales, and cure claim objection, state as follows:

1. This is a contested matter, pursuant to Bankruptcy Rules 6006(b) and 9014.

2. Jurisdiction is based upon 28 U.S.C. §1334.

3. This is a core proceeding within the meaning of 28 U.S.C. §157(b).

---

[1] The Taubman Landlords are the owners or operators of regional retail shopping centers at which one of the debtors is a tenant pursuant to written leases, which for purposes of this Objection include the following: Cherry Creek (debtors' store #170); Fair Oaks (debtors' store #55); Great Lakes Crossing (debtors' store #763); MacArthur Center (debtors' store #802); Northlake Village (debtors' store #943); Partridge Creek (debtors' store #972); Twelve Oaks Mall (debtors' store #42); and Woodfield (debtors' store #24) (each of the leases collectively referred to as the "Taubman Leases").

[2] The Taubman Landlords file this "precautionary" objection to the debtors' motion for approval of the sale of assets and possible assumption and assignment of leases and requirement for authorization to conduct going out of business sales because of the extremely short period of time scheduled between the close of the auction and hearing date on the approval of sale and assumption and assignment of leases, and/or going out of business sales.

4. On June 17, 2009 ("Filing Date"), the debtors filed their petitions for relief under Chapter 11 of the United States Bankruptcy Code ("Bankruptcy Code").

### I. Assumption and Assignment

5. The debtors have failed to satisfy the requirements of Bankruptcy Code Section 365(b) for assumption of the Taubman Leases in that they have failed to cure existing defaults under the lease. In addition, inasmuch as Sections 11.03 and 19.03 of the Taubman Leases requires the debtors' payment of the landlord's attorneys' fees under these circumstances, in order to meet the requirements of Section 365(b) the debtors must reimburse the landlords for their pecuniary losses. *In re: Tech Hifi, Inc.*, 49 B.R. 876 (Bankr. D. Mass. 1985) (reasonable attorneys fees required to be paid in order to assume lease).

6. Furthermore, the proposed assignments to an as of yet unidentified assignee has yet to be shown to comply with the provisions of Bankruptcy Code Section 365(f) and, therefore, cannot be approved by this Court. Section 365(f) of the Bankruptcy Code provides, in pertinent part:

> (f)(2) The trustee may assign an executory contract or unexpired lease of the debtor only if--
>
> (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B) <u>adequate assurance of future performance</u> by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease. (Emphasis added.)

Section 365(b)(3) defines adequate assurance of future performance as follows:

> (3) For the purposes of paragraph (1) of this subsection and paragraph (2)(B) of subsection (f), adequate assurance of future performance of a lease of real property in a shopping center includes adequate assurance--

    (A) of the source of rent and other consideration due under such lease, and in the case of an assignment, <u>that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease</u>;

    (B) that any percentage rent due under such lease will not decline substantially;

    (C) that assumption or <u>assignment of such lease is subject to all the provisions thereof</u>, including (but not limited to) provisions such as a radius, location, use, or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center; and

    (D) that assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center. (Emphasis added.)

  7. Since the debtors' leases with the Taubman Landlords are of real property in a shopping center, the debtors have the burden of proof to establish that assumption and assignment will not affect the "use," will not disrupt the tenant mix or balance in the shopping center affected, will not substantially affect future performance of non-monetary obligations of the lessee, and will insure the performance of all monetary obligations under the lease. *In re: Lafayette Radio Electronics Corp.*, 12 B.R. 302 (Bankr. E.D.N.Y. 1981).

  8. The debtors' motion has failed to establish these requirements and meet its burden of proof. Nowhere in the debtors' motion is there a showing that all provisions of the leases including the use and radius clauses will be complied with. Nowhere in the debtors' motion is there a showing of any history of an operating performance by the assignee or that the assignee's operating performance will be similar to the operating performance of the debtors as of the time the debtors became the lessee under the lease. Finally, nowhere in the debtors' motion or any supporting

documents is there a showing that the financial condition of the proposed assignee is similar to the financial condition of the debtors <u>as of the time the debtors became the lessee under the lease</u> as required by Section 365(b)(3)(A).

