IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- X
In re:                                                          :   Chapter 11
                                                                :
EDDIE BAUER HOLDINGS, INC., *et al.*,                           :   Case No. 09-12099 (MFW)
                                                                :
                                                                :   Jointly Administered
                        Debtors.                                :
                                                                :   Related Docket No. 24
                                                                :
                                                                :   Hearing Date: July 22, 2009 at 9:30 a.m.
---------------------------------------------------------------- X

## THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' STATEMENT IN SUPPORT OF DEBTORS' SALE MOTION

**TO THE HONORABLE MARY F. WALRATH**
**UNITED STATES BANKRUPTCY JUDGE:**

The Official Committee of Unsecured Creditors (the "Committee") of Eddie Bauer Holdings, Inc. and its affiliated debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors" or "Eddie Bauer"), by and through its proposed counsel Cooley Godward Kronish LLP and Benesch, Friedlander, Coplan & Aronoff LLP, hereby submits this statement in support (this "Statement in Support") of the Debtors' motion (the "Sale Motion") for entry of an order (a) approving the sale of the Debtors' assets free and clear of all liens, claims, encumbrances and interests; (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases; (c) establishing rejection procedures and guidelines for conducting store closing sales; and (d) extending the deadline to assume or reject unexpired leases of nonresidential real property, dated June 17, 2009 (Doc. No. 24), and respectfully represents as follows:

## BACKGROUND

1. On June 17, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware. Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and properties as debtors-in-possession. No trustee or examiner has been appointed in these cases.

2. On the Petition Date, the Debtors filed (I) the Sale Motion and (II) that motion for a final order (i) authorizing the Debtors to obtain postpetition financing pursuant to that certain agreement among the Debtors, Bank of America, N.A. and other lenders and agents party thereto (collectively, the "Revolving Lenders" or the "DIP Lenders"), (ii) authorizing the Debtors to use the cash collateral of (a) the Revolving Lenders and (b) Wilmington Trust FSB and other lenders and agents party to that certain prepetition term credit agreement (collectively, the "Term Lenders" and together with the DIP Lenders, the "Lenders"), and (iii) granting certain liens, superpriority claims and other adequate protection to the Lenders, dated June 17, 2009 (Doc. No. 14) (the "DIP Financing Motion").

3. On June 25, 2009, the Committee was appointed in these cases by the Office of the United States Trustee for the District of Delaware, consisting of the following seven members: (i) The Bank of New York Mellon, as Indenture Trustee; (ii) Tara Hill, c/o Marc Primo, Esq., Initiative Legal Group LLP; (iii) RR Donnelley & Sons Company; (iv) Simon Property Group; (v) GGP Limited Partnership; (vi) AQR Capital; and (vii) Highbridge International LLC. On that same day, the Committee selected Cooley Godward Kronish LLP as its proposed lead counsel, Benesch, Friedlander, Coplan & Aronoff LLP as its proposed local counsel, and Capstone Advisory Group, LLC as its proposed financial advisors.

4. On June 30, 2009, the Court granted the relief requested in Part I of the Sale Motion and entered that Order (A) Establishing Bidding and Auction Procedures Related to the Sale of All of the Debtors' Assets; (B) Approving Bid Protections for the Sale of All of the Debtors' Assets; (C) Scheduling an Auction and Sale Hearing for the Sale of All of the Debtors' Assets; (D) Establishing Certain Notice Procedures for Determining Cure Amounts for Executory Contracts and Leases to be Assigned; and (E) Granting Certain Related Relief (the "Bid Procedures Order").

5. Following a hearing held on July 7, 2009 (the "Final DIP Hearing"), the Court entered an order on July 8, 2009 granting the DIP Financing Motion, with modifications, on a final basis (the "Final DIP Order")

6. Pursuant to the Bid Procedures Order, (i) an auction for the sale of all or substantially all of the Debtors' assets was held on July 16, 2009 (the "Auction"), at the conclusion of which the Debtors' announced the Successful Bid (defined below) as the highest or otherwise best bid for the purchase of the Debtors' assets, and (ii) a hearing to approve the Successful Bid was scheduled for July 22, 2009 (the "Sale Hearing").

