IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>EBHI HOLDINGS, INC.,<br>et al.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 09-12099 (MFW)<br><br>Jointly Administered<br><br>Ref. Docket Nos. 508 and 603 |

**DEBTORS' RESPONSE TO OBJECTION OF DISTRIBUTION
MANAGEMENT GROUP, INC. TO PARTIAL ASSUMPTION AND
ASSIGNMENT OF DMG-FEDEX CONTRACTS AND DMG
CONFIDENTIALITY AGREEMENT TO EVEREST HOLDINGS LLC**

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") hereby file this response (the "**Response**") to the objection (the "**Objection**") of Distribution Management Group, Inc. ("**DMG**") to the assumption and assignment of certain contracts to Everest Holdings LLC ("**Everest**") pursuant to the terms and conditions of the Order (A) Approving the Sale of the Debtors' Assets Free and Clear of all Liens, Claims, Encumbrances, and Interests; (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (C) Establishing Rejection Procedures and Guidelines for Conducting Store Closing Sales; and (D) Extending the Deadline to Assume or Reject Unexpired Leases of Nonresidential Real Property Pursuant to 11 U.S.C. § 365(D)(4) (the

---

[1] The Debtors in these cases, along with the last four digits of each Debtors's federal tax identification number, are: Eddie Bauer Holdings, Inc., a Delaware corporation (2352); Eddie Bauer, Inc., a Delaware corporation (9737); Eddie Bauer Fulfillment Services, Inc., a Delaware corporation (0882); Eddie Bauer Diversified Sales, LLC, a Delaware limited liability company (1567); Eddie Bauer Services, LLC, an Ohio limited liability company (disregarded), Eddie Bauer International Development, LLC, a Delaware limited liability company (1571); Eddie Bauer Information Technology, LLC, a Delaware limited liability company (disregarded); Financial Services Acceptance Corporation, a Delaware corporation (7532); and Spiegel Acceptance Corporation, a Delaware corporation (7253). The mailing address for Eddie Bauer Holdings, Inc. is 10401 N.E. 8th Street, Suite 500, Bellevue, WA 98004. On or about the Petition Date, Eddie Bauer of Canada, Inc. and Eddie Bauer Customer Services, Inc., affiliates of the Debtors, commenced a proceeding before the Superior Court of Justice, Commercial List, for the Judicial District of Ontario, for a plan of compromise or arrangement under the Companies' Creditors Arrangement Act.

"**Sale Order**")[2] [Docket Number 508]. In support of this Response, the Debtors respectfully state as follows:

## BACKGROUND

**A.     The Debtors' Various Pre-Petition Contracts with DMG and FedEx**

1.     The Debtors had arrangements with numerous shippers, including FedEx Corporate Services, Inc. ("**FedEx**") and UPS. In early 2008, prior to the Petition Date (defined below), the Debtors began to explore whether they could obtain superior shipping rates by entering into a contract with a single shipper.

2.     On or about January 8, 2008, the Debtors and FedEx entered into a Confidentiality and Non-Disclosure Agreement (the "**FedEx Confidentiality Agreement**") attached hereto as Exhibit EB-1. EB-1 at 4; Deposition of Earl Devanny, 8:23-9:4, attached hereto as Exhibit EB-13. The Debtors entered into the FedEx Confidentiality Agreement so the Debtors and FedEx could exchange confidential information and enable FedEx to submit a proposal to be the Debtors primary or sole shipper. EB-1 at 1; Deposition of Earl Devanny, 9:14-23.

3.     FedEx submitted a proposal to the Debtors. Deposition of Earl Devanny, 10:14-19. After receiving the proposal, the Debtors determined they may be able to get even better shipping rates if they were to engage a broker/consultant for the purpose of assisting the Debtors in their negotiations with FedEx and other shippers. Deposition of Earl Devanny, 10:14-11:2. On or about September 26, 2008, the Debtors and DMG entered into a Confidentiality and Non-Disclosure Agreement (the "**DMG Confidentiality Agreement**") attached hereto as Exhibit EB-2. EB-2 at 3. The Debtors entered into the DMG Confidentiality Agreement (and similar confidentiality and non-disclosure agreements with other broker/consultants that the

---

[2]     Capitalized terms used herein shall have the meanings ascribed to them in the Sale Order.

