## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| EBHI HOLDINGS, INC., *et al.*,[1] | Case No. 09-12099 (MFW) |
| Debtors. | Jointly Administered |

## DISCLOSURE STATEMENT FOR
## THE JOINT PLAN OF LIQUIDATION OF EBHI HOLDINGS, INC., et al.

David S. Heller, Esq.
Josef S. Athanas, Esq.
Caroline A. Reckler, Esq.
LATHAM & WATKINS LLP
Suite 5800
233 South Wacker Drive
Chicago, Illinois 60606
(312) 876-7700

-and-

Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
YOUNG, CONWAY, STARGATT & TAYLOR LLP
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Attorneys for the Debtors and Debtors-in-Possession

---

[1]   The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: EBHI Holdings, Inc. f/k/a Eddie Bauer Holdings, Inc., a Delaware corporation (2352); Amargosa, Inc. f/k/a Eddie Bauer, Inc., a Delaware corporation (9737); Gobi Fulfillment Services, Inc. f/k/a Eddie Bauer Fulfillment Services, Inc., a Delaware corporation (0882); Arabian Diversified Sales, LLC f/k/a Eddie Bauer Diversified Sales, LLC, a Delaware limited liability company (1567); Gibson Services, LLC f/k/a Eddie Bauer Services, LLC, an Ohio limited liability company (disregarded); Karakum International Development, LLC f/k/a Eddie Bauer International Development, LLC, a Delaware limited liability company (1571); Simpson Information Technology, LLC f/k/a Eddie Bauer Information Technology, LLC, a Delaware limited liability company (disregarded); Sandy Financial Services Acceptance Corporation f/k/a Financial Services Acceptance Corporation, a Delaware corporation (7532); and Sonoran Acceptance Corporation f/k/a Spiegel Acceptance Corporation, a Delaware corporation (7253). The mailing address for EBHI Holdings, Inc. is 10401 N.E. 8th Street, Suite 500, Bellevue, WA 98004.

I. INTRODUCTION ...........................................................................................................1

    A.     Overview of the Plan .........................................................................4
    B.     Voting Instructions.............................................................................7
    C.     Confirmation of the Plan by the Bankruptcy Court ...........................9

II. BACKGROUND OF THE DEBTORS..........................................................................10

    A.     The Debtors......................................................................................10
    B.     Events Leading to Chapter 11 ..........................................................11

III. THE CHAPTER 11 CASES .......................................................................................12

    A.     Commencement of the Chapter 11 Cases .........................................12
    B.     Commencement of the CCAA ...........................................................12
    C.     Retained Professionals .....................................................................13
    D.     First Day Orders...............................................................................13
    E.     Appointment of Creditors' Committee ..............................................16
    F.     Cash Collateral and Debtor-In-Possession Financing........................16
    G.     Sale of Assets...................................................................................17
    H.     The Debtors Current Management.....................................................20
    I.     506(c) Settlement Stipulation ..........................................................20
    J.     Committee Settlement Stipulations....................................................21
    K.     The Claims Process ..........................................................................23
    L.     Senior Notes and Subordinated Notes Issued by the Debtors
           Pursuant to Indentures......................................................................24
    M.    Substantive Consolidation of the Debtors..........................................24

IV. CHAPTER 11 PLAN...................................................................................................26

    A.     Plan Overview..................................................................................27
    B.     Plan Summary...................................................................................27
    C.     Unclassified and/or Unimpaired Claims............................................27
    D.     Treatment of Claims and Interests ....................................................29
    E.     Post-Confirmation Operations of the Debtors ...................................33
    F.     Liquidating Trust Agreement............................................................36
    G.     Objections to Claims........................................................................45
    H.     Distributions Under the Plan.............................................................45
    I.     Conditions to Confirmation ..............................................................48
    J.     Conditions to the Effective Date........................................................48
    K.     Termination of Plan for Failure To Become Effective. ......................48
    L.     Modification of the Plan ...................................................................49
    M.    Effect of Confirmation.....................................................................49
    N.     Exculpation, Injunction, and Limitation of Liability .........................49
    O.     Retention of Jurisdiction...................................................................51
    P.     Treatment of Executory Contracts and Unexpired Leases .................53
    Q.     No Admissions..................................................................................55

DB02:9065158.1

068417.1001

R.      Preservation of Rights of Setoffs ................................................................56
S.      Defenses with Respect to Unimpaired Claims........................................56
T.      Dissolution of Creditors' Committee ......................................................56

V. CONFIRMATION OF THE PLAN.............................................................................56

A.      Confirmation Hearing ..............................................................................56
B.      Confirmation Standards ...........................................................................56

VI. Funding and feasibility of the Plan ........................................................................57

A.      Funding of the Plan..................................................................................57
B.      Best Interests Test....................................................................................57
C.      Avoidance Action Analysis .....................................................................58
D.      Feasibility.................................................................................................58
E.      Risk Factors Associated with the Plan.....................................................58

VII. ALTERNATIVES TO THE PLAN .........................................................................60

VIII. CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS....................60

DB02:9065158.1
068417.1001

**Exhibits To Disclosure Statement**

| | |
|---|---|
| **Exhibit A** | **Joint Plan of Liquidation** |
| **Exhibit B** | **Claims Objections** |
| **Exhibit C** | **Liquidation Analysis** |
| **Exhibit D** | **Preferences** |
| **Exhibit E** | **Insider Payments** |

DB02:9065158.1

068417.1001

# DISCLOSURE STATEMENT FOR THE JOINT PLAN OF
# LIQUIDATION OF EBHI HOLDINGS, INC., et al.

> THE DEBTORS RESERVE THE RIGHT TO AMEND OR SUPPLEMENT THIS PROPOSED DISCLOSURE STATEMENT AT OR BEFORE THE CONFIRMATION HEARING.

## I.
## INTRODUCTION

EBHI Holdings, Inc. f/k/a Eddie Bauer Holdings, Inc., a Delaware corporation ("EBHI"); Amargosa, Inc. f/k/a Eddie Bauer, Inc., a Delaware corporation ("Amargosa"); Gobi Fulfillment Services, Inc. f/k/a Eddie Bauer Fulfillment Services, Inc., a Delaware corporation ("Gobi"); Arabian Diversified Sales, LLC f/k/a Eddie Bauer Diversified Sales, LLC, a Delaware limited liability company ("Arabian"); Gibson Services, LLC f/k/a Eddie Bauer Services, LLC, an Ohio limited liability company ("Gibson"); Karakum International Development, LLC f/k/a Eddie Bauer International Development, LLC, a Delaware limited liability company ("Karakum"); Simpson Information Technology, LLC f/k/a Eddie Bauer Information Technology, LLC, a Delaware limited liability company ("Simpson"); Sandy Financial Services Acceptance Corporation f/k/a Financial Services Acceptance Corporation, a Delaware corporation ("Sandy"); and Sonoran Acceptance Corporation f/k/a Spiegel Acceptance Corporation, a Delaware corporation ("Sonoran" and, together with EBHI, Amargosa, Gobi, Arabian, Gibson, Karakum, Simpson and Sandy, the "Debtors"), provide this Disclosure Statement (the "Disclosure Statement") to certain of the Debtors' impaired creditors to permit such creditors to make an informed decision in voting to accept or reject the Joint Plan of Liquidation of EBHI Holdings, Inc., et al. (the "Plan") filed on December 22, 2009 with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") in connection with the above-captioned cases filed pursuant to chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). A copy of the Plan is attached to this Disclosure Statement as Exhibit A. **Capitalized terms used herein but not otherwise defined have the meanings assigned to such terms in the Plan.** Whenever the words "include," "includes" or "including" are used in this Disclosure Statement, they are deemed to be followed by the words "without limitation."

This Disclosure Statement is presented to certain holders of Claims against the Debtors in accordance with the requirements of section 1125 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code"). Section 1125 of the Bankruptcy Code requires that a disclosure statement provide information sufficient to enable a hypothetical and reasonable investor, typical of the Debtors' creditors and stockholders, to make an informed judgment whether to accept or reject the Plan. This Disclosure Statement may not be relied upon for any purpose other than that described above.

The Disclosure Statement is based on information publicly available in SEC filings and pleadings filed with the Bankruptcy Court, information provided by the Debtors' management, claims information provided by Kurtzman Carson Consultants, LLC ("KCC"), the official claims agent, a liquidation analysis prepared by Alvarez & Marsal North America, LLC

("Alvarez & Marsal") as the financial advisors to the Official Committee of Unsecured Creditors (the "Committee"), and legal analysis by Latham & Watkins LLP ("Latham & Watkins") and Young Conaway Stargatt & Taylor, LLP ("Young Conaway"), co-counsel for the Debtors.

THIS DISCLOSURE STATEMENT AND THE PLAN ARE AN INTEGRAL PACKAGE, AND THEY MUST BE CONSIDERED TOGETHER FOR THE READER TO BE ADEQUATELY INFORMED. THIS INTRODUCTION IS QUALIFIED IN ITS ENTIRETY BY THE REMAINING PORTIONS OF THIS DISCLOSURE STATEMENT, AND THIS DISCLOSURE STATEMENT IN TURN IS QUALIFIED, IN ITS ENTIRETY, BY THE PLAN.

NO REPRESENTATIONS CONCERNING THE DEBTORS (PARTICULARLY AS TO THE VALUE OF THEIR PROPERTY) ARE AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT AND ITS EXHIBITS. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OF THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND ITS EXHIBITS SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION, AND SUCH ADDITIONAL REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTORS, WHO WILL IN TURN DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS MAY BE APPROPRIATE.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING ANY EXHIBITS CONCERNING THE FINANCIAL CONDITION OF THE DEBTORS AND THE OTHER INFORMATION CONTAINED HEREIN, HAS NOT BEEN SUBJECT TO AN AUDIT OR INDEPENDENT REVIEW EXCEPT AS EXPRESSLY SET FORTH HEREIN. ACCORDINGLY, THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONCERNING THE DEBTORS OR THEIR FINANCIAL CONDITION IS ACCURATE OR COMPLETE. THE PROJECTED INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PRESENTED FOR ILLUSTRATIVE PURPOSES ONLY, AND, BECAUSE OF THE UNCERTAINTY AND RISK FACTORS INVOLVED, THE DEBTORS' ACTUAL RESULTS MAY NOT BE AS PROJECTED HEREIN.

ALTHOUGH AN EFFORT HAS BEEN MADE TO BE ACCURATE AND THE DEBTORS BELIEVE IN GOOD FAITH THAT THE INFORMATION HEREIN IS ACCURATE, THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND ITS EXHIBITS IS CORRECT. THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN. EACH CREDITOR IS STRONGLY URGED TO REVIEW THE PLAN PRIOR TO VOTING ON IT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE OF THIS DISCLOSURE STATEMENT UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS DISCLOSURE

STATEMENT WILL NOT UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE HAS NOT BEEN ANY CHANGE IN THE FACTS SET FORTH SINCE THE DATE OF THIS DISCLOSURE STATEMENT.

A STATEMENT OF THE ASSETS AND LIABILITIES OF THE DEBTORS AS OF THE DATE OF THE COMMENCEMENT OF THEIR CHAPTER 11 CASES IS ON FILE WITH THE CLERK OF THE BANKRUPTCY COURT AND MAY BE INSPECTED BY INTERESTED PARTIES DURING REGULAR BUSINESS HOURS.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW. ENTITIES HOLDING OR TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST, INTERESTS IN OR SECURITIES OF, THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT ONLY IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION NOR HAS SUCH COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT WILL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN. EACH CREDITOR SHOULD, THEREFORE, CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISERS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN OR THE TRANSACTIONS CONTEMPLATED THEREBY.

Pursuant to the Bankruptcy Code, this Disclosure Statement and the Plan were filed on December 22, 2009. The Bankruptcy Court will hold a hearing on confirmation of the Plan beginning at 3 p.m. (prevailing Eastern time) on March 18, 2010, in the United States Bankruptcy Court, 824 North Market Street, 6th Floor, Wilmington, Delaware 19801 (the "Confirmation Hearing"). At that Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the requirements of the Bankruptcy Code, including whether the Plan is in the best interests of the claimants, and will review a ballot report concerning votes cast for acceptance or rejection of the Plan.

DB02:9065158.1

068417.1001

To obtain, at your cost, additional copies of this Disclosure Statement or of the Plan, please contact:

> EBHI Holdings, Inc. Document Request
> c/o Kurtzman Carson Consultants LLC
> 2335 Alaska Avenue
> El Segundo, CA 90245
> Telephone: (866) 967-1781
> www.kccllc.net/eddiebauer

A.      **Overview of the Plan**

**THE FOLLOWING IS A BRIEF SUMMARY OF THE TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN. THE DESCRIPTION OF THE PLAN SET FORTH BELOW CONSTITUTES A SUMMARY ONLY AND IS QUALIFIED, IN ITS ENTIRETY, BY THE PLAN, THE LIQUIDATING TRUST AGREEMENT, AND THE OTHER PLAN DOCUMENTS. CREDITORS AND OTHER PARTIES IN INTEREST ARE URGED TO REVIEW THE MORE DETAILED DESCRIPTION OF THE PLAN CONTAINED IN SECTION IV OF THIS DISCLOSURE STATEMENT AND THE PLAN ITSELF. THE PLAN IS ATTACHED AS <u>EXHIBIT A</u> TO THIS DISCLOSURE STATEMENT. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN CONTROLS.**

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business reorganization. The fundamental purpose of a chapter 11 case is to formulate a plan to restructure a debtor's finances so as to maximize recoveries to its creditors. With this purpose in mind, businesses sometimes use chapter 11 as a means to conduct asset sales and other forms of liquidation. Whether the aim is reorganization or liquidation, a chapter 11 plan sets forth and governs the treatment and rights to be afforded to creditors and stockholders with respect to their claims against and equity interests in a debtor's bankruptcy estate.

As an initial matter, the Plan contemplates and is predicated upon the substantive consolidation of all the Debtors with respect to the voting and treatment of all Claims and Interests other than General Secured Claims. This means that the Debtors propose to satisfy the claims of all their respective creditors from a common pool comprised of their collective assets. The Plan divides the Claims against and Interests in the Debtors into Classes. Certain Claims – in particular, Administrative Expense Claims, Statutory Fees, Professional Claims and Priority Tax Claims – remain unclassified in accordance with section 1123(a)(1) of the Bankruptcy Code. The Plan assigns all other Claims and Interests as described below.

Class 1 consists of all Other Priority Claims, holders of which will receive Cash in the full amount of their Allowed Other Priority Claims. Class 1 is unimpaired and will be deemed to accept the Plan.

Class 2 consists of all General Secured Claims, including Possessory Lienholder Claims. On the Effective Date, the Allowed General Secured Claims shall receive Cash in the

full amount of their Allowed General Secured Claim, and the Liens and security interests on the Debtors' Assets securing such Allowed General Secured Claims shall be released and the Debtors and their Estates shall have no further liability therefor; provided, however, that any Deficiency Claims of holders of Class 2 General Secured Claims shall not constitute Class 2 General Secured Claims and shall be treated as Class 4 General Unsecured Claims under the Plan. Class 2 is unimpaired and will be deemed to accept the Plan.

Class 3 consists of the Term Lender Secured Claim, the Allowed Term Lender Deficiency Claim and any Term Lender Adequate Protection Claim. Wilmington Trust FSB, as successor by assignment to JPMorgan Chase Bank, N.A., as agent for the Pre-Petition Term Lenders under the Pre-Petition Term Credit Agreement (the "Agent") shall receive, for the benefit of the Pre-Petition Term Lenders, in full satisfaction, settlement and release of and in exchange for the Allowed Term Lender Secured Claim, periodic distributions from the Liquidating Trust of the Term Lender Assets Proceeds. The Allowed Term Lender Deficiency Claim and any Term Lender Adequate Protection Claim were released by the Pre-Petition Term Agent on behalf of the Pre-Petition Term Parties as part of the Committee Settlement Stipulation. Therefore, no distributions shall be made on account of such Claims and, on the Effective Date, such Claims shall be cancelled. Class 3 is impaired and may vote to accept or reject the Plan.

Class 4 consists of all General Unsecured Claims, holders of which will receive, after (a) satisfaction in full or satisfaction in accordance with the Plan of all Allowed Administrative Expense Claims, Professional Claims and Allowed Priority Tax Claims as provided in Article 2 of the Plan, and (b) the treatment provided in the Plan for Allowed Claims in Classes 1 and 2, all remaining Available Cash (if any), which shall be allocated Pro Rata among holders of Senior Notes Claims and Allowed Other Unsecured Claims. Each holder of an Allowed General Unsecured Claim, shall receive, in full satisfaction, settlement and release of and in exchange for its Allowed General Unsecured Claim, periodic distributions from the Liquidating Trust of its share of Available Cash allocable on account of its Allowed General Unsecured Claim, shared Pro Rata with the holders of other Allowed General Unsecured Claims. Class 4 is impaired and may vote to accept or reject the Plan.

Class 5 consists of all Noteholder Securities Claims. Holders of Noteholder Securities Claims will not receive any distribution under the Plan on account of their Claims and, on the Effective Date, the Noteholder Securities Claims will be cancelled. Class 5 is impaired and will be deemed to reject the Plan.

Class 6 consists of all Intercompany Claims. Holders of Class 6 Claims will not receive any distribution of property under the Plan and, on the Effective Date, the Intercompany Claims will be cancelled; provided, however, Class 6 shall exclude any claims of a Debtor against a non-Debtor Affiliate or a non-Debtor subsidiary. Class 6 is impaired and will be deemed to reject the Plan.

Class 7A consists of all Interests of the Debtors. Holders of Class 7A Interests will not receive any distribution of property under the Plan and, on the Effective Date, the Interests will be cancelled. Class 7A is impaired and will be deemed to reject the Plan.

Class 7B consists of all Interests Securities Claims. Holders of Interests Securities Claims will not receive any distribution of property under the Plan and, on the Effective Date, the Interests Securities Claims will be cancelled. Class 7B is impaired and will be deemed to reject the Plan.

The Debtors believe that the distributions under the Plan will provide Creditors of the Debtors at least the same recovery on account of Allowed Claims as would distributions by a chapter 7 trustee. However, distributions under the Plan to Creditors of the Debtors would be made more quickly than distributions by a chapter 7 trustee and a chapter 7 trustee would charge a substantial fee, reducing the amount available for distribution on account of Allowed Claims.

**ACCORDINGLY, THE DEBTORS URGE EACH CREDITOR ENTITLED TO VOTE ON THE PLAN TO VOTE TO <u>ACCEPT</u> THE PLAN.**

Following are detailed, Class-by-Class summaries of the estimated Allowed Claims against the Debtors and the estimated distribution to the Creditors of the Debtors on account of such Allowed Claims.

The Debtors calculated the total asserted claims (other than Administrative Expense Claims)[1] based on filed and scheduled claims. To the extent a creditor filed a proof of claim that superceded a scheduled claim, the amount in the filed proof of claim was utilized.

The Debtors then reviewed all of the proofs of claims asserting Priority Tax Claims, Other Priority Claims and Subordinated Unsecured Claims, and a large sample size of the proofs of claims asserting General Unsecured Claims, and Alvarez & Marsal reviewed all of the proofs of claims asserting General Secured Claims.

The Debtors (with the assistance of Alvarez & Marsal with respect to General Secured Claims) then determined a range of estimated Allowed Claims by reducing asserted claims amounts for duplicate claims, amended claims, misclassified claims, settled claims, repaid claims and claims that lack merit.

With respect to the Real Property Leases, the Debtors (with the assistance of Alvarez & Marsal) analyzed their financial accounts and prepared estimates of cure amounts and rejection claims for each lease. For leases that were to be "assumed and assigned," such cure amounts were then negotiated with each lease counter-party to arrive upon a mutually agreeable "Allowed Claim."

The differences between asserted claims and Allowed Claims estimated herein are typical of large chapter 11 cases. See, e.g., <u>GST Telecommunications, Inc.</u>, Case No. 00-1982 (Del. 2000) (over $5 billion of claims filed and $1.25 billion of claims scheduled, approximately $1.18 billion of claims allowed).

---

[1]   Asserted Administrative Expense Claims are based on filed, accrued and budgeted amounts.

DB02:9065158.1                                                                                              068417.1001

**THE RECOVERY PERCENTAGES SET FORTH IN THE FOLLOWING TABLE ARE MERELY ESTIMATES. THE ACTUAL AMOUNTS DISTRIBUTED TO HOLDERS OF ALLOWED CLAIMS UNDER THE PLAN MAY BE HIGHER OR LOWER THAN ESTIMATED.**

| Class | Description | Approximate Amount Asserted | Range of Estimated Allowed Amounts | Range of Estimated Recovery | Status |
|---|---|---|---|---|---|
| N/A | Administrative Expense Claims | $28,910,000 | $160,000 - $850,000 | 100% | Unclassified and not entitled to vote |
| N/A | Priority Tax Claims | $1,900,000 | $280,000 - $1,900,000 | 100% | Unclassified and not entitled to vote |
| N/A | Statutory Fees | $0 | $0 | 100% | Unclassified and not entitled to vote |
| N/A | Professional Claims | $0 | $0 | 100% | Unclassified and not entitled to vote |
| 1 | Other Priority Claims | $1,010,000 | $0 - $1,010,000 | 100% | Unimpaired, deemed to accept the Plan and not entitled to vote |
| 2 | General Secured Claims | $600,000 | $0 - $600,000 | 100% | Unimpaired, deemed to accept the Plan and not entitled to vote |
| 3 | Term Lender Secured Claim | $202,993,054 | $202,993,054 | 85%-96% | Impaired and entitled to vote |
| 4 | General Unsecured Claims | $132,600,000 | $89,800,000 - $132,600,000 | 1%-20% | Impaired and entitled to vote |
| 5 | Noteholders Securities Claims | N/A | N/A | 0% | Impaired, deemed to reject the Plan and not entitled to vote |
| 6 | Intercompany Claims | N/A | N/A | 0% | Impaired, deemed to reject the Plan and not entitled to vote |
| 7A | Interests | N/A | N/A | 0% | Impaired, deemed to reject the Plan and not entitled to vote |
| 7B | Interests Securities Claims | N/A | N/A | 0% | Impaired, deemed to reject the Plan and not entitled to vote |

B.     **Voting Instructions**

**THE DEBTORS STRONGLY RECOMMEND EACH CREDITOR ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.**

The Bankruptcy Code entitles only holders of impaired claims or equity interests who receive some distribution under a proposed plan to vote to accept or reject that plan. Holders of claims or equity interests that are unimpaired under a proposed plan are conclusively presumed to have accepted that plan and are not entitled to vote on it. Holders of classes of claims or equity interests that will receive no distributions under a proposed plan are conclusively presumed to reject that plan and, therefore, are also not entitled to vote on it.