In 1984, Congress amended Section 365(b)(3) to stop the assumption and assignment of shopping center leases which would violate the use clause of the lease and disrupt the tenant mix. 130 Cong. Rec. S-8895 (June 29, 1994, Statement of Sen. Hatch). To further protect shopping centers, Congress also amended Section 365(b)(3)(A) to require the debtor to provide adequate assurance that an assignee has a financial condition and operating performance similar to that of the original tenant when the lease was executed. The legislative history indicates that the purpose of this language was "to insure that the assignee itself will not soon go into bankruptcy and will provide operating and advertising benefits to the other tenants similar to those provided by the original tenant when its lease was executed." 130 Cong. Rec. S-8895 (June 29, 1994), reprinted in App. 3 Collier on Bankruptcy XX-71 (15th ed. 1989). *See also, In re: The Casual Male*, Lexis 2277 (Bankr. Mass., October 3, 1990). Furthermore, the "party moving to assume [and assign] a lease has the ultimate burden of persuasion that . . . all requirements for assumption [and assignment] have been met." *In re: Rachels Industries, Inc.*, 109 B.R. 797, 802 (Bankr. W.D. Tenn. 1990).

9. To the contrary, as evidence of adequate assurance the debtors have offered only a confidentially protected statement that fails to offer anything close to adequate assurance that the acquiring entity will have the wherewithal to pay the rent going forward. Section 365(b) provides as follows:

> (l) If an expired lease under which the debtor is the lessee is assigned pursuant to this section, the lessor of the property may require a deposit or other security for the performance of the debtor's obligations under the lease substantially

the same as would have been required by the landlord upon the initial leasing to a similar tenant.

Given the fact the proposed assignee is a newly-formed company, the Taubman Landlords assert that the Court should at the very least require a security deposit in the amount of six (6) months' rent and other charges or a two-year guaranty from a solvent parent corporation.

10. The current version of Section 365 differs significantly from the prior version of this section, which provided as follows:

> (C) that assumption or assignment of such lease will not breach *substantially* any provision, such as a radius, location, use, or exclusivity provision, in any other lease, financing agreement, or master agreement relating to such shopping center. . . .

11 U.S.C. §365(b)(3)(C) (Law. Co-op. 1985), at pp. 225-236. (repealed October 10, 1984) ("the 1978 Version").

Close inspection of these two provisions reveals that the difference between the two versions lies primarily in the deletion of a single, but important, word. The 1978 version required that the assignment of the lease not "substantially" breach any use clause. In 1984, Congress amended this section by removing the word substantially, in order to overrule certain decisions authored by bankruptcy courts seeking to stretch the language of the section in order to allow debtors' estates to profit by assignments to non-conforming users. This intent is clearly revealed in the legislative history to the 1984 version, which provides, in part:

> The [1982] bankruptcy code currently provides that when a shopping center lease is assumed or assigned, assurances must be given that the lease provisions will not be substantially breached and that the tenant mix will not be substantially disrupted. Unfortunately, courts have misapplied these provisions in ways which have deprived shopping centers and their tenants of the protections which Congress intended to provide them.
>
> This bill would delete the word "substantially" from [§365(b)(C)]

thus requiring that any clause in the lease be adhered to. It is especially important that any use clause in the lease be strictly adhered to and that the tenant mix not be disrupted. The bankruptcy courts will still retain the flexibility to determine whether or not a proposed new use for the premises falls within any use clause of the lease and whether or not the new use would disrupt the tenant mix. This amendment requires strict compliance with the provisions of the use clauses in shopping center leases and prohibits any changes in the use of the tenant's space not permitted by the use clause. *This amendment is intended to stop courts from creating new leases by changing essential lease terms to facilitate assignments. It is intended to stop the practice of some courts to determine whether there has been a disruption by reference to the amount of space to be assigned as a percentage of the total area in the shopping center.* This amendment is not intended to enforce requirements to operate under a specified trade name.