## STATEMENT IN SUPPORT

7. The Committee's primary focus since its formation has been to (i) maximize the value of the Debtors' assets, including the assets which are not the Prepetition Lenders' collateral; (ii) minimize the remaining administrative and priority claims, and (iii) produce a return to general unsecured creditors. The selection of Everest Holdings LLC (the "Successful Bidder") as the highest and best bidder for the purchase of substantially all of the Debtors' assets (the "Successful Bid") at the conclusion of the Auction is a giant step forward in meeting these important estate goals. However, it is not nearly the final step in the process. The Committee

submits this Statement in Support to not only voice its support for the results of the 15-1/2 hour Auction, but also to ensure that the net proceeds of this sale are not prematurely distributed to the Term Lenders, who have not so much as agreed to fund the administrative accruals of these estates or any of the Section 506(c) expenses of preserving and disposing of their prepetition collateral. The Committee respectfully submits that without the Court's guidance and direction on the allocation of sale proceeds to unencumbered assets and what may and may not be distributed to the Term Lenders following the closing, the potential benefits of the Successful Bid to these estates may be lost at the expense of unsecured creditors.

### A. Sale Proceeds Of Unencumbered Assets Must Be Preserved

8. As first argued in the Committee's objection to the DIP Financing Motion, and as joined on the record by counsel for the Debtors at the DIP Hearing,[1] the Term Lenders do not hold valid and perfected prepetition liens on certain assets of the Debtors proposed to be sold to the Successful Bidder, including the Chicago IT Center and possibly other owned real property, real estate leases and the enterprise value they represent, one third of the equity in the Canadian Debtors and avoidance actions. Rather, the Term Lenders have only adequate protection liens and claims on these assets (excluding avoidance actions) as provided in the Final DIP Order. As both the Debtors and the Committee articulated at the Final DIP Hearing, and the Court memorialized in the Final DIP Order, the Term Lenders must first satisfy their affirmative evidentiary burden to show "actual" diminution in value of their prepetition collateral before they are entitled to share in the proceeds of previously unencumbered assets.[2] The Term Lenders have not provided any evidence of diminution in value of their prepetition collateral. Therefore,

---

[1] See Transcript of Final DIP Hearing at p. 67-68. A copy of this transcript is annexed hereto as Exhibit A.

[2] See e.g., Final DIP Order at paragraph 4 (p. 26) ("Adequate Protection for Pre-Petition Obligations").

a dollar value must be allocated or assigned to these unencumbered assets, either consensually by the parties or upon further order of the Court, and under no circumstances should any of the proceeds of the unencumbered assets be distributed to the Term Lenders until they satisfy their evidentiary burden to prove an actual diminution in value of their prepetition collateral in connection with their adequate protection liens and claims. These estates should not be forced to waste precious resources chasing at least forty-three (43) Term Lenders for the return of sale proceeds that they were not entitled to in the first place.[3]

9. Proceed allocation is critical to the Committee, as the proceeds of the Debtors' unencumbered assets may represent the only source of recovery for unsecured creditors, and certainly represent the Committee's only source of funding to prosecute potentially valuable estate causes of action related to the Term Lenders' prepetition liens, claims and conduct. As the Court has previously been advised, the Term Lenders' prepetition claim is believed to have increased by more than $22,000,000 within the 90-days prior to the Petition Date through an amendment (the "Term Amendment") to the Prepetition Term Credit Agreement executed on April 2, 2009. In addition to other consideration received by the Term Lenders under the Term

---

[3] As of July 14, 2009, the Term Lenders consisted of the following entities: AMMC CLO IV LTD, AMMC CLO V LTD, AMMC VIII LTD, ANCHORAGE CAPITAL MASTER OFFSHORE, LTD., ANCHORAGE CROSSOVER CREDIT FINANCE, LTD., AURUM CLO 2002-1 LTD, BALLYROCK CLO 2006-1 LTD, BALLYROCK CLO 2006-2 LTD, BALLYROCK CLO II LIMITED, BALLYROCK CLO III LIMITED, BATTALION CLO 2007-I LTD, BLACKWELL PARTNERS LLC, CENT CDO 14 LTD, CENT CDO 15 LTD, COLISEUM CAPITAL PARTNERS, LP, CONCORDIA INSTITUTIONAL MULTI-STRATEGY LTD., CONCORDIA MAC 29 LTD, CONCORDIA PARTNERS, L.P., CREDIT SUISSE LOAN FUNDING LLC, DRY BROOK CR OPP MASTER FD LTD, FIDELITY ADVISOR SERIES I: FIDELITY ADVISOR FLOATING RATE HIGH INCOME FUND, FLAGSHIP CLO III, FLAGSHIP CLO IV, FLAGSHIP CLO V, FLAGSHIP CLO VI, GORDON BROTHERS BRANDS, LLC, H SENIOR INCOME FUND LLC, HEB FUNDING, LLC, JPMORGAN CHASE BANK, N.A., LFSIGXG LLC, LOEWS CORPORATION, MARINER LDC, MARINER TRICADIA CREDIT STRATEGIES MASTER FUND, LTD, MONARCH MASTER FUNDING LTD, NACM CLO II, NATIONWIDE LIFE INS CO, PENSION INVESTMENT COMMITTEE OF GENERAL MOTORS FOR GENERAL MOTORS EMPLOYEES DOMESTIC GROUP PENSION TRUST, SERENGETI LOXODON ONSHORE I LTD., SERENGETI LOXODON OVERSEAS I LTD., TCW SHARED OPPORTUNITY FUND V, L.P., TRICADIA DISTRESSED AND SPECIAL SITUATIONS MASTER FUND, LTD, and WHITEHORSE V LTD.