Debtors were considering) so the Debtors could provide confidential and proprietary information to DMG in connection with DMG's proposal to represent the Debtors and, if DMG were hired, in connection with DMG's representation of the Debtors in negotiations with FedEx and other shippers. Deposition of Earl Devanny, 11:13-19.

4. After discussions with various broker/consultants, the Debtors chose to hire DMG. Deposition of Earl Devanny, 10:20-11:2. On or about August 13, 2008, the Debtors and DMG entered into a Consulting and Confidentiality Agreement (the "**DMG Consulting Agreement**"), attached hereto as Exhibit EB-3, which was drafted by DMG. Deposition of Earl Devanny, 13:12. DMG thereafter performed certain services for the Debtors under this agreement. Working with the Debtors, DMG prepared Requests for Proposal identifying the Debtors' shipping needs, and proposing discounted pricing the Debtors sought. Deposition of Earl Devanny, 13:24-16:1. A Small Parcel Request for Proposal was transmitted to FedEx on behalf of the Debtors on September 15, 2008 and is attached hereto as Exhibit EB-4. See also Deposition of Earl Devanny, 14:18-20. DMG also prepared a Small Parcel Request for Proposal to UPS on behalf of the Debtors, attached hereto as Exhibit EB-5. See also Deposition of Earl Devanny, 16:1. In exchange for its services, DMG was to be, and was prior to the June 17, 2009 Petition Date, paid a commission based on a percentage of the savings the Debtors obtained on shipping rates as a result of DMG's services. EB-3 at 1.

5. On October 4, 2008, FedEx delivered its proposal to Eddie Bauer, attached hereto as Exhibit EB-6. Deposition of Earl Devanny, 16:21-22. Similarly, UPS prepared and submitted a proposal, attached hereto as Exhibit EB-7. Deposition of Earl Devanny, 17:12.

6. After negotiations, on October 23, 2008, the Debtors entered into a Pricing Agreement with FedEx (the "**FedEx Pricing Agreement**"), attached hereto as Exhibit EB-8.

EB-8 at 3. Also on October 23, 2008, the Debtors entered into a Service Agreement with FedEx SmartPost, Inc. (the "**FedEx SmartPost Service Agreement**"), attached hereto as <u>Exhibit EB-9</u>. EB-9 at 5. The FedEx Pricing Agreement was subsequently amended on or about December 1, 2008 (the "**FedEx Pricing Agreement First Amendment**"), attached hereto as <u>Exhibit EB-10</u>. EB-10 at 1. The FedEx Pricing agreement was again amended on or about March 20, 2009, (the "**FedEx Pricing Agreement Second Amendment**"), attached hereto as <u>Exhibit EB-11</u>. EB-11 at 1.

**B. The Debtors' Bankruptcy Cases, the Sale of Their Assets and Related Assumption of Executory Contracts**

7. The Debtors commenced the above-captioned cases (the "**Chapter 11 Cases**") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code on June 17, 2009 (the "**Petition Date**").

8. On June 17, 2009, the Debtors filed a motion pursuant to which they sought to sell substantially all of their assets and assume and assign certain executory contracts to the proposed buyer. [Docket No. 24]. Additionally, on June 30, 2009, the Debtors filed a Notice of Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances and Interests (the "**Sale Notice**") [Docket No. 297] pursuant to which the Debtors provided notice that they were selling substantially all of their assets. Paragraph 4 of the Sale Notice provides that "[o]bjections, if any, to the proposed cure amount, or to the possible assumption of an executory contract" must be made before 4:00 p.m. on July 16, 2009. As set forth in the Affidavit of Service of David J. Steinahfel [Docket No. 314], the Sale Notice was served on each of DMG and FedEx on July 2, 2009.