DB02:9065158.1

068417.1001

The holders of Claims in Classes 1 and 2 are not Impaired under the Plan. Thus, pursuant to section 1126(f) of the Bankruptcy Code, the claimants in Classes 1 and 2 are deemed to have accepted the Plan and are not entitled to vote.

The holders of Claims in Class 3 and Class 4 are Impaired and thus may vote to accept or reject the Plan. The Debtors have enclosed Ballots with this Disclosure Statement to solicit the votes of all claimants in Class 3 and Class 4.

The holders of Claims in Class 5, Class 6 and 7B and holders of Class 7A Interests will receive no distribution under the Plan. Thus, pursuant to section 1126(g) of the Bankruptcy Code, the holders of Claims in Class 5, Class 6 and 7B and holders of Class 7A Interests are deemed to have rejected the Plan.

**A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASS 3 AND CLASS 4. BEFORE VOTING, SUCH HOLDERS SHOULD READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS, INCLUDING THE PLAN AND THE PLAN DOCUMENTS, IN THEIR ENTIRETY.**

You should use the Ballot sent to you with this Disclosure Statement to cast your vote for or against the Plan. You may not cast Ballots or votes orally or by facsimile. **In order for your Ballot to be considered by the Bankruptcy Court, it must be received at the above address by 4 p.m. (prevailing Eastern time) on March 4, 2010 (the "<u>Voting Deadline</u>").** If you are a claimant in Class 3 or Class 4, and you did not receive a Ballot with this Disclosure Statement, please contact:

> EBHI Holdings, Inc. Ballot Processing
> c/o Kurtzman Carson Consultants LLC
> 2335 Alaska Avenue
> El Segundo, CA 90245
> Telephone: (866) 967-1781

Only holders of Allowed Claims in Impaired Classes of Claims are entitled to vote on the Plan. Any Ballot executed by the holder of an Allowed Claim, but which does not indicate acceptance or rejection of the Plan, will be considered a vote to accept the Plan. Any Ballot not executed by the holder of an Allowed Claim will not be counted as a vote to accept or reject the Plan.

**An Impaired class of Claims accepts the Plan if at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in the Class that actually vote are cast in favor of the Plan.** Whether or not a creditor or interest holder votes on the Plan, such Person will be bound by the terms and treatment set forth in the Plan if the Plan is accepted by the requisite majorities of the classes of creditors and is confirmed by the Bankruptcy Court. Pursuant to the provisions of section 1126(e) of the Bankruptcy Code, the Bankruptcy Court may disallow any vote accepting or rejecting the Plan if such vote is not cast in good faith.

If the voting members of an Impaired Class do not vote unanimously for the Plan but, nonetheless, vote for the Plan by at least the requisite two-thirds (2/3) in amount and one-half (1/2) in number of Allowed Claims in that Class actually voted, the Plan, at a minimum, must provide that each member of such Class will receive property of a value, as of the Effective Date, that is not less than the amount such Class members would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

The Debtors or other parties in interest, including the Committee, may dispute proofs of Claims or Interests that have been filed or that the Debtors listed as disputed in the schedules the Debtors filed with the Bankruptcy Court. A list of all Claims which the Debtors and the Committee have disputed as of the date hereof is attached hereto as <u>Exhibit B</u>. Persons whose Claims are disputed may vote on or otherwise participate in distributions under the Plan only to the extent that the Bankruptcy Court allows their Claims. The Bankruptcy Court may temporarily allow a Claim for voting purposes only. Allowance of a Claim for voting purposes or disallowance of a Claim for voting purposes does not necessarily mean that all or a portion of that Claim will be allowed or disallowed for distribution purposes. The Debtors' schedules listing Claims and whether such Claims are disputed can be inspected at the Delaware offices of Young Conaway Stargatt & Taylor, LLP at 1000 West Street, 17th Floor, Wilmington, Delaware 19801, or at the offices of KCC, as set forth above.

## C.      Confirmation of the Plan by the Bankruptcy Court

Once it is determined which Impaired classes have or have not accepted the Plan, the Bankruptcy Court will determine whether the Plan may be confirmed. Class 5, Class 6, Class 7A and Class 7B will receive no distributions on account of their respective Claims and Interests and are therefore deemed to have rejected the Plan. However, the Bankruptcy Court may confirm the Plan even if all but one of the Impaired classes do not accept the Plan if the Bankruptcy Court finds that the remaining Impaired class of Claims (not including any acceptances by "insiders" as defined in section 101(31) of the Bankruptcy Code) has accepted the Plan and that certain additional conditions are met. The Debtors will therefore request that the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code with respect to any non-accepting Class of Claims or Interests.

Section 1129(b) of the Bankruptcy Code is generally referred to as the "cramdown" provision. Pursuant to the cramdown provision, the Bankruptcy Court may confirm the Plan over the objection of a non-accepting Class of Secured Claims if the Plan satisfies one of the alternative requirements of section 1129(b)(2)(A) of the Bankruptcy Code. Likewise, the Bankruptcy Court may confirm the Plan over the objection of a non-accepting Class of Unsecured Claims if the non-accepting claimants will receive the full value of their Claims, or, if the non-accepting claimants receive less than full value, if no Class of junior priority will receive anything on account of their pre-petition Claims or Interests.

If the Plan does not meet the cramdown requirements as set forth above with respect to all of the Debtors, (a) in the Debtors' sole discretion, the Plan may be revoked as to all of the Debtors, or (b) the Debtors may revoke the Plan as to any Debtor not satisfying the cramdown requirements (such Debtor's Chapter 11 Case being converted to a chapter 7

9

liquidation, continued or dismissed in the Debtors' sole discretion) and confirmed as to the remaining Debtors.

**THESE ARE COMPLEX STATUTORY PROVISIONS, AND THE PRECEDING PARAGRAPHS ARE NOT INTENDED TO BE A COMPLETE SUMMARY OF THE LAW. IF YOU DO NOT UNDERSTAND THESE PROVISIONS, PLEASE CONSULT WITH YOUR ATTORNEY. BECAUSE CLASS 4 IS LIKELY TO VOTE TO REJECT THE PLAN AND CLASSES 5, 6, 7A AND 7B RECEIVE NO DISTRIBUTIONS ON ACCOUNT OF THEIR RESPECTIVE CLAIMS AND INTERESTS AND ARE THUS DEEMED TO HAVE REJECTED THE PLAN, THE DEBTORS INTEND TO RELY UPON THE "CRAMDOWN" PROVISION OF SECTION 1129(b) OF THE BANKRUPTCY CODE.**

The Plan provides for the liquidation of substantially all of the property of the Debtors' estates. Pursuant to section 1141(d)(3) of the Bankruptcy Code, confirmation of the Plan will not discharge the Debtors from any of their debts which arose prior to June 17, 2009, except Secured Claims assumed by the Liquidating Trust, however, Confirmation will make the Plan binding upon the Debtors, their creditors, holders of Claims and Interests, and other parties in interest regardless of whether they have accepted the Plan.

The Plan is premised on the substantive consolidation all of the Debtors with respect to the voting and treatment of all Claims and Interests except for the General Secured Claims in Class 2, as provided below. The Plan does not contemplate substantive consolidation of the Debtors with respect to the General Secured Claims against the Debtors, which claims shall apply separately with respect to each Plan proposed by each Debtor. The Plan serves as a request by the Debtors, in lieu of a separate motion, to the Bankruptcy Court that it grant substantive consolidation with respect to the treatment of all Claims and Interests other than Class 2 Claims.

## II.
## BACKGROUND OF THE DEBTORS

A.     **The Debtors**

The Debtors primarily operated as a specialty retailer selling outerwear, apparel and accessories for the active outdoor lifestyle (the "Business"). Debtor EBHI (f/k/a Eddie Bauer Holdings, Inc.) is the parent company of Debtors Amargosa (f/k/a Eddie Bauer, Inc.), Sandy (f/k/a Financial Services Acceptance Corp.) and Sonoran (f/k/a Spiegel Acceptance Corp.).

Debtor Amargosa was the primary operating subsidiary of EBHI and owns 100% of the equity in Debtors Gobi (f/k/a Eddie Bauer Fulfillment Services, Inc.), Arabian (f/k/a Eddie Bauer Diversified Sales, LLC, Gibson (f/k/a Eddie Bauer Services, LLC), Karakum (f/k/a Eddie Bauer International Development, LLC) and Simpson (f/k/a Eddie Bauer Information Technology, LLC) in addition to equity interests that it holds in other non-debtor subsidiaries.

Debtor Gobi supported the United States distribution, fulfillment and inbound/outbound transportation requirements of the Business.

Debtors Gibson and Simpson were disregarded entities.

Debtor Arabian was created to receive third party licensing royalties while Debtor Karakum was formed to receive royalty revenues from the joint ventures in Japan and Germany.

Debtor Sandy is a dormant company initially created in 2005 and Debtor Sonoran was created in 2007. Both were formed to sell receivables originating from the Spiegel bankruptcy.

As of the Petition Date, the Debtors collectively employed approximately 7,700 people in their domestic operations (including full-time, part-time and temporary employees). As of April 4, 2009, the Debtors' consolidated, unaudited financial statements reflected assets of approximately $525.2 million and liabilities of approximately $448.9 million.

B.      **Events Leading to Chapter 11**

Catalog retailer Spiegel, Inc. ("Spiegel") acquired Amargosa, and its subsidiaries, in July 1988. In March 2003, Spiegel and its affiliates and subsidiaries filed petitions for chapter 11 relief in the U.S. Bankruptcy Court for the Southern District of New York (the "Spiegel Bankruptcy"). In connection with the Spiegel Bankruptcy, EBHI was formed as a new holding company to serve as the parent company for Amargosa and its subsidiaries. EBHI and Amargosa, along with their U.S. subsidiaries as guarantors entered into a $300 million senior secured term loan agreement, the proceeds from which were used to pay Spiegel creditors, not to fund operations of Amargosa or its subsidiaries (the "Original Term Loan"). EBHI and its subsidiaries emerged from the Spiegel Bankruptcy as a stand-alone company.

In April 2007, the Debtors entered into an amended and restated term loan agreement (the "Amended Term Loan") which reduced the principal outstanding balance of the Original Term Loan from $273.8 million to $225 million, extended the maturity date of the Original Term Loan to April 1, 2014 and authorized the issuance of not less than $75 million of convertible notes (the "Convertible Notes"). In April 2009, the Amended Term Loan was further amended to alter certain financial covenants.

Following the Spiegel Bankruptcy, the Debtors suffered from the significant debt incurred under the Amended Term Loan and a continued erosion of the Debtors' brand identity that began during Spiegel's ownership of Amargosa. This led to a decrease in profitability and significant financial difficulties which were exacerbated by the global economic downturn. The Debtors' Boards of Directors authorized the commencement of voluntary chapter 11 cases to enable the Debtors to preserve assets from collection activities of creditors, to assist in stabilizing the Debtors' operations and to enable the Debtors, in consultation with their creditors and other stakeholders, to achieve their goal of maximizing the value of their estates.

DB02:9065158.1                                                                 068417.1001

# III.
# THE CHAPTER 11 CASES

## A.     Commencement of the Chapter 11 Cases

On June 16, 2009, EBHI and substantially all of its subsidiaries, including certain non-Debtor subsidiaries but excluding Sandy and Sonoran, (the "Sellers") entered into an Asset Purchase Agreement with an affiliate of CCMP Capital Advisors ("CCMP") pursuant to which the Sellers agreed to sell substantially all of their assets to CCMP, and CCMP agreed to assume certain liabilities of the Sellers. The sale was to be conducted under the provisions of Section 363 of the Bankruptcy Code and was subject to proposed bidding procedures and the receipt of a higher and better bid at auction.

On June 17, 2009 (the "Petition Date"), the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code. The Debtors in the Chapter 11 Cases are continuing in possession of their respective properties and are operating their respective businesses, as debtors-in-possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

The Chapter 11 Cases are pending before the Honorable Mary F. Walrath, Chief Judge for the United States Bankruptcy Court for the District of Delaware, located at the United States Bankruptcy Court, 824 North Market Street, 6th Floor, Wilmington, Delaware 19801.

On July 16, 2009, the Sellers conducted an auction pursuant to the provisions of Section 363 of the Bankruptcy Code at which Golden Gate Capital was determined to be the highest and best offer. On July 17, 2009, the Sellers entered into an Asset Purchase Agreement with an affiliate of Golden Gate Capital ("Golden Gate") pursuant to which Golden Gate agreed to purchase substantially all of the assets of Sellers for $286 million in cash and to assume certain liabilities associated with the purchased Assets (the "Asset Sale"). The Asset Sale was approved by the Bankruptcy Court on July 22, 2009, and the Asset Sale was completed on August 3, 2009.

## B.     Commencement of the CCAA

On June 17, 2009, Tenere of Canada, Inc. (f/k/a Eddie Bauer of Canada Inc.), the Canadian retail arm of the Eddie Bauer Group, and Yuma Customer Services, Inc. (f/k/a Eddie Bauer Customer Services Inc.), the customer service operation for the Eddie Bauer organization, filed for protection under the Companies' Creditors Arrangement Act ("CCAA") with the Ontario Superior Court of Justice, Commercial List, ("Canadian Court"). RSM Richter Inc. was appointed as the Monitor of the Canadian companies under the CCAA. Contemporaneous with the issuance of the Initial Order, the Canadian Court and the US Court, under separate Orders, approved a cross-border protocol to assist with the holding of joint hearings and coordination of proceedings between Canada and the US.

As a result of a joint hearing on June 29, 2009, the Canadian Court issued a Bidding Procedures Order approving the stocking horse bid with an affiliate of CCMP Capital Advisors, and authorizing the conduct of an auction in the New York offices of Latham & Watkins LLP for the sale of all of the assets of the Canadian Applicants together with the US Debtors. As a result of the auction held on July 16, 2009, a joint hearing was held between the

Canadian Court and the US Court on July 28, 2009 for the approval of the successful bid of Golden Gate Capital. The Golden Gate transaction was approved by the Canadian Court and proceeded to close on August 3, 2009.

Since the closing of the Golden Gate transaction, the Canadian companies have obtained an order from the Canadian Court approving a claims process, have called for claims and are in the process, with the assistance of the Monitor, of reviewing all such claims to determine the amounts payable to Canadian creditors. The Canadian companies, with the assistance of the Monitor, anticipate being in a position before the end of the calendar year to begin making interim distributions on account of claims against the Canadian companies.

Pursuant to the Plan, on the Effective Date, (i) the Debtors' equity interests in Tenere of Canada, Inc. and Yuma Customer Services and (ii) the Debtors' claims against such entities arising from any intercompany claims, loans, notes, transfers, or other obligations shall be transferred by the Debtors to the Liquidating Trustee, and continue to be subject to the Liens of the Pre-Petition Term Agent in favor of the Pre-Petition Term Lenders. The Liquidating Trustee (or his duly appointed successor) shall exercise his powers as the sole shareholder to appoint himself as the sole officer and director of Tenere of Canada, Inc. and Yuma Customer Services, Inc.

## C.      Retained Professionals

The Bankruptcy Court authorized the Debtors to retain certain professionals to represent them and assist them in connection with the Chapter 11 Cases. Specifically, the Debtors have retained, and the Bankruptcy Court has approved the retention of, the following professionals: (a) Latham & Watkins, as counsel for the Debtors in these Chapter 11 Cases; (b) Young Conaway as co-counsel to the Debtors; (c) Alvarez and Marsal North America, LLC as financial advisors to the Debtors; and (d) KCC, as official noticing, claims and/or solicitation and balloting agent for the Debtors (collectively, the "Debtors' Professionals"). In addition, the Debtors have retained approximately 7 firms to handle special litigation issues. Finally, the Bankruptcy Court authorized the Debtors to retain, employ, compensate and reimburse the expenses of certain professionals, primarily attorneys, who have rendered services to the Debtors unrelated to the Chapter 11 Cases to assist with the operation of the Debtors' businesses in the ordinary course.

On June 25, 2009, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the Committee. The Committee retained Cooley Godward Kronish, LLP, as counsel for the Committee, Benesch, Friedlander, Coplan & Aronoff, LLP, as co-counsel for the Committee and Capstone Advisory Group, LLC ("Capstone") as its financial advisors (collectively, the "Committee Professionals"). The Bankruptcy Court has approved the Committee's retention of all of these professional firms.

## D.      First Day Orders

On the Petition Date, the Debtors filed a number of motions seeking approval of certain so-called "first day orders." The first day orders facilitated the transition between the Debtors' pre-petition and post-petition business operations by authorizing the Debtors to

continue with certain regular business practices that may not be specifically authorized under the Bankruptcy Code, or for which the Bankruptcy Code requires prior court approval. The first day orders in these Chapter 11 Cases, the majority of which were signed at a hearing held on June 18, 2009, authorized, among other things, the following:

1. **Motion for Joint Administration of the Chapter 11 Cases**

The Bankruptcy Court authorized the joint administration of the Debtors' Chapter 11 Cases.

2. **Motion to Continue Using Existing Cash Management Systems**

The Bankruptcy Court authorized the Debtors to continue to utilize their existing centralized cash management systems, to continue to use their existing bank accounts and business forms, to allow administrative expense status for postpetition intercompany claims and to continue performing under intercompany transactions and historical practices.

3. **Motion for Authority to Pay Prepetition Claims of Critical Vendors, Administrative Expense Claimholders, Customs Agents and Other Shippers and Postpetition Delivery of Outstanding Orders**

The Bankruptcy Court authorized the Debtors to pay or otherwise honor the pre-petition claims (a) of critical vendors up to a maximum dollar amount of $250,000 per vendor and a maximum aggregate dollar amount of $2,400,000, (b) entitled to administrative priority pursuant to Section 503(b)(9) of the Bankruptcy Code to a maximum dollar amount of $250,000 per vendor and a maximum aggregate dollar amount of $1,200,000, (c) of shippers, warehousemen and other parties involved in the transport of Debtors' inventory and merchandise up to a maximum aggregate dollar amount of $2,000,000, (d) related to U.S. customs duties imposed on shipments from foreign suppliers up to a maximum aggregate dollar amount of $2,500,000 and (e) of undisputed obligations arising from the postpetition shipment or delivery of imported goods for which orders had been placed prior to the Petition Date.

4. **Motion for Authority to Pay Pre-Petition Employee Wages, Salaries, Benefits, Miscellaneous Employee Expenses and Independent Contractor Fees and Expenses and Directing All Banks to Honor Pre-Petition Checks for Payment of the Foregoing**

The Bankruptcy Court authorized the Debtors to pay or otherwise honor the pre-petition wages, salaries benefits in the approximate amount of $2,900,000, reimbursable employee and executive expenses in the approximate amount of $100,000, independent contractor fees in the approximate amount of $132,000 and reimbursable contractor expenses in the approximate amount of $10,000. The Bankruptcy Court directed all financial institutions at which the Debtors maintained payroll and benefit accounts to honor pre-petition checks for payment of all such pre-petition obligations.

DB02:9065158.1

068417.1001

5.    **Motion Prohibiting Utilities From Altering, Refusing or Discontinuing Services, Deeming Utility Providers Adequately Assured of Future Performance and Establishing Procedures for Determining Requests for Additional Adequate Assurance**

The Bankruptcy Court initially entered an interim order and subsequently entered a final order prohibiting the Debtors' utility service providers from altering, refusing or discontinuing services on account of pre-petition invoices, deeming the utility providers adequately assured of future performance and establishing procedures for determining requests for additional adequate assurance.

6.    **Motion For Authority to Pay Taxes and Fees and Directing All Banks to Honor Checks for Payment of the Foregoing**

The Bankruptcy Court authorized the Debtors to pay pre-petition sales and use and other taxes collected by the Debtors from their customers or incurred in the ordinary course of their businesses up to a maximum aggregate dollar amount of $6,750,000 to the appropriate taxing authorities and instructed all banks and financial institutions to honor and process all checks or electronic transfers related to the foregoing.

7.    **Motion for Authority to Honor Certain Pre-petition Obligations to Customers, Maintain Customer Service Policies, Programs and Practices in the Ordinary Course of Business and Pay Certain Fees Associated with Credit Card Transaction and Gift Card Programs**

The Bankruptcy Court authorized the Debtors to honor and perform their obligations with respect to their customer programs, without regard to whether the obligations arose before or after the Petition Date; provided, that Debtors authorization to honor gift cards, certificates and promotional codes was limited to the earlier of (a) the time at which an auction for the sale of substantially all of the Debtors' assets is conducted and (b) September 1, 2009. The Bankruptcy Court directed all financial institutions on which checks were drawn or electronic payment requests were made to honor such checks and payment requests.