Approximately half of all U.S. retail trade is conducted in shopping centers. Retail merchants in shopping centers depend upon the operation of a carefully chosen mix of stores, all shopping center tenants . . . are using their space in ways not provided for in the lease and which disrupt the tenant mix, the financial health of all of the other merchants and of the shopping center itself can be threatened. This bill will reduce the likelihood that provisions of the bankruptcy code will themselves add to the economic distress of retail merchants in shopping centers.

130 Cong. Rec., §8891 (daily ed. June 29, 1984) (statement of Sen. Hatch) (emphasis supplied).

In other words, Bankruptcy Code Section 365(b)(3)(C) was amended in order to mandate that assignees strictly comply with existing use clauses. *See also* L. Cherkis, *Collier Real Estate Transactions and the Bankruptcy Code* para. 3.01 [6] (1987) ("The amendments to 365(b)(3) were intended to require a prospective assignee of a shopping center lease from a trustee of a debtor-tenant to adhere to a use clause which reflects the landlord's judgment of the proper tenant mix and synergy in the shopping center, and does not permit a court to change the use prescribed in the lease in order to facilitate an assignment.").

11. The requirement that the use clause provision of the lease must be complied with has been emphasized by the recent bankruptcy code amendments. The ability of the debtor to

assign a shopping center lease under section 365(b(f) is subject to the right of a shopping center lessor to enforce use, radius, exclusivity, tenant mix and similar provisions in its leases. See the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). The legislative history supports the clear intent of Congress and states:

> "Section 404(b) [of BAPCPA] amends section 365(f)(1) to assure that section 365(f) does not override any part of section 365(b). Thus, section 404(b) makes a trustee's authority to assign an executory contract or unexpired lease subject not only to section 365(c), but also to section 365(b), which is given full effect. Therefore, for example, assumption or assignment of a lease of real property in a shopping center must be subject to the provisions of the lease, such as use clauses."

*House Report No. 109-31, Pt. 1, 109th Cong., 1st Sess. 87 (2005).*

12.   One case that has interpreted Section 365(b)(3)(C) as being a strict requirement that the bankruptcy courts not alter use clauses by approving assignments which effect changes of use. In *In re Rose's Stores, Inc.*, 1995 U.S. App. Lexis 8090 (Decided April 12, 1995) (4th Cir.) the Court rejected a proposed assignee who wished to operate a grocery store in what had been a department store. In addition, two cases interpreting the 1978 version have clearly indicated that the future course of interpreting this section, under the 1984 version, would be governed by an entirely different mandate. One such case is *In re Tech Hifi, Inc.*, 49 Bankr. 876 (Bankr. D. Mass. 1985). In *Tech Hifi*, the landlord was attempting to prevent the debtor, an electronics retail and service store, from assigning its lease to a leather goods retailer. After determining that the 1978 version of §365(b)(3)(C) does not require a showing that assignment will not breach the lease to be assigned, but only a showing that the assignment will not substantially breach other agreements relating to the shopping center, *Id*. at 879-880, the Court remarked:

> The recent amendment to §365(b)(3)(C) by the Bankruptcy Amendments and Federal Judgeship Act of 1984 require strict adherence to use clauses. Assignment is subject to all use and exclusivity provisions in the particular lease to be assigned . . .

*Id*. at 879, n. 2. Thus, the Court clearly indicated that it would not allow any deviations from or modifications to a use clause when a trustee assigns a lease under the 1984 version.

An identical view was expressed in *In re Bricker*, 43 Bankr. 344 (Bankr. D. Ariz. 1984). The court in *Bricker* held that the debtor had no rights to an automatic stay pursuant to 11 U.S.C. §362. *Id*. With respect to the 1978 version of §365(b)(3)(C), the court noted that a new rule would apply to future changes in use:

> Apparently feeling this provision has been misapplied to deprive shopping centers of use restriction protections, Congress deleted the word "substantially" from §365(b)(3)(C) in the Bankruptcy Amendments and Federal Judgeship Act of 1984. H.R. 5174, Title III, Subtitle C. 130 Cong. Red. H. 7480 (June 29, 1984). Thus, strict adherence to use restrictions is mandated for future cases.

*Id*. at 347, n. 4. Again, this language indicates that the slightest deviation from a lease's use clause will not be permitted in order to effect an assignment.