Amendment (described below), the Debtors paid the Term Lenders an "amendment fee" of approximately $1,900,000 on April 3, 2009, without new funding or waivers from the Term Lenders. Rather, in exchange for the minimal relaxation of certain financial covenants under the Prepetition Term Credit Agreement at a time when (a) Eddie Bauer's prepetition sale efforts were well under way and (b) Eddie Bauer was not suffering liquidity problems, the Term Lenders received at least $24,000,000 in value comprised of the following:

- a cash amendment fee of approximately **$1,900,000**, earned and paid on April 3, 2009, representing the amount equal to 1% of the outstanding principal balance due under the Prepetition Term Credit Agreement as of April 3, 2009;

- another cash amendment fee of approximately **$3,800,000**, earned as of April 3, 2009 and payable on November 30, 2009, representing the amount equal to 2% of the outstanding principal balance due under the Prepetition Term Credit Agreement as of April 3, 2009;

- an initial PIK fee of approximately **$9,471,699.19**, representing the sum of (i) an amount equal to 5% of the outstanding principal balance due under the Prepetition Term Credit Agreement as of April 3, 2009, and (ii) PIK interest accruing initially at the Eurodollar Rate for a six-month interest period. The First PIK Fee is deemed earned on April 3, 2009 and payable April 1, 2014 under the Term Amendment;

- a second PIK fee of approximately **$9,221,551.57**, representing the sum of (i) an amount equal to 5% of the outstanding principal balance due under the Prepetition Term Credit Agreement (inclusive of the First PIK Fee) as of July 2, 2009, and (ii) PIK interest initially accruing at the Eurodollar Rate for a six-month interest period. The Second PIK Fee is deemed earned and payable on July 2, 2009 under the Term Amendment; and

- interest rates were increased 3.5% or more per annum on the outstanding principal balance due under the Prepetition Term Credit Agreement.[4]

---

[4] In addition to the foregoing, the Term Amendment also provided for: (i) Eddie Bauer's agreement to issue warrants to the Term Lenders for the aggregate purchase of 19.9% of Eddie Bauer Holdings, Inc.'s common stock (as of April 3, 2009) at $.01 per share; (ii) the Term Lenders' right to appoint up to three directors to sit on Eddie Bauer's board of directors; and (iii) a decrease in Eddie Bauer's permitted capital expenditures from (a) $60,000,000 to $20,000,000 for 2009 and (b) $70,000,000 to $20,000,000 for 2010.

The Committee has a duty to fully investigate these transfers and all other potential causes of action against the Term Lenders and should not be left without the necessary funding to prosecute such claims for the benefit of the Debtors' estates and creditors, particularly where a definitive source of funds exist and the Committee's access to such funds rests within the sound discretion of this Court as discussed below.

### B. Sale Proceeds Sufficient To Cover A Section 506(c) Surcharge Must Be Preserved

10. At the Final DIP Hearing, and over the objection of the Term Lenders, this Court preserved the Debtors' rights under section 506(c) of the Bankruptcy Code to surcharge the Term Lenders for the cost and expense of preserving and disposing of their prepetition collateral. A surcharge against the Term Lenders' collateral could be asserted to pay the millions of dollars in costs and expenses not otherwise paid for at or prior to closing, including, without limitation, professional fees, transaction fees, operating expenses, inventory counts, payroll and employee incentive programs, section 503(b)(9) claims, and sales and use taxes.