9. On June 30, 2009, the Debtors also filed the Notice of (I) Cure Amount with Respect to Executory Contracts to be Assumed and Assigned and (II) Potential Assumption

and Assignment of Executory Contracts (the "**Notice of Potential Assumption and Assignment**") [Docket No. 299] as required by the Order Pursuant to 11 U.S.C. §§ 105(A), 363, 365, and Bankruptcy Rules 2002, 6004, 6006 (A) Establishing Bidding and Auction Procedures Related to the Sale of All of the Debtors' Assets; (B) Approving Bid Protections for the Sale of All of the Debtors' Assets; (C) Scheduling an Auction and Sale Hearing for the Sale of All of the Debtors' Assets; (D) Establishing Certain Notice Procedures for Determining Cure Amounts for Executory Contracts and Leases to be Assigned; and (E) Granting Certain Related Relief (the "**Bidding Procedures Order**") [Docket No. 222] entered by this Court on June 30, 2009.

10. Paragraph 1 of the Notice of Potential Assumption and Assignment provided notice that the Debtors are party to various executory contracts and unexpired leases (the "**Contracts**"), as set forth on Exhibit 1 of the Notice of Potential Assumption and Assignment, and that the Debtors intended to seek to assume and assign some or all of the Contracts in connection with the proposed sale of the Debtors' assets. Exhibit 1 included, among other Contracts, the FedEx Confidentiality Agreement, the DMG Confidentiality Agreement, the DMG Consulting Agreement, the FedEx Pricing Agreement, and the FedEx SmartPost Service Agreement. Paragraph 4 of the Notice of Potential Assumption and Assignment provided that objections, if any, to the possible assumption and assignment of any contract listed on Exhibit 1 must be served and filed before 4:00 p.m. on July 16, 2009. As set forth in the Affidavit of Service of Patrick J. Ivie [Docket No. 301], the Notice of Potential Assumption and Assignment was served on each of DMG and FedEx on July 2, 2009.

11. Despite being served with both the Sale Notice and the Notice of Potential Assumption and Assignment containing the July 16, 2009 objection deadline, DMG did not file an objection prior to the July 16, 2009 objection deadline.

12. After a spirited auction, Everest was identified as the party who had submitted the highest and best bid for the Debtors' assets. On July 23, 2009, after a lengthy sale hearing at which numerous objections were resolved, this Court entered the Sale Order approving the sale of substantially all of the Debtors' assets to Everest. [Docket Number 508]. Paragraph 10 of the Sale Order permitted the assumption and assignment of executory contracts, including the contracts at issue, to Everest upon Everest's designation of which contracts Everest wished to be assumed and assigned. Paragraph 10 further provided that "[e]ach counterparty to a Potentially Assumed Contract...is forever barred, estopped, and permanently enjoined from raising or asserting against the Debtors...any assignment fee, default, breach, claim, pecuniary loss, liability or obligation...arising under or related to the Potentially Assumed Contracts that Everest elects to have assumed and assigned to it existing as of the Closing Date or arising by reason of Closing."

13. On August 4, 2009, the Debtors filed a Notice of Assumption and Assignment of Executory Contracts [Docket Number 557] which identified the contracts that the Debtors sought to assume and assign to Everest. Among other Contracts, the FedEx Confidentiality Agreement, the DMG Confidentiality Agreement, the FedEx Pricing Agreement, and the FedEx SmartPost Service Agreement (collectively, the "**Assumed Contracts**") were Contracts that the Debtors assumed and assigned to Everest. The DMG Consulting Agreement was not assumed and assigned by the Debtors and, accordingly, was not listed on the Assumption Notice.

14. On August 13, 2009, **four weeks after the objection deadline**, DMG filed the Objection, arguing that the DMG Consulting Agreement and the Assumed Contracts

constitute a single agreement and that the Assumed Contracts cannot be assumed unless the DMG Consulting Agreement is also assumed.

15. On October 8, 2009, the Debtors filed a Notice of Rejection of Unexpired Executory Contract [Docket Number 842] providing notice of the Debtors' intent to reject the DMG Consulting Agreement.

## RESPONSE

### A. The Objection is Procedurally Improper and Should be Overruled

16. As an initial matter, the Objection is procedurally improper. DMG styled the Objection as an objection to the Notice of Assumption and Assignment of Executory Contracts, but the assumption and assignment of the Assumed Contracts referenced in that notice was already approved by the Sale Order. Since the Sale Order was entered and had become a final order before the Objection was even filed, at best the Objection is an improper request to alter or amend the Sale Order without meeting any of the requirements of the Bankruptcy Rules or Local Rules for doing so.