8.    **Motion for Authorization of the Incurrence of Post-petition Secured Indebtedness with Priority Over Certain Secured Indebtedness and with Administrative Superpriority, Granting Liens, Authorizing Use of Cash Collateral and Providing for Adequate Protection, Modifying the Automatic Stay and Scheduling a Final Hearing**

The Bankruptcy Court initially entered an interim order and subsequently entered a final order:

(a)    authorizing the Debtors to enter into a Debtor-In-Possession Loan and Security Agreement (the "DIP Credit Agreement") and related agreements with certain lenders and agents (the "DIP Secured Parties") and to perform its obligations thereunder;

(b)    authorizing the Debtors to borrow up to $90,000,000 on an interim basis (the "DIP Funds");

15

(c)     authorizing the Debtors to use the DIP Funds consistently with the terms of the DIP Credit Agreement;

(d)     granting the DIP Secured Parties first priority liens on the Debtors' assets;

(e)     granting (subject to certain exceptions) superpriority administrative expense claim status to the obligations incurred in connection with the DIP Credit Agreement;

(f)     authorizing the Debtors to use the cash collateral and proceeds of the DIP Credit Agreement; and

(h)     setting a final hearing date of July 7, 2009.

E.     **Appointment of Creditors' Committee**

On June 25, 2009, the U.S. Trustee appointed the Committee to represent the interests of the Debtors' unsecured creditors. Since its formation, the Debtors have consulted with the Committee concerning the administration of the Chapter 11 Cases. The Debtors have kept the Committee informed about their operations and have sought the concurrence of the Committee for actions and transactions taken outside of the ordinary course of the Debtors' businesses. The Committee has participated actively, together with the Debtors' management and professionals, in connection with negotiation of the Plan.

The Committee initially consisted of the following members: The Bank of New York Mellon; Tara Hill; RR Donnelley & Sons Company; Simon Property Group; GGP Limited Partnership; AQR Capital; and Highbridge Capital Management, LLC.

The Committee has had an active role in the Chapter 11 Cases. The Committee has worked with the Debtors hand in hand on all aspects of these Chapter 11 Cases,

F.     **Cash Collateral and Debtor-In-Possession Financing**

1.     **Cash Collateral**

The Debtors' obligations to its pre-petition lenders were secured by perfected first priority liens and security interests in substantially all of the personal property of the Debtors, including cash collateral (but subject to the intercreditor arrangements entered into by and among the Pre-Petition Term Lenders and the Pre-Petition Term Agent, collectively the "Pre-Petition Term Parties"). Thus, the Debtors did not have any unencumbered cash with which to operate their businesses. Moreover, the pre-petition secured lenders under the Pre-Petition Credit Agreements were unwilling to lend additional funds to the Debtors in excess of the amounts outstanding under the Pre-Petition Credit Agreements.

As a result, the Debtors explored post-petition financing with a number of financial institutions. While continuing to negotiate debtor-in-possession financing, the Debtors reached an agreement with their pre-petition lenders, Bank of America ("BofA"), allowing the Debtors to use the cash in which the Prepetition Secured Lenders had a security interest (the "Cash Collateral") to fund the day-to-day operations of the Debtors' businesses.

16

2.    **Debtor-in-Possession Financing**

On June 18, 2009, EBHI, as guarantor, entered into a Senior Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement (the "DIP Credit Agreement") providing for up to $100,000,000 as a debtor-in-possession credit facility (the "DIP Credit Facility") with Amargosa as borrower, the U.S. subsidiaries of Amargosa as guarantors, Bank of America, N.A., as agent ("BofA") and the other agents and lenders party thereto. On June 18, 2009, the Bankruptcy Court approved the DIP Credit Agreement on an interim basis, and authorized the Debtors to borrow up to $90,000,000 in the aggregate on an interim basis (the "Interim DIP Order"). On July 7, 2009, the Court entered the Final DIP Order (the "Final DIP Order"), permitting the Debtors to obtain credit and incur debt to a maximum amount of $100,000,000, with such debt secured by first priority, valid, priming, perfected, and enforceable liens on property of the Debtors' estates and with priority, as to administrative expenses, subject to the terms and conditions of the Bankruptcy Code and the Final DIP Order.

In conjunction with the final DIP Order, the Debtors granted the DIP Secured Parties Pre-Petition Replacement Term Liens (as defined in the Final DIP Order) and Pre-Petition Term Lien Superpriority Claims (as defined in the Final DIP Order) against the DIP Collateral (as defined in the Final DIP Order) to secure any Diminution in Value (as defined in the Final DIP Order) of the Pre-Petition Term Collateral. The Debtors also retained the right to assert claims against the DIP Secured Parties, the Pre-Petition Term Collateral and the DIP Collateral under Section 506(c) of the Bankruptcy Code ("506(c) Claims").

G.    **Sale of Assets**

On December 1, 2008, the Debtors engaged Peter J. Solomon Company, L.P. ("PJS") to act as investment banker in an advisory capacity to evaluate financial and strategic alternatives to preserve the Debtors as a going concern and pursue a sale process. As part of the engagement, PJS and the Debtors pursued a potential sale of the Debtors' assets.

On June 16, 2009, EBHI and substantially all of its subsidiaries, including certain non-Debtor subsidiaries but excluding Sandy and Sonoran, (the "Sellers") entered into an Asset Purchase Agreement with an affiliate of CCMP Capital Advisors ("CCMP") pursuant to which the Sellers agreed to sell substantially all of their assets to CCMP, and CCMP agreed to assume certain liabilities of the Sellers. The sale was to be conducted under the provisions of Section 363 of the Bankruptcy Code and was subject to proposed bidding procedures and the receipt of a higher and better bid at auction.

On June 30, 2009, the Bankruptcy Court entered an Order (A) Establishing Bidding and Auction Procedures Related to the Sale of All of the Debtors' Assets, (B) Approving Bid Protections for the Sale of All of the Debtors' Assets, (C) Scheduling an Auction and Sale Hearing for the Sale of All of the Debtors' Assets, (D) Establishing Certain Notice Procedures for Determining Cure Amounts for Executory Contracts and Leases to be Assigned and (E) Granting Certain Related Relief (the "Bid Procedures Order"). Pursuant to the Bid Procedures Order, the assets of (1) the Debtors and (2) certain of the Debtors' affiliate non-Debtor entities were offered for sale at an auction. The auction was scheduled for July 16, 2009 (the "Auction") and July 22, 2009 was set as the date of the sale hearing (the "Sale Hearing").

On July 16, 2009, the Sellers conducted and completed the Auction at which Golden Gate Capital was determined to be the highest and best offer. On July 17, 2009, the Sellers entered into an Asset Purchase Agreement with an affiliate of Golden Gate Capital ("Golden Gate") pursuant to which Golden Gate agreed to purchase substantially all of the assets of Sellers for $286 million in cash and to assume certain liabilities associated with the purchased Assets (the "Asset Sale").

On July 23, 2009, the Bankruptcy Court entered an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests; (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (C) Establishing Rejection Procedures and Guidelines for Conducting Stores Closing Sales; and (D) Extending the Deadline to Assume or Reject Unexpired Leases of Nonresidential Real Property Pursuant to 11 U.S.C. § 365(D)(4) (the "Sale Order").

On August 3, 2009, the Asset Sale was completed (the "Consummation Date") and (a) the Debtors' authority to use cash collateral expired; (b) the Debtors' obligations arising under the DIP Credit Facility were paid in cash and satisfied in full; (c) the Pre-Petition Term Agent, for the benefit of the Pre-Petition Term Lenders, received a payment of $135 million in partial satisfaction of the pre-petition obligations; (d) $11 million was deposited with the Canadian Monitor to be held pending resolution of the Canadian CCAA Cases; and (e) the unpaid Carve-Out of $9,436,650 was funded into the Carve-Out Escrow, $10,016,000 was funded into the Working Capital Adjustment Escrow to cover any purchase price adjustments under the Asset Purchase Agreement, and a total of $6,990,125.40 was funded into the Cure Escrow Deposit Accounts to fund cure amounts for executory contracts and unexpired leases assumed under the Asset Purchase Agreement. After making the payments described above, the Debtors' estates held approximately $39.6 million. As set forth in the Sale Order, liens, claims, interests and encumbrances attached to sale proceeds in the same order and priority as they existed prior to the completion of the Asset Sale.

*Transitional Services Agreement*

Upon the Consummation Date of the Asset Sale, and as required by the Asset Purchase Agreement, the Sellers and Golden Gate entered into a Real Property Lease Transitional Services Agreement ("Transitional Services Agreement"), attached as Exhibit E to the Asset Purchase Agreement. The Transitional Services Agreement permitted Golden Gate to enter into certain specified real property leases held by the Debtors that have not yet been designated for assumption and assignment pursuant to the terms of the Asset Purchase Agreement and to sell inventory and other merchandise from those retail stores (the "Stores") until the earlier of (i) the date on which Golden Gate designates the relevant real property lease as a lease it does not want to be assumed and assigned to it or its designee pursuant to the Asset Purchase Agreement or (ii) 5:00 p.m. (New York time) on the date that is two hundred ten (210) days from the Petition Date (determined to be January 13, 2010). During that time, Golden Gate agreed to pay all out-of-pocket expenses and costs of the Debtors resulting from Golden Gate conducting operations at the Stores, provided that Golden Gate is not required to pay for any indirect allocation of any administrative, internal or other overhead expenses of the Debtors.

DB02:9065158.1 068417.1001

Under the TSA, the Debtors also agreed to use their commercially reasonable efforts, until the date that is one hundred twenty (120) days from the Petition Date, to provide Golden Gate the benefits under certain specified contracts that had not yet been designated by Golden Gate as contracts that it did, or did not, want to be assumed and assigned to it or its designee pursuant to the Asset Purchase Agreement. Golden Gate agreed to be unconditionally responsible for payment of all amounts payable under such specified contracts during that one hundred twenty (120) day period.

Pursuant to the TSA, the Debtors also agreed, on behalf of and for the benefit of Golden Gate, to accept goods and inventory imported by Golden Gate into the United States in the operation of the Debtors' former business as the "importer of record" under the Debtors' United States Customs and Border Protection Continuous Import Bond beginning with the consummation of the Asset Sale and ending upon the earlier of (i) sixty (60) days following the consummation of the Asset Sale and (ii) the date on which Golden Gate obtained its own United States Customs and Border Protection Continuous Import Bond. Golden Gate agreed to pay all amounts due in connection with the Debtors' receipt and acceptance of any goods or inventory for or on behalf of Golden Gate.

*Assumption and Assignment or Rejection of Unexpired Real Property Leases*

The Asset Purchase Agreement provides that Golden Gate may designate any store lease as a lease that it would like to have assumed by the Sellers and assigned to it, or designate a lease as a lease that it would not like assumed, by providing a written notice to the Sellers prior to ten days before the designation deadline, which is 5:00pm (New York time) on the date that is two hundred ten (210) days from the Petition Date (determined to be January 13, 2010).

Upon receiving written notice of Golden Gate's designation of a store lease as a lease it would like assumed and assigned, or as a lease that it would not like assumed and assigned, the Sellers will prepare the Notice of Assumption or Rejection Notice as required by the Sale Order to effectuate the assumption or rejection of such leases. The Debtors must then file and serve on the lease counterparties a "Notice of Assumption and Assignment of Unexpired Real Property Leases" (the "Notice of Assumption") and also serve on the lease counterparties an updated adequate assurance package, including a statement of the Debtors' Final Cure Amount, as provided in the Bid Procedures Order. Similarly, the Debtors may reject any Unexpired Real Property Lease by filing and serving on the lease counterparties a notice of rejection (the "Rejection Notice").

The Notice of Assumption and the Rejection Notice must include a deadline of ten (10) days during which the lease counterparties may file an objection. Following the objection deadline, if there is no objection, the Sellers may submit an order that finalizes the assumption of the lease and the assignment of the lease to Golden Gate, and the Sellers will then be required to cure pre-existing defaults under the lease by payment of the agreed cure amounts to the lease counterparty. If there is an objection to the assumption, the assumption and assignment of the lease will be ordered after either the parties or the bankruptcy court resolve the objection. The rejection of a real property lease will become effective on the later of (i) ten days from the date the Rejection Notice is served on the landlord for the affected lease; or (ii) the date

the premises are vacated and any keys or keycodes are turned over to the affected landlord. Any property of the Sellers or Golden Gate on the premises of a rejected lease must be removed before the rejection is effective or declared abandoned.

## H.    **The Debtors' Current Management**

On August 3, 2009, in connection with the Asset Sale, EBHI's executive officers resigned, although Marv Toland, EBHI's Chief Financial Officer, and Freya Brier, EBHI's General Counsel, continued to perform in limited roles after that date. In addition, substantially all of the Debtors' employees were transferred to Golden Gate. On August 17, 2009, the board of directors of EBHI approved the appointment of Brent Kugman of Kugman Partners as EBHI's Chief Restructuring Officer, subject to approval of the Bankruptcy Court. The Bankruptcy Court entered an interim order approving the appointment of Mr. Kugman on August 18, 2009 and a final order approving the appointment of Mr. Kugman on _____, 2009. Mr. Kugman is currently the sole executive officer of the Debtors. The Debtors have no employees.

## I.    **The 506(c) Settlement Stipulation**

Upon the Consummation Date and as described above, the Debtors authority to use Cash Collateral expired, the obligations under the DIP Credit Facility were paid in cash and satisfied, the Pre-Petition Term Agent received payment in partial satisfaction of the Term Lender Secured Claim and various segregated deposit accounts were set up under the Sale Order and the Final Financing Order to fund specified obligations of the Debtors, including the Carve-Out Escrow, the Working Capital Adjustment Escrow and the Cure Escrow Deposit Accounts.

In addition, the Pre-Petition Term Agent and the Debtors entered into a Stipulation dated September 23, 2009, which was approved by the Final Order Authorizing the Debtors to Enter Into Stipulation with Wilmington Trust FSB, as Administrative Agent Resolving 506(c) Claims And Cash Collateral Issues dated September 23, 2009 (the "Section 506(c) Stipulation").

Pursuant to the Section 506(c) Stipulation, in exchange for a release and discharge of all claims arising under Section 506(c) of the Bankruptcy Code ("506(c) Claims") against the DIP Secured Parties, the Pre-Petition Term Collateral and the DIP Collateral (as each are defined in the DIP Facility Order), the Debtors and Pre-Petition Term Agent stipulated, among other things, for the provision of a settlement payment of $12,465,000 (the "Settlement Payment"), with the payment directed to the parties as set forth below:

- $3,075,000 or such lesser amount as approved by the Bankruptcy Court, to be paid to Peter J. Solomon Company, L.P. and Peter J. Solomon Securities Company, LLC (collectively, "PJS") in complete satisfaction of all fees and expenses due and owing by the Debtors to PJS;

- $2,960,000 for the fees and expenses of Debtor Professionals, other than PJS, to be added to the Carve Out and funded into the Carve-Out Escrow; and

      

- $6,430,000 for (i) tax and supplemental accounting support; (ii) banking, escrow and other miscellaneous expenses; (iii) consent payments; (iv) sales and use taxes; (v) real property taxes, personal property taxes and other miscellaneous taxes; and (vi) workers compensation and other employee benefit-related expenses to be deposited the Additional Deposit Account.

The Section 506(c) Stipulation also provided that:

- The Pre-Petition Term Lenders would retain their liens, claims and security interests on the deposit accounts and funds therein, but such liens, claims and security interests shall be junior and subordinate to the rights and claims of the beneficiaries of the Deposit Accounts and the Additional Deposit Account described in the DIP Facility Order, the Sale Order and in the Section 506(c) Stipulation; and

- The Debtors would not seek to use cash collateral or priming financing or otherwise to seek the use of cash collateral other than the Settlement Payment and the amounts in the Carve-Out Escrow, the Working Capital Adjustment Escrow, the Cure Escrow Deposit Accounts and the Additional Deposit Account unless consented to in advance. The Debtors also agreed not to prime or seek to prime or otherwise subordinate the Term Lender Secured Claim.

## J.      The Committee Settlement Stipulation

Pursuant to the Section 506(c) Stipulation between the Debtors and the Pre-Petition Term Agent, the Debtors waived the right to assert 506(c) Claims against the Pre-Petition Term Lenders, the Pre-Petition Term Collateral and the DIP Collateral (as each are defined in the DIP Facility Order). The Committee however, retained the rights to assert claims against the Pre-Petition Term Lenders, the Pre-Petition Term Collateral and the DIP Collateral on any other basis, including, without limitation, claims attacking the validity, priority and extent of the Pre-Petition Term Lenders' liens and claims (the "Committee Claims").

The Debtors, Creditors' Committee and the Pre-Petition Term Agent on behalf of the Pre-Petition Term Lenders subsequently agreed to resolve, settle and release the Committee Claims on the terms and conditions set forth in the Committee Settlement Stipulation. The Committee Settlement Stipulation was approved by the Order Authorizing the Debtors to Enter Into Stipulation with the Committee and Wilmington Trust FSB, as Administrative Agent Resolving, Releasing and Settling Claims held by the Official Committee of Unsecured Creditors dated October 22, 2009.

The terms of the Committee Settlement Stipulation provided that the Debtors' estates would receive the following consideration:

- $600,000 of the cash proceeds of the 363 Sale for the fees and expenses of the 'Creditors' Committees' Professionals would be added to the Carve Out and deposited in the Carve-Out Escrow;

- $6,000,000 of cash proceeds of the 363 Sale;

- the first $500,000 (or such lesser amount, which may be zero) remaining in the Cure Escrow Deposit Accounts after the beneficiaries of the Cure Escrow Deposit Accounts described in the Sale Order are paid pursuant to the terms and conditions as provided for in the Sale Order;

- any amounts remaining in the Carve-Out Escrow or the Additional Deposit Account after the beneficiaries of such accounts are paid in full;

- any refunds of any taxes received by the Debtors' estates from and after the Petition Date, including any actual payment of refunds of any taxes received by Tenere of Canada, Inc. and Yuma Customer Services, Inc. from their proceeding before the Superior Court of Justice, Commercial List, for the Judicial District of Ontario, which are subsequently paid to the Debtors' Estates solely up to the amount of any such refunds actually received by such entities from and after the Petition Date, which, for purposes of clarity, does not include the realization on any offsets of tax refunds against tax claim amounts.

The terms of the Committee Settlement Stipulation provided that the Pre-Petition Term Lenders would receive the following consideration (paid to the Pre-Petition Term Agent for the benefit of the Pre-Petition Term Lenders):

- all cash of the Debtors that from time to time comes into the possession of the Debtors' estates, other than cash to be used to fund the Carve-Out Escrow, the Additional Deposit Account or the Settlement Payment;

- any amounts remaining in the Working Capital Adjustment Escrow after the beneficiaries of the Working Capital Adjustment Escrow described in the Sale Order are paid pursuant to the terms and conditions as provided for in the Sale Order;

- any amounts remaining in the Cure Escrow Deposit Accounts after the beneficiaries of the Cure Escrow Deposit Accounts described in the Sale Order are paid pursuant to the terms and conditions as provided for in the Sale Order and after the first $500,000 in excess of such amounts paid is distributed to the Debtors' estates pursuant to the Committee Settlement Stipulation;

- any amount distributed by the Canadian proceedings on account of (i) the Debtors' equity interests in such entities or (ii) the Debtors' claims against such entities arising from any intercompany claims, loans, notes, transfers

or other obligations, except for the amounts to be distributed to the Debtors' estates on account of tax refunds;

- that under no circumstances shall the Pre-Petition Term Lenders be liable for any future funding or payments to the Debtors' estates, including, without limitation, for the payment of any claims arising from any deficit of the Working Capital Adjustment Escrow, the Carve-Out Escrow, the Additional Deposit Account, or the Cure Escrow Deposit Accounts to satisfy any obligations arising to the beneficiaries of such accounts. The Debtors' estates shall be responsible for any anticipated or unanticipated deficits arising with respect to the foregoing including any costs or claims associated with any potential reorganization of the Debtors, including, without limitation, any claims that may be asserted by the Pension Benefit Guaranty Corporation, and none of all of the foregoing such claims shall be chargeable to, or be the responsibility of, the Pre-Petition Term Lenders.

The Committee Settlement Stipulation further provided that the Pre-Petition Term Lenders would retain their liens, claims and security interests on (i) the Cure Escrow Deposit Accounts and the funds therein; and (ii) the Working Capital Adjustment Escrow and the funds therein. However, such liens and security interests would be junior and subordinate to the rights and claims of the beneficiaries of the Cure Escrow Deposit Accounts and the Working Capital Adjustment Escrow as described in the Sale Order and the Stipulation and (ii) any cash supporting any of the Debtors' letters of credit.

In return for such consideration, the Creditors' Committee waived, released and forever discharged all Committee Claims, whenever arising, against the Pre-Petition Term Lenders, the Pre-Petition Term Collateral and the DIP Collateral and the validity or amount of the Term Lender Secured Claim. The Pre-Petition Term Agent, in return, on behalf of the Term Lenders (and at the direction of the requisite Pre-Petition Term Lenders) waived, released and forever discharged any Term Lender Deficiency Claim and any Term Lender Adequate Protection Claim.