13. The debtors have the burden of proof under Section 365(b)(1) of the Bankruptcy Code. *In re Memphis-Friday's Associates*, 88 Bankr. 830, 840-841 (Bankr. W.D. Tenn. 1988); *In re Lafayette Radio Electronics Corp.*, 12 Bankr. 302, 307 (Bankr. E.D.N.Y. 1981). *See also In re TSW Stores, Inc., supra*, (The court denied the application to assign the lease where the debtor had "failed to establish that the assumption and assignment of its shopping center lease [would] not disrupt substantially any tenant mix or balance in the shopping center.")

14. The Taubman Landlords entered into the Taubman Leases with a known entity which at the time exhibited a strong financial position and demonstrated a tradition of effective and experienced management. Without a showing that the assignee has a similar financial capacity, has

a similar track record with regard to managerial experience with this type of operation, and plans to continue to operate the enterprise in a manner consistent with the restrictions of the leases, it is patently unfair and violative of the requirements of Bankruptcy Code Section 365 to permit the debtor to assume and assign the Taubman Leases pursuant to the motion currently on file.

## II. Going Out of Business Sale

15. Section 7.02 of the Taubman Leases provides in its relevant part, as follows:

> No auction, liquidation, going out of business, fire or bankruptcy sales may be conducted in the leased premises.

16. Section 365(d)(3) of the Bankruptcy Code requires the debtor to timely perform all obligations under the Taubman Leases arising from and after the order for relief is entered. With respect to the mall locations from which the debtors wish to run going out of business sales, or sales of fixtures and furniture, such sales would constitute a violation of Section 7.02 of the Taubman Leases.

17. The existence of 11 U.S.C. §105 does not permit this Court to enter an Order that it believes makes "good business sense," when the result of the Order is to negate the express language of the Code. Thus 11 U.S.C. §105 has generally been held not to be a basis for an order which may be inconsistent with the plain language of other Sections of the Bankruptcy Code. *Cf. In re: Ionosphere Clubs, Inc.*, 922 F.2d 984, 995 (2d Cir. 1990); *In re: Morristown and Erie R. Co.*, 885 F.2d 98 (3rd Cir. 1989); *In re: NWFX, Inc.*, 864 F.2d 593 (8th Cir. 1989).

18. The Taubman Landlords acknowledge that the Bankruptcy Court is a court of equity; however, it is well settled that the Court's equitable powers "must and can only be exercised within the confines of the Bankruptcy Code." *Northwest Bank of Worthington v. Ahlens*, 485 U.S. 197, 206 (1988). As discussed *infra*, the Shopping Center Amendments of the Bankruptcy Code

appear to be a clear expression of congressional intent concerning the rights of non-residential landlords to enforce the contractual terms of the leases which have not yet been assumed or rejected. *See* 11 U.S.C. §365(d)(3) and (d)(4). Arguably, no going out of business sale should be permitted, as it is uncontroverted that the Taubman Leases prohibit such sales. The Taubman Landlords concede that under some circumstances, it might be appropriate to allow a liquidation sale that is conducted in a manner that is not likely to cause harm to landlords. However, in the case *sub judice*, it would be inequitable to allow the sale to occur unless the signage requirements and use and operations clauses of the Taubman Leases are complied with, as required by 11 U.S.C. §365(d)(3), and there is a clear showing that a balance of equity favors the tenant. The duration of the sale is of major concern to the Taubman Landlords. Obviously, a limited period is in the best interests of the neighboring tenants and the landlords, and the Taubman Landlords would suggest a six (6) week sale period (i.e. through the end of August 2009) is a sufficient balancing of the interests of all concerned parties. Also, to the extent the debtors are proposing to have a liquidator pay "occupancy costs" on a per diem basis, such practice has been rejected by the Courts in the Sixth Circuit and elsewhere. *See, e.g. In re: Koenig Sporting Goods, Inc.*, 203 F.3d 986 (6th Cir. 2000), *In re: Ha-Lo Industries*, 343 F.3d 794 (7th Cir. 2003), *In re: ZB Company, Inc.*, 302 B.R. 316, 319 (Bankr. D. Del. 2003); *citing In re: Montgomery Ward Holding Corp.*, 268 F.3d 205, 209 (3rd Cir. 2001).