11. The preservation of this critical right to surcharge the Term Lenders' collateral was fought hard for by both the Debtors and the Committee (and was ultimately granted by this Court) because the Term Lenders, unlike their prepetition counterparts, have merely consented to the Debtors' use of cash collateral to liquidate their collateral through an expedited chapter 11 sale process, without any additional agreement to fund the administrative accruals of these estates. The issue of whether and to what extent the Debtors can or will surcharge the Term Lenders' collateral is not ripe for the Sale Hearing, as it is well settled that section 506(c) applies from the date of the filing of the petition through confirmation. *See e.g., Telfair v. First Union Mortgage Corp.*, 216 F.3d 1333 (11th Cir. 2000), *cert. denied*, 531 U.S. 1073 (2001). The

Committee respectfully requests this Court to maintain the status quo and preserve the Debtors' right to surcharge the Term Lenders' collateral.

C. **The Court Is Not Required To Direct The Turnover Of Sale Proceeds To The Term Lenders And These Estates Will Not Be Prejudiced By The Preservation of Sale Proceeds**

12. The Bankruptcy Code does not provide for the payment of prepetition claims before confirmation of a plan of reorganization and the Term Lenders, who did not provide the Debtors with any postpetition financing and who are the primary beneficiaries of the three week sale process, certainly do not warrant exception to the general rule. *See, e.g., Chiasson v. Matherne & Assoc. (In re Oxford Mgmt., Inc.)*, 4 F.3d 1329, 1334 (5th Cir. 1993) (holding bankruptcy court improperly allowed the payment of postpetition funds to satisfy prepetition claims and noting that "[n]either the appellees nor the bankruptcy court cited a specific provision of the Code that would allow the payment of post-petition funds to satisfy prepetition claims"); *Crowe & Assocs., Inc. v. Bricklayers & Masons Union Local No. 2 (In re Crowe & Assocs.)*, 713 F.2d 211, 216 (6th Cir. 1983) (bankruptcy courts do not have the power to authorize debtors to pay prepetition claims prior to a plan of reorganization); *In re Allegheny Intl, Inc.*, 118 B.R. 282, 296 (W.D. Pa. 1990) ("It is beyond dispute that a debtor may not pay creditors outside of a plan of reorganization.").

13. Accordingly, this Court is undoubtedly authorized to stay any distribution to the Term Lenders until confirmation of a plan in these chapter 11 cases. Given the facts and circumstances of these cases – the significant unencumbered proceeds, the potentially valuable estate causes of action against the Term Lenders, the preservation of the Debtors' surcharge right and the Term Lenders' unmitigated refusal to "pay to play" – the Committee respectfully requests this Court to use its discretion to deny the Term Lenders any distribution of sale

proceeds until confirmation of a chapter 11 plan in these cases. Moreover, the Committee will dispute at the Sale Hearing the Term Lenders' bald assertion that they are oversecured creditors "entitled" to immediate payment of principal and accrued postpetition interest. The Term Lenders, in what has become their typical fashion, would have this Court simply subtract the DIP Revolver from the Successful Bid and declare the Term Lenders oversecured, without any consideration given to unencumbered proceed allocation, administrative accruals, a potentially substantial section 506(c) surcharge and the Term Lenders' glaring prepetition claim exposure.

14. Alternatively, the Committee submits that the Court should stay any distribution of sale proceeds to the Term Lenders until the earlier of (i) the date the Committee waives its right to challenge the Term Lenders' liens, claims and conduct, (ii) the date by which any such challenge is fully and finally resolved by agreement of the parties or order of this Court, and (iii) the date this Court allows the Term Lenders' claims on a final basis. Under all circumstances, the Court should stay any distribution to the Term Lenders until the Debtors have been provided an opportunity to analyze, assert and, if necessary, prosecute a section 506(c) surcharge claim and further stay any distribution to the Term Lenders of sale proceeds allocated to previously unencumbered assets of the Debtors until such time as the Term Lenders meet their affirmative burden to prove actual diminution in value of their prepetition collateral.

[signature on following page]

Dated: July 21, 2009
Wilmington, Delaware

Respectfully Submitted,

By: /s/ Bradford J. Sandler

BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
(302) 442-7007
(302) 442-7012 (Facsimile)
Bradford J. Sandler (No. 4204)

-and-

COOLEY GODWARD KRONISH LLP
1114 Avenue of the Americas
New York, New York 01136
(212) 479-6000
(212) 479-6275 (Facsimile)
Jay R. Indyke (JI 0353)
Cathy R. Hershcopf (CH 5875)
Seth Van Aalten (SV 2663)

*Proposed Local and Lead Counsel For The Official Committee Of Unsecured Creditors Of Eddie Bauer Holdings, Inc., et al.*