17. DMG must meet the requirements of Federal Rule of Civil Procedure 59(e) ("**Rule 59(e)**"), made applicable here by Rule 9023 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), if it wants to alter or amend the Sale Order. DMG failed to file the Objection within the ten-day period established by Rule 59(e). The Sale Order was entered on July 23, 2009, and therefore the ten-day period required under Rule 59(e) ended on August 2, 2009. Nonetheless, DMG waited until August 13, 2009 to file its Objection.

18. Having missed the 10-day deadline required by Rule 59(e), if DMG seeks to amend the Sale Order, DMG may only proceed under Federal Rule of Civil Procedure 60(b) ("**Rule 60(b)**"), made applicable here by Rule 9024 of the Bankruptcy Rules. Rule 60(b) allows a party to seek relief from a final judgment or order if the party shows "(1) mistake,

inadvertence, surprise, or excusable neglect; (2) newly discovered evidence . . .; (3) fraud . . .; (4) the judgment is void; (5) . . . it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment." Id. Rule 60(b) motions are "generally granted only upon a showing of exceptional circumstances," Mendel v. Gollust, 909 F.2d 724, 731 (2d Cir. 1990); see also Gonzales v. Crosby, 545 U.S. 524, 535 (2005) (requiring a movant seeking Rule 60(b) relief to show "extraordinary circumstances").

19. DMG has not even attempted to claim or allege that it has satisfied the exacting standards set forth by Rule 60(b), and indeed it cannot. The facts are exactly the same as when this Court entered the Sale Order, and do not amount to the "extraordinary circumstances" that would permit modification of the Sale Order under Rule 60(b). Therefore, the Objection should be overruled.

**B. The Objection Also Fails on the Merits Because the Assumed Contracts and the DMG Consulting Agreement Do Not Constitute a Single Integrated Agreement**

20. Even if the relief requested by DMG was properly pled and DMG satisfied the requirements of Rule 60(b), the Objection should be overruled on the merits as well. The contracts at issue are multiple distinct and separate agreements that were entered into at different times, between different parties, having different subject matters and providing for separate and distinct consideration. As a result, the Assumed Contracts and the DMG Consulting Agreement cannot be considered a single integrated agreement.

1. **The DMG Consulting Agreement Should Not Be Considered a Single Integrated Contract With Any of the Assumed Contracts**

21. DMG claims that the contracts between the Debtors and FedEx are merely extensions of the DMG Consulting Agreement and "are properly viewed as schedules thereof" because those contracts arose as a direct consequence of the DMG Consulting Agreement and DMG's services. Objection at 7-8. DMG's claims are undermined by the plain language of the contracts themselves, the facts relating to the contracts at issue, and by applicable law.

22. The question of divisibility is a matter of state law. In re T&H Diner, Inc., 108 B.R. 448, 453 (Bankr. D.N.J. 1989); see also In re Buffet Holdings, 387 B.R. 115, 120 (Bankr. D. Del. 2008) ("The determination of whether a specific contract or lease is an indivisible agreement or several agreements in one is a question of state law."). The FedEx Pricing Agreement, the FedEx SmartPost Service Agreement, the FedEx Confidentiality Agreement, and the DMG Consulting Agreement all include a provision selecting Washington as the choice of law.[3] Under Washington state law, "[w]hether separate agreements are in fact part of one transaction depends on the intention of the parties as evidenced by the agreements." Boyd v. Davis, 897 P.2d 1239 (Wash. 1995) (citing Don L. Cooney, Inc. v. Star Iron & Steel Co., 528 P.2d 487 (1974)).

23. In re Gardinier, Inc., 831 F.2d 974 (11th Cir. 1987), sets forth the standard for determining—based on the intention of the parties as evidenced by the agreements—whether agreements are severable or an integrated agreement that must be assumed together. In Gardinier, the debtor had agreed to sell a parcel of land pursuant to a sale agreement entered into prior to the bankruptcy filing. Id. at 975. The sale agreement included a provision requiring the debtor/seller to pay a broker a 10% commission. Id. The 11th Circuit affirmed the bankruptcy

---

[3] The DMG Confidentiality Agreement provides that Ohio is the governing law.

court's decision that a brokerage agreement, requiring the debtor/seller to pay a broker a 10% commission in connection with a land sale, was separate and distinct from the land sale agreement itself. Accordingly, the 11th Circuit held that the debtor could assume the sale agreement and reject the brokerage agreement **even though the two agreements were in the same document**. Id.