## K.     **The Claims Process**

The Bankruptcy Code provides a procedure for each person who believes he has a claim against a debtor to assert such claim, so that such claimant can receive distributions from the debtor's bankruptcy estate. The bankruptcy court establishes a "bar date" – a date by which creditors must file their claims, or else such claims will not participate in the bankruptcy case or any distribution. After the filing of all claims, the debtor evaluates such claims and can, along with other parties in interest, raise objections to them. These claims objections allow the debtor to minimize claims against it, and thereby maximize the recovery to creditors with Allowed Claims.

By Order dated July 20, 2009 ("Bar Date Order"), the Bankruptcy Court established September 21, 2009 (the "Original Bar Date") as the deadline for filing proofs of Claims against the Debtors, other than claims of governmental units and Administrative Expense

Claims. The Bankruptcy Court established December 14, 2009 as the date as the deadline for filing proofs of Claims by governmental units (the "Governmental Units Claims Bar Date").

Pursuant to the Plan, all unpaid Administrative Expense Claims must be filed on or before the Administrative Expense Claims Bar Date. The Administrative Expense Claims Bar Date is the first Business Day that is at least forty-five (45) days following the Effective Date.

The Debtors have been reviewing, analyzing and resolving Claims on an ongoing basis as part of the claims reconciliation process. To date approximately 1,300 proofs of claim have been asserted in the Chapter 11 Cases. Over the last several months, the Debtors have only preliminarily begun to reconcile the amount and classification of outstanding claims and to assert and prosecute objections to claims. The Debtors have also identified Claims for future resolution, as well as other existing or potential claims disputes. Nonetheless, a significant number of Claims have not yet been resolved to date, and the actual ultimate aggregate amount of Allowed Claims may differ significantly from the amounts used for the purposes of the Debtors' estimates. Additionally, the Debtors are in the process of reviewing their schedules filed with the Bankruptcy Court and, upon the completion of such review, will likely amend such schedules to account for certain Claims that have been satisfied or settled. Accordingly, the amount of the Pro Rata share that will ultimately be received by any particular holder of an Allowed Claim may be adversely affected by the outcome of the claims resolution process.

L.      **Convertible Senior Notes Issued by the Debtors Pursuant to the Indenture**

The Debtors issued certain 5.25% Convertible Senior Notes due 2014 pursuant to the Indenture dated as of April 4, 2007, among EBHI and The Bank of New York, as trustee, and all supplements and amendments thereto. As of the Petition Date, the Face Amount of such notes was $75,000,000. The Senior Notes Claims are Unsecured Claims and will receive the same treatment as other Unsecured Claims under the Plan.

M.      **Substantive Consolidation of the Debtors**

As set forth in more detail in Section IV, the Plan provides for the substantive consolidation of the Debtors with respect to the voting and treatment of all Claims and Interests except General Secured Claims. Section 105(a) of the Bankruptcy Code empowers a bankruptcy court to authorize substantive consolidation. Although the United States Court of Appeals for the Third Circuit has not articulated a standard regarding substantive consolidation, several courts, including the United States Courts of Appeals for the First Circuit, Second Circuit, D.C. Circuit, Eighth Circuit and Eleventh Circuit have developed similar tests for authorizing substantive consolidation. See Reider v. F.D.I.C. (In re Reider), 31 F.3d 1102, 1107-1108 (11th Cir. 1994); Woburn Assoc. v. Kahn (In re Hemingway Transport Inc.), 954 F.2d 1, 11-12 (1st Cir. 1992); First Nat'l Bank of El Dorado v. Giller (In re Giller), 962 F.2d 796, 798-99 (8th Cir. 1992); Union Sav. Bank. v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.), 860 F.2d 515, 518 (2d Cir. 1988); Drabkin v. Midland-Ross Corp. (In re Auto-Train Corp.), 810 F.2d 270, 276 (D.C. Cir. 1987).

Several courts within the Third Circuit have acknowledged the existence and application of substantive consolidation of separate bankruptcy estates in appropriate circumstances. See In re Molnar Bros., 200 B.R. 555 (Bankr. D.N.J. 1996) (recognizing the application of substantive consolidation of two or more bankruptcy estates); In re PWS Holding Corp., Bruno's. Inc., et al., Case No. 98-212-223 (SLR) (D. Del. 1998) (approving substantive consolidation of debtors pursuant to a plan of reorganization); In re Smith Corona Corp. et al., Case No. 95-788 (HSB) (Bankr. D. Del., Oct. 18, 1996) (adopting substantive consolidation test articulated by the Eighth Circuit); Bracaglia v. Manzo (In re United Stairs Corp.), 176 B.R. 359, 368 (Bankr. D.N.J. 1995) (stating that it is "well established that in the appropriate circumstances the court may substantively consolidate corporate entities"); In re Buckhead American Corp., 1992 Bankr. LEXIS 2506 (Bankr. D. Del. August 13, 1992) (substantively consolidating debtors); In re Cooper, 147 B.R. 678, 682 (Bankr. D.N.J. 1992) (stating that substantive consolidation constitutes the "merger of the assets and liabilities of two or more estates, creating a common fund of assets and a single body of creditors.") (citation omitted).

In general, these cases identify two factors which must be examined in the context of a substantive consolidation analysis: (i) whether there is a "substantial identity" or an inseparable "interrelationship" or "entanglement" between the debtors to be consolidated and (ii) whether the benefits of consolidation outweigh the harm or prejudice to creditors, including whether individual creditors relied upon the separate identity of one of the entities to be consolidated such that they would be prejudiced by consolidation. The facts of these Chapter 11 Cases necessitate substantive consolidation, and substantive consolidation is warranted under either prong of the aforementioned test

There is extensive evidence of a substantial identity, extensive interrelationship, interdependence and entanglement between and among the Debtors such that the Debtors are inextricably intertwined in virtually all operational and financial aspects. Such operational and financial interdependence and entanglement is evidenced in numerous ways and has been pervasive since the Debtors' inception. For instance, the members of the board of directors and the officers for each direct and indirect subsidiary of Amargosa are substantially identical. Additionally, although separate books and records are maintained for each Debtor, the Debtors' businesses were operated without regard for their separate assets, liabilities, employees or management. For example, all of the Debtors paid their employees out of the same payroll account and the Debtors filed consolidated federal tax returns.

The Debtors prepared and disseminated consolidated financial reports to the public, including customers, suppliers, landlords, lenders, credit rating agencies and stockholders. Because the Debtors disseminated financial information to the public on a consolidated basis, it is unlikely that creditors relied on the separate identity of any Debtor in extending credit to such Debtor.

After considering how the Debtors conducted their businesses, it is clear that the Debtors businesses were inextricably intertwined on a financial basis and not merely on an operational basis.

The second prong of the test for determining whether substantive consolidation of the Debtors is warranted is whether the benefits of consolidation will outweigh the potential

DB02:9065158.1 068417.1001

prejudice to the Debtors' creditors. As noted above, because financial information disseminated to customers, suppliers, landlords, lenders, credit rating agencies and stockholders, has been prepared and presented on a consolidated basis, it is unlikely that creditors relied upon the separate identity of any Debtor when deciding whether to extend credit to such Debtor. Moreover, because the Debtors' affairs are integrated, interrelated and entangled from both a functional and a financial perspective, the substantive consolidation of the Debtors would be equitable for all creditors. Substantive consolidation would ensure that all of the Debtors' creditors, having relied on the creditworthiness of the Debtors as a unit, receive the benefit of distribution in satisfaction of their claims from the single pool of assets.

Finally, substantive consolidation will expedite the conclusion of the Chapter 11 Cases. Absent substantive consolidation, the Debtors would be required to disentangle their assets and liabilities and litigate the validity and priority of their respective Intercompany Claims. The reconciliation and resolution of the Intercompany Claims that would be required by such disentanglement would be extremely costly and would unnecessarily delay the conclusion of the Chapter 11 Cases. See In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723, 766 (Bankr. S.D.N.Y. 1992) (ordering substantive consolidation and stating "[e]stablishing to whom actual liability, if any, should be allocated would be a herculean task consuming years of costly professional services. . . . The reorganization effort will be obstructed perhaps irreparably . . . by an effort to [tear] apart pieces of an integrated whole."); Chemical Bank New York Trust Co. v. Kheel (In re Seatrade Corp.), 369 F.2d 845, 847 (2d Cir. 1966) (ordering substantive consolidation and stating "where the interrelationships of the group are hopelessly obscured and the time and expense necessary even to attempt to unscramble them so substantial as to threaten the realization of any net assets for all the creditors, equity is not helpless to reach a rough approximation of justice to some rather than deny any to all.").

For the reasons set forth above, the Debtors believe that the requirements for substantive consolidation of the Debtors with respect to voting and treatment of all Claims and Interests except for Class 2 Claims are satisfied.

The Plan and Disclosure Statement do not contemplate or seek the substantive consolidation of any of the Debtors with their non-Debtor subsidiaries. The Plan and Disclosure Statement also do not seek substantive consolidation with respect to General Secured Claims. Thus, any pledge by any of the Debtors of any of its respective Assets, including, without limitation any stock in any of its subsidiaries, is unaffected by the limited substantive consolidation proposed in the Plan.

## IV.
## CHAPTER 11 PLAN

**THE FOLLOWING IS A BRIEF SUMMARY OF CERTAIN OF THE MORE SIGNIFICANT MATTERS CONTEMPLATED BY OR IN CONNECTION WITH THE CONFIRMATION OF THE PLAN. THUS, THE FOLLOWING SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN, WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS EXHIBIT A. THIS SUMMARY ONLY HIGHLIGHTS CERTAIN SUBSTANTIVE PROVISIONS OF THE PLAN. CONSIDERATION OF THIS SUMMARY WILL NOT, NOR IS IT INTENDED TO, YIELD A THOROUGH**

26

UNDERSTANDING OF THE PLAN. SUCH CONSIDERATION IS NOT A SUBSTITUTE FOR A FULL AND COMPLETE READING OF THE PLAN. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO REVIEW THE PLAN CAREFULLY. THE PLAN, IF CONFIRMED, WILL BE BINDING ON EACH OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS.

A.    **Plan Overview**

The Plan contains four types of unclassified Claims: Administrative Expense Claims, Statutory Fees, Professional Claims and Priority Tax Claims. In addition, the Plan classifies Claims and Interests as follows: Class 1 Other Priority Claims, Class 2 General Secured Claims, Class 3 Term Lender Secured Claim, Class 4 General Unsecured Claims, Class 5 Noteholder Securities Claims, Class 6 Intercompany Claims, Class 7A Interests and Class 7B Interests Securities Claims. Classes 1 and 2 are Unimpaired and Classes 3, 4, 5, 6, 7A and 7B are Impaired.

B.    **Plan Summary**

The Plan is premised on the substantive consolidation of all of the Debtors with respect to the voting and treatment of all Claims and Interests except for the General Secured Claims in Class 2, as provided below. The Plan does not contemplate substantive consolidation of the Debtors with respect to the Class 2 Claims, which shall be deemed to apply separately with respect to the Plan proposed by each Debtor. The Plan shall serve as a request by the Debtors, in lieu of a separate motion, to the Bankruptcy Court that it grant substantive consolidation with respect to the treatment of all Claims and Interests other than Class 2 Claims as follows: on the Effective Date, ) (a) all Class 6 Intercompany Claims will be eliminated (except to the extent such claims are by a Debtor against a non-Debtor Affiliate or a non-Debtor subsidiary); (b) all Assets and liabilities of the Debtors will be merged or treated as though they were merged (except to the extent they secure any Allowed General Secured Claim); (c) all guarantees of the Debtors of the obligations of any other Debtor and any joint or several liability of any of the Debtors shall be eliminated; and (d) each and every Claim or Interest (except for General Secured Claims) against any Debtor shall be deemed Filed against the consolidated Debtors and all Claims (except for General Secured Claims) Filed against more than one Debtor for the same liability shall be deemed one Claim against any obligation of the consolidated Debtors.

C.    **Unclassified and/or Unimpaired Claims**

The Unclassified and/or Unimpaired Claims consist of Administrative Expense Claims, Statutory Fees, Professional Claims and Priority Tax Claims. These Claims shall be treated as follows:

**Administrative Expense Claims.** Subject to the allowance procedures and deadlines provided in the Plan, on the Effective Date or as soon thereafter as is practicable in recognition of the applicable claims resolution process set forth herein, the holder of an Allowed Administrative Expense Claim shall receive on account of the Allowed Administrative Expense Claim and in full satisfaction, settlement and release of and in exchange for such Allowed

DB02:9065158.1                                                                      068417.1001

Administrative Expense Claim, (a) Cash equal to the unpaid portion of such Allowed Administrative Expense Claim, or (b) such other treatment as to which the Debtors and the holder of such Allowed Administrative Expense Claim have agreed upon in writing; provided, however, that Administrative Expense Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreement or course of dealing relating thereto and Professional Claims shall be paid in accordance with Section 2.3 of the Plan; provided, further, that any payments made on account of an Allowed Administrative Expense Claim shall be made solely from Other Assets Proceeds.

**Statutory Fees.** On or before the Effective Date, all fees due and payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid in full, in Cash, solely from Other Assets Proceeds.

**Professional Claims.** Immediately prior to the Effective Date, the Debtors shall pay all amounts owing to the Professionals for all outstanding Professional Claims relating to prior periods and for the period ending on the Effective Date solely from Cash in the Carve-Out Escrow or from Other Assets Proceeds. The Professionals shall estimate Professional Claims due for periods that have not been billed as of the Effective Date. On or prior to the Administrative Expense Claims Bar Date, each Professional shall file with the Bankruptcy Court its final fee application seeking final approval of all fees and expenses from the Petition Date through the Effective Date. Within ten (10) days after entry of a Final Order with respect to its final fee application, each Professional shall remit any overpayment to the Liquidating Trustee or the Liquidating Trustee shall pay any outstanding amounts owed to the Professional solely from Cash in the Carve-Out Escrow or from Other Assets Proceeds.

**Priority Tax Claims.** With respect to each Allowed Priority Tax Claim, at the sole option of the Debtors, the holder of an Allowed Priority Tax Claim shall be entitled to receive on account of such Allowed Priority Tax Claim, in full satisfaction, settlement and release of and in exchange for such Allowed Priority Tax Claim, (a) in accordance with Bankruptcy Code section 1129(a)(9)(C), equal Cash payments made on the Effective Date or as soon as practicable thereafter in recognition of the applicable claims reconciliation process set forth herein and on the last Business Day of every three (3) month period following the Effective Date, over a period not exceeding six (6) years after the assessment of the tax on which such Claim is based, totaling the principal amount of such Claim plus simple interest on any outstanding balance, compounded annually from the Effective Date, calculated at the interest rate available on ninety (90) day United States Treasuries on the Effective Date; (b) such other treatment agreed to by the holder of such Allowed Priority Tax Claim and the Debtors on or prior to the date ninety (90) days after the Effective Date, provided such treatment is on more favorable terms to the Debtors, as the case may be, than the treatment set forth in subsection (a) above; or (c) payment in full, in Cash to all holders of Allowed Priority Tax Claims that have not agreed to less favorable terms made on the Effective Date or as soon thereafter as is practicable in recognition of the applicable claims reconciliation process set forth herein; provided, however, that any payment made on account of an Allowed Priority Tax Claim shall be made solely from Other Assets Proceeds.

DB02:9065158.1 068417.1001

In accordance with the Bankruptcy Code, the Allowed Administrative Expense Claims and Allowed Priority Tax Claims are not classified. Therefore, the claimants holding the aforementioned Claims may not vote on the Plan.

**D.      Treatment of Claims and Interests**

The treatment of and consideration to be received by holders of Allowed Claims and the treatment of Interests pursuant to Article 5 of the Plan will be in full satisfaction, settlement, release, extinguishment and discharge of their respective Allowed Claims against, or Interests in, the Debtors and the Debtors' Estates, except as otherwise expressly provided in the Plan or the Confirmation Order.

1.      **Class 1 – Priority Claims**

a.      Definition of Class 1 – Other Priority Claims

Other Priority Claims are any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, of a Creditor to the extent such Claim is entitled to priority pursuant to Bankruptcy Code section 507(a).

b.      Treatment of Class 1 – Other Priority Claims

On the Effective Date, or as soon thereafter as is reasonably practicable in recognition of the applicable claims reconciliation process set forth herein, each Allowed Other Priority Claim shall receive from the Other Assets Proceeds (as defined in the Plan), in full satisfaction, settlement and release of and in exchange for such Allowed Other Priority Claim, (a) Cash equal to the amount of such Allowed Other Priority Claim, or (b) such other treatment as to which the Debtors and the holder of such Allowed Other Priority Claim have agreed upon in writing.

c.      Voting Status of Class 1 – Other Priority Claims

Class 1 is not Impaired and is deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Thus, the claimants in Class 1 may not vote on the Plan.

2.      **Class 2 – General Secured Claims**

a.      Definition of Class 2 – General Secured Claims

General Secured Claims are all Secured Claims against the Debtors other than the Allowed Term Lender Secured Claims.

b.      Treatment of Class 2 – General Secured Claims

On the Effective Date or as soon thereafter as is practicable in recognition of the applicable claims reconciliation process set forth herein, each Allowed General Secured Claim, that was not assumed by the Purchaser in connection with the 363 Sale shall receive from the

Other Assets Proceeds, in full satisfaction, settlement and release of and in exchange for such Allowed General Secured Claim, (a) Cash equal to the amount of such Allowed General Secured Claim, or (b) such other treatment as to which the Debtors and the holder of such Allowed General Secured Claim have agreed upon in writing, and the Liens and security interests on the Debtors' Assets securing such Allowed General Secured Claim shall be released and the Debtors and their Estates shall have no further liability therefor; provided, however, that any Deficiency Claims of holders of Class 2 General Secured Claims shall not constitute Class 2 General Secured Claims and shall be treated as Class 4 General Unsecured Claims under the Plan.

        c.      Voting Status of Class 2 – General Secured Claims

Class 2 is not Impaired and is deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Thus, the claimants in Class 2 may not vote on the Plan.

        3.      **Class 3 – Term Lender Secured Claim**

        a.      Definition of Class 3 – Term Lender Secured Claim

The Term Lender Secured Claim is the claim of the Pre-Petition Term Agent on behalf of the Pre-Petition Term Lenders, which is Allowed in the amount of $202,933,053.85, plus post-petition interest and all out-of-pocket fees and expenses of the Pre-Petition Term Agent and the Pre-Petition Term Lenders (including, but not limited to, attorney fees, audit fees, appraiser fees and financial advisor fees) as provided for in the Committee Settlement Stipulation.

        b.      Treatment of Class 3 – Term Lender Secured Claim

The Pre-Petition Term Agent shall receive, for the benefit of the Pre-Petition Term Lenders, in full satisfaction, settlement and release of and in exchange for the Allowed Term Lender Secured Claim, periodic distributions from the Liquidating Trust of the Term Lender Assets Proceeds pursuant to the terms of the Committee Settlement Stipulation.

The Allowed Term Lender Deficiency Claim and any Term Lender Adequate Protection Claim were released by the Pre-Petition Term Agent on behalf of the Pre-Petition Term Parties as part of the Committee Settlement Stipulation. Therefore, no distributions shall be made on account of the Allowed Term Lender Deficiency Claim or any Term Lender Adequate Protection Claim and, on the Effective Date, the Allowed Term Lender Deficiency Claim and any Term Lender Adequate Protection Claim shall be cancelled.

        c.      Voting Status of Class 3 – Term Lender Secured Claim

Class 3 is Impaired and may vote on the Plan.

4.    **Class 4 – General Unsecured Claims**

     a.    Definition of Class 4 – General Unsecured Claims

General Unsecured Claims are all Unsecured Claims against the Debtors other than the Term Lender Deficiency Claims, the Intercompany Claims, the Noteholder Securities Claims and the Interests Securities Claims.

     b.    Treatment of Class 4 – General Unsecured Claims

After (a) satisfaction in full or satisfaction in accordance with the Plan of all Allowed Administrative Expense Claims, Professional Claims and Allowed Priority Tax Claims as provided in Article 2 of the Plan, and (b) the treatment provided in the Plan for Allowed Claims in Classes 1 and 2, all remaining Available Cash (if any) shall be allocated Pro Rata among holders of Senior Notes Claims and Allowed Other Unsecured Claims. Each holder of an Allowed General Unsecured Claim, shall receive, in full satisfaction, settlement and release of and in exchange for its Allowed General Unsecured Claim, periodic distributions from the Liquidating Trust of its share of Available Cash allocable on account of its Allowed General Unsecured Claim, shared Pro Rata with the holders of other Allowed General Unsecured Claims.

     c.    Voting Status of Class 4 – General Unsecured Claims

Class 4 is Impaired and may vote on the Plan.

5.    **Class 5 – Noteholder Securities Claims**

     a.    Definition of Class 5 – Noteholder Securities Claim

Noteholder Securities Claims are the Claims, including unknown claims, demands, rights, liabilities and causes of action of any kind whatsoever, known or unknown, which have been or could be asserted in a direct, derivative or other capacity against any Debtor and/or the Indenture Trustee arising out of, relating to or in connection with (a) the purchase, sale or other decision or action made or taken, or declared, failed or refused to be made or taken, or otherwise foregone, concerning or relating to the Senior Notes; (b) the purchase, ownership or sale of the Senior Notes; and (c) any other claims arising out of, relating to or in connection with the Senior Notes that would be subject to section 510(b) of the Bankruptcy Code.

     b.    Treatment of Class 5 – Noteholder Securities Claims

Holders of Noteholder Securities Claims will not receive any distribution under the Plan on account of their Claims and, on the Effective Date, the Noteholder Securities Claims will be cancelled.

     c.    Voting Status of Class 5 – Noteholder Securities Claims

Class 5 is Impaired. However, because the holders of Noteholders Securities Claims in Class 5 will receive no distribution under the Plan, they are deemed to have rejected

DB02:9065158.1

068417.1001

the Plan pursuant to section 1126(g) of the Bankruptcy Code. Consequently, holders of Noteholder Securities Claims in Class 5 may not vote on the Plan.