19. The GOB aspect of the debtors' motion seeks a grant of authority to organize, advertise and otherwise conduct the going out of business sales pursuant to the debtors' agent's (or

assignee's) own discretion without regard to the limitations of the Taubman Leases. Section 9.01[3] and Exhibit B of the Taubman Leases govern the manner in which the debtors may post signage at the leased premises and Sections 7.01 and 7.02 of the Taubman Leases govern the manner in which the debtors may conduct their operations and advertise their businesses. To the extent the debtors' GOB motion seeks authority to breach these covenants, the requirements of Section 365(d)(3) prohibit such relief and the Taubman Landlords object to such request. Specifically, debtors' proposed sale guidelines are faulty for the following reasons:

      a.      There is no prohibition against attaching signage to the windows at the store front as there should be. Debtors should be required to place their signs on a pedestal at least two feet back from the windows.

---

[3] Section 9.01 of the Taubman Leases governing signage at the leased premises provide as follows:

> **Section 9.01. SIGNS.** Tenant shall affix a sign to the exterior surface of the storefront of the leased premises fronting on the enclosed Mall and shall maintain said sign in good condition and repair during the entire term of this Lease. Said sign shall conform to the criteria for signs contained in Exhibit B, and the size, content, design and location thereof shall be subject to the prior written approval of Landlord. Except as hereinabove mentioned, Tenant shall not place or cause to be placed, erected or maintained on any exterior door, wall, window or the roof of the leased premises, or on the glass of any window or door of the leased premises, or on any sidewalk or other location outside the leased premises, or within any display window space in the leased premises, or within three (3) feet of the front of the storefront or opening, whether or not there is a display window space in the leased premises, or within any entrance of the leased premises, or otherwise visible from the Mall, any sign (flashing, moving, hanging, handwritten, or otherwise), decal, placard, decoration, flashing, moving or hanging lights, lettering or any other advertising matter of any kind or description. Moreover, Tenant is prohibited from utilizing any displays which are not part of the fixture plan approved in writing by Landlord for the leased premises. If Tenant places or causes to be placed or maintained any of the foregoing, the same may be removed by Landlord or Landlords' representative without notice and without such removal constituting a breach of this Lease or entitling Tenant to claim damages on account thereof. No symbol, design, name, mark or insignia adopted by Landlord for the Shopping Center shall be used without the prior written consent of Landlord. No illuminated sign located in the interior of the leased premises and which is visible from the outside thereof shall be permitted without the prior written approval of Landlord. All signs located in the interior of the leased premises shall be in good taste and professionally printed so as not to detract from the general appearance of the leased premises and the Shopping Center.

b. Landlords should be allowed to barricade a store front after the sale is completed.

c. The sale should be concluded within a reasonable period of time, and certainly before the debtors' deadline to assume or reject the leases pursuant to §365(d)(4).

d. The debtors should not be entitled to extend the sale date without the Landlords' written consent.

e. The liquidator should be required to submit gross sales reports directly to the landlords. Percentage rent, if any becomes due, should be calculated and paid by the debtors' on a monthly basis as an administrative expense.

f. There should be a prohibition on any solicitation of customers (whether in writing or not) outside of the Premises.

g. There should be no more than one sign in any front window of the stores and the signs may not take up more than 50% of the window space.

h. Only one interior banner no larger than 3' x 8' may be hung. The interior banner may only be hung in the rear third of the store.

i. Total additional in-store signage must be limited to four 24" x 36" signs per 1,000 square feet of store floor area.

j. The debtors and any agent must be required to repair any damage caused by the placement of any signage.

k. The Guidelines should specify that no interior or exterior balloons are permitted.

l. There should be no sign walkers, sandwich boards or street signage. No sign walkers should be used on mall property, immediately adjacent streets, or ring roads.

m. It should be made clear that no signs or advertisements can use the terms "bankruptcy," "bankruptcy liquidation," "lost our lease," or use similar themes.

n. There should be no auctions.

o. Only furniture, fixture and equipment ("FF&E") owned by debtor should be sold and must be removed through exists designated by the objecting landlords.

p. To the extent the debtors propose to bring additional inventory to the leased premises, all such inventory must be in compliance with the requirements of Sections 7.01 and 7.02 of the Taubman Leases pursuant to Section 365(d)(3) of the Bankruptcy Code.

q. The sale must be conducted on all days and for all hours that the shopping centers' rules require.

r. The sale must be subject to a provision which permits the landlord an expedited hearing with respect to violations of sale guidelines.