24. The Gardinier court applied a three-part analysis that has been widely adopted by other bankruptcy courts. *First*, the Gardinier court looked to the subject matter of the agreement. The court noted that the nature and purpose of the agreements were different in that one contemplated the sale of property and the other contemplated an employment contract that was related to that sale. Id. at 976. *Second*, the court looked to the consideration and held that the consideration for each agreement was distinct and separate in that the buyer would be paying an amount of money to the seller under the sales contract, and then the seller would separately pay the broker. Id. *Finally*, the court noted that the obligations of the parties to the contracts were not interrelated because there were no promises running between the buyer and the broker, rather, the debtor/seller agreed to sell land to the buyer and the debtor/seller agreed to pay the commission to the buyer. Id. Since these were two distinct and separate agreements, the court concluded that the debtor could assume the contract for sale of the land and reject the brokerage agreement. The Gardinier court observed that, as a result, the broker would become a general unsecured creditor and may only get a percentage of its commission, but concluded that this "is the harsh reality of bankruptcy" and that the broker "must suffer the consequences of [the debtor's] bankruptcy along with the other general creditors." Id. at 978.

25. Bankruptcy courts in this district have often followed Gardinier and applied the same three step analysis to determine the severability of agreements. See, e.g., In re


Indian River Homes, Inc., 108 B.R. 46 (D. Del. 1989); In re American Home Mortgage Holdings, Inc., 402 B.R. 87 (Bankr. D. Del. 2009) (applying the Gardinier factors in order to determine severability of a loan servicing agreement from a master agreement); In re L.D. Patella Constr. Corp., 114 B.R. 53, 57 (Bankr. D. N.J. 1990).

26. In In re Indian River Homes, Inc., for example, the District Court for the District of Delaware held that a land sale contract was a separate agreement from an addendum to the contract requiring payment of commissions and attorneys' fees. In re Indian River Homes, Inc. 108 B.R. at 48. In reaching this conclusion, the court relied on the factors considered by the Gardinier court, noting that in Gardinier the court had found that the nature and purpose of a land sale and brokerage agreement are different, with the former being for the sale of property and the latter being an employment contract. Id. at 49. Significantly, the court noted that the Gardinier court had found that a brokerage agreement only contains promises between the seller and broker, with no promises running between the broker and buyer. Id. The court held that "[t]his court is satisfied that the rationales discussed in the Gardinier opinion, as well as the fact that the commissions addendum was entered into two months after the initial contract, lead to the conclusion that the addendum was a contract separate from the land sale agreement." Id.

27. Application of Gardinier and its progeny to the facts at hand demonstrates that the DMG Consulting Agreement is not part of any Assumed Contract, but is instead a distinct agreement that the Debtors may reject or assume without regard to the Assumed Contracts.

28. First, the nature and purpose of the agreements at issue are different. The purpose of the FedEx Pricing Agreement and the FedEx SmartPost Service Agreement is to establish pricing terms for delivery services. EB-8; EB-9; Deposition of Earl Devanny, 21:10-

14. The purpose of the FedEx Confidentiality Agreement and DMG Confidentiality Agreement are to safeguard confidential information revealed in the course of the parties' dealings. EB-1; EB-2; Deposition of Earl Devanny, 11:13-19. In contrast, the purpose of the DMG Consulting Agreement is the retention of an independent contractor to perform consulting/brokerage services. EB-3; Deposition of Earl Devanny, 15:12-13. The DMG Consulting Agreement cannot reasonably be understood to have the same nature and purpose as any of the Assumed Contracts.

29. Second, the consideration for the various agreements is distinct and separate. Under the FedEx Pricing Agreement and the FedEx SmartPost Service Agreement, the Debtors were to pay certain rates to FedEx in exchange for the delivery of certain amounts of goods. EB-8 at 4-27; EB-9 at 6-7. Under the DMG Consulting Agreement, the Debtors were to pay to DMG a commission equal to a percentage of savings on shipping costs over the course of a three-year period as a result of DMG's services. EB-3 at 1-2; Deposition of Earl Devanny, 13:6-9.