6.  **Class 6 – Intercompany Claims**

    a.    Definition of Class 6– Intercompany Claims

    Intercompany Claims are the Claims of any Debtor against any other Debtor, and shall exclude any claims of a Debtor against a non-Debtor Affiliate or a non-Debtor subsidiary.

    b.    Treatment of Class 6– Intercompany Claims

    As a result of substantive consolidation of the Debtors for distribution purposes under the Plan as provided in Section 7.1 thereof, holders of Intercompany Claims will not receive any distribution of property under the Plan on account of their Intercompany Claims and, on the Effective Date, the Intercompany Claims will be cancelled; provided, however, Class 6 shall exclude any claims of a Debtor against a non-Debtor Affiliate or a non-Debtor subsidiary.

    c.    Voting Status of Class 6 – Intercompany Claims

    Class 6 is Impaired. However, because the holders of Claims in Class 6 will receive no distribution under the Plan, they are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Consequently, holders of Claims in Class 6 may not vote on the Plan.

7.  **Class 7A – Interests**

    a.    Definition of Class 7A – Interests

    Interest means, when used in the context of holding an equity security of the Debtors (and not used to denote (i) the compensation paid for the use of money for a specified time and usually denoted as a percentage rate of interest on a principal sum of money or (ii) a security interest in property), an interest or share in, or warrant, option, restricted stock unit, or other right asserted against, the Company of the type described in the definition of "equity security" in Bankruptcy Code section 101(16), and shall include all common stock and all warrants, options or other rights to purchase or subscribe to, or otherwise obtain common stock issued by the Company.

    b.    Treatment of Class 7A – Interests

    Holders of Interests will receive no distributions on account of such holders' Interests. On the Effective Date, all Interests of the Debtors will be cancelled.

    c.    Voting Status of Class 7A – Interests

    Class 7A is Impaired. However, because the holders of Interests in Class 7A will receive no distribution under the Plan, they are deemed to have rejected the Plan pursuant to

32

section 1126(g) of the Bankruptcy Code. Consequently, holders of Interests in Class 7A may not vote on the Plan.

        8.        **Class 7B – Interests Securities Claims**

                a.        Definition of Class 7B – Interests Securities Claims

Interests Securities Claims are the Claims, including unknown claims, demands, rights, liabilities and causes of action of any kind whatsoever, known or unknown, which have been or could be asserted in a direct, derivative or other capacity against any Debtor arising out of, relating to or in connection with (a) the purchase, sale or other decision or action made or taken, or declined, failed or refused to be made or taken, or otherwise foregone, concerning or relating to the Interests; (b) the purchase, ownership or sale of the Interests; and (c) any other claims arising out of, relating to or in connection with the Interests that would be subject to section 510(b) of the Bankruptcy Code.

                b.        Treatment of Class 7B – Interests Securities Claims

Holders of Interests Securities Claims will receive no distributions on account of such holders' Claims. On the Effective Date, all Interests Securities Claims will be cancelled.

                c.        Voting Status of Class 7B – Interests Securities Claims

Class 7B is Impaired. However, because the holders of Interests in Class 7B will receive no distribution under the Plan, they are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Consequently, holders of Interests in Class 7B may not vote on the Plan.

E.        **Post-Confirmation Operations of the Debtors**

On the Effective Date, the Debtors, on their own behalf and on behalf of the Beneficiaries, shall execute the Liquidating Trust Agreement and take all steps necessary to establish the Liquidating Trust. The Liquidating Trustee shall be chosen by the Creditors' Committee and shall be Brent Kugman or another person reasonably acceptable to the Pre-Petition Term Agent, at the direction of the requisite Pre-Petition Term Lenders.

The Liquidating Trust (as described more fully below) is being established for the sole purpose of liquidating the Debtors' Assets and distributing the proceeds thereof to certain holders of Allowed Claims, as identified in and prescribed by the Plan. The Liquidating Trust shall not continue or engage in any trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. Unless otherwise required by law, it is intended that all parties shall treat the Liquidating Trust as a liquidating trust for all federal income tax purposes.

On the Effective Date of the Plan, each of the Debtors shall transfer and assign all of its respective Assets to the Liquidating Trust free and clear of all Liens, Claims, interests and encumbrances. All of the Term Lender Assets transferred to the Liquidating Trust shall be transferred subject to the Liens of the Pre-Petition Term Agent in favor of the Pre-Petition Term

Lenders, and the Carve-Out Escrow shall be transferred subject to the Carve Out. Title to all Assets contributed to the Liquidating Trust shall vest in the Liquidating Trust on the Effective Date following the transfer.

As soon as possible after the Effective Date, but in no event later than ninety (90) days thereafter, the Liquidating Trustee, based upon his good faith determination after consultation with his counsel, shall inform the Beneficiaries in writing solely as to his estimate of the value of the assets transferred to the Liquidating Trust and the value of such assets allocable to the Holders of Allowed Claims in Classes 3 and 4. The valuation shall be used consistently by all parties (including, without limitation, the Debtors, the Liquidating Trustee, and the Beneficiaries) for all federal income tax purposes, and the parties shall file tax returns consistent with such valuation; provided, however, that such valuation shall not be binding on the Liquidating Trustee or any other party for any other purposes, including, without limitation, in regard to the liquidation of the Trust Assets, whether by disposition, liquidation, litigation, settlement or otherwise.

For U.S. federal income tax purposes, the Debtors, the Liquidating Trustee and the Beneficiaries will treat the transfer of assets to the Liquidating Trust as a transfer by the Debtors of the assets (net of any applicable liabilities) to the Beneficiaries (to the extent of the value of their respective interests in the applicable Liquidating Trust Assets), followed by a transfer of such assets (net of any applicable liabilities) by the Beneficiaries to the Liquidating Trust (to the extent of the value of their respective interests in the applicable Liquidating Trust Assets). For U.S. federal income tax purposes, the Liquidating Trust (except with respect to the Disputed Claims Reserve) will be treated as one or more grantor trusts, and the Beneficiaries will be treated as the grantors and deemed owners of the Liquidating Trust.

On the Effective Date, except as otherwise specifically provided for in the Plan, (i) the Indenture and the Senior Notes shall be cancelled and (ii) the obligations and Claims against the Debtors arising under, evidenced by, or relating to any agreements, indentures, certificates of designation, bylaws, certificates or articles of incorporation, or similar documents governing the Senior Notes and the Indenture shall be released and discharged. Notwithstanding the foregoing, the obligations and duties of the Indenture Trustee arising under the Indenture shall continue in effect solely for the purposes of (A) permitting the Indenture Trustee to make the distributions to be made on account of Senior Notes Claims as provided for in the Plan and (B) maintaining any rights or Liens the Indenture Trustee may have against the holders of the Senior Notes for fees, costs, or expenses under the Indenture. Upon the cancellation, the Indenture Trustee, its agents, attorneys and employees will be released from all obligations, claims or liabilities (other than the right to enforce the Debtors' and the Liquidating Trustee's obligations under the Plan, and the contracts, instruments, releases, agreements and documents delivered under the Plan) that are based in whole or in part on any act or omission, transaction, event or other occurrence in connection with the Indenture taking place on or prior to the Effective Date.

In furtherance of the implementation of the Plan, except as otherwise provided therein, all injunctions or stays provided for in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect and apply to all Beneficiaries and creditors holding claims against

the Debtors, the Estates, the Assets, the Liquidating Trustee, the Liquidating Trust and the Trust Assets until the Final Distribution Date.

On or prior to the Effective Date, EBHI shall create a direct or indirect wholly owned Delaware corporation subsidiary (the "Equityholding Subsidiary"). On the Effective Date, prior to the transfer of the Assets by the Debtors to the Liquidating Trust, (i) the Debtors' equity interests in Tenere of Canada, Inc. and Yuma Customer Services, Inc. and (ii) the Debtors' claims against such entities arising from any intercompany claims, loans, notes, transfers or other obligations shall be transferred by the Debtors to the Equityholding Subsidiary, and continue to be subject to the Liens of the Pre-Petition Term Agent in favor of the Pre-Petition Term Lenders. The equity interests of the Equityholding Subsidiary shall be transferred to the Liquidating Trust, and the Liquidating Trustee (or his duly appointed successor) shall exercise his powers as the sole shareholder of the Equityholding Subsidiary to appoint himself as the sole officer and director of the Equityholding Subsidiary.

Following Confirmation and prior to the occurrence of the Effective Date, the then-current officers and directors of each of the Debtors shall continue in their respective capacities and the Debtors shall execute such documents and take such other action as is necessary to effectuate the transactions provided for in the Plan. On and after the Effective Date, all such officers and directors shall be deemed to have resigned.

As soon as practicable after the Effective Date, each of the Debtors will be dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtors or payments to be made in connection therewith; provided, however, that pursuant to section 1124(b) of the Bankruptcy Code, the Liquidating Trustee shall be authorized to file each Debtor's final tax returns, and shall be authorized to file and shall file with the official public office for keeping corporate records in each Debtor's state of incorporation a certificate of dissolution or equivalent document. Such a certificate of dissolution may be executed by the Liquidating Trustee without need for any action or approval by the shareholders or Board of Directors of any Debtor. From and after the Effective Date, the Debtors (i) for all purposes shall be deemed to have withdrawn their business operations from any state in which they were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum or take any other action, in order to effectuate such withdrawal, (ii) shall be deemed to have cancelled pursuant to the plan all Interests and all Intercompany Claims, and (iii) shall not be liable in any manner to any taxing authority for franchise, business, license or similar taxes accruing on or after the Effective Date.

Notwithstanding anything to the contrary in the Bankruptcy Rules providing for earlier closure of the Chapter 11 Cases, when all Assets contributed to the Liquidating Trust have been liquidated and converted into Cash (other than those Assets abandoned by the Liquidating Trust), and such Cash has been distributed in accordance with the Liquidating Trust Agreement and the plan, the Liquidating Trustee shall seek authority from the Bankruptcy Court to close the Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules.

Except as otherwise set forth in the Plan, the Confirmation Order or the Liquidating Trust Agreement, on and after the Effective Date, (a) the Liquidating Trustee shall

not be required to obtain approval of the Bankruptcy Court to settle Litigation Claims or sell Assets owned by the Liquidating Trust and (b) none of the non-Debtor subsidiaries shall be required to obtain approval of the Bankruptcy Court to sell their assets.

Pursuant to section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order, after transfer of the Assets to the Liquidating Trust pursuant to Section 7.2.3 of the Plan, the Liquidating Trustee (and to the extent retained by the Liquidating Trust to perform such work, any other Person) will have the exclusive right to enforce any and all causes of action against any Entity and rights of the Debtors that arose before or after the Petition Date, including but not limited to the rights and powers of a trustee and debtor-in-possession, against any Entity whatsoever, including but not limited to all avoidance powers granted to the Debtors under the Bankruptcy Code and all causes of action and remedies granted pursuant to sections 502, 506, 510, 541, 542, 543, 544, 545, 547 through 551 and 553 of the Bankruptcy Code, but excluding Released Claims.

As promptly as practicable after the making of any distributions that are required under the Plan to be made on the Effective Date or as soon as practicable thereafter in recognition of the applicable claims reconciliation process, but in any event no later than ten (10) Business Days after the making of such distributions, the Liquidating Trustee shall File with the Bankruptcy Court and serve on the United States Trustee a report setting forth the amounts and timing of all such distributions and the recipients thereof. Thereafter, the Liquidating Trustee shall File with the Bankruptcy Court and serve on the United States Trustee quarterly reports summarizing the cash receipts and disbursements of the Liquidating Trust for the immediately preceding three-month period. Each quarterly report shall also state the Liquidating Trust's cash balances as of the beginning and ending of each such period. Quarterly reports shall be provided no later than the fifteenth (15th) day of each January, April, July and October until all Final Distributions under the Plan have been made.

F.     **Liquidating Trust Agreement**

On the Effective Date, the Debtors and [        ] as Liquidating Trustee, will enter into the Liquidating Trust Agreement. A summary of certain significant terms of the Liquidating Trust Agreement are set forth below. The Liquidating Trust Agreement is attached to the Plan as Exhibit 2 and the Plan is attached hereto as Exhibit A.

1.     **Purpose of Liquidating Trust.**

The Liquidating Trust is created and organized for the sole purposes of collecting, holding, liquidating, and distributing the Trust Estate and administering, compromising, settling, withdrawing, objecting to, or litigating the Litigation Claims and objections to the Claims under the Plan, with no objective to engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. In accordance with such express and limited purposes, as of the Effective Date, the Liquidating Trust is hereby authorized and directed: (i) to take any and all steps necessary to maintain the Liquidating Trust (except with respect to the Disputed Claims Reserve) as one or more liquidating trusts for federal income tax purposes in accordance with Treasury Regulation § 301.7701-4(d) and as one or more "grantor trusts" subject to the provisions of Subchapter J,

Subpart E of the IRC unless otherwise required; (ii) to take all reasonable and necessary actions to conserve and protect the Trust Estate; (iii) to administer, compromise, settle, and litigate the Litigation Claims and any other claims or causes of action belonging to the Liquidating Trust; (iv) to the extent necessary and appropriate, object to any Claims asserted against the Debtors' Estates and the Liquidating Trust; and (v) to maintain, operate or lease (for purposes of holding for sale), or sell or otherwise liquidate or dispose of the Trust Estate, in accordance with the terms of the Liquidating Trust Agreement, the Plan and the Confirmation Order, and to distribute the net proceeds of such disposition to the Beneficiaries, in as prompt, efficient and orderly a fashion as possible in accordance with the provisions of Section 5 of the Liquidating Trust.

2.    **Segregated Funds.**

On the Effective Date, the Liquidating Trustee shall establish a segregated deposit account to be used solely for the purpose of funding of the Trust Administrative Fund. The account shall be funded solely from the Other Assets Proceeds. Any unspent Cash remaining in the Trust Administrative Fund immediately prior to the Final Distribution Date shall be distributed to the Beneficiaries as if such Cash were Other Assets Proceeds.

On the Effective Date, the Liquidating Trustee shall establish a segregated deposit account to be used solely for the payment of Available Cash to holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims and Allowed General Secured Claims. The account shall be funded solely from the Other Assets Proceeds. To the extent Cash remains in such account following the payment in full of all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims and Allowed General Secured Claims, such Cash shall be distributed to the Beneficiaries as if such Cash were Other Assets Proceeds.

3.    **Valuation of Assets.**

As soon as possible after the Effective Date, but in no event later than ninety (90) days thereafter, the Liquidating Trustee, based upon his good faith determination after consultation with his counsel, shall inform the Beneficiaries in writing solely as to his estimate of the value of the assets transferred to the Liquidating Trust and the value of such assets allocable to the Holders of Allowed Claims in Classes 3 and 4. The valuation shall be used consistently by all parties (including, without limitation, the Debtors, the Liquidating Trustee, and the Beneficiaries) for all federal income tax purposes, and the parties shall file tax returns consistent with such valuation; provided, however, that such valuation shall not be binding on the Liquidating Trustee or any other party for any other purposes, including without limitation in regard to the liquidation of the Trust Assets, whether by disposition, liquidation, litigation, settlement, or otherwise.

4.    **Continuation of the Automatic Stay.**

In furtherance of the implementation of the Plan, except as otherwise provided therein, all injunctions or stays provided for in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect and apply to all Beneficiaries and creditors holding claims against

the Debtors, the Estates, the Assets, the Liquidating Trustee, the Liquidating Trust and the Trust Assets until the Final Distribution Date.

5. **Trust Administrative Fund.**

The Liquidating Trustee shall establish a reserve fund (the "Trust Administrative Fund") for the payment by the Liquidating Trustee of all liquidation expenses including, without limitation, the compensation of the Liquidating Trustee, any attorney, accountant, advisor or other professional retained by the Liquidating Trustee, and the payment of all other reasonable and reasonably anticipated expenses, debts, charges, liabilities and obligations relating to the Trust Estate and its administration including the fees of the Indenture Trustee in connection with Plan distributions. The Trust Administrative Fund shall be funded from the Other Assets Proceeds in such amounts deemed reasonable and necessary by the Liquidating Trustee in his sole discretion. Any balance remaining in the Trust Administrative Fund after the payment of all expenses, debts, charges, liabilities and obligations intended to be paid therefrom shall be distributed to Beneficiaries as provided in Section 5 of the Liquidating Trust Agreement. Any monies deposited in the Trust Administrative Fund pursuant to the terms of the Liquidating Trust Agreement shall be invested in interest-bearing deposits or investments specified in Section 4.5b of the Liquidating Trust Agreement, and the interest earned thereon shall be credited thereto. Any unspent Cash remaining in the Trust Administrative Fund immediately prior to the Final Distribution Date shall be distributed to the Beneficiaries as if such Cash were Other Assets Proceeds.

6. **Claims Reserves.**

The Liquidating Trustee shall establish a reserve fund solely from Other Assets Proceeds (the "Disputed Claims Reserve") for the payment by the Liquidating Trustee of all Disputed Claims, including Claims based on the rejection of Executory Contracts but excluding the (a) Term Lender Secured Claim, (b) the Term Lender Deficiency Claim and (c) any Term Lender Adequate Protection Claim. Each time a distribution of Other Assets Proceeds is made to any Class of Claims, the Liquidating Trustee shall deposit into the Disputed Claims Reserve an amount equal to the distribution each holder of a Disputed Claim in such Class would have received were the Face Amount of its Disputed Claim in such Class an Allowed Claim solely from Other Assets Proceeds. With respect to any unliquidated Disputed Claim, the Disputed Claims Reserve shall be funded upon entry of and in accordance with an order(s) of the Bankruptcy Court estimating the amount (the "Estimated Amount") of such unliquidated Disputed Claim. Any Person whose Disputed Claim is so estimated shall be entitled to an Allowed Claim only up to an amount not to exceed the Estimated Amount even if such Person's Disputed Claim, as finally allowed, would have exceeded the maximum Estimated Amount thereof. At the time a Person's Disputed Claim is Allowed, in whole or in part, such Person shall receive from the Disputed Claims Reserve a distribution equal to the distributions such Person would have received on account of its Allowed Claim had it been an Allowed Claim at the time of such prior distributions, with any surplus Cash held in the Disputed Claims Reserve on account of such Disputed Claim becoming generally available for use by the Liquidating Trustee as Available Cash in accordance with the Plan and the Liquidating Trust Agreement. Such Person shall also become a new Beneficiary of the Liquidating Trust and such Person shall be deemed, at such time, to have received a distribution of assets of the Trust Estate equal to the

amount of the Allowed Claim (but in no case more than the Estimated Amount of the Claim) immediately followed by a transfer by such Person to the Liquidating Trust of such assets, and said new Beneficiary shall be treated, at such time, as a new grantor and deemed owner and Beneficiary of the Liquidating Trust to the extent of his Allowed Claim.

7.    **Administrative Powers of the Liquidating Trustee.**

During the Liquidating Trustee's administration of the Liquidating Trust, and subject to (i) all the other provisions of the Liquidating Trust Agreement (including, but not limited to, Sections 4.5 and 4.6 thereof) and (ii) the Plan, the Liquidating Trustee may exercise the power:

- To receive and hold all the assets of the Trust Estate and to have exclusive possession and control thereof as permissible under applicable law;

- To manage, sell and convert all or any portion of the assets in the Trust Estate to Cash and distribute the net distributable proceeds as specified in the Plan and the Liquidating Trust Agreement;

- To incur indebtedness;

- To enter into, perform and exercise rights under contracts binding upon the Liquidating Trust (but not upon the Liquidating Trustee in his respective individual or corporate capacity) which are reasonably incident to the administration of the Liquidating Trust and which the Liquidating Trustee, in the exercise of his best business judgment, reasonably believes to be in the best interests of the Liquidating Trust;

- To delegate his authority under the Liquidating Trust to other persons, provided that such delegation must be made pursuant to a written agreement that either has been approved by the Bankruptcy Court in conjunction with the confirmation of the Plan or is approved by the Liquidating Trust Committee;

- To establish and maintain accounts at banks and other financial institutions, in a clearly specified fiduciary capacity, into which the Trust Administrative Fund, Disputed Claims Reserve or other Cash and property of the Liquidating Trust may be deposited, and draw checks or make withdrawals from such accounts, and to pay or distribute such amounts of the Trust Estate as permitted or required under the Plan and the Liquidating Trust Agreement;

- To employ attorneys, accountants, appraisers, expert witnesses, insurance adjusters or other persons whose services may be reasonably necessary or advisable, in the sole judgment of the Liquidating Trustee after consultation with the Liquidating Trust Committee, to advise or assist him in the discharge of his duties as Liquidating Trustee or otherwise in the

exercise of any powers vested in the Liquidating Trustee, and to pay from the Trust Administrative Fund reasonable compensation to such attorneys, accountants, appraisers, expert witnesses, insurance adjusters or other persons;

- To pay any and all reasonable and necessary expenses attributable or relating to the management, maintenance, operation, preservation or liquidation of the Trust Estate;

- To investigate, file, compromise, settle, withdraw or litigate in the Bankruptcy Court or on appeal (or pursuant to a withdrawal of the reference of jurisdiction) objections to Claims filed against the Debtors' Estates, the Trust Estate or the Liquidating Trust;

- To investigate, analyze, compromise, adjust, arbitrate, sue on or defend, pursue, prosecute, abandon, or otherwise deal with and settle, in accordance with the terms set forth in the Liquidating Trust Agreement, all Litigation Claims and claims in favor of or against the Liquidating Trust as the Liquidating Trustee shall deem advisable;

- To avoid and recover transfers of the Debtors' property as may be permitted by the Bankruptcy Code or applicable state law, including, without limitation, those transfers identified in the Disclosure Statement;

- To take all appropriate action with respect to the Trust Estate, including, without limitation, the filing, prosecution, settlement or other resolution of claims and Litigation Claims;

- To sue or be sued in connection with any matter arising from or related to the Plan or the Liquidating Trust Agreement that affects in any way the rights or obligations of the Liquidating Trust, the Liquidating Trustee or the Beneficiaries;

- To represent the interests of the Beneficiaries with respect to any matters relating to the Plan, the Liquidating Trust Agreement, or the Liquidating Trust affecting the rights of such Beneficiaries;

- If the Liquidating Trust shall become subject to federal or state income tax, the Liquidating Trustee shall have the power, exercisable at his reasonable discretion, to take any action reasonably necessary to minimize any adverse federal or state income tax consequences to the Beneficiaries resulting from any distribution made by the Liquidating Trust to such Beneficiaries;

- In general, without in any manner limiting any of the foregoing or the following, to deal with the Trust Assets or any part or parts thereof in all other ways as would be lawful for any person owning the same to deal

40

therewith; provided, however, that the investment powers of the Liquidating Trustee, other than those reasonably necessary to maintain the value of the Trust Assets of the Liquidating Trust and to further the liquidating purpose of the Liquidating Trust, are limited by the terms thereof;

- To do any and all other things not in violation of any other terms of the Plan, the Confirmation Order and the Liquidating Trust Agreement that, in the reasonable business judgment of the Liquidating Trustee, are necessary or appropriate for the proper liquidation, management, investment and distribution of the assets of the Trust Estate in accordance with the provisions of the Liquidating Trust Agreement and the Plan;

- To file final tax returns for each of the Debtors; and

- At the appropriate time, to request that the Bankruptcy Court enter a final decree closing each of the Debtors' Chapter 11 Cases.