### III. Cure Claims Objection

20. Bankruptcy Code Section 365(b)(2), governs the financial obligations of a debtor which wishes to assume and assign a lease. Section 365(b) provides in pertinent part as follows:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, <u>for any actual pecuniary loss to such party resulting from such default</u>; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

(Emphasis added).

21. The Taubman Landlords assert that the requirements of Section 365(b)(1)(B) include compensation to the landlord for sums incurred for attorneys' fees in connection with the bankruptcy case. *See, In re: F&N Acquisition Corp.*, 152 B.R. 304 (W.D.Wash. 1993); *In re: Westworld Community Healthcare, Inc.*, 95 B.R. 730 (C.D.Cal. 1989); *In re: Ryan's Subs, Inc.*, 25 Bankr. Ct. Dec. 649 (W.D.Md. 1994); and *In re: Child World, Inc.*, 161 B.R. 349 (S.D.N.Y. 1993) (Section 365(b)(1)(B) allows for recovery of attorneys' fees if based upon the language of the lease). The Taubman Landlords' lease has language in Articles XI and XIX which requires the reimbursement of attorneys' fees in connection with proceedings of this kind.

22. Pursuant to the terms of section 365 of the Bankruptcy Code, the debtors can only assume and assign what rights they have under the Taubman Leases.

23. The cure amounts necessary to assume the Taubman Leases with the debtors through July 14, 2009, not including pecuniary losses incurred by the landlords, additional amounts due after July 14, 2009, and year-end adjustments for common area maintenance, taxes, and percentage rent are as follows:

| **Debtors' Store** | **Shopping Center** | **Lease Cure Amount** | **Attorneys' Fees** | **Total Cure Amount** |
|---|---|---|---|---|
| 170 | Cherry Creek | $0.00 | $2,000.00 | $2,000.0 |
| 55 | Fair Oaks | $0.00 | $2,000.00 | $2,000.00 |
| 763 | Great Lakes Crossing | $705.79 | $2,000.00 | $2,705.79 |
| 802 | MacArthur Center | $0.00 | $2,000.00 | $2,000.00 |
| 943 | Northlake Village | $298.07 | $2,000.00 | $2,298.07 |
| 972 | Partridge Creek | $1,415.53 | $2,000.00 | $3,415.53 |
| 42 | Twelve Oaks | $1,299.36 | $2,000.0 | $3,299.36 |
| 24 | Woodfield | $0.00 | $2,000.00 | $2,000.00 |

Copies of Account Status Reports showing all amounts due and owing are attached hereto as "Exhibit 1."

Wherefore, the Taubman Landlords request that the debtors' motion to assume and assign the Taubman Leases be denied, and in the event of assumption of the leases that the debtors be required to cure all outstanding defaults, that going out of business sales be subject to the additional requirements set forth above, that the cure amounts be established in the amounts set forth above, and that the Taubman Landlords be awarded their costs and attorneys' fees incurred in connection with this objection.

Dated: July 14, 2009

Andrew S. Conway
Attorney for The Taubman Landlords

By:       /s/ Andrew S. Conway
      Andrew S. Conway
      200 East Long Lake Road, Suite 300
      Bloomfield Hills, MI 48304
      (248) 258-7427

and

Cooch and Taylor, P.A.
Local Counsel for The Taubman Landlords

By:  /s/ Susan E. Kaufman
      Susan E. Kaufman, (DSB 3381)
      1000 West Street, 10th Floor
      Brandywine Building
      PO Box 1680
      Wilmington, DE 19899-1680
      (302) 984-3800/(302) 984-3939 Fax
      skaufman@coochtaylor.com