30. Third, the obligations of the parties to the various agreements are not interrelated in any way. DMG candidly acknowledges that it is not a party to any of the agreements between the Debtors and FedEx. Deposition of Mitch Felts, 40:6-24, attached hereto as Exhibit EB-14; Deposition of Earl Devanny, 18:12-23:1. In fact, the FedEx Pricing Agreement and the FedEx SmartPost Service Agreement contain no reference to DMG. Deposition of Earl Devanny, 21:7; Deposition of Mitch Felts, 39:7-41:8. DMG does not owe any obligation to any FedEx entity under any of the agreements in issue, nor does FedEx have any obligations to DMG under any agreement in issue. See EB-8; EB-9; Deposition of Mitch Felts, 39:7-41:8. Indeed, DMG admits that it does not owe **any** duties to FedEx under the FedEx

Pricing Agreement or the FedEx SmartPost Service Agreement. Deposition of Mitch Felts, 40:6-24. The DMG Consulting Agreement is simply an agreement between the Debtors and DMG. EB-3 at 3; Deposition of Earl Devanny, 12:16-17.

31. Additionally, the contracts at issue were entered into at different times and by different parties. For example, the DMG Confidentiality Agreement was entered into between Eddie Bauer Fulfillment Services, Inc. ("**EBFS**") and DMG. EB-2 at 3. DMG signed the DMG Confidentiality Agreement on May 20, 2008 and EBFS signed the agreement on September 26, 2008. EB-2 at 3. The DMG Consulting Agreement was entered into between Eddie Bauer, Inc. and DMG in August 2008. EB-3 at 3. Nearly two months later, the FedEx Pricing Agreement was entered into between Federal Express Corporation, FedEx Ground Package Systems, Inc., and Eddie Bauer Inc. EB-8 at 3; Deposition of Earl Devanny, 18:12-13; Deposition of Mitch Felts, 39:10-41:3. The FedEx SmartPost Service Agreement was signed by Eddie Bauer, Inc. on October 23, 2008 and by FedEx SmartPost, Inc. on November 10, 2008. EB-9 at 5.

32. The DMG Consulting Agreement is not an integrated agreement with any of the Assumed Contracts. Rather, it is a distinct and independent contract that the Debtors are free to assume or reject pursuant to the Sale Order regardless of whether the Debtors assume any of the Assumed Contracts. Therefore, this Court should overrule the Objection.

2. **The Contracts Between the Debtors and FedEx Are Not Carrier Proposals and Are Not Part Of the DMG Consulting Agreement**

33. DMG attempts to find support for its Objection by relying on Section 1(c) of the DMG Consulting Agreement, which provides that "all carrier proposals received by [the Debtors] will be forwarded to DMG for analysis and will be considered part of this Agreement and as potential savings to [the Debtors]." EB-3 at 1. Although not part of their objection, DMG apparently intends to argue that the FedEx Pricing Agreement and the FedEx SmartPost Agreement between the Debtors and FedEx somehow constitute "carrier proposals" that "are incorporated into and form part of the DMG Consulting Agreement." Affidavit of Mitch Felts in Support of Objection of Distribution Management Group, Inc. to Partial Assumption and Assignment of DMG-FedEx Contracts and DMG Confidentiality Agreement to Everest Holdings, LLC (the "Felts Affidavit") at 3, attached hereto as Exhibit EB-12; See also Deposition of Mitch Felts, 34:11-35:20. DMG also claims that the amendments to the FedEx Pricing Agreement are "carrier proposals." Deposition of Mitch Felts, 37:12-13.

34. The FedEx Pricing Agreement and the FedEx SmartPost Agreement are not "carrier proposals." But even if they were, the reference in the DMG Consulting Agreement that "carrier proposals" are "considered part of" the DMG Consulting Agreement does **not** mean that the DMG Consulting Agreement somehow becomes part of the FedEx Pricing Agreement and the FedEx SmartPost Agreement, or that all three agreements constitute one and the same agreement.