8.    **Limitations on Liquidating Trustee.**

The Liquidating Trustee shall carry out the purposes of the Liquidating Trust and the directions contained therein and shall not at any time cause the Liquidating Trust to enter into or engage in any trade or business (except as may be consistent with the limited purposes of the Liquidating Trust), including, without limitation, the purchase of any assets or property (other than such assets or property as are reasonably necessary to carry out the purposes of the Liquidating Trust Agreement, on behalf of the Liquidating Trust or the Beneficiaries). The Liquidating Trustee is directed to take all reasonable and necessary actions to dispose of the Trust Estate in as prompt, efficient and orderly a fashion as possible, to make timely distributions of the proceeds of the Trust Estate, and to otherwise not unduly prolong the duration of the Liquidating Trust.

The Liquidating Trustee shall invest any monies held at any time as part of this Trust Estate, including, without limitation, in the Trust Administrative Fund and every other reserve or escrow fund established pursuant to the terms of the Liquidating Trust Agreement, only in interest-bearing deposits or certificates of deposit issued by any federally insured banking institution or short-term investments, including short-term obligations of, or unconditionally guaranteed as to payment by, the United States of America and its agencies or instrumentalities, pending the need for the disbursement thereof in payment of costs, expenses, and liabilities of the Liquidating Trust or in making distributions pursuant to Section 5 of the Liquidating Trust Agreement. The Liquidating Trustee shall be restricted to the collection and holding of such monies and any income earned on such monies and to the payment and distribution thereof (at least annually if such monies are not necessary to maintain the value of the Trust Estate or to satisfy Claims against the Trust Estate) for the purposes set forth in the Plan and the Liquidating Trust Agreement, and to the conservation and protection of the Trust Estate in accordance with the provisions of the Liquidating Trust Agreement.

DB02:9065158.1

068417.1001

The Liquidating Trustee shall be obligated to consult with the Liquidating Trust Committee regarding all matters affecting the Trust Estate involving $1,000,000 or more, including, but not limited to, Claims objections, litigation, and contested matters. Notwithstanding anything contained in the Liquidating Trust Agreement, a member of the Liquidating Trust Committee must recuse itself from the Liquidating Trust Committee regarding any contested matter, objection to Claim, or other Litigation Claim to which it is a party or otherwise has a conflict of interest.

In all other events, unless otherwise set forth in the Liquidating Trust Agreement, the Liquidating Trustee is authorized to compromise or settle an action without any notice or consent, if the Liquidating Trustee reasonably believes such settlement or compromise to be in the best interests of the Liquidating Trust, and shall be held harmless by the Beneficiaries in taking such action.

Notwithstanding anything in the Liquidating Trust Agreement to the contrary, the Liquidating Trustee shall be authorized to pay the reasonable fees and expenses incurred by professionals after the Effective Date without providing notice to or obtaining the approval of any party; provided, however, that such payments may be made only from the Trust Administrative Fund.

9. **Compensation of Liquidating Trustee.**

The Liquidating Trustee will be compensated from the Trust Administrative Fund on an hourly basis according to the terms of Schedule 4.11 of the Liquidation Trust Agreement.

10. **Reports.**

The Liquidating Trustee shall:

Prepare and file unaudited interim financial reports as may be required by regulatory authorities, applicable laws, rules or regulations or as the Liquidating Trustee deems advisable during the fiscal year;

Prepare, file and mail, within the time required by applicable law or regulation, necessary income tax information, tax returns or reports to the Beneficiaries and applicable taxing authorities, including, on an annual basis, the manner and calculation of the Liquidating Trust's taxable gain or loss which the Liquidating Trust would recognize if it were a separate taxable entity. In this connection, the Liquidating Trustee shall file returns for the Liquidating Trust, except with respect to the Disputed Claims Reserve, as one or more grantor trusts pursuant to Treasury Regulation Section 1.671-4(a); and

As soon as practicable after each calendar quarter, and in no event later than thirty (30) days after the end of each quarter, the Liquidating Trustee shall submit to the United States Trustee, the Liquidating Trust Committee, and any Beneficiary who requests copies of such quarterly report after the Confirmation Date, an unaudited written report and account showing:

- the assets and liabilities of the Liquidating Trust;

DB02:9065158.1

068417.1001

- any distributions made and expenses paid pursuant to the Plan and the Liquidating Trust Agreement during that calendar quarter;
- any changes in the Trust Assets that have not been previously reported; and,
- any material action taken by the Liquidating Trustee in the performance of his or her duties under the Liquidating Trust Agreement that has not been previously reported.

11. **Liquidating Trust Committee.**

The Committee shall appoint an administrative trust committee (the "Liquidating Trust Committee"), consisting of no more than three (3) members, to consult with the Liquidating Trustee from time to time on various matters as set forth in the Liquidating Trust Agreement. As appointed by the Committee, the Liquidating Trust Committee initially shall consist of the three (3) members identified, who each shall serve for an initial term of three (3) years. Thereafter, members of a subsequent Liquidating Trust Committee shall be nominated to serve by the previous Liquidating Trust Committee and shall qualify to serve upon the affirmative majority vote of the members of the previous Liquidating Trust Committee then serving and actually voting for such purpose; provided, however, that if for any reason no Liquidating Trust Committee members remain to make such nomination, the Liquidating Trustee will make such nomination and such nominee shall qualify to serve upon an affirmative majority vote of the holders representing a majority (in dollar amount) of the Beneficial Interests ("Majority Holders") actually voting for such purpose (as recorded on the records of the Liquidating Trust as of such date). Unless otherwise specified in the Liquidating Trust Agreement, approval of a majority of the members of such Liquidating Trust Committee shall be required for the Liquidating Trust Committee to act. In the event that a member of the Liquidating Trust Committee resigns prior to the expiration of his term or is otherwise unable to serve out his term, the remaining member or members of the Liquidating Trust Committee shall select the successor to serve the remainder of such term; provided, however, that if no such member remains, such selection shall be made by the affirmative majority vote of holders representing a majority of Beneficial Interests (as recorded on the records of the Liquidating Trust as of such date). The Liquidating Trust Committee shall have the rights and powers set forth in the Liquidating Trust Agreement. In the event that a Liquidating Trust Committee shall not be formed and continuing to exist under the Liquidating Trust Agreement, all references therein to required approval or other action of such Liquidating Trust Committee shall be of no force or effect. In performance of their duties under the Liquidating Trust Agreement, members of the Liquidating Trust Committee shall be entitled to receive reimbursement of reasonable costs, expenses and obligations as set forth in Section 7.6e(iii) of the Liquidating Trust Agreement.

12. **Removal of the Liquidating Trustee.**

The Liquidating Trust Committee shall be authorized, by unanimous vote of the member or members thereof, to remove the Liquidating Trustee for reasonable cause and to select a replacement or successor liquidating trustee in accordance with the provisions of the Liquidating Trust Agreement.

DB02:9065158.1

068417.1001

13. **Indemnification.**

Pursuant to the Liquidating Trust Agreement, the Liquidating Trust agrees to indemnify to the full extent of the Trust Estate (subject, with respect to the Carve-Out Escrow, to the Carve Out, and subject, with respect to the Term Lender Assets, to the Lien of the Pre-Petition Term Agent for the benefit of the Pre-Petition Term Lenders) any person or entity who was or is a party, or is threatened to be made a party to any threatened, pending, or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative by reason of the fact that such person or entity is or was a Liquidating Trustee or an employee, attorney or agent of the Liquidating Trust or Liquidating Trustee, from and against any and all expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such person or entity in connection with such action, suit or proceeding, including appeals thereof, if such person or entity acted without gross negligence and willful misconduct in the exercise and performance of any power or duties of such person or entity in accordance with the liquidating Trust Agreement.

14. **Termination Date.**

The Liquidating Trust shall terminate on such date when (a) a final decree has been entered closing the Chapter 11 Cases, (b) all assets in the Trust Estate have been distributed and (c) all claims have been pursued or abandoned pursuant to, and in accordance with, the Plan and the liquidating Trust Agreement (the "Termination Date"). However, the term of the Liquidating Trust shall not exceed five (5) years from the Effective Date; provided that, upon a finding that an extension is necessary to the liquidating purpose of the Liquidating Trust and upon approval by the Bankruptcy Court, the term may be extended for a finite term based on the particular facts and circumstances. Each such extension must be approved by the Bankruptcy Court within six (6) months of the beginning of the extended term. The Liquidating Trustee shall be released of all liabilities and discharged from his or her obligations under the Plan or the Liquidating Trust Agreement once the Liquidating Trust has terminated pursuant to the terms of the Liquidating Trust Agreement.

15. **Limitation on Liability.**

No provision of the Liquidating Trust Agreement shall be construed to impart any liability upon the Liquidating Trustee unless it shall be proven in a court of competent jurisdiction that the Liquidating Trustee's actions or omissions constituted gross negligence or willful misconduct in the exercise of or failure to exercise any right or power vested in the Liquidating Trustee under the Liquidating Trust Agreement. For the avoidance of doubt, none of such obligations shall be chargeable against any of the Term Lender Assets.

16. **Costs and Expenses of Liquidating Trustee.**

The Liquidating Trustee shall pay out of the Trust Administrative Fund all reasonable costs, expenses and obligations incurred by the Liquidating Trustee in carrying out his duties under the Liquidating Trust Agreement or in any manner connected, incidental or related to the administration of the Liquidating Trust without application to the Bankruptcy Court, including, without limitation:

- Any reasonable, documented fees and out-of-pocket expenses of attorneys, accountants, investment advisors, expert witnesses, insurance adjusters, professionals or other persons whom the Liquidating Trustee may reasonably deem advisable to employ in connection with the Liquidating Trust, or on their own behalf in accordance with the terms of the Liquidating Trust Agreement;
- Any taxes, charges and assessments which may be owed by, or levied or assessed against, the Trust Estate or any property held in trust under the Liquidation Trust Agreement; and
- Any reasonable, documented costs, and out-of-pocket expenses incurred by the Liquidating Trust Committee in carrying out its duties under the Plan.

17.    **Resignation and Removal.**

The Liquidating Trustee may resign and be discharged from any future obligations and liabilities under the Liquidating Trust Agreement by giving written notice thereof to the Bankruptcy Court and the Liquidating Trust Committee at least thirty (30) days prior to the effective date of such resignation. Subject to the expiration of such notice period, such resignation shall become effective on the day specified in such notice.

The Liquidating Trustee may be removed with cause at any time by order of the Bankruptcy Court upon motion by any party in interest or in accordance with Section 4.15 of the Liquidating Trust Agreement. Upon any such removal, such removed Liquidating Trustee shall be entitled to any reimbursement and indemnification set forth in the Liquidating Trust Agreement which remain due and owing to such Liquidating Trustee at the time of such removal.

G.    **Objections to Claims**

Subject to applicable law, from and after the Effective Date, the Liquidating Trustee shall have the authority to File, settle, compromise, withdraw, arbitrate or litigate to judgment objections to Claims pursuant to applicable procedures established by the Bankruptcy Code, the Bankruptcy Rules, the Liquidating Trust Agreement and the Plan. Objections to any Claim other than an Administrative Expense Claim (for which the objection deadline is set forth in Section 2.5.1 of the Plan) must be Filed and served on the claimant no later than the later of (x) ninety (90) days after the date the Claim is Filed or (y) ninety (90) days after the Effective Date or such other date as may be ordered from time to time by the Court. The Debtors or the Liquidating Trustee, as the case may be, shall use reasonable efforts to promptly and diligently pursue resolution of any and all disputed Claims.

H.    **Distributions Under the Plan**

In accordance with Section 7.1 of the Plan and unless otherwise expressly provided therein, to the extent more than one Debtor is liable for any Claim, such Claim shall be considered a single Claim and entitled only to the payment provided therefor under the applicable provisions of the Plan and the Liquidating Trust Agreement.

The Indenture Trustee shall be entitled to file an application for payment of the Indenture Trustee's Expenses as an Administrative Expense Claim; provided, however, that nothing contained in the Plan or the Disclosure Statement shall constitute an admission by the Debtors or any other party-in-interest that the Indenture Trustee's Expenses are or should be entitled to treatment, under the Plan or otherwise, as an Administrative Expense Claim. Distributions under the Plan on account of Allowed Claims arising from or out of the Senior Notes shall be made by the Liquidating Trust to the Indenture Trustee, as appropriate, as disbursing agent for such Allowed Claims, for further distribution to holders of such Allowed Claims. Any such further distributions shall be made by the Indenture Trustee pursuant to the Indenture and the Plan (i) first, to the Indenture Trustee for the Indenture Trustee's Expenses, to the extent allowed under the Indenture; and (ii) thereafter, on account of the Allowed Claims arising from or out of the Indenture, as the case may be.

At the close of business on the Distribution Record Date, the transfer records for the Indenture shall be closed, and there shall be no further changes in the record holders of the Senior Notes. The Debtors, the Liquidating Trust, the Liquidating Trustee and the Indenture Trustee shall have no obligation to, and shall not, recognize any transfer of Claims arising from or out of the Indenture occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes under the Plan with only those record holders as of the close of business on the Distribution Record Date.

Distributions to holders of Allowed Claims shall be made: (a) at the addresses set forth in the proofs of Claim Filed by such holders; (b) at the addresses set forth in any written notices of address change filed with the Bankruptcy Court or delivered to the Liquidating Trustee after the date on which any related proof of Claim was Filed; or (c) at the addresses reflected in the Schedules relating to the applicable Allowed Claim if no proof of Claim has been Filed and the Liquidating Trustee has not received a written notice of a change of address.

Except as required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. Interest shall not accrue or be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a Final Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim. To the extent that any Allowed Claim entitled to a distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for federal income tax purposes to the principal amount of the Allowed Claim first and then, to the extent the consideration exceeds the principal amount of the Allowed Claim, to the portion of such Allowed Claim representing accrued but unpaid interest.

No payment of Cash in an amount of less than $100.00 shall be required to be made on account of any Allowed Claim. Such undistributed amount may instead be made part of the Available Cash for use in accordance with the plan and the Liquidating Trust Agreement. If the Available Cash for the Final Distribution is less than $25,000, and the Liquidating Trustee, in his sole discretion, determines that it would cost more than $10,000 to distribute such funds, the Liquidating Trustee may donate such funds to the charity of his choice. Upon the Termination Date, any Term Lender Assets Proceeds which had not previously been distributed to the Pre-Petition Lender Agent for the benefit of the Pre-Petition Lenders, shall be distributed

to the Pre-Petition Lender Agent for the benefit of the Pre-Petition Lenders, even if such amount is less then $100,000.

Unless otherwise expressly set forth in the Plan with respect to a specific Claim or Class of Claims, for the purpose of the provisions of Article 9 of the Plan, the "Face Amount" of a Disputed Claim means the amount set forth on the proof of Claim unless the Disputed Claim has been estimated for distribution purposes or, in the alternative, if no proof of Claim has been timely Filed or deemed Filed, zero.

If the distribution check to any holder of an Allowed Claim is not cashed within 90 days after issuance by the Debtors or Liquidating Trustee, after consultation with the Liquidating Trust Committee, the Liquidating Trustee may give a stop payment order with respect to the check and no further distributions shall be made to such holder on account of such Allowed Claim. Such Allowed Claim shall be discharged and the holder of such Allowed Claim shall be forever barred from asserting such Claim against the Liquidating Trust, the Liquidating Trustee, the Debtors, their Estates or their respective property. In such cases, any Cash held for distribution on account of such Claim shall (i) become the property of the Liquidating Trust, (ii) if applicable, be returned by the Indenture Trustee to the Liquidating Trustee, and (iii) be distributed to other Creditors in accordance with the terms of the plan and the Liquidating Trust Agreement.

The Liquidating Trust shall make distributions from the Term Lender Assets Proceeds to the Pre-Petition Term Agent for the benefit of the Pre-Petition Term Lenders from time to time as and when required by the Committee Settlement Stipulation on account of the Allowed Lender Secured Claim.

On the Effective Date, or as soon thereafter as practicable, the Liquidating Trust shall distribute to the holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Class 1 Claims and Allowed Class 2 Claims equal to the distributions for each respective Class as set forth in the Plan.

Unless otherwise provided in the Plan, to the extent there is Available Cash subsequent to the Administrative Expense Claims Bar Date, the Liquidating Trustee shall distribute from the Other Asset Proceeds such Available Cash to the Beneficiaries entitled thereto from time to time in accordance with Section 5.2(c) of the Liquidating Trust Agreement.

The Liquidating Trustee shall make a final distribution in accordance with Section 5.6 of the Liquidating Trust Agreement.

The Liquidating Trustee shall establish reserves for Disputed Claims in accordance with the terms of the Liquidating Trust Agreement.

In connection with the Plan and the distributions made in accordance therewith, to the extent applicable, the Debtors and the Liquidating Trust shall comply with all tax withholding and reporting requirements imposed by any Governmental Unit and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. The Liquidating Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

I.  **Conditions to Confirmation**

The following are each conditions to entry of the Confirmation Order:

- The Confirmation Order shall be in form and substance reasonably satisfactory to the Debtors, the Pre-Petition Term Agent, at the direction of the requisite Term Lenders, and the Creditors' Committee.

J.  **Conditions to the Effective Date**

The Plan shall not become effective and the Effective Date shall not occur unless and until the following conditions are satisfied or, if waivable pursuant to Section 10.4 of the Plan, waived:

a.  The Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonable satisfactory to the Debtors, the Pre-Petition Term Agent, at the direction of the requisite Term Lenders, and the Creditors' Committee;

b.  No stay of the Confirmation Order shall be in effect at the time the other conditions set forth in Section 10.2 of the Plan are satisfied, or, if permitted, waived;

c.  All documents, instruments and agreements, in form and substance reasonably satisfactory to the Debtors, the Pre-Petition Term Agent, at the direction of the requisite Term Lenders, and the Creditors' Committee, provided for under the Plan or necessary to implement the Plan, including, without limitation, the Liquidating Trust Agreement, shall have been executed and delivered by the parties thereto, unless such execution or delivery has been waived by the parties benefited thereby;

d.  The Professional Claims shall have been paid in full in Cash in accordance with Section 2.3 of the Plan;

e.  Subject to the terms of the Global Stipulations, there shall exist sufficient Available Cash to pay all estimated Allowed Administrative Expense Claims, Allowed Other Priority Claims, Allowed Priority Tax Claims and Allowed General Secured Claims; and

f.  The Confirmation Order shall have become a Final Order.

K.  **Termination of Plan for Failure To Become Effective.**

If the Effective Date shall not have occurred on or prior to the date that is forty-five (45) days after the Confirmation Date, then the Plan shall terminate and be of no further force or effect unless the provisions of Section 10.3 of the Plan are waived in writing by the Debtors.

DB02:9065158.1

068417.1001

L.    **Modification of the Plan**

Subject to the restrictions on Plan modifications set forth in section 1127 of the Bankruptcy Code, the Debtors reserve the right to alter, amend or modify the Plan before its substantial consummation.

M.    **Effect of Confirmation**

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including among other things, jurisdiction over the subject matters set forth in Article 12 of the Plan.

Except as otherwise provided in section 1141(d) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against or Interest in the Debtors and its respective successors and assigns, whether or not the Claim or Interest of such holder is Impaired under the Plan and whether or not such holder has accepted the Plan.