35. First, the FedEx Pricing Agreement and FedEx SmartPost Agreement do not constitute "carrier proposals." The FedEx carrier proposal is an entirely different document. The Debtors sent FedEx the September 15, 2008, Request for Proposal attached hereto as Exhibit EB-4. In response, on October 4, 2008, FedEx submitted its carrier proposal titled "Response to

Eddie Bauer's Request for Proposal" to Eddie Bauer, which is attached hereto as <u>Exhibit EB-6</u>. UPS also submitted its own carrier proposal, attached hereto as <u>Exhibit EB-7</u>. Weeks later, after analysis of the carrier proposals by DMG and direct negotiations with the carriers regarding their proposals, the Debtors and FedEx entered into the FedEx Pricing Agreement and the FedEx SmartPost Agreement, which are not carrier proposals. FedEx's "Response to Eddie Bauer's Request for Proposal" was the carrier's proposal. In contrast, the FedEx Pricing Agreement and the FedEx SmartPost Service Agreement are both titled "agreements," not proposals. <u>EB-8 at 1</u>; <u>EB-9 at 1</u>.

36. DMG's claim that the FedEx Pricing Agreement and the FedEx SmartPost Agreement, rather than the Response to Eddie Bauer's Request for Proposal, constitute "carrier proposals" is contradicted by their own President and Chief Executive Officer, Mitch Felts. Mr. Felts made clear, in a signed affidavit, that carrier proposals are far different from final, signed agreements. He acknowledged, for example, that after sending the September 15 Requests for Proposals, "DMG reviewed various carrier proposals received by the Debtors. . ." Thereafter, Mr. Felts explained, direct negotiations occurred, and **after** those negotiations "the Debtors entered into certain pricing and service agreements with FedEx." <u>Felts Affidavit at 2</u>. Thus, by DMG's own admission, the Debtors and FedEx entered into *agreements* which were distinct from the carrier proposals and executed after the proposals were received. By DMG's own admission, therefore, "carrier proposals" and final, signed agreements are not one in the same.

37. Second, even if the contracts between FedEx and the Debtors somehow could be "considered part of" the DMG Consulting Agreement, it does not follow that the DMG Consulting Agreement is one and the same agreement as the FedEx Pricing Agreement and the FedEx SmartPost Agreement. By DMG's own admission, DMG was not a party to the contracts

with FedEx and DMG does not consider itself to be bound by the contracts between the Debtors and FedEx. See Deposition of Mitch Felts, 40:6-24. In Gardinier, 831 F.2d at 975, and Indian River Homes, 108 B.R. at 48, the 11th Circuit and the District Court for the District of Delaware both held that even where a brokerage agreement or other agreement to pay commissions was part of the same document as a sale agreement, such agreements should be deemed separate agreements for purposes of assumption or rejection.

38. The DMG Consulting Agreement was entered into at a different time, between different parties, and has a different purpose than the Assumed Contracts. The Debtors respectfully submit that there is no reasonable basis for one to determine that the DMG Consulting Agreement is one and the same agreement as the Assumed Contracts. Therefore, this Court should overrule the Objection.

## **CONCLUSION**

39. DMG failed to file a timely objection and therefore must proceed under Rule 60(b) in its attempt to alter or amend the Sale Order. However, DMG has failed to establish a right to relief under Rule 60(b). Additionally, DMG's claim that the FedEx Pricing Agreement and the FedEx SmartPost Service Agreement should be considered to be an integrated agreement with the DMG Consulting Agreement not only goes against the facts and plain language of the contracts in issue, but is further undermined by the relevant case law. Similarly, the DMG Confidentiality Agreement cannot be considered part of the DMG Consulting Agreement. Thus, the Objection of DMG should be overruled.

Dated: October 16, 2009  Respectfully Submitted,
Wilmington, Delaware

/s/ Michael R. Nestor
Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
Kevin P. Garland (No. 5171)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

David S. Heller
Josef S. Athanas
Caroline A. Reckler
LATHAM & WATKINS LLP
Sears Tower, Suite 5800
233 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 876-7700
Facsimile: (312) 993-9767

-and-

Heather L. Fowler
LATHAM & WATKINS LLP
355 South Grand Avenue
Los Angeles, California 90071-1560
Telephone: (213) 485-1234
Facsimile: (213) 891-8763

ATTORNEYS FOR DEBTORS AND DEBTORS-IN-POSSESSION