N.    **Exculpation, Injunction, and Limitation of Liability**

**Except as otherwise specifically provided in the Plan, none of the Debtors or the Committee (solely with respect to its conduct as a committee and not with respect to the actions of its members as individual creditors), the Pre-Petition Term Agent, the Pre-Petition Lenders, nor any of such parties' respective present members (with respect to members of the Committee, solely with respect to each member's conduct in furtherance of its, his, or her duties as a member of the Committee, and not with respect to the actions of such members as individual creditors), officers, directors, shareholders, employees, representatives, advisors, attorneys, financial advisors, investment bankers or agents or any of such parties' successors and assigns, shall have or incur, and are hereby released from, any Claim, obligation, cause of action or liability to one another or to any holder of a Claim or an Interest, or any other party in interest, or any of their respective officers, directors, shareholders, members and/or enrollees, employees, representatives, advisors, attorneys, financial advisors, investment bankers, agents, or Affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the negotiation and pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their gross negligence or willful misconduct, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities (if any) under the Plan.**

**Notwithstanding any other provision of the Plan, neither any holder of a Claim or Interest, or other party in interest, nor any of their respective officers, directors, shareholders, members and/or enrollees, employees, representatives, advisors, attorneys, financial advisors, investment bankers, agents or Affiliates, and no successors or assigns of the foregoing, shall have any right of action against any Debtor or the Committee (solely in**

its capacity as a committee, and not in each particular member's capacity as an individual creditor), the Pre-Petition Term Agent, the Pre-Petition Term Lenders, or any of such parties' respective present members (with respect to members of the Committee, solely with respect to the capacity of each member in furtherance of its, his, or her duties as a member of the Committee, and not in each particular member's capacity as an individual creditor), officers, directors, shareholders, employees, representatives, advisors, attorneys, financial advisors, investment bankers or agents or such parties' successors and assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the negotiation and pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for such Persons' gross negligence or willful misconduct.

Except as otherwise specifically provided in the Plan or the Confirmation Order, all Entities who have held, hold or may hold claims, rights, causes of action, liabilities or any equity interests based upon any act or omission, transaction or other activity of any kind or nature related to the Debtors or the Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, regardless of the filing, lack of filing, allowance or disallowance of such a Claim or Interest and regardless of whether such Entity has voted to accept the Plan, and any successors, assigns or representatives of such Entities shall be precluded and permanently enjoined on and after the Effective Date from (a) the commencement or continuation in any manner of any claim, action or other proceeding of any kind with respect to any Claim, Interest or any other right or claim against the Debtors, or any assets of the Debtors which they possessed or may possess prior to the Effective Date, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order with respect to any Claim, Interest or any other right or claim against the Debtors, or any assets of the Debtors which such Entities possessed or may possess prior to the Effective Date, (c) the creation, perfection or enforcement of any encumbrance of any kind with respect to any Claim, Interest or any other right or claim against the Debtors or any assets of the Debtors which they possessed or may possess prior to the Effective Date, and (d) the assertion of any Claims that are released hereby.

Except as expressly provided in the Plan, upon the Effective Date, each of the Debtors (i) remises, acquits, waives, releases and forever discharges each of the Debtor Releasees, and (ii) covenants and agrees never to institute or cause to be instituted any suit or other form of action or proceeding of any kind or nature whatsoever against any of the Debtor Releasees based upon any claims, demands, indebtedness, agreements, promises, causes of action, obligations, damages or liabilities of any nature whatsoever (other than rights to enforce obligations of the Debtor Releasees under the Section 506(c) Stipulation, the Committee Settlement Stipulation, the orders of the Bankruptcy Court, the Plan and all contracts, instruments, releases and other agreements delivered in connection therewith), in law or in equity, whether or not known, suspected or claimed, that the Debtors or the Estates ever had, claimed to have, has, or may have or claim to have against the Debtor Releasees, or any of them, by reason of any matter, cause, thing, act or omission of the Debtor Releasees, or any of them, in each case related to the Debtors.

As of the Effective Date, to the fullest extent permitted under applicable law, in consideration for the obligations under the Plan and the Cash, securities, contracts, instruments, releases and other agreements or documents to be delivered in connection with the Plan, and the benefits provided by the Creditor Releasees in the Plan and in the Chapter 11 Cases, each present and former holder of a Claim or Interest who votes in favor of the Plan will be deemed to release forever, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities (other than the rights to enforce the Debtors' obligations under the Section 506(c) Stipulation, the Committee Settlement Stipulation, the orders of the Bankruptcy Court, the Plan and the securities, contracts, instruments, releases and other agreements and documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, or the Plan against Creditor Releasees.

Except as expressly set forth in the Plan, following the Effective Date, none of the Debtors, the Liquidating Trustee, the Pre-Petition Term Agent, the Pre-Petition Term Lenders, the Committee, or any of their respective members, officers, directors, employees, advisors, attorneys, professionals or agents shall have or incur any liability to any holder of a Claim or Interest for any act or omission in connection with, related to, or arising out of, the Chapter 11 Cases, the negotiation and pursuit of confirmation of the Plan, the consummation of the Plan or any contract, instrument, release or other agreement or document created in connection with the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for gross negligence or willful misconduct.

Except as expressly set forth in the Global Stipulations, under no circumstances shall the Pre-Petition Term Agent and the Pre-Petition Term Lenders be liable for any future funding or payments to the Debtors' Estates, including, without limitation, for the payment of any claims arising from any deficit of the Working Capital Adjustment Escrow, the Carve-Out Escrow, the Additional Deposit Account, or the Cure Escrow Deposit Account, to satisfy any obligations arising to the beneficiaries of such accounts. The Debtors' Estates shall be responsible for any anticipated or unanticipated deficits arising with respect to the foregoing, including any costs or claims associated with this liquidation of the Debtors, and none of the foregoing claims shall be chargeable to, or the responsibility of, the Pre-Petition Term Agent or the Pre-Petition Term Lenders.

## O. Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order, the occurrence of the Effective Date and the transfer of the Assets to the Liquidating Trust, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases after the Effective Date to the fullest extent legally permissible, including jurisdiction to, among other things:

- Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of all Claims and Interests;

- Hear and determine any and all causes of action against any Person and rights of the Debtors that arose before or after the Petition Date, including but not limited to the rights and powers of a trustee and debtor-in-possession, against any Person whatsoever, including, but not limited to, all avoidance powers granted to the Debtors under the Bankruptcy Code and all causes of action and remedies granted pursuant to sections 502, 506, 510, 541, 542, 543, 544, 545, 547 through 551 and 553 of the Bankruptcy Code;

- Grant or deny any applications for allowance of compensation for professionals authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

- Resolve any matters relating to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which any Debtor is a party or with respect to which any of the Debtors may be liable, including without limitation the determination of whether such contract is executory for the purposes of section 365 of the Bankruptcy Code, and hear, determine and, if necessary, liquidate any Claims arising therefrom;

- Enter orders approving the Debtors' or the Liquidating Trust's post-Confirmation sale or other disposition of Assets;

- Ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and the Liquidating Trust Agreement;

- Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving any Debtor that may be pending in the Chapter 11 Cases on the Effective Date;

- Hear and determine matters concerning state, local or federal taxes in accordance with sections 346, 505 or 1146 of the Bankruptcy Code;

- Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Liquidating Trust Agreement, the Plan and the Confirmation Order;

DB02:9065158.1

068417.1001

- Hear and determine any matters concerning the enforcement of the provisions of Article 11 of the Plan and any other exculpations, limitations of liability or injunctions contemplated by the Plan;

- Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Liquidating Trust Agreement, the Plan or the Confirmation Order;

- Permit the Debtors, to the extent authorized pursuant to section 1127 of the Bankruptcy Code, to modify the Plan or any agreement or document created in connection with the Plan, or remedy any defect or omission or reconcile any inconsistency in the Plan or any agreement or document created in connection with the Plan;

- Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of the Liquidating Trust Agreement, the Plan or the Confirmation Order;

- Enforce any injunctions entered in connection with or relating to the Plan or the Confirmation Order;

- Enter and enforce such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated, or distributions pursuant to the Liquidating Trust Agreement or the Plan are enjoined or stayed;

- Determine any other matters that may arise in connection with or relating to the Plan or any agreement or the Confirmation Order;

- Enter any orders in aid of prior orders of the Bankruptcy Court; and

- Enter a final decree closing the Chapter 11 Cases.

P.    **Treatment of Executory Contracts and Unexpired Leases**

Pursuant to the Sale Order, the Bankruptcy Court established deadlines and procedures for the assumption and rejection of executory contracts and unexpired leases by the Debtors at the direction of the Purchaser and allocated responsibility for payment of cure amounts between the Debtors and the Purchaser. Any executory contracts and unexpired leases of the Debtors not assumed and assigned to the Purchaser or rejected prior to the Effective Date or with respect to which the Debtors have not Filed a Notice of Assumption and Assignment prior to the Effective Date (the "Remaining Contracts") shall be rejected pursuant to Section 6.5 of the Plan unless assumed or assumed and assigned pursuant to Section 6.2 of the Plan. Notwithstanding anything in Article 6 of the Plan to the contrary, to the extent the Debtors have Filed a Notice of Assumption and Assignment prior to the Effective Date with respect to an executory contract or unexpired lease to be assumed and assigned to the Purchaser, but the

Bankruptcy Court has not yet entered an order approving such assumption and assignment and fixing the cure amount therefor, any cure amount not assumed by the Purchaser in connection with the 363 Sale shall be paid solely from the Cure Escrow Deposit Accounts in accordance with the Sale Order.

As of the Effective Date, the Debtors shall assume or assume and assign, as applicable, pursuant to Bankruptcy Code section 365, each of the Remaining Contracts of the Debtors that are identified in Exhibit 3 to the Plan that have not expired under their own terms prior to the Effective Date. The Debtors reserve the right to amend such Exhibit not later than ten (10) days prior to the Confirmation Hearing either to: (a) delete any executory contract or lease listed therein and provide for its rejection pursuant to Section 6.5 of the Plan; or (b) add any executory contract or lease to such Exhibit, thus providing for its assumption or assumption and assignment, as applicable, pursuant to the Plan. The Debtors shall provide notice of any such amendment of such Exhibit to the parties to the executory contract or lease affected thereby and counsel for the Committee not later than ten (10) days prior to the Confirmation Hearing. The Confirmation Order shall constitute an order of the Bankruptcy Court pursuant to Bankruptcy Code section 365 approving all such assumptions or assumptions and assignments, as applicable, described in Section 6.2 of the Plan, as of the Effective Date.

Any monetary defaults under each Remaining Contract to be assumed under the Plan shall be satisfied, pursuant to Bankruptcy Code section 365(b)(1), in either of the following ways: (a) by payment of the default amount in Cash, in full on the Effective Date solely from the Cure Escrow Deposit Account or from Other Asset Proceeds; or (b) by payment of the default amount on such other terms as may be agreed to by the Debtors and the non-Debtor parties to such Remaining Contract solely from the Cure Escrow Deposit Account or from Other Asset Proceeds. In the event of a dispute regarding (i) the amount or timing of any cure payments, (ii) the ability of the Debtors, the Liquidating Trustee, or an assignee thereof to provide adequate assurance of future performance under the such Remaining Contract to be assumed or assumed and assigned, as applicable, or (iii) any other matter pertaining to assumption or assumption and assignment of the Remaining Contract to be assumed, the Debtors or the Liquidating Trust shall pay all required cure amounts, first from the Cure Escrow Deposit Account, until exhausted, and then from Other Asset Proceeds, promptly following the entry of a Final Order resolving the dispute.

To the extent that any party to a Remaining Contract identified for assumption asserts arrearages or damages pursuant to Bankruptcy Code section 365(b)(1), or has any other objection with respect to any proposed assumption, revestment, cure or assignment on the terms and conditions provided in the Plan, all such arrearages, damages and objections must be Filed and served: (a) as to any Remaining Contract identified in Exhibit 3 to the Plan that is mailed to any party to any such Remaining Contract along with all other solicitation materials accompanying the Plan, within the same deadline and in the same manner established for the Filing and service of objections to Confirmation of the Plan; and (b) as to any Remaining Contract identified in any subsequent amendments to Exhibit 3 to the Plan that is mailed to any party to any such Remaining Contract not later than ten (10) days prior to the Confirmation Hearing, in such a manner as to be received by the Bankruptcy Court and the Debtors, the proposed Liquidating Trustee and counsel thereto, as the case may be, if applicable, no later than

the earlier of (i) twenty (20) days after such subsequent amendment is served and (ii) one (1) day prior to the Confirmation Hearing.

Failure to assert such arrearages, damages or objections in the manner described above shall constitute consent to the proposed assumption, revestment, cure or assignment on the terms and conditions provided in the Plan, including an acknowledgement that the proposed assumption and/or assignment provides adequate assurance of future performance and that the amount identified for "cure" in Exhibit 3 to the Plan is the amount necessary to cover any and all outstanding defaults under the Remaining Contract to be assumed, as well as an acknowledgement and agreement that no other defaults exist under such Remaining Contract.

If any assumption of a Remaining Contract proposed in the Plan for any reason is not approved by the Bankruptcy Court, then the Debtors shall be entitled, in their sole discretion, upon written notice to the applicable non-Debtor party to such Remaining Contract, to deem such Remaining Contract to have been rejected pursuant to the provisions of Section 6.5 of the Plan.

Except for those executory contracts and unexpired leases that (a) are assumed pursuant to the Plan, (b) have been previously assumed, assumed and assigned or rejected pursuant to previous orders of the Bankruptcy Court, or (c) are the subject of a pending motion before the Bankruptcy Court with respect to the assumption or assumption and assignment of such executory contracts and unexpired leases, as of the Effective Date, all executory contracts and unexpired leases of the Debtors shall be rejected pursuant to section 365 of the Bankruptcy Code; *provided*, *however*, that neither the inclusion by the Debtors of a contract or lease on Exhibit 3 nor anything contained in Article 6 of the Plan shall constitute an admission by any Debtor that such contract or lease is an executory contract or unexpired lease or that any Debtor or its successors and assigns, including, but not limited to, the Liquidating Trust, has any liability thereunder.

The Confirmation Order shall constitute an Order of the Bankruptcy Court approving the rejection of executory contracts and unexpired leases under Section 6.5 of the Plan pursuant to Bankruptcy Code section 365 as of the Effective Date. Any Claim for damages arising from any such rejection must be Filed within thirty (30) days after the mailing of notice of the entry of the Confirmation Order, or such Claim shall be forever barred, shall not be enforceable against the Debtors, their Estates, the Liquidating Trust, the Liquidating Trustee, or any of their respective properties and shall receive no distribution under the Plan or otherwise on account of such Claim.

Q.    **No Admissions**

If Confirmation or the Effective Date does not occur, nothing contained in the Plan or Disclosure Statement shall be deemed as an admission by the Debtors with respect to any matter set forth herein or therein including, without limitation, liability on any Claim or the propriety of any Claims classification.

R.     **Preservation of Rights of Setoffs**

The Debtors, may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors may have against the holder of such Claims; but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors of any such claim that the Debtors may have against such holder.

S.     **Defenses with Respect to Unimpaired Claims**

Except as otherwise provided in the Plan, nothing shall affect the rights and legal and equitable defenses of the Debtors with respect to any Unimpaired Claim, including all rights in respect of legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

T.     **Dissolution of Creditor's Committee**

The Creditors' Committee shall be dissolved on the Effective Date without need for a further order of the Bankruptcy Court. On the Effective Date, a Liquidating Trust Committee, comprised of three members appointed by the members of the Committee, on behalf of the Beneficiaries, shall be established to perform the duties set forth in Section 4.14 of the Liquidating Trust Agreement.

# V.
# CONFIRMATION OF THE PLAN

A.     **Confirmation Hearing**

The Bankruptcy Court has scheduled the Confirmation Hearing for confirmation of the Plan for March 18, 2010 at 3 p.m. (prevailing Eastern time) before the Honorable Mary F. Walrath, Chief Judge for the United States Bankruptcy Court for the District of Delaware, located at the United States Bankruptcy Court, 824 Market Street, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time without notice except as given at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing. The Bankruptcy Court has directed that objections, if any, to the confirmation of the Plan be served on or before March 4, 2010 at 4 p.m. (prevailing Eastern time) in the manner described in the Notice accompanying this Disclosure Statement.

B.     **Confirmation Standards**

For a plan to be confirmed, the Bankruptcy Code requires, among other things, that a plan be proposed in good faith and comply with the applicable provisions of chapter 11 of the Bankruptcy Code. Section 1129 of the Bankruptcy Code also imposes requirements that at least one class of impaired claims accept a plan, that confirmation of a plan is not likely to be followed by the need for further financial reorganization, that a plan be in the best interest of creditors, and that a plan be fair and equitable with respect to each class of claims or interests which is impaired under the plan.

DB02:9065158.1                                                                                   068417.1001

The Bankruptcy Court will confirm a plan only if it finds that all of the requirements enumerated in section 1129 of the Bankruptcy Code have been met. The Debtors and the Committee believe that the Plan satisfies all of the requirements for confirmation.

## VI.
## FUNDING AND FEASIBILITY OF THE PLAN

A.     **Funding of the Plan**

The plan will be funded from the Term Assets Proceeds and the Other Assets Proceeds. In particular, the Term Assets Proceeds will be distributed to the Pre-Petition Term Agent for the benefit of the Pre-Petition Term Lenders and the Other Assets Proceeds, which consists of the consideration paid to the Debtors' estates pursuant to the Committee Settlement Stipulation described above, shall fund all other payments under the Plan.

B.     **Best Interests Test**

Notwithstanding acceptance of the Plan by each Impaired Class, in order to confirm the Plan, the Bankruptcy Court must determine that the Plan is in the best interests of each holder of a Claim or Interest in any such Impaired Class who has not voted to accept the Plan. Accordingly, if an Impaired Class does not unanimously accept the Plan, the best interests test requires the Bankruptcy Court to find that the Plan provides to each member of such Impaired Class a recovery on account of the Class member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the distribution that each such Class member would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

To estimate what members of each Impaired Class of unsecured creditors and equity security holders would receive if the Debtors were liquidated under chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the Debtors' assets if the Chapter 11 Cases were converted to a chapter 7 case under the Bankruptcy Code and the assets were liquidated by a trustee in bankruptcy (the "Liquidation Value" of such assets). The Liquidation Value would consist of the net proceeds from the disposition of the Debtors' Assets and would be augmented by any Cash held by the Debtors.

As detailed in the liquidation analysis prepared by the financial advisors to the Committee from information provided by the Debtors and other sources, a copy of which is attached hereto as Exhibit C, the Liquidation Value of the Debtors' Assets available to general Creditors would be reduced by the costs and expenses of the liquidation, as well as other administrative expenses of the chapter 7 cases. The Debtors' costs of liquidation under chapter 7 would include the compensation of a trustee or trustees, as well as counsel and other professionals retained by the trustee(s), disposition expenses, all unpaid expenses incurred by the Debtors during their chapter 11 proceedings (such as compensation for attorneys and accountants) which are allowed in the chapter 7 proceedings, and litigation costs and claims against the Debtors arising from their business operations during the pendency of their Chapter 11 Cases and chapter 7 liquidation proceedings. These costs, expenses and claims would be paid

in full out of the Debtors' liquidation proceeds before the balance would be made available to pay Unsecured Claims.

Once the percentage recoveries in liquidation of secured claimants, priority claimants, general unsecured creditors and equity security holders are ascertained, the value of the distribution available out of the Liquidation Value is compared with the value of the property offered to each of the classes of Claims and Interests under the Plan to determine whether the Plan is in the best interests of each Class. The Debtors and the Committee believe that the Plan satisfies this best interest test because the Debtors' assets will be liquidated under the terms of the Plan. If the Plan is not confirmed and, instead, the Chapter 11 Cases are converted to chapter 7, the value of the Debtors' estates would diminish because (i) the estates would need to pay fees to any chapter 7 trustee and (ii) the estates would incur increased professional fee costs associated with supporting the Chapter 7 proceedings and associated litigation costs and claims. Comparing the claims in Section I hereof with the liquidation analysis attached hereto as <u>Exhibit C</u>, the Debtors believe that distributions under the Plan will provide at least the same recovery to holders of Allowed Claims against each of the Debtors on account of such Allowed Claims as would distributions by a chapter 7 trustee. Conversion would also likely delay the liquidation process and the ultimate distributions to creditors.

C.      **Avoidance Action Analysis**

Pursuant to Section 7.18(b) of the Asset Purchase Agreement, the Debtors agreed not to pursue any preference or avoidance claims or actions ("**<u>Avoidance Actions</u>**"), including any such claims or actions arising under Section 544, 547, 548, 549, or 550 of the Bankruptcy Code, against any current or former supplier, vendor or landlord of the Debtors or their business who was a party to any contract, including any real property lease, with the Debtors, and each of the Debtors released, effective as of the closing of the 363 Sale, any rights it may have with respect to any such Avoidance Action.

D.      **Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that the Debtors be able to perform their obligations under the Plan. For purposes of determining whether the Plan meets this requirement, the Debtors analyzed their ability to meet their obligations under the Plan. The Debtors believe that they have adequate funding to be able to meet their obligations under the Plan.

E.      **Risk Factors Associated with the Plan**

Holders of Claims against the Debtors should read and consider carefully the information set forth below, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference), prior to voting to accept or reject the Plan. This information, however, should not be regarded as the only risk involved in connection with the Plan and its implementation.

The Claims of holders of Class 4 General Unsecured Claims are subject to the risk of dilution if the total amount of Claims is higher than the Debtors' estimate. A number of Disputed Claims are material and the total amount of all Claims, including Disputed Claims, is

materially in excess of the total amount of Allowed Claims assumed in calculating the estimated distributions as set forth in Section I above. Accordingly, the amount of distribution that will ultimately be received by any particular holder of a Class 4 General Unsecured Claim may be adversely affected by the aggregate amount of all Allowed Claims. Consequently, distributions to holders of Class 4 General Unsecured Claims will be made on an incremental basis until all Disputed Claims have been resolved.

A substantial amount of time may elapse between the Effective Date and the receipt of distributions, including, but not limited to, a Final Distribution, under the Plan for certain holders of Claims, particularly holders of Class 3 and Class 4 Claims, because of the time required to achieve recovery of certain assets such as tax refunds or collateral held by certain secured parties. To the extent that distributions under the Plan are derived, in whole or in part, from recoveries on the Litigation Claims prosecuted by the Liquidating Trustee, there can be no assurance that any such Litigation Claims will produce recoveries that will provide sufficient funds for such distributions to be made by the Liquidating Trust.

If the Bankruptcy Court were not to grant the Debtors' request for substantive consolidation of the Debtors with respect to the voting and treatment of all Claims and Interests other than General Secured Claims, confirmation and consummation of the Plan, if still possible, could be substantially more burdensome, time consuming, and costly to the Debtors' Estates. As stated above, the Debtors believe that substantive consolidation of the Debtors' Estates for purposes of the voting and treatment of all Claims and Interests other than General Secured Claims will facilitate implementation of the Plan and foster similarity and fairness of treatment among holders of Claims. There can be no assurance, however, that the Bankruptcy Court will reach the same conclusion.

Even if all Classes entitled to vote accept the Plan, the Plan might not be confirmed by the Bankruptcy Court. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, that the confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization unless, as here, such liquidation or reorganization is proposed in the plan, and that the value of distributions to dissenting creditors and equity security holders not be less than the value of distributions such creditors and equity security holders would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code. The Debtors believe that the Plan satisfies all the requirements for confirmation of a plan of reorganization under the Bankruptcy Code. There can be no assurance, however, that the Bankruptcy Court will also conclude that the requirements for confirmation of the Plan have been satisfied.

Additionally, successful confirmation of the Plan is subject to satisfaction or waiver of the conditions to Plan effectiveness, which are discussed in detail above. **THUS, THERE CAN BE NO ASSURANCE THAT ALL OF THE VARIOUS CONDITIONS TO EFFECTIVENESS OF THE PLAN WILL BE TIMELY SATISFIED OR WAIVED.**

DB02:9065158.1

068417.1001

# VII.
# ALTERNATIVES TO THE PLAN

Although this Disclosure Statement is intended to provide information to assist a Claim or Interest holder in determining whether to vote for or against the Plan, a summary of the alternatives to confirmation of the Plan may be helpful.

If the Plan is not confirmed with respect to any of the Debtors, the following alternatives are available: (a) confirmation of another chapter 11 plan; (b) conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; or (c) dismissal of the Chapter 11 Cases leaving creditors and interest holders to pursue available non-bankruptcy remedies. These alternatives to the Plan are very limited and not likely to benefit creditors. Although the Debtors could theoretically file a new plan, the most likely result if the Plan is not confirmed is that the Chapter 11 Cases will be converted to cases under chapter 7 of the Bankruptcy Code. The Debtors believe that conversion of the Chapter 11 Cases to chapter 7 cases would result in (i) significant delay in distributions to all creditors who would have received a distribution under the Plan and (ii) diminished recoveries for certain classes of creditors. If the Chapter 11 Cases are dismissed, creditors would be free to pursue non-bankruptcy remedies in their attempts to satisfy claims against the Debtors. However, in that event, creditors would be faced with the costs and difficulties of attempting, each on its own, to collect claims from a non-operating entity.

# VIII.
# CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

A.    **In General**

The following discussion summarizes certain material U.S. federal income tax consequences expected to result from the consummation of the Plan. This discussion is based on current provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), applicable Treasury Regulations, judicial authority and current administrative rulings and pronouncements of the Internal Revenue Service (the "Service"). There can be no assurance that the Service will not take a contrary view, no ruling from the Service has been or will be sought nor will any counsel provide a legal opinion as to any of the expected tax consequences set forth below.

Legislative, judicial or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein. Any such changes or interpretations may or may not be retroactive and could affect the tax consequences to the beneficial owners of Claims (each a "Holder" and collectively, the "Holders"), the Liquidating Trust, the Debtors or any of the entities the ownership of which are transferred to the Liquidating Trust. It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences described herein.

The following summary is for general information only. The tax treatment of a Holder may vary depending upon such Holder's particular situation. This summary does not address all of the tax consequences that may be relevant to a Holder, including any alternative

60

minimum tax consequences and does not address the tax consequences to a Holder that has made an agreement to resolve its claim in a manner not explicitly provided for in the Plan. This summary also does not address the U.S. federal income tax consequences to persons not entitled to vote on the Plan or Holders subject to special treatment under the U.S. federal income tax laws, such as brokers or dealers in securities or currencies, certain securities traders, tax-exempt entities, financial institutions, insurance companies, foreign persons, partnerships and other pass-through entities, Holders that hold Claims as a position in a "straddle" or as part of a "synthetic security," "hedging," "conversion" or other integrated transaction, Holders that have a "functional currency" other than the United States dollar and Holders that have acquired Claims in connection with the performance of services. The following summary assumes that the Claims are held by Holders as "capital assets" within the meaning of Section 1221 of the IRC and that all Claims denominated as indebtedness are properly treated as debt for U.S. federal income tax purposes.

The tax treatment of Holders and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan may vary, depending upon, among other things: (i) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the Holder in exchange for the Claim and whether the Holder receives distributions under the Plan in more than one taxable year; (iii) whether the Holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the Holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (viii) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the Holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (xi) whether the "market discount" rules are applicable to the Holder. Therefore, each Holder should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such Holder of the transactions contemplated by the Plan.

THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FOLLOWING DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL, AND APPLICABLE NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

TO COMPLY WITH INTERNAL REVENUE SERVICE CIRCULAR 230, TAXPAYERS ARE HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR

WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER UNDER THE INTERNAL REVENUE CODE, (B) ANY SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN, AND (C) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

B.    **U.S. Federal Income Tax Consequences to the Debtors**

If there is a discharge of a debt obligation by a debtor (in the case of indebtedness with multiple obligors, indebtedness that is allocable to such debtor) for an amount less than the adjusted issue price (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments), such discharge generally would give rise to cancellation of debt ("COD") income, which must be included in the debtor's income. However, the Debtors should be able to utilize a special tax provision which excludes from income debts discharged in a chapter 11 case (the "Bankruptcy Exception").

Under Section 108(b) of the IRC and Treasury Regulations that apply to members of a consolidated group, each Debtor that does not recognize COD income under the Bankruptcy Exception will be required to reduce certain tax attributes, including consolidated attributes, such as consolidated net operating losses and net operating loss carryforwards (and certain other losses, credits and carryforwards, if any), attributable to such Debtor, attributes that arose in separate return limitation years of such Debtor (if any), and the Debtor's tax basis in its assets (but not below the amount of its liabilities remaining immediately after the discharge of indebtedness), in an amount generally equal to the amount of such Debtor's COD income excluded from income under the Bankruptcy Exception. A "look-through rule" applies when asset basis reduction reduces the basis of stock of another member of the consolidated group and requires corresponding adjustments to be made to the attributes attributable to the lower-tier member.

As a result of the required attribute reduction resulting from the discharge of indebtedness, the Debtors believe that a significant portion of NOLs (and alternative minimum tax NOLs) of the Debtors will be eliminated after consummation of the Plan. Because the Debtors are liquidating rather than continuing to operate in reorganized form, and because substantially all of the Debtors' assets will be transferred to the Liquidating Trust, any remaining NOLs allocable to the Debtors are not expected to have material value.

The 363 Sale, the transfer of the Debtors' assets to the Liquidating Trust and the liquidation of the Debtors may trigger income or gain recognition by the Debtors. However, the Debtors' existing NOLs and capital losses (prior to being reduced as a result of any attribute reduction) should generally first be available to offset any such income or gain (with any capital losses available to only offset capital gains). Based on the amount of the Debtors' NOLs, the Debtors do not anticipate owing regular U.S. federal income tax with respect to taxable years ending after the Petition Date. If, however, the Service were to prevail in assessing U.S. federal income tax for any of these years or for tax years ending prior to the Petition Date, payments of such taxes could reduce the amounts otherwise available for distribution under the Plan.

A corporation or a consolidated group of corporations may incur alternative minimum tax ("AMT") liability even where a NOL is generated for regular corporate income tax purposes or where NOL carryovers and certain other tax attributes are sufficient to eliminate taxable income as computed under the regular corporate income tax. In general, the AMT is imposed on a corporation's alternative minimum taxable income at a twenty percent (20%) rate to the extent such tax exceeds the corporation's regular U.S. federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances allowed in computing a corporation's regular U.S. federal income tax are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, a portion of a corporation's taxable income for AMT purposes may not be offset by available NOL carryforwards (as computed for AMT purposes). Although it is possible that the Debtors could be liable for the AMT, at this time the Debtors do not expect to incur a material amount of AMT.

C.      **U.S. Federal Income Tax Treatment of the Liquidating Trust**

Except with respect to the Disputed Claims Reserve, it is intended that the Liquidating Trust will be treated as one or more "grantor trusts" for U.S. federal income tax purposes. In general, a grantor trust is not a separate taxable entity. The Service, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an advanced ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. Consistent with the requirements of Revenue Procedure 94-45, the Liquidation Trust Agreement requires all relevant parties to treat, for federal income tax purposes, the transfer of the Debtors' assets to the Liquidating Trust as (i) a transfer of such assets (net of any applicable liabilities) to the Beneficiaries of the Liquidating Trust (to the extent of the value of their respective interests in the applicable Liquidating Trust Assets) followed by (ii) a transfer of such assets (net of any applicable liabilities) by such Beneficiaries to the Liquidating Trust (to the extent of the value of their respective interests in the applicable Liquidating Trust Assets), with the Beneficiaries being treated as the grantors and owners of the Liquidating Trust. Each Beneficiary of the Liquidating Trust will generally recognize gain (or loss) in its taxable year that includes the Effective Date in an amount equal to the difference between the amount realized in respect of its Claim and its adjusted tax basis in such Claim. The amount realized for this purpose should generally equal the amount of cash and the fair market value of any other assets (net of any applicable liabilities) received or deemed received for U.S. federal income tax purposes under the Plan in respect of such Holder's Claim. A Holder that is deemed to receive for U.S. federal income tax purposes a non-cash asset under the Plan in respect of its Claim should generally have a tax basis in such asset in an amount equal to the fair market value of such asset on the date of its deemed receipt.

The Plan and the Liquidating Trust Agreement generally provide that the Beneficiaries of the Liquidating Trust must value the assets of the Liquidating Trust consistently with the values determined by the Liquidating Trustee for all U.S. federal, state, local and foreign income tax purposes. As soon as possible after the Effective Date, but in no event later than ninety (90) days thereafter, the Liquidating Trustee, based upon his good faith determination after consultation with his counsel, shall inform the Beneficiaries in writing solely as to his estimate of the value of the assets transferred to the Liquidating Trust and the value of such assets allocable to the Holders of Allowed Claims in Classes 3 and 4.

Consistent with the treatment of the Liquidating Trust (except with respect to the Disputed Claims Reserve) as one or more grantor trusts, the Liquidating Trust Agreement will require each Holder to report on its U.S. federal income tax return its allocable share of the Liquidating Trust's income. Therefore, a Holder may incur a U.S. federal income tax liability with respect to its allocable share of the income of the Liquidating Trust whether or not the Liquidating Trust has made any distributions to such Holder. The character of items of income, gain, deduction, and credit to any Holder and the ability of such Holder to benefit from any deduction or losses will depend on the particular situation of such Holder.

In general, a distribution of underlying assets from the Liquidating Trust to a Beneficiary (other than in respect of distributions attributable to a reduction in the Disputed Claims Reserve) will generally not be taxable to such Holder because such Holders are already regarded for U.S. federal income tax purposes as owning such assets. Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of distributions from the Liquidating Trust.

Except with respect to the Disputed Claims Reserve, the Liquidating Trustee will file with the Service tax returns for the Liquidating Trust as one or more grantor trusts pursuant to Treasury Regulation Section 1.671-4(a) and will also send to each Holder a separate statement setting forth such Holder's share of items of Trust income, gain, loss, deduction, or credit. Each such Holder will be required to report such items on its U.S. federal income tax return. The Liquidating Trustee shall determine for tax reporting purposes whether to treat Holders of Allowed Claims in Classes 3 and 4 as grantors in a single grantor trust or as grantors in two distinct grantor trusts. It is anticipated that such reporting will not have a material affect on the income, gain and loss recognition, for federal income tax purposes, of Holders of Allowed Claims in Classes 3 and 4.

The discussion above assumes that, except with respect to the Disputed Claims Reserve, the Liquidating Trust will be respected as one or more grantor trusts for U.S. federal income tax purposes. If the Service were to challenge successfully such classification, the U.S. federal income tax consequences to the Liquidating Trust and the Beneficiaries could differ materially from those discussed herein (including the potential for an entity level tax to be imposed on all income of the Liquidating Trust).

D.      **Disputed Claims Reserve**

Until such time as all of the beneficial interests in the Liquidating Trust can be distributed to the Holders in accordance with the terms of the Plan, the Disputed Claims Reserve will be treated as owning a portion of the assets in the Liquidating Trust. Distributions from the Disputed Claims Reserve will be made to Holders of Disputed Claims when such Claims are subsequently Allowed and to other Beneficiaries when Disputed Claims are subsequently disallowed. The Liquidating Trust shall file all income tax returns with respect to any income attributable to the Disputed Claims Reserve and shall pay the federal, state and local income taxes attributable to the Disputed Claims Reserve, based on the items of income, deduction, credit or loss allocable thereto.

Beneficiaries should note the tax treatment of the Disputed Claims Reserve is unclear and should consult their tax advisors as to the tax consequences to them of the establishment of, the income on, and distributions from, the Disputed Claims Reserve.

E.    **U.S. Federal Income Tax Consequences to Holders of Claims**

1.    **Holders of Allowed Claims in Classes 3 and 4.**

Although not free from doubt, Holders of Allowed Claims in Class 3 and Class 4 as of the Effective Date should be treated as receiving from the Debtors their respective shares of the applicable assets (net of any applicable liabilities) of the Liquidating Trust remaining (other than any assets allocated to the Disputed Claims Reserve) after distributions to Holders of Administrative Expense Claims, Priority Tax Claims, Class 1 Claims and Class 2 Claims in satisfaction of their Allowed Claims, and simultaneously transferring such assets (net of any applicable liabilities) to the Liquidating Trust. Accordingly, a Holder of such Claim should generally recognize gain or loss in an amount equal to the amount deemed realized on the Effective Date (as described above) less its adjusted tax basis of its Claim. Additionally, such Holders should generally recognize their allocable share of income, gain, loss and deductions recognized by the Liquidating Trust on an annual basis.

Because a Holder's ultimate share of the assets of the Liquidating Trust based on its Allowed Class 3 Claim or Allowed Class 4 Claim will not be determinable on the Effective Date due to, among other things, the existence of Disputed Claims and the value of the assets at the time of actual receipt not being ascertainable on the Effective Date, such Holder should recognize additional or offsetting gain or loss if, and to the extent that, the aggregate amount of cash and fair market value of the assets of the Liquidating Trust ultimately received by such Holder is greater than or less than the amount used in initially determining gain or loss in accordance with the procedures described in the preceding paragraph. It is unclear when a Holder of an Allowed Class 3 Claim or an Allowed Class 4 Claim should recognize, as an additional amount received for purposes of computing gain or loss, an amount attributable to the disallowance of a Disputed Claim.

The character of any gain or loss as capital gain or loss or ordinary income or loss and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including: (i) the nature and origin of the Claim; (ii) the tax status of the Holder of the Claim; (iii) whether the Claim has been held for more than one year; (iv) the extent to which the Holder previously claimed a loss or bad debt deduction with respect to the Claim; and (v) whether the Claim was acquired at a market discount. A Holder that purchased its Claim from a prior Holder at a market discount may be subject to the market discount rules of the IRC. Under those rules (subject to a *de minimis* exception), assuming that such Holder has made no election to accrue the market discount and include it in income on a current basis, any gain recognized on the exchange of such Claim generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

It is possible that the Service may assert that any loss should not be recognizable until the Liquidating Trustee makes its final distribution of the assets of the Liquidating Trust.

Holders should consult their tax advisors regarding the possibility that the recognition of gain or loss may be deferred until the final distribution of the assets of the Liquidating Trust.

2. **Holders of Disputed Claims.**

Although not free from doubt, Holders of Disputed Claims should not recognize any gain or loss on the date that the assets of the Debtors are transferred to the Liquidating Trust, but should recognize gain or loss in an amount equal to: (i) the amount of cash and the fair market value of any other property actually distributed to such Holder less (ii) the adjusted tax basis of its Claim. However, it is possible that such Holders may be required to recognize the fair market value of such Holder's allocable share of the Liquidating Trust's assets, as an amount received for purposes of computing gain or loss, either on the Effective Date or the date such Holder's Claim becomes an Allowed Claim.

3. **Interest Income with respect to Allowed Claims.**

Holders of Allowed Claims will be treated as receiving a payment of interest (includible in income in accordance with the Holder's method of accounting for tax purposes) to the extent that any cash or other property received (or deemed received) pursuant to the Plan is attributable to accrued but unpaid interest, if any, on such Allowed Claims. The extent to which the receipt of cash or other property should be attributable to accrued but unpaid interest is unclear. The Debtors and the Liquidating Trust intend to take the position, and the Plan provides, that such cash or property distributed pursuant to the Plan will first be allocable to the principal amount of an Allowed Claim and then, to the extent necessary, to any accrued but unpaid interest thereon. Each Holder should consult its tax advisor regarding the determination of the amount of consideration received under the Plan that is attributable to interest (if any). A Holder generally will be entitled to recognize a loss to the extent any accrued interest was previously included in its gross income and is not paid in full.

F. **Backup Withholding and Information Reporting.**

A Holder of an Allowed Claim may be subject to backup withholding currently at the rate of 28% with respect to any "reportable" payments received pursuant to the Plan unless (i) such Holder is a corporation or comes within certain other exempt categories and, when required, demonstrates this fact or (ii) provides a correct taxpayer identification number, certifies as to no loss of exemption from backup withholding and complies with applicable requirements of the backup withholding rules. A Holder who does not provide a correct taxpayer identification number may be subject to penalties imposed by the Service. Amounts withheld under the backup withholding rules may be credited against a Holder's tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup holding rules by timely filing the appropriate claim for refund with the Service.

The Liquidating Trustee will report annually to each Holder of an Allowed Class 3 Claim and an Allowed Class 4 Claim, and to the Service the Holder's share of any income, gains and losses of the Liquidating Trust during the calendar year to the extent required by law.

Treasury Regulations generally require disclosure by a taxpayer on its U.S.

federal income tax return of certain types of transactions in which the taxpayer participated, including certain transactions that result in the taxpayer recognizing a loss in excess of specified thresholds. Each Holder should consult its tax advisor regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations.

**THE FOREGOING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. ACCORDINGLY, EACH HOLDER SHOULD CONSULT ITS TAX ADVISOR WITH RESPECT TO THE TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN AND THE APPLICATION OF FEDERAL, STATE, LOCAL AND FOREIGN TAX LAWS. NEITHER THE DEBTORS, THE COMMITTEE NOR EITHER OF THEIR PROFESSIONALS SHALL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE U.S. FEDERAL, STATE, LOCAL OR FOREIGN TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.**

DB02:9065158.1
068417.1001

# CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that confirmation of the Plan is preferable to all other alternatives. Consequently, the Debtors recommend all holders of Class 3 Claims to vote to **ACCEPT** the Plan, and to complete and return their Ballots so that they will be **RECEIVED** by the Balloting Agent on or before 4 p.m. (prevailing Eastern time) on March 4, 2010.

Dated: December 22, 2009

EBHI Holdings, Inc.

By:    /s/ Brent Kugman
        Name:  Brent Kugman
        Title:   Chief Restructuring Officer


Amargosa, Inc.

By:    /s/ Brent Kugman
        Name:  Brent Kugman
        Title:   Chief Restructuring Officer


Gobi Fulfillment Services, Inc.

By:    /s/ Brent Kugman
        Name:  Brent Kugman
        Title:   Chief Restructuring Officer


Arabian Diversified Sales, LLC

By:    /s/ Brent Kugman
        Name:  Brent Kugman
        Title:   Chief Restructuring Officer


Gibson Services, LLC

By:    /s/ Brent Kugman
        Name:  Brent Kugman
        Title:   Chief Restructuring Officer


Karakum International Development, LLC

By:    /s/ Brent Kugman
        Name:  Brent Kugman
        Title:   Chief Restructuring Officer

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Co-Counsel for the Debtors
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600

By:   _____
       Michael R. Nestor, Esq.
       Kara Hammond Coyle, Esq.


LATHAM & WATKINS LLP
Co-Counsel for the Debtors
233 S. Wacker Drive
Chicago, IL 60614
(312) 876-7700

By:   _____
       David S. Heller, Esq.
       Josef S. Athanas, Esq.
       Caroline A. Reckler, Esq.

Simpson Information Technology, LLC

By:     /s/ Brent Kugman
        Name:  Brent Kugman
        Title:   Chief Restructuring Officer


Sandy Financial Services Acceptance
Corporation

By:     /s/ Brent Kugman
        Name:  Brent Kugman
        Title:   Chief Restructuring Officer


Sonoran Acceptance Corporation

By:     /s/ Brent Kugman
        Name:  Brent Kugman
        Title:   Chief Restructuring Officer

DB02:9065158.1

068417.1001